**No. __-____**

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

IN RE CISCO SYSTEMS, INC. AND CDW CORPORATION,

*Petitioners*

Petition for Writ of Mandamus from the
United States District Court for the Eastern District of Texas, Texarkana Division
Civil Action No. 5:22-cv-00053-RWS-JBB,
Honorable Robert W. Schroeder, III, United States District Judge

## APPENDIX TO PETITION FOR A WRIT OF MANDAMUS

James A. Reeder, Jr.
717 Texas, Suite 3300
Houston, TX 77002
(832) 239-3838
jareeder@jonesday.com

Thomas D. York
J. Benjamin Aguiñaga
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
(214) 969-4523
tdyork@jonesday.com
jbaguinaga@jonesday.com

*Attorneys for CDW Corporation*

Aaron M. Panner
Andrew E. Goldsmith
Ryan M. Folio
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
agoldsmith@kellogghansen.com
rfolio@kellogghansen.com

Deron R. Dacus
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

*Attorneys for Cisco Systems, Inc.*

April 24, 2023

| Date | ECF Number | Document Description | Appendix Page Range |
|---|---|---|---|
| 04/27/22 | 1 | Dexon Original Complaint | 1-41 |
| 06/23/22 | 21 | Cisco Motion to Transfer | 42-61 |
| 06/23/22 | 21-1 | Exh. A – Comparison of EDTX Complaint & NDCA Claims | 62-109 |
| 06/23/22 | 21-2 | Exh. B – Dexon NDCA Amended Answer, Affirmative Defenses, Counterclaims & Third-Party Claims | 110-172 |
| 06/23/22 | 21-3 | Exh. C – Cisco Motion to Dismiss Dexon Amended Counterclaims | 173-206 |
| 06/23/22 | 21-4 | Exh. D – Dexon Second Amended Answer, Affirmative Defenses, Counterclaims & Third-Party Claims | 207-242 |
| 06/23/22 | 21-5 | Exh. E – Cisco Motion to Dismiss Dexon Second Amended Counterclaims | 243-258 |
| 06/23/22 | 21-6 | Exh. F – Dexon Third Amended Answer, Affirmative Defenses, Counterclaims & Third-Party Claims | 259-312 |
| 06/23/22 | 21-7 | Exh. G – Dexon Opposition to Cisco Motion to Dismiss Third Amended Counterclaims | 313-333 |
| 06/23/22 | 21-8 | Exh. H – Dexon Motion for Leave to File Fourth Amended Counterclaims | 334-343 |
| 06/23/22 | 21-9 | Exh. I – Order Granting Motion to Dismiss Counterclaims & Denying Motion for Leave to File Fourth Amended Counterclaims | 344-361 |
| 06/23/22 | 22 | Cisco Motion to Dismiss Under Rule 12(b)(6) | 362-400 |
| 06/23/22 | 22-1 | Exh. A – NDCA Complaint for Damages & Injunctive Relief | 401-424 |
| 06/23/22 | 22-2 | Exh. B – Dexon Opposition to Cisco Motion to Dismiss | 425-456 |

| 06/23/22 | 22-3 | Exh. C – Dexon Amended Answer, Affirmative Defenses, Counterclaims & Third-Party Claims | 457-519 |
|---|---|---|---|
| 07/07/22 | 24 | Dexon Opposition to Cisco Motion to Dismiss | 520-556 |
| 07/07/22 | 24-1 | Exh. A – Order from *Eldridge v. Equifax, Inc., et al.* | 557-563 |
| 07/07/22 | 25 | Dexon Opposition to Cisco Motion to Transfer Venue | 564-579 |
| 07/08/22 | 27 | CDW Notice of Joinder to Cisco Motion to Transfer Venue | 580-582 |
| 07/08/22 | 28 | CDW Motion to Dismiss Complaint Pursuant to Rule 12(b)(6) | 583-610 |
| 07/14/22 | 31 | Cisco Reply in Support of Motion to Transfer | 611-623 |
| 07/14/22 | 32 | Cisco Reply in Support of Motion to Dismiss Under Rule 12(b)(6) | 624-639 |
| 07/21/22 | 34 | Dexon Surreply in Opposition to Cisco Motion to Dismiss | 640-654 |
| 07/21/22 | 35 | Dexon Surreply in Opposition to Cisco Motion to Transfer Venue | 655-661 |
| 08/01/22 | 37 | Dexon Opposition to CDW Motion to Dismiss | 662-689 |
| 08/01/22 | 38 | Dexon Response to CDW Notice of Joinder to Cisco Motion to Transfer Venue | 690-691 |
| 08/08/22 | 44 | CDW Reply in Support of Motion to Dismiss Complaint Pursuant to Rule 12(b)(6) | 692-703 |
| 08/15/22 | 48 | Dexon Sur-Reply in Further Opposition to CDW Motion to Dismiss | 704-718 |
| 12/22/22 | 94 | ORDER Denying Cisco & CDW Motion for Transfer | 719-732 |
| 01/03/23 | 96 | Cisco & CDW Objection to ORDER Denying Motion to Transfer | 733-740 |
| 01/17/23 | 102 | Dexon Opposition to Cisco Objection to Magistrate Judge Baxter's Ruling on Cisco Motion to Transfer | 741-747 |

| 02/07/23 | 107 | Report and Recommendation of the United States Magistrate Judge Regarding Cisco Motion to Dismiss & CDW Motion to Dismiss | 748-829 |
| 02/21/23 | 119 | Cisco Objection to Report & Recommendation Denying Cisco Motion to Dismiss | 830-840 |
| 02/21/23 | 120 | CDW Objections to Judge Baxter's February 7, 2023 Report & Recommendation | 841-851 |
| 03/07/23 | 121 | Dexon Opposition to Cisco Objection to Judge Baxter's Report & Recommendation on Cisco Motion to Dismiss | 852-861 |
| 03/07/23 | 122 | Dexon Opposition to CDW Objection to Judge Baxter's Report & Recommendation | 862-871 |
| 03/31/23 | 149 | ORDER Adopting Report & Recommendation of Magistrate Judge Baxter | 872-937 |
| 04/14/23 | 162 | Cisco Answer to Complaint | 938-978 |
| 04/14/23 | 162-1 | Exh. A – Cisco Discovery Letter to Dexon | 979-982 |
| 04/14/23 | 162-2 | Exh. B – Dexon Response to Cisco Discovery Letter | 983-985 |
| 04/14/23 | 162-3 | Exh. C – Cisco Reply to Dexon Response | 986-987 |

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

## ORIGINAL COMPLAINT

Plaintiff, Dexon Computer, Inc. ("Dexon") files this Original Complaint against

Defendants Cisco Systems, Inc. ("Cisco") and CDW Corporation ("CDW"), alleging as follows:

## I.     INTRODUCTION

1.     Cisco is a monopolist threatening and coercing customers into buying overpriced

networking equipment because of the market power Cisco holds over customers, especially small

and medium businesses that have no choice but to give into Cisco's demands.  Specifically, after

customers pay for necessary network equipment maintenance and service, Cisco changes its course

of conduct and demands that customers must buy new overpriced equipment in order to avoid a

technologically compromised network, and foreclosing its networking equipment competitors in

the process.

2.     Upon information and belief these tactics have been employed by Cisco across the

country, but Cisco has carried out these tactics extensively in Texas.  Dexon is aware of at least

five examples, involving millions of dollars in equipment sales, in Texas in order to keep

networking prices high and to foreclose competition from competing providers of networking

equipment.  For these reasons, Dexon seeks relief before this Court.

3.      As one example, a Texas-based bank bought Ethernet switches and routers (types of networking products discussed below), as well as a maintenance and service package for that equipment under a program called SmartNet.  When the SmartNet service package came up for renewal, the customer sought only to renew the package, but Cisco demanded that it must also buy new Ethernet switches and routers to be eligible for the renewal.  The customer did not want or need any new networking equipment, but had no choice other than to give into Cisco's demand to obtain and keep the maintenance and support it needed. This requirement expanded Cisco's grip over the customer due to the additional networking equipment the customer was forced to purchase.  Cisco has been able to maintain its supra-competitive prices for its networking equipment, foreclose networking equipment competitors which customers would consider in the absence of Cisco's conduct, and decrease the amount of revenue and profits Cisco's networking equipment competitors have to fund innovation and new product offerings.

4.      Cisco's conduct is especially oppressive and greatly injures competition for networking products because Cisco's conduct applies to small and medium businesses with limited IT budgets for networking products necessary for their network infrastructures.  As explained in further detail below, purchases of networking products are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products.  As a result, when Cisco forces customers to purchase overpriced equipment through its coercive tactics, Cisco forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase.

5.      In addition, through Cisco's coercion, it has forced customers to pay a higher price for networking equipment they had already purchased through a "re-certification fee," by threatening not to service that equipment unless customers pay the additional equipment fees.

**App.2**

When customers pay that re-certification fee, customers' limited budgets are restrained further, because the money spent on that fee cannot be spent with Cisco's networking competitors if customers could choose a product on a merits.  Thus, any claim by Cisco that its conduct does not foreclose its network equipment competitors ignores how purchases of networking equipment are made and the limited opportunities that competitors have to meaningfully expand their market share; instead, Cisco is able to maintain and increase its market share and supra-competitive pricing by unlawfully constraining the opportunities of its competitors.

6.      Cisco considers certain resellers selling both Cisco networking equipment and the networking equipment of Cisco's competitors to be a prime competitive threat to its networking equipment monopolies.  Through its improper conduct, by its business practices, Cisco has coerced customers not to purchase from these customers' desired resellers.  Cisco has successfully employed a strategy of "fear, uncertainty and doubt," or "FUD," wrongly claiming to customers that unfavored resellers sell "bootleg", "unauthorized", or goods with "malware" or "spyware" to dissuade purchases from these resellers of other manufacturers, including Cisco's competitors.  In the process, Cisco has further foreclosed its networking equipment competitors who by and large have never cracked single digit market shares and has allowed Cisco to maintain market power and monopoly shares for decades.

7.      Another instance of Texas-based coercion illustrates Cisco's FUD strategy.  An energy company headquartered in Texas bought Ethernet switches and routers from Dexon, and also bought a multi-year SmartNet maintenance and service package through one of Cisco's preferred dealers. The Ethernet switches and router purchases from Dexon were known and approved by Cisco at the time of these purchases.  After providing the promised maintenance and service support to the customer for several years, Cisco then changed its course of conduct and

**App.3**

demanded that the customer purchase new Ethernet switches and routers from a vendor other than Dexon to continue receiving the SmartNet maintenance and service.  The customer informed Dexon that it still desired to buy networking equipment from Dexon now and in the future, due to the attractive pricing and competitive options Dexon is able to provide, but it could no longer do so because Cisco's new position was that Cisco no longer provide the maintenance support the customer needed.  As a result, Cisco's networking equipment competitors selling through Dexon or any other reseller have been foreclosed for at least the lifespan of the products and services Cisco forced the customer to purchase, and the customer has been forced to restrict its choices and ability to make future purchasing decisions on the merits.

8.      Cisco's anticompetitive conduct also impacted a local Texas emergency 911-center which had purchased networking equipment from Dexon.  In the midst of a five-year SmartNet service package the 911-center had purchased from Cisco, Cisco told the Texas emergency 911-center it needed to purchase new routers and Ethernet switches from a non-Dexon vendor when the customer checked on its account for purposes of a service issue if it wanted to receive the service it was due under its SmartNet service package.  Cisco had never notified the customer of a cancellation of the SmartNet service package in the absence of a new equipment purchase.  The 911-center cannot afford new equipment, and thus continues to face Cisco's threat that it will not receive the previously paid for service  unless it chooses a different vendor for new product purchases, even if that means human lives are put at risk due to a network support issue.  This FUD based strategy intends to and successfully:  (1) forecloses Cisco's networking equipment competitors from reaching customers through resellers like Dexon, and (2) forces customers to pay more for products that it sought to purchase from less expensive resellers like Dexon.

9.      Cisco's conduct violates both Sections 1 and 2 of the Sherman Act, by using its near-virtual monopoly position in the relevant aftermarket for the maintenance and service of its network equipment in order to foreclose customers from buying from competitors in the equipment market and allowing Cisco to maintain supra-competitive prices in relevant product markets in which Cisco is still a monopolist, but faces more prospective competition.  Cisco is a monopolist that uses whatever means necessary to keep the prices for its networking products as high as possible to the detriment of its customers.

10.     Cisco's use of its "service arm," which upon information and belief is entirely separate in terms of personnel, expertise, profitability, process, and corporate structure from its "products arm," to maintain and maximize profitability in its products arm, must stop.

11.     Any claim by Cisco that it is merely controlling its distribution channel and has the incentive to keep its prices as competitive as possible ignores that it is a monopolist in several markets and its improper conduct maintains its supra-competitive pricing and forecloses its networking equipment competitors.  Cisco's threats to withhold service in no way serves anyone other than Cisco, and making such threats because Dexon and other multi-vendor resellers have been deemed a competitive problem for Cisco.

12.     It was not always this way.  Dexon is a company that has been servicing its customers for decades, providing timely and reliable services as well as selling network equipment to meet the budgets of hospitals, emergency services providers, public service organizations, and many other small and medium businesses, including those providing essential services before and during the COVID-19 pandemic.  Cisco even previously sent one of its representatives to Dexon to aid it in its sales efforts and familiarity with its products.  For at least four years prior to 2015, Dexon had access to Cisco's online database in which it could arrange for maintenance service on

**App.5**

behalf of it and Cisco's customers.  This served to everyone's benefit, as Dexon kept its customers happy while Cisco earned customers' loyalty to its product line.

13.     But by at least 2015, Cisco deemed resellers like Dexon a competitive threat to its product monopolies.  Upon information and belief, Cisco learned that Dexon had been able to convert customers of Cisco networking equipment to customers of its competitors' networking equipment, such as from Juniper.  Even for customers that did not convert from Cisco to one of its competitors, resellers like Dexon put pressure on Cisco to lower prices and improve its service (including shipping lead times, where Cisco has been especially lagging).  To put an end to these competitive threats, Cisco engaged in the discussed multi-prong strategy, including to threaten customers not to do business with resellers like Dexon or else pay the consequences in the service market where Cisco has complete control.  In the process, Cisco has constrained its network equipment competitors and thus customer choice and has maintained its supra-competitive pricing in several relevant product markets.  As discussed below, Cisco even recruited and agreed with one of its favored distributors, CDW, to help it exclude resellers like Dexon and maintain its network equipment monopolies.

14.     The Court must hold Cisco accountable for these anticompetitive acts that are crippling small and medium businesses and Cisco competitors, including Dexon.

## II.     THE PARTIES

15.     Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

16.     On information and belief, Defendant Cisco Systems, Inc. (Cisco) is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California

**App.6**

95134 and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

17.     On information and belief, Defendant CDW Corporation (CDW) is a Delaware corporation with its principal place of business at 200 North Milwaukee Ave, Vernon Hills, IL 60061 and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

### III.    JURISDICTION

18.     Dexon brings this case under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages, costs, and attorney's fees for injuries sustained by Dexon because of Cisco's and CDW's violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

19.     This Court has jurisdiction over Dexon's antitrust claims under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22.

20.     This Court also has jurisdiction over Dexon's claims pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Dexon, Cisco, and CDW, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

21.     Venue is appropriate in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Cisco and CDW transact business in this district, and has served countless customers within this District that utilize networking equipment, and many of the actions and activities complained of in this Complaint occurred and are occurring in this District.

22.     Indeed, Cisco has two offices in Dallas, and offices in San Antonio, Houston and Lubbock, Texas.  CDW has an office in Plano, Texas.  Given the extensive business the Defendants do in the State, there is sufficient basis for personal jurisdiction over the Defendants.

## IV.    FACTS

**CISCO:**

23.    Cisco is dominant in several Worldwide and US markets related to networking equipment and services for the Internet.  Cisco offers products and related services in the core technologies of routing and switching, along with more advanced technologies in areas such as home networking, IP telephony, optical networking, security, storage area networking, and wireless technology.  On information and belief, Cisco contracts for the manufacture of a majority of its products overseas to keep costs of manufacture at a minimum.

24.    On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry as explained below.  Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceeded 40% or more with its closest competitors half its size, in markets with high barriers to entry.

**Cisco is Using Its Monopoly In After Market Maintenance Services to Force Subsequent Supracompetitive Network Equipment Purchases**

**A.    Cisco is a Monopolist For After-Market Maintenance Services On Cisco Equipment**

25.    Customers of networking equipment may require maintenance and service to ensure the proper functioning of their equipment.  Only Cisco can provide full maintenance and support on its router and Ethernet switch products.  These maintenance services include onsite visits from certified engineers, software updates, technical assistance center ("TAC") access, online resources, and hardware replacement services. Without such maintenance services, customers cannot address critical performance issues and address service problems that can be catastrophic to their businesses.

**App.8**

26.     Customers without the budget to justify maintenance services provided by Cisco rely on third-party maintenance and service providers to provide hardware maintenance and support (for instance for a power supply or fan issue), but because of Cisco's policies described herein, cannot provide software maintenance and support.  Thus, Cisco is able to maintain a price premium for its maintenance services, including its SmartNet service packages. As Cisco highlights in its SmartNet sales materials, "no Third Party Maintenance Provider can provide [customers] with an apples-to-apples match with what Cisco's SmartNet provides," and "a Third Party Maintenance Provider is not authorized to provide [customers] with Cisco bug fixes, patches and updates."  These "bug fixes, patches and updates" can be essential to the efficient, effective, and full operation of Cisco's hardware – they cannot be replicated and there are no reasonably interchangeable substitutes for such services.

27.     Although end users are not required to purchase SmartNet service packages for their Cisco products, they are effectively compelled do so, because the service packages offered are integral to the products' functionality.  Without SmartNet service, end users will not receive important software bug fixes, patches, and updates (collectively, "updates") that permit Cisco products to serve their intended functions.  These updates are designed to repair malfunctions or defects in the software or to combat security vulnerabilities.  Consumers who do not update the software on their Cisco products are potentially exposed to security and operational risks.  In addition, without the software updates, their Cisco products may not function properly.

28.     Because Cisco products run on proprietary operating system software that is essential for the products to function, these updates can be obtained only from Cisco.  While customary and routine in the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and Microsoft, to make updates available to their consumers for free, Cisco,

**App.9**

in contrast, provides updates only to consumers who purchase SmartNet service packages.  Upon information and belief, Cisco does not routinely inform customers at the time of initial purchase of these stifling limitations.

29.     Thus, the aforementioned services constitute a Relevant After-Market for Maintenance Services on Cisco Equipment (hereinafter the "Relevant Service Market") in which Cisco is a monopolist, and no other competitive service provider has reached a double-digit share. Upon information and belief, Cisco consistently has possessed a share of the Relevant Service Market in excess of 90%, and because it dictates that only it can provide certain critical services, Cisco has erected its own high barriers to entry to prevent any meaningful penetration of its dominance by any competitive service vendor.  Cisco has thus admitted that SmartNet pricing is far more expensive than that of third-party providers.  The geographic market for the Relevant Service Market is (i) the United States and (ii) the world, determined by the geographic scope of customers and the extent to which they require maintenance services in the US only or worldwide. In the case of the former, customers look to service providers located in the US, whereas in the latter case, customers will require vendors with an international team and associated capabilities.

30.     The Relevant Service Market is separate and distinct from the Relevant Markets for routers, Ethernet switches, and IP phones discussed below.  Customers can and do purchase Cisco networking equipment without maintenance services, and the pricing for networking equipment is entirely independent and separate from SmartNet service package pricing.  Moreover, upon information and belief, Cisco's customers in these separate markets (1) deal with different Cisco personnel teams (e.g., TAC support vs. sales managers), (2) purchase the products and services at different times/schedules based on different needs, and (3) work with different engineers because engineers on the service and maintenance team are often different than the engineers on the product

**App.10**

manufacturing and sales teams.  In addition, upon information and belief, Cisco's tracks and monitors the profitability of its "service arm" separately from its "products arm," despite its current anticompetitive efforts for one unit to support the profitability of the other unit.

**B.     Cisco is Also A Monopolist In the Router and Ethernet Switch Relevant Markets**

31.     Ethernet switches are a relevant product market.  Ethernet switches are devices that control data flow within a network to enable network components to communicate efficiently. They are the fundamental building blocks of modern local area networks, deployed in virtually every modern business and government office.  While Ethernet switches are differentiated across vendors and customer types, there is no adequate substitute technology that provides the same function and value within a network infrastructure.

32.     Ethernet switches are durable, high fixed cost goods with extended longevity; consumers of these Ethernet switches commonly intend to use them for many years. Transitioning from Cisco Ethernet switches to Ethernet switches made by another manufacturer is an expensive process, requiring the replacement of significant amounts of hardware and the retraining of personnel.

33.     Buyers of Ethernet switches would not be able to turn to routers or other alternative technologies in response to a monopolist's price increase above the competitive level.

34.     The geographic markets for the sale of Ethernet switches are (i) the United States and (ii) the world. The global market for Ethernet switches includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is substantial industry recognition of both a global market for Ethernet switches and narrower U.S.-only market for Ethernet switches. A monopolist of Ethernet switches in the United States would be able to raise prices profitably over competitive levels.

**App.11**

Correspondingly, a monopolist of Ethernet switches globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices above competitive levels both globally and in the United States.

35.     Cisco has monopoly power in the U.S. and global markets for Ethernet switches, consistently holding shares above 60% in both markets, and protected by high barriers to entry as discussed below.  Cisco's Ethernet switch market shares are commonly at least five times its closest Ethernet switch competitors in the US, as well as commonly five times its closest Ethernet switch competitors globally. Cisco has managed to maintain its market dominance for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

36.     Routers have been a technology that is complementary to, and not a substitute for, Ethernet switches, and also constitute their own relevant product market.  While Ethernet switches connect components to create a network, routers allow for communication between networks.  The two types of devices generally operate at different logical levels in a network:  Ethernet switches transfer information in the data link layer using physical addresses for network components, whereas routers transfer packets in the Network or IP layer using virtual addresses. As technology has evolved, Ethernet switch manufacturers have begun to incorporate certain routing technologies into a single combined product. This confirms that routers are complements for Ethernet switches and not substitutes.

37.     Buyers of routers would not be able to turn to Ethernet switches or other alternative technologies in response to a monopolist's price increase above the competitive level.

38.     The geographic markets for the sale of routers are (i) the United States and (ii) the world.  The global market for routers includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability.

**App.12**

There is substantial industry recognition of both a global market for routers and a narrower U.S.-only market for routers.  A monopolist of routers in the United States would be able to raise prices profitably over competitive levels.  Correspondingly, a monopolist of routers globally would be able to raise prices profitably over competitive levels.  In fact, Cisco itself has been able to maintain prices for routers above competitive levels both globally and in the United States.

39.     Cisco has monopoly power in the U.S. and global markets for routers, consistently holding a share in excess of 60% in both markets, and protected by high barriers to entry as discussed below.  Cisco's router market shares are roughly at least five times its closest router competitors in the US, as well as five times its closest router competitors globally.  Cisco has managed to maintain its market dominance on routers for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

40.     The Relevant Router and Switch Markets are both characterized by high barriers to entry and expansion.  There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors.  To begin with, the costs to develop router software and hardware as well as switch software and hardware are substantial, requiring tens of millions of dollars for initial development, and then hundreds of millions more to tailor the product to specific customer needs and to build an effective sales network.

41.     Another barrier to entry for the Relevant Router and Switch Markets lies in customers' long purchase cycles when replacing or upgrading their network components to the next technology.  For example, it took approximately 15 years for customers to widely deploy 10+ Gigabit Ethernet switches to replace 1 Gigabit Ethernet switches.  These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

42.     As Cisco publicly promotes (*e.g.*, https://blogs.cisco.com/internet-of-things/cisco-ranked-1-again-in-industrial-networking), it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to Ethernet switches and routers.  Thus, a further barrier to entry is created by the simple fact of Cisco's dominance.  Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new Ethernet switch or router entrant may need to offer a full line of network components.

43.     Cisco's practice of holding customers hostage through their SmartNet service packages also creates a particularly pernicious barrier to entry.  Any customer wishing to preserve the value of its SmartNet package would not be able to viably consider router or Ethernet switch purchases from competitive vendors to Cisco if the customers are under duress that in the absence of a Cisco purchase their maintenance service may not be provided.   Even if a customer were willing to risk a period without maintenance, purchasing replacement routers or Ethernet switches from a Cisco competitor means risking the value of the SmartNet package for which the customer has already paid during the remaining service period.

44.     To summarize, Cisco has monopoly power in the following relevant markets:  the Relevant Service Market (both globally and limited to the U.S.), the Relevant Router Market (both globally and limited to the U.S.), and the Relevant Switch Market (both globally and limited to the U.S.).  Hereinafter the Relevant Router and Switch Markets are referred to collectively as the "Relevant Network Equipment Markets."  As explained below, Cisco is also attempting to monopolize the IP Phone Markets, which will be referred to as the Relevant IP Phone Markets.  Hereinafter the Relevant Network Equipment Markets and the Relevant IP Phone Markets are referred to collectively as the "Relevant Product Markets."  Upon information and belief, Cisco

**App.14**

may be engaging in the same coercive tactics with respect to other Relevant Product Markets, such as optics, access points, and network management software, and should that prove to be the case Dexon will make that apparent in the course of litigation.

### C.   Cisco Locks In Customers Who Require Maintenance With SmartNet, and Then Uses SmartNet As A Hammer To Force Supracompetitive Purchases of Routers and Ethernet Switches

45.   Customers seek to find the best economic and performance deal for networking equipment regardless of when it is purchased.  Either around the time of such an equipment purchase or at a different time, customers may also consider purchasing a SmartNet service package for several different types of networking equipment.  Upon information and belief, the larger a particular deployment and the more legacy Cisco equipment the customer has in its network, the more likely customers will require a SmartNet package for one or more aspects of their network at any time.

46.   For those customers that do or might require a SmartNet service package, the objective is to secure maintenance services for networking equipment that already is or will be in use for the customers' networks.  To satisfy themselves that this will be the case, SmartNet customers will provide Cisco with the precise serial numbers, part numbers, products, and customer information for which the purchased SmartNet service package will apply.  Cisco specifically approves the service package with this information, including in scenarios where Cisco can see that customer is purchasing the SmartNet service package through a secondary reseller which does not have a direct purchasing relationship with Cisco.

47.   Indeed, Cisco has full knowledge that its standard sellers or partners sell an extremely large volume of SmartNet service packages to secondary market sellers such as Dexon. In fact, Cisco's Technical Assistance Center has and will alter or change serial numbers in order to approve and thereby receive payment for SmartNet service packages relating to secondary

**App.15**

market equipment. Cisco willfully turns a blind eye to such transactions because they are extremely profitable for Cisco.

48. Upon information and belief, Cisco receives a payment from customers pursuant to this SmartNet approval process at or around the time of the SmartNet purchases.

49. Customers expect to receive the service they paid for from Cisco for anywhere from months to years into the purchased SmartNet service package. As explained below, parties such as Dexon would facilitate such service through Cisco's service team that would keep customers happy with both companies. But since at least 2015 through the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet service package that the SmartNet service packages were no longer valid in the absence of a new purchase of Cisco equipment, including at least routers and/or Ethernet switches. Alternatively, Cisco forced customers to pay a "re-certification" fee for previously purchased networking equipment so that SmartNet service would not be withheld, as Cisco threatened. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process for the equipment and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. Given that customers are locked into the Cisco installed base of products, they have little choice other than to accede to Cisco's demands.

50. Given the Cisco approval process associated with customers' SmartNet purchases, customers had no reasonable expectation when they bought the SmartNet service package that Cisco would subsequently claim that entirely new, unwanted networking equipment or a "re-certification" fee for the equipment would be required. This is especially true given that Cisco has unique access to customers for the months or years after it purchased the service packages, and customers received the service for which they had paid during that period. Cisco changed its

**App.16**

course of conduct not because of enforcement of a consistent policy, but rather because it newly disapproved, after approving previously, customers' purchase of networking equipment and SmartNet service.

51.     Another example from Texas, in addition to those above, represents an iteration of how this has occurred in the marketplace.  A Texas based automobile dealership purchased Ethernet switches through Dexon as well as a SmartNet service package through another vendor, all with the knowledge and approval of Cisco.  Pursuant to the SmartNet service package, Cisco first provided maintenance services and support for the Ethernet switches, including with software updates.  However, one of Cisco's software updates had a critical flaw that, when deployed by Cisco, rendered the Ethernet switches useless (or "bricked" as known in the industry).  At first, Cisco replaced the Ethernet switches pursuant to the SmartNet service package, but Cisco then claimed it would not replace other defective Ethernet switches or complete any maintenance unless the customer bought entirely new Ethernet switches from a vendor other than Dexon.   Because the customer could not afford new Ethernet switches, due to a limited IT budget, the customer was forced to deal with a network disruption on its own and without any ability to switch to a competing network equipment provider.  Because the customer relied on Cisco's original assurance that the customer would receive the service and maintenance for which it had paid, when Cisco changed its position, it robbed the customer of the ability to make a free choice about its equipment manufacturer and reseller.  Thus, both Cisco's competitors in the Relevant Networking Products were improperly foreclosed, as well as Dexon because the customer is under a new impression that any use of its products or services will put any Cisco service in jeopardy.

52.     Upon information and belief, these examples are part of an overall course of conduct by Cisco to hold up its SmartNet customers, at least since 2015.  As explained below

through Dexon's experience, upon information and belief, there has been an enterprise-wide effort at Cisco to use SmartNet service packages in this way to be sure that customers purchase networking equipment at supra-competitive prices to pad Cisco's profits as well as the commissions of its sales representatives.  Dexon is aware of at least one of its customers that has threatened legal action against Cisco for these tactics, but Cisco does not care, as Cisco's continued profiteering from this conduct as a monopolist in the Relevant Service Market and Relevant Networking Markets far outweighs the costs it would face for defending itself in litigation.

53.    Cisco draws an economic benefit from these coercion tactics to SmartNet customers because, upon information and belief, its margins are far higher for sales made through channels that have higher resale prices.  For instance, if Cisco can maintain the supra-competitive prices it charges to favored VARs, such as CDW, by coercing customers to use that distribution channel, Cisco can maintain its overall profitability.  For this reason, as part of Cisco's anticompetitive strategy, it has sought to limit the number of resellers who compete for each customer, even though such competition benefits customers.  Conversely, if VARs can negotiate lower pricing from Cisco because customers have a variety of distribution options unimpacted by coercion, then Cisco's overall profitability goes down.  Cisco's sales representatives also earn higher commissions for sales in the Relevant Product Markets made through coercion, on the backs of their customers.

54.    There is a substantial amount of commerce involved in the Relevant Product Markets for which Cisco is forcing supracompetitive purchases.  Each year, Cisco sells billions of dollars of Ethernet switches and routers, both in the US and worldwide.

55.    Cisco also attempts to leverage its exclusive control of essential software updates and services for Cisco products to functionally incapacitate select secondary market products.

Cisco provides services and updates to its products via SmartNet service packages.  End users acquire these packages in order to obtain those services.

**D.     Cisco Recruits CDW to Aid It In Its Plan, and Cisco's Coercion Strategy Expands to IP Phones**

56.     One of Cisco's favored resellers is CDW, headquartered in Illinois, with revenue of $18.47 billion in fiscal year 2020 (compared with Cisco's $49.8 billion in the same time period). Upon information and belief, CDW sells Cisco equipment in the Relevant Networking Markets. Cisco favors CDW because CDW's resale prices in the Relevant Networking Markets allow Cisco to maintain its supra-competitive pricing in those Markets.  Conversely, resellers like Dexon provide attractive service and pricing to customers that puts pressure on Cisco to charge lower prices to its favored resellers.

57.     Once Cisco deemed Dexon a competitive threat, it also determined that CDW could be an ally in its plan to foreclose resellers like Dexon from providing superior service, pricing, and competitive network equipment options for its customers.  To this end, Cisco and CDW conspired to exclude Dexon from making sales in at least the Relevant Networking Equipment Market to end user customers.

58.     Dexon's attempt to sell Relevant Networking Equipment to a hospital system in Pennsylvania provides an example of how the conspiracy works.  For several years, Dexon had provided routers, Ethernet switches, line cards, access points and modules to the hospital.  The customer was open to purchasing products from manufacturers apart from Cisco, and valued the fact that Dexon provided those options, because it led to better pricing and service.

59.     Pleased with the products and service Dexon had provided, the hospital decided to make a significant investment in routers and Ethernet switches, and the deal would have been worth a significant amount of business for Dexon (on top of the prior business with Dexon which

was already significant).  Upon learning that the hospital had selected Cisco for the purchase and had awarded the order to Dexon, Cisco threatened the customer that if it did not cancel the order for the new purchase of hardware and associated SmartNet service with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics which the customer had been receiving service and support from Cisco for years.  This tactic worked, and the customer did not go through with the contemplated deal with Dexon, and never made another purchase from Dexon again.

60.    Cisco's agreement with CDW to exclude Dexon from at least the Relevant Networking Equipment Market facilitated this outcome, which restricted both inter-brand competition (between Cisco and its competitors in the Relevant Network Markets) and intra-brand competition (between Cisco resellers).  Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment.  The sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the "savior" to the hospital system so that the customer could keep its service for all of its Networking Equipment, when in fact the intention and purpose of the scheme was to exclude resellers like Dexon, so that the customer would pay more for the equipment with CDW as the sole supplier.  Upon information and belief, the Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon.

61.    This Cisco-CDW conspiracy has limited intra-brand competition between resellers selling Cisco Networking Equipment in the Relevant Markets, because its purpose and effect is to

prevent end user customers' from having access to Dexon which offers top quality service at more aggressive pricing than other resellers.  The conspiracy also had the dual effect of limiting inter-brand competition between Cisco and its competitors in the Relevant Networking Equipment Markets, because not all resellers prioritize or promote competitive products in the Relevant Networking Equipment Market in the same way.  As an example, on CDW's website, when one completes a search for "Ethernet switches," it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections (and most below 100).  Upon information and belief, this is because CDW believes it will receive favorable treatment by Cisco by showing so many of its offerings and portraying its competitors as more limited.  By contrast, Dexon has earned the respect and trust of its customers precisely because it does not prioritize any particular brand or make assumptions about what a customer wants, and merely seeks to guide the customer to the best option.  Thus, when Cisco conspired with CDW, Cisco knew that it would tilt the competitive playing field in its favor, limiting the opportunities of its competitors to make sales through resellers like Dexon which does not favor any particular Network Equipment competitor.

62.    The conspiracy between Cisco and CDW continues through the present day.  Upon information and belief, as part of their conspiracy to exclude Dexon, Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed.  Confirming this agreement, upon information and belief, when the CDW representative previously assigned to Dexon refused to comply with the Cisco's demand, CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy.  This worked.  Pursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021.

63.    The Cisco-CDW conspiracy has foreclosed a substantial amount of interstate commerce to Dexon by virtue of the Pennsylvania Health System alone, but upon information and belief, millions of dollars of purchases across the country have been foreclosed to Dexon due to the Cisco-CDW conspiracy.

64.    Dexon believes that several such instances with Cisco's favored resellers occurred, but rather than hearing about representatives that were willing to stick up for customers' right to the best deal, Cisco successfully coerced such resellers to limit or withdraw their business from Dexon.

65.    Upon seeing how successful this FUD and coercion campaign worked for the Relevant Networking Equipment Markets, Cisco expanded its sights to IP Phones.  Once again in Texas, an Independent School District awarded Dexon a multi-year exclusive contract to provide IP phones to the District, after several years of successful dealings with Dexon.  Dexon was awarded the most recent business after an exhaustive RFP process, in which Dexon was rated the clear winner for every criterion being considered by the School Board.  Indeed, several of the evaluation criteria related to the reputation and quality of Dexon's goods and services, which would include the products of several IP phone manufacturers.  As a result, the School Board approved the award of the contract to Dexon for thousands of IP phones.  Upon information and belief, Cisco threatened the School District that if it did not cancel the order from Dexon, it would not service the other Networking Equipment already purchased by the District.  Once again, this coercion worked, and the customer was forced to cancel its order with Dexon, and upon information and belief, the District paid more for the same exact equipment from another reseller.

66.    As a result, upon information and belief, not only was the Texas School District forced to spend more for an RFP that was already completed and approved, but it forecloses any

**App.22**

competitive product purchase that would have been considered from Dexon due to the successful execution of FUD.

67.    Upon information and belief, these FUD tactics are not isolated instances of misconduct but rather a standard coercion tactic used by Cisco, especially in Texas, when it seeks to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products.  Because customers are forced to rely on Cisco to service its installed base of networking equipment, the FUD tactic can be used with respect to any new purchase a customer is considering for which Cisco offers a purchase option.  In the above example for a Texas School District, there is simply no plausible reason the School would be forced to withdraw from its preferred business partner in the absence of FUD from Cisco.

68.    As another example of FUD, Cisco recently claimed to a Maryland customer that line cards sold by Dexon suffered from "malware," even though there is no software associated with the sale of line cards.  Cisco is essentially immune from any criticism it may receive from customers due to these false statements because it knows that customers still require so many of its services.

69.    While not quite as dominant in IP phones as it is in other types of networking equipment, Cisco still maintains in excess of a 40% share of the global and US based IP phone markets, and has possessed in excess of a 60% share of enterprise Unified Communications (UC) purchases which include IP phones.  Cisco has shipped more than 100 million IP phones to more than 200,000 customers worldwide, with 95% penetration in Fortune 500 companies.  Like other markets in which it is dominant, Cisco's next closest competitors in these IP phone markets are a fraction of its size, possessing shares at least 20% lower than that of Cisco.

**App.23**

70.     Thus, through the above tactics, Cisco has attempted to and likely succeeded in monopolizing the Global and US Relevant Markets for IP Phones (hereinafter "Relevant IP Phone Markets").  While landlines, or analog phone systems, carry voice signals over copper wires, VoIP technology transmits voice traffic over the internet in the form of data packets. IP phones need only a live broadband connection to make and receive calls, and thus have eliminated the need for expensive landline rentals.

71.     Additionally, IP phones offer far greater geographical flexibility for users than landline phones.  Landlines are tethered to the wired office phone, yet IP phones allow you to have a virtual local presence anywhere in the world.  IP phones are also easily scalable, allowing a company to remove or add new users with ease, and gives users the ability to have a phone with them via their own smartphone or computer via software.

72.     IP phones can offer more features at a lower cost than landlines as well, such as video conferencing.  IP phones can integrate voice, messaging, presence and cloud sharing and more into one single platform.  There are likely several sub-segments to the Relevant IP phone markets, such as UC communications, that will be identified in the course of discovery.

73.     Buyers of IP phones would not be able to turn to landlines or other alternative technologies in response to a monopolist's price increase above the competitive level.

74.     The geographic markets for the sale of IP phones are (i) the United States and (ii) the world.  The global market for IP phones includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is industry recognition of both a global market for IP phones and a narrower U.S.-only market for IP phones.  A monopolist of IP phones in the United States would be able to raise prices profitably over competitive levels.  Correspondingly, a monopolist of IP phones globally would

be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for IP phones above competitive levels both globally and in the United States.

75.     The Relevant IP Phone Markets are characterized by high barriers to entry and expansion.  There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors.  The costs to develop IP phone software and hardware are substantial, likely at least tens of millions of dollars, and requires millions more to build the capability to install in large national and multinational corporations.

76.     Another barrier to entry for the Relevant IP Phone markets is customers' long purchase cycles when replacing or upgrading their phones to the next technology.  These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

77.     As Cisco publicly promotes, it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to IP phones. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new IP phone entrant may need to offer a full line of network components.

**E.     The Anticompetitive Effects of Cisco's Conduct Are Overwhelming**

78.     Upon information and belief, the instances described above are not isolated instances of pressure, but rather part of an overall effort to force customers to only be able to access networking equipment, IP phones and service through the most expensive avenues, while foreclosing Cisco's equipment competitors.  As explained, Cisco was not always hostile to a channel that sought to give customers the best deals, likely because that process aided Cisco's overall effort to be known as the most ubiquitous networking equipment provider regardless of the

channel the networking equipment reached the customer.  But that changed sometime around 2015, when Cisco apparently decided that padding its own profit margins and keeping its sales representatives satisfied was more important than servicing all of its customers.

79.     In some cases, Cisco was able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products.  Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment.  There is no "business justification" to this, and Cisco practices are merely designed to shift economic welfare from customers to itself.

80.     The inevitable effect of this overall course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives.  While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases.  As the above examples make clear, many customers are left with no practical choice other than to purchase unwanted and overpriced equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

81.     Indeed, in the case of a Texas-based 911 operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics.  There is no justification that can be advanced to accept this needless risk to human safety.

**App.26**

82.    Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather are forced to acquiesce to Cisco's pressure.  Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers cannot afford to risk the services it needs that only Cisco provides.  In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

### F.    Dexon Has Suffered An Antitrust Injury

83.    Cisco's overall course of conduct is specifically designed (i) to foreclose or otherwise eliminate distribution options through which customers can purchase from manufacturers competitive to Cisco, and (ii) to eliminate the option a customer would have to secure such a product for a lower price that puts upstream pressure on Cisco to lower its own prices should customers opt for a Cisco product.  Dexon's injury illustrates both of these phenomenon. As illustrated above, Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco.  Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

84.    Cisco's conduct is designed to harm resellers like Dexon precisely because of the benefits to customers that Dexon has provided for decades, which run counter to Cisco's profit motives.  Cisco is a quintessential monopolist that knows that it can earn more profit by limiting

**App.27**

supply and forcing customers into more expensive, exclusive channels.  If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions or quality improvements that would impact Cisco's bottom line.  The coercion and other conduct at issue in this case allows Cisco's monopoly power to not only be maintained, but grown, and Dexon's losses are a direct byproduct of this phenomenon.

85.     Dexon has also sustained loses to its goodwill and reputation in the marketplace by virtue of Cisco's conduct.  Because of Cisco's monopoly position in both the Relevant Service Market and the Relevant Product Markets, it has been immune to customer dissatisfaction with its conduct and has attempted to shift the problem of its own creation to Dexon.  Namely, rather than respond to customer feedback and attempt to win purchases by virtue of better service or terms, Cisco has attempted to portray Dexon as an unworthy sales partner who is the cause of the customers' problems.  But this is not the case, as Dexon has spent decades building trust and goodwill with its customers, even to the benefit of Cisco.  But now that Cisco's priority is to bully and intimidate any company that stands in the way of its maximum profit, Dexon is being painted in a different light.

86.     Dexon's reputation has been unjustifiably harmed due to Cisco's antitrust violations in the United States and in Texas specifically.  Dexon lost a major award for IP phones from a public school district, was forced to sustain losses so that a 911 operator could continue to serve citizens, was forced to stop doing business with an automobile chain, and no longer can do business with an energy company all because of Cisco's FUD and associated coercive tactics.  Texans should be able to benefit from the competition options and service that Dexon can offer, but instead Cisco has employed anticompetitive tactics specific to the State to deprive its businesses and public entities of those benefits.

**App.28**

## V.    CLAIMS FOR RELIEF

### A.    Count I (Sherman Act Section 1)

**Conspiracy in Unreasonable Restraint of Trade Against Cisco and CDW**

87.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

88.    Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon.  In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

89.    The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery.

90.    The goal and effect of the conspiracy was to limit both inter-brand and intra-brand competition in the Relevant Product Markets.  As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products.  Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products over Cisco's competitors.  In addition, Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco.  Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

91.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets.  This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly positions in all of these product markets, and potentially others.

Original Complaint                                                                                                  Page 29

**App.29**

92.     The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

93.     The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

### B.     Count II (Sherman Act Section 2)

**Conspiracy To Monopolize Against Cisco and CDW**

94.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

95.     Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon.  In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

96.      The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery.  Cisco pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

97.     Another goal and effect of the conspiracy was to limit both inter-brand and intra-brand competition in at least the Relevant Networking Equipment Markets.  As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products.  Conversely, Cisco views CDW as

**App.30**

a reseller that is more likely to aggressively market its products.  Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco.  Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

98.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets.  This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly positions in all of these product markets, and potentially others.

99.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

100.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in at least the Relevant Networking Equipment Markets, harm innovation associated with the products offered in the Relevant Networking Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

### C.    Count III (Sherman Act Section 1)

**Per Se Tying In the Relevant Product Markets Against Cisco**

101.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

102.    Cisco is a monopolist in the Relevant Service Markets and has used its SmartNet service packages in that Market as a tying product.  Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco.  Cisco conditions its

**App.31**

continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

103.    The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently.  Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Market.  Indeed, Cisco's conduct at issue in this case confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

104.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

105.    A substantial amount of commerce has been affected in the Relevant Product Markets (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars.  This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

106.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability

**App.32**

to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

107.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

108.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

    **D.**    **Count IV (Sherman Act Section 2)**

**Unlawful Monopolization of the Relevant Networking Equipment Markets Against Cisco**

109.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

110.    Cisco's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Network Equipment Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

111.    For the purpose of maintaining its monopoly power, Cisco committed numerous acts, including:

    a.    Coercing purchases in the Relevant Network Equipment Markets by withholding service in the Relevant Service Markets;

**App.33**

b.      Engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels; and

c.      Upon information and belief, engaging in related FUD tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Network Equipment Markets and likely other Markets.

112.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Network Equipment Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Network Equipment Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco, not to that of customers or competition on the merits.

113.    Cisco's conduct has injured competition in the Relevant Network Equipment Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

114.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Network Equipment Markets, harm innovation associated with the products offered in the Relevant Network Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

Original Complaint                                                                                      Page 34

**App.34**

E.    **Count V (Sherman Act Section 2)**

**Unlawful Attempted Monopolization of the Relevant Product Markets Against Cisco**

115.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

116.    Cisco acted with a specific intent to monopolize and destroy competition in the Relevant Product Markets.  Cisco devised and implemented an overall plan to force customers to pay supra-competitive prices in the Relevant Product Markets, with the associated destruction of competition in the Relevant Product Markets.

117.    Cisco willfully engaged in a course of anticompetitive conduct to obtain a monopoly in the Relevant Product Markets, including:

a.    Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

b.    Engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supracompetitive through Cisco's most expensive channels;

c.    Interfering with the proper award of at least one major RFP to Dexon, and denigrating Dexon for the purpose of securing a direct sales relationship with an important Texas public entity; and

d.    Upon information and belief, engaging in related FUD tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

118.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability

to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

119.     Throughout the time Cisco engaged in this anticompetitive conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Product Markets and continuing to maintain supra-competitive prices and exclude its competitors.

120.     Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

121.     Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

### F.     Count VI (Violation of the Texas Free Enterprise & Antitrust Act, Against Cisco and CDW)

122.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

123.     Upon information and belief, Cisco's overall anticompetitive scheme was directed and executed within Texas and has a direct impact upon Texas-based small and medium businesses.

**App.36**

124.    Cisco is a monopolist in the Relevant Service Market and has used its SmartNet service packages in that Market as a tying product.  Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted by customers but favored by Cisco.  Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

125.    The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently.  Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Markets.  Indeed, Cisco's conduct at issue in this case confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

126.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets.  Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

127.    A substantial amount of commerce has been affected in the Relevant Product Markets due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has

constituted tens or hundreds of thousands of dollars.  This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

128.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

129.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

130.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

131.    Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon.  In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

**App.38**

132.    The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Product Markets, and potentially others as will be confirmed in discovery.  Cisco pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

133.    Another goal and effect of the conspiracy was to limit both inter-brand and intra-brand competition in the Relevant Product Markets.  As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products.  Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products.  In addition, Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco.  Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

134.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets and is dominant in the Relevant IP Phone Markets.  The Cisco-CDW conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly and dominant positions in all of these product markets, and potentially others.

135.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

136.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products

**App.39**

offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

137.   The above conduct has harmed competition and resulted in loses to Dexon in Texas.

## VI.   **PRAYER FOR RELIEF**

Dexon Computer, Inc. prays for judgment and relief against Defendants Cisco and CDW as follows:

a.   An Order directing the termination of the anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1-2) and the Texas Free Enterprise & Antitrust Act;

b.   Treble damages (including lost profits), in an amount to be determined at trial and that cannot now be adequately quantified before relevant discovery;

d.   Awarding Dexon's costs of suit herein, including its attorneys' fees incurred in asserting antitrust claims;

i.   An award of punitive damages in an amount sufficient to punish Defendants, to make an example of them to the community, and to deter them from such conduct as to Dexon or others in the future;

j.   For equitable remedial efforts by Defendants sufficient to rehabilitate Dexon's damaged reputation;

k.   For orders restraining Cisco and Dexon from engaging in similar conduct in the future; and

p.   Such other and further relief as this Court deems just and equitable.

## VII.   **DEMAND FOR JURY TRIAL**

Dexon demands a trial by jury on all issues so triable.

**App.40**

DATED:  April 27, 2022                    Respectfully submitted,

                                          By:  */s/ David H. Reichenberg w/ permission*
                                          *William E. Davis, III*
                                          William E. Davis, III
                                          Texas State Bar No. 24047416
                                          bdavis@davisfirm.com
                                          **The Davis Firm PC**
                                          213 N. Fredonia Street, Suite 230
                                          Longview, Texas 75601
                                          Telephone: (903) 230-9090
                                          Facsimile: (903) 230-9661

                                          David H. Reichenberg
                                          (*pro hac vice pending*)
                                          Manatt, Phelps, & Phillips LLP
                                          7 Times Square
                                          New York, NY 10036
                                          dreichenberg@manatt.com
                                          Phone:  212-790-4626

                                          **ATTORNEYS FOR PLAINTIFF**
                                          **DEXON COMPUTER, INC.**

**App.41**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 5:22-cv-00053-RWS-CMC |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. and CDW CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## <u>DEFENDANT CISCO SYSTEMS, INC.'S</u>
## <u>MOTION TO TRANSFER</u>

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com

June 23, 2022          rfolio@kellogghansen.com

*Counsel for Cisco Systems, Inc.*

**App.42**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ ii

I.   INTRODUCTION ...................................................................................... 1

II.   FACTS ....................................................................................................... 1

Procedural History ....................................................................................... 1

Dexon's Antitrust Claims ............................................................................ 3

III.   ARGUMENT ............................................................................................ 6

A.   The Facts And Issues Substantially Overlap ........................................ 8

B.   The Parties Are Substantially Identical ................................................. 10

C.   There Is A Risk Of Piecemeal Litigation And Inconsistent Outcomes ............. 11

D.   The Issues Dexon Raises Now Can Be And Already Have Been Decided In The Earlier-Filed Case ........................................................... 13

IV.   CONCLUSION ......................................................................................... 14

i

**App.43**

## TABLE OF AUTHORITIES

Page

**CASES**

*Acceleron, LLC v. Egenera, Inc.*,
   2010 WL 11474372 (E.D. Tex. Jan. 26, 2010).................................................... 7, 8

*Alexander v. Franklin Res., Inc.*,
   2007 WL 518859 (N.D. Cal. Feb. 14, 2007) ..................................................... 10

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012) ........................................................................ 9

*Cadle Co. v. Whataburger of Alice*,
   174 F.3d 599 (5th Cir. 1999) ...........................................................6, 7, 10, 12

*California Sec. Co-Op, Inc. v. Multimedia Cablevision, Inc.*,
   897 F. Supp. 316 (E.D. Tex. 1995)............................................................ 7, 8, 11

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
   2022 WL 797015 (N.D. Cal. Mar. 16, 2022)...................................................... 3

*Cisco Sys. Inc. v. Dexon Computer, Inc.*,
   2021 WL 5848080 (N.D. Cal. Dec. 9, 2021) ................................................... 2, 9

*Clarendon Nat'l Ins. Co. v. Nat'l Trust Ins. Co.*,
   2018 WL 11258139 (E.D. Tex. Aug. 15, 2018) ...............................................7, 8

*Huntsman Corp. v. Int'l Risk Ins. Co.*,
   2008 WL 1836384 (E.D. Tex. Apr. 22, 2008) .................................................. 8

*Integra Techs. Int'l, Inc. v. Durst Image Tech. US LLC*,
   2009 WL 10669338 (W.D. Tex. Aug. 20, 2009)........................................... 9, 10

*Mann Mfg., Inc. v. Hortex, Inc.*,
   439 F.2d 403 (5th Cir. 1971) .......................................................................... 8

*Mosaid Techs. Inc. v. Micron Tech., Inc.*,
   2008 WL 11348413 (E.D. Tex. July 2, 2008)................................................7, 8

*Needbasedapps, LLC v. Robbins Research Int'l, Inc.*,
   926 F. Supp. 2d 907 (W.D. Tex. 2013)............................................................. 7

*Save Power Ltd. v. Syntek Fin. Corp.*,
   121 F.3d 947, 951 (5th Cir. 1997) .............................................................. 7, 10

*SIPCO, LLC v. Emerson Elec. Co.*,
   2016 WL 7743496 (E.D. Tex. July 1, 2016) .................................................6, 11

ii

*Stannard v. Nat'l Indoor RV Ctrs., LLC,*
    2018 WL 3608560 (E.D. Tex. July 27, 2018) ......................................................... 7

*State Farm Mut. Auto. Ins. Co. v. Plunkett,*
    2011 WL 2670063 (N.D. Miss. July 7, 2011) ...................................................... 12

*Tech. Ins. Co. v. Ben E. Keith Co.,*
    2015 WL 4367597 (N.D. Tex. July 15, 2015) ....................................................... 8

*TravelPass Grp. LLC v. Caesars Ent. Corp.,*
    2019 WL 4071784 (E.D. Tex. Aug. 29, 2019) ..................................................... 10

*United States v. Safety Nat'l Cas. Corp.,*
    2010 WL 11595787 (W.D. Tex. Sept. 24, 2010) ........................................... 9, 12

*Vertical Computer Sys., Inc. v. Interwoven, Inc.,*
    2011 WL 13141016 (E.D. Tex. May 10, 2011) .................................................. 10

*West Gulf Mar. Ass'n v. ILA Deep Sea Local 24,*
    751 F.2d 721 (5th Cir. 1985) ..................................................... 6, 7, 8, 11, 12, 13

TO COUNSEL AND THIS HONORABLE COURT:  Defendant, Cisco Systems, Inc.

("Cisco") hereby brings this Motion to transfer this matter to the United States District Court for

the Northern District of California.  Cisco and Dexon Computer, Inc. ("Dexon") have litigated

substantially similar claims in that court – which has already rejected Dexon's theory of antitrust

liability and injury on the merits – and transfer of this action to that court is required pursuant to

the "first to file" rule.

## I.    INTRODUCTION

Cisco sued Dexon in the Northern District of California in July 2020, alleging that Dexon

has been selling counterfeit Cisco products.  In July 2021, Dexon filed counterclaims against

Cisco, including claims under Section 1 and Section 2 of the Sherman Act.  On December 9, 2021,

Judge Breyer of the Northern District of California granted Cisco's motion to dismiss Dexon's

antitrust claims pursuant to Rule 12(b)(6).  While Dexon has since filed two amended

counterclaims that have included other federal and state claims, Dexon has not re-pleaded its

antitrust claims in the Northern District of California.  Instead, Dexon refiled its antitrust claims in

this Court.  Because the "first to file" rule bars such forum shopping, this Court should dismiss the

complaint or transfer it to the Northern District of California, where litigation continues between

Cisco and Dexon.

## II.    FACTS

### *Procedural History*

On July 22, 2020, Cisco filed suit against Dexon in the U.S. District Court for the

Northern District of California.  *Cisco Systems, Inc. and Cisco Technology, Inc. v. Dexon*

*Computer, Inc.,* No. 3:29-cv-4926 (the "California Lawsuit").  In the California Lawsuit, Cisco

alleged that Dexon traffics in counterfeit Cisco products (including switches and transceivers) in

violation of the Lanham Act and California state law.  On July 29, 2021, Dexon filed its

Amended Answer, Affirmative Defenses, Counterclaims and Third Party Claims ("Dexon's

California Counterclaims") [ECF 50, attached as Exhibit B], which included claims that Cisco

violated Sections 1 and 2 of the Sherman Act by tying, monopolizing, and attempting to

monopolize markets for Ethernet switches and routers.

 On October 13, 2021, Cisco filed a Motion to Dismiss Dexon's California Counterclaims,

pursuant to Rule 12(b)(6).  [ECF 72, attached as Exhibit C]  After the matter was fully briefed,

the Court issued a thorough and well-reasoned opinion dismissing all of Dexon's claims for

failure to state a claim.  *See Cisco Sys. Inc. v. Dexon Computer, Inc.*, 2021 WL 5848080, at *5

(N.D. Cal. Dec. 9, 2021) ("*Cisco I*") (dismissing tying claims under Section 1 of the Sherman

Act and California's Cartwright Act because "Dexon fails to plead a tying claim"); *see also id.* at

*5-6 (dismissing monopolization and attempted monopolization claims under Section 2 of the

Sherman Act because Dexon failed to plead that Cisco's conduct was anticompetitive); *see also*

*id.* at *6 (dismissing all of Dexon's federal and state antitrust claims because "Dexon has not

pleaded antitrust injury").

 The court in the Northern District of California has allowed Dexon multiple opportunities

to amend its counterclaims.  In its December 9, 2021 Order that dismissed Dexon's antitrust

claims (as well as all of Dexon's other federal and state counterclaims), the Court granted Dexon

leave to amend.  *See id.* at *9.  On January 10, 2022, Dexon filed its Second Amended Answer,

Affirmative Defenses, Counterclaims and Third-Party Claims ("Second Amended

Counterclaims").  In that pleading, Dexon did not re-assert any antitrust claims.  [ECF 92,

attached as Exhibit D, (alleging counterclaims against Cisco for Lanham Act False Advertising,

Intentional Interference with Contractual Relations, Intentional Interference with Prospective

Economic Advantage, and Trade Libel).]  Cisco filed a motion to dismiss the Second Amended

Claims under Rule 12(b)(6).  [ECF 96, attached as Exhibit E]  On March 16, 2022, after the

matter had been fully briefed, the Court dismissed Dexon's Second Amended Claims for failure

to state a claim.  *See Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 797015, at *1 (N.D.

Cal. Mar. 16, 2022) ("*Cisco II*").  Judge Breyer gave Dexon "leave to amend one last time." *Id.*

at *8.

On April 6, 2022, Dexon filed its Third Amended Answer, Affirmative Defenses,

Counterclaims and Third-Party Claims ("Third Amended Counterclaims").  Once again, Dexon

chose not to re-plead any antitrust claims.[1]  [ECF 107, attached as Exhibit F]  On April 27, 2022,

Cisco again moved to dismiss Dexon's Third Amended Counterclaims pursuant to Rule

12(b)(6).[2]  [ECF 117, attached as Exhibit G]  That same day, Dexon filed its Complaint in this

Court.  The Complaint alleges antitrust causes of action substantially similar to those Dexon

asserted in its July 29, 2021 California Lawsuit that were ultimately dismissed by the district

court in California.

### Dexon's Antitrust Claims

Most of the antitrust counterclaims that Dexon asserts in this matter are nearly identical

to the claims that the Northern District of California dismissed in the California Action almost

---

[1] Dexon alleged counterclaims against Cisco for a Declaratory Judgment related to the legal status of Cisco's software, Lanham Act False Advertising, Intentional Interference with Contractual Relations, Intentional Interference with Prospective Economic Advantage, Trade Libel, and Trade Libel Per Se.

[2] Dexon opposed Cisco's motion [Exh. G], and it sought leave to file Fourth Amended Counterclaims [ECF 116, attached as Exhibit H].  On June 21, 2022, the court issued an order that dismissed Dexon's third amended counterclaims because Dexon again failed to state any legally cognizable claim, and it denied Dexon's motion for leave to file fourth amended counterclaims "because Dexon's amendments would be futile."  [ECF 127, attached as Exhibit I, pp. 15, 17]

3

**App.48**

nine months earlier.  In both actions, Dexon alleges:  violations of the Sherman Act Section 1 for

tying [*compare* Compl. ¶¶ 101-108, *with* Dexon's California Counterclaims, Exh. B ¶¶ 61-68];

unlawful monopolization under Section 2 of the Sherman Act [*compare* Compl. ¶¶ 109-114, *with*

Dexon's California Counterclaims, Exh. B ¶¶ 60-74]; attempted monopolization in violation of

Section 2 of the Sherman Act [*compare* Compl. ¶¶ 115-121, *with* Dexon's California

Counterclaims, Exh. B ¶¶ 75-98]; and parallel state-law antitrust claims [*compare* Compl.

¶¶ 122-137, *with* Dexon's California Counterclaims, Exh. B ¶¶ 82-91].

Dexon's current complaint also contains brief and conclusory allegations that Cisco and a

reseller, CDW, conspired to violate Section 1 of the Sherman Act by unreasonably restraining

trade [Compl. ¶¶ 87-93], and Section 2 of the Sherman Act by maintaining Cisco's alleged

monopoly in certain equipment markets [Compl. ¶¶ 94-100].

The factual allegations in the present complaint are likewise materially the same as the

allegations that Dexon relied upon for its California Lawsuit — Dexon copied many of its

allegations here from its California Counterclaims verbatim:[3]

| Paragraphs from Dexon's California Complaint | Paragraphs from Dexon's Texas Complaint | Nature of Allegation |
|---|---|---|
| ¶¶ 14-15 | ¶¶ 20-21 | Describing Cisco's relevant markets. |
| ¶ 16 | ¶ 22 | Describing the need for maintenance and service of Cisco products. |
| ¶ 17 | ¶ 23 | Claiming that Cisco maintains a premium price for its maintenance and service contracts. |
| ¶ 18 | ¶ 24 | Claiming that Cisco compels customers to purchase SmartNet service contracts. |
| ¶ 19 | ¶ 25 | Claiming that software updates are available only for customers who purchase SmartNet. |

---

[3]  Attached, as Exhibit A, is a redline comparison of Dexon's California Counterclaims
and the present complaint, which shows the close similarity of all material allegations.

| Paragraphs from Dexon's California Complaint | Paragraphs from Dexon's Texas Complaint | Nature of Allegation |
|---|---|---|
| ¶¶ 20-21 | ¶¶ 26-27 | Defining the supposed "Relevant Service Market." |
| ¶¶ 22-23 | ¶¶ 28-29 | Allegations related to Ethernet switches. |
| ¶¶ 24-26 | ¶¶ 30-32 | Claiming that Cisco has a monopoly on Ethernet switches. |
| ¶¶ 27-28 | ¶¶ 33-34 | Allegations related to "routers." |
| ¶ 29 | ¶ 35 | Allegation related to relevant router geographic market for antitrust analysis. |
| ¶ 30 | ¶ 36 | Claiming that Cisco has monopoly power in markets for routers. |
| ¶¶ 31-33 | ¶¶ 37-39 | There are high barriers to entry and expansion in the "Relevant Router and Switch Markets." |
| ¶¶ 34-35 | ¶¶ 40-41 | Reiterating claims that Cisco exercises control over the relevant markets, has a "practice of holding customers hostage" through SmartNet service packages, and exercises monopoly power. |
| ¶¶ 36-41 | ¶¶ 42-47 | Customers' alleged reliance upon SmartNet and related conduct by Cisco. |
| ¶¶ 45-47 | ¶¶ 49-51 | The benefit Cisco supposedly obtains through conduct related to sale of SmartNet and the effect that purportedly has on Cisco's customers. |
| ¶ 52 | ¶ 56 | Allegation that Cisco threatened a company [identified in the Texas Complaint as CDW] not to do business with Dexon; and, in response, that company re-assigned its employee who did business with Dexon to a different region and account. |
| ¶ 53 | ¶ 72 | Dexon's belief regarding the history of Cisco's conduct. |
| ¶ 54 | ¶ 73 | Alleged effect of re-certification fees on competition. |
| ¶ 55 | ¶ 74 | Alleged effect of Cisco's conduct on competition. |
| ¶ 56 | ¶ 75 | Alleged effect of Cisco's conduct upon a 911 operator.  [The Texas Complaint identifies the 911 Operator as being in Texas.] |
| ¶ 57 | ¶ 76 | Alleged effects of Cisco's conduct on competition. |
| ¶¶ 58-60 | ¶¶ 77-79 | Dexon's supposed harm. |

The only arguable differences between Dexon's California Counterclaims and the present complaint are that, while Dexon's California Counterclaims include allegations regarding conduct involving an unnamed value added reseller, the present Complaint identifies that reseller

as CDW, adds allegations related to CDW, and names CDW as a defendant.[4]  Dexon also

attempts to provide additional detail describing some of the allegations it first raised in its

various pleadings in the California Lawsuit.[5]

### III.    ARGUMENT

This Court should transfer Dexon's complaint pursuant to the "first to file" rule because

Dexon already asserted the claims in its complaint in the Northern District of California.  *See*,

*e.g.*, *Cadle Co. v. Whataburger of Alice*, 174 F.3d 599, 606 (5th Cir. 1999) (holding that the

second court should "transfer the case" to the first-filed court for resolution); *SIPCO, LLC v.*

*Emerson Elec. Co.*, 2016 WL 7743496, at *4-5 (E.D. Tex. July 1, 2016) (Mitchell, M.J.)

(transferring the second-filed action "to the first-filed court . . . to determine the resolution of the

second-filed case").  The "first to file" rule avoids serial initiation and litigation of substantially

similar cases, conflicting rulings, and piecemeal litigation.  *See West Gulf Mar. Ass'n v. ILA Deep*

---

[4]  The following redline excerpt provides an example of the changes between Dexon's California Counterclaims (at ¶ 52) and the present complaint (at ¶ 56), where Dexon inserted the name "CDW" for the phrase "VAR," which was used in the California Counterclaims:  "Upon information and belief, as part of their conspiracy to exclude Dexon, Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed. Confirming this agreement, upon information and belief, when the ~~VAR~~CDW representative previously assigned to Dexon refused to comply with the (sic) Cisco's demand, ~~he was~~CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy. This worked. Pursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021."

[5]  The present complaint contains new allegations related to Cisco phones.  [Compl. ¶¶ 24, 30, 44, 65, 69, 71-78, 134]  However, all of Dexon's pleadings in the California lawsuit include factual allegations regarding Cisco phones, purportedly in support of other non-antitrust claims.  [*See* Dexon California Counterclaims ¶ 121; Second Amended Counterclaims ¶ 138; Third Amended Counterclaims ¶ 169]  For example, Dexon's Second and Third Amended Counterclaims in the California litigation and its Texas lawsuit all include allegations regarding phone transactions involving the Fort Bend Independent School District.  [*Compare* Second Amended Counterclaims ¶ 138, and Third Amended Counterclaims ¶¶ 165-169, *with* Compl. ¶¶ 65-67, 86]

*Sea Local 24*, 751 F.2d 721, 729 (5th Cir. 1985); *see also Mosaid Techs. Inc. v. Micron Tech., Inc.*, 2008 WL 11348413, at *2 (E.D. Tex. July 2, 2008).

When applying the "first to file" rule, the court in which the second action is filed "decide[s] whether the moving party in the second-filed court has demonstrated a 'substantial overlap' between the two suits." *Stannard v. Nat'l Indoor RV Ctrs., LLC*, 2018 WL 3608560, at *1 (E.D. Tex. July 27, 2018). "If the moving party satisfies this overlap requirement, the second-filed court allows the first-filed court to 'resolve the question of whether both [cases] should be allowed to proceed.'" *Id.* (quoting *Cadle*, 174 F.3d at 605); *Clarendon Nat'l Ins. Co. v. Nat'l Trust Ins. Co.,* 2018 WL 11258139, at *1 (E.D. Tex. Aug. 15, 2018) (Schroeder, J.) (granting motion to transfer).

The factors relevant to substantial overlap are whether:  (1) the "overall content" of both lawsuits overlaps to a substantial degree[6]; (2) some (or all) of the parties are the same in the two cases[7]; (3) there is a risk of piecemeal litigation or inconsistent outcomes[8]; and (4) the issues in the second-filed case can be decided in the first-filed court.[9]  These factors require transfer of Dexon's antitrust case to the Northern District of California.

---

[6] *See Acceleron, LLC v. Egenera, Inc.*, 2010 WL 11474372, at *2 (E.D. Tex. Jan. 26, 2010) (cases "involve substantially overlapping questions and core issues"); *California Sec. Co-Op, Inc. v. Multimedia Cablevision, Inc.*, 897 F. Supp. 316, 317-18 (E.D. Tex. 1995) (Folsom, J.) (granting motion to transfer).

[7] *See Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 951 (5th Cir. 1997); *Needbasedapps, LLC v. Robbins Research Int'l, Inc.*, 926 F. Supp. 2d 907, 915 (W.D. Tex. 2013) ("While the parties need not be identical to find 'substantial overlap,' the near identity of these parties certainly weighs in favor of such a finding.").

[8] *Cadle*, 174 F.3d at 606 (court in the second-filed case properly refused to act as a "super appellate court" by avoiding a potential inconsistent ruling with the first-filed court).

[9] *Needbasedapps*, 926 F. Supp. 2d at 915 ("Because all of the defendants in the Texas Lawsuit are subject to the personal jurisdiction of the United States District Court for the Central District of California, [counterclaimant] can obtain the same relief it seeks in Texas by filing counterclaims in the California action.").

A.        The Facts And Issues Substantially Overlap

This first factor favors dismissal or transfer because "the two pending actions [are] so duplicative or . . . involve such substantially similar issues that one court should decide the subject matter of both actions." *Huntsman Corp. v. Int'l Risk Ins. Co.*, 2008 WL 1836384, at *4 (E.D. Tex. Apr. 22, 2008) (internal quotations and citation omitted); *see also Clarendon Nat'l Ins.*, 2018 WL 11258139, at *1; *Tech. Ins. Co. v. Ben E. Keith Co.*, 2015 WL 4367597, at *2 (N.D. Tex. July 15, 2015) ("Corresponding 'threshold issues' are sufficient to raise the possibility of substantial overlap."); *Acceleron, LLC v. Egenera, Inc.*, 2010 WL 11474372, at *2 (E.D. Tex. Jan. 26, 2010) (granting transfer where the two actions involved "substantially overlapping questions and core issues").

This factor favors transfer where the core issues or the proof adduced would be the same in the second-filed case as in the prior-filed case. *See West Gulf Mar. Ass'n*, 751 F.2d at 730 (core issue was the same); *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 407-08 (5th Cir. 1971) (reversing district court and ordering transfer of second-filed action, where overall content of multiple patents was likely to overlap to substantial degree in the two actions); *Mosaid Techs.*, 2008 WL 11348413, at *3 (granting motion to transfer in patent case where the technology in both actions overlapped, even though the actual patents being asserted were not identical).  As Judge Folsom wrote in *California Security Co-Op, Inc. v. Multimedia Cablevision, Inc.*, 897 F. Supp. 316, 318 (E.D. Tex. 1995), granting a motion to transfer is appropriate if the plaintiff filing the second complaint "is alleging essentially the same conduct [ ] but has simply discovered a potential alternate route to recovery."

Both the California lawsuit and the present complaint involve nearly identical antitrust claims and claimed damages, and both arise from the same alleged business practices that Dexon

claims violate the antitrust laws.  The overlap in the foregoing chart shows that, if the two cases were filed in this district, then they would undoubtedly be consolidated – satisfying this factor in favor of transfer or dismissal.  *See United States v. Safety Nat'l Cas. Corp.*, 2010 WL 11595787, at *1 (W.D. Tex. Sept. 24, 2010) ("A substantial relationship exists between two suits where the issues, though not identical, are similar enough that the cases would be consolidated if filed in the same court.").

Allowing the present lawsuit to proceed would require a finding that directly conflicts with Judge Breyer's holding that Dexon's substantively identical allegations did not plausibly allege an antitrust injury.  *See Cisco I*, 2021 WL 5848080, at *6 (finding that Dexon has not pleaded that it was harmed by anticompetitive conduct).  An antitrust claim requires a plaintiff to "allege both that defendant's behavior is anticompetitive and that plaintiff has been injured by an 'anticompetitive' aspect of the practice under scrutiny." *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) (internal quotations omitted).  Another federal court has already determined that Dexon has done neither in a ruling that would necessarily conflict with allowing Dexon to proceed past the pleadings here.

The court's decision granting a motion to transfer in *Integra Technologies International, Inc. v. Durst Image Technology US LLC*, 2009 WL 10669338 (W.D. Tex. Aug. 20, 2009), is instructive.  In that case, Durst first sued Integra in the Southern District of New York, for trademark infringement, unfair competition, and other causes of action.  While that case was pending, Integra brought a lawsuit in the Western District of Texas, alleging that Durst violated the Sherman Act and other causes of action.  The court determined that "[w]hile the claims asserted in each case may not arise out of the 'same transaction or occurrence,' that is not the test for the first-to-file rule." *Id.* at *1.  "Given the similarities described above, this Court would

likely consolidate the cases if it had jurisdiction over both, and thus finds the purposes of the first-to-file rule, namely 'principles of comity and sound judicial administration,' best served by transferring this case to New York." *Id.* (quoting *Cadle*, 174 F.3d at 603). The case for transfer is far stronger here because there is overlap of parties and allegations sufficient to warrant consolidation (and thus transfer) *and* – unlike *Integra* – Dexon *itself* has brought substantially similar antitrust claims in both lawsuits (having lost in the first-filed court where litigation is ongoing). Such naked forum-shopping warrants transfer (or dismissal). *See Alexander v. Franklin Res., Inc.*, 2007 WL 518859, at *4 (N.D. Cal. Feb. 14, 2007) ("One could reasonably infer forum shopping here, where the same plaintiff represented by the same law firm filed a similar lawsuit in New Jersey, and after receiving unfavorable rulings from that court, filed the instant case.").

> **B.     The Parties Are Substantially Identical**

This factor also favors transfer because Dexon and Cisco are both before the district court in California. The presence of CDW as a named defendant in this case is of no legal consequence because the first-filed rule does not require *identical* parties where the issues substantially overlap. *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 951 (5th Cir. 1997) ("Complete identity of parties is not required for dismissal or transfer of a case filed subsequently to a substantially related action."); *Vertical Computer Sys., Inc. v. Interwoven, Inc.*, 2011 WL 13141016, at *2 (E.D. Tex. May 10, 2011) ("a party cannot circumvent the policies underlying the first-to-file rule by merely tacking on an additional defendant in a later, duplicative action"); *but cf. TravelPass Grp. LLC v. Caesars Ent. Corp.*, 2019 WL 4071784, at *5-6 (E.D. Tex. Aug. 29, 2019) (Schroeder, J.) (denying transfer where different plaintiff brought later-filed action). As Judge Folsom noted, adding an additional defendant is

immaterial where the cases overlap substantively, particularly where (as here) the first-filed case referenced (but did not name) the defendant added to the second-filed lawsuit.  *See Cal. Sec. Co-op*, 897 F. Supp. at 318 (granting transfer where the added party was referenced in the first-filed case, and when that party was named as a defendant in the second-filed case, but "the subject matter did not change").

The references in Dexon's California Counterclaims to CDW, albeit not by name, indicate that the overlap in parties is even more complete than might first appear.  Dexon's present complaint replaces allegations that a "VAR" (an acronym for "Value Added Reseller", a reseller of Cisco products) cooperated with Cisco and ceased doing business with Dexon, with allegations naming CDW.  *See supra* note 4.  Such changes in wording "are differences in form rather than substance and it is unquestionable that the two actions are duplicative and overlap substantially if not completely."  *Cal. Sec. Co-op*, 897 F. Supp. at 318; *see also SIPCO*, 2016 WL 7743496, at *3 n.4 (finding substantial similarity notwithstanding inclusion of additional parties in second-filed action where allegations against new defendant were "limited . . . to the purchase and use of [Smart Wireless] products, which are already accused of infringement in [the first-filed action]").  Accordingly, the substantial overlap of the parties between the two actions favors transfer.

### C.    There Is A Risk Of Piecemeal Litigation And Inconsistent Outcomes

The "first to file" doctrine aims to avoid duplicative rulings and avoid piecemeal resolution of disputes; both considerations warrant transfer here.  *West Gulf Mar. Ass'n*, 751 F.2d at 729-31 (warning against resolving issues piecemeal among multiple districts and creating disharmony among the federal courts).  "As between federal district courts, . . . the general principle is to avoid duplicative litigation," *id.* at 728 (internal quotations and citation

omitted), and deter forum shopping.  *See Safety Nat'l Cas.*, 2010 WL 11595787, at *2

(transferring case alleging breach of 10 immigration bonds pursuant to "first to file" rule where

the Southern District of Texas was hearing case involving 1400 alleged breaches observing that

"it appears that *DHS was unhappy with Judge Ellison's rulings and seeks a different venue*

*hoping for a better result*," but "[t]he first-to-file rule is designed to *prevent such forum*

*shopping*") (emphasis added); *see also State Farm Mut. Auto. Ins. Co. v. Plunkett*, 2011 WL

2670063, at *3 (N.D. Miss. July 7, 2011) ("Filing suit in one court while the same action is

pending before another judge in the same district will *inevitably lead to what can be seen as*

*'judge shopping' or 'forum shopping.'*  In order to eliminate the risk of such, the Court exercises

its direction and transfers this case to [the first filed court] for proper resolution of this cause of

action.") (emphasis added).

Transfer to the first-filed court is particularly appropriate where, as here, the court with the

first-filed case has already exercised jurisdiction over the parties.  *See Cadle*, 174 F.3d at 604-05.

Dexon filed antitrust counterclaims in the Northern District of California, contending that those

claims arose from the same controversy as do the allegations in Cisco's complaint before that

court.  [Dexon's California Counterclaims, Exh. B ¶ 13]  Now, Dexon asks this Court to be a

"super appellate court," *Cadle*, 174 F.3d at 606, hoping it will decide issues common to both cases

in a way contrary to those of another federal court.  Such "trenching on the authority of its sister

court" must be avoided.  *Id.*; *see also West Gulf Mar. Ass'n*, 751 F.2d at 732 (second court should

avoid "pass[ing] on" the merits of decision by judge in the first-filed case).

The risk of inconsistent outcomes is significant here because the Northern District of

California already examined and dismissed Dexon's antitrust claims – Dexon is *necessarily*

seeking a contrary ruling.  Further, the outcome of Cisco's still-ongoing Lanham Act claims

against Dexon in the California lawsuit could be highly relevant to this Court's evaluation of

Dexon's antitrust claims.  Should Cisco's motion to transfer be denied, Cisco may assert as

affirmative defenses before this Court that the conduct Dexon alleges to be in violation of

federal and Texas antitrust law protects consumers from counterfeit and unlicensed products,

like those that Dexon allegedly distributes.  The close legal nexus between Cisco's Lanham Act

claims against an unauthorized reseller of Cisco products and Dexon's challenge to the legality

of Cisco's policies regarding unauthorized resale means that trying the two claims separately

would expose the parties to the risk of inconsistent results.

**D.      The Issues Dexon Raises Now Can Be And Already Have Been Decided In The Earlier-Filed Case**

To avoid duplication and preserve judicial resources, the court in the second-filed case

"may dismiss an action where the issues presented can be resolved in an earlier-filed action

pending in another district court."  *West Gulf Mar. Ass'n*, 751 F.3d at 729.  Here, there is a pending

action (the California lawsuit) in which the issues presented by Dexon can be resolved, and in fact

where substantially similar antitrust claims have *already been* resolved.  That ongoing litigation

has been pending for nearly two years, and both the parties and the court have spent significant

resources.  The parties have fully briefed the legal issues, which Judge Breyer ruled on late last

year.  If Dexon thinks its present claims are meritorious modifications to the antitrust counterclaims

that the Northern District of California dismissed, then Dexon could have amended those antitrust

counterclaims (as Judge Breyer permitted) in the Northern District of California.  Dexon should not

be afforded an opportunity to file substantially the same claims here that a federal judge has already

considered and dismissed.

## IV.    CONCLUSION

For the foregoing reasons, and any others that this Court may consider just, Dexon's lawsuit should be transferred to the Northern District of California.

Dated:  June 23, 2022

Respectfully submitted,

*/s/ Deron R. Dacus*
DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Attorneys for Defendant Cisco Systems, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record, who are deemed to have consented to

electronic service are being served on this June 23, 2022 with a copy of this document via the

Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served

by electronic mail, facsimile transmission and/or first class mail on this same date.


*/s/ Deron R. Dacus*
Deron R. Dacus

**CERTIFICATE OF CONFERENCE**

I hereby certify that counsel for Cisco Systems, Inc. has complied with the meet-and-confer requirement in Local Rule CV-7(h).  On June 22, 2022, counsel for Cisco Systems, Inc. (Aaron M. Panner) met and conferred with counsel for Dexon Computer, Inc. (David Reichenberg), during which counsel for Dexon Computer, Inc. stated that Dexon Computer, Inc. will oppose the motion because Dexon Computer, Inc. does not think transfer to the United States District Court for the Northern District of California is warranted.  Accordingly, discussions between the parties on this topic have conclusively ended in an impasse as between Cisco Systems, Inc. and Dexon Computer, Inc. – counsel for CDW Corporation has informed counsel for Cisco Systems, Inc. that CDW Corporation will not oppose the foregoing motion – leaving an open issue for the court to resolve.

*/s/ Deron R. Dacus*
Deron R. Dacus

# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

**ORIGINAL COMPLAINT**

~~Counterclaim~~ Plaintiff, Dexon Computer, Inc. ~~asserts the following counterclaims~~ ("Dexon") files this Original Complaint against ~~Counterclaim Defendant~~Defendants Cisco Systems, Inc.~~, and~~ ("Cisco~~Technology, Inc."~~) and CDW Corporation (~~hereinafter referred to jointly as "Cisco~~"CDW") ~~alleges~~, alleging as follows:

**I.    INTRODUCTION**

1.    ~~1.    Cisco is a monopolist that uses whatever means necessary to keep the prices for its~~Cisco is a monopolist threatening and coercing customers into buying overpriced networking equipment because of the market power Cisco holds over customers, especially small and medium businesses that have no choice but to give into Cisco's demands. Specifically, after customers pay for necessary network equipment maintenance and service, Cisco changes its course of conduct and demands that customers must buy new overpriced equipment in order to avoid a technologically compromised network, and foreclosing its networking equipment competitors in the process.

2.    Upon information and belief these tactics have been employed by Cisco across the

**App.63**

country, but Cisco has carried out these tactics extensively in Texas. Dexon is aware of at least five examples, involving millions of dollars in equipment sales, in Texas in order to keep networking prices high and to foreclose competition from competing providers of networking equipment. For these reasons, Dexon seeks relief before this Court.

3.      As one example, a Texas-based bank bought Ethernet switches and routers (types of networking products discussed below), as well as a maintenance and service package for that equipment under a program called SmartNet. When the SmartNet service package came up for renewal, the customer sought only to renew the package, but Cisco demanded that it must also buy new Ethernet switches and routers to be eligible for the renewal. The customer did not want or need any new networking equipment, but had no choice other than to give into Cisco's demand to obtain and keep the maintenance and support it needed. This requirement expanded Cisco's grip over the customer due to the additional networking equipment the customer was forced to purchase. Cisco has been able to maintain its supra-competitive prices for its networking equipment, foreclose networking equipment competitors which customers would consider in the absence of Cisco's conduct, and decrease the amount of revenue and profits Cisco's networking equipment competitors have to fund innovation and new product offerings.

4.      Cisco's conduct is especially oppressive and greatly injures competition for networking products because Cisco's conduct applies to small and medium businesses with limited IT budgets for networking products necessary for their network infrastructures. As explained in further detail below, purchases of networking products are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products. As a result, when Cisco forces customers to purchase overpriced equipment through its coercive tactics, Cisco forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase.

**App.64**

5.      In addition, through Cisco's coercion, it has forced customers to pay a higher price for networking equipment they had already purchased through a "re-certification fee," by threatening not to service that equipment unless customers pay the additional equipment fees.

When customers pay that re-certification fee, customers' limited budgets are restrained further, because the money spent on that fee cannot be spent with Cisco's networking competitors if customers could choose a product on a merits. Thus, any claim by Cisco that its conduct does not foreclose its network equipment competitors ignores how purchases of networking equipment are made and the limited opportunities that competitors have to meaningfully expand their market share; instead, Cisco is able to maintain and increase its market share and supra-competitive pricing by unlawfully constraining the opportunities of its competitors.

6.      Cisco considers certain resellers selling both Cisco networking equipment and the networking equipment of Cisco's competitors to be a prime competitive threat to its networking equipment monopolies. Through its improper conduct, by its business practices, Cisco has coerced customers not to purchase from these customers' desired resellers. Cisco has successfully employed a strategy of "fear, uncertainty and doubt," or "FUD," wrongly claiming to customers that unfavored resellers sell "bootleg", "unauthorized", or goods with "malware" or "spyware" to dissuade purchases from these resellers of other manufacturers, including Cisco's competitors. In the process, Cisco has further foreclosed its networking equipment competitors who by and large have never cracked single digit market shares and has allowed Cisco to maintain market power and monopoly shares for decades.

7.      Another instance of Texas-based coercion illustrates Cisco's FUD strategy. An energy company headquartered in Texas bought Ethernet switches and routers from Dexon, and also bought a multi-year SmartNet maintenance and service package through one of Cisco's preferred dealers. The Ethernet switches and router purchases from Dexon were known and

**App.65**

approved by Cisco at the time of these purchases. After providing the promised maintenance and service support to the customer for several years, Cisco then changed its course of conduct and demanded that the customer purchase new Ethernet switches and routers from a vendor other than Dexon to continue receiving the SmartNet maintenance and service. The customer informed Dexon that it still desired to buy networking equipment from Dexon now and in the future, due to the attractive pricing and competitive options Dexon is able to provide, but it could no longer do so because Cisco's new position was that Cisco no longer provide the maintenance support the customer needed. As a result, Cisco's networking equipment competitors selling through Dexon or any other reseller have been foreclosed for at least the lifespan of the products and services Cisco forced the customer to purchase, and the customer has been forced to restrict its choices and ability to make future purchasing decisions on the merits.

8.     Cisco's anticompetitive conduct also impacted a local Texas emergency 911-center which had purchased networking equipment from Dexon. In the midst of a five-year SmartNet service package the 911-center had purchased from Cisco, Cisco told the Texas emergency 911-center it needed to purchase new routers and Ethernet switches from a non-Dexon vendor when the customer checked on its account for purposes of a service issue if it wanted to receive the service it was due under its SmartNet service package. Cisco had never notified the customer of a cancellation of the SmartNet service package in the absence of a new equipment purchase. The 911-center cannot afford new equipment, and thus continues to face Cisco's threat that it will not receive the previously paid for service unless it chooses a different vendor for new product purchases, even if that means human lives are put at risk due to a network support issue. This FUD based strategy intends to and successfully: (1) forecloses Cisco's networking equipment competitors from reaching customers through resellers like Dexon, and (2) forces customers to pay more for products that it sought to purchase from less expensive resellers like Dexon.

**App.66**

9.      Cisco's conduct violates both Sections 1 and 2 of the Sherman Act, by using its near-virtual monopoly position in the relevant aftermarket for the maintenance and service of its network equipment in order to foreclose customers from buying from competitors in the equipment market and allowing Cisco to maintain supra-competitive prices in relevant product markets in which Cisco is still a monopolist, but faces more prospective competition. Cisco is a monopolist that uses whatever means necessary to keep the prices for its networking products as high as possible to the detriment of its customers.

2.      While high prices are permissible if lawfully obtained, Cisco engaged and continues to engage in coercion of its customers who purchase its SmartNet service package which is the only way for those customers to receive software and other updates for networking equipment that are often essential for the maintenance of Cisco's networking products such as routers and Ethernet switches.

3.      Specifically, customers buy routers and Ethernet switches manufactured by Cisco, and also separately purchase the SmartNet service package for those products for a one to five year period. At the time a SmartNet service package is purchased, Cisco approves customers' SmartNet service purchase and knows that in many cases the service package is being purchased through a secondary reseller. SmartNet customers then receive service from Cisco for a portion of the period, but at some point before the end of the service packageperiod, when customers contact Cisco to get the service they paid for, Cisco notifies customers that their SmartNet service has been terminated unless they buy entirely newCisco's use of its "service arm," which upon information and belief is entirely separate in terms of personnel, expertise, profitability, process, and corporate structure from its "products arm," to maintain and maximize profitability in its products arm, must stop.

routers and/or Ethernet switches from a specified Cisco source at a far higher price than the original network equipment purchase. Alternatively, to preserve customers' SmartNet service, Cisco will demand a "re-certification" fee, charging just as much if not more than the original equipment purchase, and providing no value to the customer other than restoration of SmartNet. In one case, Cisco even threatened a customer that it would not

**App.67**

~~service~~ any of the customer's Cisco products pursuant to its SmartNet service package, regardless of how or when the customer previously purchased those products, unless the customer made all new equipment purchases.

4.   This coercion works. Customers are forced to either buy new, expensive Any claim by Cisco that it is merely controlling its distribution channel and has the incentive to keep its prices as competitive as possible ignores that it is a monopolist in several markets and its improper conduct maintains its supra-competitive pricing and forecloses its networking equipment ~~or pay a "re-certification" fee so that they can continue receiving SmartNet service, or are forced to "make the best of" a situation in which they can never be sure that they will receive the service they paid for and had previously been provided. In the latter situation, Cisco has even kept the money it received for the SmartNet purchase despite not providing the requested services.~~

~~5.   While any customer subject to this treatment has sustained an injury that should be rectified, Cisco's conduct has impacted at least one local 911 emergency services provider whose network could have been compromised in the midst of these threats.~~ competitors. Cisco's threats to withhold service in no way serves anyone other than Cisco, and making such threats because Dexon and other multi-vendor resellers have been deemed a competitive problem for Cisco.

10.    It was not always this way.   Dexon is a company that has been servicing its customers for decades, providing timely and reliable services as well as selling ~~affordable~~ network equipment to meet the budgets of hospitals, emergency services providers, public service organizations, and many other small and medium businesses, including those providing essential services ~~including~~ before and during the COVID-19 pandemic. ~~Dexon and its customers have been victimized by the above coercion tactics. Cisco seeks to squash a small provider like Dexon for providing reliable service and products to customers at a price lower than other Cisco dealers, figuring that Dexon would just succumb to Cisco's illegitimate claims of "counterfeit." Cisco is mistaken, and its anticompetitive conduct must be remedied.~~

~~7.   Cisco's use of its "service arm," which upon information and belief is entirely~~

separate in terms of personnel, expertise, profitability, process, and corporate structure from its "products arm," to maintain and maximize profitability in its products arm, must stop. 8.    Cisco's course of dealing with Dexon confirms its anticompetitive motive and harm to customers. From Cisco even previously sent one of its representatives to Dexon to aid it in its sales efforts and familiarity with its products. For at least 2010 four years prior to 2015, Dexon was a registered user of had access to Cisco's service online database in which it could coordinate repairs and other arrange for maintenance service calls for its on behalf of it and Cisco's customers. Both parties benefitted during this time: This served to everyone's benefit, as Dexon kept its customers happy and while Cisco retained the loyalty of customers who continued to buy Cisco equipment thanks to Dexon's work. Then earned customers' loyalty to its product line. in 2016, Cisco terminated Dexon's access to the database, but after a Dexon representative called Cisco and explained how disappointed customers were, Dexon was reinstated. Unfortunately however, in 2018, Cisco again terminated Dexon's access, this time without reinstatement. At that point, Cisco took a financial loss because frustrated customers went to competitive networking equipment vendors to buy networking equipment manufactured by Cisco's competitors. The clear intent and effect of this course of conduct is for Cisco to sustain a short term loss for the impermissible long term benefit of eliminating a low cost provider in the market for its products. 9. But by at least 2015, Cisco deemed resellers like Dexon a competitive threat to its product monopolies. Upon information and belief, Cisco learned that Dexon had been able to convert customers of Cisco networking equipment to customers of its competitors' networking equipment, such as from Juniper. Even for customers that did not convert from Cisco to one of its competitors, resellers like Dexon put pressure on Cisco to lower prices and improve its service (including shipping lead times, where Cisco has been especially lagging). To put an end to these competitive threats, Cisco engaged in the discussed multi-prong strategy, including to threaten customers not to do business with resellers like Dexon or else pay the consequences in the service market where Cisco has complete control. In the process, Cisco has constrained its network equipment competitors and thus customer choice and has maintained its supra-competitive pricing in several relevant product markets. As discussed below, Cisco even recruited and agreed with one of its favored distributors, CDW, to help it exclude resellers like Dexon and maintain its network equipment monopolies.

**App.69**

11.     The Court must hold Cisco accountable for these anticompetitive acts that are crippling small and medium businesses and Cisco competitors, including but far from limited to Dexon.

## II.     THE PARTIES

12.     10.   Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

13.     11.   On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.12.     On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI"Cisco) is a CaliforniaDelaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134. and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

14.     On information and belief, Defendant CDW Corporation (CDW) is a Delaware corporation with its principal place of business at 200 North Milwaukee Ave, Vernon Hills, IL 60061 and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

## III.     JURISDICTION

15.     13.   Dexon brings this case under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages, costs, and attorney's fees for injuries sustained by Dexon because of Cisco's and CDW's violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

16.     This Court has subject matter jurisdiction over Dexon's counterclaimsantitrust

claims under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22.

17.    This Court also has jurisdiction over Dexon's claims pursuant to 28 U.S.C. §§ 1367 and § 1332. Dexon's counterclaims arise out of the same controversy as plaintiffs' Federal claims, thereThere is complete diversity of citizenship between Plaintiffs and Dexon, Cisco, and CDW, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00),exclusive of interest and costs.

18.    Venue is appropriate in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Cisco and CDW transact business in this district, and has served countless customers within this District that utilize networking equipment, and many of the actions and activities complained of in this Complaint occurred and are occurring in this District.

19.    Indeed, Cisco has two offices in Dallas, and offices in San Antonio, Houston and Lubbock, Texas. CDW has an office in Plano, Texas. Given the extensive business the Defendants do in the State, there is sufficient basis for personal jurisdiction over the Defendants.

**IV.**    **FACTS**

**CISCO:**

20.    314.  Cisco is the worldwidedominant in several Worldwide and US leader ofmarkets related to networking equipment and services for the Internet. Cisco offers products and related services in the core technologies of routing and switching, along with more advanced technologies in areas such as home networking, IP telephony, optical networking, security, storage area networking, and wireless technology. On information and belief, Cisco contracts for the manufacture of a majority of its products overseas to keep costs of manufacture at a minimum.

21.    15. On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more,

including in routers and Ethernet switches, both markets with high barriers to entry as explained below. Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceeded 40% or more with its closest competitors half its size, in markets with high barriers to entry.

**Cisco is Using Its Monopoly In After Market Maintenance Services to Force Subsequent Supracompetitive Network Equipment Purchases**

   A.    A. Cisco is a Monopolist For After-Market Maintenance Services On Cisco Equipment

   22.    16. Customers of networking equipment may require maintenance and service to ensure the proper functioning of their equipment. Only Cisco is able to can provide full maintenance and support on its router and Ethernet switch products. These maintenance services include onsite visits from certified engineers, software updates, technical assistance center ("TAC") access, online resources, and hardware replacement services. Without such maintenance services, customers may not be able to cannot address critical performance issues and address service problems that can be catastrophic to their businesses.

   23.    17.   For customers that may not have Customers without the budget to justify maintenance services provided by Cisco, they rely on third -party maintenance and service providers that can to provide hardware maintenance and support (for instance for a power supply or fan issue), but because of Cisco's policies described herein, cannot provide software maintenance and support. Thus, Cisco is able to maintain a price premium for its maintenance services, including its SmartNet service packages, because as. As Cisco highlights in its SmartNet sales materials, "no Third Party Maintenance Provider can provide [customers] with an apples-to-apples match with what Cisco's SmartNet provides," and "a Third Party Maintenance Provider is not authorized to provide [customers] with Cisco bug fixes, patches and updates." These "bug fixes, patches and updates" can be essential to the efficient, effective, and full operation of Cisco's

**App.72**

hardware – they cannot be replicated and there are no reasonably interchangeable substitutes for such services.

24.   18. Although end users are not legally required to purchase SmartNet service packages for their Cisco products, they are effectively compelled to do so, because the service packages offered are integral to the products' functionality. Without SmartNet service, end users will not receive important software bug fixes, patches, and updates (collectively, "updates") that permit Cisco products to serve their intended functions. These updates are designed to repair malfunctions or defects in the software or to combat security vulnerabilities. Consumers who do not update the software on their Cisco products are potentially exposed to security and operational risks.  In addition, without the software updates, their Cisco products may not function properly.

25.   19. Because Cisco products run on proprietary operating system software that is essential for the products to function, these updates can be obtained only from Cisco. It isWhile customary and routine in the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and Microsoft, to make updates available to their consumers for free., Cisco, in contrast, provides updates only to consumers who have purchasedpurchase SmartNet service packages.  Upon information and belief, Cisco does not routinely inform customers at the time of initial purchase of these stifling limitations.

26.   20. Thus, the aforementioned services constitute a Relevant After-Market for Maintenance Services on Cisco Equipment (hereinafter the "Relevant Service Market") in which Cisco is a monopolist, and no other competitive service provider has reached a double-digit share. Upon information and belief, Cisco consistently has possessed a share of the Relevant Service Market in excess of 90%, and because it dictates that only it can provide certain critical services, Cisco has erected its own high barriers to entry to prevent any meaningful penetration of its dominance by any competitive service vendor. Cisco has thus admitted that SmartNet pricing is

**App.73**

far more expensive than that of third-party providers. The geographic market for the Relevant Service Market is (i) the United States and (ii) the world, determined by the geographic scope of customers and the extent to which they require maintenance services in the US only or worldwide. In the case of the former, customers look to service providers located in the US, whereas in the latter case, customers will require vendors with an international team and associated capabilities.

27.    21. The Relevant Service Market is separate and distinct from the Relevant Markets for routers, Ethernet switches, and other networking equipment IP phones discussed below. Customers can and do purchase Cisco networking equipment without maintenance services, and the pricing for networking equipment is entirely independent and separate from SmartNet service package pricing.  Moreover, upon information and belief, Cisco's customers in these separate markets (1) deal with different Cisco personnel teams (e.g., TAC support vs. sales managers), (2) purchase the products and services at different times/schedules based on different needs, and (3) work with different engineers because engineers on the service and maintenance team are often different than the engineers on the product manufacturing and sales teams.

B.    In addition, upon information and belief, Cisco's tracks and monitors the profitability of its "service arm" separately from its "products arm," despite its current anticompetitive efforts for one unit to support the profitability of the other unit.

**B.    Cisco is Also A Monopolist In the Router and Ethernet Switch Relevant Markets**

28.    22. Ethernet switches are a relevant product market. Ethernet switches are devices that control data flow within a network to enable network components to communicate efficiently. They are the fundamental building blocks of modern local area networks, deployed in virtually every modern business and government office.  While Ethernet switches are differentiated across vendors and customer types, there is no adequate substitute technology that provides the same function and value within a network infrastructure.

**App.74**

29.    23. Ethernet switches are durable, high fixed cost goods with extended longevity; consumers of these Ethernet switches commonly intend to use them for many years. Transitioning from Cisco Ethernet switches to Ethernet switches made by another manufacturer is an expensive process, requiring the replacement of significant amounts of hardware and the retraining of personnel.

30.    24. Buyers of Ethernet switches would not be able to turn to routers or other alternative technologies in response to a monopolist's price increase above the competitive level.

31.    25. The geographic markets for the sale of Ethernet switches are (i) the United States and (ii) the world. The global market for Ethernet switches includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is substantial industry recognition of both a global market for Ethernet switches and narrower U.S.-only market for Ethernet switches. A monopolist of Ethernet switches in the United States would be able to raise prices profitably over competitive levels.

Correspondingly, a monopolist of Ethernet switches globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices above competitive levels both globally and in the United States.

32.    26. Cisco has monopoly power in the U.S. and global markets for Ethernet switches, consistently holding shares above 60% in both markets, and protected by high barriers to entry as discussed below. Cisco's Ethernet switch market shares are commonly at least five times its closest Ethernet switch competitors in the US, as well as commonly five times its closest Ethernet switch competitors globally. Cisco has managed to maintain its market dominance for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

33.    27. Routers have been a technology that is complementary to, and not a substitute for, Ethernet switches, and also constitute their own relevant product market. While Ethernet

switches connect components to create a network, routers allow for communication between networks. The two types of devices generally operate at different logical levels in a network: Ethernet switches transfer information in the data link layer using physical addresses for network components, whereas routers transfer packets in the Network or IP layer using virtual addresses. As technology has evolved, Ethernet switch manufacturers have begun to incorporate certain routing technologies into a single combined product. This confirms that routers are complements for Ethernet switches and not substitutes.

34.    28.  Buyers of routers would not be able to turn to Ethernet switches or other alternative technologies in response to a monopolist's price increase above the competitive level.

35.    29.  The geographic markets for the sale of routers are (i) the United States and (ii) the world. The global market for routers includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is substantial industry recognition of both a global market for routers and a narrower U.S.-only market for routers. A monopolist of routers in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of routers globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for routers above competitive levels both globally and in the United States.

36.    30.  Cisco has monopoly power in the U.S. and global markets for routers, consistently holding a share in excess of 60% in both markets, and protected by high barriers to entry as discussed below. Cisco's router market shares are roughly at least five times its closest router competitors in the US, as well as five times its closest router competitors globally. Cisco has managed to maintain its market dominance on routers for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

37.    31.  The Relevant Router and Switch Markets are both characterized by high barriers

**App.76**

to entry and expansion.  There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors. To begin with, the costs to develop router software and hardware as well as switch software and hardware are substantial. ~~requires~~, requiring tens of millions of dollars for initial development, and then hundreds of millions more to tailor the product to specific customer needs and to build an effective sales network.

38. ~~32.~~ Another barrier to entry for the Relevant Router and Switch Markets lies in customers' long purchase cycles when replacing or upgrading their network components to the next technology.  For example, it took approximately ~~fifteen~~15 years for customers to widely deploy 10+ Gigabit Ethernet switches to replace 1 Gigabit Ethernet switches. These circumstances mean that competitors have limited opportunities to significantly expand their~~4~~ market share and take market share from competitors.

39. ~~33.  As Cisco publicly promotes~~As Cisco publicly promotes (*e.g.*, https://blogs.cisco.com/internet-of-things/cisco-ranked-1-again-in-industrial-networking), it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to Ethernet switches and routers. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new Ethernet switch or router entrant may need to offer a full line of network components.

40. ~~34.~~ Cisco's practice of holding customers hostage through their SmartNet service packages also creates a particularly pernicious barrier to entry. Any customer wishing to preserve the value of its SmartNet package would not be able to viably consider router or Ethernet switch purchases from competitive vendors to Cisco if the customers are under duress that in the absence of a Cisco purchase their maintenance service may not be provided. Even if a customer were

**App.77**

willing to risk a period without maintenance, purchasing replacement routers or Ethernet switches from a Cisco competitor means risking the value of the SmartNet package for which the customer has already paid during the remaining service period.

41.         35. To summarize, Cisco has monopoly power in the following relevant markets: the Relevant Service Market (both globally and limited to the U.S.), the Relevant Router Market (both globally and limited to the U.S.), and the Relevant Switch Market (both globally and limited to the U.S.). Hereinafter the Relevant Router and Switch Markets are referred to collectively as the "Relevant Network Equipment Markets." As explained below, Cisco is also attempting to monopolize the IP Phone Markets, which will be referred to as the Relevant IP Phone Markets. Hereinafter the Relevant Network Equipment Markets and the Relevant IP Phone Markets are referred to collectively as the "Relevant Product Markets." Upon information and belief, Cisco may be engaging in the same coercive tactics with respect to other Relevant Product Markets, such as optics, access points, and network management software, and should that prove to be the case Dexon will make that apparent in the course of litigation.

### C.    C. Cisco Locks In Customers Who Require Maintenance With SmartNet, and Then Uses SmartNet As A Hammer To Force Supracompetitive Purchases of Routers and Ethernet Switches

42.         36. Customers seek to find the best economic and performance deal for networking equipment regardless of when it is purchased. Either around the time of such an equipment purchase or at a different time, customers may also consider purchasing a SmartNet service package for several different types of networking equipment.  Upon information and belief, the larger a particular deployment and the more legacy Cisco equipment the customer has in its network, the more likely customers will require a SmartNet package for one or more aspects of their network at any time.

43.         37. For those customers that do or might require a SmartNet service package, the

objective is to secure maintenance services for networking equipment that already is or will be in use for the customers' networks.  To satisfy themselves that this will be the case, SmartNet customers will provide Cisco with the precise serial numbers, part numbers, products, and customer information for which the purchased SmartNet service package will apply. Cisco specifically approves the service package with this information, including in scenarios where Cisco can see that customer is purchasing the SmartNet service package through a secondary reseller which does not have a direct purchasing relationship with Cisco.

44.     38. Indeed, Cisco has full knowledge that its standard sellers or partners sell an extremely large volume of SmartNet service packages to secondary market sellers such as Dexon. In fact, Cisco's Technical Assistance Center has and will alter or change serial numbers in order to approve and thereby receive payment for SmartNet service packages relating to secondary market equipment. Cisco willfully turns a blind eye to such transactions because they are extremely profitable for Cisco.

45.     39. Upon information and belief, Cisco receives a payment from customers pursuant to this SmartNet approval process at or around the time of the SmartNet purchases.

46.     40.  As one would Customers expect, customers would to receive the service they paid for from Cisco for anywhere from months to years into the purchased SmartNet service package.  As explained below, parties such as Dexon would facilitate such service through Cisco's service team that would keep customers happy with both companies. But since at least 2015 through the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet service package that the SmartNet service packages were no longer valid in the absence of a new purchase of Cisco equipment, including at least routers and/or Ethernet switches. Alternatively, Cisco has been able to force forced customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with for previously purchased

networking ~~products~~equipment so that SmartNet service would not be withheld, as Cisco threatened. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process ~~or other associated service,~~for the equipment and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. Given that customers are locked into the Cisco installed base ~~they already purchased and already invested in the SmartNet service package~~ of products, they have little choice other than to ~~give in~~accede to Cisco's demands.

47. ~~41.~~ Given the Cisco approval process associated with customers' SmartNet purchases, customers had no reasonable expectation when they bought the SmartNet service package that Cisco would subsequently claim that entirely new, unwanted networking equipment or a "re- certification" fee for the equipment would be required ~~to preserve their service package investment~~. This is especially true given that Cisco has unique access to customers for the months or years after it purchased the service packages, and customers received the service for which they had paid during that period. Cisco changed its course of conduct not because of enforcement of a consistent policy, but rather because it newly disapproved, after approving previously, customers' purchase of networking equipment and SmartNet service.

~~42.      One scenario involving a hospital provides a poignant example. For several years, Dexon had provided Cisco routers, Ethernet switches, line cards, access points and modules to the hospital, for which the hospital also purchased a series of SmartNet service packages~~from Dexon.   ~~Pleased with the products and service Dexon had provided, the hospital~~decided to make a significant investment in Cisco routers and__Another example from Texas, in addition to those above, represents an iteration of how this has occurred in the marketplace. A Texas based automobile dealership purchased__ Ethernet switches ~~with~~through Dexon~~, the deal would have been worth a significant amount of business for the hospital (on~~

~~top~~ of the prior business with Dexon which ~~was already significant). Upon learning that the hospital had awarded the order to Dexon, Cisco threatened the customer that if it did not cancel the order for the new purchase of Cisco hardware and associated SmartNet service~~ with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics which the customer had been receiving service and support from Cisco for years. This tactic worked, and the customer ~~did not go through with the contemplated deal with Dexon, and never made~~ another purchase from Dexon again. Upon information and belief, the hospital was coerced to deal on terms that met with Cisco's approval, rather than what free market forces would have provided to the hospital and its patients.

~~43.    These terrible tactics were also applied to at least one local 911 service center, for which the center's purchase and maintenance of reliable routers and Ethernet switches can be a matter of life and death. In the midst of a five-year SmartNet service package the 911 center had purchased from Cisco,~~ when the customer checked on its account for purposes of a service issue, Cisco threatened the customer that it needed to purchase new routers ~~and~~ as well as a SmartNet service package through another vendor, all with the knowledge and approval of Cisco. Pursuant to the SmartNet service package, Cisco first provided maintenance services and support for the Ethernet switches, including with software updates. However, one of Cisco's software updates had a critical flaw that, when deployed by Cisco, rendered the Ethernet switches useless (or "bricked" as known in the industry). At first, Cisco replaced the Ethernet switches pursuant to the SmartNet service package, but Cisco then claimed it would not replace other defective Ethernet switches or complete any maintenance unless the customer bought entirely new Ethernet switches ~~if it wanted to receive the service it was due under its SmartNet service package. The 911 center~~ from a vendor other than Dexon. Because the customer could not afford new ~~equipment, and Dexon at its own expense purchased a new  SmartNet service package for any support issues that may arise on the same networking~~ Ethernet switches, due to a limited IT

**App.81**

budget, the customer was forced to deal with a network disruption on its own and without any ability to switch to a competing network equipment provider. ~~Even at~~Because the ~~time of this pleading, upon information and belief,~~customer relied on Cisco ~~will not honor the~~'s original ~~SmartNet~~assurance that the customer would receive the service and maintenance for which ~~the 911 center~~it had paid ~~and the local community is at risk due to Cisco's coercion tactics that seek to extract improper profits even from the most vulnerable of situations.~~, when Cisco changed its position, it robbed the customer of the ability to make a free choice about its equipment manufacturer and reseller. Thus, both Cisco's competitors in the Relevant Networking Products were improperly foreclosed, as well as Dexon because the customer is under a new impression that any use of its products or services will put any Cisco service in jeopardy.

48. ~~44.~~ Upon information and belief, these examples are part of an overall course of conduct by Cisco to hold up its SmartNet customers, at least since 2015. As explained below through Dexon's experience, upon information and belief, there has been an enterprise-wide effort at Cisco to use SmartNet service packages in this way to be sure that customers purchase networking equipment at supra-competitive prices to pad Cisco's profits as well as the commissions of its sales representatives. Dexon is aware of at least one of its customers that has threatened legal action against Cisco for these tactics, but Cisco does not care, as Cisco's continued profiteering from this conduct as a monopolist in the Relevant Service Market and Relevant ~~Product~~Networking Markets far outweighs the costs it would face for defending itself in litigation. ~~This Court's involvement is desperately needed to make it stop.~~

49. ~~45.~~ Cisco draws an economic benefit from these coercion tactics to SmartNet customers because, upon information and belief, its margins are far higher for sales made through channels that have higher resale prices.  For instance, if Cisco can maintain the supra-competitive prices it charges to ~~major~~favored VARs, such as CDW, by coercing customers to use that distribution channel, Cisco can maintain its overall profitability.  For this reason, as part of Cisco's anticompetitive strategy, it has sought to limit the number of resellers who compete for

**App.82**

each customer, even though such competition benefits customers. Conversely, if ~~major~~ VARs can negotiate lower pricing from Cisco because customers have a variety of distribution unimpacted by coercion, then Cisco's overall profitability goes down.  Cisco's sales representatives also earn higher commissions for sales in the Relevant Product Markets made through coercion, on the backs of their customers.

50.    ~~46.~~ There is a substantial amount of commerce involved in the Relevant Product Markets for which Cisco is forcing supracompetitive purchases. Each year, Cisco sells billions of dollars of Ethernet switches and routers, both in the US and worldwide.

51.    ~~47.~~ Cisco also attempts to leverage its exclusive control of essential software updates and services for Cisco products to functionally incapacitate select secondary market products. Cisco provides services and updates to its products via SmartNet service packages. End ~~20~~ users acquire these packages in order to obtain those services.

~~48.    Cisco selectively chooses when to enforce its alleged restrictions on sales of SmartNet service packages by "Authorized" sellers to secondary market sellers. In addition to being contrary to well-established agency principles, on information and belief, such alleged restrictions between Cisco and its "Authorized" sellers are often not properly renewed or maintained and are therefore not in force and effect.~~

~~**Cisco's Conduct Toward Dexon Specifically Shows Its Anticompetitive Intent and Results in Anticompetitive Effects With No Valid Business Justification**~~

~~49. Cisco was once on amicable terms with Dexon, even sending a Cisco representative to Dexon to aid it in its sales efforts and familiarity with its products. For at least four years prior to 2015, Dexon had access to Cisco's online database in which it could arrange for maintenance service on behalf of its and Cisco's customers. This served to both companies' benefit, as Dexon kept its customers happy while Cisco earned customers' loyalty to its product line.~~

~~50.    That changed in 2015 however, when Cisco deactivated Dexon's access to the service~~ **Cisco Recruits CDW to Aid It In Its Plan, and Cisco's Coercion Strategy Expands to IP Phones**

52.     One of Cisco's favored resellers is CDW, headquartered in Illinois, with revenue of $18.47 billion in fiscal year 2020 (compared with Cisco's $49.8 billion in the same time period). Upon information and belief, CDW sells Cisco equipment in the Relevant Networking Markets. Cisco favors CDW because CDW's resale prices in the Relevant Networking Markets allow Cisco to maintain its supra-competitive pricing in those Markets. Conversely, resellers like Dexon provide attractive service and pricing to customers that puts pressure on Cisco to charge lower prices to its favored resellers.

53.     Once Cisco deemed Dexon a competitive threat, it also determined that CDW could be an ally in its plan to foreclose resellers like Dexon from providing superior service, pricing, and competitive network equipment options for its customers. To this end, Cisco and CDW conspired to exclude Dexon from making sales in at least the Relevant Networking Equipment Market to end user customers. database for a period of several months. Upon learning this from upset customers, Dexon diligently followed up with Cisco and was able to be reinstated. The reinstatement was within Cisco's rationale economic interest because it knew it would lose both short term sales and loyalty for its networking equipment if a valuable reseller could not provide the Dexon's attempt to sell Relevant Networking Equipment to a hospital system in Pennsylvania provides an example of how the conspiracy works. For several years, Dexon had provided routers, Ethernet switches, line cards, access points and modules to the hospital. The customer was open to purchasing products from manufacturers apart from Cisco, and valued the fact that Dexon provided those options, because it led to better pricing and service that customers came to expect. 51.       However, in 2018, Cisco decided that it was willing to sustain a short term loss of sales, so that in the long run customers would not have access to more aggressive pricing from Dexon. Namely, Cisco shut off Dexon's access to the service database, and did not reinstate it despite knowing, upon information and belief, that the customers would purchase competitive

~~networking equipment from Cisco's competitors. Indeed, Dexon is aware of at least two customers that purchased networking equipment from a Cisco competitor due to the way the customers and Dexon were handled by Cisco.~~

~~52.   Cisco's more recent efforts to block value added resellers (VARs) like Dexon do not end there. Major VARs (in terms of volume) will commonly supply networking equipment to smaller VARs such as Dexon because they can reach smaller and more diverse customers. One such major VAR frequently used Dexon for this purpose, and profitably did business with Dexon for several years.~~ Upon information and belief, Cisco threatened the VAR not to do business with Dexon, and Pleased with the products and service Dexon had provided, the hospital decided to make a significant investment in routers and Ethernet switches, and the deal would have been worth a significant amount of business for Dexon (on top of the prior business with Dexon which was already significant). Upon learning that the hospital had selected Cisco for the purchase and had awarded the order to Dexon, Cisco threatened the customer that if it did not cancel the order for the new purchase of hardware and associated SmartNet service with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics which the customer had been receiving service and support from Cisco for years. This tactic worked, and the customer did not go through with the contemplated deal with Dexon, and never made another purchase from Dexon again.

54.    Cisco's agreement with CDW to exclude Dexon from at least the Relevant Networking Equipment Market facilitated this outcome, which restricted both inter-brand competition (between Cisco and its competitors in the Relevant Network Markets) and intra-brand competition (between Cisco resellers). Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment. The sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the "savior" to the hospital system so

**App.85**

that the customer could keep its service for all of its Networking Equipment, when in fact the intention and purpose of the scheme was to exclude resellers like Dexon, so that the customer would pay more for the equipment with CDW as the sole supplier. Upon information and belief, the Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon.

55.    This Cisco-CDW conspiracy has limited intra-brand competition between resellers selling Cisco Networking Equipment in the Relevant Markets, because its purpose and effect is toprevent end user customers' from having access to Dexon which offers top quality service at more aggressive pricing than other resellers. The conspiracy also had the dual effect of limiting inter- brand competition between Cisco and its competitors in the Relevant Networking Equipment Markets, because not all resellers prioritize or promote competitive products in the Relevant Networking Equipment Market in the same way. As an example, on CDW's website, when one completes a search for "Ethernet switches," it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections (and most below 100). Upon information and belief, this is because CDW believes it will receive favorable treatment by Cisco by showing so many of its offerings and portraying its competitors as more limited. By contrast, Dexon has earned the respect and trust of its customers precisely because it does not prioritize any particular brand or make assumptions about what a customer wants, and merely seeks to guide the customer to the best option. Thus, when Cisco conspired with CDW, Cisco knew that it would tilt the competitive playing field in its favor, limiting the opportunities of its competitors to make sales through resellers like Dexon which does not favor any particular Network Equipment competitor.

56.    The conspiracy between Cisco and CDW continues through the present day. Upon information and belief, as part of their conspiracy to exclude Dexon, Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been

to both parties' benefit), and CDW agreed. Confirming this agreement, upon information and belief, when the ~~VAR~~CDW representative previously assigned to Dexon refused to comply with the Cisco's demand, ~~he was~~CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy. This worked. Pursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021.

57.    The Cisco-CDW conspiracy has foreclosed a substantial amount of interstate commerce to Dexon by virtue of the Pennsylvania Health System alone, but upon information and belief, millions of dollars of purchases across the country have been foreclosed to Dexon due to the Cisco-CDW conspiracy.

58.    Dexon believes that several such instances with ~~larger VARs~~Cisco's favored resellers occurred, but rather than hearing about representatives that were willing to stick up for customers' right to the best deal, Cisco successfully coerced such ~~VARs~~resellers to limit or withdraw their business from Dexon.

59.    ~~53.~~   Upon seeing how successful this FUD and coercion campaign worked for the Relevant Networking Equipment Markets, Cisco expanded its sights to IP Phones. Once again in Texas, an Independent School District awarded Dexon a multi-year exclusive contract to provide IP phones to the District, after several years of successful dealings with Dexon. Dexon was awarded the most recent business after an exhaustive RFP process, in which Dexon was rated the clear winner for every criterion being considered by the School Board. Indeed, several of the evaluation criteria related to the reputation and quality of Dexon's goods and services, which would include the products of several IP phone manufacturers. As a result, the School Board approved the award of the contract to Dexon for thousands of IP phones. Upon information and belief, Cisco threatened the School District that if it did not cancel the order from Dexon, it would

not service the other Networking Equipment already purchased by the District. Once again, this coercion worked, and the customer was forced to cancel its order with Dexon, and upon information and belief, the District paid more for the same exact equipment from another reseller.

60.    As a result, upon information and belief, not only was the Texas School District forced to spend more for an RFP that was already completed and approved, but it forecloses any competitive product purchase that would have been considered from Dexon due to the successful execution of FUD.

61.    Upon information and belief, these FUD tactics are not isolated instances of misconduct but rather a standard coercion tactic used by Cisco, especially in Texas, when it seeks to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products. Because customers are forced to rely on Cisco to service its installed base of networking equipment, the FUD tactic can be used with respect to any new purchase a customer is considering for which Cisco offers a purchase option. In the above example for a Texas School District, there is simply no plausible reason the School would be forced to withdraw from its preferred business partner in the absence of FUD from Cisco.

62.    As another example of FUD, Cisco recently claimed to a Maryland customer that line cards sold by Dexon suffered from "malware," even though there is no software associated with the sale of line cards. Cisco is essentially immune from any criticism it may receive from customers due to these false statements because it knows that customers still require so many of its services.

63.    While not quite as dominant in IP phones as it is in other types of networking equipment, Cisco still maintains in excess of a 40% share of the global and US based IP phone markets, and has possessed in excess of a 60% share of enterprise Unified Communications (UC) purchases which include IP phones. Cisco has shipped more than 100 million IP phones to more

**App.88**

than 200,000 customers worldwide, with 95% penetration in Fortune 500 companies. Like other markets in which it is dominant, Cisco's next closest competitors in these IP phone markets are a fraction of its size, possessing shares at least 20% lower than that of Cisco.

64.     Thus, through the above tactics, Cisco has attempted to and likely succeeded in monopolizing the Global and US Relevant Markets for IP Phones (hereinafter "Relevant IP Phone Markets"). While landlines, or analog phone systems, carry voice signals over copper wires, VoIP technology transmits voice traffic over the internet in the form of data packets. IP phones need only a live broadband connection to make and receive calls, and thus have eliminated the need for expensive landline rentals.

65.     Additionally, IP phones offer far greater geographical flexibility for users than landline phones. Landlines are tethered to the wired office phone, yet IP phones allow you to have a virtual local presence anywhere in the world. IP phones are also easily scalable, allowing a company to remove or add new users with ease, and gives users the ability to have a phone with them via their own smartphone or computer via software.

66.     IP phones can offer more features at a lower cost than landlines as well, such as video conferencing. IP phones can integrate voice, messaging, presence and cloud sharing and more into one single platform. There are likely several sub-segments to the Relevant IP phone markets, such as UC communications, that will be identified in the course of discovery.

67.     Buyers of IP phones would not be able to turn to landlines or other alternative technologies in response to a monopolist's price increase above the competitive level.

68.     The geographic markets for the sale of IP phones are (i) the United States and (ii) the world. The global market for IP phones includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is industry recognition of both a global market for IP phones and a narrower U.S.-only

market for IP phones. A monopolist of IP phones in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of IP phones globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for IP phones above competitive levels both globally and in the United States.

69.    The Relevant IP Phone Markets are characterized by high barriers to entry and expansion. There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors. The costs to develop IP phone software and hardware are substantial, likely at least tens of millions of dollars, and requires millions more to build the capability to install in large national and multinational corporations.

70.    Another barrier to entry for the Relevant IP Phone markets is customers' long purchase cycles when replacing or upgrading their phones to the next technology. These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

71.    As Cisco publicly promotes, it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to IP phones. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new IP phone entrant may need to offer a full line of network components.

**D.    The Anticompetitive Effects of Cisco's Conduct Are Overwhelming**

72.    Upon information and belief, the instances described above are not isolated instances of pressure, but rather part of an overall effort to force customers to only be able to access both networking equipment, IP phones and service through the most expensive avenues, while foreclosing Cisco's equipment competitors. As explained, Cisco was not always hostile to a channel that sought to give customers the best deals, likely because it that process aided Cisco's

overall effort to be known as the most ubiquitous networking equipment provider regardless of the channel the networking equipment reached the customer. But that changed sometime around 2015, when Cisco apparently decided that padding its own profit margins and keeping its sales representatives satisfied was more important than servicing all of its customers.

73.    54. In some cases, Cisco was able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service, and reactivated the SmartNet service package simply because the customer paid more money. This shows that any purported for the networking equipment. There is no "business justification" to this, and Cisco advances for its practices is pretextual and is are merely designed to shift economic welfare from customers to itself.

74.    55. The inevitable effect of this overall course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives. While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases. As the above examples make clear, many customers are left with no practical choice other than to purchase unwanted and overpriced equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

75.    156. Indeed, in the case of a Texas-based 911 operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics. There is no justification that can be advanced to accept this needless risk to human safety.

**App.91**

76. 57. Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather needare forced to account for the likely reaction ofacquiesce to Cisco's pressure. Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers needcannot afford to take account of what treatment it will face if it drawsrisk the services it needs that only Cisco's disapproval provides. In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

### E.    Dexon Has Suffered An Antitrust Injury

77. 58. Cisco's overall course of conduct is specifically designed (i) to foreclose or otherwise eliminate distribution options through which customers can purchase from manufacturers competitive to Cisco, and (ii) to eliminate the option a customer would have to secure such a product for a lower price that puts upstream pressure on Cisco to lower its own prices should customers opt for a Cisco product. Dexon's injury illustrates both of these phenomenon. As illustrated above, Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

78. 59. Cisco's conduct is designed to harm VARs justresellers like Dexon precisely because of the benefits to customers that Dexon provideshas provided for decades, which run

**App.92**

counter to Cisco's profit motives Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive, exclusive channels. If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions or quality improvements that would impact Cisco's bottom line. The coercion and other conduct at issue in this case allows Cisco's monopoly power to not only be maintained, but grown, and Dexon's losses are a direct byproduct of this phenomenon.

79. 360. Dexon has also sustained loses to its goodwill and reputation in the marketplace by virtue of Cisco's conduct. Because of Cisco's monopoly position in both the Relevant Service Market and the Relevant Product Markets, it has been immune to customer dissatisfaction with its conduct, and has attempted to shift the problem of its own creation to Dexon. Namely, rather than respond to customer feedback and attempt to win purchases by virtue of better products service or terms, Cisco has attempted to portray Dexon as an unworthy sales partner who is the cause of the customers' problems. But this is not the case, as Dexon has spent decades building trust and goodwill with its customers, even to the benefit of Cisco. But now that Cisco's priority is to bully and intimidate any company that stands in the way of its maximum profit, Dexon is being painted in a different light.

## Claims For Relief

80. Dexon's reputation has been unjustifiably harmed due to Cisco's antitrust violations in the United States and in Texas specifically. Dexon lost a major award for IP phones from a public school district, was forced to sustain losses so that a 911 operator could continue to serve citizens, was forced to stop doing business with an automobile chain, and no longer can do business with an energy company all because of Cisco's FUD and associated coercive tactics. Texans should be able to benefit from the competition options and service that Dexon can offer,

but instead Cisco has employed anticompetitive tactics specific to the State to deprive its businesses and public entities of those benefits.

### V.    CLAIMS FOR RELIEF

#### A.    Count I

~~Violation of~~ (Sherman Act Section 1)

**Conspiracy in Unreasonable Restraint of Trade Against Cisco and CDW**

81.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

82.    Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

83.     The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery.

84.     The goal and effect of the conspiracy was to limit both inter-brand and intra-brand competition in the Relevant Product Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products over Cisco's competitors. In addition, Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

85.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets. This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to

**App.94**

maintain its monopoly positions in all of these product markets, and potentially others.

86.      The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

87.      The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

**B.      Count II (Sherman Act: Section 2) Conspiracy To Monopolize Against Cisco and CDW**

88.      Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

89.      Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

90.      The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery. Cisco pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

91.      Another goal and effect of the conspiracy was to limit both inter-brand and intra-brand competition in at least the Relevant Networking Equipment Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted

**App.95**

customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products. Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

92.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets. This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly positions in all of these product markets, and potentially others.

93.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

94.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in at least the Relevant Networking Equipment Markets, harm innovation associated with the products offered in the Relevant Networking Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

**C.    Count III (Sherman Act Section 1)**

**Per Se** **Tying** **In the Relevant Product Markets Against Cisco**

95.    61. Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

96.    62. Cisco is a monopolist in the Relevant Service ~~Market,~~Markets and has used its SmartNet service packages in that Market as a tying product. Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco.

Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

97.  63.  The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently. Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Market.  Indeed, Cisco's conduct at issue in this case confirms that Cisco's near- absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

98.  64.  Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

99.  65.  A substantial amount of commerce has been affected in the Relevant Product Markets (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

100.  66.  Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services

it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

101. 67. Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

102. 168. Cisco's conduct has and will continue to maintain supra-competitive prices to2 customers in the Relevant Product Markets, harm innovation associated with the products3 offered in the Relevant Product Markets, and otherwise deprive customers of their ability to4 make an unfettered choice of technology on the merits.

**D.**     **Count II**
~~Violation of Section 2 of the~~ **IV (Sherman Act: Section 2)**

**Unlawful Monopolization of the Relevant Networking Equipment Markets Against Cisco**

103. 69. Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

104. 70. Cisco's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant ~~Product~~Network Equipment Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

105. 71. For the purpose of maintaining its monopoly power, Cisco committed numerous acts, including:

a.    a.  Coercing purchases in the Relevant ~~Product~~Network Equipment Markets by withholding service in the Relevant Service Markets;

b.    b.  Engaging in associated pressure and bullying tactics pursuant to its overall~~17~~ goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels; and ~~c.   Pressuring at least one large volume VAR not to deal with Dexon or other efficient, low-cost providers in the Relevant Product Markets;d.   Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database for the purpose of eliminating a low cost providerfrom the Relevant Product Markets in the long term; e.   Reversing     its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in which customers are penalized for using such lower-priced and efficient VARs; and~~

c.    ~~f.~~Upon information and belief, engaging in related FUD tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant ~~Product~~Network Equipment Markets and likely other Markets.

106.    ~~472.~~Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant ~~Product~~ Network Equipment Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. ~~Neither~~Nor does Cisco's conduct reduce barriers to other

**App.99**

vendors'-entry, or otherwise result in greater competition in the Relevant ~~Product~~Network Equipment Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco~~'s advantage~~, not to that of customers or competition on the merits.

107. ~~73.~~ Cisco's conduct has injured competition in the Relevant ~~Product~~Network Equipment Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

108. ~~74.~~ Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant ~~Product~~Network Equipment Markets, harm innovation associated with the products offered in the Relevant ~~Product~~Network Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

**App.100**

**E.**     **Count ~~III~~ V (Sherman Act: Section 2)**

~~Violation of Section 2 of the~~ **V (Sherman Act: Section 2)**

**Unlawful** Attempted Monopolization **of the Relevant Product Markets Against Cisco**

109. ~~75.~~ Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

110. ~~76.~~ Cisco acted with a specific intent to monopolize and destroy competition in the–Relevant Product Markets.  Cisco devised and implemented an overall plan to force customers to pay supra-competitive prices in the Relevant Product Markets, with the associated destruction of competition in the Relevant Product Markets.

111. ~~177.~~ Cisco willfully engaged in a course of anticompetitive conduct to obtain a monopoly in the Relevant Product Markets, including:

a. ~~a.~~ Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

b. ~~b.~~ Engaging in associated pressure and bullying tactics pursuant to its overall goal to force ~~purchases~~ unwanted and supracompetitive through Cisco's most expensive channels;

c. ~~c.     Pressuring~~ Interfering with the proper award of at least one ~~large volume VAR not~~ major RFP to ~~deal with~~ Dexon ~~or other efficient, low-cost providers in the Relevant Product Markets;~~

d. ~~d.     Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database~~, and denigrating Dexon for

the purpose of ~~eliminating a low cost provider from the Relevant Product Markets in the long term~~<u>securing a direct sales relationship with an important Texas public entity</u>;

<u>e.</u>    ~~e.     Reversing its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in~~ <u>and</u> ~~which customers are penalized for using such lower-priced and efficient VARs; and~~

<u>f.</u>    ~~f.~~ Upon information and belief, engaging in related <u>FUD</u> tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall ~~competition~~ in the Relevant Product Markets and other Markets.

<u>112.</u>    ~~78.~~ Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded ~~and~~ received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. ~~Neither~~<u>Nor</u> does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a

reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

113. ~~179.~~ Throughout the time Cisco engaged in this anticompetitive conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Product Markets and continuing to maintain supra-competitive prices and exclude its competitors.

114. ~~580.~~ Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

115. ~~881.~~ Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

**F.**    **Count ~~IV13~~VI (Violation of the ~~California Cartwright Act~~Texas Free Enterprise & Antitrust Act, Against Cisco and CDW)**

116. ~~82.~~ Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

117. ~~83.~~ Upon information and belief, Cisco's overall anticompetitive scheme was directed and executed within ~~California,~~Texas and has a direct impact upon ~~California~~Texas-based small and medium businesses.

118. 84. Cisco is a monopolist in the Relevant Service Market, and has used its SmartNet service packages in that Market as a tying product. Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

119. 85. The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently. Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Markets.  Indeed, Cisco's conduct at issue in this case confirms that Cisco's near- absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

120. 86. Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers

**App.104**

are forced to interact with Cisco to request the service they were previously promised by Cisco.

121. ~~87.~~ A substantial amount of commerce has been affected in the Relevant Product Markets due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

122. ~~88.~~ Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in an greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. ~~Neither~~Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

123. ~~89.~~ Cisco's conduct has injured competition in the Relevant Product

**App.105**

Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

124. 90. Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

125. Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

126. The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Product Markets, and potentially others as will be confirmed in discovery. Cisco pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

127. Another goal and effect of the conspiracy was to limit both inter-brand and intra- brand competition in the Relevant Product Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products.

**App.106**

In addition, Dexon has prided itself on being a value- driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

128.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets and is dominant in the Relevant IP Phone Markets. The Cisco-CDW conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly and dominant positions in all of these product markets, and potentially others.

129.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

130.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

131.    91. The above phenomenon conduct has harmed competition and resulted in loses to Dexon in California.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Defendant, Counterclaim Plaintiff and Third Party Plaintiff

**App.107**

~~Dexon~~ Dexon Computer, Inc. prays for judgment and relief against ~~Plaintiffs and Counterclaim~~ Defendants Cisco ~~Systems, Inc.~~ and ~~Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited  Network Solutions and Wisecom Technologies~~CDW as follows:

a. ~~a.~~An Order directing the termination of the anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1-2)~~;~~ and the ~~California  Cartwright~~Texas Free Enterprise & Antitrust Act~~, and Section 17200 of the California Business and Professional Code~~;

b. ~~b.~~Treble damages (including lost profits), in an amount to be determined at trial and that cannot now be adequately quantified before relevant discovery;

~~c. Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with prejudice, together with costs and disbursements;8~~ d. Awarding Dexon's costs of  suit herein, including its attorneys' fees incurred in ~~defending against Cisco's claims and~~ asserting antitrust claims;

~~e. Declaring that Dexon's sale of genuine Cisco goods which Cisco has unilaterally deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or  ineligible for warranty services as a result thereof, does not violate the Lanham  Act, 15 U.S.C.     §§ 1114, 1125(a);~~

**App.108**

~~f.        Declaring that Cisco's refusal to warrant genuine products sold in New York violates New York General Business Law § 369-b;~~

~~g. Awarding Dexon restitutionary disgorgement;~~

~~h. Awarding Dexon actual damages, subject to proof at trial but in an amount in excess of $75,000.;~~

i.        ~~i.~~ An award of punitive damages in an amount sufficient to punish ~~Counterclaim21~~Defendants, to make an example of them to the community, and to deter them from such conduct as to Dexon or others in the future;

j.        ~~j.~~ For equitable remedial efforts by ~~Counterclaim~~ Defendants sufficient to rehabilitate Dexon's damaged reputation;

k.        ~~k.~~ For orders restraining Cisco ~~Systems, Inc.~~and Dexon from engaging in similar conduct in the future; and

l.        ~~l.        Awarding Dexon damages, lost profits, and treble damages pursuant to the Lanham Act;~~

~~m. Awarding Dexon its costs and expenses of litigation, including reasonable attorneys' fees;~~

~~n. Enjoining Cisco from further violations of the laws enumerated herein;~~

~~o. An award in Dexon's favor against Third Party Defendants sufficient to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting from the claims herein; and~~

~~p.~~ Such other and further relief as this Court deems just and equitable.

## VII.        DEMAND FOR JURY TRIAL

Dexon ~~Computer, Inc.~~ demands a trial by jury on all issues so triable.

# Exhibit B

| | |
|---|---|
| Amanda R. Washton (SB# 227541) | David H. Reichenberg (pro hac vice pending) |
| *a.washton@conklelaw.com* | *DReichenberg@cozen.com* |
| **CONKLE, KREMER & ENGEL** | **COZEN O'CONNOR** |
| Professional Law Corporation | 3 WTC, 175 Greenwich Street, 56th Floor |
| 3130 Wilshire Boulevard, Suite 500 | New York, New York 10006 |
| Santa Monica, California 90403-2351 | Phone: (212) 883-4900 |
| Phone: (310) 998-9100 | Fax: (646) 461-2091 |
| Fax: (310) 998-9109 | |
| | |
| Michael M. Lafeber (*pro hac vice*) | Mark A. Jacobson (*pro hac vice pending*) |
| *mlafeber@taftlaw.com* | *mjacobson@cozen.com* |
| O. Joseph Balthazor Jr. (*pro hac vice*) | **COZEN O'CONNOR** |
| *jbalthazor@taftlaw.com* | 33 South 6th Street |
| **TAFT STETTINIUS &** | Suite 3800 |
| **   HOLLISTER LLP** | Minneapolis, MN 55402 |
| 2200 IDS Center | Phone: (612) 260-9000 |
| 80 S. 8th Street | Fax: (612) 260-8026 |
| Minneapolis, MN 55402 | |
| Phone: 612.977.8400 | |
| Fax: 612.977.8650 | |

Attorneys for Defendant, Counterclaim
Plaintiff and Third-Party Plaintiff Dexon
Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, | Case No. 3:20-CV-4926-CRB |
| | **DEFENDANT'S AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |
| Plaintiffs, | |
| v. | |
| DEXON COMPUTER, INC., a Minnesota corporation, | **DEMAND FOR JURY TRIAL** |
| | Hon. Charles R. Breyer |
| Defendant. | Presiding Judge |
| | Trial Date:          None |
| DEXON COMPUTER, INC., a Minnesota corporation, | |
| Counterclaim Plaintiff and Defendant, | |
| v. | |

| | |
|---|---|
| 1 | CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, |
| 2 | INC., a California corporation, |
| 3 | Counterclaim Defendants and Plaintiffs. |
| 4 | |
| 5 | DEXON COMPUTER, INC., a Minnesota corporation, |
| 6 | |
| 7 | Third-Party Plaintiff, |
| 8 | v. |
| 9 | ATLANTIX GLOBAL SYSTEMS INTERNATIONAL, LLC, BIZCOM ELECTRONICS, INC., DIGI DEVICES |
| 10 | ONLINE, ENTERPRISE BUSINESS TECHNOLOGIES, INC., FIBER CABLE |
| 11 | CONNECTIONS, MJSI, MULTIMODE TECHNOLOGIES, LLC, NETWORK |
| 12 | REPUBLIC, OPTIMUM DATA, INC., PARAGON, PURE FUTURE |
| 13 | TECHNOLOGY, INC., SEASTAR IT TRADING LLC, SERVER TECH |
| 14 | SUPPLY, SOFTNETWORKS, INC., STRADA NETWORKS, LLC, |
| 15 | STRATEGIC TELECOM SUPPLY & SOLUTIONS, TEKSAVERS, |
| 16 | UNLIMITED NETWORK SOLUTIONS, and  WISECOM TECHNOLOGIES,, |
| 17 | |
| 18 | Third-Party Defendants, |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.112**

Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc. and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs are entitled to any of the relief requested in their Prayer for Relief.  In response to each of the numbered paragraphs of the Complaint, Dexon states as follows. To the extent the headings or any other non-numbered statements in the Complaint contain allegations, Dexon denies each and every such allegation.

### INTRODUCTION

1.    Dexon denies the allegations of paragraph 1 of the Complaint.

2.    Dexon denies the allegations of paragraph 2 of the Complaint.

### THE PARTIES

3.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 3 of the Complaint, and on that basis Dexon denies those allegations.

4.    Dexon admits the allegations of paragraph 4 of the Complaint.

5.    Dexon denies the allegations of paragraph 5 of the Complaint.

### JURISDICTION AND VENUE

6.    Admits that the Complaint purports to be one "founded upon violations of Federal trademark laws" but denies any such purported claims have legal or factual merit.  The remaining allegations in paragraph 6 of the Complaint are legal conclusions and questions of law regarding jurisdiction to which no response is required. To the extent a response is required, Dexon denies such allegations.

7.    Dexon denies the allegations of paragraph 7 of the Complaint.

8.    Dexon denies the allegations of paragraph 8 of the Complaint.

9.    Dexon denies the allegations of paragraph 9 of the Complaint.

10.    Dexon denies the allegations of paragraph 10 of the Complaint.

11.    Dexon denies the allegations in paragraph 11 of the Complaint.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.113**

## **FACTUAL ALLEGATIONS**

### **Alleged Cisco Business and History**

12.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on that basis Dexon denies those allegations.

14.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

### **Alleged Cisco Trademarks**

15.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

### **Alleged Counterfeit "Cisco" Products**

19.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

### **Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products**

21.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

**App.114**

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.     Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.     Dexon denies the allegations of paragraph 24 of the Complaint.

25.     Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.     Dexon denies the allegations in paragraph 26 of the Complaint.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.     Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1  the letters or communications which speak for themselves. Plaintiffs previously commenced

2  a lawsuit against Dexon in 2011 including claims based directly on such allegations which

3  were resolved via a confidential settlement agreement and dismissed with prejudice.

4  **Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to Wayne**
5  **State University (Detroit, Michigan) and Cisco's C&D Letter**

6  29.     Dexon admits selling and shipping Cisco product to Wayne State University on or

7  about February 21, 2010 but denies the remainder of the allegations in paragraph 29 of the

8  Complaint, including, without limitation, any allegation the product involved was

9  counterfeit. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including

10  claims based directly on such allegations which were resolved via a confidential settlement

11  agreement and dismissed with prejudice.

12  30.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve

13  O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to Wayne

14  State University, but Dexon denies the reminder of the allegations in paragraph 30 of the

15  Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter

16  which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011

17  including claims based directly on such allegations which were resolved via a confidential

18  settlement agreement and dismissed with prejudice.

19  31.     Dexon admits it responded via a letter from counsel to Plaintiff's Wayne State

20  University allegations on or about August 23, 2010, but Dexon denies the reminder of the

21  allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs'

22  attempted characterization of the letter which speaks for itself. Plaintiffs previously

23  commenced a lawsuit against Dexon in 2011 including claims based directly on such

24  allegations which were resolved via a confidential settlement agreement and dismissed with

25  prejudice.

26  32.     Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the Wayne

27  State University allegations on or about August 30, 2010, but Dexon denies the reminder of

28  the allegations in paragraph 32 of the Complaint, including, without limitation, Plaintiffs'

**App.116**

1  attempted characterization of the letter which speaks for itself.    Plaintiffs previously

2  commenced a lawsuit against Dexon in 2011 including claims based directly on such

3  allegations which were resolved via a confidential settlement agreement and dismissed with

4  prejudice.

5        **Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco
        Investigator (Los Angeles, California)**

6

7  33.    Dexon denies the allegations in paragraph 33 of the Complaint.  Plaintiffs previously

8  commenced a lawsuit against Dexon in 2011 including claims based directly on such

9  allegations which were resolved via a confidential settlement agreement and dismissed with

10  prejudice.

11        **<u>Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit</u>**

12  34.    Dexon denies the allegations in paragraph 34 of the Complaint.

13        **Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things
        Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter**

14

15  35.    Dexon admits selling Cisco product to Things Remembered, Inc. on or about July

16  2015, but denies the remainder of the allegations in paragraph 35 of the Complaint, including

17  any allegation the product was counterfeit.

18  36.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the

19  Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon

20  responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the

21  Complaint, including, without limitation, Plaintiffs' attempted characterizations of the

22  letters or communications which speak for themselves.

23        **Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to
        Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D
        Letter**

24

25  37.    Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack Henry")

26  on or about December 2016, but denies the remainder of the allegations in paragraph 37 of

27  the Complaint, including, without limitation, any allegation the product was counterfeit.

28

38.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph 38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

39.    Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the responsive letter which speaks for itself.

**Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Berkeley, California)**

40.    Dexon denies the allegations in paragraph 40 of the Complaint.

**Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**

41.    Dexon admits selling Cisco product to Community Health Alliance ("CHA") on or about January 2018, but denies the remainder of the allegations in paragraph 41 of the Complaint, including, without limitation, any allegation the product was counterfeit.

42.    Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or communications relating to the CHA allegations, but denies the remainder of the allegations in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to Tucson Medical Center (Arizona)**

43.    Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on or about April 2018, but denies the remainder of the allegations in paragraph 43 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**App.118**

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter**

44.    Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

46.    Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter**

47.    Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from PureFutureTech (Fremont, California)**

49.    Dexon admits purchasing Cisco product from PureFutureTech on or about 2018 and that the purported supplier of such product was HongKong Sellsi, a former authorized

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1  licensed seller of Cisco products, but lacks sufficient information to admit or deny the
2  remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon denies such
3  allegations.

4  50.     Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit involving
5  Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were ultimately required
6  to file a motion relating to such non-party subpoena.  Dexon denies the remaining allegations
7  of paragraph 50 of the Complaint, including, without limitation, any allegation, suggestion
8  or implication Dexon "refused to cooperate" with, or in any way failed to meet its obligations
9  arising from, the subpoena.

10            **Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers
              from Pure Future Tech, Inc. (Fremont, California)**
11

12  51.     Dexon admits purchasing Cisco product from Pure Future Tech, Inc. in the period
13  2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient information
14  to admit or deny the remaining allegations in paragraph 51 of the Complaint and on that
15  basis denies such allegations.

16  52.     Dexon denies the allegations in paragraph 52 of the Complaint, including, without
17  limitation, any allegation Dexon knew or reasonably should have known any Cisco product
18  was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

19            **Dexon's Sales of Alleged Counterfeit Products to Murray State University
              (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**
20

21  53.     Dexon admits selling Cisco product to Murray State University ("MSU") in or about
22  2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the Complaint,
23  including, without limitation, any allegation the product was counterfeit.

24  54.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the
25  MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of the
26  Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter
27  which speaks for itself.

28

**Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

55.     Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

56.     Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.     Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Alleged California Directed Conduct Identified Through Jurisdictional Discovery**

59.     Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

**Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

60.     Dexon denies the allegations in paragraph 60 of the Complaint.

**App.121**

**Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers**

61.    Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.    Dexon denies the allegations in paragraph 62 of the Complaint.

63.    Dexon denies the allegations in paragraph 63 of the Complaint.

64.    Dexon denies the allegation in paragraph 64 of the Complaint.

**FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**
***(15 U.S.C. § 1114)***

65.    Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

66.    Dexon denies the allegations of paragraph 66 of the Complaint.

67.    Dexon denies the allegations of paragraph 67 of the Complaint.

68.    Dexon denies the allegations of paragraph 68 of the Complaint.

69.    Dexon denies the allegations of paragraph 69 of the Complaint.

70.    Dexon denies the allegations of paragraph 70 of the Complaint.

71.    Dexon denies the allegations of paragraph 71 of the Complaint.

72.    Dexon denies the allegations of paragraph 72 of the Complaint.

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
***(15 U.S.C. § 1114)***

73.    Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

74.    Dexon denies the allegations of paragraph 74 of the Complaint.

75.    Dexon denies the allegations of paragraph 75 of the Complaint.

76.    Dexon denies the allegations of paragraph 76 of the Complaint.

77.    Dexon denies the allegations of paragraph 77 of the Complaint.

1  78.    Dexon denies the allegations of paragraph 78 of the Complaint.

2  79.    Dexon denies the allegations of paragraph 79 of the Complaint.

3
**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**
4
**(15 U.S.C. *§ 1125*)**

5  80.    Dexon restates and incorporates by reference its responses to the allegations in

6  paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

7  81.    Dexon denies the allegations of paragraph 81 of the Complaint

8  82.    Dexon denies the allegations of paragraph 82 of the Complaint.

9  83.    Dexon denies the allegations of paragraph 83 of the Complaint.

10  84.    Dexon denies the allegations of paragraph 84 of the Complaint.

11  85.    Dexon denies the allegations of paragraph 85 of the Complaint.

12
**FOURTH PURPORTED CLAIM FOR RELIEF**
**California Unfair Business Practices**
13
**(Cal. Bus. & Prof. Code *§§ 17200 et seq.*)**

14  86.    Dexon restates and incorporates by reference its responses to the allegations in

15  paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

16  87.    The allegations in paragraph 87 of the Complaint are legal conclusions of law

17  regarding California Business and Professions Code §§ 17200 *et seq* to which no response

18  is required. To the extent such allegations imply or suggest Dexon has in any way violated

19  California Business and Professions Code §§ 17200 *et seq* Dexon denies such allegations.

20  88.    Dexon denies the allegations of paragraph 88 of the Complaint.

21  89.    Dexon denies the allegations of paragraph 89 of the Complaint.

22  90.    Dexon denies the allegations of paragraph 90 of the Complaint.

23  91.    Dexon denies the allegations of paragraph 91 of the Complaint.

24  92.    Dexon denies the allegations of paragraph 92 of the Complaint.

25
**FIFTH PURPORTED CLAIM FOR RELIEF**
**Unjust Enrichment**
26
**(Common Law)**

27  93.    Dexon restates and incorporates by reference its responses to the allegations in

28  paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

94.    Dexon admits the allegations of paragraph 94 of the Complaint.

95.    Dexon denies the allegations of paragraph 95 of the Complaint.

### AFFIRMATIVE DEFENSES

Without admitting any wrongful conduct on the part of Dexon, and without admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or injury, Dexon alleges the following affirmative defenses to the Complaint.  By designating the following as affirmative defenses, Dexon does not in any way waive or limit any defenses which are or may be raised by their denial, allegations, and averments set forth herein.  These defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such defenses, and are without prejudice to Dexon's ability to raise other and further defenses. Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and during pretrial proceedings in this action.  Dexon expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if fully set forth in each of the following affirmative defenses.

### FIRST AFFIRMATIVE DEFENSE
#### (Res Judicata and Collateral Estoppel)

96.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

### SECOND AFFIRMATIVE DEFENSE
#### (Laches)

97.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of laches. Plaintiffs' have had longstanding knowledge concerning the legal open or "secondary" market for its products and have proactively engaged in anticompetitive behavior in an effort to selectively manipulate and control such secondary market to their advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein, resulting in substantial prejudice to Defendants.

**App.124**

1

2

### THIRD AFFIRMATIVE DEFENSE
### (Estoppel)

3   98.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of

4   estoppel. Plaintiffs' advertises that consumers can purchase their products from their

5   "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should

6   have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate

7   in and sell their products on the secondary market. Plaintiffs have allowed these "Authorized

8   Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status

9   despite knowledge of their participation in the secondary market, including evidence of their

10  sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that

11  secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such

12  "authorized" vendors when sourcing Cisco products, including, without limitation,

13  procuring Cisco product from such "authorized vendors" end customers.  Plaintiffs also

14  claim to have developed "tools" capable of detecting counterfeit goods.  However, unlike

15  their competitors in the market, have intentionally failed or refused to provide or offer such

16  "tools" to secondary market resellers such as Dexon to aid and assist in their efforts to detect

17  and deter counterfeit goods. Plaintiffs have also actively contributed to the presence of

18  counterfeit product in the marketplace by, without limitation, failing to properly police and

19  control their manufacturers and failing to properly manage their product serial numbers.  As

20  one example, Plaintiffs "authorized" vendors intentionally modify or change product serial

21  numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service

22  packages.  Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking

23  damages related to alleged counterfeit products.

24

25

### FOURTH AFFIRMATIVE DEFENSE
### (First Sale Doctrine and Exhaustion)

26  99.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale

27  doctrine, which protects secondary market resellers such as Dexon from liability for the

28

**App.125**

1  purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights

2  in further transactions.

3  ### FIFTH AFFIRMATIVE DEFENSE
   #### (Statutes of Limitations)

4

5  100.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable

6  statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38,

7  CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of Plaintiffs' claims

8  involve conduct outside of the applicable statutes of limitations.

9  ### SIXTH AFFIRMATIVE DEFENSE
   #### (Waiver)

10

11  101.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of

12  waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full

13  knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product;

14  and ii) actively and regularly deal with secondary market resellers such as Dexon.

15  Secondary market resellers such as Dexon have understandably relied upon Plaintiffs'

16  promotion and endorsement of such "authorized" sellers when sourcing Cisco products for

17  their customers. As noted above, Plaintiffs have also intentionally failed or refused to

18  provide or offer their claimed "tools" for detecting counterfeit product to secondary market

19  resellers such as Dexon, and have actively contributed to the presence of counterfeit product

20  in the marketplace by, without limitation, failing to properly police and control their

21  manufacturers and failing to properly manage their product serial numbers.  Accordingly,

22  Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit

23  goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized"

24  vendors.

25  ### SEVENTH AFFIRMATIVE DEFENSE
   #### (Unjust Enrichment)

26

27  102.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of

28  unjust enrichment. Plaintiffs have engaged in anticompetitive practices and made

misrepresentations to consumers regarding: i) the quality and authenticity of products sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict consumers use and transfer of Cisco hardware and software.  Such anticompetitive and inequitable conduct has improperly steered customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

**EIGHTH AFFIRMATIVE DEFENSE**
**(Unclean Hands/Inequitable Conduct)**

103.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of unclean hands, inequitable conduct, and similar defenses.  Without limitation, Plaintiffs have: i) engaged in anticompetitive practices, (ii) intentionally misled consumers into thinking that genuine products on the secondary market are used, counterfeit, or stolen, (iii) sold products to resellers whom it knew, or should have known, were reselling the products on the secondary market, (iv) held out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have known these entities sold counterfeit goods, and engaged in other inequitable practices that bar recovery on its claims.

**NINTH AFFIRMATIVE DEFENSE**
**(Redundancy)**

104.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because they are redundant and/or duplicative of one another.

**TENTH AFFIRMATIVE DEFENSE**
**(Abandonment)**

105.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment of any marks at issue. Plaintiffs' have failed to properly police and exercise adequate quality control over its marks and have thereby abandoned their rights therein.

**ELEVENTH AFFIRMATIVE DEFENSE**
**(Conduct of Others)**

106.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because the conduct complained of is the conduct of others, including, without limitation, Plaintiff's "authorized" vendors and/or Plaintiffs' licensed manufacturers.

**TWELVE AFFIRMATIVE DEFENSE**
**(Failure to Mitigate)**

107.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

**THIRTEENTH AFFIRMATIVE DEFENSIVE**
**(Lack of Personal Jurisdiction)**

108.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

**FOURTEENTH AFFIRMATIVE DEFENSIVE**
**(Improper Venue)**

109.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

**FIFTEENTH AFFIRMATIVE DEFENSIVE**
**(Failure to State a Claim)**

110.    The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

## SIXTEENTH AFFIRMATIVE DEFENSIVE
### (One Satisfaction Rule / Bar on Double Recovery)

111.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

## COUNTERCLAIMS

Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendant Cisco Systems, Inc., and Cisco Technology, Inc. (hereinafter referred to jointly as "Cisco") alleges as follows:

1.    Cisco is a monopolist that uses whatever means necessary to keep the prices for its networking products as high as possible to the detriment of its customers.

2.    While high prices are permissible if lawfully obtained, Cisco engaged and continues to engage in coercion of its customers who purchase its SmartNet service package which is the only way for those customers to receive software and other updates for networking equipment that are often essential for the maintenance of Cisco's networking products such as routers and Ethernet switches.

3.    Specifically, customers buy routers and Ethernet switches manufactured by Cisco, and also separately purchase the SmartNet service package for those products for a one to five year period.  At the time a SmartNet service package is purchased, Cisco approves customers' SmartNet service purchase and knows that in many cases the service package is being purchased through a secondary reseller.  SmartNet customers then receive service from Cisco for a portion of the period, but at some point before the end of the service package period, when customers contact Cisco to get the service they paid for, Cisco notifies customers that their SmartNet service has been terminated unless they buy entirely new routers and/or Ethernet switches from a specified Cisco source at a far higher price than the original network equipment purchase.  Alternatively, to preserve customers' SmartNet service, Cisco will demand a "re-certification" fee, charging just as much if not more than the original equipment purchase, and providing no value to the customer other than restoration of SmartNet.  In one case, Cisco even threatened a customer that it would not

**App.129**

1    service any of the customer's Cisco products pursuant to its SmartNet service package,

2    regardless of how or when the customer previously purchased those products, unless the

3    customer made all new equipment purchases.

4    4.       This coercion works.  Customers are forced to either buy new, expensive networking

5    equipment or pay a "re-certification" fee so that they can continue receiving SmartNet

6    service, or are forced to "make the best of" a situation in which they can never be sure that

7    they will receive the service they paid for and had previously been provided.  In the latter

8    situation, Cisco has even kept the money it received for the SmartNet purchase despite not

9    providing the requested services.

10   5.       While any customer subject to this treatment has sustained an injury that should be

11   rectified, Cisco's conduct has impacted at least one local 911-emergency services provider

12   whose network could have been compromised in the midst of these threats.

13   6.       Dexon is a company that has been servicing its customers for decades, providing

14   timely and reliable services as well as selling affordable network equipment to meet the

15   budgets of hospitals, emergency services providers, public service organizations and many

16   other small and medium businesses including those providing essential services including

17   during the COVID-19 pandemic.  Dexon and its customers have been victimized by the

18   above coercion tactics.  Cisco seeks to squash a small provider like Dexon for providing

19   reliable service and products to customers at a price lower than other Cisco dealers, figuring

20   that Dexon would just succumb to Cisco's illegitimate claims of "counterfeit."  Cisco is

21   mistaken, and its anticompetitive conduct must be remedied.

22   7.       Cisco's use of its "service arm," which upon information and belief is entirely

23   separate in terms of personnel, expertise, profitability, process, and corporate structure from

24   its "products arm," to maintain and maximize profitability in its products arm, must stop.

25   8.       Cisco's course of dealing with Dexon confirms its anticompetitive motive and harm

26   to customers.  From at least 2010 to 2015, Dexon was a registered user of Cisco's service

27   database in which it could coordinate repairs and other service calls for its customers.  Both

28   parties benefitted during this time:  Dexon kept its customers happy and Cisco retained the

1  loyalty of customers who continued to buy Cisco equipment thanks to Dexon's work.  Then

2  in 2016, Cisco terminated Dexon's access to the database, but after a Dexon representative

3  called Cisco and explained how disappointed customers were, Dexon was reinstated.

4  Unfortunately however, in 2018, Cisco again terminated Dexon's access, this time without

5  reinstatement.  At that point, Cisco took a financial loss because frustrated customers went

6  to competitive networking equipment vendors to buy networking equipment manufactured

7  by Cisco's competitors.  The clear intent and effect of this course of conduct is for Cisco to

8  sustain a short term loss for the impermissible long term benefit of eliminating a low cost

9  provider in the market for its products.

10  9.     The Court must hold Cisco accountable for these anticompetitive acts that are

11  crippling small and medium businesses, including but far from limited to Dexon.

12                                              **THE PARTIES**

13  10.     Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a

14  Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway,

15  Suite BB, Bloomington, Minnesota 55420.

16  11.     On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc.

17  ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman

18  Drive, San Jose, California 95134.

19  12.     On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology,

20  Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman

21  Drive, San Jose, California 95134.

22                                              **JURISDICTION**

23  13.     This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28

24  U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as

25  plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and

26  Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00),

27  exclusive of interest and costs.

28

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1

**FACTS**
**Cisco**

2

3   14.     Cisco is the worldwide and US leader of networking for the Internet.  Cisco offers

4   products and related services in the core technologies of routing and switching, along with

5   more advanced technologies in areas such as home networking, IP telephony, optical

6   networking, security, storage area networking, and wireless technology.  On information and

7   belief, Cisco contracts for the manufacture of a majority of its products overseas to keep

8   costs of manufacture at a minimum.

9   15.     On information and belief, Cisco has a stranglehold on the supply of networking

10  products in the United States, with a dominant market share that has reached 70% or more,

11  including in routers and Ethernet switches, both markets with high barriers to entry as

12  explained below.

13  **Cisco is Using Its Monopoly In After Market Maintenance Services to Force**

14  **Subsequent Supracompetitive Network Equipment Purchases**

15  **A.     Cisco is a Monopolist For After-Market Maintenance Services On Cisco**

16  **Equipment**

17  16.     Customers of networking equipment may require maintenance and service to ensure

18  the proper functioning of their equipment.  Only Cisco is able to provide full maintenance

19  and support on its router and Ethernet switch products.  These maintenance services include

20  onsite visits from certified engineers, software updates, technical assistance center ("TAC")

21  access, online resources, and hardware replacement services. Without such maintenance

22  services, customers may not be able to address critical performance issues and address

23  service problems that can be catastrophic to their businesses.

24  17.     For customers that may not have the budget to justify maintenance services provided

25  by Cisco, they rely on third party maintenance and service providers that can provide

26  hardware maintenance and support (for instance for a power supply or fan issue), but because

27  of Cisco's policies described herein, cannot provide software maintenance and support.

28  Thus, Cisco is able to maintain a price premium for its maintenance services, including its

1  SmartNet service packages, because as Cisco highlights in its SmartNet sales materials, "no
2  Third Party Maintenance Provider can provide [customers] with an apples-to-apples match
3  with what Cisco's SmartNet provides," and "a Third Party Maintenance Provider is not
4  authorized to provide [customers] with Cisco bug fixes, patches and updates." These "bug
5  fixes, patches and updates" can be essential to the efficient, effective, and full operation of
6  Cisco's hardware – they cannot be replicated and there are no reasonably interchangeable
7  substitutes for such services.

8  18.     Although end users are not legally required to purchase SmartNet service packages
9  for their Cisco products, they are effectively compelled to do so, because the service
10  packages offered are integral to the products' functionality.  Without SmartNet service, end
11  users will not receive important software bug fixes, patches, and updates (collectively,
12  "updates") that permit Cisco products to serve their intended functions.  These updates are
13  designed to repair malfunctions or defects in the software or to combat security
14  vulnerabilities.  Consumers who do not update the software on their Cisco products are
15  potentially exposed to security and operational risks.  In addition, without the software
16  updates, their Cisco products may not function properly.

17  19.     Because Cisco products run on proprietary operating system software that is essential
18  for the products to function, these updates can be obtained only from Cisco.  It is routine in
19  the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and
20  Microsoft, to make updates available to their consumers for free.  Cisco, in contrast, provides
21  updates only to consumers who have purchased SmartNet service packages.   Upon
22  information and belief, Cisco does not routinely inform customers at the time of purchase of
23  these stifling limitations.

24  20.     Thus, the aforementioned services constitute a Relevant After-Market for
25  Maintenance Services on Cisco Equipment (hereinafter the "Relevant Service Market") in
26  which Cisco is a monopolist, and no other competitive service provider has reached a double
27  digit share.  Upon information and belief, Cisco consistently has possessed a share of the
28  Relevant Service Market in excess of 90%, and because it dictates that only it can provide

1  certain critical services, Cisco has erected its own high barriers to entry to prevent any

2  meaningful penetration of its dominance by any competitive service vendor.  Cisco has thus

3  admitted that SmartNet pricing is far more expensive than that of third-party providers.  The

4  geographic market for the Relevant Service Market is (i) the United States and (ii) the world,

5  determined by the geographic scope of customers and the extent to which they require

6  maintenance services in the US only or worldwide.  In the case of the former, customers

7  look to service providers located in the US, whereas in the latter case, customers will require

8  vendors with an international team and associated capabilities.

9  21.    The Relevant Service Market is separate and distinct from the Relevant Markets for

10  routers, Ethernet switches and other networking equipment discussed below.  Customers can

11  and do purchase Cisco networking equipment without maintenance services, and the pricing

12  for networking equipment is entirely independent and separate from SmartNet service

13  package pricing.   Moreover, upon information and belief, Cisco's customers in these

14  separate markets (1) deal with different Cisco personnel teams (e.g., TAC support vs. sales

15  managers), (2) purchase the products and services at different times/schedules based on

16  different needs, and (3) work with different engineers because engineers on the service and

17  maintenance team are often different than the engineers on the product manufacturing and

18  sales teams.

19  **B.     Cisco is Also A Monopolist In the Router and Ethernet Switch Relevant Markets**

20  22.    Ethernet switches are a relevant product market.  Ethernet switches are devices that

21  control data flow within a network to enable network components to communicate

22  efficiently.   They are the fundamental building blocks of modern local area networks,

23  deployed in virtually every modern business and government office.   While Ethernet

24  switches are differentiated across vendors and customer types, there is no adequate substitute

25  technology that provides the same function and value within a network infrastructure.

26  23.    Ethernet switches are durable, high fixed cost goods with extended longevity;

27  consumers of these Ethernet switches commonly intend to use them for many years.

28  Transitioning from Cisco Ethernet switches to Ethernet switches made by another

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.134**

1  manufacturer is an expensive process, requiring the replacement of significant amounts of

2  hardware and the retraining of personnel.

3  24.     Buyers of Ethernet switches would not be able to turn to routers or other alternative

4  technologies in response to a monopolist's price increase above the competitive level.

5  25.     The geographic markets for the sale of Ethernet switches are (i) the United States and

6  (ii) the world. The global market for Ethernet switches includes manufacturers with product

7  portfolios that are worldwide in scope and multinational customers that have a demand for

8  such global capability. There is substantial industry recognition of both a global market for

9  Ethernet switches and narrower U.S.-only market for Ethernet switches. A monopolist of

10  Ethernet switches in the United States would be able to raise prices profitably over

11  competitive levels.  Correspondingly, a monopolist of Ethernet switches globally would be

12  able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to

13  maintain prices above competitive levels both globally and in the United States.

14  26.     Cisco has monopoly power in the U.S. and global markets for Ethernet switches,

15  consistently holding shares above 60% in both markets, and protected by high barriers to

16  entry as discussed below.  Cisco's Ethernet switch market shares are commonly at least five

17  times its closest Ethernet switch competitors in the US, as well as commonly five times its

18  closest Ethernet switch competitors globally. Cisco has managed to maintain its market

19  dominance for at least twenty years, with global and U.S. market shares commonly

20  exceeding 60%, and often above 70%.

21  27.     Routers have been a technology that is complementary to, and not a substitute for,

22  Ethernet switches, and also constitute their own relevant product market.  While Ethernet

23  switches connect components to create a network, routers allow for communication between

24  networks.  The two types of devices generally operate at different logical levels in a network:

25  Ethernet switches transfer information in the data link layer using physical addresses for

26  network components, whereas routers transfer packets in the Network or IP layer using

27  virtual addresses. As technology has evolved, Ethernet switch manufacturers have begun to

28

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Case 5:22-cv-00053-RWS-JBB-CRB Document 21 Filed 06/07/22 Page 26 of 52 PageID #: 174

1  incorporate certain routing technologies into a single combined product. This confirms that
2  routers are complements for Ethernet switches and not substitutes.

3  28.      Buyers of routers would not be able to turn to Ethernet switches or other alternative
4  technologies in response to a monopolist's price increase above the competitive level.

5  29.      The geographic markets for the sale of routers are (i) the United States and (ii) the
6  world.  The global market for routers includes manufacturers with product portfolios that
7  are worldwide in scope and multinational customers that have a demand for such global
8  capability.  There is substantial industry recognition of both a global market for routers and
9  a narrower U.S.-only market for routers.  A monopolist of routers in the United States would
10  be able to raise prices profitably over competitive levels.  Correspondingly, a monopolist of
11  routers globally would be able to raise prices profitably over competitive levels. In fact,
12  Cisco itself has been able to maintain prices for routers above competitive levels both
13  globally and in the United States.

14  30.      Cisco has monopoly power in the U.S. and global markets for routers, consistently
15  holding a share in excess of 60% in both markets, and protected by high barriers to entry as
16  discussed below. Cisco's router market shares are roughly at least five times its closest router
17  competitors in the US, as well as five times its closest router competitors globally. Cisco has
18  managed to maintain its market dominance on routers for at least twenty years, with global
19  and U.S. market shares commonly exceeding 60%, and often above 70%.

20  31.      The Relevant Router and Switch Markets are both characterized by high barriers to
21  entry and expansion.  There are several factors that contribute to these high entry and
22  expansion barriers for potential new entrants and existing competitors.  To begin with, the
23  costs to develop router software and hardware as well as switch software and hardware are
24  substantial.  It requires tens of millions of dollars for initial development, and then hundreds
25  of millions more to tailor the product to specific customer needs and to build an effective
26  sales network.

27  32.      Another barrier to entry for the Relevant Router and Switch Markets lies in
28  customers' long purchase cycles when replacing or upgrading their network components to

1    the next technology.  For example, it took approximately fifteen years for customers to
2    widely deploy 10+ Gigabit Ethernet switches to replace 1 Gigabit Ethernet switches.  These
3    circumstances mean that competitors have limited opportunities to significantly expand their
4    market share and take market share from competitors.

5    33.    As Cisco publicly promotes, it is the number one vendor for major network
6    components often required by customers for their enterprise infrastructures – such as for
7    wireless LAN and telepresence – in addition to Ethernet switches and routers. Thus, a further
8    barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high
9    transaction costs for customers, and the presence of bundled offerings, any new Ethernet
10   switch or router entrant may need to offer a full line of network components.

11   34.    Cisco's practice of holding customers hostage through their SmartNet service
12   packages also creates a particularly pernicious barrier to entry.  Any customer wishing to
13   preserve the value of its SmartNet package would not be able to viably consider router or
14   Ethernet switch purchases from competitive vendors to Cisco if the customers are under
15   duress that in the absence of a Cisco purchase their maintenance service may not be
16   provided.  Even if a customer were willing to risk a period without maintenance, purchasing
17   replacement routers or Ethernet switches from a Cisco competitor means risking the value
18   of the SmartNet package for which the customer has already paid during the remaining
19   service period.

20   35.    To summarize, Cisco has monopoly power in the following relevant markets:  the
21   Relevant Service Market (both globally and limited to the U.S.), the Relevant Router Market
22   (both globally and limited to the U.S.), and the Relevant Switch Market (both globally and
23   limited to the U.S.).  Hereinafter the Relevant Router and Switch Markets are referred to
24   collectively as the "Relevant Product Markets."  Upon information and belief, Cisco may be
25   engaging in the same coercive tactics with respect to other Relevant Product Markets, such
26   as optics, access points, and network management software, and should that prove to be the
27   case Dexon will make that apparent in the course of litigation.

28

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.137**

**C.    Cisco Locks In Customers Who Require Maintenance With SmartNet, and Then Uses SmartNet As A Hammer To Force Supracompetitive Purchases of Routers and Ethernet Switches**

36.    Customers seek to find the best deal for networking equipment regardless of when it is purchased.  Either around the time of such an equipment purchase or at a different time, customers may also consider purchasing a SmartNet service package for several different types of networking equipment.  Upon information and belief, the larger a particular deployment and the more legacy Cisco equipment the customer has in its network, the more likely customers will require a SmartNet package for one or more aspects of their network at any time.

37.    For those customers that require a SmartNet service package, the objective is to secure maintenance services for networking equipment that already is or will be in use for the customers' networks.  To satisfy themselves that this will be the case, SmartNet customers will provide Cisco with the precise serial numbers, part numbers, products, and customer information for which the purchased SmartNet service package will apply.  Cisco specifically approves the service package with this information, including in scenarios where Cisco can see that customer is purchasing the SmartNet service package through a secondary reseller which does not have a direct purchasing relationship with Cisco.

38.    Indeed, Cisco has full knowledge that its standard sellers or partners sell an extremely large volume of SmartNet service packages to secondary market sellers such as Dexon.  In fact, Cisco's Technical Assistance Center has and will alter or change serial numbers in order to approve and thereby receive payment for SmartNet service packages relating to secondary market equipment.  Cisco willfully turns a blind eye to such transactions because they are extremely profitable for Cisco.

39.    Upon information and belief, Cisco receives a payment from customers pursuant to this SmartNet approval process at or around the time of the SmartNet purchases.

40.    As one would expect, customers would receive the service they paid for from Cisco for anywhere from months to years into the purchased SmartNet service package.  As explained below, parties such as Dexon would facilitate such service through Cisco's service

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.138**

1    team that would keep customers happy with both companies.  But since at least 2015 through

2    the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet

3    service package that the SmartNet service packages were no longer valid in the absence of

4    a new purchase of Cisco equipment, including at least routers and/or Ethernet switches.

5    Alternatively, Cisco has been able to force customers to pay a "re-certification" fee

6    associated with the reinstatement of its SmartNet service associated with previously

7    purchased networking products.  Upon information and belief, Cisco simply accepted this

8    payment without doing any type of "re-certification" process or other associated service, and

9    reactivated the SmartNet service package simply because the customer paid more money for

10   the networking equipment.  Given that customers are locked into the Cisco installed base

11   they already purchased and already invested in the SmartNet service package, they have

12   little choice other than to give in to Cisco's demands.

13   41.    Given the Cisco approval process associated with customers' SmartNet purchases,

14   customers had no reasonable expectation when they bought the SmartNet service package

15   that Cisco would subsequently claim that entirely new, unwanted networking equipment or

16   a "re-certification" fee would be required to preserve their service package investment.  This

17   is especially true given that Cisco has unique access to customers for the months or years

18   after it purchased the service packages, and customers received the service for which they

19   had paid during that period.  Cisco changed its conduct not because of enforcement of a

20   consistent policy, but rather because it newly disapproved, after approving previously,

21   customers' purchase of networking equipment and SmartNet service.

22   42.    One scenario involving a hospital provides a poignant example.  For several years,

23   Dexon had provided Cisco routers, Ethernet switches, line cards, access points and modules

24   to the hospital, for which the hospital also purchased a series of SmartNet service packages

25   from Dexon.  Pleased with the products and service Dexon had provided, the hospital

26   decided to make a significant investment in Cisco routers and Ethernet switches with Dexon,

27   and the deal would have been worth a significant amount of business for the hospital (on top

28   of the prior business with Dexon which was already significant).  Upon learning that the

1  hospital had awarded the order to Dexon, Cisco threatened the customer that if it did not

2  cancel the order for the new purchase of Cisco hardware and associated SmartNet service

3  with Dexon, that not only would Cisco not honor the contemplated new SmartNet service

4  package, but Cisco also would cancel immediately <u>all</u> SmartNet service packages which the

5  customer had in place for the entire hospital system and clinics which the customer had been

6  receiving service and support from Cisco for years.  This tactic worked, and the customer

7  did not go through with the contemplated deal with Dexon, and never made another purchase

8  from Dexon again.  Upon information and belief, the hospital was coerced to deal on terms

9  that met with Cisco's approval, rather than what free market forces would have provided to

10  the hospital and its patients.

11  43.    These terrible tactics were also applied to at least one local 911-service center, for

12  which the center's purchase and maintenance of reliable routers and Ethernet switches can

13  be a matter of life and death.  In the midst of a five-year SmartNet service package the 911-

14  center had purchased from Cisco, when the customer checked on its account for purposes of

15  a service issue, Cisco threatened the customer that it needed to purchase new routers and

16  Ethernet switches if it wanted to receive the service it was due under its SmartNet service

17  package.  The 911-center could not afford new equipment, and Dexon at its own expense

18  purchased a new SmartNet service package for any support issues that may arise on the same

19  networking equipment.  Even at the time of this pleading, upon information and belief, Cisco

20  will not honor the original SmartNet service for which the 911-center had paid and the local

21  community is at risk due to Cisco's coercion tactics that seek to extract improper profits

22  even from the most vulnerable of situations.

23  44.    Upon information and belief, these examples are part of an overall course of conduct

24  by Cisco to hold up its SmartNet customers, at least since 2015.  As explained below through

25  Dexon's experience, upon information and belief, there has been an enterprise-wide effort

26  at Cisco to use SmartNet service packages in this way to be sure that customers purchase

27  networking equipment at supra-competitive prices to pad Cisco's profits as well as the

28  commissions of its sales representatives.  Dexon is aware of at least one of its customers that

| | |
|---|---|
| 1 | has threatened legal action against Cisco for these tactics, but Cisco does not care, as Cisco's |
| 2 | continued profiteering from this conduct as a monopolist in the Relevant Service Market and |
| 3 | Relevant Product Markets far outweighs the costs it would face for defending itself in |
| 4 | litigation.  This Court's involvement is desperately needed to make it stop. |
| 5 | 45.     Cisco draws an economic benefit from these coercion tactics to SmartNet customers |
| 6 | because, upon information and belief, its margins are far higher for sales made through |
| 7 | channels that have higher resale prices.  For instance, if Cisco can maintain the supra- |
| 8 | competitive prices it charges to major VARs by coercing customers to use that distribution |
| 9 | channel, Cisco can maintain its overall profitability.  Conversely, if major VARs can |
| 10 | negotiate lower pricing from Cisco because customers have a variety of distribution options |
| 11 | unimpacted by coercion, then Cisco's overall profitability goes down.  Cisco's sales |
| 12 | representatives also earn higher commissions for sales in the Relevant Product Markets |
| 13 | made through coercion, on the backs of their customers. |
| 14 | 46.     There is a substantial amount of commerce involved in the Relevant Product Markets |
| 15 | for which Cisco is forcing supracompetitive purchases.  Each year, Cisco sells billions of |
| 16 | dollars of Ethernet switches and routers, both in the US and worldwide. |
| 17 | 47.     Cisco also attempts to leverage its exclusive control of essential software updates and |
| 18 | services for Cisco products to functionally incapacitate select secondary market products. |
| 19 | Cisco provides services and updates to its products via SmartNet service packages.  End |
| 20 | users acquire these packages in order to obtain those services. |
| 21 | 48.     Cisco selectively chooses when to enforce its alleged restrictions on sales of |
| 22 | SmartNet service packages by "Authorized" sellers to secondary market sellers.  In addition |
| 23 | to being contrary to well-established agency principles, on information and belief, such |
| 24 | alleged restrictions between Cisco and its "Authorized" sellers are often not properly |
| 25 | renewed or maintained and are therefore not in force and effect. |
| 26 | |
| 27 | |
| 28 | |

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**Cisco's Conduct Toward Dexon Specifically Shows Its Anticompetitive Intent and Results in Anticompetitive Effects With No Valid Business Justification**

49.     Cisco was once on amicable terms with Dexon, even sending a Cisco representative to Dexon to aid it in its sales efforts and familiarity with its products.  For at least four years prior to 2015, Dexon had access to Cisco's online database in which it could arrange for maintenance service on behalf of its and Cisco's customers.  This served to both companies' benefit, as Dexon kept its customers happy while Cisco earned customers' loyalty to its product line.

50.     That changed in 2015 however, when Cisco deactivated Dexon's access to the service database for a period of several months.  Upon learning this from upset customers, Dexon diligently followed up with Cisco and was able to be reinstated.  The reinstatement was within Cisco's rationale economic interest because it knew it would lose both short term sales and loyalty for its networking equipment if a valuable reseller could not provide the service that customers came to expect.

51.     However, in 2018, Cisco decided that it was willing to sustain a short term loss of sales, so that in the long run customers would not have access to more aggressive pricing from Dexon.  Namely, Cisco shut off Dexon's access to the service database, and did not reinstate it despite knowing, upon information and belief, that the customers would purchase competitive networking equipment from Cisco's competitors.  Indeed, Dexon is aware of at least two customers that purchased networking equipment from a Cisco competitor due to the way the customers and Dexon were handled by Cisco.

52.     Cisco's more recent efforts to block value added resellers (VARs) like Dexon do not end there.  Major VARs (in terms of volume) will commonly supply networking equipment to smaller VARs such as Dexon because they can reach smaller and more diverse customers.  One such major VAR frequently used Dexon for this purpose, and profitably did business with Dexon for several years.  Upon information and belief, Cisco threatened the VAR not to do business with Dexon, and when the VAR representative assigned to Dexon refused to comply with the demand, he was assigned to a different region and account.  Dexon believes

1  that several such instances with larger VARs occurred, but rather than hearing about
2  representatives that were willing to stick up for customers' right to the best deal, Cisco
3  successfully coerced such VARs to limit or withdraw their business from Dexon.

4  53.    Upon information and belief, the instances described above are not isolated instances
5  of pressure, but rather part of an overall effort to force customers to only be able to access
6  both networking equipment and service through the most expensive avenues.  As explained,
7  Cisco was not always hostile to a channel that sought to give customers the best deals, likely
8  because it aided Cisco's overall effort to be known as the most ubiquitous networking
9  equipment provider regardless of the channel the networking equipment reached the
10 customer.  But that changed sometime around 2015, when Cisco apparently decided that
11 padding its own profit margins and keeping its sales representatives satisfied was more
12 important than servicing all of its customers.

13 54.    In some cases, Cisco was able to force customers to pay a "re-certification" fee
14 associated with the reinstatement of its SmartNet service associated with previously
15 purchased networking products.  Upon information and belief, Cisco simply accepted this
16 payment without doing any type of "re-certification" process or other associated service, and
17 reactivated the SmartNet service package simply because the customer paid more money.
18 This shows that any purported "business justification" Cisco advances for its practices is
19 pretextual and is merely designed to shift economic welfare from customers to itself.

20 55.    The inevitable effect of this course of conduct is to drive supra-competitive prices in
21 the Relevant Product Markets and hinder the ability for customers to find alternatives.  While
22 in theory customers could divert purchases in the Relevant Product Markets to Cisco's
23 competitors, because of Cisco's installed base for so many of its customers is a large portion
24 of their networks, it is practically difficult for many customers to make a wholesale change,
25 or to even do so over an extended period of time given the infrequency of new purchases.
26 As the above examples make clear, many customers are left with no practical choice other
27 than to purchase equipment in the Relevant Product Markets on Cisco's terms or face a
28 greater risk of a technical compromise.

56.     Indeed, in the case of a 911-operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics.  There is no justification that can be advanced to accept this needless risk to human safety.

57.     Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather need to account for the likely reaction of Cisco.  Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers need to take account of what treatment it will face if it draws Cisco's disapproval.  In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

**Dexon Has Suffered An Antitrust Injury**

58.     As illustrated above, Dexon has lost customers due to the anticompetitive and coercive tactics employed by Cisco.  Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct.  Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

59.     Cisco's conduct is designed to harm VARs just like Dexon precisely because of the benefits to customers that Dexon provides, which run counter to Cisco's profit motives.  Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive channels.  If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions that would impact Cisco's bottom line.  The coercion and other conduct at issue in this case allows Cisco's monopoly power to not

1    only be maintained, but grown, and Dexon's losses are a direct byproduct of this
2    phenomenon.

3    60.    Dexon has also sustained loses to its goodwill and reputation in the marketplace by
4    virtue of Cisco's conduct.  Because of Cisco's monopoly position in both the Relevant
5    Service Market and the Relevant Product Markets, it has been immune to customer
6    dissatisfaction with its conduct, and has attempted to shift the problem of its own creation
7    to Dexon.  Namely, rather than respond to customer feedback and attempt to win purchases
8    by virtue of better products or terms, Cisco has attempted to portray Dexon as an unworthy
9    sales partner who is the cause of the customers' problems.  But this is not the case, as Dexon
10   has spent decades building trust and goodwill with its customers, even to the benefit of
11   Cisco.  But now that Cisco's priority is to bully and intimidate any company that stands in
12   the way of its maximum profit, Dexon is being painted in a different light.

13                                    **Claims For Relief**
                                         **Count I**
14              **Violation of Section 1 of the Sherman Act:  Tying**

15   61.    Dexon repeats and realleges each of the allegations set forth in the preceding
16   paragraphs as if fully set forth herein.

17   62.    Cisco is a monopolist in the Relevant Service Market, and has used its SmartNet
18   service packages in that Market as a tying product.  Namely, after approving the terms under
19   which customers would receive a SmartNet service package, Cisco would later use the
20   SmartNet service package as a tying product in order to coerce new purchases in the
21   Relevant Product Markets on terms that are unwanted by customers but favored by Cisco.
22   Cisco conditions its continued service for SmartNet on the purchase of new equipment in
23   the Relevant Product Markets, and upon information and belief, other products that will be
24   confirmed in discovery.

25   63.    The Relevant Service Market is distinct from the Relevant Product Markets because
26   they are fundamentally different offerings that are created, marketed, sold, and accounted
27   for by providers and customers differently.  Driven by budgets and unique customer needs,
28   customers can and have bought products in the Relevant Product Markets without associated

1   service in the Relevant Service Market.  Indeed, Cisco's conduct at issue in this case

2   confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used

3   as a coercive weapon to maintain and further expand its monopolies in the Relevant Product

4   Markets, because customers often have separate demand for service on the one hand and

5   new networking equipment on the other.

6   64.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement

7   between customers and a provider of Cisco branded merchandise in the Relevant Product

8   Markets.  Cisco also effectuates this coercion through its direct relationship with customers

9   through the SmartNet service package, in which customers are forced to interact with Cisco

10   to request the service they were previously promised by Cisco.

11   65.    A substantial amount of commerce has been affected in the Relevant Product Markets

12   (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product

13   Markets has constituted tens or hundreds of thousands of dollars.  This is unsurprising, as

14   the total amount of commerce in the Relevant Product Markets is billions of dollars.

15   66.    Cisco does not have a legitimate business purpose for its anticompetitive conduct.

16   Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded

17   and received additional compensation for the same services it had already been providing,

18   without providing anything additional to customers. Cisco's conduct does not result in any

19   greater ability to reduce costs in producing or innovating offerings in the Relevant Product

20   Markets that it sells to customers that could result in reduced prices, higher quality, or greater

21   availability to customers.  Neither does Cisco's conduct reduce barriers to other vendors'

22   entry, or otherwise result in greater competition in the Relevant Product Markets.  The only

23   "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit

24   inures only to Cisco's advantage, not to that of customers or competition on the merits.

25   67.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed

26   Dexon's sales in those markets and the products of other competitors, diminished Dexon's

27   and future sales opportunities, and increased Dexon's operating costs.

28

68.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

**Count II**
**Violation of Section 2 of the Sherman Act:  Unlawful Monopolization**

69.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

70.    Cisco's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Product Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

71.    For the purpose of maintaining its monopoly power, Cisco committed numerous acts, including:

a.    Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

b.    Engaging in associated pressure and bullying tactics pursuant to its overall goal to force purchases through Cisco's most expensive channels;

c.    Pressuring at least one large volume VAR not to deal with Dexon or other efficient, low-cost providers in the Relevant Product Markets;

d.    Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database for the purpose of eliminating a low cost provider from the Relevant Product Markets in the long term;

e.    Reversing its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in which customers are penalized for using such lower-priced and efficient VARs; and

**App.147**

f.     Upon information and belief, engaging in related tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

72.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

73.     Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

74.     Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

## Count III
### Violation of Section 2 of the Sherman Act:  Attempted Monopolization

75.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

76.     Cisco acted with a specific intent to monopolize and destroy competition in the Relevant Product Markets.  Cisco devised and implemented an overall plan to force customers to pay supra-competitive prices in the Relevant Product Markets, with the associated destruction of competition in the Relevant Product Markets.

77.     Cisco willfully engaged in a course of anticompetitive conduct to obtain a monopoly in the Relevant Product Markets, including:

    a.     Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

    b.     Engaging in associated pressure and bullying tactics pursuant to its overall goal to force purchases through Cisco's most expensive channels;

    c.     Pressuring at least one large volume VAR not to deal with Dexon or other efficient, low-cost providers in the Relevant Product Markets;

    d.     Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database for the purpose of eliminating a low cost provider from the Relevant Product Markets in the long term;

    e.     Reversing its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in which customers are penalized for using such lower-priced and efficient VARs; and

    f.     Upon information and belief, engaging in related tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

78.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

1    79.    Throughout the time Cisco engaged in this anticompetitive conduct, it had a
2    dangerous probability of succeeding in gaining a monopoly in and controlling each of the
3    Relevant Product Markets and continuing to maintain supra-competitive prices and exclude
4    its competitors.

5    80.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed
6    Dexon's sales in those markets and the products of other competitors, diminished Dexon's
7    and future sales opportunities, and increased Dexon's operating costs.

8    81.    Cisco's conduct has and will continue to maintain supra-competitive prices to
9    customers in the Relevant Product Markets, harm innovation associated with the products
10   offered in the Relevant Product Markets, and otherwise deprive customers of their ability to
11   make an unfettered choice of technology on the merits.

12                                      **Count IV**
13                   **Violation of the California Cartwright Act**

14   82.    Dexon repeats and realleges each of the allegations set forth in the preceding
15   paragraphs as if fully set forth herein.

16   83.    Upon information and belief, Cisco's overall anticompetitive scheme was directed
17   and executed within California, and has a direct impact upon California-based small and
18   medium businesses.

19   84.    Cisco is a monopolist in the Relevant Service Market, and has used its SmartNet
20   service packages in that Market as a tying product.  Namely, after approving the terms under
21   which customers would receive a SmartNet service package, Cisco would later use the
22   SmartNet service package as a tying product in order to coerce new purchases in the
23   Relevant Product Markets on terms that are unwanted by customers but favored by Cisco.
24   Cisco conditions its continued service for SmartNet on the purchase of new equipment in
25   the Relevant Product Markets, and upon information and belief, other products that will be
26   confirmed in discovery.

27   85.    The Relevant Service Market is distinct from the Relevant Product Markets because
28   they are fundamentally different offerings that are created, marketed, sold, and accounted

for by providers and customers differently. Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Markets. Indeed, Cisco's conduct at issue in this case confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

86.     Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

87.     A substantial amount of commerce has been affected in the Relevant Product Markets due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

88.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

89.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

90.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

91.    The above phenomenon has harmed competition and resulted in loses to Dexon in California.

### Count V
### Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.

92.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

### The Secondary Market

93.    As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products.  On information and belief, authentic or genuine Cisco products come to the secondary market in the United States in a variety of ways including: (a) Cisco's knowing sale of such products to secondary market suppliers in the context of either specific end user deals or when Cisco needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what they need for a specific end user order and subsequent resale of such product into the secondary market; (c) Cisco end user's resale of new, unused product; and (d) through importation of such product from abroad where it has been sold by distributors, resellers, or end users under similar circumstances.  On information and belief, Cisco resists attempts by end users and resellers to return product, resulting in a natural supply of secondary market Cisco product.

94.    Given the substantial profits available from sale of Cisco-branded products, market forces dictate that a secondary market will develop for such products.  These market forces benefit end users in that they reduce prices for such products.

95.     Dexon is an independent secondary-market reseller of computer networking products, including routers, Ethernet switches and other computer hardware.  Dexon provides new, refurbished and discontinued hardware products, including authentic or genuine products to its customers from leading manufacturers including, without limitation, Hewlett Packard, Dell, Juniper Networks and Cisco.

96.     Dexon obtains Cisco products from reliable suppliers, subjects such products to extensive quality control, and then resells such products to other resellers and to end users, at a profit but frequently at prices lower than those offered by Cisco "Authorized" sellers.

97.     Cisco has created an "Authorized Channel Network" in which Cisco sells products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."  Within this "Authorized" network, Cisco exerts strict control over how, and at what prices, its "Authorized" partners can buy and sell Cisco products.

98.     While manufacturers like Cisco are permitted to control the initial sale of their products, they may not wield trademark or copyright protections to dictate the terms by which their products are resold by other parties.  The well-established "first sale doctrine" protects parties who engage in the subsequent resale of Cisco's products, even if those subsequent resales occur outside the "Authorized" channels. Accordingly, the "Authorized Channel Network" does not have a monopoly on the legal sale and purchase of Cisco goods in the market (unlike Cisco's monopolies in the Relevant Service and Relevant Product Markets), and Cisco may not forbid the resale of its products outside the "Authorized" network.

### Cisco's Anticompetitive Interference with the Secondary Market
### EULA Misrepresentations and Abuse

99.     Cisco products, like virtually all modern electronics, contain embedded software. And just as a car, refrigerator, or cell phone will not function properly without internal software, Cisco's products—including the Cisco products resold by Dexon—cannot function without Cisco's embedded software.

100.    Cisco uses the fact that its products have embedded software as an attempted end-around to the first sale doctrine.  It does so by informing consumers, after their purchases, that although they have bought Cisco hardware, they are unable to use such hardware unless they license the embedded software from Cisco —software that was packaged and sold with the hardware (and without which the hardware will not function). Cisco does not require end users to acknowledge, read, or accept a license agreement before using the Cisco goods sold by Dexon.  Nevertheless, Cisco purports only to license the software pursuant to the terms of its End User License Agreement, or "EULA."

101.    The EULA provides or has provided that Cisco will grant a license only to consumers who purchase Cisco hardware with embedded software from a so-called "Approved Source," defined as "Cisco or . . . [a] Cisco authorized reseller, distributor, or systems integrator[.]"  Cisco warns that end users are "not licensed to Use the Software on secondhand or refurbished Cisco equipment not authorized by Cisco, or on Cisco equipment not purchased through an Approved Source."

102.    In an effort to dissuade consumers from purchasing secondary market goods, Cisco informs consumers that although its hardware can be freely resold, the "embedded Cisco software that runs on the hardware" is "not transferable," and purchasers of secondary market Cisco equipment "must acquire a new license from Cisco before the software can be used." The only way to avoid having to purchase a new license, Cisco says, is to buy refurbished equipment through Cisco's own program.

103.    These representations to consumers are false.  Even if it were possible for Cisco to sell hardware but license embedded software, the EULA would not be a permissible license of that software because it operates anticompetitively by not applying to products purchased in the secondary market.

104.    Accordingly, pursuant to the first sale doctrine, consumers who purchase Cisco hardware may use embedded software.  They may also transfer the embedded software, along with the hardware, freely.  Cisco may not sidestep the first sale doctrine by refusing to license software that it builds into hardware (to which the first sale doctrine indisputably

**App.154**

1    applies) solely because consumers did not purchase the hardware through Cisco's more
2    lucrative supply chain.  And it may not deceive consumers by telling them that although they
3    can buy secondary-market Cisco products, they will not be able to use those products without
4    buying a license from Cisco.

5    105.    Cisco's misrepresentations regarding consumers' right to buy and use secondary-
6    market Cisco products successfully deter consumers from purchasing Cisco goods on the
7    secondary market.  Dexon has lost sales of products that would have been made but for
8    Cisco's false representations to consumers regarding their ownership rights for Cisco
9    hardware and embedded software purchased on the secondary market.  These false
10   representations have unjustly enriched Cisco at Dexon's expense.

11   106.    Cisco has also improperly extorted license fees from consumers who are frightened
12   into believing they will not be able to use the Cisco products they have lawfully purchased.
13   On information and belief, when consumers who purchase Cisco goods on the secondary
14   market attempt to register those goods with Cisco, Cisco falsely informs the consumers that
15   their software licenses are invalid and that they cannot use their lawfully purchased hardware
16   unless they pay additional license fees to Cisco.  Cisco would not have obtained these license
17   fees but for misrepresentations it makes to consumers regarding their ability to use Cisco
18   embedded software.

19   107.    On occasions where secondary market sellers obtain Cisco product directly from an
20   "Authorized" seller, Cisco threatens that the end users rights are restricted because the sale
21   was contrary to the "Authorized" seller's agreement with Cisco.  Cisco's enforcement of
22   this improper policy is selective.  In addition to being contrary to well-established agency
23   principles, on information and belief, such alleged agreements between Cisco and its
24   "Authorized" sellers are often not properly renewed or maintained and are therefore not in
25   force and effect.

26   108.    Relatedly, due to the robust secondary market, Cisco routinely and intentionally sells
27   multiple SmartNet service packages on the same product covering the same time period.  For
28   example, it is not uncommon for a consumer to purchase a Cisco product as well as a

1   SmartNet service package covering such product.  If the consumer ends up not using such

2   product, such product may be sold – unopened in a sealed box – on the secondary market.

3   The customer receives no refund on the SmartNet service package and may in fact

4   mistakenly renew its SmartNet service package for such product it no longer owns.  In

5   addition, the new customer who bought the unopened product may purchase its own

6   SmartNet service package for such product.

7   109.    It is common for secondary market sellers such as Dexon to purchase a duplicate

8   SmartNet service package covering the exact same product for its customers.  Despite having

9   records pairing the product's serial number to each SmartNet servce package, Cisco

10  knowingly accepts payment and fails to provide any refund on such redundant SmartNet

11  service packages.

12  **Misclassification of Cisco Products**

13  110.    As part of Cisco's anticompetitive interference in the secondary market, Cisco also

14  selectively classifies genuine, lawfully obtained Cisco products as "used," "stolen,"

15  "counterfeit," "black market," "a security risk," "malware," "scrapped," "out of compliance"

16  or "inactive" simply because these products were traded on the secondary market.  As a

17  result, end users or resellers who communicate with Cisco about the status of certain Cisco

18  products are deliberately provided with misinformation.

19  111.    Cisco's contortion of the term "used" is particularly egregious.  Rather than give the

20  term its ordinary meaning, Cisco has unilaterally decided that "used equipment" means

21  "previously owned equipment that is now owned by a party other than the original

22  customer," including both "opened and unopened equipment."  Cisco even instructs its

23  employees to tell consumers that "unopened boxes do[] not necessarily mean [that

24  equipment is] 'new.'"

25  112.    Accordingly, Cisco routinely publicly criticizes and labels secondary market product

26  which has never been used – including product contained in unopened sealed boxes – as

27  "used" contrary to consumers' well understood meaning of such term.

28

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

113.    Cisco knows that its unilateral definition of the term "used" is contrary to the common consumer understanding, and that consumers are misled by its use of the term.  Indeed, Cisco deploys its false definition of the term "used" in order to deceive consumers as to the nature of products they purchase on the secondary market.  Cisco does so in an effort to stifle competition and extract additional profits from consumers who would, but for Cisco's misrepresentations and misuse of the term "used," purchase products on the secondary market.

**Wrongful Denial of Warranty Coverage**

114.    Cisco has also wrongfully denied warranty coverage of genuine Cisco products solely as a result of the fact that those products were sold in the secondary market.  Cisco states as a general policy that products sold on the secondary market are ineligible for Cisco warranties.  Cisco's ostensible justification for this refusal is that Cisco is unsure whether products sold on the secondary market are genuine. But this is a farce: Cisco is well-aware that genuine Cisco products are commonly sold on the secondary market.

115.    Cisco has at various times asserted that these anticompetitive strictures are necessary in order to mitigate the risk of counterfeit goods being sold to unwitting customers or receiving Cisco services.  These justifications are pretextual and designed to obscure the fact Cisco seeks to minimize competition and exact more control over the market for Cisco products, to the detriment of the consuming public.

116.    Secondary market resellers of Cisco products, including Dexon, are highly incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a counterfeit product, an independent reseller's own reputation suffers significantly when it sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

117.    "Authorized Reseller" status is not foolproof protection against counterfeit products.  Cisco's "Authorized" sellers are likewise victimized by the presence of counterfeit product in the marketplace and have been caught selling counterfeit Cisco product.

**App.157**

118.    Cisco has contributed to and caused the presence of counterfeit product in the stream of commerce by: i) claiming to have developed "tools" capable of detecting counterfeit goods yet, unlike their competitors in the market, intentionally failing or refusing to provide or offer such "tools" to secondary market resellers such as Dexon to aid and assist their efforts to detect and deter counterfeit products; ii) failing to properly police and control their manufacturers; and iii) failing to properly manage their product serial numbers.  As one example, Plaintiffs' Technical Assistance Center will intentionally modify or change product serial numbers in order to ensure secondary market products qualify for, and Plaintiffs' receive compensation for, SmartNet.

119.    Cisco's anticompetitive behavior as alleged herein has attracted the attention of government regulators and interested parties worldwide.  Upon information and belief, Cisco has sought to avoid a wholesale dismantling of its anticompetitive practices by incrementally providing relief when compelled to do so.  For example, in 2014, when Cisco was under investigation by the Swiss Competition Commission related to Cisco's failure to provide updates and other anticompetitive behavior, Cisco was compelled to make a commitment that updates could be obtained within Switzerland and the European Union without having to purchase SmartNet service packages.  Cisco also had to implement a series of remedial measures to inform consumers of these policies.  In the United States, however, Cisco continues to pursue the anticompetitive practices alleged herein.

**Cisco's Tortious Efforts to Interfere with Dexon's Business**

120.    Because Cisco regards secondary market resellers like Dexon as a threat to its excess profits, Cisco spends substantial money and effort to attack secondary market participants such as Dexon and to chill reseller and end user participation in the secondary market.  These steps include but are not limited to:

        a.  Prompting federal investigation of the secondary market on specious grounds that the secondary market presents a threat to the national security of the United States.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

b. Employing a team of "Brand Protection" employees whose primary responsibility is to intervene with resellers and end users in cases where they are either contemplating the purchase of product, or have ordered product, from the secondary market. Brand Protection personnel use a variety of tools to disrupt secondary market sales, including: (i) advising resellers and end users that product from the secondary market is suspect, may damage or jeopardize their network operations, may void Cisco warranties, may be counterfeit, and is otherwise unreliable; and (ii) spreading false rumors about secondary market resellers and their owners.

c. Instructing its account managers, assigned to specific end users: (i) to convince end users to specify in RFPs the acquisition of Cisco equipment through "authorized" resellers only (even if the result is materially higher pricing); (ii) to advise resellers and end users of the same issues raised by Brand Protection and, if necessary, invite Brand Protection into the discussion.

d. Tortiously and erroneously insinuating to resellers and end users that secondary market participants in general are engaging in illegal activity when this is not the case.

121.    Such tortious conduct includes, without limitation, falsely advising Dexon's actual and prospective customers that: i) Dexon does not sell genuine Cisco product; ii) Dexon does not sell new Cisco product; iii) Dexon "repackages" used Cisco product as "new"; iii) Dexon opens new Cisco product and substitutes parts or software; iv) Dexon's products are "counterfeit" solely because they were sold on the secondary market despite the fact such products are in fact genuine; v) Dexon products violate purported Cisco licenses even though such products (such as phones) are not governed by any purported applicable Cisco licenses.

122.    Cisco has presented, published, and/or caused to be published the false and misleading message that alleged "genuine" and/or "new" Cisco gear only comes from Cisco and its "Authorized" sellers.

123.     Cisco has engaged in a pattern and practice of this tortious conduct with the intent to disrupt contracts between Dexon and its customers, pending opportunities with such customers, future business with such customers, and even with the apparent goal of driving Dexon out of business altogether.

124.     As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

125.     California Business and Professions Code §§ 17200 et seq. prohibit acts of unfair competition, which includes any unlawful, unfair, or fraudulent business act or practice. Cisco's conduct, as set forth herein, is unlawful, unfair, and fraudulent as well as untrue and deceptive within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.

126.     As detailed above, Cisco has taken numerous anticompetitive steps designed to afford it a greater level of control over the purchase and sale of Cisco-branded products than the law permits. These anticompetitive actions are tantamount to violations of the antitrust laws.

127.     Cisco has engaged in these unfair and wrongful actions in order to hinder the ability of those in the secondary market to compete with Cisco. These practices harm both independent resellers like Dexon, whose ability to compete is impeded, and customers, who are forced to pay increased costs for genuine Cisco products as a result of this artificially deflated competition. Cisco's acts, which destroy competition for its products at the expense of consumers, are tantamount to violations of the antitrust laws. As a result of Cisco's unfair, fraudulent, and unlawful conduct, Dexon has lost sales of Cisco products they otherwise would have made, and have accordingly lost money or property as a result of Cisco's practices.

128.     Cisco's actions have caused, and unless restrained by this Court, will continue to cause irreparable injury to Dexon. Dexon is entitled to injunctive relief to preclude Cisco's unfair competition.

129.    Dexon seeks the full restitution by Cisco that is necessary and according to proof to restore any and all property and monies, including interest, acquired by Cisco, and all costs caused to Dexon as a result of Cisco's unlawful and unfair business practices.

130.    Dexon's claims, including their claims under California Business & Professions Code § 17200, are brought to enforce an important right affecting the public interest. Accordingly, Dexon is entitled to recover its attorneys' fees from Cisco. CAL. CIV. PROC. CODE § 1021.5.

**Count VI**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201-2202)**

131.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

132.    Counterclaimants seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 & 2202, that the sale of genuine Cisco product which Cisco has unilaterally deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or ineligible for warranty services as a result thereof, do not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125.

133.    Contrary to Cisco's assertions, the first sale doctrine does not permit a trademark holder to transform non-infringing goods into infringing goods simply by fiat. The sale of genuine goods whose warranty eligibility has been unilaterally revoked by Cisco does not violate the Lanham Act.

134.    A real and actual controversy presently exists between the parties to this action which is concrete and justiciable in character, and as to which each party possesses an interest in resolving.

135.    Counterclaimant sells, and intends to continue selling, genuine Cisco products which Cisco asserts are ineligible for warranty services once they come into Counterclaimant's possession in the ordinary course of commerce. Unless and until Counterclaimant's sales of genuine Cisco products are deemed to be permissible under United States law, Counterclaimant's ability to sell such products will be wrongfully and unnecessarily

1   impaired, and Counterclaimant will continue to be injured and damaged by this threat.

2   Accordingly, Counterclaimant seeks declaratory relief from this Court.

3   136.   The controversy between Counterclaimant and Cisco warrants relief declaring the

4   rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that the sale of

5   genuine Cisco products whose warranty eligibility has been unilaterally revoked by Cisco

6   after entering the stream of commerce does not violate the Lanham Act.

7                                    **Count VII**
                              **Declaratory Judgment**
8                             **(28 U.S.C. §§ 2201-2202)**

9   137.   Dexon repeats and realleges each of the allegations set forth in the preceding

10  paragraphs as if fully set forth herein.

11  138.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.,

12  Counterclaimant is entitled to judgment from this Court that Counterclaimants' refusal to

13  warrant genuine Cisco products acquired outside of Cisco's "Authorized Reseller Network"

14  violates New York General Business Law § 369-b and is unenforceable in New York.

15  139.   A real and actual controversy presently exists between the parties to this action which

16  is concrete and justiciable in character, and as to which each party possesses an interest in

17  resolving.

18  140.   Counterclaimant sells, and intends to continue selling, genuine Cisco products in New

19  York which Cisco asserts are ineligible for warranty services once they come into

20  Counterclaimant's possession in the ordinary course of commerce. Cisco's claims harm

21  Counterclaimant's ability to sell these products in New York due to wrongfully representing

22  to customers that products sold by Counterclaimant are not eligible for warranties.

23  Accordingly, Counterclaimant seeks declaratory relief from this Court.

24  141.   The controversy between Counterclaimant and Cisco warrants relief declaring the

25  rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that Cisco's refusal

26  to warrant genuine products sold in New York based on their purchase or sale in the

27  secondary market violates New York General Business Law § 369-b.

28

**Count VIII**
**Lanham Act False Advertising**
**(15 U.S.C. § 1125(a)(1)(B))**

142.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

143.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is unlawful for any person to use a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

144.   As set forth above, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding the software embedded in Cisco hardware sold on the secondary market.

145.   In addition, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding whether products in the secondary market are "used."

146.   The foregoing false and misleading representations of fact are designed to mislead consumers, and do in fact mislead consumers, at the expense of Dexon, causing direct and substantial loss to Dexon of money and market share.

147.   The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

148.   Cisco's misrepresentations have caused, and unless restrained by this Court, will continue to cause irreparable injury to Dexon.

**Count IX**
**Intentional Interference with Contractual Relations**

149.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

**App.163**

150.    Dexon secured contracts with certain customers for the sale of Cisco products on which Dexon would have earned significant profits.

151.    On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

152.    On information and belief, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.

153.    Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

154.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

155.    Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

**Count X**
**Intentional Interference with Prospective Economic Advantage**

156.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

157.    An economic relationship existed between Dexon and its actual and prospective customers, each of which contained the probability of substantial future economic benefits to Dexon.

158.    On information and belief, Cisco knew or should have known of these relationships.

159.    On information and belief, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships, including:

a. By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that the Cisco products Dexon sold were not new, used, counterfeit, suspect, non-genuine, and/or unauthorized; and

b. By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that if they purchased product from secondary market resellers such as Dexon, they would jeopardize the security of their data networks.

c. By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that Dexon somehow improperly modified Cisco product, including, without limitation, by "repackaging" such products and/or substituting or replacing parts/software on such product.

160. Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to put Dexon out of business and to ensure that these customers would purchase Cisco product at higher prices from "Cisco Authorized Resellers" under Cisco's control.

161. As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships. As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether.

162. Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

163. Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

**App.165**

## Count XI
### Trade Libel

164.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

165.    On information and belief, Dexon alleges that Cisco has repeatedly made disparaging statements about Dexon's products as detailed herein.

166.    Cisco's statements disparaged Dexon's products.  On information and belief, Dexon alleges that the claims made were false or materially misleading.

167.    Dexon has suffered and will continue to suffer irreparable harm should Cisco's trade libel be allowed to continue.

168.    As a proximate result of Cisco's statements, prospective and actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

169.    Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

170.    Dexon will suffer irreparable harm to its goodwill if this trade libel continues.  Dexon is entitled to injunctive relief to preclude Cisco's trade libel.

### THIRD PARTY CLAIMS

Third Party Plaintiff Dexon Computer, Inc. asserts the following claims against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and Wisecom Technologies alleges as follows:

**App.166**

| | |
|---|---|
| 1 | **THE PARTIES** |
| 2 | 171.   Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation |
| 3 | with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, |
| 4 | Bloomington, Minnesota 55420. |
| 5 | 172.   On information and belief, Third Party Defendant Atlantix Global Systems |
| 6 | International, LLC is a Georgia limited liability corporation with its principal place of |
| 7 | business in Georgia. |
| 8 | 173.   On information and belief, Third Party Defendant Bizcom Electronics, Inc., is a |
| 9 | California corporation with its principal place of business in California. |
| 10 | 174.   On information and belief, Third Party Defendant Digi Devices Online is a foreign |
| 11 | corporation with its principal U.S. place of business in Texas. |
| 12 | 175.   On information and belief, Third Party Defendant Enterprise Business Technologies, |
| 13 | Inc. is a New York corporation with its principal place of business in New York. |
| 14 | 176.   On information and belief, Third Party Defendant Fiber Cable Connections is a |
| 15 | Washington corporation with its principal place of business in Washington. |
| 16 | 177.   On information and belief, Third Party Defendant MJSI is a California corporation |
| 17 | with its principal place of business in California. |
| 18 | 178.   On information and belief, Third Party Defendant Multimode Technologies, LLC is |
| 19 | a Minnesota limited liability company with its principal place of business in Minnesota. |
| 20 | 179.   On information and belief, Third Party Defendant Network Republic is a Texas |
| 21 | corporation with its principal place of business in Texas. |
| 22 | 180.   On information and belief, Third Party Defendant Opitmum Data, Inc. is a Nebraska |
| 23 | corporation with its principal place of business in Nebraska. |
| 24 | 181.   On information and belief, Third Party Defendant Paragon is a Massachusetts |
| 25 | corporation with its principal place of business in Massachusetts. |
| 26 | 182.   On information and belief, Third Party Defendant Pure Future Technology, Inc. is a |
| 27 | California corporation with its principal place of business in California. |
| 28 | |

183.    On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

184.    On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

185.    On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

186.    On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

187.    On information and belief, Third Party Defendant Strategic Telecom Supply & Solutions is a Virginia limited liability company with its principal place of business in Virginia.

188.    On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

189.    On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

190.    On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

### **Supply of Alleged Counterfeit and Infringing Product**

191.    The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

192.    Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants.  While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

193.    Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like."  See U.C.C. §2-312(3).

**FIRST THIRD PARTY CLAIM**
**(Indemnification - All Third Party Defendants)**

194.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

195.   Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

196.   Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

**SECOND THIRD PARTY CLAIM**
**(Contribution - All Third Party Defendants)**

197.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

198.   Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

199.   Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

**PRAYER FOR RELIEF**

**WHEREFORE,** Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and Wisecom Technologies as follows:

a. An Order directing the termination of the anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1-2), the California Cartwright Act, and Section 17200 of the California Business and Professional Code;

b. Treble damages (including lost profits), in an amount to be determined at trial and that cannot now be adequately quantified before relevant discovery;

c. Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with prejudice, together with costs and disbursements;

d. Awarding Dexon's costs of suit herein, including its attorneys fees incurred in defending against Cisco's claims and asserting antitrust claims;

e. Declaring that Dexon's sale of genuine Cisco goods which Cisco has unilaterally deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or ineligible for warranty services as a result thereof, does not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125(a);

f. Declaring that Cisco's refusal to warrant genuine products sold in New York violates New York General Business Law § 369-b;

g. Awarding Dexon restitutionary disgorgement;

h. Awarding Dexon actual damages, subject to proof at trial but in an amount in excess of $75,000.;

i. An award of punitive damages in an amount sufficient to punish Counterclaim Defendants, to make an example of them to the community, and to deter them from such conduct as to Dexon or others in the future;

j. For equitable remedial efforts by Counterclaim Defendants sufficient to rehabilitate Dexon's damaged reputation;

k. For orders restraining Cisco Systems, Inc. from engaging in similar conduct in the future;

l. Awarding Dexon damages, lost profits, and treble damages pursuant to the Lanham Act;

**App.170**

1    m.  Awarding Dexon its costs and expenses of litigation, including reasonable attorneys'

2        fees;

3    n.  Enjoining Cisco from further violations of the laws enumerated herein;

4    o.  An award in Dexon's favor against Third Party Defendants sufficient to compensate

5        Dexon for all economic loss, damages, attorney's fees and costs resulting from the

6        claims herein; and

7    p.  Such other and further relief as this Court deems just and equitable.

8

9    Dated:  July 29, 2021                    /s/ Amanda R. Washton
                                              _____
10                                            Amanda Washton
                                                 a.washton@conklelaw.com
11                                            CONKLE, KREMER & ENGEL, PLC
                                              3130 Wilshire Boulevard, Suite 500
12                                            Santa Monica, CA 90403

13                                            Michael M. Lafeber
                                                 mlafeber@taftlaw.com
14                                            O. Joseph Balthazor Jr.
                                                 jbalthazor@taftlaw.com
15                                            TAFT STETTINIUS & HOLLISTER LLP
                                              2200 IDS Center
16                                            80 S. 8th St.
                                              Minneapolis, MN 55402

17                                            David H. Reichenberg (*pro hac vice pending*)
                                                 DReichenberg@cozen.com
18                                            COZEN O'CONNOR
                                              3 WTC, 175 Greenwich Street, 56th Floor
19                                            New York, New York 10006

20                                            Mark A. Jacobson (*pro hac vice pending*)
                                                 mjacobson@cozen.com
21                                            COZEN O'CONNOR
                                              33 South 6th Street, Suite 3800
22                                            Minneapolis, MN 55402

23                                            Attorneys for Defendant, Counterclaim Plaintiff and
                                              Third-Party Plaintiff Dexon Computer, Inc.
24

25

26

27

28

**DEMAND FOR JURY TRIAL**

Dexon Computer, Inc. demands a trial by jury on all issues so triable.

Dated:  July 29, 2021

/s/ Amanda R. Washton

Amanda R. Washton
  a.washton@conklelaw.com
**CONKLE, KREMER & ENGEL, PLC**
3130 Wilshire Boulevard, Suite 500
Santa Monica, CA 90403

Michael M. Lafeber
  mlafeber@taftlaw.com
O. Joseph Balthazor Jr.
  jbalthazor@taftlaw.com
**TAFT STETTINIUS & HOLLISTER LLP**
2200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402

David H. Reichenberg (*pro hac vice pending*)
  DReichenberg@cozen.com
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006

Mark A. Jacobson (*pro hac vice pending*)
  mjacobson@cozen.com
**COZEN O'CONNOR**
33 South 6th Street, Suite 3800
Minneapolis, MN 55402

Attorneys for Defendant, Counterclaim Plaintiff and
Third-Party Plaintiff Dexon Computer, Inc.

0640.002\9976                                                    Case No. 3:20-CV-4926-CRB
                                         -62-
AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

# Exhibit C

Richard J. Nelson (SBN 141658)
Louis P. Feuchtbaum (SBN 219826)
Angela M. He (SBN 319351)
Artur A. Minasyan (SBN 322248)
**SIDEMAN & BANCROFT LLP**
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com
ahe@sideman.com
aminasyan@sideman.com

Aaron M. Panner* (D.C. Bar No. 453608)
Kylie C. Kim* (D.C. Bar No. 230277)
Christopher M. Sarma* (D.C. Bar. No. 1510831)
Alex A. Parkinson* (D.C. Bar No. 166695)
Ryan M. Folio* (New York Bar No. 5823943)
**KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.**
1615 M Street, NW, Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
kkim@kellogghansen.com
csarma@kellogghansen.com
aparkinson@kellogghansen.com
rfolio@kellogghansen.com

*Attorneys for Plaintiffs and Counterclaim Defendants
Cisco Systems, Inc. and Cisco Technology, Inc.*

* Admitted *pro hac vice.*  Mr. Folio
is not admitted in the District of
Columbia; his practice is supervised
by members of the firm.

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| CISCO SYSTEMS, INC., a California corporation, and CISCO TECHNOLOGY, INC., a California corporation,<br><br>     Plaintiffs and Counterclaim Defendants,<br><br>     v.<br><br>DEXON COMPUTER, INC., a Minnesota Corporation,<br><br>     Defendant and Counterclaim Plaintiff. | Case No.  3:20-cv-4926-CRB<br><br>**PLAINTIFFS AND COUNTERCLAIM DEFENDANTS CISCO SYSTEMS, INC.'S AND CISCO TECHNOLOGY, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS DEFENDANT DEXON COMPUTER, INC.'S AMENDED COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  December 9, 2021<br>Time:  10:00 a.m.<br>Courtroom:  6<br>Judge:  Honorable Charles R. Breyer |

Case No.  3:20-cv-4926
PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.174**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on December 9, 2021 at 10:00 a.m., or as soon thereafter as this matter can be heard, in Courtroom 6 on the 17th Floor of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, before the Honorable Charles R. Breyer, Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. (together, "Cisco") will, and hereby do, respectfully move this Court for an order dismissing the amended counterclaims by Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") in their entirety and with prejudice.  *See* Dkt. 50.

This Motion is based on this Notice of Motion and Motion; the following Memorandum of Points and Authorities below; the record in this matter; and such other and further papers, evidence, and argument as may be submitted to support this Motion.

DATED:  October 13, 2021

Respectfully Submitted,

By:  */s/ Aaron M. Panner*
　　　Aaron M. Panner

| | |
|---|---|
| Richard J. Nelson (SBN 141658) | Aaron M. Panner* |
| Louis P. Feuchtbaum (SBN 219826) | Kylie C. Kim* |
| Angela M. He (SBN 319351) | Christopher M. Sarma* |
| Artur A. Minasyan (SBN 322248) | Alex A. Parkinson* |
| **SIDEMAN & BANCROFT LLP** | Ryan M. Folio* |
| One Embarcadero Center | **KELLOGG, HANSEN, TODD,** |
| Twenty-Second Floor | **FIGEL & FREDERICK, P.L.L.C.** |
| San Francisco, CA 94111-3711 | 1615 M Street, NW, Suite 400 |
| (415) 392-1960 | Washington, D.C. 20036 |
| rnelson@sideman.com | (202) 326-7900 |
| lfeuchtbaum@sideman.com | apanner@kellogghansen.com |
| ahe@sideman.com | kkim@kellogghansen.com |
| aminasyan@sideman.com | csarma@kellogghansen.com |
| | aparkinson@kellogghansen.com |
| | rfolio@kellogghansen.com |

*Attorneys for Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc.*

* Admitted *pro hac vice.*  Mr. Folio is not admitted in the District of Columbia; his practice is supervised by members of the firm.

i

Case No.  3:20-cv-4926

**App.175**

1

2 **TABLE OF CONTENTS**

3                                                                                                    **Page**

4

TABLE OF AUTHORITIES ................................................................................................ iv

5

STATEMENT OF REQUESTED RELIEF ......................................................... 1

6

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

7

INTRODUCTION AND SUMMARY OF ARGUMENT.................................... 1

8

BACKGROUND ................................................................................................. 4

9

     A.    Cisco's World-Class Critical Infrastructure ............................ 4

10

     B.    Cisco Protects the Safety of Its Products and Distribution Channels ...................... 5

11

     C.    Dexon's Counterclaims ............................................................ 5

12

LEGAL STANDARD ......................................................................................... 6

13

ARGUMENT ...................................................................................................... 7

14

I.    Dexon Fails To Allege An Actionable Tying Claim (Counts I & IV) ................................. 7

15

     A.    The Section 1 Claim Fails Because Dexon Does Not Allege Any Foreclosure in the Tied Product Market or Any Tying Between Service and Equipment ................................ 7

16

17

     B.    Dexon's Parallel Cartwright Act Claim Also Fails (Count IV) ............................. 10

18

II.    Dexon's Section 2 Monopolization Claims Fail (Counts II & III) .................................... 10

19

     A.    Dexon Fails To Allege Any Exclusionary Conduct................................................. 10

20

     B.    Dexon's Opaque Refusal-to-Deal Claim Fails as a Matter of Law........................ 12

21

III.    Dexon Lacks Antitrust Injury (Counts I-IV).................................................................... 15

22

IV.    The California Unfair Competition Law Claim Fails (Count V) ....................................... 16

23

     A.    Dexon Fails To State a Claim Under the UCL Based On Alleged Misrepresentations ............................ 17

24

          1.    Dexon lacks statutory standing to maintain its UCL claim based on alleged fraud. .................................. 17

25

26

          2.    Dexon fails to plead fraud with the requisite particularity........................... 18

27

     B.    Dexon Has Not Alleged That Cisco Engaged in Any Unlawful or Unfair Conduct ................................ 20

28

1    C.    Dexon Does Not Seek a Statutorily Authorized Remedy ........................................ 20

2  V.    The Declaratory-Judgment Claims (Counts VI and VII) Should Be Dismissed For
       Lack Of Jurisdiction .................................................................................................... 21

3

4       A.    Count VI Fails Because Dexon Fails To Allege That Cisco Has Threatened
             or Will Threaten Litigation Over Sales of Genuine Cisco Products ...................... 22

5       B.    Count VII Fails Because Dexon Improperly Seeks Declaratory Relief Based
             on a Statute That Provides No Private Right of Action .......................................... 22

6  VI.    The Lanham Act Claim Fails (Count VIII) ..................................................................... 23

7       A.    The Lanham Act Claim Fails to Meet Rule 9(b)'s Heightened Pleading
8             Standard .................................................................................................................... 23

9       B.    The Alleged Misrepresentations Are Legal Opinions and Therefore Not
             Actionable Under the Lanham Act ........................................................................... 23

10  VII.   The Intentional Interference And Trade Libel Claims Fail (Counts IX-XI) ................... 24

11  CONCLUSION .......................................................................................................................... 25

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.177**

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

1 
2 
3 
4 *AccuImage Diagnostics Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941 (N.D. Cal. 2003)...........24

5 *Acer Am. Corp. v. Intellisoft Ltd.*, 2021 WL 1164756 (N.D. Cal. Mar. 26, 2021)...................7, 22

6 *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947 (9th Cir. 1998)...............12

7 *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016).............................9, 12

8 *Alfasigma USA, Inc. v. First Databank, Inc.*, 2021 WL 930453 (N.D. Cal. Mar. 11, 2021)....3, 23

9 *Apple iPod iTunes Antitrust Litig., In re*, 796 F. Supp. 2d 1137 (N.D. Cal. 2011)......................13

10 *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................6, 12

11 *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) ..................................13

12 *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853 (9th Cir. 2017) ..........................................3, 22

13 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..............................................................6, 12, 20

14 *Block v. eBay, Inc.*, 2012 WL 1601471 (N.D. Cal. May 7, 2012),

15      *aff'd*, 747 F.3d 1135 (9th Cir. 2014) ...............................................................................3, 18

16 *Blough v. Holland Realty, Inc.*, 574 F.3d 1084 (9th Cir. 2009) ....................................................8

17 *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012)...............................2, 8, 9, 12, 15

18 *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977)...........................................16

19 *Buso v. ACH Food Cos.*, 445 F. Supp. 3d 1033 (S.D. Cal. 2020)................................................17

20 *Carreno v. 360 Painting, LLC*, 2021 WL 1087106 (S.D. Cal. Mar. 19, 2021) .......................3, 19

21 *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883 (9th Cir. 2008) ..........................................10

22 *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) ...............3, 20

23 *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813 (N.D. Cal. 2019) ..............18, 19, 22

24 *Cisco Sys. Inc. v. Link US, LLC*, 2019 WL 6682838 (N.D. Cal. Dec. 6, 2019).........18, 19, 20, 21

25 *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148 (9th Cir. 2001)..................................10

26 *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999)..........23, 24

27 *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977).........................................................11

28 *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992).......................................5, 7

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.178**

| | |
|---|---|
| *eBay Seller Antitrust Litig.*, *In re*, 545 F. Supp. 2d 1027 (N.D. Cal. 2008) | 8 |
| *Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925 (N.D. Cal. Sept. 10, 2021), | |
| *appeal filed*, No. 21-16506 (9th Cir. Sept. 13, 2021) | 20 |
| *Equinox Hotel Mgmt., Inc. v. Equinox Holdings, Inc.*, | |
| 2018 WL 659105 (N.D. Cal. Feb. 1, 2018) | 3, 17 |
| *Facebook, Inc. v. Brandtotal Ltd.*, 2021 WL 2354751 (N.D. Cal. June 9, 2021) | 12 |
| *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, | |
| 569 F. Supp. 2d 929 (N.D. Cal. 2008) | 25 |
| *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) | 12, 13, 14 |
| *Graminex, L.L.C. v. Aktiebolaget Cernelle*, 451 F. Supp. 3d 732 (E.D. Mich. 2020) | 22 |
| *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137 (N.D. Cal. 2020) | 13 |
| *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) | 7 |
| *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) | 7, 15 |
| *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019) | 20 |
| *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009) | 6, 18, 23 |
| *Knutson v. Daily Review, Inc.*, 548 F.2d 795 (9th Cir. 1976) | 16 |
| *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) | 7 |
| *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134 (2003) | 3, 20 |
| *Language Line Servs., Inc. v. Language Servs. Assocs., LLC*, | |
| 2011 WL 5024281 (N.D. Cal. Oct. 13, 2011) | 3, 24 |
| *Lee v. Luxottica Retail N.A., Inc.*, 65 Cal. App. 5th 793 (2021) | 21 |
| *Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440 (2005) | 21 |
| *Magic Leap, Inc. v. Chi Xu*, 2020 WL 3268659 (N.D. Cal. June 17, 2020) | 25 |
| *McMahon v. Pier 39 Ltd. P'ship*, 2001 WL 1463814 (N.D. Cal. Nov. 8, 2001), | |
| *aff'd*, 54 F. App'x 644 (9th Cir. 2003) | 15 |
| *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) | 21, 22 |
| *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124 (9th Cir. 2004) | 13, 14 |
| *Miller v. City & Cnty. of S.F.*, 187 Cal. App. 2d 480 (1960) | 19 |

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.179**

| | | |
|---|---|---|
| 1 | *Monster Cable Prods., Inc. v. Euroflex S.R.L.*, 642 F. Supp. 2d 1001 (N.D. Cal. 2009) | .........3, 22 |
| 2 | *Mozart Co. v. Mercedes-Benz of N.A., Inc.*, 833 F.2d 1342 (9th Cir. 1987) | ................14 |
| 3 | *Muddy Waters, LLC v. Superior Ct.*, 62 Cal. App. 5th 905 (2021) | ................24 |
| 4 | *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149 (9th Cir. 2010) | ................23 |
| 5 | *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038 (9th Cir. 2008) | ................9 |
| 6 | *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) | ................13 |
| 7 | *O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989 (N.D. Cal. 2014) | ................18 |
| 8 | *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997) | ................11 |
| 9 | *Oracle Am., Inc. v. CedarCrestone, Inc.*, 2012 WL 12897962 (N.D. Cal. Dec. 7, 2012) | ............12 |
| 10 | *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) | ................13 |
| 11 | *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007) | ................14 |
| 12 | *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) | ................14 |
| 13 | *Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963 (9th Cir. 2008) | .........9, 15 |
| 14 | *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987) | ................2, 16 |
| 15 | *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160 (N.D. Cal. 2013) | ................10 |
| 16 | *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780 (9th Cir. 1996) | ............14 |
| 17 | *Spindler v. Johnson & Johnson Corp.*, 2011 WL 13278876 (N.D. Cal. Jan. 21, 2011) | ................8 |
| 18 | *State Oil Co. v. Khan*, 522 U.S. 3 (1997) | ................11 |
| 19<br>20 | *Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*,<br>2021 WL 3616480 (N.D. Cal. Aug. 16, 2021), *appeal filed*, No. 21-16494<br>(9th Cir. Sept. 10, 2021) | ................15 |
| 21 | *Underwager v. Channel 9 Australia*, 69 F.3d 361 (9th Cir. 1995) | ................24 |
| 22 | *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U/S. 398 (2004) | ....2, 10, 12 |
| 23 | *Vernor v. Autodesk, Inc.*, 621 F.3d 1102 (9th Cir. 2010) | ................19 |
| 24 | *Water, Inc. v. Everpure, Inc.*, 2009 WL 10670419 (C.D. Cal. Oct. 28, 2009) | ................16 |
| 25 | *Webkinz Antitrust Litig., In re*, 695 F. Supp. 2d 987 (N.D. Cal. 2010) | ................8 |
| 26 | **STATUTES** | |
| 27 | 17 U.S.C. 109(a) | ................19 |
| 28 | 28 U.S.C. §§ 2201-2022 | ................21 |

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.180**

1 | Cal. Bus. & Prof. Code § 17200 ..................................................................... 17

2 | N.Y. Gen. Bus. Law § 369-b .......................................................................... 22

3 | **RULES**

4 | Fed. R. Civ. P. 9(b) ........................................................... 6, 17, 18, 23, 24, 25

5 | Fed. R. Civ. P. 12(b)(1) .................................................................................. 1

6 | Fed. R. Civ. P. 12(b)(6) .................................................................................. 1

7 | Fed. R. Civ. P. 12(f) ....................................................................................... 1

8 | **OTHER AUTHORITIES**

9 | Am. Answer and Countercls., *Cisco Sys., Inc. v. Beccela's Etc., LLC*,

10 |      No. 5:18-CV-00477-BLF (N.D. Cal. Jan. 2, 2019), Dkt. 81 ............................. 19

11 | X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020) ................... 9

Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.181**

**STATEMENT OF REQUESTED RELIEF**

Cisco requests that the Court dismiss Dexon's counterclaims under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1), and, in the alternative, strike (in part) Count V under Rule 12(f).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The counterclaims allege that Cisco targeted Dexon – which claims to be a distributor of Cisco equipment – because it is an "efficient, low-cost" seller of Cisco's equipment. Dexon's Am. Countercls. ("CC") ¶ 71c, Dkt. 50. This proposition makes no sense. Cisco is a manufacturer of network equipment, and it competes with other manufacturers that sell to end users through distributing resellers. Like any manufacturer, Cisco has every incentive to design a distribution system that is low-cost and efficient – if middlemen earn large profits, that raises prices for end users and hurts Cisco's sales; but if Cisco's distribution channel is low-cost and efficient, it makes Cisco's equipment more competitive. To be sure, it is critical to Cisco's business of creating reliable networking products that its resellers protect end users against counterfeit goods and goods that cybercriminals have compromised. Cisco depends on reliable and responsible resellers who provide its end users with excellent service. There is no logic to Dexon's claim that Cisco earns higher margins "for sales made through channels that have higher resale prices." *Id.* ¶ 45. Why would that be? Cisco can set the price it charges for the equipment it manufactures. Why would it charge efficient resellers higher prices than inefficient ones?

But even granting this implausible premise, Dexon fails to state any claim under the antitrust laws or any other state or federal law. The fundamental defect with Dexon's antitrust claims is that none of the conduct that Dexon purports to challenge has anything to do with competition in the relevant markets for network equipment (switches and routers). Dexon recognizes that Cisco faces competition from (at least) Hewlett Packard Enterprise, Dell, and Juniper Networks. *See id.* ¶ 95. For Dexon's claims to get off the ground, it must therefore allege that Cisco's conduct limited competition from Cisco's rivals in those markets. But Dexon does not even attempt to allege any such thing.

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.182**

Dexon first attempts a "tying" claim – asserting that Cisco used its supposed power in a claimed market for service to induce customers to purchase Cisco equipment. That claim fails because Dexon never alleges that the supposed tying arrangement prevented any customer from purchasing equipment sold by a Cisco competitor. Rather, Dexon complains that the supposed tie led one (unidentified) customer who always intended to buy Cisco equipment to buy that equipment from someone other than Dexon. *Id*. ¶ 42. But in the absence of any allegation that the tying arrangement foreclosed any *competitor's* sales – and Dexon makes no such allegation – there is no antitrust claim. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-1202 (9th Cir. 2012). Accordingly, Dexon's claims brought under Section 1 of the Sherman Antitrust Act (Count I) and California's Cartwright Act (Count IV) fail.

Dexon next alleges "monopolization" and "attempted monopolization" based on Cisco having supposedly denied Dexon access to a service-related database. Such refusal-to-deal claims rarely survive motions to dismiss, and Dexon does not come close to pleading one here. *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Dexon never alleges that Cisco's conduct excluded any competitor from the market. As noted above, in the supposedly monopolized markets for network equipment, Cisco's competitors are other manufacturers, not Dexon. And Dexon does not claim that Cisco made it harder for those rivals to distribute their products, only that Cisco made it harder for Dexon to distribute Cisco's products. Nor does Dexon allege facts suggesting that its success or failure has any significance for competition in the relevant markets. For each reason, Dexon's Section 2 claims (Counts II-III) fail as a matter of law.

All of Dexon's antitrust claims (Counts I-IV) independently fail for the additional reason that Dexon lacks antitrust injury. Dexon has at most alleged that Cisco's conduct undermined Dexon's ability to sell Cisco products; Dexon does not allege, as it must, any injury flowing from reduced competition between Cisco and its competitors in the alleged relevant markets. *See Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734-35 (9th Cir. 1987). As to the alleged tying conduct, Dexon does not allege any injury from reduced competition in the tied product markets for routers and switches (i.e., the competition between Cisco and other manufacturers). And as to the

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.183**

1   vague refusal-to-deal theory, Dexon fails to allege reduced competition in any relevant antitrust

2   market, instead asserting mere harm to itself, which is insufficient as a matter of law.

3           Dexon bases its remaining claims on vague allegations that Cisco engaged in

4   misrepresentations, but Dexon has no standing to assert such claims under the fraudulent prong of

5   the California Unfair Competition Law ("UCL"), *see Equinox Hotel Mgmt., Inc. v. Equinox*

6   *Holdings, Inc.*, 2018 WL 659105, at *13 (N.D. Cal. Feb. 1, 2018); none of the representations is

7   pleaded with the requisite particularity, *see Block v. eBay, Inc.*, 2012 WL 1601471, at *4 (N.D. Cal.

8   May 7, 2012) (Breyer, J.); and the claim that Cisco's End User Licensing Agreement ("EULA") is

9   misleading (it is not) fails as a matter of law in any event because it states a legal position, not facts,

10  *see Carreno v. 360 Painting, LLC*, 2021 WL 1087106, at *5 (S.D. Cal. Mar. 19, 2021).  Nor does

11  Dexon allege any facts to support the assertion that Cisco's conduct was "anticompetitive" for

12  purposes of the UCL.  *See Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th

13  163, 187 (1999).  In any event, the UCL does not authorize Dexon to obtain monetary relief for

14  supposedly lost sales.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1144

15  (2003).

16          Dexon's two declaratory-judgment claims (Counts VI-VII) should be dismissed for want of

17  jurisdiction.  *See Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 867 (9th Cir. 2017).  Count VI,

18  which seeks a declaration that Dexon's sales of "genuine" Cisco products do not violate the Lanham

19  Act, turns on a hypothetical dispute, not the requisite actual case or controversy.  *See Monster Cable*

20  *Prods., Inc. v. Euroflex S.R.L.*, 642 F. Supp. 2d 1001, 1010-11 (N.D. Cal. 2009).  And Count VII

21  impermissibly seeks a declaration under a state law that provides no private right of action.  Dexon

22  thus fails to establish subject-matter jurisdiction as to either claim.

23          The Lanham Act claim (Count VIII) fails – like the UCL claim – because Dexon does not

24  allege with particularity (as it must) the supposed misrepresentations on which this claim turns.  *See*

25  *Alfasigma USA, Inc. v. First Databank, Inc.*, 2021 WL 930453, at *9-10 & n.6 (N.D. Cal. Mar. 11,

26  2021).   And the vaguely alleged misrepresentations that Dexon does assert relate to legal

27  conclusions in Cisco's EULA, which are not actionable under the Lanham Act.  *See Language Line*

28  *Servs., Inc. v. Language Servs. Assocs., LLC*, 2011 WL 5024281, at *11 (N.D. Cal. Oct. 13, 2011).

1  Finally, Dexon's tort claims (Counts IX-XI) likewise fail to plead the requisite elements of any
2  cause of action.

3        For the foregoing reasons and those that follow, Dexon's counterclaims should be dismissed
4  in their entirety with prejudice.

5  **BACKGROUND**

6      **A.   Cisco's World-Class Critical Infrastructure**

7        Dexon alleges (at ¶ 14) that Cisco is a "worldwide" leader of "networking for the Internet."
8  Cisco manufactures "core technologies" – critical infrastructure – across a range of product uses,
9  including for "home networking, IP telephony, optical networking, security, storage area
10  networking, and wireless technology." CC ¶ 14. These core technologies include Internet
11  switches and routers, which are "network equipment" hardware components that enable Internet
12  access. *See id.* ¶¶ 22, 27. Cisco competes for equipment sales against a number of "leading
13  manufacturers," including "Hewlett Packard [Enterprise], Dell, [and] Juniper Networks," *id.* ¶ 95
14  – some of the most successful technology companies in the world. If consumers are dissatisfied
15  with Cisco, then they will "purchase competitive networking equipment from Cisco's
16  competitors." *Id.* ¶ 51. The products these companies manufacture are "the fundamental building
17  blocks" of modern Internet infrastructure, "deployed in virtually every modern business and
18  government office." *Id.* ¶ 22.

19        Cisco also services the products it manufactures (but not other manufacturers' equipment),
20  including by offering a service package called SmartNet. *See id.* ¶¶ 17, 20. SmartNet gives Cisco
21  customers access to proprietary "bug fixes, patches and updates" that enable the "effective" and
22  safe operation of Cisco hardware by protecting purchasers of that critical infrastructure from
23  "security vulnerabilities" and "operational risks." *Id.* ¶¶ 17, 18. As Dexon acknowledges, Cisco
24  does not "require[ ]" its equipment customers to purchase SmartNet. *Id.* ¶ 18. And as Dexon
25  further alleges, "third-party providers" can offer Cisco's hardware customers alternatives to
26  receive services on Cisco equipment. *Id.* ¶ 20; *see also id.* ¶ 37. Cisco's hardware customers may
27  choose to purchase a SmartNet package after purchasing equipment. *See id.* ¶ 36. But those
28  customers need not purchase SmartNet from Cisco directly; companies other than Cisco "sell an

Case No. 3:20-cv-4926
4

**App.185**

1  extremely large volume of SmartNet service packages." *Id.* ¶ 38.

2  **B.    Cisco Protects the Safety of Its Products and Distribution Channels**

3       According to Dexon's counterclaims, Cisco sells a majority of the hardware it

4  manufactures through a "distribution channel," *id.* ¶ 45, comprised of distributors and many value

5  added resellers, *see id.* ¶¶ 48, 52.  Dexon identifies more than a dozen resellers of Cisco equipment

6  (and does not claim that those resellers constitute more than a tiny fraction of the total).  *See id.*

7  ¶¶ 172-190 (listing "dealers and merchants" against whom Dexon brings third-party claims).  A

8  significant "[s]econdary market" for Cisco products also exists; Dexon acknowledges that "rogue

9  actors" have infiltrated this market with "counterfeit goods," i.e., equipment passed off as genuine

10  Cisco product when in fact it is not.  *Id.* ¶ 116.  Unfortunately, Cisco's "[a]uthorized [r]eseller"

11  model "is not foolproof protection against counterfeit products" that have "victimized" Cisco's

12  customers.  *Id.* ¶ 117.  Therefore, as Dexon alleges, Cisco maintains a policy of refusing to

13  warranty or service "products sold on the secondary market" if Cisco cannot determine whether

14  the products are "genuine" or counterfeit.  *Id.* ¶ 114.  Cisco may, however, take steps "to ensure

15  secondary market products qualify" for Cisco's service, *id.* – including the SmartNet service

16  package – upon payment of a "re-certification" fee, *id.* ¶¶ 4, 118.  This "re-certification" process

17  supports the "continu[ation]" of "SmartNet service associated with previously purchased

18  networking products."  *Id.* ¶¶ 4, 54.

19  **C.    Dexon's Counterclaims**

20       Dexon's counterclaims fall into four categories:

21       *First*, Counts I (Section 1 of the Sherman Act), II-III (Section 2 of the Sherman Act), and

22  IV (Cartwright Act) depend on the claim that Cisco "tied" the purchase of new Cisco routers and

23  switches to the provision of SmartNet service.  *See id.* ¶¶ 37-43.  Despite the label, the factual

24  allegations are unlike those supporting any tying claim that a court has recognized.  In particular,

25  they should not be confused with "aftermarket" claims in which a manufacturer allegedly requires

26  customers to purchase service as a condition of gaining access to proprietary parts.  *See, e.g.*,

27  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992).  Here, the "tying" product is

28  the service that Cisco provides to SmartNet purchasers, which Cisco supposedly uses to direct

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1   customers to purchase new Cisco equipment from resellers other than Dexon.  But Dexon never

2   alleges that this conduct prevented sales by any other manufacturer.  *See* CC ¶ 42 (alleging a

3   customer wanted to buy Cisco equipment and bought Cisco equipment).

4   　　　　*Second*, Counts III-IV (Section 2 of the Sherman Act) depend on allegations that Cisco

5   terminated Dexon's access to a service database that Cisco maintains and makes available to

6   resellers.  *See id.* ¶¶ 50-51, 71d.  Dexon (illogically) asserts that this conduct allows Cisco to

7   maintain (or attempt to acquire) a monopoly in alleged product markets for switches and routers,

8   even though Dexon does not allege that denying Dexon access to the database does anything to

9   interfere with anyone's sales of any competing manufacturer's equipment.

10   　　　　*Third*, Counts V (UCL), VIII (Lanham Act), and IX-XI (common-law claims) involve

11   claims that Cisco misrepresents Dexon's products and services to discourage unidentified

12   customers from contracting with Dexon.  Yet Dexon does not allege the "who, what, when, where,

13   or how" of any supposed misrepresentation, providing not one detail about any customer,

14   representation, speaker, specific untrue statement, the reliance any Cisco statement induced, or

15   why that reliance was reasonable.  Dexon does not even allege that it was ever misled.

16   　　　　*Fourth*, Count VI seeks a declaratory judgment that Dexon's sale of genuine Cisco

17   equipment does not violate the Lanham Act – even though Cisco has never claimed that it does.

18   And Count VII seeks a declaration that Cisco's refusal to warrant certain resold products is

19   "unenforceable in New York" – though Dexon does not allege that there is (or even could be,

20   since the statute at issue provides no private right of action) any actual controversy between the

21   parties with respect to that legal question.

22   　　　　　　　　　　　　　　　**LEGAL STANDARD**

23   　　　　"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim

24   to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted),

25   and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

26   And, where the counterclaims sound in fraud, Dexon must satisfy Rule 9(b)'s heightened pleading

27   standard by alleging, with particularity, "the who, what, when, where, and how of the misconduct

28   charged."  *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1  omitted).  Dexon also bears the burden of establishing that the court has subject-matter jurisdiction

2  as to each claim.  *See Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Acer*

3  *Am. Corp. v. Intellisoft Ltd.*, 2021 WL 1164756, at *2 (N.D. Cal. Mar. 26, 2021).

**ARGUMENT**

4  **I.      Dexon Fails To Allege An Actionable Tying Claim (Counts I & IV)**

5       **A.      The Section 1 Claim Fails Because Dexon Does Not Allege Any Foreclosure in**

6            **the Tied Product Market or Any Tying Between Service and Equipment**

7       **1.**      Dexon's claim that Cisco engages in unlawful tying fails for multiple reasons, most

8  fundamentally because Dexon never alleges that Cisco used its supposed power in any market to

9  foreclose sales of any competitor's equipment.  To plead a tying claim under Section 1 of the

10  Sherman Act, Dexon must allege that the defendant seller "exploit[ed]. . . its control over the tying

11  product to force the buyer into the purchase of a tied product that the buyer either did not want at

12  all, or might have preferred to purchase elsewhere on different terms."  *Jefferson Par. Hosp. Dist.*

13  *No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep.*

14  *Ink, Inc.*, 547 U.S. 28 (2006).  For example, in *Eastman Kodak*, the plaintiff (respondent in the

15  Supreme Court) serviced Kodak copiers; it alleged that Kodak agreed to sell replacement parts to

16  owners of its copiers only if they agreed not to obtain service from independent service providers

17  like the plaintiff.  *See* 504 U.S. at 462-63.  Post-sale service of Kodak copiers was the tied product

18  market, and the tie foreclosed the plaintiff from competing with Kodak to provide that service.

19  Here, the supposed tying product is not equipment or replacement parts, but service

20  provided under SmartNet contracts.  *See* CC ¶¶ 47, 62.  The counterclaims allege that on one

21  occasion, an unidentified customer cancelled an order with Dexon for Cisco equipment because

22  Cisco warned that it would not provide service on the specific Cisco equipment Dexon sold; the

23  customer instead purchased Cisco equipment elsewhere.  *See id.* ¶ 42.

24  Accepting these allegations as true, they do not support any claim that Cisco foreclosed the

25  sale of any *competitor's* equipment.  Dexon defines the Relevant Product Markets as markets for

26  network equipment, *see id.* ¶ 35, in which Cisco allegedly competes with manufacturers such as

27  Hewlett Packard Enterprise, Dell, and Juniper Networks, *see id.* ¶ 95.  But Dexon does not allege

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.188**

1   that any customer was induced to forgo purchases of those competitors' routers and switches in

2   order to gain access to SmartNet service.  The anonymous customer whom Cisco allegedly

3   subjected to the "tie" bought Cisco equipment from a different retailer.  Even on the assumption

4   that the alleged conduct posed an obstacle to *Dexon's* sales of *Cisco* equipment, it posed no

5   impediment to *competition* in any of the relevant markets.

6        The failure to allege foreclosure of any competitor's sale of equipment is fatal to Dexon's

7   tying claim.  *See, e.g., Brantley*, 675 F.3d at 1199-1202 (tying claim fails absent allegations

8   supporting foreclosure, i.e., that consumers "would" have "purchased [other] services" in the tied

9   market from a competitor but for the tie); *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089

10  (9th Cir. 2009) (no valid Section 1 tying claim where no sales in the tied market are "foreclosed to

11  competitors by the tie") (internal quotation marks omitted); *Spindler v. Johnson & Johnson Corp.*,

12  2011 WL 13278876, at *5 (N.D. Cal. Jan. 21, 2011) (tying claim fails where plaintiffs failed to

13  allege reduction in competition in the relevant market between drugs offered by the defendant and

14  "competitors' drugs"); *In re Webkinz Antitrust Litig.*, 695 F. Supp. 2d 987, 996-98 (N.D. Cal.

15  2010) (dismissing tying claim where plaintiffs failed to "allege that consumers are unable to

16  purchase the competing manufacturers' products from other retailers" in the allegedly tied

17  market); *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1034 (N.D. Cal. 2008)

18  (dismissing tying claim where plaintiffs had not alleged that the tie "denie[d] competitors free

19  access to the tied product market").

20        **2.**     The tying claim fails for an additional fundamental reason:  Dexon has not

21  plausibly alleged any tie between service and equipment.  To allege a tie, the plaintiff must allege

22  "an agreement by [the seller] to sell one product but only on the condition that the buyer also

23  purchase a different (or tied) product, or at least agrees that he will not purchase that product from

24  any other supplier."  *Webkinz Antitrust Litig.*, 695 F. Supp. 2d at 993.  Dexon alleges (at ¶ 62) that

25  Cisco's SmartNet "service packages" are the "tying product," but, by definition, customers

26  purchase SmartNet to receive services for Cisco equipment.  *See* CC ¶ 20 (defining the tying

27  product market as "Maintenance Services on Cisco Equipment").  As the leading antitrust treatise

28  has explained, it defies logic to complain that Cisco will not agree to provide service on Cisco

8

Case No.  3:20-cv-4926

**App.189**

1   equipment unless a customer buys Cisco equipment.  No consumer wants Cisco service unless it

2   wants Cisco equipment in the first place.  *See* X Phillip E. Areeda & Herbert Hovenkamp,

3   *Antitrust Law* ¶ 1740c4 (4th ed. 2020) ("The only possible tying product is the machine.  Repair

4   parts or service might be tied, but neither can be the tying product, for no customer could prefer

5   the defendant's machine because of an unrequited desire for a part to repair that very machine.").

6         As noted, Dexon suggests that, in one instance, a Cisco customer bought new Cisco

7   equipment from a retailer other than Dexon in order to continue receiving contracted-for service

8   not only on new Cisco equipment but also on Cisco equipment it already owned.  But this claim

9   sounds in contract, not antitrust, law – either any limitation on service was consistent with the

10   contract (and the customer presumably knew about the limitation from the start) or (as Dexon

11   seems to allege) it was not.  *See* CC ¶ 43 (alleging Cisco "will not honor" agreements with third

12   parties).  If it was not, then customers could simply enforce their contracts.  In any event, taking

13   all allegations as true, there is no claim that Cisco used supposed power in any alleged service

14   aftermarket to induce anyone to purchase Cisco equipment when it would have preferred to

15   purchase some other manufacturer's equipment.  Thus, any condition in the service contract had

16   nothing to do with *tying*.  *See Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 973

17   (9th Cir. 2008); *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1047 (9th Cir. 2008).

18         **3.**     In any event, Dexon's factual allegations belie the claim that Cisco required

19   customers to purchase new equipment as a condition of obtaining SmartNet contracts.  On the

20   contrary, Dexon alleges (at ¶ 4) that Cisco's customers can receive SmartNet service for any

21   genuine Cisco equipment by paying a "re-certification fee" – meant to ensure the equipment is not

22   counterfeit or vulnerable to security exploits – without purchasing any new equipment.  That is not

23   a tying claim.  *See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1179 (9th Cir. 2016)

24   (plaintiff's acknowledgment that defendant "routinely sells [auxiliary power units] parts to airlines

25   without conditioning sales on service contracts" precludes tying claim as a matter of law).  Even if

26   this re-certification fee amounted to a price increase, the Ninth Circuit has instructed that "merely

27   enhancing the price of the tying product" "does not," as a matter of law, "threaten an injury to

28   competition."  *Brantley*, 675 F.3d at 1199.

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1    **B.    Dexon's Parallel Cartwright Act Claim Also Fails (Count IV)**

2    Because Dexon has failed to plead a tying claim under the Sherman Act, its Cartwright Act

3    claim also fails for the same reasons. *See Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148,

4    1160 (9th Cir. 2001) (explaining that the "analysis under California's antitrust law mirrors the

5    analysis under federal law"); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1181 (N.D. Cal. 2013)

6    (granting motion to dismiss; Cartwright Act claim fails for the same reasons as the Section 1 claim).

7    **II.    Dexon's Section 2 Monopolization Claims Fail (Counts II & III)**

8    **A.    Dexon Fails To Allege Any Exclusionary Conduct**

9    **1.**    Dexon does not allege actionable exclusionary conduct, as it must for a Section 2

10   monopolization claim. *See Trinko*, 540 U.S. at 407 ("the possession of monopoly power will not

11   be found unlawful unless it is accompanied by an element of anticompetitive *conduct*"). Dexon's

12   allegation (at ¶ 71a) that Cisco unlawfully maintained a monopoly in (or attempted to monopolize)

13   the equipment markets by "withholding service in the Relevant Service Markets" – fails for the

14   same reason that its tying claim fails:  the counterclaims do not allege that Cisco's service-contract

15   conduct prevents Cisco's *competitors* from making any sales. *See Cascade Health Sols. v.*

16   *PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008) ("Anticompetitive conduct is behavior that tends

17   to impair the opportunities of rivals and either does not further competition on the merits or does

18   so in an unnecessarily restrictive way.").

19   **2.**    Dexon's allegation (at ¶¶ 50-51) that Cisco denied it "access to the service

20   database" provides no support for the claim that Cisco maintained a monopoly in (or attempted

21   monopolization of) any market for equipment.  Again, on the assumption that the alleged conduct

22   makes it harder for Dexon to sell *Cisco* equipment, there is no allegation that it makes it harder for

23   Dexon (or anyone else) to sell any *competitor's* equipment.  There is thus no connection to the

24   supposed maintenance (or acquisition) of monopoly power in any market for equipment.  On the

25   contrary, Dexon insists that Cisco's purported conduct *encourages* consumers to "purchase

26   competitive networking equipment from Cisco's competitors."  CC ¶ 51.  Whatever the effect on

27   Dexon, there is no allegation that the conduct had any adverse effect on Cisco's competitors in the

28   relevant markets.

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1    Dexon suggests (at ¶ 45) that Cisco restricts distribution of Cisco equipment to certain

2    channels to maintain high prices, but even if accepted as true, these restrictions have nothing to do

3    with maintaining *a monopoly.*  For distribution restrictions to raise antitrust concerns, a

4    monopolist must use its market power to foreclose a substantial share of distribution opportunities

5    that its competitors would otherwise use.  *Cf. Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157,

6    1163 (9th Cir. 1997) ("If competitors can reach the ultimate consumers of the product . . . it is

7    unclear whether such restrictions [on distribution] foreclose from competition *any* part of the

8    relevant market.").  But Dexon has not alleged that Cisco has denied (or even tried to deny)

9    competitors the ability to distribute their products to end users.  Even assuming that Dexon finds it

10   hard to sell Cisco equipment without access to Cisco's database, that says nothing about Dexon's

11   ability to sell other manufacturers' equipment.  And Dexon has made no factual allegations to

12   support any suggestion that *Dexon's* distribution capabilities are of any market-wide significance

13   in any event.  On the contrary, Dexon alleges that the "total amount of commerce in the Relevant

14   Product Markets is billions of dollars," CC ¶ 65, without alleging anything about the volume of its

15   own sales.  Instead, Dexon names more than a dozen Third-Party Defendants who are "reputable

16   dealers and merchants with respect to the Cisco products alleged to be counterfeit" (but which

17   Dexon claims to believe are genuine), *id.* ¶ 191; and Dexon concedes that there are larger value-

18   added resellers ("in terms of volume") distributing Cisco products, *id.* ¶ 52.  Even assuming what

19   is not alleged – that Cisco's conduct somehow made it harder for Dexon to distribute competitors'

20   products – there is no allegation that Dexon's success or failure would affect competition.

21   Nor does Dexon's theory even begin to make economic sense as a monopolization claim.

22   Cisco's economic incentive is to ensure that its distribution chain is competitive to keep

23   distributors' margins low while ensuring that its retail customers receive service that protects

24   Cisco's brand reputation.  *Cf. State Oil Co. v. Khan*, 522 U.S. 3, 17-18 (1997) (rejecting per se

25   liability for vertical maximum price fixing, explaining that "business judgment" and self-

26   interested maintenance of competitive distribution channels limit abusive conduct); *Cont'l T.V.,*

27   *Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977) ("when interbrand competition exists . . .  it

28   provides a significant check on the exploitation of intrabrand market power because of the ability

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.192**

1    of consumers to substitute a different brand of the same product").  If prices of Cisco equipment

2    rise because of inefficiency in distribution, that can only help Cisco's competitors and hurt Cisco.

3         It is often said that antitrust claims "must make economic sense."  *Adaptive Power Sols.,*

4    *LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998).  Dexon's do not; such facial

5    implausibility warrants dismissal on the pleadings.  *See Iqbal*, 556 U.S. at 679 (claims must be

6    plausible in light of "judicial experience and common sense"); *Twombly*, 550 U.S. at 555-56, 558

7    ("a district court must retain the power to insist upon some specificity in pleading before allowing

8    a potentially massive factual controversy to proceed").

9         **B.     Dexon's Opaque Refusal-to-Deal Claim Fails as a Matter of Law**

10        **1.**     Because Dexon's claim depends on the assertion that Cisco had a duty under the

11   antitrust laws to deal with Dexon – by providing access to a service database – its claim fails for

12   the additional reason that it has not come close to clearing the very high bar set for such refusal-to-

13   deal claims.  *See Facebook, Inc. v. Brandtotal Ltd.*, 2021 WL 2354751, at *16 (N.D. Cal. June 9,

14   2021) (stating that, "so long as [the defendant] generally has a right to set rules for accessing [its

15   database] – a principle not reasonably in dispute – its refusal to authorize the access [plaintiff]

16   seeks is a refusal to deal with a potential competitor"); *cf. Oracle Am., Inc. v. CedarCrestone, Inc.*,

17   2012 WL 12897962, at *5-6 (N.D. Cal. Dec. 7, 2012) (explaining that refusal to provide pricing

18   was, "[a]t bottom," a "simple refusal to deal"); *cf. Aerotec Int'l*, 836 F.3d at 1179-80, 1184

19   (rejecting attempt to reframe "refusal to deal claim" as a tying claim where nothing "suggests that

20   arguably manipulative tactics imposed on a third-party competitor are sufficient by themselves to

21   create a tie with respect to a separate buyer simply because they make it less desirable to purchase

22   from the third party").

23        Cisco is under no duty to grant Dexon "access to [Cisco's] service database" – the only

24   conduct Dexon alleges that could plausibly affect its sales.  *See Trinko*, 540 U.S. at 409-11; *FTC*

25   *v. Qualcomm Inc.*, 969 F.3d 974, 993 (9th Cir. 2020).  Cisco is free to structure its distribution

26   network in the manner it deems most efficient; even a dominant firm has every incentive to

27   promote competitive downstream distribution.  *Cf. Brantley*, 675 F.3d at 1201-02 (merely alleging

28   a "tying arrangement" is insufficient to state a claim because such arrangements in distribution

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1   networks are "consistent with pro-competitive behavior" and firms' freedom to "choose the

2   manner in which they do business absent an injury to competition").  Dexon's claims that Cisco

3   "abused" its "power" in the services market "to prevent rival firms from competing effectively in

4   the retail market" are therefore "not cognizable under the Sherman Act in the absence of an

5   antitrust duty to deal."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).

6       **2.**     Dexon does not plead any element of any possible narrow exception to this

7   doctrine.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).

8   Specifically, Dexon does not allege that Cisco terminated a "profitable course of dealing" by

9   refusing to provide Dexon access to a product "already sold in a retail market to other customers,"

10  *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004), nor does it allege

11  that this conduct was "irrational but for its anticompetitive effect," *Novell, Inc. v. Microsoft Corp.*,

12  731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.); *see also In re Apple iPod iTunes Antitrust*

13  *Litig.*, 796 F. Supp. 2d 1137, 1145 (N.D. Cal. 2011) (requiring that "anticompetitive malice"

14  motivated the refusal to deal).  Dexon's failure to satisfy these mandatory elements is fatal to its

15  claims.

16      **a.**     Dexon does not allege that Cisco terminated a profitable course of dealing.  It

17  alleges the opposite:  denying Dexon access to the service database allowed Cisco to boost "its

18  own profit margins," CC ¶ 53, and "force purchases through Cisco's most expensive channels," *id.*

19  ¶¶ 71b, 77b; *see also id.* ¶ 45 (alleging that Cisco's "margins are far higher for sales made through

20  channels that have higher resale prices").  The allegation that Cisco opted for a "more lucrative"

21  distribution channel is fatal to Dexon's claim.  *Qualcomm*, 969 F.3d at 994.  The conclusory

22  assertion (at ¶ 53) that cutting off Dexon harmed Cisco's attempt to be "known as the most

23  ubiquitous networking equipment provider" does not substitute for an allegation that dealing with

24  Dexon specifically was "profitable" to Cisco.  *Cf. hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp.

25  3d 1137, 1151 (N.D. Cal. 2020) (allegation that competitor's use of LinkedIn network "help[ed]

26  prove LinkedIn's value proposition" to customers failed to plead profitable course of dealing

27  under *Aspen Skiing*).

28

Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.194**

**b.**     There is no allegation that Cisco singled out Dexon, i.e., that Cisco made access to its service database available to "other" resellers similarly situated to Dexon on terms different from those to which Dexon was purportedly subject, or even that Cisco will not sell to Dexon at prices available to similarly situated buyers.  *See MetroNet Servs.*, 383 F.3d at 1132-33.  Indeed, the counterclaims contain no facts at all about access to the service database that would support any plausible refusal-to-deal claim.  *See Qualcomm*, 969 F.3d at 995 (explaining that *Aspen Skiing* claim requires allegations and proof that the defendant "singles out" particular firms "for anticompetitive treatment," and that allegedly exclusionary polices are not applied "equally with respect to all competitors"); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1002 (N.D. Cal. 2020) (explaining that a refusal-to-deal claim fails on the pleadings where policy applied neutrally to similarly situated firms).

**c.**     The restriction that Dexon alleges is a permissible means for Cisco to have used to ensure end-user customers receive high-quality network equipment and service.  *See SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (recognizing "efficiency" as a legitimate business reason for a refusal to deal, and holding that a firm's legitimate business reason for refusing to deal can be decided "as a matter of law"); *Mozart Co. v. Mercedes-Benz of N.A., Inc.*, 833 F.2d 1342, 1348-50 (9th Cir. 1987) (upholding "quality control" as a "legitimate business justification" capable of defeating distributors' tying claim); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 125 (2d Cir. 2007) (affirming order granting motion to dismiss where "[t]he facts pleaded" can "sugges[t] . . . the purpose of increasing efficiency" in a distribution channel).  Exerting control over its distribution channel is how Cisco "preserve[s] the integrity of customers' networks" – including both for equipment and service.  CC ¶ 58.  That dooms the refusal-to-deal claim, which can survive only if there is no "conceivable rationale" for the conduct other than "the exclusion of competition."  *Qualcomm*, 969 F.3d at 993-94 (citing *MetroNet Servs.*, 383 F.3d at 1132); *see MetroNet Servs.*, 383 F.3d at 1133 (requiring that firm refuse "to provide to [its] competitors products that were already sold in a retail market"); *see also Port Dock & Stone*, 507 F.3d at 124-25 (affirming order granting motion to dismiss refusal-to-deal claim on the pleadings).  Dexon has not come close to making that showing.

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**III.    Dexon Lacks Antitrust Injury (Counts I-IV)**

Dexon also cannot maintain its federal or California antitrust counterclaims because it fails to allege antitrust injury from any supposed tying or refusal to deal.  *See Brantley*, 675 F.3d at 1200 ("[I]n order to state a claim successfully, plaintiffs must allege both that the defendant's behavior is anticompetitive and that plaintiff has been injured by an [anticompetitive] aspect of the practice under scrutiny.") (citation and internal quotation marks omitted); *Top Agent Network, Inc. v. Nat'l Ass'n of Realtors*, 2021 WL 3616480, at *8 (N.D. Cal. Aug. 16, 2021) ("A plaintiff bringing claims under the Cartwright Act must meet the same antitrust injury requirement as under the Sherman Act."), *appeal filed*, No. 21-16494 (9th Cir. Sept. 10, 2021).  To plead actionable injury, a "plaintiff[] must allege facts that if taken as true would allow them to recover for an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brantley*, 675 F.3d at 1200 (citations and internal quotation marks omitted).  Dexon fails to do so for either its tying claim or its refusal-to-deal claim.

*First*, Dexon cannot plead antitrust injury from the alleged tying conduct because it does not plead any injury resulting from reduced competition in the claimed Relevant Product Markets.  Tying is subject to antitrust scrutiny because it may threaten "reduced competition in the market for the tied product." *Rick-Mik Enters.*, 532 F.3d at 971 (citing *Jefferson Parish*, 466 U.S. at 12).  Accordingly, to establish antitrust injury, Dexon must plausibly allege that its injuries flow from reduced competition in the markets for routers and switches.  But Dexon does not allege any injury from reduced competition in those markets.  Rather, Dexon alleges (at ¶¶ 67, 73, 80, 89) that the purported tying decreased its sales of *Cisco equipment*.  Dexon also claims (at ¶¶ 43, 58) that it had to coax customers to continue using Cisco's equipment by purchasing the equipment itself and supplying it to the customers.  None of these injuries arises from the foreclosure of sales by Cisco competitors like Hewlett Packard Enterprise, Dell, and Juniper Networks. *See* CC ¶ 95.

*Second*, Dexon's refusal-to-deal allegations likewise fail to support any claim of antitrust injury.  The injury caused by an unlawful refusal to deal is reduced competition in a relevant antitrust market, not mere harm to a competitor. *See*, *e.g.*, *McMahon v. Pier 39 Ltd. P'ship*, 2001 WL 1463814, at *3 (N.D. Cal. Nov. 8, 2001) (Breyer, J.) ("Antitrust injury requires proof that

1    defendant's conduct injured competition, not merely that the conduct injured a competitor."),

2    *aff'd*, 54 F. App'x 644 (9th Cir. 2003); *see also Rutman Wine*, 829 F.2d at 735 ("A termination is

3    not unlawful because of some adverse effect on the distributor's business, even if the effect is the

4    elimination of the distributor from the market.  The complaining distributor must show that the

5    refusal to deal was intended to or did bring about some restraint of trade beyond the loss of

6    business suffered by the distributor or the market's loss of a distributor-competitor.") (quoting

7    *Knutson v. Daily Review, Inc.*, 548 F.2d 795, 803 (9th Cir. 1976)).

8        Dexon does not allege that its injuries flow from reduced competition in markets for

9    switches and routers that Cisco supposedly monopolized or attempted to monopolize by denying

10    Dexon access to Cisco's service database.  Instead, it alleges (at ¶ 8) that, in 2018, Cisco

11    terminated Dexon's access to a service database, leading Dexon to lose business because

12    customers bought non-Cisco equipment from Dexon's competitors – the opposite of what Dexon

13    must allege to have antitrust standing.  It further alleges (at ¶¶ 42, 52) that Cisco convinced a

14    hospital (i.e., a Dexon customer) and a major value-added reseller (i.e., a Cisco supplier) not to

15    deal with Dexon.  But none of these alleged lost sales has anything to do with reduced competition

16    in the relevant markets for switches and routers; if anything, Dexon claims that its losses spring

17    from the *gains* of Cisco's competitors.  *Cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S.

18    477, 488 (1977) (awarding damages for competition is "inimical to the purposes of" the antitrust

19    laws).  On the assumption that Dexon "pleads injury to itself, its conclusion that competition has

20    been harmed thereby does not follow."  *Rutman Wine*, 829 F.2d at 734; *see also Water, Inc. v.*

21    *Everpure, Inc.*, 2009 WL 10670419, at *5 (C.D. Cal. Oct. 28, 2009) (granting judgment on federal

22    and California antitrust claims because the antitrust plaintiff – a dealer terminated by the

23    manufacturer because of alleged counterfeiting – had not adequately alleged restraint of trade

24    beyond its own loss of business).  Each of its state and federal antitrust claims therefore fails.

25   **IV.**      **The California Unfair Competition Law Claim Fails (Count V)**

26        Dexon's UCL claim is based on allegations that Cisco interfered with "secondary market"

27    sales by (1) stating in its EULA that Cisco software licenses are not transferable, *see* CC ¶¶ 99-

28    109; (2) misinforming customers about the status of Cisco products sold in the secondary market,

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1    *see id.* ¶¶ 110-113, 120b-d,[1] 122; (3) making false statements about Dexon in particular, *see id.*

2    ¶ 121; and (4) declining to provide warranty coverage to products sold on the secondary market,

3    *see id.* ¶¶ 114-119.  The UCL prohibits "unlawful, unfair or fraudulent" business practices.  Cal.

4    Bus. & Prof. Code § 17200  Most of Dexon's allegations supporting its UCL claim are based on

5    supposed misrepresentations that sound in fraud; Dexon also refers to "anticompetitive actions,"

6    CC ¶ 126, apparently intending to implicate the "unlawful" or "unfair" prongs of the UCL.

7          The Court should dismiss this claim.  *First*, Dexon lacks statutory standing to bring a UCL

8    action based on alleged fraud because it never alleges that it relied on any of the alleged

9    misrepresentations.  *Second*, Dexon has not satisfied the heightened pleading requirements that

10    apply to its fraud-based claims under Rule 9(b).  *Third*, any claim under the "unlawful" and

11    "unfair" prongs of the UCL fails because Dexon has not alleged any violation of the antitrust laws

12    or any conduct that would constitute an "incipient" violation of those laws.  Furthermore, and

13    independently, Dexon has no valid claim for monetary relief, because the UCL does not provide

14    for recovery of lost profits from expected sales.

15        **A.**      **Dexon Fails To State a Claim Under the UCL Based On Alleged**

16              **Misrepresentations**

17             **1.**      **Dexon lacks statutory standing to maintain its UCL claim based on**

18                  **alleged fraud.**

19          Dexon lacks statutory standing to bring its fraud-based UCL claim because it did not

20    allege, as is required, that it relied on any of Cisco's alleged misrepresentations.  *See Equinox*

21    *Hotel Mgmt.*, 2018 WL 659105, at *13 ("The Court finds that plaintiff's claim under the

22    fraudulent prong of UCL fails because plaintiff has not alleged actual reliance . . . ."); *see also*

23    *Buso v. ACH Food Cos.*, 445 F. Supp. 3d 1033, 1037 (S.D. Cal. 2020) (stating that UCL claims

24    based on consumer deception go to the "fraudulent prong").  Instead, Dexon alleges (at ¶¶ 103-

25    106) that unidentified customers relied on Cisco's misrepresentations.  *See also* CC ¶ 105

26

27

28

---

[1] Dexon refers in passing to Cisco's having prompted "federal investigation of the secondary market on specious grounds," CC ¶ 120a, but says no more about it.

Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.198**

1   ("Cisco's misrepresentations regarding consumers' right to buy and use secondary-market Cisco

2   products successfully deter consumers from purchasing Cisco goods on the secondary market.").

3   But "UCL fraud plaintiffs must allege their *own* reliance – not the reliance of third parties – to

4   have standing under the UCL." *O'Connor v. Uber Techs., Inc*., 58 F. Supp. 3d 989, 1002 (N.D.

5   Cal. 2014). Dexon fails to do so.[2]

6              **2.**     **Dexon fails to plead fraud with the requisite particularity.**

7         Dexon's fraud-based claims also fail because it has not pleaded with particularity that

8   Cisco engaged in any fraudulent conduct. UCL claims brought in federal court and sounding in

9   fraud must satisfy the pleading requirements of Rule 9(b). *See Block*, 2012 WL 1601471, at *4

10   (dismissing UCL claim for failure to plead fraud with particularity), *aff'd*, 747 F.3d 1135 (9th Cir.

11   2014). Rule 9(b) requires Dexon to allege "the who, what, when, where, and how of the

12   misconduct charged." *Kearns*, 567 F.3d at 1124 (internal quotation marks omitted). Yet Dexon

13   does not identify any specific customers to whom Cisco made false statements. *See, e.g.*, CC

14   ¶ 105 ("Cisco's misrepresentations . . . successfully deter consumers."); *id.* ¶ 110 ("[E]nd users or

15   resellers who communicate with Cisco . . . are . . . provided with misinformation."); *id.* ¶ 121

16   ("falsely advising Dexon's actual and prospective customers"). Nor does Dexon specify who at

17   Cisco made any specific statements. And Dexon does not allege when, where, or how the

18   unnamed individuals made the vague statements that Dexon identifies.

19         Dexon's claim that Cisco misrepresented the "used" status of resold equipment is not

20   alleged with the requisite particularity either. Though this Court in *Cisco Systems Inc. v. Link US,*

21   *LLC*, found that a similar allegation was to survive a motion to dismiss, Dexon's counterclaim

22   does not identify where any supposed representation appeared, who was exposed to it, or what

23   impact it had on any specific consumer. *Cf.* 2019 WL 6682838, at *8 (N.D. Cal. Dec. 6, 2019)

24   (quoting specific language); *see also* Am. Answer and Countercls. ¶ 186 & n.7, *Cisco Sys., Inc. v.*

25

26   ————————————

27   [2] While this Court and another court of this district allowed certain claims under the UCL to
proceed in a similar posture, *see Cisco Sys. Inc. v. Link US, LLC*, 2019 WL 6682838, at *9 (N.D.
Cal. Dec. 6, 2019) (Breyer, J.); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 830

28   (N.D. Cal. 2019), neither decision addresses this threshold statutory standing issue.

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

*Beccela's Etc., LLC*, No. 5:18-CV-00477-BLF (N.D. Cal. Jan. 2, 2019), Dkt. 81 (citing specific representations).  Though Dexon copies language from the counterclaims in those cases, Dexon's allegations are limited only to high-level generalities.

Dexon's allegation (at ¶ 102) that Cisco misrepresented in its EULA that Cisco customers receive a non-transferable software license is, moreover, legally insufficient to support Dexon's misrepresentation claim.  According to Dexon, this statement is false because copyright's first-sale doctrine permits customers to transfer their software licenses.  CC ¶ 104; *cf.* 17 U.S.C. 109(a).  To start, Dexon is wrong on the law:  Cisco sells equipment, but it *licenses* software; thus, the first-sale doctrine does not apply.  *See Link US*, 2019 WL 6682838, at *8 (citing *Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1107 (9th Cir. 2010)); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 828 (N.D. Cal. 2019) (same).[3]  A purchaser of Cisco equipment does not acquire any right to transfer ownership of software, because the purchaser does not own the software in the first place.

But even if the state of the law were in legitimate dispute, Cisco's representation that purchasers of secondary market Cisco equipment must acquire a new software license is a statement of legal opinion and therefore cannot form the basis of a valid UCL claim.  *See Carreno*, 2021 WL 1087106, at *5 (dismissing UCL claim because "there's no fraud in statements of legal opinion"); *see also Miller v. City & Cnty. of S.F.*, 187 Cal. App. 2d 480, 483 (1960) ("a misrepresentation of law is not an actionable fraud . . . , at least where, as here, no confidential relationship exists between the parties").

---

[3] The court in *Beccela's Etc.* noted that a software license is binding only if a consumer agrees to it and credited counterclaimants' allegation that Cisco had made "representations about the EULA's binding effect" that could support a Lanham Act claim.  *See* 403 F. Supp. 3d at 829.  By contrast, Dexon makes no allegation that Cisco misrepresented the binding effect of its software license.

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1      **B.**    **Dexon Has Not Alleged That Cisco Engaged in Any Unlawful or Unfair**

2      **Conduct**

3      Dexon vaguely asserts that the conduct alleged under the rubric of its UCL claim is

4  "tantamount to violations of the antitrust laws." *See, e.g.*, CC ¶ 126.[4]  But Dexon alleges no facts

5  to support the claim that Cisco's EULA- and warranty-related conduct "threaten[ed] an incipient

6  violation of an antitrust law, or violate[d] the policy or spirit of one of those laws because its

7  effects are comparable to or the same as a violation of the law, or otherwise significantly threatens

8  or harms competition." *Cel-Tech*, 20 Cal. 4th at 187; *see also Link US*, 2019 WL 6682838, at *6

9  (applying *Cel-Tech* test where plaintiff was a reseller).  Dexon does not allege any facts to suggest

10  that Cisco violated any duty under the antitrust laws; it defines no markets for purposes of its UCL

11  claim; it alleges nothing about the market impact of Cisco's conduct; and it does not explain how

12  "hinder[ing]" secondary market sellers, CC ¶ 127, could possibly violate the antitrust laws.  *See*

13  *supra* Parts I-II; *see also Epic Games, Inc. v. Apple Inc.*, 2021 WL 4128925, at *116 (N.D. Cal.

14  Sept. 10, 2021) (rejecting most of Epic's UCL claims because Apple had proffered "mostly valid

15  and non-pretextual procompetitive justifications" for its policies, but finding that one specific

16  policy violated the UCL because Epic had presented evidence showing the anticompetitive effects

17  of that specific policy), *appeal filed*, No. 21-16506 (9th Cir. Sept. 13, 2021).  All Dexon offers is

18  the purely conclusory assertion that Cisco's conduct is "anticompetitive"; that fails to plead a

19  claim.  *See Twombly*, 550 U.S. at 555 ("a formulaic recitation of the elements of a cause of action

20  will not do").

21      **C.**    **Dexon Does Not Seek a Statutorily Authorized Remedy**

22      The UCL also does not permit Dexon to obtain monetary relief for "lost sales of Cisco

23  products [Dexon] otherwise would have made," CC ¶ 127, because monetary relief based on lost

24  profits is not an available remedy under the UCL.  *See Korea Supply*, 29 Cal. 4th at 1144.  Any

25  

---

26  [4] To the extent Dexon intended to refer to the conduct alleged in support of its antitrust claims to

27  support a claim under the "unlawful" prong of the UCL, that claim fails for the reasons explained
above.  *See supra* Parts I-II; *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 923 (N.D. Cal.

28  2019) (ruling that because "the Sherman Act and Cartwright Act violations are insufficiently pled,
it follows that Plaintiffs have failed to sufficiently plead a violation of the UCL").

1   restitution award under the UCL must "restore the status quo by returning to the plaintiff funds *in*

2   *which he or she has an ownership interest*." *Id.* at 1149 (emphasis added); *see also id.* at 1148

3   ("Under the UCL, an individual may recover profits unfairly obtained to the extent that these

4   profits represent monies given to the defendant or benefits in which the plaintiff has an ownership

5   interest.").  Future expected sales are not a form of restitution because they are "merely a

6   contingent interest." *Id.* at 1149; *see also Lee v. Luxottica Retail N.A.*, *Inc*., 65 Cal. App. 5th 793,

7   807 (2021) ("Simply put, regardless of label ('lost market share,' 'lost business opportunity' or

8   'lost profits'), a plaintiff cannot recover anticipated but unearned, future income under the UCL in

9   the guise of restitution because, absent a legally enforceable right to that stream of future income,

10   the plaintiff lacks an ownership interest in it and thus there is nothing to 'restore.' ").

11      For the same reason, Dexon also cannot obtain unjust enrichment based on the theory (*see*

12   CC ¶ 105) that it lost potential sales.  *See Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 455

13   (2005) (unjust enrichment damages not available because the "object [of the UCL] is to return to

14   the plaintiff funds in which he or she has an ownership interest").  To the extent that the Court

15   does not dismiss all of Count V, it should strike Dexon's requests for monetary relief for

16   supposedly lost sales.  *See Link US*, 2019 WL 6682838, at *9 (striking Link's request for

17   compensation for lost sales).

18   **V.      The Declaratory-Judgment Claims (Counts VI and VII) Should Be Dismissed For**

19   **Lack Of Jurisdiction**

20      The Court should dismiss both of Dexon's claims under the Declaratory Judgment Act, 28

21   U.S.C. §§ 2201-2022, because Dexon fails to establish the existence of any actual controversy

22   with respect to its purported claims.  The Declaratory Judgment Act does not expand the

23   jurisdiction of the federal courts; rather, it provides a mechanism for resolving actual cases or

24   controversies when, for example, a party threatens, but does not bring, an affirmative lawsuit.  *See*,

25   *e.g.*, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 130 (2007).  To establish the requisite

26   case or controversy for a declaratory-judgment claim, "the facts alleged, under all the

27   circumstances, [must] show that there is a substantial controversy, between parties having adverse

28   legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

1  judgment." *Bayer*, 861 F.3d at 867 (quoting *MedImmune*, 549 U.S. at 127).  The burden is on

2  Dexon to establish that the Court has jurisdiction.  *See Acer Am.*, 2021 WL 1164756, at *2.  It fails

3  to do so here.

### A.   Count VI Fails Because Dexon Fails To Allege That Cisco Has Threatened or Will Threaten Litigation Over Sales of Genuine Cisco Products

6  In Count VI, Dexon seeks a declaration that its sales of "genuine Cisco product" do not

7  violate the Lanham Act.  CC ¶ 132.  But Dexon does not allege any facts to show "a real and

8  reasonable apprehension" of suit for Lanham Act violations relating to its sale of *genuine* Cisco

9  products. *See Monster Cable Prods.*, 642 F. Supp. 2d at 1010-11 ("Under Ninth Circuit trademark

10  law, to satisfy the actual controversy requirement [for a declaratory-judgment claim], the plaintiff

11  must show 'real and reasonable apprehension' that it would be liable for infringement.") (citation

12  omitted).  To be sure, Cisco *has* sued Dexon over its sale of counterfeit goods, defined as goods

13  "not manufactured by Cisco, or under its authority."  First Am. Compl. ¶ 23, Dkt. 32.  But Cisco

14  has not sued, and Dexon makes no allegation that Cisco has threatened to sue, Dexon for selling

15  authentic Cisco products. *See* CC ¶ 93 (alleging that "authentic or genuine Cisco products" are

16  available in the "secondary market"); *see also*, *e.g.*, *Graminex, L.L.C. v. Aktiebolaget Cernelle*,

17  451 F. Supp. 3d 732, 741 (E.D. Mich. 2020) ("no threatened litigation" where defendant sent

18  protests letters that did not mention the specific trademarks at issue); *cf. Beccela's Etc.*, 403 F.

19  Supp. 3d at 823-24 (holding that "substantial controversy" existed with respect to declaratory-

20  judgment counterclaim against Cisco, based on finding that Cisco had sued counterclaimant under

21  the Lanham Act over sale of "genuine" Cisco products).  Accordingly, Dexon fails to establish

22  that there is any actual controversy with respect to Count VI.

### B.   Count VII Fails Because Dexon Improperly Seeks Declaratory Relief Based on a Statute That Provides No Private Right of Action

25  Count VII – which seeks a declaratory judgment under New York General Business Law

26  § 369-b – likewise fails because "there is no private right of action under [§] 369-b." *Beccela's*

27  *Etc.*, 403 F. Supp. 3d at 826.  Dexon seeks a declaration with respect to Cisco's alleged

28  obligations to provide warranties for certain goods sold in New York.  But a plaintiff "cannot

1    bring a declaratory judgment claim based on a statute for which there is no private right of action."

2    *Id.* (citing *N. Cnty. Commc'ns Corp. v. Cal. Catalog & Tech.*, 594 F.3d 1149, 1162 (9th Cir. 2010)

3    (dismissing declaratory-judgment claim)).  The Court should therefore dismiss Count VII as well.

4    **VI.**      **The Lanham Act Claim Fails (Count VIII)**

5         **A.**      **The Lanham Act Claim Fails to Meet Rule 9(b)'s Heightened Pleading**

6              **Standard**

7         Dexon's false advertising claim under the Lanham Act fails to meet the heightened Rule

8    9(b) pleading standard.  *See Alfasigma USA*, 2021 WL 930453, at *9-10 & n.6 (applying Rule 9(b)

9    to Lanham Act claims).  Dexon alleges two misrepresentations:  (1) "false or misleading

10    representations of fact regarding the software embedded in Cisco hardware sold on the secondary

11    market," CC ¶ 144; and (2) "false or misleading representations of fact regarding whether products

12    in the secondary market are 'used,'" *id.* ¶ 145.

13         But Dexon fails to identify "the particular circumstances surrounding such

14    representations."  *Kearns*, 567 F.3d at 1126.  For example, Dexon fails to allege when and to

15    whom specifically Cisco supposedly made false representations regarding whether all products in

16    the secondary market are "used," let alone what effect – if any – this had on those specific

17    customers' purchasing decisions and thereby Dexon's business.  *See* CC ¶¶ 110-113; *see also*

18    *supra* Part IV.A.2.  Accordingly, those allegations fall far short of meeting the heightened

19    pleading standard.  *See Kearns*, 567 F.3d at 1126 (plaintiff alleged that statements were made but

20    failed to "specify *who* made this statement or *when* this statement was made," and alleged the

21    existence of marketing materials containing misrepresentations but failed to identify *what* the

22    materials "specifically stated," "*when* he was exposed to them," "which ones he found material,"

23    or which he "relied upon" when making his purchasing decision) (emphases added).

24         **B.**      **The Alleged Misrepresentations Are Legal Opinions and Therefore Not**

25              **Actionable Under the Lanham Act**

26         Dexon's EULA-related allegations fail to state a claim under the Lanham Act for the

27    additional reason that, as under the UCL, legal opinions are not "actionable under the Lanham

28    Act."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999);

23

---

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;<br>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1    *see also Language Line Servs.*, 2011 WL 5024281, at *11 (explaining that the court should inquire

2    whether "the statement itself is sufficiently factual to be susceptible of being proved true or false")

3    (quoting *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995)).  Because Cisco's

4    alleged representations in the EULA that customers are receiving a "non-transferable" software

5    license are a legal opinion, Dexon cannot state a Lanham Act violation based on those

6    representations.  *See* CC ¶¶ 102-104; *see also Coastal Abstract Serv.*, 173 F.3d at 732 (holding

7    that a legal opinion "could not give rise to a Lanham Act claim" "even if a California court

8    ultimately concludes" that the legal opinion is incorrect).

9    **VII.    The Intentional Interference And Trade Libel Claims Fail (Counts IX-XI)**

10           The Court should dismiss Counts IX-XI because Dexon fails to identify actual or potential

11   customers who refused to contract with Dexon because of Cisco's conduct – a necessary allegation

12   for all three common-law claims to survive a motion to dismiss.  *See AccuImage Diagnostics*

13   *Corp. v. Terarecon, Inc.*, 260 F. Supp. 2d 941, 956 (N.D. Cal. 2003) (dismissing intentional

14   interference with contractual relations claims because plaintiff made only "conclusory allegations

15   that valid 'contracts' exist between itself and an unspecified third party"); *id.* at 956-57

16   (dismissing intentional interference with economic advantage claim because the "complaint

17   alleges no specific existing or prospective relationships"); *Muddy Waters, LLC v. Superior Ct.*, 62

18   Cal. App. 5th 905, 926 (2021) (ordering dismissal of trade libel claim because plaintiff did not

19   identify any specific customers "let alone any specific contract or sale that it claims was lost").

20   Instead, Dexon alleges that an unspecified number of customers – including an unidentified

21   hospital (CC ¶¶ 42-43) – refused to contract with Dexon because of Cisco's conduct.  *Cf. id.*

22   ¶¶ 150-154 (Cisco's conduct "disrupted . . . contractual relationships between Dexon and its

23   customers"); *id.* ¶ 161 (Cisco's conduct has disrupted "Dexon's relationships with its potential and

24   actual customers"); *id.* ¶ 168 (Cisco's statements deterred "prospective and actual

25   customers . . . from buying Dexon's products").  This is insufficient:  Dexon has not named any

26   specific customer or a specific contract that it lost.

27           These counterclaims must also satisfy Rule 9(b) because Dexon alleged (at ¶¶ 152, 159,

28   166) that Cisco made false and misleading statements to customers.  *See Magic Leap, Inc. v. Chi*

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1  *Xu*, 2020 WL 3268659, at *6 (N.D. Cal. June 17, 2020) (ruling that 9(b) applied to the interference

2  with contract claim because the complaint alleged that defendant's conduct was based on fraud);

3  *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 937 (N.D.

4  Cal. 2008) (trade libel claim was "deficient" because the complaint did not give "any indication of

5  who from First Advantage made the allegedly libelous statements, to whom they made those

6  statements, when they made the statements, or what exactly they said").  Once again, however,

7  Dexon does not allege who at Cisco made these allegedly libelous statements, to whom they were

8  made, when they were made, or what was said.  *See supra* Parts IV.A.2, VI.A.

9                                      **CONCLUSION**

10         For the foregoing reasons, the Court should dismiss Dexon's counterclaims in their entirety

11  and with prejudice.

12  DATED:  October 13, 2021                    Respectfully Submitted,

13                                      By:    */s/ Aaron M. Panner*
                                            _____
14                                             Aaron M. Panner

15  Richard J. Nelson (SBN 141658)         Aaron M. Panner*
    Louis P. Feuchtbaum (SBN 219826)       Kylie C. Kim*
16  Angela M. He (SBN 319351)              Christopher M. Sarma*
    Artur A. Minasyan (SBN 322248)         Alex A. Parkinson*
17  **SIDEMAN & BANCROFT LLP**             Ryan M. Folio*
18  One Embarcadero Center                 **KELLOGG, HANSEN, TODD,**
    Twenty-Second Floor                    **  FIGEL & FREDERICK, P.L.L.C.**
19  San Francisco, CA 94111-3711           1615 M Street, NW, Suite 400
    (415) 392-1960                         Washington, D.C. 20036
20  rnelson@sideman.com                    (202) 326-7900
    lfeuchtbaum@sideman.com                apanner@kellogghansen.com
21  ahe@sideman.com                        kkim@kellogghansen.com
    aminasyan@sideman.com                  csarma@kellogghansen.com
22                                         aparkinson@kellogghansen.com
                                           rfolio@kellogghansen.com
23
24                                         *Attorneys for Plaintiffs and Counterclaim Defendants*
                                           *Cisco Systems, Inc. and Cisco Technology, Inc.*
25
26                                         * Admitted *pro hac vice*.  Mr. Folio is not admitted in
                                           the District of Columbia; his practice is supervised by
27                                         members of the firm.

28

25                                              Case No.  3:20-cv-4926
PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.206**

# Exhibit D

1

2   Amanda R. Washton (SB# 227541)          David H. Reichenberg (pro hac vice pending)
     a.washton@conklelaw.com                  dreichenberg@cozen.com
3   **CONKLE, KREMER & ENGEL**              **COZEN O'CONNOR**
    Professional Law Corporation            3 WTC, 175 Greenwich Street, 56th Floor
    3130 Wilshire Boulevard, Suite 500      New York, New York 10006
4   Santa Monica, California 90403-2351     Phone:  (212) 883-4900
    Phone: (310) 998-9100                   Fax:  (646) 461-2091
5   Fax: (310) 998-9109

6   Michael M. Lafeber (*pro hac vice*)      Mark A. Jacobson (*pro hac vice pending*)
     mlafeber@taftlaw.com                     mjacobson@cozen.com
7   O. Joseph Balthazor Jr. (*pro hac vice*) **COZEN O'CONNOR**
     jbalthazor@taftlaw.com                  33 South 6th Street
8   **TAFT STETTINIUS &**                    Suite 3800
       **HOLLISTER LLP**                     Minneapolis, MN 55402
9   2200 IDS Center                          Phone: (612) 260-9000
    80 S. 8th St.                            Fax: (612) 260-8026
10  Minneapolis, MN 55402
    Phone: 612.977.8400
11  Fax: 612.977.8650

12
    Attorneys for Defendant, Counterclaim
13  Plaintiff and Third-Party Plaintiff Dexon
    Computer, Inc.
14

15              UNITED STATES DISTRICT COURT

16      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

17

| 18 | CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, | Case No. 3:20-CV-4926-CRB |
|---|---|---|
| 19 | | **DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |
| 20 | Plaintiffs, | |
| 21 | v. | Hon. Charles R. Breyer |
| 22 | DEXON COMPUTER, INC., a Minnesota corporation, | Presiding Judge |
| 23 | | Trial Date:          None |
| 24 | Defendant. | |
| 25 | DEXON COMPUTER, INC., a Minnesota corporation, | |
| 26 | | |
| 27 | Counterclaim Plaintiff and Defendant, | |
| 28 | v. | |

**App.208**

| | |
|---|---|
| 1 | |
| 2 | CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation, |
| 3 | |
| 4 | Counterclaim Defendants and Plaintiffs. |
| 5 | |
| 6 | DEXON COMPUTER, INC., a Minnesota corporation, |
| 7 | Third-Party Plaintiff, |
| 8 | v. |
| 9 | ATLANTIX GLOBAL SYSTEMS |
| 10 | INTERNATIONAL, LLC, BIZCOM ELECTRONICS, INC., DIGI DEVICES ONLINE, ENTERPRISE BUSINESS |
| 11 | TECHNOLOGIES, INC., FIBER CABLE CONNECTIONS, MJSI, MULTIMODE |
| 12 | TECHNOLOGIES, LLC, NETWORK REPUBLIC, OPTIMUM DATA, INC., |
| 13 | PARAGON, PURE FUTURE TECHNOLOGY, INC., SEASTAR IT |
| 14 | TRADING LLC, SERVER TECH SUPPLY, SOFTNETWORKS, INC., |
| 15 | STRADA NETWORKS, LLC, STRATEGIC TELECOM SUPPLY & |
| 16 | SOLUTIONS, TEKSAVERS, UNLIMITED NETWORK SOLUTIONS, |
| 17 | and WISECOM TECHNOLOGIES, |
| 18 | Third-Party Defendants, |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.209**

1   Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned

2   counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc.

3   and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except

4   as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs

5   are entitled to any of the relief requested in their Prayer for Relief.  In response to each of

6   the numbered paragraphs of the Complaint, Dexon states as follows.  To the extent the

7   headings or any other non-numbered statements in the Complaint contain allegations,

8   Dexon denies each and every such allegation.

9                           **INTRODUCTION**

10   1.    Dexon denies the allegations of paragraph 1 of the Complaint.

11   2.    Dexon denies the allegations of paragraph 2 of the Complaint.

12          **THE PARTIES**

13   3.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 3 of

14   the Complaint, and on that basis Dexon denies those allegations.

15   4.    Dexon admits the allegations of paragraph 4 of the Complaint.

16   5.    Dexon denies the allegations of paragraph 5 of the Complaint.

17          **JURISDICTION AND VENUE**

18   6.    Admits that the Complaint purports to be one "founded upon violations of Federal

19   trademark laws" but denies any such purported claims have legal or factual merit.  The

20   remaining allegations in paragraph 6 of the Complaint are legal conclusions and questions

21   of law regarding jurisdiction to which no response is required.  To the extent a response is

22   required, Dexon denies such allegations.

23   7.    Dexon denies the allegations of paragraph 7 of the Complaint.

24   8.    Dexon denies the allegations of paragraph 8 of the Complaint.

25   9.    Dexon denies the allegations of paragraph 9 of the Complaint.

26   10.   Dexon denies the allegations of paragraph 10 of the Complaint.

27   11.   Dexon denies the allegations in paragraph 11 of the Complaint.

28

**FACTUAL ALLEGATIONS**

**Alleged Cisco Business and History**

12.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on that basis Dexon denies those allegations.

14.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

**Alleged Cisco Trademarks**

15.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

**Alleged Counterfeit "Cisco" Products**

19.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

**Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products**

21.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.    Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.    Dexon denies the allegations of paragraph 24 of the Complaint.

25.    Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and  Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.    Dexon denies the allegations in paragraph 26 of the Complaint. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.    Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.    Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of

1   the letters or communications which speak for themselves. Plaintiffs previously commenced

2   a lawsuit against Dexon in 2011 including claims based directly on such allegations which

3   were resolved via a confidential settlement agreement and dismissed with prejudice.

4
5   **Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to
     WayneState University (Detroit, Michigan) and Cisco's C&D Letter**

6   29.     Dexon admits selling and shipping Cisco product to Wayne State University on or

7   about February 21, 2010 but denies the remainder of the allegations in paragraph 29 of the

8   Complaint, including, without limitation, any allegation the product involved was

9   counterfeit. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including

10  claims based directly on such allegations which were resolved via a confidential settlement

11  agreement and dismissed with prejudice.

12  30.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve

13  O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to Wayne

14  State University, but Dexon denies the reminder of the allegations in paragraph 30 of the

15  Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter

16  which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011

17  including claims based directly on such allegations which were resolved via a confidential

18  settlement agreement and dismissed with prejudice.

19  31.     Dexon admits it responded via a letter from counsel to Plaintiff's Wayne State

20  University allegations on or about August 23, 2010, but Dexon denies the reminder of the

21  allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs'

22  attempted characterization of the letter which speaks for itself. Plaintiffs previously

23  commenced a lawsuit against Dexon in 2011 including claims based directly on such

24  allegations which were resolved via a confidential settlement agreement and dismissed with

25  prejudice.

26  32.     Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the Wayne

27  State University allegations on or about August 30, 2010, but Dexon denies the reminder of

28  the allegations in paragraph 32 of the Complaint, including, without limitation, Plaintiffs'

1  attempted characterization of the letter which speaks for itself. Plaintiffs previously

2  commenced a lawsuit against Dexon in 2011 including claims based directly on such

3  allegations which were resolved via a confidential settlement agreement and dismissed with

4  prejudice.

5  **Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Los Angeles, California)**

6

7  33.   Dexon denies the allegations in paragraph 33 of the Complaint. Plaintiffs previously

8  commenced a lawsuit against Dexon in 2011 including claims based directly on such

9  allegations which were resolved via a confidential settlement agreement and dismissed with

10  prejudice.

11  **Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit**

12  34.   Dexon denies the allegations in paragraph 34 of the Complaint.

13  **Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter**

14

15  35.   Dexon admits selling Cisco product to Things Remembered, Inc. on or about July

16  2015, but denies the remainder of the allegations in paragraph 35 of the Complaint, including

17  any allegation the product was counterfeit.

18  36.   Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the

19  Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon

20  responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the

21  Complaint, including, without limitation, Plaintiffs' attempted characterizations of the

22  letters or communications which speak for themselves.

23  **Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D Letter**

24

25

26  37.   Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack Henry")

27  on or about December 2016, but denies the remainder of the allegations in paragraph 37 of

28  the Complaint, including, without limitation, any allegation the product was counterfeit.

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.214**

38.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph 38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

39.     Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the responsive letter which speaks for itself.

### Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Berkeley, California)

40.     Dexon denies the allegations in paragraph 40 of the Complaint.

### Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter

41.     Dexon admits selling Cisco product to Community Health Alliance ("CHA") on or about January 2018, but denies the remainder of the allegations in paragraph 41 of the Complaint, including, without limitation, any allegation the product was counterfeit.

42.     Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or communications relating to the CHA allegations, but denies the remainder of the allegations in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

### Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to Tucson Medical Center (Arizona)

43.     Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on or about April 2018, but denies the remainder of the allegations in paragraph 43 of the Complaint, including, without limitation, any allegation the product was counterfeit.

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.215**

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter**

44.     Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

46.     Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter**

47.     Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from PureFutureTech (Fremont, California)**

49.     Dexon admits purchasing Cisco product from PureFutureTech on or about 2018 and that the purported supplier of such product was HongKong Sellsi, a former authorized licensed seller of Cisco products, but lacks sufficient information to admit or deny the

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.216**

1  remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon denies such

2  allegations.

3  50.     Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit involving

4  Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were ultimately required

5  to file a motion relating to such non-party subpoena.  Dexon denies the remaining allegations

6  of paragraph 50 of the Complaint, including, without limitation, any allegation, suggestion

7  or implication Dexon "refused to cooperate" with, or in any way failed to meet its obligations

8  arising from, the subpoena.

9          **Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers**
10         **from Pure Future Tech, Inc. (Fremont, California)**

11  51.     Dexon admits purchasing Cisco product from Pure Future Tech, Inc. in the period

12  2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient information

13  to admit or deny the remaining allegations in paragraph 51 of the Complaint and on that

14  basis denies such allegations.

15  52.     Dexon denies the allegations in paragraph 52 of the Complaint, including, without

16  limitation, any allegation Dexon knew or reasonably should have known any Cisco product

17  was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

18         **Dexon's Sales of Alleged Counterfeit Products to Murray State**
19         **University (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

20  53.     Dexon admits selling Cisco product to Murray State University ("MSU") in or about

21  2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the Complaint,

22  including, without limitation, any allegation the product was counterfeit.

23  54.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the

24  MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of the

25  Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter

26  which speaks for itself.

27

28

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.217**

1
2
   **Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

3   55.     Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies

4   the remainder of the allegations in paragraph 55 of the Complaint, including, without

5   limitation, any allegation the product was counterfeit.

6
7
   **Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

8   56.     Dexon admits selling Cisco product to Coppell Independent School District ("CISD")

9   on or about September 2019, but denies the remainder of the allegations in paragraph 56 of

10  the Complaint.

11  57.     Dexon denies any allegation, suggestion or implication in paragraph 57 of the

12  Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient

13  information to admit or deny the remainder of the allegations in paragraph 57 of the

14  Complaint and on that basis denies such allegations.

15  58.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the

16  CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the

17  Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter

18  which speaks for itself.

19
20
   **Dexon's Alleged California Directed Conduct Identified Through Jurisdictional Discovery**

21  59.     Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the

22  remainder of the allegations in paragraph 59 of the Complaint, including, without limitation,

23  Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such

24  discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

25
26
   **Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

27  60.     Dexon denies the allegations in paragraph 60 of the Complaint.

28

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.218**

**Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers**

61.     Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.     Dexon denies the allegations in paragraph 62 of the Complaint.

63.     Dexon denies the allegations in paragraph 63 of the Complaint.

64.     Dexon denies the allegation in paragraph 64 of the Complaint.

**FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**
*(15 U.S.C. § 1114)*

65.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

66.     Dexon denies the allegations of paragraph 66 of the Complaint.

67.     Dexon denies the allegations of paragraph 67 of the Complaint.

68.     Dexon denies the allegations of paragraph 68 of the Complaint.

69.     Dexon denies the allegations of paragraph 69 of the Complaint.

70.     Dexon denies the allegations of paragraph 70 of the Complaint.

71.     Dexon denies the allegations of paragraph 71 of the Complaint.

72.     Dexon denies the allegations of paragraph 72 of the Complaint.

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
*(15 U.S.C. § 1114)*

73.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

74.     Dexon denies the allegations of paragraph 74 of the Complaint.

75.     Dexon denies the allegations of paragraph 75 of the Complaint.

76.     Dexon denies the allegations of paragraph 76 of the Complaint.

77.     Dexon denies the allegations of paragraph 77 of the Complaint.

78.     Dexon denies the allegations of paragraph 78 of the Complaint.

79.     Dexon denies the allegations of paragraph 79 of the Complaint.

**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**
*(15 U.S.C. § 1125)*

80.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

81.     Dexon denies the allegations of paragraph 81 of the Complaint

82.     Dexon denies the allegations of paragraph 82 of the Complaint.

83.     Dexon denies the allegations of paragraph 83 of the Complaint.

84.     Dexon denies the allegations of paragraph 84 of the Complaint.

85.     Dexon denies the allegations of paragraph 85 of the Complaint.

**FOURTH PURPORTED CLAIM FOR RELIEF**
**California Unfair Business Practices**
*(Cal. Bus. & Prof. Code §§ 17200 et seq.)*

86.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87.     The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 et seq to which no response is required.  To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 et seq Dexon denies such allegations.

88.     Dexon denies the allegations of paragraph 88 of the Complaint.

89.     Dexon denies the allegations of paragraph 89 of the Complaint.

90.     Dexon denies the allegations of paragraph 90 of the Complaint.

91.     Dexon denies the allegations of paragraph 91 of the Complaint.

92.     Dexon denies the allegations of paragraph 92 of the Complaint.

**FIFTH PURPORTED CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

93.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

**App.220**

1   94.     Dexon admits the allegations of paragraph 94 of the Complaint.

2   95.     Dexon denies the allegations of paragraph 95 of the Complaint.

3                       **AFFIRMATIVE DEFENSES**

4           Without admitting any wrongful conduct on the part of Dexon, and without

5   admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss,

6   damage, or injury, Dexon alleges the following affirmative defenses to the Complaint.  By

7   designating the following as affirmative defenses, Dexon does not in any way waive or

8   limit any defenses which are or may be raised by their denial, allegations, and averments

9   set forth herein.  These defenses are pled in the alternative, are raised to preserve the rights

10  of Dexon to assert such defenses, and are without prejudice to Dexon's ability to raise

11  other and further defenses.  Dexon expressly reserves all rights to reevaluate their defenses

12  and/or assert additional defenses upon discovery and review of additional documents and

13  information, upon the development of other pertinent facts, and during pretrial proceedings

14  in this action.  Dexon expressly incorporate all allegations of its Answer, Counterclaims

15  and Cross-Claims as if fully set forth in each of the following affirmative defenses.

16                  **FIRST AFFIRMATIVE DEFENSE**
                    **(Res Judicata and Collateral Estoppel)**
17  96.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of

18  res judicata and collateral estoppel.

19                  **SECOND AFFIRMATIVE DEFENSE**
                         **(Laches)**
20  97.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of

21  laches.  Plaintiffs' have had longstanding knowledge concerning the legal open or

22  "secondary" market for its products and have proactively engaged in unfair and tortious

23  behavior in an effort to selectively manipulate and control such secondary market to their

24  advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the

25  legal secondary market since well before 2011, yet have failed to take timely action to

26  assert their claims herein, resulting in substantial prejudice to Defendants.

27

28

0640.002\9968                      -14-                    Case No. 3:20-CV-4926-CRB

**App.221**

### THIRD AFFIRMATIVE DEFENSE
#### (Estoppel)

98.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of estoppel.  Plaintiffs' advertises that consumers can purchase their products from their "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate in and sell their products on the secondary market.  Plaintiffs have allowed these "Authorized Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status despite knowledge of their participation in the secondary market, including evidence of their sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such "authorized" vendors when sourcing Cisco products, including, without limitation, procuring Cisco product from such "authorized vendors'" end customers.  Plaintiffs have also actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  As one example, Plaintiffs "authorized" vendors intentionally modify or change product serial numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service packages. Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking damages related to alleged counterfeit products.

### FOURTH AFFIRMATIVE DEFENSE
#### (First Sale Doctrine and Exhaustion)

99.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale doctrine, which protects secondary market resellers such as Dexon from liability for the purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights in further transactions.

## FIFTH AFFIRMATIVE DEFENSE
### (Statutes of Limitations)

100.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38, CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of Plaintiffs' claims involve conduct outside of the applicable statutes of limitations.

## SIXTH AFFIRMATIVE DEFENSE
### (Waiver)

101.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product; and ii) actively and regularly deal with secondary market resellers such as Dexon. Secondary market resellers such as Dexon have understandably relied upon Plaintiffs' promotion and endorsement of such "authorized" sellers when sourcing Cisco products for their customers. As noted above, Plaintiffs have also intentionally failed or refused to provide or offer their claimed "tools" for detecting counterfeit product to secondary market resellers such as Dexon, and have actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  Accordingly, Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized" vendors.

## SEVENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

102.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of unjust enrichment.  Plaintiffs have engaged in unfair and tortious practices and made misrepresentations to consumers regarding: i) the quality and authenticity of products sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict consumers

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1  use and transfer of Cisco hardware and software.  Such conduct has improperly steered

2  customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

3  **EIGHTH AFFIRMATIVE DEFENSE**
**(Unclean Hands/Inequitable Conduct)**

4

5  103.  Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of

6  unclean hands, inequitable conduct, and similar defenses.  Without limitation, Plaintiffs

7  have: (i) intentionally misled consumers into thinking that genuine products on the

8  secondary market are used, counterfeit, or stolen, (ii) sold products to resellers whom it

9  knew, or should have known, were reselling the products on the secondary market, (iii) held

10  out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have

11  known these entities sold counterfeit goods, and engaged in other inequitable practices that

12  bar recovery on its claims.

13  **NINTH AFFIRMATIVE DEFENSE**
**(Redundancy)**

14

15  104.  Plaintiffs' claims and/or recovery are barred, in whole or in part, because they are

16  redundant and/or duplicative of one another.

17

18  **TENTH AFFIRMATIVE DEFENSE**
**(Abandonment)**

19

20  105.  Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment of

21  any marks at issue. Plaintiffs' have failed to properly police and exercise adequate quality

22  control over its marks and have thereby abandoned their rights therein.

23  **ELEVENTH AFFIRMATIVE DEFENSE**
**(Conduct of Others)**

24

25  106.  Plaintiffs' claims and/or recovery are barred, in whole or in part, because the

26  conduct complained of is the conduct of others, including, without limitation, Plaintiffs'

27  "authorized" vendors and/or Plaintiffs' licensed manufacturers.

28

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.224**

**TWELVE AFFIRMATIVE DEFENSE**
**(Failure to Mitigate)**

107.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

**THIRTEENTH AFFIRMATIVE DEFENSIVE**
**(Lack of Personal Jurisdiction)**

108.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

**FOURTEENTH AFFIRMATIVE DEFENSIVE**
**(Improper Venue)**

109.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

**FIFTEENTH AFFIRMATIVE DEFENSIVE**
**(Failure to State a Claim)**

110.    The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

**SIXTEENTH AFFIRMATIVE DEFENSIVE**
(One Satisfaction Rule / Bar on Double Recovery)

111.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

**COUNTERCLAIMS**

112.    Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendants Cisco Systems, Inc., and Cisco Technology, Inc. (hereinafter referred to jointly as "Cisco") alleges as follows:

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.225**

## THE PARTIES

113.  Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

114.  On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

115.  On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

## JURISDICTION

116.  This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28 U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

## FACTS

### The Secondary Market for Cisco Products

117.  As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products.  On information and belief, authentic or genuine Cisco products come to the secondary market in the United States in a variety of ways including: (a) Cisco's knowing sale of such products to secondary market suppliers in the context of either specific end user deals or when Cisco needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what they need for a specific end user order and subsequent resale of such product into the secondary market; (c) Cisco end user's resale of new, unused product; and (d) through importation of such product from abroad where it has been sold by distributors, resellers, or end users under

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.226**

1  similar circumstances.  On information and belief, Cisco resists attempts by end users and
2  resellers to return product, resulting in a natural supply of secondary market Cisco product.
3  Given the substantial profits available from sale of Cisco-branded products, market forces
4  dictate that a secondary market will develop for such products.  These market forces
5  benefit end users in that they reduce prices for such products.

6  118.  Dexon is an independent secondary-market reseller of computer networking
7  products, including routers, Ethernet switches and other computer hardware.  Dexon
8  provides new, refurbished and discontinued hardware products, including authentic or
9  genuine products to its customers from leading manufacturers including, without limitation,
10  Hewlett Packard, Dell, Juniper Networks and Cisco.

11  119.  Dexon obtains Cisco products from reliable suppliers, subjects such products to
12  extensive quality control, and then resells such products to other resellers and to end users,
13  at a profit but frequently at prices lower than those offered by Cisco "Authorized" sellers.

14  120.  Secondary market resellers of Cisco products, including Dexon, are highly
15  incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer
16  such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a
17  counterfeit product, an independent reseller's own reputation suffers significantly when it
18  sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including
19  Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

20  121.  Cisco has created an "Authorized Channel Network" in which Cisco sells products
21  to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."  Within
22  this "Authorized" network, Cisco exerts strict control over how, and at what prices, its
23  "Authorized" partners can buy and sell Cisco products.

24  122.  "Authorized Reseller" status is not foolproof protection against counterfeit products.
25  Cisco's "Authorized" sellers are likewise victimized by the presence of counterfeit product
26  in the marketplace and have been caught selling counterfeit Cisco product.

27  123.  While manufacturers like Cisco are permitted to control the initial sale of their
28  products, they may not wield trademark or copyright protections to dictate the terms by

0640.002\9968                          -20-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.227**

1   which their products are resold by other parties.  The well-established "first sale doctrine"
2   protects parties who engage in the subsequent resale of Cisco's products, even if those
3   subsequent resales occur outside the "Authorized" channels. Cisco may not forbid the resale
4   of its products outside the "Authorized" network.

5   **<u>Cisco's Improper Interference with the Secondary Market</u>**

6   **<u>Falsely Claiming Purchasers' Use and Transfer is Restricted</u>**

7   124.   Cisco products, like virtually all modern electronics, contain embedded software.
8   And just as a car, refrigerator, or cell phone will not function properly without internal
9   software, Cisco's products—including the Cisco products resold by Dexon—cannot
10  function without Cisco's embedded software.

11  125.   Cisco uses the fact that its products have embedded software as an attempted end-
12  around to the first sale doctrine.  It does so by attempting to unilaterally impose purported
13  contractual restrictions on the use and transfer of its products *after* their purchase.  Namely,
14  Cisco attempts to rely on purported "End User License Agreements" seeking to restrict the
15  owners' use and/or transfer of the subject hardware, including the embedded software
16  packaged and sold with the hardware (and without which the hardware will not function).

17  126.   Cisco attempts to rely on such purported "End User License Agreements" ("EULA")
18  despite the absence of any assent to such purported agreements/contracts by the owners of
19  the hardware.  Specifically, Cisco does not require or mandate that end users acknowledge,
20  read, accept or provide any affirmative assent to such purported agreements/contracts before
21  purchasing or using the Cisco goods sold by Dexon.  In fact, Cisco purports to advise
22  purchasers or end users of its alleged "End User License Agreement" by directing them to
23  domain names or websites containing the purported EULA (i.e. www.cisco.com/go/eula;
24  www.cisco.com/go/license)

25  127.   In the event any purchasers or end users actually go to the cited domain names or
26  websites, they are not required to provide any affirmative assent such as a "click through."
27  Rather,  Cisco's purported EULA states that that their "download, installation, or use of the
28  Cisco Technology" constitutes assent.  Notably, the new Cisco equipment sold on the

**App.228**

1   secondary market by resellers such as Dexon has never been "download[ed], install[ed] or

2   use[d]. . ."

3   128.   Cisco's purported EULA provides or has provided that Cisco will grant a license only

4   to consumers who purchase Cisco hardware with embedded software from a so-called

5   "Approved Source," defined as "Cisco or . . . [a] Cisco authorized reseller, distributor, or

6   systems integrator[.]" Cisco warns that end users are "not licensed to Use the Software on

7   secondhand or refurbished Cisco equipment not authorized by Cisco, or on Cisco equipment

8   not purchased through an Approved Source."

9   129.   In other words, Cisco attempts to prevent consumers from making any use of Cisco

10  hardware they have lawfully purchased on the secondary market by prohibiting use of the

11  embedded software.  Cisco further informs consumers that the "embedded Cisco software

12  that runs on the hardware" is "not transferable," and purchasers of secondary market Cisco

13  equipment "must acquire a new license from Cisco before the software can be used."  The

14  only way to avoid having to purchase a new license, Cisco says, is to buy refurbished

15  equipment through Cisco's own program.

16  130.   These representations to consumers are false. Pursuant to the first sale doctrine, and

17  absent any assent to Cisco's purported EULA, consumers who purchase Cisco hardware

18  may use embedded software.  They may also transfer the embedded software, along with the

19  hardware, freely.  Cisco may not sidestep the first sale doctrine based on embedded software

20  (to which the first sale doctrine indisputably applies) solely because consumers did not

21  purchase the hardware through Cisco's more lucrative supply chain.  And it may not deceive

22  consumers by telling them that products purchased on the secondary-market are governed

23  by a purported EULA restricting their use and/or transfer despite the absence of any assent

24  to such EULA.

25  131.   Cisco's misrepresentations regarding consumers' rights to buy, use and transfer

26  secondary-market Cisco products deters consumers from purchasing Cisco goods on the

27  secondary market.  Dexon has lost sales of products that would have been made but for

28  Cisco's false representations to consumers regarding their ownership rights for Cisco

**App.229**

1  hardware and embedded software purchased on the secondary market.  These false

2  representations have unjustly enriched Cisco at Dexon's expense.

3  132.    On occasions where secondary market sellers obtain Cisco product directly from an

4  "Authorized" seller, Cisco falsely threatens that the end users rights are restricted because

5  the sale was contrary to the "Authorized" seller's agreement with Cisco.    Cisco's

6  enforcement of this improper policy is selective.  In addition to being contrary to well-

7  established agency principles, such alleged agreements between Cisco and its "Authorized"

8  sellers are often not properly renewed or maintained and are therefore not in force and effect.

9  **Falsely Labeling New Secondary Market Products "Used"**

10  133.    Cisco also falsely labels genuine, lawfully obtained Cisco products as "used," simply

11  because such products were traded on the secondary market. As a result, end users or

12  resellers who communicate with Cisco about the status of certain Cisco products are

13  deliberately provided with misinformation.

14  134.    Cisco's contortion of the term "used" is particularly egregious. Rather than give the

15  term its ordinary meaning, Cisco has unilaterally decided that "used equipment" means

16  "previously owned equipment that is now owned by a party other than the original

17  customer," including both "opened and unopened equipment."  Cisco's form letters from its

18  Brand Protection Team have and continue to direct secondary market customers, including

19  Dexon's customers, to domains and websites (i.e. www.cisco.com/go/relicensing) which

20  misleadingly inform or have informed such customers that all products purchased on the

21  secondary market are "used."  Such site defines or has defined "used" as "previously owned

22  equipment that is now owned by a party other than the original customer" including both

23  "opened and unopened equipment."

24  135.    Accordingly, Cisco routinely publicly criticizes and labels secondary market product

25  which has never been used – including product contained in unopened sealed boxes – as

26  "used" contrary to consumers' well understood meaning of such term.

27  136.    Cisco knows that its unilateral definition of the term "used" is contrary to the common

28  consumer understanding, and that consumers are misled by its use of the term.

0640.002\9968                                      -23-                              Case No. 3:20-CV-4926-CRB

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**Cisco's Tortious Efforts to Interfere with Dexon's Business**

137.    Because Cisco regards secondary market resellers like Dexon as a threat to its excess profits, Cisco spends substantial money and effort to attack secondary market participants such as Dexon and to chill reseller and end user participation in the secondary market.  These steps include but are not limited to employing a team of "Brand Protection" employees whose primary responsibility is to intervene with resellers and end users in cases where they are either contemplating the purchase of product, or have ordered product, from the secondary market. Brand Protection personnel use a variety of tools to disrupt secondary market sales, including: (i) advising resellers and end users that product from the secondary market is suspect, may damage or jeopardize their network operations, may void Cisco warranties, may be counterfeit, and is otherwise unreliable.

138.    Such tortious conduct includes, without limitation, falsely advising Dexon's actual and prospective customers that: i) Dexon does not sell new but rather "used" Cisco product; ii) Dexon's products are "counterfeit" solely because they were sold on the secondary market despite the fact such products are in fact genuine; iii) Dexon products violate a purported EULA despite the absence of any assent to such EULA and/or despite the fact the relevant product (i.e. phones) require no license.

139.    Cisco has presented, published, and/or caused to be published the false and misleading message that alleged "genuine" and/or "new" Cisco gear only comes from Cisco and its "Authorized" sellers.

140.    Cisco has engaged in a pattern and practice of this tortious conduct with the intent to disrupt contracts between Dexon and its customers, pending opportunities with such customers, future business with such customers, and even with the apparent goal of driving Dexon out of business altogether.

141.    As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

0640.002\9968                                          -24-                     Case No. 3:20-CV-4926-CRB
DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.231**

<u>**Count I**</u>
**Lanham Act False Advertising**
**(15 U.S.C. § 1125(a)(1)(B))**

142.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

143.    Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is unlawful for any person to use a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

144.    As set forth above, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding the software embedded in Cisco hardware sold on the secondary market.

145.    In addition, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding whether products in the secondary market are "used."

146.    Without limitation, on or about July 9, 2019, Sean O'Brien, a member of Cisco's Brand Protection Team, sent a letter to Dexon customer Fort Bend Independent School District.  Fort Bend Independent School District had previously entered into a written contract with Dexon for the purchase of over $1,300,000.00 in new Cisco equipment.  Such letter stated: "According to Cisco Systems' records (www.cisco.com/go/eula, the Cisco goods listed in Exhibit A are not recorded as being sold to Fort Bend Independent School District through one of Cisco's authorized resellers.  It appears you may have purchased the Cisco goods from a company name **Dexon Computer**.  <u>**Unfortunately, Dexon Computers is not a member of the Cisco authorize reseller program**</u>.  As such, Cisco recommends that you return these goods for a refund, along with any other Cisco products received by the vendor, and replace the items with authorized Cisco products sold via an authorized reseller."

Case 5:22-cv-00053-RWS-CMC Document 21-4 Filed 06/23/22 Page 27 of 36 PageID #: 271

147.   Such letter further warned Dexon's customer that such products "may not come with a valid software license" and that "Customers purchasing most Cisco goods outside of Cisco's authorized sales channels would not automatically have a license to use the software."

148.   In addition to falsely advising Dexon's customer it would not have a license to use products purchased from Dexon, such letter referred Dexon's customer to www.cisco.com/go/relicensing containing the false and misleading definition of "used."

149.   As a direct result of the July 9, 2019 correspondence, as well as other communications with Cisco's Brand Protection Team, Fort Bend Independent School District falsely believed the Cisco equipment purchased from Dexon was "used" and/or that it would lack a necessary license to use such equipment.  As a result, Fort Bend Independent School District cancelled its contract with Dexon.

150.   Without limitation, on or about March 14, 2019, Tim Casto, a member of Cisco's Brand Protection Team, sent a letter to Dexon customer Lockridge Grindal and Nauen ("Lockridge").  Such letter falsely advised Dexon customer Lockridge that "six swtiches" purchased from Dexon were "counterfeit."

151.   The March 14, 2019 letter warned that "Dexon is NOT a member of the Cisco Authorized Reseller Program" and that "[r]egardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it supplies is consider unauthorized."  Such letter falsely represented that absolutely no product obtained from Dexon comes with a "valid software license."

152.   In addition to falsely labeling "six switches" obtained from Dexon counterfeit and falsely stating that no products obtained from Dexon came with a "valid software license," such letter also referred Dexon customer Lockridge to the domain or website containing the false and misleading definition of "used."

153.   As a direct result of the March 14, 2019 correspondence, as well as other communications with Cisco's Brand Protection Team, Lockridge falsely believed all six

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.233**

1  switches it purchased from Dexon were counterfeit and/or that it would not have the required

2  licenses necessary to use Cisco product purchased from Dexon.

3  154.    Without limitation, on or about , January 27, 2020, Tim Casto, a member of Cisco's

4  Brand Protection Team, sent an email to Dexon customer Accuray Inc. ("Accuray").  Such

5  email acknowledged that products purchased by Accuray from Dexon had been determined

6  to be authentic or "genuine."  However, the email falsely stated that because such genuine

7  products were purchased on the secondary market, they "did not have a valid software

8  license."  The email stated in relevant part, "Cisco reviewed the console readout and

9  determined that the items are genuine. . .The below items, however, show as sold to end

10  users other than Accuray.  This means that the below products do not have a valid software

11  license. . ."

12  155.    Without limitation, on or about July 12, 2021, Shuting Li, on information and belief

13  a member of Cisco's Brand Protection Team, sent an email to Dexon customer Meadowridge

14  Networks, Inc. ("Meadowridge").   Such letter falsely implied product purchased from

15  Dexon was not new or not genuine.  The email stated, "Serial number is verified to be an

16  unauthorized unit is because this unit is now in possession of end customer which is different

17  from the reported end customer.  So it is an overseas diversion unit."

18  156.    As a direct result of the July 12, 2021 email, as well as other communications with

19  Cisco,   Meadowridge   understandably   understood   Cisco   to   be   claiming   the   products

20  purchased from Dexon to be "used" and/or counterfeit.  In a responsive email, Meadowridge

21  explained, "I am the first end-user to open the box. . .This came to me in an unopened Cisco

22  box and was not a 'used' unit in any sense of the word. . .I had every reason to think that

23  this was a legitimate unit and no reason to believe that it wasn't."

24  157.    Rather than clarify Meadowridge's interpretation and misunderstanding of its prior

25  communications, Cisco responded by directing Meadowridge to a domain or website

26  containing its false and misleading definition of "used."

27

28

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.234**

158.   The foregoing false and misleading representations of fact were designed to mislead consumers, and have in fact misled consumers, at the expense of Dexon, causing direct and substantial loss and damage to Dexon.

159.   The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

160.   Cisco's misrepresentations have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

**<u>Count II</u>**
**Intentional Interference with Contractual Relations**

161.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

162.   Dexon secured contracts with certain customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge and Accuray for the sale of Cisco products on which Dexon would have earned significant profits.

163.   On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

164.   On information and belief, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.

165.   Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

166.   Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

167.   Cisco's actions have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.235**

### Count III
#### Intentional Interference with Prospective Economic Advantage

168.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

169.    An economic relationship existed between Dexon and its actual and prospective customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge, and Accuray, each of which contained the probability of substantial future economic benefits to Dexon.

170.    On information and belief, Cisco knew or should have known of these relationships.

171.    On information and belief, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships.

172.    Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to damage Dexon and or divert business to "Cisco Authorized Resellers" under Cisco's control.

173.    As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships. As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether.

174.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

175.    Cisco's actions have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

**App.236**

### Count IV
### Trade Libel

176.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

177.   On information and belief, Dexon alleges that Cisco has repeatedly made disparaging statements about Dexon's products as detailed herein, including, without limitation, the statements and representations detailed above to Dexon customers Fort Bend Independent School District, Lockridge, Meadowridge and Accuray.

178.   Cisco's statements disparaged Dexon's products.  On information and belief, Dexon alleges that the claims made were false or materially misleading.

179.   Dexon has suffered and will continue to suffer irreparable harm should Cisco's trade libel be allowed to continue.

180.   As a proximate result of Cisco's statements, prospective and actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

### THIRD PARTY CLAIMS

181.   Third Party Plaintiff Dexon Computer, Inc. asserts the following claims against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies alleges as follows:

### THE PARTIES

182.   Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.237**

183.    On information and belief, Third Party Defendant Atlantix Global Systems International, LLC is a Georgia limited liability corporation with its principal place of business in Georgia.

184.    On information and belief, Third Party Defendant Bizcom Electronics, Inc., is a California corporation with its principal place of business in California.

185.    On information and belief, Third Party Defendant Digi Devices Online is a foreign corporation with its principal U.S. place of business in Texas.

186.    On information and belief, Third Party Defendant Enterprise Business Technologies, Inc. is a New York corporation with its principal place of business in New York.

187.    On information and belief, Third Party Defendant Fiber Cable Connections is a Washington corporation with its principal place of business in Washington.

188.    On information and belief, Third Party Defendant MJSI is a California corporation with its principal place of business in California.

189.    On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

190.    On information and belief, Third Party Defendant Opitmum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

191.    On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

192.    On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

193.    On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

194.    On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

195.    On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

**App.238**

196.    On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

197.    On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

198.    On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

199.    On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

### Supply of Alleged Counterfeit and Infringing Product

200.    The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

201.    Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants. While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

202.    Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like." *See* U.C.C. §2-312(3).

### FIRST THIRD PARTY CLAIM
**(Indemnification - All Third Party Defendants)**

203.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

204.    Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

205.    Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

## SECOND THIRD PARTY CLAIM
### (Contribution - All Third Party Defendants)

206.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

207.    Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

208.    Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

## PRAYER FOR RELIEF

**WHEREFORE**, Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies as follows:

      a.    Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with prejudice, together with costs and disbursements;

      b.    Awarding Dexon actual damages, subject to proof at trial but in an amount in excess of $75,000.;

      c.    For equitable remedial efforts by Counterclaim Defendants sufficient to rehabilitate Dexon's damaged reputation;

      d.    For orders restraining or enjoining Cisco from engaging in similar conduct in the future;

      e.    Awarding Dexon damages, lost profits, and treble damages pursuant to the Lanham Act;

f.  Awarding Dexon its costs and expenses of litigation, including reasonable attorneys' fees;

g.  An award in Dexon's favor against Third Party Defendants sufficient to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting from the claims herein; and

h.  Such other and further relief as this Court deems just and equitable.

Dated:  January 10, 2022

*/s/ Amanda R. Washton*

Amanda Washton
  a.washton@conklelaw.com
**CONKLE, KREMER & ENGEL, PLC**
3130 Wilshire Boulevard, Suite 500
Santa Monica, CA 90403

Michael M. Lafeber
  mlafeber@taftlaw.com
O. Joseph Balthazor Jr.
  jbalthazor@taftlaw.com
**TAFT STETTINIUS & HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402

David H. Reichenberg (*pro hac vice pending*)
  DReichenberg@cozen.com
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006

Mark A. Jacobson (*pro hac vice pending*)
  mjacobson@cozen.com
**COZEN O'CONNOR**
33 South 6th Street, Suite 3800
Minneapolis, MN 55402

Attorneys for Defendant, Counterclaim Plaintiff and
Third-Party Plaintiff Dexon Computer, Inc.

DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
THIRD-PARTY CLAIMS

**App.241**

Case 5:22-cv-00053-RWS-JBB-CRB Document 71 Filed 06/23/20 Page 35 of 35 PageID #: 280

1

### DEMAND FOR JURY TRIAL

2

Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4  Dated:  January 10, 2022

*/s/ Amanda R. Washton*

5                                    Amanda R. Washton
                                       *a.washton@conklelaw.com*

6                                    **CONKLE, KREMER & ENGEL, PLC**
                                      3130 Wilshire Boulevard, Suite 500

7                                      Santa Monica, CA 90403

8                                      Michael M. Lafeber
                                      *mlafeber@taftlaw.com*

9                                      O. Joseph Balthazor Jr.
                                      *jbalthazor@taftlaw.com*

10                                    **TAFT STETTINIUS & HOLLISTER LLP**
                                    2200 IDS Center

11                                      80 S. 8th Street
                                    Minneapolis, MN 55402

12                                    David H. Reichenberg (*pro hac vice pending*)
                                    *DReichenberg@cozen.com*

13                                    **COZEN O'CONNOR**
                                    3 WTC, 175 Greenwich Street, 56th Floor

14                                    New York, New York 10006

15                                    Mark A. Jacobson (*pro hac vice pending*)
                                    *mjacobson@cozen.com*

16                                    **COZEN O'CONNOR**
                                    33 South 6th Street, Suite 3800

17                                    Minneapolis, MN 55402

18                                    Attorneys for Defendant, Counterclaim Plaintiff and
                                    Third-Party Plaintiff Dexon Computer, Inc.

19

20

21

22

23

24

25

26

27

28

**App.242**

Case 5:22-cv-00053-RWS-CMC   Document 21-5   Filed 06/23/22   Page 1 of 16 PageID #:  281

# Exhibit E

| | |
|---|---|
| 1 | Richard J. Nelson (SBN 141658) | Aaron M. Panner* (D.C. Bar No. 453608) |

1  Richard J. Nelson (SBN 141658)   Aaron M. Panner* (D.C. Bar No. 453608)
   Louis P. Feuchtbaum (SBN 219826)   Kylie C. Kim* (D.C. Bar No. 230277)
2  Artur A. Minasyan (SBN 322248)   Christopher M. Sarma* (D.C. Bar. No. 1510831)
   **SIDEMAN & BANCROFT LLP**   Alex A. Parkinson* (D.C. Bar No. 166695)
3  One Embarcadero Center   Ryan M. Folio* (New York Bar No. 5823943)
   Twenty-Second Floor   **KELLOGG, HANSEN, TODD,**
4  San Francisco, CA 94111-3711     **FIGEL & FREDERICK, P.L.L.C.**
5  (415) 392-1960   1615 M Street, NW, Suite 400
   rnelson@sideman.com   Washington, D.C. 20036
6  lfeuchtbaum@sideman.com   (202) 326-7900
   aminasyan@sideman.com   apanner@kellogghansen.com
7    kkim@kellogghansen.com
     csarma@kellogghansen.com
8    aparkinson@kellogghansen.com
     rfolio@kellogghansen.com
9

10

11  *Attorneys for Plaintiffs and Counterclaim Defendants*
    *Cisco Systems, Inc. and Cisco Technology, Inc.*

12  * Admitted *pro hac vice.*  Mr. Folio
    is not admitted in the District of
13  Columbia; his practice is supervised
    by members of the firm.
14

15              **UNITED STATES DISTRICT COURT**
              **NORTHERN DISTRICT OF CALIFORNIA**
16                **SAN FRANCISCO DIVISION**

17
    CISCO SYSTEMS, INC., a California      Case No.  3:20-cv-4926-CRB
18  corporation, and CISCO TECHNOLOGY,
    INC., a California corporation,        **PLAINTIFFS AND COUNTERCLAIM**
19                                         **DEFENDANTS CISCO SYSTEMS, INC.'S**
                                           **AND CISCO TECHNOLOGY, INC.'S**
20          Plaintiffs and Counterclaim    **NOTICE OF MOTION AND MOTION TO**
            Defendants,                    **DISMISS DEFENDANT DEXON**
21                                         **COMPUTER, INC.'S SECOND**
        v.                                 **AMENDED COUNTERCLAIMS;**
22                                         **MEMORANDUM OF POINTS AND**
    DEXON COMPUTER, INC., a Minnesota      **AUTHORITIES IN SUPPORT THEREOF**
23  Corporation,
24                                         Date:  March 17, 2022
            Defendant and Counterclaim     Time:  10:00 a.m.
25          Plaintiff.                     Courtroom:  6
                                           Judge:  Honorable Charles R. Breyer
26

27

28
                                                    Case No.  3:20-cv-4926

1    **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

2    **PLEASE TAKE NOTICE** that on March 17, 2022, at 10:00 a.m., or as soon thereafter as

3    this matter can be heard, in Courtroom 6 on the 17th Floor of the United States District Court for

4    the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, before the

5    Honorable Charles R. Breyer, Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and

6    Cisco Technology, Inc. (together, "Cisco") will, and hereby do, respectfully move this Court for an

7    order dismissing the second amended counterclaims by Defendant and Counterclaim Plaintiff

8    Dexon Computer, Inc. ("Dexon") in their entirety and with prejudice. *See* Dkt. 92.

9    This Motion is based on this Notice of Motion and Motion; the following Memorandum of

10   Points and Authorities below; the record in this matter; and such other and further papers, evidence,

11   and argument as may be submitted to support this Motion.

12

13   DATED:  January 31, 2022          Respectfully Submitted,

14                                     By:  */s/ Aaron M. Panner*
                                           Aaron M. Panner

15

16   Richard J. Nelson (SBN 141658)    Aaron M. Panner*
     Louis P. Feuchtbaum (SBN 219826)  Kylie C. Kim*

17   Artur A. Minasyan (SBN 322248)    Christopher M. Sarma*
     **SIDEMAN & BANCROFT LLP**        Alex A. Parkinson*

18   One Embarcadero Center            Ryan M. Folio*
     Twenty-Second Floor               **KELLOGG, HANSEN, TODD,**

19   San Francisco, CA 94111-3711       **FIGEL & FREDERICK, P.L.L.C.**
     (415) 392-1960                    1615 M Street, NW, Suite 400

20   rnelson@sideman.com               Washington, D.C. 20036
     lfeuchtbaum@sideman.com           (202) 326-7900

21   aminasyan@sideman.com             apanner@kellogghansen.com
                                       kkim@kellogghansen.com

22                                     csarma@kellogghansen.com

23                                     aparkinson@kellogghansen.com
                                       rfolio@kellogghansen.com

24

25                                     *Attorneys for Plaintiffs and Counterclaim Defendants*
                                       *Cisco Systems, Inc. and Cisco Technology, Inc.*

26

27                                     * Admitted *pro hac vice.*  Mr. Folio is not admitted in the
                                       District of Columbia; his practice is supervised by members

28                                     of the firm.

---

i                                                    Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.245**

**TABLE OF CONTENTS**

                                                                                                    Page

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT OF ISSUES TO BE DECIDED ................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 1

BACKGROUND ................................................................................................................. 1

LEGAL STANDARD ......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.      DEXON'S LANHAM ACT CLAIM FAILS TO ALLEGE ANY FALSE

        STATEMENT ......................................................................................................... 4

II.     DEXON'S FAILURE TO PLEAD FALSE STATEMENTS IS LIKEWISE FATAL

        TO THE BUSINESS-TORT COUNTERCLAIMS ................................................ 7

III.    DEXON'S COUNTERCLAIMS SHOULD BE DISMISSED TO THE EXTENT

        IT FAILS TO PLEAD RESULTING HARM ......................................................... 8

CONCLUSION ................................................................................................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Case No.  3:20-cv-4926

**App.246**

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3  **CASES**

4  *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133 (N.D. Cal. 2019) ............................10

5  *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................................3

6  *Becton, Dickinson & Co. v. Cytek Biosciences Inc.*, 2020 WL 1877707

7      (N.D. Cal. Apr. 15, 2020).........................................................................................................9

8  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................4

9  *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813 (N.D. Cal. 2019) ..............................6

10 *Cisco Sys. Inc. v. Link US, LLC*, 2019 WL 6682838 (N.D. Cal. Dec. 6, 2019).............................6

11 *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725 (9th Cir. 1999)....................5

12 *ComputerXpress, Inc. v. Jackson*, 113 Cal. Rptr. 2d 625 (Cal. Ct. App. 2001)............................7, 8

13 *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010).......................................................3

14 *DNA Sports Performance Lab, Inc. v. Major League Baseball*, 2020 WL 4430793

15     (N.D. Cal. Aug. 1, 2020).........................................................................................................8

16 *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020)........................................................7

17 *Kearns v. Ford Motor Co.*, 567 F.3d 1120 (9th Cir. 2009).........................................................4, 7

18 *Miller v. City & Cnty. of S.F.*, 187 Cal. App. 2d 480 (1960) ..........................................................5

19 *Openwave Messaging, Inc. v. Open-X-change, Inc.*, 2016 WL 2621872

20     (N.D. Cal. May 9, 2016)..........................................................................................................9

21 *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587 (Cal. 1990)..........................................8

22 *Robinson v. HSBC Bank USA*, 732 F. Supp. 2d 976 (N.D. Cal. 2010) .........................................8, 9

23 *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003) ..................................................4, 7

24 *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069 (9th Cir. 2014) .......................4

25 **STATUTE**

26 17 U.S.C. § 109(a).............................................................................................................................5

27 15 U.S.C. § 1125(a)..........................................................................................................................9

28

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1 **RULES**

2 Fed. R. Civ. P. 9(b)...............................................................................................4, 7, 8

3 Fed. R. Civ. P. 12(b)(6)..............................................................................................1

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No.  3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1                                 **STATEMENT OF ISSUES TO BE DECIDED**

2         Whether Dexon's second amended counterclaims should be dismissed with prejudice

3 under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

4                           **MEMORANDUM OF POINTS AND AUTHORITIES**

5         Dexon's second amended counterclaims reassert four of the eleven claims it asserted in its

6 first amended counterclaims:  false advertising under the Lanham Act; intentional interference with

7 contractual relations and prospective economic advantage; and trade libel.  Each of these claims

8 sounds in fraud, but Dexon fails to plead facts sufficient to overcome the legal deficiencies that led

9 this Court to dismiss its claims before.  Despite adding allegations regarding four of Dexon's

10 customer relationships, *see* Dexon's Second Am. Counterclaims ("SAC") ¶¶ 146-157, Dkt. 92,

11 Dexon still fails to plead with the requisite specificity any misrepresentation by Cisco or facts

12 showing that supposedly false statements harmed Dexon.  Furthermore, the counterclaims suffer

13 from additional legal defects that require their dismissal.  The Court should grant the motion with

14 prejudice.

15                                       **BACKGROUND**

16       **1.**       Cisco sued Dexon because Dexon sold counterfeit equipment bearing Cisco's

17 trademarks.  After filing its answer and counterclaims, Dexon filed an amended answer and

18 counterclaims asserting eleven causes of action under federal and state antitrust law, California's

19 Unfair Competition Law, the Declaratory Judgment Act, the Lanham Act, and state common law.

20 *See* Dexon's First Am. Counterclaims ("FAC"), Dkt. 50.  Cisco moved to dismiss, and the Court

21 dismissed all of these counterclaims without prejudice.  Order Granting Mot. To Dismiss

22 Counterclaims at 14-15 ("Order"), Dkt. 87.

23         In the Order, the Court held that multiple counterclaims failed because Dexon had not

24 alleged a misrepresentation with the requisite particularity.  Dexon's factual allegations in the first

25 amended counterclaims centered on two supposed misrepresentations:  the first regarding the need

26 for secondary-market purchasers to acquire a license to the software installed on Cisco equipment;

27 the second regarding the "used" status of secondary-market equipment.  This Court held that

28 "Cisco's statement that secondary-market equipment purchasers require a software license is not a

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1    misrepresentation," Order 14, explaining:

> Dexon alleges that Cisco informs customers that "although its hardware can be
> freely resold, the 'embedded Cisco software that runs on the hardware' is 'not
> transferable,' and purchasers of secondary market Cisco equipment 'must acquire
> a new license from Cisco before the software can be used.'" Dexon contends that
> this statement is false because it violates the first sale doctrine. But that doctrine
> applies to purchased software, not to purchased software <u>licenses</u>. Dexon alleges
> no plausible facts suggesting that initial owners of Cisco equipment own (rather
> than merely license) the embedded software. Cisco makes no misrepresentation
> when it informs secondary-market equipment purchasers that they need a software
> license.

Order 12 (internal citation omitted).

The Court also held that Dexon had "not pleaded with particularity the 'who, what, or when' regarding Cisco's allegedly misleading definition of 'used,' who was misled, and how specifically the misrepresentation caused Dexon harm." Order 14; *see also id.* at 12.

**2.** Cisco's second amended counterclaims include the last four counts of the first amended counterclaims, i.e., under the Lanham Act (Count I), for intentional interference (Counts II and III), and for trade libel (Count IV). All of these claims rely on the same allegations of fraud as the first amended counterclaims, centered on (1) the need for secondary-market purchasers to obtain software licenses; and (2) the "used" status of secondary-market equipment.

As to Dexon's second amended counterclaims regarding software licenses, Dexon asserts that Cisco "attempt[s] to unilaterally impose purported contractual restrictions on the use and transfer of its products *after* their purchase" through its End User License Agreements ("EULA"). SAC ¶ 125. Dexon asserts that, "[p]ursuant to the first sale doctrine, *and absent any assent to Cisco's purported EULA*, consumers who purchase Cisco hardware may use embedded software. They may also transfer the embedded software, along with the hardware, freely." SAC ¶ 130 (new language emphasized); *cf.* FAC ¶ 104 (identical allegation without the emphasized language). But Dexon does not make any new allegations to supply the necessary fact that this Court held was

2

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1  missing from the amended counterclaims, namely, that "initial owners of Cisco equipment own
2  (rather than merely license) the embedded software" on Cisco equipment.  Order 12.

3      With respect to the "used" status of secondary-market equipment, Dexon adds an allegation
4  that "Cisco's form letters . . . direct secondary market customers . . . to domains and websites (i.e.
5  www.cisco.com/go/relicensing) which misleadingly inform or have informed such customers that
6  all products purchased on the secondary market are 'used.'"  SAC ¶ 134.  The website
7  incorporated by reference into Dexon's counterclaim complaint – which this Court may consider
8  on this motion to dismiss, *see Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)
9  – describes the "Cisco Hardware Inspection and Software Relicensing Program."  *See* Panner Decl.
10  Ex. 1.  In the "Frequently Asked Questions" tab of that same website, the following statement
11  appears in response to the question "How does Cisco define 'used and secondary-market
12  equipment' that qualifies for this program?":

13      Cisco defines used equipment as previously owned equipment that is now owned
14      by a party other than the original customer.  Secondary-market equipment is any
15      Cisco equipment – whether it is represented as new, used, or refurbished – that is
16      purchased from a seller that is not an authorized Cisco reseller or distributor.  This
17      includes both opened and unopened equipment.

18  *Id.*  Accordingly, the website states that "secondary-market equipment" is broader than "used
19  equipment" and includes "both opened and unopened equipment."

20      **3.**  In dismissing the intentional interference and trade libel counts in Dexon's first
21  amended counterclaims, the Court noted that "Dexon's allegations are far too unspecific."
22  Order 15.  In response, Dexon adds certain details concerning Cisco's communications with four
23  Dexon customers:  Fort Bend Independent School District ("FBISD"), Lockridge Grindal and
24  Nauen ("Lockridge"), Accuray, Inc. ("Accuray"), and Meadowridge Networks, Inc.
25  ("Meadowridge").  *See* SAC ¶¶ 146-157.

26                    **LEGAL STANDARD**

27      "[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim
28  to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation

3                                          Case No.  3:20-cv-4926
PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.251**

1  marks omitted), and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S.

2  544, 555 (2007).  Because Dexon's counterclaims sound in fraud, it must also satisfy Rule 9(b)'s

3  heightened pleading standard by alleging, with particularity, "the who, what, when, where, and how

4  of the misconduct charged," *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009)

5  (internal quotation marks omitted), including "what is false or misleading about a statement, and

6  why it is false," *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

7  **ARGUMENT**

8  Dexon's second amended counterclaims all fail for the same reasons that the Court dismissed

9  the corresponding causes of action in the first amended counterclaims:  Dexon fails to allege with

10  specificity any false or misleading statement that caused Dexon harm (among other deficiencies).

11  The second amended counterclaims should thus be dismissed in their entirety and with prejudice.

12  **I.     DEXON'S LANHAM ACT COUNTERCLAIM FAILS TO ALLEGE ANY FALSE**

13  **STATEMENT**

14  The Lanham Act counterclaim fails because Dexon does not plausibly allege that Cisco

15  made a false statement of fact.  *See* Order 14 (applying Rule 9(b) to the Lanham Act

16  counterclaim); *see also Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071-

17  72 (9th Cir. 2014) (requiring a false statement).  As before, Dexon's misrepresentation allegations

18  center on statements regarding the rights of secondary-market purchasers to use embedded

19  software (*see* SAC ¶¶ 124-132) and the labeling of secondary-market equipment as "used" (*see*

20  SAC ¶¶ 133-136).  Notwithstanding the guidance this Court provided in the Order, Dexon does

21  not plausibly allege that the statements it points to are false.

22  **1.     Software Licenses:**  As this Court held, Cisco's statement that secondary-market

23  purchasers do not automatically obtain a license to use copyrighted software installed on

24  secondary-market equipment cannot support a Lanham Act claim because the statement is true.

25  *See* Order 12.  Dexon appears to assert that, unless the initial purchaser of Cisco's equipment

26  affirmatively agrees to the EULA, there is no restriction on that purchaser's ability to transfer the

27  software embedded on that equipment.  *See* SAC ¶ 130 (focusing on the alleged absence of "assent

28  to Cisco's purported EULA").  But that is incorrect for reasons this Court has explained.  *See*

Case No.  3:20-cv-4926
4

**App.252**

1    Order 12.  The "first sale" doctrine is a *defense* to copyright infringement:  it provides that once a

2    copy of copyrighted work is *sold* with the copyright owner's authorization, then the copyright

3    holder cannot prevent the resale of that particular copy.  *See* 17 U.S.C. § 109(a).  But Dexon does

4    not claim that it (or anyone else) purchased the software installed on any Cisco equipment that

5    Dexon sells; accordingly, there is no first *sale*, and secondary transferees, to whom no license has

6    been granted, do not acquire any right to use the copyrighted software.  That is true whether or not

7    any prior transferee agreed to – or was even aware of – the terms of the EULA.  That is what this

8    Court held before, and Dexon alleges nothing to address this legal defect.  *See* Order 12.

9       In particular, none of the specific representations that Cisco allegedly made to FBISD,

10   Lockridge, or Accuray contains false statements.  Cisco allegedly (SAC ¶ 147) told FBISD that

11   "[c]ustomers purchasing most Cisco goods outside of Cisco's authorized sales channels would not

12   automatically have a license to use the software"; Cisco allegedly (SAC ¶ 151) told Lockridge that

13   unauthorized products would not come with a "valid software license"; and Cisco allegedly (SAC

14   ¶ 154) told Accuray that secondary-market products "did not have a valid software license."  But

15   Dexon fails to allege any facts that would render those statements false.

16      Furthermore, Cisco's representation that purchasers of secondary-market Cisco equipment

17   must acquire a new software license is a statement of legal opinion and therefore not "actionable

18   under the Lanham Act."  *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731

19   (9th Cir. 1999); *see Miller v. City & Cnty. of S.F.*, 187 Cal. App. 2d 480, 483 (1960) ("a

20   misrepresentation of law is not an actionable fraud . . . , at least where, as here, no confidential

21   relationship exists between the parties"); *see also* Cisco Mot. To Dismiss Dexon's First Am.

22   Counterclaims at 23-24, Dkt. 72.

23      **2.    "Used" Status:**  Dexon does not allege that Cisco made any false statement

24   regarding the "used" status of secondary-market equipment.  The statement on Cisco's website

25   that Dexon incorporates by reference into its counterclaims (SAC ¶ 134; and which Dexon quoted

26   with a screenshot in its opposition to Cisco's prior motion to dismiss, *see* Dexon's Opp'n to Mot.

27   To Dismiss at 25, Dkt. 81) reveals that the challenged representation is about "used *and secondary*

28   *market* equipment."  Panner Decl. Ex. 1.  That phrase encompasses not only equipment "owned by

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1  a party other than the original customer" – i.e., Cisco's definition of "used equipment" – but also

2  "new, used, or refurbished" equipment "purchased from a seller that is not an authorized Cisco

3  reseller or distributor." *Id.* Cisco expressly discloses that secondary-market equipment may be

4  "unopened." Dexon does not allege any facts to support the assertion that this language is false or

5  deceptive.

6      While this Court and another in this district allowed certain fraud-based counterclaims to

7  proceed in a similar posture – *see Cisco Sys. Inc. v. Link US, LLC*, 2019 WL 6682838, at *9 (N.D.

8  Cal. Dec. 6, 2019) (Breyer, J.); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 830

9  (N.D. Cal. 2019) – the allegations in those cases were quite different. Those counterclaimants

10  alleged that Cisco told customers that secondary-market equipment *was* "used," "even when it has

11  never been turned on or even opened." *Link*, 2019 WL 6682838, at *8; *see Beccela's*, 403 F.

12  Supp. 3d at 821 ("Cisco allegedly misinforms customers who contact it by telling them that

13  products sold on the secondary market are used, which it defines as 'previously owned equipment

14  that is now owned by a party other than the original customer,' including both 'opened and

15  unopened equipment.'"). In that circumstance, the existence of an *accurate* definition on Cisco's

16  website could be "insufficient to set a reasonable consumer straight." *Link*, 2019 WL 6682838,

17  at *9. Here, by contrast, there is no allegation that Cisco falsely told anyone that unopened

18  equipment was "used," and Dexon does not allege any facts to support its assertion that the

19  definition, on its own, is misleading at all.

20      Far from bolstering its claim, Dexon's allegations regarding its four customer relationships

21  underscore the deficiencies of its general allegations. Dexon does not allege that Cisco told

22  FBISD that its equipment was used – it claims only (SAC ¶ 148) that a letter from Cisco referred

23  FBISD to Cisco's website where a definition of "used" appears. Cisco allegedly (SAC ¶ 151)

24  acknowledged the equipment that Lockridge purchased from Dexon might be "used" *or* "in new

25  sealed boxes." Dexon does not allege that Cisco told Accuray anything about the used status of its

26  equipment. And Dexon does not allege that Cisco told Meadowridge that its equipment was

27  "used"; it again alleges (SAC ¶ 157) that Cisco directed Meadowridge to its website. None of this

28

    Case No. 3:20-cv-4926

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

**App.254**

1  satisfies Dexon's burden.

2  **II.     DEXON'S FAILURE TO PLEAD FALSE STATEMENTS IS LIKEWISE FATAL**

3  **           TO THE BUSINESS-TORT COUNTERCLAIMS**

4       Dexon's business-tort counterclaims – intentional interference with contractual relations,

5  intentional interference with prospective economic advantage, and trade libel – fail for the same

6  reasons.  Because these counterclaims sound in fraud, *see* Order 14, Rule 9(b) requires Dexon to

7  allege falsity.  *See Kearns*, 567 F.3d at 1126 (claimant must allege "the particular circumstances

8  surrounding such representations"); *see also Vess*, 317 F.3d at 1102 ("The Federal Rules of Civil

9  Procedure apply . . . irrespective of whether the substantive law at issue is state or federal.").

10      Falsity is an element of each counterclaim.  The Supreme Court of California recently held

11 that "to state a claim for interference with an at-will contract by a third party, the plaintiff must

12 allege that the defendant engaged in an independently wrongful act," which includes fraud.  *Ixchel*

13 *Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020).  An at-will contract is one that "may

14 be terminated, by its terms, at the prerogative of a single party, whether it is because that party

15 found a better offer from a competitor, because the party decided not to continue doing business,

16 or for some other reason."  *Id.* at 1147.  As alleged in the second amended counterclaims, FBISD

17 and Dexon entered into an at-will contract; FBISD allegedly "cancelled" the contract, but Dexon

18 does not allege that FBISD breached any obligation by doing so.  SAC ¶ 149.  Thus, Dexon's

19 counterclaim for intentional interference with contractual relations requires it to allege falsity.

20 Dexon must also allege falsity to state a claim for intentional interference with prospective

21 economic advantage.  *See ComputerXpress, Inc. v. Jackson*, 113 Cal. Rptr. 2d 625, 644 (Cal. Ct.

22 App. 2001) ("interference with prospective economic advantage requires false statements of

23 fact").  And Dexon's counterclaim for trade libel also requires falsity.  *See id.* at 641 ("To

24 constitute trade libel, a statement must be false.").

25      Dexon does not plausibly allege that Cisco made a false statement of fact to any of the four

26 customers it identifies.  Most of those statements are discussed above in connection with the

27 Lanham Act claims.  *See supra* pp. 5-6.  With one exception, Dexon does not allege any of the

28 other statements to be false either.  Dexon alleges (SAC ¶ 146) that Cisco told FBISD that Dexon

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1  is not an authorized reseller, but Dexon does not (and cannot) allege that this statement was false.

2  Dexon alleges (SAC ¶ 154) that Cisco told Accuray that certain equipment "show[s] as sold to end

3  users other than Accuray," but Dexon does not allege that statement was false.  And Dexon alleges

4  (SAC ¶ 155) that Cisco told Meadowridge that certain equipment "is now in possession of end

5  customer which is different from the reported end customer," but, again, Dexon never alleges that

6  Cisco's statement was false.

7     Dexon does assert (SAC ¶ 150) that Cisco "falsely advised . . . Lockridge that 'six

8  switches' purchased from Dexon were 'counterfeit.'"  As explained below, Dexon's claims related

9  to Lockridge are barred because Dexon does not allege any disruption of its relationship with

10  Lockridge or harm from this alleged statement; furthermore, especially in context, Dexon's

11  allegations fail to plead falsity with the required specificity.  Dexon does not plead any facts to

12  show that the equipment was, in reality, genuine.  Such conclusory assertions do not satisfy the

13  specificity required by Rule 9(b).  *See* Order 12-13.

14     Accordingly, the Court should dismiss all of Dexon's business-tort counterclaims.  *See*

15  *ComputerXpress*, 113 Cal. Rptr. 2d at 644 ("A person cannot incur liability for interfering with

16  contractual or economic relations by giving truthful information to a third party."); *see also*

17  *Robinson v. HSBC Bank USA*, 732 F. Supp. 2d 976, 985-86 (N.D. Cal. 2010) (dismissing trade-

18  libel claim because plaintiffs did not plead any false statements).

19  **III.**  **DEXON'S COUNTERCLAIMS SHOULD BE DISMISSED TO THE EXTENT IT**

20     **FAILS TO PLEAD RESULTING HARM**

21     Finally, Dexon's counterclaims should be dismissed for another, independent reason:  Dexon

22  never alleges that it was harmed by the statements Cisco allegedly made to Lockridge, Accuray, and

23  Meadowridge.  For all of its counterclaims, Dexon must plausibly allege harm.  *See DNA Sports*

24  *Performance Lab, Inc. v. Major League Baseball*, 2020 WL 4430793, at *4 (N.D. Cal. Aug. 1, 2020)

25  (Lanham Act); *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 791 P.2d 587, 589-90 (Cal. 1990)

26  (intentional interference); *Robinson*, 732 F. Supp. 2d at 986 (trade libel).

27     Dexon alleges (SAC ¶ 149) that FBISD "cancelled its contract with Dexon."  As noted

28  above, however, Dexon does not allege that Cisco made any false statement to FBISD.  And, with

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1   respect to the remaining customers named in the SAC, Dexon makes no allegation of having

2   suffered harm.  Dexon alleges (SAC ¶ 153) that "Lockridge falsely believed all six switches it

3   purchased from Dexon were counterfeit and/or that it would not have the required licenses necessary

4   to use Cisco product purchased from Dexon,"[1] but not that Lockridge cancelled any purchase.

5   Dexon alleges (SAC ¶ 156) that Meadowridge complained to Cisco, but Dexon does not allege that

6   Meadowridge altered its dealings with Dexon.  And Dexon alleges nothing about its commercial

7   relationship with Accuray aside from the observation (SAC ¶ 154) that Accuray was a "customer"

8   that had purchased "products."

9       Dexon has accordingly failed to allege this required element of its counterclaims.  *See*, *e.g.*,

10  *Robinson*, 732 F. Supp. 2d at 986 (dismissing trade-libel claim because complaint was "devoid of

11  any allegation that [claimant] suffered *any* pecuniary or special damages").  The Court should

12  therefore dismiss all four counterclaims to the extent they rely on allegations about Lockridge,

13  Accuray, and Meadowridge.  The same is true for FBISD with respect to Dexon's Lanham Act claim

14  because Dexon does not allege that FBISD cancelled its contract because of any statement "in

15  commercial advertising or promotion."  15 U.S.C. § 1125(a)(1)(B); *see Openwave Messaging, Inc.*

16  *v. Open-X-change, Inc.*, 2016 WL 2621872, at *5 (N.D. Cal. May 9, 2016) (statements are not

17  commercial advertising or promotion if they are a "few isolated comments made with respect to a

18  few customers").

19      In addition to this deficiency infecting all of Dexon's counterclaims, the intentional

20  interference with prospective economic advantage counterclaim also fails because Dexon does not

21  allege a "probability of *future* economic benefit" from any of the purported customer relationships

22  that it claims to have lost as a result of Cisco's alleged conduct.  Order 15 (emphasis added) (internal

23

24      [1] The "and/or" – which appears elsewhere in the SAC (¶¶ 149, 156) – itself undermines the

25  adequacy of Dexon's allegations.  Where a plaintiff is required to plead fact A, and an allegation
    of fact B is legally inadequate, the allegation "A and/or B" is insufficient by its terms.  *See Becton,*

26  *Dickinson & Co. v. Cytek Biosciences Inc.*, 2020 WL 1877707, at *4 (N.D. Cal. Apr. 15, 2020)
    ("Where a claim rests on an 'and/or' pleading, both allegations connected by 'and/or' must

27  independently suffice to state a claim.").  Thus, even if Dexon had alleged that Lockridge
    cancelled a purchase, it would fail to show harm based on any representation that the equipment

28  was "counterfeit" rather than that Lockridge lacked necessary software licenses.

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

1  quotation marks omitted).  In particular, Dexon alleges nothing about the prospect of any future

2  sales or service contracts.  *See* SAC ¶¶ 146-157.  And without such allegations, "it is impossible for

3  the Court to determine whether it is reasonably probable that the prospective economic advantage

4  would have been realized but for [Cisco's alleged] interference."  *AlterG, Inc. v. Boost Treadmills*

5  *LLC*, 388 F. Supp. 3d 1133, 1152 (N.D. Cal. 2019).

6  **CONCLUSION**

7    The Court should dismiss Dexon's second amended counterclaims in their entirety and with

8  prejudice.

9  DATED:  January 31, 2022     Respectfully Submitted,

10              By: */s/ Aaron M. Panner*

11                 Aaron M. Panner

12  Richard J. Nelson (SBN 141658)   Aaron M. Panner*
   Louis P. Feuchtbaum (SBN 219826)  Kylie C. Kim*

13  Artur A. Minasyan (SBN 322248)   Christopher M. Sarma*
   **Sideman & Bancroft LLP**      Alex A. Parkinson*

14  One Embarcadero Center       Ryan M. Folio*
   Twenty-Second Floor        **Kellogg, Hansen, Todd,**

15  San Francisco, CA 94111-3711    **Figel & Frederick, P.L.L.C.**
   (415) 392-1960         1615 M Street, NW, Suite 400

16  rnelson@sideman.com       Washington, D.C. 20036
   lfeuchtbaum@sideman.com     (202) 326-7900

17  aminasyan@sideman.com      apanner@kellogghansen.com

18                  kkim@kellogghansen.com

19                  csarma@kellogghansen.com

20                  aparkinson@kellogghansen.com
                   rfolio@kellogghansen.com

21              *Attorneys for Plaintiffs and Counterclaim Defendants*

22              *Cisco Systems, Inc. and Cisco Technology, Inc.*

23              * Admitted *pro hac vice.*  Mr. Folio is not admitted in
               the District of Columbia; his practice is supervised by

24              members of the firm.

25

26

27

28

PLAINTIFFS AND COUNTERCLAIM DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION

# Exhibit F

1   Amanda R. Washton (SB# 227541)
       *a.washton@conklelaw.com*
2   **CONKLE, KREMER & ENGEL**
    Professional Law Corporation
3   3130 Wilshire Boulevard, Suite 500
    Santa Monica, California 90403-2351
4   Phone: (310) 998-9100
    Fax: (310) 998-9109
5
    Michael M. Lafeber (*pro hac vice*)
6       *mlafeber@taftlaw.com*
    O. Joseph Balthazor Jr. (*pro hac vice*)
7       *jbalthazor@taftlaw.com*
    **TAFT STETTINIUS &**
8       **HOLLISTER LLP**
    2200 IDS Center
9   80 S. 8th St.
    Minneapolis, MN 55402
10  Phone: 612.977.8400
    Fax: 612.977.8650
11
    Attorneys for Defendant, Counterclaim
12  Plaintiff and Third-Party Plaintiff Dexon
    Computer, Inc.

13

14              UNITED STATES DISTRICT COURT

15      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

16

17  CISCO SYSTEMS, INC., a Delaware          Case No. 3:20-CV-4926-CRB
    corporation and CISCO TECHNOLOGY,
18  INC., a California corporation,          **DEFENDANT'S THIRD AMENDED
                                             ANSWER, AFFIRMATIVE
19              Plaintiffs,                  DEFENSES, COUNTERCLAIMS AND
                                             THIRD-PARTY CLAIMS**
20          v.
                                             Hon. Charles R. Breyer
21  DEXON COMPUTER, INC., a Minnesota        Presiding Judge
    corporation,
22
                Defendant.
23  _____

24  DEXON COMPUTER, INC., a Minnesota        Trial Date:        None
    corporation,
25
                Counterclaim Plaintiff and
26              Defendant,
27          v.

28
    0640.002\9965                               Case No. 3:20-CV-4926-CRB
    ───────────────────────────────────────────────────────────────
    DEFENDANT'S SECOND AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND
                           THIRD-PARTY CLAIMS

1  CISCO SYSTEMS, INC., a Delaware
corporation and CISCO TECHNOLOGY,
2  INC., a California corporation,

3          Counterclaim Defendants
           and Plaintiffs.
4

5  DEXON COMPUTER, INC., a Minnesota
corporation,
6
           Third-Party Plaintiff,
7
      v.
8
ATLANTIX GLOBAL SYSTEMS
9  INTERNATIONAL, LLC, BIZCOM
ELECTRONICS, INC., DIGI DEVICES
10 ONLINE, ENTERPRISE BUSINESS
TECHNOLOGIES, INC., FIBER CABLE
11 CONNECTIONS, MJSI, MULTIMODE
TECHNOLOGIES, LLC,  OPTIMUM
12 DATA, INC., PARAGON, PURE
FUTURE TECHNOLOGY, INC.,
13 SEASTAR IT TRADING LLC, SERVER
TECH SUPPLY, SOFTNETWORKS,
14 INC., STRADA NETWORKS, LLC,
TEKSAVERS, UNLIMITED NETWORK
15 SOLUTIONS, and WISECOM
TECHNOLOGIES,
16
           Third-Party Defendants,
17

18

19

20

21

22

23

24

25

26

27

28

0640.002\9965                    -2-              Case No. 3:20-CV-4926-CRB

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

**App.261**

1    Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned

2    counsel, for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc.

3    and Cisco Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except

4    as expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs

5    are entitled to any of the relief requested in their Prayer for Relief.  In response to each of

6    the numbered paragraphs of the Complaint, Dexon states as follows.  To the extent the

7    headings or any other non-numbered statements in the Complaint contain allegations,

8    Dexon denies each and every such allegation.

9

10                                    **INTRODUCTION**

11    1.    Dexon denies the allegations of paragraph 1 of the Complaint.

12    2.    Dexon denies the allegations of paragraph 2 of the Complaint.

13    **THE PARTIES**

14    3.    Dexon lacks sufficient information to admit or deny the allegations of

15    paragraph 3 of the Complaint, and on that basis Dexon denies those allegations.

16    4.    Dexon admits the allegations of paragraph 4 of the Complaint.

17    5.    Dexon denies the allegations of paragraph 5 of the Complaint.

18    **JURISDICTION AND VENUE**

19    6.    Admits that the Complaint purports to be one "founded upon violations of

20    Federal trademark laws" but denies any such purported claims have legal or factual merit.

21    The remaining allegations in paragraph 6 of the Complaint are legal conclusions and

22    questions of law regarding jurisdiction to which no response is required.  To the extent a

23    response is required, Dexon denies such allegations.

24    7.    Dexon denies the allegations of paragraph 7 of the Complaint.

25    8.    Dexon denies the allegations of paragraph 8 of the Complaint.

26    9.    Dexon denies the allegations of paragraph 9 of the Complaint.

27    10.    Dexon denies the allegations of paragraph 10 of the Complaint.

28    11.    Dexon denies the allegations of paragraph 11 of the Complaint.

## **FACTUAL ALLEGATIONS**

### **Alleged Cisco Business and History**

12.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 of the Complaint, and on that basis Dexon denies those allegations.

13.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 of the Complaint, and on that basis Dexon denies those allegations.

14.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 of the Complaint, and on that basis Dexon denies those allegations.

### **Alleged Cisco Trademarks**

15.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 of the Complaint, and on that basis Dexon denies those allegations.

16.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 of the Complaint, and on that basis Dexon denies those allegations.

17.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 of the Complaint, and on that basis Dexon denies those allegations.

18.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 of the Complaint, and on that basis Dexon denies those allegations.

### **Alleged Counterfeit "Cisco" Products**

19.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 of the Complaint, and on that basis Dexon denies those allegations.

20.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 of the Complaint, and on that basis Dexon denies those allegations.

### **Alleged Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products**

21.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 of the Complaint, and on that basis Dexon denies those allegations.

22.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 of the Complaint, and on that basis Dexon denies those allegations.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Case 5:22-cv-00053-RWS-JBB   Document 16   Filed 06/24/22   Page 6 of 54 PageID #: 302

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.    Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.    Dexon denies the allegations of paragraph 24 of the Complaint.

25.    Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.    Dexon denies the allegations in paragraph 26 of the Complaint. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.    Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.    Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.264**

Case 5:22-cv-00053-RWS-JBB   Document 16   Filed 06/24/22   Page 7 of 64 PageID #: 303

characterizations of the letters or communications which speak for themselves. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

### Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to Wayne State University (Detroit, Michigan) and Cisco's C&D Letter

29.    Dexon admits selling and shipping Cisco product to Wayne State University on or about February 21, 2010 but denies the remainder of the allegations in paragraph 29 of the Complaint, including, without limitation, any allegation the product involved was counterfeit. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

30.    Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to Wayne State University, but Dexon denies the reminder of the allegations in paragraph 30 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

31.    Dexon admits it responded via a letter from counsel to Plaintiff's Wayne State University allegations on or about August 23, 2010, but Dexon denies the reminder of the allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

32.    Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the Wayne State University allegations on or about August 30, 2010, but Dexon denies the

1    reminder of the allegations in paragraph 32 of the Complaint, including, without limitation,

2    Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs

3    previously commenced a lawsuit against Dexon in 2011 including claims based directly on

4    such allegations which were resolved via a confidential settlement agreement and dismissed

5    with prejudice.

6    **Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco**

7    **Investigator (Los Angeles, California)**

8    33.    Dexon denies the allegations in paragraph 33 of the Complaint. Plaintiffs

9    previously commenced a lawsuit against Dexon in 2011 including claims based directly on

10   such allegations which were resolved via a confidential settlement agreement and dismissed

11   with prejudice.

12   **<u>Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit</u>**

13   34.    Dexon denies the allegations in paragraph 34 of the Complaint.

14   **Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things**

15   **Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter**

16   35.    Dexon admits selling Cisco product to Things Remembered, Inc. on or about

17   July 2015, but denies the remainder of the allegations in paragraph 35 of the Complaint,

18   including any allegation the product was counterfeit.

19   36.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to

20   the Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon

21   responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the

22   Complaint, including, without limitation, Plaintiffs' attempted characterizations of the

23   letters or communications which speak for themselves.

24   **Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to**

25   **Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D**
     **Letter**

26

27   37.    Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack

28   Henry") on or about December 2016, but denies the remainder of the allegations in

paragraph 37 of the Complaint, including, without limitation, any allegation the product was counterfeit.

38.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph 38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

39.     Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the responsive letter which speaks for itself.

**Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Berkeley, California)**

40.     Dexon denies the allegations in paragraph 40 of the Complaint.

**Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter**

41.     Dexon admits selling Cisco product to Community Health Alliance ("CHA") on or about January 2018, but denies the remainder of the allegations in paragraph 41 of the Complaint, including, without limitation, any allegation the product was counterfeit.

42.     Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or communications relating to the CHA allegations, but denies the remainder of the allegations in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to Tucson Medical Center (Arizona)**

43.     Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on or about April 2018, but denies the remainder of the allegations in paragraph 43 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to
DARCARS (Maryland) and Cisco's C&D Letter**

44.    Dexon admits selling Cisco product to DARCARS on or about April 2018,
but denies the remainder of the allegations in paragraph 44 of the Complaint, including,
without limitation, any allegation the product was counterfeit.

45.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to
the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph
45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of
the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to
Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

46.    Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on
or about August 2018, but denies the remainder of the allegations in paragraph 46 of the
Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to
Regional Justice Information Service (St. Louis, MO) and Cisco's C&D
Letter**

47.    Dexon admits selling Cisco product to Regional Justice Information Service
("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph
47 of the Complaint, including, without limitation, any allegation the product was
counterfeit.

48.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to
the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of
the Complaint, including, without limitation, Plaintiffs' attempted characterization of the
letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from
PureFutureTech (Fremont, California)**

49.    Dexon admits purchasing Cisco product from PureFutureTech on or about
2018 and that the purported supplier of such product was HongKong Sellsi, a former

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

**App.268**

Case 5:22-cv-00053-RWS-JBB    Document 146-1    Filed 06/23/22    Page 10 of 54 PageID #:  307

authorized licensed seller of Cisco products, but lacks sufficient information to admit or deny the remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon denies such allegations.

50.    Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit involving Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were ultimately required to file a motion relating to such non-party subpoena.  Dexon denies the remaining allegations of paragraph 50 of the Complaint, including, without limitation, any allegation, suggestion or implication Dexon "refused to cooperate" with, or in any way failed to meet its obligations arising from, the subpoena.

**Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers from Pure Future Tech, Inc. (Fremont, California)**

51.    Dexon admits purchasing Cisco product from Pure Future Tech, Inc. in the period 2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient information to admit or deny the remaining allegations in paragraph 51 of the Complaint and on that basis denies such allegations.

52.    Dexon denies the allegations in paragraph 52 of the Complaint, including, without limitation, any allegation Dexon knew or reasonably should have known any Cisco product was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

**Dexon's Sales of Alleged Counterfeit Products to Murray State University (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

53.    Dexon admits selling Cisco product to Murray State University ("MSU") in or about 2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the Complaint, including, without limitation, any allegation the product was counterfeit.

54.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

55.     Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

56.     Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.     Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Alleged California Directed Conduct Identified Through Jurisdictional  Discovery**

59.     Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

**Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

60.     Dexon denies the allegations in paragraph 60 of the Complaint.

Case 5:22-cv-00053-RWS-JBB   Document 14-1   Filed 06/23/22   Page 13 of 34 PageID #:  309

**Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers**

61.     Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.     Dexon denies the allegations in paragraph 62 of the Complaint.

63.     Dexon denies the allegations in paragraph 63 of the Complaint.

64.     Dexon denies the allegation in paragraph 64 of the Complaint.

**FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**
*(15 U.S.C. § 1114)*

65.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

66.     Dexon denies the allegations of paragraph 66 of the Complaint.

67.     Dexon denies the allegations of paragraph 67 of the Complaint.

68.     Dexon denies the allegations of paragraph 68 of the Complaint.

69.     Dexon denies the allegations of paragraph 69 of the Complaint.

70.     Dexon denies the allegations of paragraph 70 of the Complaint.

71.     Dexon denies the allegations of paragraph 71 of the Complaint.

72.     Dexon denies the allegations of paragraph 72 of the Complaint.

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
*(15 U.S.C. § 1114)*

73.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

74.     Dexon denies the allegations of paragraph 74 of the Complaint.

75.     Dexon denies the allegations of paragraph 75 of the Complaint.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.271**

Case 5:22-cv-00532-RWS-CMC-CRB-Document 21-6 1 Filed 06/23/22 Page 14 of 34 PageID #: 310

| | |
|---|---|
| 1 | 76. Dexon denies the allegations of paragraph 76 of the Complaint. |
| 2 | 77. Dexon denies the allegations of paragraph 77 of the Complaint. |
| 3 | 78. Dexon denies the allegations of paragraph 78 of the Complaint. |
| 4 | 79. Dexon denies the allegations of paragraph 79 of the Complaint. |

**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**
*(15 U.S.C. § 1125)*

80. Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

81. Dexon denies the allegations of paragraph 81 of the Complaint

82. Dexon denies the allegations of paragraph 82 of the Complaint.

83. Dexon denies the allegations of paragraph 83 of the Complaint.

84. Dexon denies the allegations of paragraph 84 of the Complaint.

85. Dexon denies the allegations of paragraph 85 of the Complaint.

**FOURTH PURPORTED CLAIM FOR RELIEF**
**California Unfair Business Practices**
*(Cal. Bus. & Prof. Code §§ 17200 et seq.)*

86. Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87. The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 et seq to which no response is required. To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 et seq Dexon denies such allegations.

88. Dexon denies the allegations of paragraph 88 of the Complaint.

89. Dexon denies the allegations of paragraph 89 of the Complaint.

90. Dexon denies the allegations of paragraph 90 of the Complaint.

91. Dexon denies the allegations of paragraph 91 of the Complaint.

92. Dexon denies the allegations of paragraph 92 of the Complaint.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

**App.272**

**FIFTH PURPORTED CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

93.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

94.     Dexon admits the allegations of paragraph 94 of the Complaint.

95.     Dexon denies the allegations of paragraph 95 of the Complaint.

## AFFIRMATIVE DEFENSES

Without admitting any wrongful conduct on the part of Dexon, and without admitting that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or injury, Dexon alleges the following affirmative defenses to the Complaint.  By designating the following as affirmative defenses, Dexon does not in any way waive or limit any defenses which are or may be raised by their denial, allegations, and averments set forth herein.  These defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such defenses, and are without prejudice to Dexon's ability to raise other and further defenses.  Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional defenses upon discovery and review of additional documents and information, upon the development of other pertinent facts, and during pretrial proceedings in this action.  Dexon expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if fully set forth in each of the following affirmative defenses.

## FIRST AFFIRMATIVE DEFENSE
**(Res Judicata and Collateral Estoppel)**

96.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of res judicata and collateral estoppel.

## SECOND AFFIRMATIVE DEFENSE
### (Laches)

97.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of laches.  Plaintiffs' have had longstanding knowledge concerning the legal open or "secondary" market for its products and have proactively engaged in unfair and tortious behavior in an effort to selectively manipulate and control such secondary market to their advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein, resulting in substantial prejudice to Defendants.

## THIRD AFFIRMATIVE DEFENSE
### (Estoppel)

98.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of estoppel.  Plaintiffs' advertises that consumers can purchase their products from their "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate in and sell their products on the secondary market.  Plaintiffs have allowed these "Authorized Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status despite knowledge of their participation in the secondary market, including evidence of their sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such "authorized" vendors when sourcing Cisco products, including, without limitation, procuring Cisco product from such "authorized vendors'" end customers.  Plaintiffs have also actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  As one example, Plaintiffs "authorized" vendors intentionally modify or change product serial numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.274**

packages. Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking damages related to alleged counterfeit products.

## FOURTH AFFIRMATIVE DEFENSE
### (First Sale Doctrine and Exhaustion)

99.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale doctrine, which protects secondary market resellers such as Dexon from liability for the purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights in further transactions.

## FIFTH AFFIRMATIVE DEFENSE
### (Statutes of Limitations)

100.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38, CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of Plaintiffs' claims involve conduct outside of the applicable statutes of limitations.

## SIXTH AFFIRMATIVE DEFENSE
### (Waiver)

101.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product; and ii) actively and regularly deal with secondary market resellers such as Dexon. Secondary market resellers such as Dexon have understandably relied upon Plaintiffs' promotion and endorsement of such "authorized" sellers when sourcing Cisco products for their customers.  Plaintiffs have also intentionally failed or refused to provide or offer their claimed "tools" for detecting counterfeit product to secondary market resellers such as Dexon, and have actively contributed to the presence of counterfeit product in the

marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers. Plaintiffs have also had longstanding specific knowledge of Dexon's activity in the legal secondary market since well before 2011, yet have failed to take timely action to assert their claims herein. Accordingly, Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized" vendors.

### SEVENTH AFFIRMATIVE DEFENSE
### (Unjust Enrichment)

102.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of unjust enrichment. Plaintiffs have engaged in unfair and tortious practices and made misrepresentations to consumers regarding: i) the quality and authenticity of products sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict consumers use and transfer of Cisco hardware and software. Such conduct has improperly steered customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

### EIGHTH AFFIRMATIVE DEFENSE
### (Unclean Hands/Inequitable Conduct)

103.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of unclean hands, inequitable conduct, and similar defenses. Without limitation, Plaintiffs have: (i) intentionally misled consumers into thinking that genuine products on the secondary market are used, counterfeit, or stolen, (ii) sold products to resellers whom it knew, or should have known, were reselling the products on the secondary market, (iii) held out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have known these entities sold counterfeit goods, and engaged in other inequitable practices that bar recovery on its claims.

0640.002\9965                                         -17-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

App.276

Case 5:22-cv-00053-RWS-JBB   Document 116   Filed 06/24/26   Page 19 of 54 PageID #:   315

## NINTH AFFIRMATIVE DEFENSE
### (Redundancy)

104.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because they are redundant and/or duplicative of one another.

## TENTH AFFIRMATIVE DEFENSE
### (Abandonment)

105.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment of any marks at issue. Plaintiffs' have failed to properly police and exercise adequate quality control over its marks and have thereby abandoned their rights therein.

## ELEVENTH AFFIRMATIVE DEFENSE
### (Conduct of Others)

106.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because the conduct complained of is the conduct of others, including, without limitation, Plaintiffs' "authorized" vendors and/or Plaintiffs' licensed manufacturers.

## TWELVE AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

107.   Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

## THIRTEENTH AFFIRMATIVE DEFENSIVE
### (Lack of Personal Jurisdiction)

108.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

## FOURTEENTH AFFIRMATIVE DEFENSIVE
### (Improper Venue)

109.    Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

## FIFTEENTH AFFIRMATIVE DEFENSIVE
### (Failure to State a Claim)

110.    The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

## SIXTEENTH AFFIRMATIVE DEFENSIVE
### (One Satisfaction Rule / Bar on Double Recovery)

111.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

## COUNTERCLAIMS

112.    Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendants Cisco Systems, Inc., and Cisco Technology, Inc. (hereinafter referred to jointly as "Cisco") alleges as follows:

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.278**

### THE PARTIES

113.   Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

114.   On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc. ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

115.   On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology, Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134.

### JURISDICTION

116.   This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28 U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

### FACTS

#### The Secondary Market for Cisco Products

117.   As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products.  On information and belief, authentic or genuine Cisco products come to the secondary market in the United States in a variety of ways including: (a) Cisco's knowing sale of such products to secondary market suppliers in the context of either specific end user deals or when Cisco needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what they need for a specific end user order and subsequent resale of such product into the secondary market; (c) Cisco end user's resale of new, unused product; and (d) through

1   importation of such product from abroad where it has been sold by distributors, resellers,

2   or end users under similar circumstances.  On information and belief, Cisco resists attempts

3   by end users and resellers to return product, resulting in a natural supply of secondary

4   market Cisco product.

5       118.    Given the substantial profits available from sale of Cisco-branded products,

6   market forces dictate that a secondary market will develop for such products.  These market

7   forces benefit end users in that they reduce prices for such products.

8       119.    Dexon is an independent secondary-market reseller of computer networking

9   products, including routers, Ethernet switches and other computer hardware.  Dexon

10  provides new, refurbished and discontinued hardware products, including authentic or

11  genuine products to its customers from leading manufacturers including, without limitation,

12  Hewlett Packard, Dell, Juniper Networks and Cisco.

13      120.    Dexon obtains Cisco products from reliable suppliers, subjects such products

14  to extensive quality control, and then resells such products to other resellers and to end

15  users, at a profit but frequently at prices lower than those offered by Cisco "Authorized"

16  sellers.

17      121.    Secondary market resellers of Cisco products, including Dexon, are highly

18  incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer

19  such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a

20  counterfeit product, an independent reseller's own reputation suffers significantly when it

21  sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including

22  Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

23      122.    Cisco has created an "Authorized Channel Network" in which Cisco sells

24  products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."

25  Within this "Authorized" network, Cisco exerts strict control over how, and at what prices,

26  its "Authorized" partners can buy and sell Cisco products.

27      123.    "Authorized Reseller" status is not foolproof protection against counterfeit

28  products.  Cisco's "Authorized" sellers are likewise victimized by the presence of

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

1  counterfeit product in the marketplace and have been discovered to be selling counterfeit

2  Cisco product.

3      124.    While manufacturers like Cisco are permitted to control the initial sale of their

4  products, they may not wield trademark or copyright protections to dictate the terms by

5  which their products are resold by other parties.  The well-established "first sale doctrine"

6  protects parties who engage in the subsequent resale of Cisco's products, even if those

7  subsequent resales occur outside the "Authorized" channels. Cisco may not forbid the resale

8  of its products outside the "Authorized" network.

9          **Cisco's Improper Intereference With Secondary Market:**
          **Original Transaction a "Sale" not a "License"**

10

11     125.    Cisco products, like virtually all modern electronics, contain embedded

12  software.  And just as a car, refrigerator, or cell phone will not function properly without

13  internal software, Cisco's products - including the Cisco products resold by Dexon - cannot

14  function without Cisco's embedded software.  Likewise, such embedded software is not

15  intended to be removed and has no independent value to the end consumer separate and

16  apart from the Cisco product with which it is compatible.

17     126.    Cisco uses the fact that its products have embedded software as an attempted

18  end-around the first sale doctrine.  It does so by falsely claiming the embedded software is

19  governed by an "End User License Agreement" ("EULA") which restricts subsequent

20  transfer and use of any Cisco product containing such embedded software.

21     127.    Cisco's false claims concerning purported contractual restrictions on the

22  transfer and use of such embedded software are not merely off the cuff "opinion" statements

23  by lower level Cisco employees or representatives.  Rather, Cisco has employed an

24  intentional, coordinated, formalized and ongoing effort to utilize such false claims to deter

25  consumers from purchasing Cisco products on the secondary market (including from

26  resellers like Dexon).

27

28

128.  For example, Cisco's official "relicensing" website found at https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html provides as follows:

| Policies | Using the Program | Product List | Frequently Asked Questions |

### Software

Cisco software–whether it is embedded operating system software or standalone application software–is not transferable unless specifically allowed under the Cisco Software License Transfer and Re-Use Policy. You must have Cisco's written consent and pay a license fee. After a transfer, the previous owner's license to the software is terminated, and the transferee's use of the software is governed by the Cisco End User License Agreement and in accordance with the original license entitlement.

129.  The same Cisco "relicensing" website advises consumers that the purported embedded software licenses are not transferrable and that any Cisco product purchased on the secondary market must be relicensed.  The website provides at https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html#q2:

Q: Is a Cisco software license transferable?

A: No, unless it is specifically allowed under the Cisco Software License Transfer and Re-Use Policy. Cisco software licenses are not transferable from user to user unless otherwise stated by Cisco or required by applicable law. Any purchaser of used or secondary-market Cisco equipment is required to relicense the software. For further details read the End User License Agreement.

130.  Cisco's "FAQ" for "Third Party Maintenance Services and purchase of Cisco Products outside the Authorized Channel" found online expressly states that product purchased on the secondary market from a non 'Cisco Channel Partner' does not come with a valid software license:

**Q. If I buy Cisco product from a company who is not a Cisco Channel Partner, willl I have a valid software license?**

**A.** No, unless the Cisco product successfully passes an inspection and any applicable relicensing fees are paid or it meets an exception contained in Cisco's Software License Transfer and Re-Use Policy.

131.  Cisco also sends vetted and approved form letters from its "Brand Protection Team" to secondary market customers stating that only the "initial purchasers" of Cisco product are entitled to the benefits of the purported EULA.   Such letters are intended to scare consumers into believing that products purchased on the secondary may not work or

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.282**

1    that they are not authorized to utilize the embedded software contained in Cisco products

2    purchased from secondary market sellers like Dexon.

3           132.    Specifically, Cisco's "Brand Protection Team" form letters define any Cisco

4    product purchased from secondary market resellers such as Dexon as "unauthorized."  Such

5    form letters then falsely claim that "any" such "unauthorized product does not have a valid

6    software license."

7           133.    For example, a March 14, 2019, Cisco Brand Protection Team form letter to

8    Dexon customer Lockridge Grindal Nauen stated in relevant part:

Please be informed Dexon is NOT a member of the Cisco Authorized Reseller Program.
Regardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new
sealed boxes, ANY Cisco product it supplies is considered unauthorized.

1.    Unauthorized product is not eligible for any Cisco OEM warranty
2.    Unauthorized product is not automatically eligible for SMARTnet
3.    Unauthorized product does not have a valid software license.

For a detailed list of authorized Cisco Channel Partners, please refer
to http://www.cisco.com/go/partnerlocator.

The following policy statement applies, whether the product is used or is in new, unopened and
sealed boxes.

When products are not sold through Cisco's authorized sales channels, Cisco can offer no
assurance as to the provenance, quality, or authenticity of those products.  Additionally, when
resellers resell Cisco products that have been sourced from outside of Cisco's authorized sales

channels, those products do not come with a valid software license or hardware warranty and are
not automatically eligible for a Cisco service support contract (such as SMARTnet maintenance).

An overview of Cisco's policy on this subject is as follows:

   Licensing.  When Cisco sells its products, software licenses (such as for Cisco IOS) are
   granted to the initial purchasers of those products.  Cisco's policy is that software may
   not be transferred to any other purchaser of the product unless specifically authorized by
   Cisco.  To the extent that Cisco believes a customer is not an initial purchaser—or if a
   customer expresses concern that it is not an initial purchaser—such issues will be
   promptly addressed and Cisco is committed to resolving all licensing issues that arise. In
   full, this policy is set forth on Cisco's
   website:  http://www.cisco.com/en/US/prod/cisco_software_transfer_relicensing_policy.
   html.

26          134.    Contrary to Cisco's representations, no valid or enforceable license exists

27    covering the embedded software.  Rather, the facts and circumstances surrounding the

28    original transactions confirm a *sale* of such products, including the embedded software,

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

**App.283**

Case 5:22-cv-00053-RWS-JBB   Document 216-1   Filed 06/23/23   Page 26 of 54 PageID #:  322

1    rather than the creation of any alleged or purported license governing the embedded

2    software.

3    **The Purchasing Process**

4    135.    Cisco sells new, unopened product to its authorized resellers. Upon

5    information and belief, these sales come in substantial quantities, sometimes in the

6    thousands of individual products.

7    136.    Upon information and belief, Cisco's authorized resellers accept the risk that

8    the brand-new Cisco products, including the embedded software, may be damaged or lost.

9    Cisco makes it extremely difficult for its authorized resellers to return any products.

10    137.    Cisco's authorized resellers offer the Cisco products for sale to consumers.

11    Such authorized resellers make it extremely difficult to for consumers to return any

12    products.

13    138.    As shown and explained below, the original consumer transaction involving

14    the Cisco products is a "sale" of both the hardware and any associated embedded software.

15    There is no creation of a license covering the embedded software. Rather, Cisco's

16    authorized resellers state that Cisco switches come with a "Cisco limited lifetime warranty"

17    without mention that the warranty is subject to any restrictions or that the product comes

18    embedded with software subject to a license. CDW and other authorized resellers offer

19    additional "[e]nhance[ments]" for the hardware, like Cisco SmartNet extended service

20    agreements.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.284**

Case 5:22-cv-00052-RWS-JBB   Document 14-1   Filed 06/23/22   Page 27 of 54 PageID #:  323

139.   Cisco's authorized reseller's do not provide original purchasers any notice prior to purchase that there is embedded software in the product or that such embedded software is governed by a license restricting the original purchaser's ability to transfer or sell the subject product.

140.   Attached as Exhibit A  is a true and correct copy of an October 15, 2020 invoice from Cisco authorized reseller CDW Direct for a Cisco Catalyst 9200L switch costing $856.47.  The invoice provides a single, flat price for the switch.  The invoice does not provide a separate itemized price for the switch's embedded software.  In fact, the invoice contains absolutely no mention of a separate or independent license agreement governing the switch's embedded software.

141.   The sole reference to "software" is buried in the small print of the attempted "Terms and Conditions" located on the back side of the CDW invoice.

142.   The attempted "Terms and Conditions" include a "Title; Risk of Loss" section which begins by placing the risk of loss or damage during shipment on the purchaser.  It then adds, in small lowercase print, that "title to software will remain with the applicable licensor(s), and Customers rights therein are contained in the license agreement between such licensor(s) and Customer."   Such notice contains no reference to "embedded software."

143.   Cisco does offer several stand alone and independent traditional software licenses, including, without limitation, licenses governing its Digital Network Architecture ("DNA") network management services.  Cisco's authorized resellers provide separate invoices or line items covering such traditional software licenses.  Accordingly, to the extent original purchasers actually read the small print "Terms and Conditions," such purchasers would have no way of knowing the referenced "software" applied to embedded software as opposed to traditional stand-alone software sold and priced separately.

144.   In addition to failing to properly notify original purchasers prior to their purchase that their ability to subsequently transfer or sell the expensive Cisco products is

restricted by a purported EULA governing the hardware's embedded software, at no time does Cisco or its Authorized Resellers obtain the purchasers assent to any purported EULA.

145.    At no time has Cisco or its Authorized Resellers placed a notice or warning of a purported EULA on the exterior packaging of any of its hardware.  Moreover, such packaging contains no notice or warning advising purchasers that by opening such packaging they would be assenting or agreeing to Cisco's alleged EULA governing the embedded software.  Below are representative photographs of the exterior packaging for a Cisco WS-C2960L switch:





DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS







**App.287**

146.    Rather than properly notifying original purchasers of the purported EULA governing the embedded software and obtaining their affirmative assent, Cisco has included various attempted notices on the *inside* of the product packaging. Such notices are accessible only *after* the products have been purchased and opened.

147.    Resellers such as Dexon sell a large volume of new, in the box, never opened Cisco products, meaning at no point were such attempted "notices" ever accessed or viewed by the original purchaser.

148.    Dexon sells such brand-new, in the box, never opened Cisco product to end users like schools, hospitals, and businesses. The individuals opening or accessing such Cisco products are often lower-level information technology personnel charged with installing such equipment.  In addition to generally being required to install such equipment in short time frames with little or no opportunity for locating, reviewing and studying any purported EULA governing the embedded software, such IT professionals often have no control over or involvement with purchasing or return decisions.

149.    The attempted notices Cisco has included inside the product packaging have varied through the years.  For example, an unopened package for a Cisco WS-C2960L switch originally sold on or about 2009 included a separate plastic bag of accessories inside the product packaging.  The plastic bag bears a green sticker providing, "Please read the license terms regarding the use of the product included inside this box.  By using the product, you agree to be bound by these license terms.  If you do not agree with these terms, promptly return the unused product, manual, related equipment and hardware (with proof of payment) to the place of purchase for a full refund":

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS



150.   The referenced licensed terms supposedly to be found "inside this box" are in fact buried in and difficult to access within a "Getting Started Guide" CD included in the plastic bag:



**App.289**



151.  The "Getting Started Guide" CD is not required to be utilized or accessed by the IT professional as part of the install process. Rather, as the name implies, it is in fact a "Getting Started Guide" containing instructions. The CD does not contain any software required to be loaded or accessed as part of the installation process and would have been routinely ignored as unnecessary or superfluous by experienced IT professionals.

152.  At some unknown time, Cisco stopped including the green sticker or the "Getting Started Guide" CD.  In fact, Cisco stopped providing or including *any* copy of the purported EULA governing the embedded software with its products.

153.  Rather, Cisco began including a small single page notice directing the user to various websites.  Such "product information" notice contains no warning that use of the product constitutes acceptance of Cisco's purported EULA governing the embedded software or that the consumer's subsequent use of the product will be restricted.  Rather, the notice requires the individual who opened the package, often a lower level IT professional having no responsibility for purchasing or return decisions, to go to a separate URL or website:



154.    Subsequent to the introduction of its DNA network management services, Cisco also began including separate notices governing independent and separate licenses for such network management services.

155.    In addition to failing to provide any proper notice of a purported EULA governing the embedded software, at no point has Cisco required or obtained any affirmative assent to such purported EULA by the original purchaser.  For example, an original purchaser who actually goes to the referenced website is not required to affirmatively accept the purported EULA governing the embedded software via a "click through" process or otherwise.

156.    Moreover, no such affirmative assent to the purported EULA governing the embedded software is required for the original purchaser to actually use the subject Cisco products.  Without limitation, at no point during the "boot up" process is an end user advised of any purported EULA governing the embedded software or asked to provide affirmative assent to any such purported EULA via a "click through" process or otherwise. Upon information and belief, downstream purchasers and end users first become aware of Cisco's

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

contention their use and transfer of the product is restricted by a purported EULA governing the embedded software via communications from Cisco's Brand Protection Team *years after* the original purchase.

157.    In light of the absence of any evidence of a valid or enforceable EULA governing the embedded software, the original transaction involving the subject Cisco products constitutes a "sale" of both the hardware and associated embedded software.  As a result, Cisco's form communications and representations that secondary market purchasers' ability to use and transfer Cisco products are false and misleading and violate the first sale doctrine codified at 17 U.S.C. § 109. Cisco does not offer or enter into a license for the subject embedded software and does not control the use of such embedded software.

158.    Consumers who purchase Cisco products on the secondary market may use the embedded software included therewith because the title of the product and embedded software is transferred to them.  They may also transfer the Cisco products, including the embedded software, freely.  They also accept all risk that the product with embedded software may be lost or damaged.

159.    When consumers receive the Cisco Brand Protection Team communications, they falsely believe that they cannot use the product or that the product will not work. There is no license covering the embedded software; rather, any "licenses" apply to add-on "enhanced" software features like DNA. Because there is no license that covers the embedded software, and no assent to any such purported license, Cisco's statements the embedded software is governed by a purported license which restricts the use and disposition of the Cisco product is false. Downstream consumers can use the embedded software without ever buying a separate or independent license from Cisco.

160.    When Dexon's customers receive the Brand Protection Team letter, they falsely believe they cannot use the product or that the product will not work because they believe, falsely, that they have to purchase a separate license. They don't.

161.    Cisco's past and ongoing misrepresentations regarding the applicability of a purported EULA governing the embedded software and secondary market purchasers'

1   rights to buy, use and transfer secondary-market Cisco products deters consumers from
2   purchasing Cisco products on the secondary market.  Dexon has lost and will continue to
3   lose sales of products that would have been made but for Cisco's false representations to
4   consumers regarding the applicability of a purported EULA and the consumers' ownership
5   rights for Cisco hardware and associated embedded software purchased on the secondary
6   market.  These false representations have unjustly enriched Cisco at Dexon's expense.

7                   **Cisco's Tortious Interference with Dexon's Business**

8           162.    Because Cisco regards secondary market resellers like Dexon as a threat to
9   its excess profits, Cisco spends substantial money and effort to attack secondary market
10  participants such as Dexon and to chill reseller and end user participation in the secondary
11  market.  These steps include but are not limited to employing a team of "Brand Protection"
12  employees whose primary responsibility is to intervene with resellers and end users in cases
13  where they are either contemplating the purchase of product, or have ordered product, from
14  the secondary market.

15          163.    Cisco Brand Protection personnel use a variety of tools to disrupt secondary
16  market sales, including, without limitation, falsely advising Dexon's actual and prospective
17  customers that: i) Dexon does not sell new but rather "used" or "refurbished" Cisco product;
18  ii) Dexon's products are "counterfeit" solely because they were sold on the secondary
19  market despite the fact such products are in fact genuine; iii) Dexon products violate a
20  purported EULA despite the absence of any proper notice of or assent to the purported
21  EULA; and iv) Dexon products violate the purported EULA even though the purported
22  EULA does not even apply to the applicable product.

23          164.    Cisco has engaged in a pattern and practice of this tortious conduct with the
24  intent to disrupt contracts between Dexon and its customers, pending opportunities with
25  such customers, future business with such customers, and even with the apparent goal of
26  driving Dexon out of business altogether.

27

28

0640.002\9965                         -34-                    Case No. 3:20-CV-4926-CRB
DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

**App.293**

**Fort Bend Independent School District**

165.    Dexon entered into a contract with Fort Bend Independent School District ("FBISD") for the sale and purchase of over $1,300,000.00 in brand new Cisco equipment. On or about June 24, 2019, Cisco representative Dan Roberts falsely advised and represented to FBISD representative Cecile Thompson that the equipment FBISD was purchasing from Dexon could not be new but rather had to "refurbished."

166.    On or about July 9, 2019, Sean O'Brien, a member of Cisco's Brand Protection Team, sent a letter to FBISD falsely claiming and representing that products sold by Dexon do not come with a "valid software license." Such letter stated: "According to Cisco Systems' records (www.cisco.com/go/eula), the Cisco goods listed in Exhibit A are not recorded as being sold to Fort Bend Independent School District through one of Cisco's authorized resellers. It appears you may have purchased the Cisco goods from a company name Dexon Computer. Unfortunately, Dexon Computer is not a member of the Cisco authorized reseller program. As such, Cisco recommends that you return these goods for a refund, along with any other Cisco products received by the vendor, and replace the items with authorized Cisco products sold via an authorized reseller."

167.    Such letter further warned Dexon's customer that such products "may not come with a valid software license" and that "Customers purchasing most Cisco goods outside of Cisco's authorized sales channels *would not automatically have a license to use the software*." (italics added.)

168.    As a direct and proximate result of such communications, FBISD falsely believed the Dexon products may not be new and that it would not be able to use such products due to the absence of a "valid software license." As a direct and proximate result of Cisco's false and misleading representations, FBISD cancelled its $1.3 million contract with Dexon, and Dexon has received no further business opportunities from FBISD.

169.    Cisco's representations to FBISD are especially egregious considering the contracted for products were Cisco phones rather than networking equipment containing embedded software which Cisco contends is governed by a purported EULA. Upon

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.294**

1   information and belief, unlike Cisco's subject networking equipment, Cisco's phones
2   utilize "open source" software.  The phones do require a completely separate and
3   independent Cisco service and license to operate (Cisco Unified Communications Manager
4   which is commonly known as "CallManager"). Thus, Cisco's statement that such products
5   would lack a "valid software license" were false and misleading.

6   **Lockridge Grindal and Nauen**

7   170.   Without limitation, on or about March 14, 2019, Tim Casto, a member of
8   Cisco's Brand Protection Team, sent a letter to Dexon customer Lockridge Grindal and
9   Nauen ("Lockridge").  Such letter falsely advised Dexon customer Lockridge that "six
10  switches" purchased from Dexon were "counterfeit."  On information and belief, only four
11  (4) of the six (6) switches are currently alleged to be counterfeit by Cisco.

12  171.   The March 14, 2019 letter warned that "Dexon is NOT a member of the Cisco
13  Authorized Reseller Program" and that "[r]egardless of what Dexon claims, and regardless
14  of whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it
15  supplies is consider unauthorized."  Such letter falsely represented that absolutely no
16  product obtained from Dexon comes with a "valid software license."

17  172.   As a direct and proximate result of the March 14, 2019 correspondence, as
18  well as other similar communications from and representations by Cisco's Brand Protection
19  Team, Lockridge falsely believed all six (6) switches it purchased from Dexon were
20  counterfeit, that the switches would not work, and that it would not have the required
21  licenses necessary to use Cisco product purchased from Dexon. Citing the Brand Protection
22  Team correspondence, Lockridge demanded a refund of all amounts paid to Dexon.  Dexon
23  lost all future business opportunities from Lockridge.

24  **Accuray, Inc.**

25  173.   Without limitation, on or about , January 27, 2020, Tim Casto, a member of
26  Cisco's Brand Protection Team, sent an email to Dexon customer Accuray Inc.
27  ("Accuray").  Such email acknowledged that products purchased by Accuray from Dexon
28  had been determined to be authentic or "genuine."  However, the email falsely stated that

**App.295**

1   because such genuine products were purchased on the secondary market, they "did not have

2   a valid software license."   The email stated in relevant part, "Cisco reviewed the console

3   readout and determined that the items are genuine. . .The below items, however, show as

4   sold to end users other than Accuray.   This means that the below products do not have a

5   valid software license. . ."

6        174.   As a direct and proximate result of the January 27, 2020 correspondence, as

7   well as other similar communications from and representations by Cisco's Brand Protection

8   Team, Accuray falsely believed that the product would not work and that it did not have

9   the required licenses necessary to use the Cisco products purchased from Dexon.   As a

10  result, Accuray demanded a refund of all amounts paid to Dexon.   Dexon lost all future

11  business opportunities from Accuray.

12  **Meadowridge Networks, Inc.**

13       175.   Without limitation, on or about July 12, 2021, Shuting Li, on information and

14  belief a member of Cisco's Brand Protection Team, sent an email to Dexon customer

15  Meadowridge Networks, Inc. ("Meadowridge").   Such letter falsely implied product

16  purchased from Dexon was not new or not genuine.   The email stated, "Serial number is

17  verified to be an unauthorized unit. . .because this unit is now in possession of end customer

18  which is different from the reported end customer.   So it is an overseas diversion unit."

19       176.   As a direct and proximate result of the July 12, 2021 email, as well as other

20  similar communications from and representations by Cisco, Meadowridge understandably

21  understood Cisco to be claiming the products purchased from Dexon to be "used" and/or

22  counterfeit.   In a responsive email, Meadowridge explained, "I am the first end-user to open

23  the box. . .This came to me in an unopened Cisco box and was not a 'used' unit in any sense

24  of the word. . .I had every reason to think that this was a legitimate unit and no reason to

25  believe that it wasn't."

26       177.   Rather than clarify Meadowridge's interpretation and misunderstanding of its

27  prior communications, Cisco responded by directing Meadowridge to a domain or website

28  containing a  false and misleading definition of "used."   Namely, such definition defined

**DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS**

"used" as all Cisco products purchased on the secondary market. (See www.cisco.com/go/relicensing which misleadingly defines "used" products as "previously owned equipment that is now owned by a party other than the original customer" including both "opened and unopened equipment."

178.    As a direct and proximate result of the Cisco Brand Protection Team communications, Meadowridge falsely believed that its use of Cisco products purchased from Dexon would be impaired or restricted and that the product would not work.  As a direct and proximate result, Meadowridge demanded a refund and was also provided a replacement or substitute product at a reduced priced.  Dexon has lost future business opportunities from Meadowridge.

179.    The foregoing false and misleading representations of fact were designed to mislead consumers, and have in fact misled consumers, at the expense of Dexon, causing direct and substantial loss and damage to Dexon.

180.    Cisco's false and misleading misrepresentations have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

181.    As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

**Count I**
**Declaratory Judgment**
**(28 U.S.C. §§ 2201-2202)**

182.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

183.    Dexon seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 & 2202, that the original transactions involving the subject Cisco products is a "sale" of both the hardware and any associated embedded software and that there exists no valid or

0640.002\9965                                    -38-                        Case No. 3:20-CV-4926-CRB
DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

App.297

enforceable license agreement governing the embedded software which prohibits the use or transfer of such products by subsequent secondary market purchasers.

184.    Cisco has made, and continues to make false representations to actual or potential secondary market purchasers, including Dexon's actual or potential customers, that their ability to use and transfer any secondary market Cisco product is prohibited by a purported EULA governing the product's embedded software.

185.    No such valid or enforceable EULA exists.

186.    Rather, the original transaction involving the subject Cisco products was a "sale" of both the hardware and any included embedded software.

187.    Accordingly, Cisco's form communications and representations are and continue to be false and have caused and will continue to cause significant harm and damage to secondary market sellers, including Dexon.

188.    A real legal dispute and actual controversy presently exists between the parties to this action which is concrete and justiciable in character, and as to which each party possesses an interest in resolving.

189.    Dexon has sold and intends to continue selling genuine Cisco products, including new, unopened, in the box Cisco products.

190.    Cisco has continued its longstanding practice of sending form communications to Dexon's actual and prospective customers falsely advising such customers that their use and transfer of any Cisco products purchased from Dexon is prohibited by a purported but invalid and unenforceable EULA.

191.    Unless and until Cisco's form communications and representations are deemed to be false and in violation of the first sale doctrine codified at 17 U.S.C. §109, Dexon's ability to sell such products will be wrongfully and unnecessarily impaired and Dexon will continue to be injured and damaged thereby. Accordingly, Dexon seeks declaratory relief from this Court.

192.    The controversy between Dexon and Cisco warrants relief declaring the rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that: i) original purchasers

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.298**

1    of Cisco products obtained the products and any associated embedded software via a "sale";

2    ii) there is no valid or enforceable EULA governing the embedded software in Cisco

3    products sold by Dexon on the secondary market; and iii) Dexon's customers' are free to

4    use and transfer such products pursuant to the first sale doctrine codified at 17 U.S.C. §109.

5

6                                      **Count II**
7                          **Lanham Act False Advertising**

8            193.   Dexon repeats and realleges each of the allegations set forth in the preceding

9    paragraphs as if fully set forth herein.

10           194.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is

11   unlawful for any person to use a "false or misleading description of fact, or false or

12   misleading representation of fact, which . . . in commercial advertising or promotion,

13   misrepresents the nature, characteristics, qualities, or geographic origin of his or her or

14   another person's goods, services, or commercial activities."

15           195.   As set forth above, Cisco has published in commercial advertising and

16   promotion, and continues to publish in commercial advertising and promotion, false or

17   misleading representations of fact regarding the software embedded in Cisco hardware sold

18   on the secondary market.

19           196.   In addition, Cisco has published in commercial advertising and promotion,

20   and continues to publish in commercial advertising and promotion, false or misleading

21   representations of fact regarding whether products in the secondary market are "used."

22           197.   Cisco knowingly tells end users that they cannot use the products with

23   embedded software because they need to purchase a separate license.

24           198.   Cisco's statements to end users that the embedded software is subject to a

25   software license like the EULA are false. End users cannot be bound by a contract that does

26   not exist in the first place and are free to use and transfer the subject products pursuant to

27   the first sale doctrine.

28

199.   The foregoing false and misleading representations of fact were designed to mislead consumers by making them falsely believe they could not use the product or that the product would not work, and have in fact misled consumers, at the expense of Dexon, causing direct and substantial loss and damage to Dexon.

200.   The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

201.   Cisco's misrepresentations have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

202.   Dexon will continue to suffer irreparable harm to its goodwill if these actions continue and Dexon is entitled to injunctive relief to preclude such conduct.

### Count III
### Intentional Interference with Contractual Relations

203.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

204.   Dexon secured contracts with certain customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge and Accuray for the sale of Cisco products on which Dexon would have earned significant profits.

205.   On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

206.   On information and belief, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.

207.   Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

Case 5:22-cv-00053-RWS-JBB   Document 14-1   Filed 06/23/22   Page 434 of 50   PageID #:  339

208.   Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

209.   Cisco's actions have caused, and unless enjoined by this Court, will continue to cause irreparable injury to Dexon.

**Count IV**
**Intentional Interference with Prospective Economic Advantage**

210.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

211.   An economic relationship existed between Dexon and its actual and prospective customers, including, without limitation, Fort Bend Independent School District, Lockridge, Meadowridge, and Accuray, each of which contained the probability of substantial future economic benefits to Dexon.

212.   On information and belief, Cisco knew or should have known of these relationships.

213.   On information and belief, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships.

214.   Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to damage Dexon and or divert business to "Cisco Authorized Resellers" under Cisco's control.

215.   Cisco's knew such statements were false and misleading or had a disregard for whether such statements were true of false and misleading.

216.   As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships. As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.301**

1  contention for business, and have ceased doing business with Dexon on other products
2  and/or altogether.

3  217.   Dexon has suffered substantial economic damage as a result of this wrongful
4  conduct in an amount subject to proof at trial.

5  218.   Cisco's actions have caused, and unless enjoined by this Court, will continue
6  to cause irreparable injury to Dexon.

7

8  **Count V**
9  **Trade Libel**

10  219.   Dexon repeats and realleges each of the allegations set forth in the preceding
11  paragraphs as if fully set forth herein.

12  220.   On information and belief, Dexon alleges that Cisco has repeatedly made
13  disparaging statements about Dexon's products as detailed herein, including, without
14  limitation, the statements and representations detailed above to Dexon customers Fort Bend
15  Independent School District, Lockridge, Meadowridge and Accuray.

16  221.   Cisco's statements disparaged Dexon's products.  On information and belief,
17  Dexon alleges that the claims made were false or materially misleading.

18  222.   Cisco intentionally made such statement knowing such statements were false
19  and misleading or having a complete disregard for whether such statements were true or
20  false and misleading.

21  223.   Dexon has suffered and will continue to suffer irreparable harm should
22  Cisco's trade libel be allowed to continue.

23  224.   As a proximate result of Cisco's statements, the identified actual customers
24  have been deterred from buying Dexon's products and from otherwise dealing with Dexon.
25  Specifically, such customers have refused to pay for certain Cisco goods, have returned
26  and/or cancelled orders for such goods, have removed Dexon's bids from contention for
27  business, and have ceased doing business with Dexon on other products altogether.

28

225.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

### Count VI
### Trade Libel Per Se

226.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

227.   As detailed herein, Cisco has repeatedly made disparaging statements about Dexon's products to Dexon customers Fort Bend Independent School District, Lockridge, Meadowridge and Accuray.

228.   Cisco's statements disparaged Dexon's products.

229.   Cisco intentionally made such statements knowing such statements were false and misleading or having a complete disregard for whether such statements were true or false and misleading.

230.   As a proximate result of Cisco's statements, the identified actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Specifically, such customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products altogether.

231.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

232.    Such false and misleading statements by Cisco go to the integrity and character of Dexon's business practices, including, without limitation, implying that Dexon misleads its customers as to the nature or quality of its goods, including that Dexon sells "refurbished" products as "new,", and that Dexon misrepresents that its secondary market customers will be able to use and transfer Cisco products purchased from Dexon.   As a result, damage is presumed for such statements irrespective of any actual damages proven by Dexon at trial.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

| | **THIRD PARTY CLAIMS** |
|---|---|
| 1 | |
| 2 | 233.   Third Party Plaintiff Dexon Computer, Inc. asserts the following claims |
| 3 | against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom |
| 4 | Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable |
| 5 | Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure |
| 6 | Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., |
| 7 | Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies alleges |
| 8 | as follows: |

**THE PARTIES**

234.   Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

235.   On information and belief, Third Party Defendant Atlantix Global Systems International, LLC is a Georgia limited liability corporation with its principal place of business in Georgia.

236.   On information and belief, Third Party Defendant Bizcom Electronics, Inc., is a California corporation with its principal place of business in California.

237.   On information and belief, Third Party Defendant Digi Devices Online is a foreign corporation with its principal U.S. place of business in Texas.

238.   On information and belief, Third Party Defendant Enterprise Business Technologies, Inc. is a New York corporation with its principal place of business in New York.

239.   On information and belief, Third Party Defendant Fiber Cable Connections is a Washington corporation with its principal place of business in Washington.

240.   On information and belief, Third Party Defendant MJSI is a California corporation with its principal place of business in California.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.304**

241.   On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

242.   On information and belief, Third Party Defendant Optimum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

243.   On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

244.   On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

245.   On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

246.   On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

247.   On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

248.   On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

249.   On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

250.   On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

251.   On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

**Supply of Alleged Counterfeit and Infringing Product**

252.   The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

253.    Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants. While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

254.    Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like." *See* U.C.C. §2-312(3).

**FIRST THIRD PARTY CLAIM**
**(Indemnification - All Third Party Defendants)**

255.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

256.    Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

257.    Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

**SECOND THIRD PARTY CLAIM**
**(Contribution - All Third Party Defendants)**

258.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

259.    Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

260.    Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.306**

**PRAYER FOR RELIEF**

**WHEREFORE**, Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Unlimited Network Solutions and Wisecom Technologies as follows:

a. Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with prejudice, together with costs and disbursements;

b. Awarding Dexon actual damages, subject to proof at trial but in an amount in excess of $75,000.;

c. For equitable remedial efforts by Counterclaim Defendants sufficient to rehabilitate Dexon's damaged reputation;

d. Declaring that: i) original purchasers of Cisco products obtained the products and any associated embedded software via a "sale"; ii) there is no valid or enforceable EULA governing the embedded software in Cisco products sold by Dexon on the secondary market; and iii) Dexon's customers' are free to use and transfer such products pursuant to the first sale doctrine codified at 17 U.S.C. §109.

e. For orders restraining or enjoining Cisco from engaging in similar conduct in the future;

f. Awarding Dexon its costs and expenses of litigation, including reasonable attorneys' fees;

g. An award in Dexon's favor against Third Party Defendants sufficient to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting from the claims herein; and

**App.307**

h.    Such other and further relief as this Court deems just and equitable.

Dated:  April 6, 2022

/s/ Amanda R. Washton
Amanda Washton
  a.washton@conklelaw.com
**CONKLE, KREMER & ENGEL, PLC**
3130 Wilshire Boulevard, Suite 500
Santa Monica, CA 90403

Michael M. Lafeber
  mlafeber@taftlaw.com
O. Joseph Balthazor Jr.
  jbalthazor@taftlaw.com
**TAFT STETTINIUS & HOLLISTER LLP**
2200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402

Attorneys for Defendant, Counterclaim Plaintiff and
Third-Party Plaintiff Dexon Computer, Inc.

DEFENDANT'S THIRD AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-
PARTY CLAIMS

**App.308**

1    **DEMAND FOR JURY TRIAL**

2    Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4    Dated:  April 6, 2022

/s/ Amanda R. Washton

5    Amanda R. Washton
        *a.washton@conklelaw.com*

6    **CONKLE, KREMER & ENGEL, PLC**
     3130 Wilshire Boulevard, Suite 500

7    Santa Monica, CA 90403

8    Michael M. Lafeber
        *mlafeber@taftlaw.com*

9    O. Joseph Balthazor Jr.
        *jbalthazor@taftlaw.com*

10   **TAFT STETTINIUS & HOLLISTER LLP**
     2200 IDS Center

11   80 S. 8th Street
     Minneapolis, MN 55402

12
     Attorneys for Defendant, Counterclaim Plaintiff and

13   Third-Party Plaintiff Dexon Computer, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Case 5:22-cv-00052-RWS-JBB Document 16 Filed 06/23/22 Page 52 of 54 PageID #: 349

| REMIT PAYMENT TO: | INVOICE | ACH INFORMATION:<br>THE NORTHERN TRUST<br>50 SOUTH LASALLE STREET<br>CHICAGO, IL 60675 | E-mail Remittance To: achremittance@cdw.com<br>ROUTING NO.: 071000152<br>ACCOUNT NAME: CDW DIRECT<br>ACCOUNT NO.: 47910 |
|---|---|---|---|

**CDW Direct**
PO Box 75723
Chicago, IL 60675-5723

RETURN SERVICE REQUESTED

| INVOICE NUMBER | INVOICE DATE | CUSTOMER NUMBER |
|---|---|---|
| 1416352 | 09/15/20 | 2988126 |

| SUBTOTAL | SHIPPING | SALES TAX |
|---|---|---|
| $856.47 | $0.00 | $0.00 |

| DUE DATE | AMOUNT DUE |
|---|---|
| 10/15/20 | **$856.47** |

DEXON COMPUTER INC
JODI NORGAARDEN
9201 E BLOOMINGTON FWY STE BB
MINNEAPOLIS MN 55420-3472
USA

CDW Direct
P.O. Box 75723
Chicago, IL 60675-5723

**PLEASE RETURN THIS PORTION WITH YOUR PAYMENT**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| INVOICE DATE | INVOICE NUMBER | | PAYMENT TERMS | | | DUE DATE |
|---|---|---|---|---|---|---|
| 09/15/20 | 1416352 | | Net 30 Days | | | 10/15/20 |
| ORDER DATE | SHIP VIA | | PURCHASE ORDER NUMBER | | | CUSTOMER NUMBER |
| 09/14/20 | Drop Ship -FedEx Ground, Cust Acct | | MM180132 | | | 2988126 |

| ITEM NUMBER | DESCRIPTION | QTY ORD | QTY SHIP | QTY B/O | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|---|
| 5396427 | CISCO CATALYST 9200L 24PORT POE+ 4X1<br>Manufacturer Part Number: C9200L-24P-4G-E<br>Serial No: SJAE24260GYG | 1 | 1 | 0 | 856.47 | 856.47 |

**GO GREEN!**
CDW is happy to announce that paperless billing is now available! If you would like to start receiving your invoices as an emailed PDF, please email CDW at paperlessbilling@cdw.com. Please include your Customer number or an Invoice number in your email for faster processing.

**REDUCE PROCESSING COSTS AND ELIMINATE THE HASSLE OF PAPER CHECKS!**
Begin transmitting your payments electronically via ACH using CDW's bank and remittance information located at the top of the attached payment coupon. Email credit@cdw.com with any questions.

| ACCOUNT MANAGER | SHIPPING ADDRESS: | SUBTOTAL | $856.47 |
|---|---|---|---|
| FRANK SZYMANSKI<br>480-270-7341<br>fransz@cdw.com | DEXON COMPUTER INC<br>MICHELLE MALASKA; PO#MM180132<br>9201 E BLOOMINGTON FWY STE BB<br>MINNEAPOLIS MN 55420-3472 | SHIPPING | $0.00 |
| SALES ORDER NUMBER | | SALES TAX | $0.00 |
| LQLL115 | | AMOUNT DUE | $856.47 |



ISO 9001 and ISO 14001 Certified
CDW DIRECT FEIN 36-4530079

**HAVE QUESTIONS ABOUT YOUR ACCOUNT?**
PLEASE EMAIL US AT credit@cdw.com
VISIT US ON THE INTERNET AT www.cdw.com

Page 1 of 1

51

Exhibit A
Page 1 of 2

Case 5:22-cv-00526-RWS-JBB   Document 21-6   Filed 06/23/22   Page 54 of 54 PageID #:  350

THE TERMS AND CONDITIONS ARE LIMITED TO THOSE CONTAINED HEREIN AND THE ADDITIONAL TERMS AND CONDITIONS CONTAINED IN THE "TERMS AND CONDITIONS" LINK AT WWW.CDW.COM INCORPORATED HEREIN BY REFERENCE. ANY TERMS NOT DEFINED HEREIN ARE DEFINED AT WWW.CDW.COM. ANY ADDITIONAL OR DIFFERENT TERMS OR CONDITIONS IN ANY FORM DELIVERED BY YOU ("CUSTOMER") ARE HEREBY DEEMED TO BE MATERIAL ALTERATIONS AND NOTICE OF OBJECTION TO THEM AND REJECTION OF THEM IS HEREBY GIVEN.

BY ACCEPTING DELIVERY OF THE PRODUCTS OR BY ENGAGING THE CDW AFFILIATE IDENTIFIED ON THE INVOICE, STATEMENT OF WORK OR OTHER CDW DOCUMENTATION ("SELLER") TO PROVIDE PRODUCT OR PERFORM OR PROCURE ANY SERVICES, CUSTOMER AGREES TO BE BOUND BY AND ACCEPTS THESE TERMS AND CONDITIONS UNLESS CUSTOMER AND SELLER HAVE SIGNED A SEPARATE AGREEMENT FOR THE PROVISION OF PRODUCT OR PERFORMANCE OF SERVICES, IN WHICH CASE THE SEPARATE AGREEMENT WILL GOVERN.

**Important Information About These Terms and Conditions:**

These Terms and Conditions constitute a binding contract between Customer and Seller and are referred to herein as either "Terms and Conditions" or this "Agreement". Customer accepts these Terms and Conditions by making a purchase from or placing an order with Seller or shopping on Seller's Website (the "Site") or otherwise requesting products (the "Products") or requesting Seller to perform or procure any Services (as this and all capitalized terms are defined herein).

Customer may issue a purchase order for administrative purposes only. Additional or different terms and conditions contained in any such purchase order will be null and void. This Agreement including the terms contained in the "Terms and Conditions" link at www.cdw.com which Customer acknowledges and agrees are incorporated herein by reference contains the entire understanding of the parties with respect to the matters contained herein and supersedes and replaces in its entirety any and all prior communications and contemporaneous agreements and understandings, whether oral, written, electronic or implied, if any, between the parties with respect to the subject matter hereof.

**Governing Law:**

THESE TERMS AND CONDITIONS, ANY STATEMENTS OF WORK, THE SERVICES HEREUNDER AND ANY SALE OF PRODUCTS HEREUNDER WILL BE GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS, WITHOUT REGARD TO CONFLICTS OF LAWS RULES. ANY ARBITRATION, ENFORCEMENT OF AN ARBITRATION OR LITIGATION WILL BE BROUGHT EXCLUSIVELY IN COOK COUNTY, ILLINOIS, AND CUSTOMER CONSENTS TO THE JURISDICTION OF THE FEDERAL AND STATE COURTS LOCATED THEREIN. SUBMITS TO THE JURISDICTION THEREOF AND WAIVES THE RIGHT TO CHANGE VENUE. CUSTOMER FURTHER CONSENTS TO THE EXERCISE OF PERSONAL JURISDICTION BY ANY SUCH COURT WITH RESPECT TO ANY SUCH PROCEEDING. Except in the case of nonpayment, neither party may institute any action in any form arising out of these Terms and Conditions more than one (1) year after the cause of action has arisen. The rights and remedies provided Seller under these Terms and Conditions are cumulative, are in addition to, and do not limit or prejudice any other right or remedy available at law or in equity.

**Title; Risk of Loss:**

If Customer provides Seller with Customer's carrier account number or selects a carrier other than a carrier that regularly ships for Seller, title to Products and risk of loss or damage during shipment pass from Seller to Customer upon delivery to the specified destination (F.O.B. Destination, freight prepaid and added). Notwithstanding the foregoing, title to software will remain with the applicable licensor(s), and Customer's rights thereto are contained in the license agreement between such licensor(s) and Customer. A purchase money security interest is retained in the Products to secure payment in full. Customer authorizes Seller to file a financing statement reflecting such security interest and, if requested, Customer will record such purchase money security interest in its favor.

**Payment:**

Orders are not binding upon Seller until accepted by Seller. Customer agrees to pay the total purchase price for the Products plus shipping (to the extent shipping is not prepaid by Customer), including shipping charges that are billed to Seller as a result of using Customer's carrier account number. Terms of payment are within Seller's sole discretion. In connection with Services being performed pursuant to a Statement of Work, Customer will pay for the Services in the amounts and in accordance with any payment schedule set forth in the applicable Statement of Work. If no payment schedule is provided, Customer will pay for the Services as invoiced by Seller. Invoices are due and payable within the time period specified on the invoice, measured from the date of invoice, subject to continuing credit approval by Seller. Seller, or any of its Affiliates on behalf of Seller may issue an invoice to Customer. If an invoice is not paid by its due date, Seller may assess a late charge equal to one and one-half percent (1.5%) per month on the highest law allowed by law. In the event of a payment default, Customer will be responsible for all of Seller's costs of collection, including, but not limited to, court costs, filing fees and attorneys' fees. In addition, if payments are not received as described above, Seller reserves the right to suspend Services until payment is received.

**Export Notice:**

If this transaction involves an export of items (including, but not limited to commodities, software or technology), subject to the Export Administration Regulations, such items were exported from the United States by Seller in accordance with the Export Administration Regulations. Diversion contrary to United States law is prohibited.

**Warranties:**

Customer understands that Seller is not the manufacturer of the Products purchased by Customer hereunder and the only warranties offered are those of the manufacturer, not Seller or its Affiliates. In purchasing the Products, Customer is relying on the manufacturer's specifications only and is not relying on any statements, specifications, photographs or other illustrations representing the Products that may be provided by Seller or its Affiliates. SELLER AND ITS AFFILIATES HEREBY EXPRESSLY DISCLAIM ALL WARRANTIES EITHER EXPRESS OR IMPLIED, RELATED TO PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTY OF TITLE, ACCURACY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTY OF NONINFRINGEMENT, OR ANY WARRANTY RELATING TO THIRD PARTY PRODUCTS. THE DISCLAIMER CONTAINED IN THIS PARAGRAPH DOES NOT AFFECT THE TERMS OF ANY MANUFACTURER'S WARRANTY. Customer expressly waives any claim that it may have against Seller or its Affiliates based on any product liability or infringement or alleged infringement of any patent, copyright, trade secret or other intellectual property rights (each a "Claim") with respect to any Product and also waives any right to indemnification from Seller or its Affiliates against any such Claim made against Customer by a third party. Customer acknowledges that no employee of Seller or its Affiliates is authorized to make any representation or warranty on behalf of Seller or any of its Affiliates that is not in this Agreement.

Seller warrants that the Services will be performed in a good and workmanlike manner. Customer's sole and exclusive remedy and Seller's entire liability with respect to this warranty will be, at the sole option of Seller, to either (a) use its reasonable commercial efforts to reperform or cause to be reperformed any Services not in substantial compliance with this warranty or (b) refund amounts paid by Customer related to the portion of the Services not in substantial compliance; provided, in each case, Customer notifies Seller in writing within five (5) business days after performance of the Services of any deficiencies EXCEPT AS SET FORTH HEREIN OR IN ANY STATEMENT OF WORK THAT EXPRESSLY INCLUDES A WARRANTY, AND SUBJECT TO APPLICABLE LAW, SELLER MAKES NO OTHER, AND EXPRESSLY DISCLAIMS ALL OTHER, REPRESENTATIONS, WARRANTIES, CONDITIONS OR COVENANTS, EITHER EXPRESS OR IMPLIED (INCLUDING WITHOUT LIMITATION, ANY EXPRESS OR IMPLIED WARRANTIES OR CONDITIONS OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, DURABILITY, TITLE, ACCURACY OR NON-INFRINGEMENT) ARISING OUT OF OR RELATED TO THE PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, INCLUDING BUT NOT LIMITED TO ANY WARRANTY RELATING TO THIRD PARTY SERVICES. SELLER WARRANTS WITH RESPECT TO THE PERFORMANCE OF ANY HARDWARE OR SOFTWARE USED IN PERFORMING SERVICES AND ANY WARRANTY CONCERNING THE RESULTS TO BE OBTAINED FROM THE SERVICES. THIS DISCLAIMER AND EXCLUSION SHALL APPLY EVEN IF THE EXPRESS WARRANTY AND LIMITED REMEDY SET FORTH HEREIN FAILS OF ITS ESSENTIAL PURPOSE. CUSTOMER ACKNOWLEDGES THAT NO REPRESENTATIVE OF SELLER OR ITS AFFILIATES IS AUTHORIZED TO MAKE ANY REPRESENTATION OR WARRANTY ON BEHALF OF SELLER OR ANY OF ITS AFFILIATES THAT IS NOT IN THIS AGREEMENT OR IN A STATEMENT OF WORK EXPRESSLY AMENDING SELLER'S WARRANTY.

Customer shall be solely responsible for daily backup and other protection of the data and software against loss, damage or corruption. Customer shall be solely responsible for reconstructing data (including but not limited to data located on disk files and memories) and software that may be lost, damaged or corrupted during the performance of Services. SELLER, ITS AFFILIATES, AND ITS AND THEIR SUPPLIERS, SUBCONTRACTORS AND AGENTS ARE HEREBY RELEASED AND SHALL CONTINUE TO BE RELEASED FROM ALL LIABILITY IN CONNECTION WITH THE LOSS, DAMAGE OR CORRUPTION OF DATA AND SOFTWARE. AND CUSTOMER ASSUMES ALL RISK OF LOSS, DAMAGE OR CORRUPTION OF DATA AND SOFTWARE IN ANY WAY RELATED TO OR RESULTING FROM THE SERVICES.

Seller will not be responsible for and no liability shall result to Seller or any of its Affiliates for any delays in delivery or in performance which result from any circumstances beyond Seller's reasonable control, including, but not limited to, Product unavailability, carrier delays, delays due to fire, severe weather conditions, failure of power, labor problems, acts of war, terrorism, embargo, acts of God or acts or laws of any government or agency. Any shipping dates or completion dates provided by Seller or any purported deadlines contained in a Statement of Work or any other document are estimates only.

**Pricing Information; Availability Disclaimer:**

Seller reserves the right to make adjustments to pricing, Products and Service offerings for reasons including, but not limited to, changing market conditions, Product discontinuation, Product unavailability, manufacturer price changes, supplier price changes and errors in advertisements. All orders are subject to Product availability and the availability of Personnel to perform the Services. Therefore, Seller cannot guarantee that it will be able to fulfill Customer's orders. If Services are being performed on a time and materials basis, any estimates provided by Seller are for planning purposes only.

**Credits:**

Any credit issued by Seller to Customer for any reason must be used within two (2) years from the date that the credit was issued and may only be used for future purchases of Products and/or Services. Any credit or portion thereof not used within the two (2) year period will automatically expire.

**Limitation of Liability:**

UNDER NO CIRCUMSTANCES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY REMEDY SET FORTH HEREIN, WILL SELLER, ITS AFFILIATES OR ITS OR THEIR SUPPLIERS, SUBCONTRACTORS OR AGENTS BE LIABLE FOR: (A) ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING BUT NOT LIMITED TO, LOSS OF PROFITS, BUSINESS, REVENUES OR SAVINGS, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITIES OF SUCH DAMAGES OR IF SUCH DAMAGES ARE OTHERWISE FORESEEABLE, IN EACH CASE, WHETHER A CLAIM FOR ANY SUCH LIABILITY IS PREMISED UPON BREACH OF CONTRACT, WARRANTY, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY OF LIABILITY; (B) ANY CLAIMS, DEMANDS OR ACTIONS AGAINST CUSTOMER BY ANY THIRD PARTY; (C) ANY LOSS OR CLAIM ARISING OUT OF OR IN CONNECTION WITH CUSTOMER'S IMPLEMENTATION OF ANY CONCLUSIONS OR RECOMMENDATIONS BY SELLER OR ITS AFFILIATES BASED ON, RESULTING FROM, ARISING OUT OF OR OTHERWISE RELATED TO THE PRODUCTS OR SERVICES; OR (D) ANY UNAVAILABILITY OF THE PRODUCT FOR USE OR ANY LOST, DAMAGED OR CORRUPTED DATA OR SOFTWARE. IN THE EVENT OF ANY LIABILITY INCURRED BY SELLER OR ANY OF ITS AFFILIATES, THE ENTIRE LIABILITY OF SELLER AND ITS AFFILIATES FOR DAMAGES FROM ANY CAUSE WHATSOEVER WILL NOT EXCEED THE LESSER OF: (A) THE DOLLAR AMOUNT PAID BY CUSTOMER FOR THE PRODUCT(S) GIVING RISE TO THE CLAIM OR THE SPECIFIC SERVICES GIVING RISE TO THE CLAIM, OR (B) $50,000.00.

**Confidential Information:**

Each party anticipates that it may be necessary to provide access to information of a confidential nature of each party, the Affiliates or a third party (hereinafter collectively referred to as "Confidential Information") to the other party in the performance of this Agreement and any Statement of Work. "Confidential Information" means any information or data in oral, electronic or written form which the receiving party learns or has reason to know is proprietary or confidential and which is disclosed by a party in connection with this Agreement or which the receiving party may have access to in connection with this Agreement, including but not limited to the terms and conditions of each Statement of Work. Confidential Information will not include information which: (a) becomes known to the public through no fault of the receiving party, (b) was known to the receiving party, or becomes known to the receiving party from a third party having the right to disclose it and having no obligation of confidentiality to the disclosing party with respect to the applicable information, or (c) is independently developed by agents, employees or subcontractors of the receiving party who have not had access to such information. To the extent practicable, Confidential Information should be clearly identified or labeled as such by the disclosing party at the time of disclosure or as promptly thereafter as possible, however, failure to so identify or label such Confidential Information will not evidence that such information is not confidential or protectable.

Each party agrees to hold the other party's Confidential Information confidential for a period of three (3) years following the date of disclosure and to do so in a manner at least as protective as it holds its own Confidential Information of like kind but to use no less than a reasonable degree of care. Disclosures of the other party's Confidential Information will be restricted (i) to those individuals who are participating in the performance of this Agreement or the applicable Statement of Work and need to know such Confidential Information for purposes of providing or receiving the Products or Services or otherwise in connection with this Agreement or the applicable Statement of Work, or (ii) to its business, legal and financial advisors, each on a confidential basis. Each party agrees not to use any Confidential Information of the other party for any purpose other than the business purposes contemplated by this Agreement and the applicable Statement of Work. Upon the written request of a party, the other party will either return or certify the destruction of the Confidential Information of the other party.

If a receiving party is required by law, rule or regulation, or requested in any judicial or administrative proceeding or by any governmental or regulatory authority, to disclose Confidential Information of the other party, the receiving party will give the disclosing party prompt notice of such request so that the disclosing party may seek an appropriate protective order or similar protective measure and will use reasonable efforts to obtain confidential treatment of the Confidential Information so disclosed.

**Return Privileges:**

To obtain Seller's return policy, Customer should contact CDW Customer Relations at 866.SVC.4CDW or email at CustomerRelations@cdw.com. Customer must notify CDW Customer Relations of any damaged Products within ten (10) days of receipt.

**Arbitration:**

Any claim, dispute, or controversy (whether in contract, tort or otherwise, whether preexisting, present or future, and including, but not limited to, statutory, common law, intentional tort and equitable claims) arising from or relating to the Products, the Services, the interpretation or application of these Terms and Conditions or any Statement of Work or the breach, termination or validity thereof, the relationships which result from these Terms and Conditions or the full extent permitted by applicable law, relationships with third parties who are not signatories hereto), or Seller's or any of its Affiliates' advertising or marketing (collectively, a "Claim") WILL BE RESOLVED, UPON THE ELECTION OF ANY OF SELLER, CUSTOMER OR THE THIRD PARTIES INVOLVED, EXCLUSIVELY AND FINALLY BY BINDING ARBITRATION. If arbitration is chosen, it will be conducted pursuant to the Rules of the American Arbitration Association. If arbitration is chosen by any party with respect to a Claim, neither Seller nor Customer will have the right to litigate that Claim in court or to have a jury trial on that Claim or to engage in pre-arbitration discovery, except as provided for in the applicable arbitration rules or by agreement of the parties involved. Further, Customer will not have the right to participate as a representative or member of any class of claimants pertaining to any Claim subject to arbitration. The arbitrator's decision will be final and binding. Other rights that Customer or Seller would have if he or she went to court may also not be available in arbitration. It is important for Customer to understand that with arbitration Customer is waiving rights to use certain procedures, including Chicago, Illinois. Any award having jurisdiction may enter judgment on the award rendered by the arbitrator(s). Each party involved will bear its own cost of any legal representation, discovery or research required to complete arbitration. The existence or results of any arbitration will be treated as confidential. Notwithstanding anything to the contrary contained herein, all matters pertaining to the collection of amounts due to Seller arising out of the Products or Services will be exclusively litigated in court rather than through arbitration.

**Miscellaneous:**

Seller may assign or subcontract all or any portion of its rights or obligations with respect to the sale of Products or the performance of Services or assign the right to receive payments, without Customer's consent. Customer may not assign these Terms and Conditions, or any of its rights or obligations herein without the prior written consent of Seller. Subject to the restrictions in assignment contained herein, these Terms and Conditions will be binding on and inure to the benefit of the parties hereto and their successors and assigns. No provision of this Agreement or any Statement of Work will be deemed waived, amended or modified by either party unless such waiver, amendment or modification is in writing and signed by both parties. The relationship between Seller and Customer is that of independent contractors and neither of employees/employees, partners/partners or joint ventures. If any provision of this Agreement or a Statement of Work is found by a court of competent jurisdiction to be invalid, the court shall not affect the other terms or conditions hereof or the validity of this Agreement or the applicable Statement of Work. Notices provided under this Agreement will be in writing and deemed received upon the earlier of actual receipt or three (3) days after mailing if mailed postage prepaid by regular mail or airmail to one (1) day after it is sent by courier or facsimile transmission. Any delay or failure by either party to exercise any right or remedy will not constitute a waiver of that party to thereafter enforce such rights.

Version Date: 02.23.2016

Exhibit A
Page 2 of 2

Case 5:22-cv-00053-RWS-CMC   Document 21-7   Filed 06/23/22   Page 1 of 21 PageID #:  351

# Exhibit G

Amanda R. Washton (SB# 227541)
*a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, CA 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
*mlafeber@taftlaw.com*
O. Joseph Balthazor Jr. (*pro hac vice*)
*jbalthazor@taftlaw.com*
**TAFT STETTINIUS &**
   **HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Phone: 612.977.8400
Fax: 612.977.8650

David H. Reichenberg (pro hac vice)
*DReichenberg@manatt.com*
**MANATT, PHELPS & PHILLIPS, LLP**
7 Times Square
New York, NY 10036
Direct: (212) 790-4626
Office: (212) 790-4500
Fax: (212) 790-4545

Attorneys for Defendant, Counterclaim
Plaintiff and Third-Party Plaintiff
Dexon Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation,<br><br>    Plaintiffs and Counterclaim Defendants,<br><br>    v.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>    Defendant, Counterclaim Plaintiff and Third Party Plaintiff.<br><br>AND RELATED CROSS-ACTIONS | Case No. 3:20-CV-4926-CRB<br><br>**COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S OPPOSITION TO COUNTERCLAIM DEFENDANTS CISCO SYSTEMS, INC. AND CISCO TECHNOLOGY, INC.'S MOTION TO DISMISS THIRD AMENDED COUNTERCLAIMS**<br><br>Judge: Honorable Charles R. Breyer<br>Date: June 17, 2022<br>Time: 9:00 AM<br>Courtroom: 6<br><br>Hon. Charles R. Breyer<br>Presiding Judge<br><br>Trial Date:      None |

Case 5:22-cv-00530-RWS-JBB   Document 17-7   Filed 06/05/21/22   Page 3 of 21   PageID #: 353

**TABLE OF CONTENTS**

Page

I.   SUMMARY OF ARGUMENT ...........................................................................5

II.   BACKGROUND ............................................................................................6

    A.   ORIGINAL TRANSACTION A "SALE" NOT A "LICENSE" ...............................6

    B.   DEXON'S "FIRST SALE DOCTRINE" DECLARATORY JUDGEMENT CLAIM ...........................................................................................9

    C.   DEXON'S LANHAM ACT AND TORT CLAIMS................................................11

    D.   NEWLY DISCOVERED FACTS AND DEXON'S MOTION TO AMEND........11

III.   LEGAL STANDARD ....................................................................................12

IV.   ARGUMENT ...............................................................................................13

    A.   DEXON'S DECLARATORY JUDGMENT CLAIMS ARE RIPE FOR REVIEW ...........................................................................................13

    B.   DEXON STATES A LANHAM ACT FALSE ADVERTISING CLAIM.............16

        1.   Falsely Representing Purchasers' Use and Transfer Restricted...................16

        2.   Dexon Has Alleged Harm to Support its Lanham Act and Tortious Interference Claims ...................................................................18

    C.   DEXON STATES A TRADE LIBEL PER SE CLAIM.........................................19

V.   CONCLUSION ...........................................................................................20

**App.315**

## TABLE OF AUTHORITIES

<b><u>Page</u></b>

**FEDERAL CASES**

*Adobe Sys. Inc. v. Kornrumpf,*
    780 F. Supp. 2d 988 (N.D. Cal. 2011) ............................................... 11

*AK Futures v. Limitless Trading Co., LLC,*
    No. 21-cv-01154, 2021 WL 5238588 (C.D. Cal. Oct. 6, 2021) .......................... 15

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................... 8

*Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC,*
    293 F. Supp. 3d 690 (E.D. Mich. 2018) ......................................... 9

*Barnes-Hind, Inc. v. Superior Court,*
    181 Cal.App.3d 377 (Cal. Ct. App. 1986) ...................................... 15

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...................................................................... 8

*Cisco Sys., Inc. v. Beccela's Etc., LLC,*
    403 F. Supp. 3d 813 (N.D. Cal. 2019) ............................................ 10

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,*
    173 F.3d 725 (9th Cir. 1999) ........................................................ 13

Dexon. *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.,*
    611 F.3d 495 (9th Cir. 2010) .......................................................... 8

*DNA Sports Performance Lab, Inc. v. Major League Baseball,*
    No. 20-cv-00546-WHA, 2020 WL 4430793 (N.D. Cal. Aug. 1, 2020) .............. 13

*Factory Direct Wholesale, LLC v. iTouchless Housewares & Products, Inc.,*
    411 F. Supp. 3d 905 (N.D. Cal. 2019) ........................................... 12

*Gart v. Logitech, Inc.,*
    254 F.3d 1334 (Fed. Cir. 2001) ..................................................... 10

*Global Truss America LLC v. GLP German Light Prods.,*
    2011 WL 13220296 (C.D. Cal. Dec. 1, 2011) .................................. 15

*Int'l Equip. Trading, Ltd. v. Illumina, Inc.,*
    312 F. Supp. 3d 725 (N.D. Ill. 2018) .............................................. 9

*Johnstech Int'l Corp. v. JF Microtechnology SDN BHD,*
    No. 14-cv-02864-JD, 2016 WL 4182402 (N.D. Cal. Aug. 8, 2016) ................ 15

*Levita Magnetics Int'l Corp. v. Attractive Surgical,* LLC,
    No. 19-cv-04605-JSW, 2020 WL 4580504 (N.D. Cal. Apr. 1, 2020) ............... 10

**App.316**

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118, 134 S. Ct. 1377 (2014) .................................................................. 13

*Lona's Lil Eats, LLC v. DoorDash, Inc.*,
  No. 20-cv-06703-TSH, 2021 WL 151978 (N.D. Cal. Jan. 18, 2021) ...................... 12, 14

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ............................................................................................. 1, 8

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008) ............................................................................. 9

*SanDisk Corp. v. STMicroelectronics, Inc.*,
  480 F.3d 1372 (Fed. Cir. 2007) ........................................................................... 9

*Shoom, Inc. v. Elec. Imaging Sys. of Am., Inc.*,
  No. 07-cv-05612 JCS, 2008 WL 11515251 (N.D. Cal. Apr. 10, 2008) .................. 10

*SoftMan Prod. Co., LLC v. Adobe Sys., Inc.*,
  171 F. Supp. 2d 1075 (C.D. Cal. 2001) ............................................................... 9

*Sys., Inc. v. Symco Grp., Inc.*,
  No. 11-cv-06268 JCS, 2012 WL 1670163 (N.D. Cal. May 14, 2012) .................... 9

*United States, for the Use and Benefit of HCI Sys., Inc. v. Agbayani Constr. Corp.*,
  No. 14-cv-02503-MEJ, 2014 WL 3866095 (N.D. Cal. Aug. 5, 2014) ................... 14

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs.*,
  758 F.3d 1069 (9th Cir. 2014) ............................................................................. 12

*Wembley, Inc. v. Superba Cravats, Inc.*,
  315 F.2d 87 (2d Cir. 1963) .................................................................................. 11

*Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*,
  42 Cal. App. 4th 507 (Ct. App. 1996) ................................................................. 14

**FEDERAL STATUTES**

17 U.S.C. §109 ......................................................................................................... 5, 6

Lanham Act § 43(a) ................................................................................................. 11

**OTHER AUTHORITIES**

McCarthy on Trademarks and Unfair Competition § 32:50 (5th ed.) ........................ 11

OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COUNTERCLAIMS

**App.317**

**I.**     **SUMMARY OF ARGUMENT**

Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. ("Dexon") submits this memorandum in opposition to Plaintiff and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc.'s ("Cisco") Rule 12(b)(6) motion to dismiss Dexon's Third Amended Counterclaims. The Court's March 16, 2022 Order recognized that a "disputed legal issue" exists concerning whether or not Cisco's transactions with the original consumers and end users constitute a "sale" or a "license" of Cisco's embedded software (Dkt. 106 at 8).[1] Accordingly, Dexon's Third Amended Counterclaims ("TAC") add a declaratory judgment claim seeking to resolve such "disputed legal issue." Dexon's TAC describes Cisco's sale process to the original consumer and end user in great detail, including the lack of _any_ proper notice of or assent to the purported license by the original consumer and user. Dexon's TAC also describes in detail Cisco's "intentional, coordinated, formalized and ongoing" form communications and publications, directed to Dexon's customers, falsely advising that their transfer and use of such Cisco products is prohibited and restricted by a non-existent license. Further, Dexon's TAC describes how Dexon has been and will continue to be harmed by Cisco's ongoing, repeating and false communications. Dexon is clearly within the "zone of interest" caused by this recognized, repeating and ongoing "disputed legal issue" and is entitled to have such "justiciable controversy" resolved. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007).

Cisco does not dispute any of Dexon's allegations concerning Cisco's sales process, including the absence of any proper notice of or assent to the purported license by the original purchaser. Nor does it dispute Dexon's allegations concerning Cisco's "intentional, coordinated, formalized and ongoing" form communications and publications. Rather, in an attempt to draw the focus away from its own critical "first sale," Cisco attacks the sufficiency allegations concerning Dexon's subsequent or downstream acquisition of the Cisco products. *See* (Dkt. 111 at 11 ("…Dexon cannot plausibly allege that its customers own Cisco's software unless Dexon first alleges that *it* owns the software."); *id.* at 17 ("Dexon does not identify. . .how Dexon acquired. . .or

---

[1] Citations to page numbers refer to the ECF page number in the header.

the circumstances that would give rise to a transfer in title of any software. . .")). Cisco misses the mark. As its name implies, the "first sale" doctrine precludes a copyright owner from exerting control following its original or "first" sale to the consumer or end user. Cisco's undisputed attempts to do so via threats and claims to Dexon's downstream and subsequent secondary market customers concerning a non-existent purported license are prohibited.

## II.   <u>BACKGROUND</u>

The Court is familiar with the background facts of this case. For purposes of this motion, Dexon focuses on the key amendments and supplements included in its TAC.[2]

### A.   <u>ORIGINAL TRANSACTION A "SALE" NOT A "LICENSE"</u>

Dexon's TAC provides great detail confirming that Cisco's original transaction involving the consumer or end user constitutes a "sale" of Cisco's embedded software rather than a "license." Such allegations include:

- Cisco's embedded software is not intended to be removed and has no independent value to the end consumer separate and apart from the Cisco product with which it is compatible. (Dkt. 107 ¶ 125).

- Cisco's authorized resellers do not provide original purchasers any notice prior to purchase that there is embedded software in the product or that such embedded software is governed by a license restricting the original purchaser's ability to transfer or sell the subject product. (*Id.* ¶ 139).

- Cisco's "Terms and Conditions" attempt to place "risk of loss" of any embedded software on the original purchaser. (*Id.* ¶ 142).

- Cisco does in fact offer several traditional stand-alone or independent software licenses for which it provides separate invoices and identifies separate line items covering the price of such traditional software licenses. (*Id.* ¶ 143).

___

[2] Cisco's motion to dismiss addresses continued references in Dexon's TAC to Cisco's practice of falsely labeling new Cisco products sold by Dexon as "used." Dexon's TAC deleted the previous section entitled "Falsely Labeling New Secondary Market Products "Used", as well as paragraphs 133-136 detailing Dexon's alleged misleading published definition of "used." To clarify, while Dexon reserves all of its rights, including its appeal rights, its current TAC is *not* asserting claims relating to Cisco's published definition of "used." However, as discussed herein, Dexon does allege Cisco falsely informed Dexon customer Fort Bend Independent School District ("FBISD") that the new Cisco equipment to be sold to FBISD by Dexon was used or "refurbished." (Dkt. 107 ¶ 165).

**App.319**

Case 5:22-cv-00530-RWS-JBC   Document 117-7   Filed 06/23/21   Page 8 of 21 PageID #:  358

1
2       -     At no time has Cisco obtained the original purchasers' assent to a purported license governing the embedded software. (*Id.* ¶ 144).

3
4       -     At no time has Cisco placed a notice or warning of a purported EULA on the exterior packaging of any of its subject products. (*Id.* ¶ 145).

5
6
7       -     Rather than properly notifying original purchasers of the purported license governing the embedded software and obtaining their affirmative assent, Cisco has included various attempted notices on the *inside* of their product packaging. Such notices are accessible only *after* the products have been purchased and opened. (*Id.* ¶ 146).

8
9
10       -     Resellers such as Dexon sell a large volume of new, in the box, never opened Cisco products, meaning at no point were such attempted "notices" *ever* accessed or viewed by the original purchaser. (*Id.* ¶ 147).

11
12
13
14
15       -     Cisco's "in the box" notices have varied over the years, ranging from enclosing a "Getting Starte" CD-ROM in which the purported license was buried and difficult to find if the CD-ROM was accessed at all, to Cisco's current practice of simply including a single page notice identifying a URL or website where Cisco posts it purported license. The current single page insert contains no warning that use of the product constitutes acceptance, or that the original purchaser's transfer or use of the embedded software is restricted. (*Id.* ¶ 153).

16
17
18
19       -     The IT personnel responsible for installing such equipment (in short time frames) have little or no opportunity for locating, reviewing and studying any purported license governing the embedded software. Further, such IT professionals often have no control over or involvement with purchasing or return decisions. (*Id.* ¶ 148).

20
21
22       -     If original purchasers actually go to the referenced URL or website, they are not required to affirmatively accept the purported license governing the embedded software via a "click through" process or otherwise. (*Id.* ¶ 155).

23
24
25       -     No affirmative assent to the purported license governing the embedded software is required for the original purchaser to actually use the subject Cisco products. At no point during the "boot up" process is an end user advised of any purported EULA governing the embedded software or asked to provide affirmative assent to any such purported EULA via a "click through" process or otherwise. (*Id.* ¶ 156).

26
27
28

OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COUNTERCLAIMS

**App.320**

Dexon's TAC also adds detailed allegations concerning Cisco's false claims that subsequent downstream or secondary market purchasers are prohibited by a non-existent license from transferring or using Cisco's embedded software.

- Cisco has employed an intentional, coordinated, formalized and ongoing effort to utilize false claims to deter consumers from purchasing Cisco products on the secondary market, including from resellers like Dexon. (*Id.* ¶127).

- Cisco's official "relicensing" website falsely warns that secondary market purchasers must "have Cisco's written consent and pay a license fee" to use Cisco's embedded software (*Id.* ¶ 128):[3]

| Policies | Using the Program | Product List | Frequently Asked Questions |

**Software**

Cisco software—whether it is embedded operating system software or standalone application software—is not transferable unless specifically allowed under the Cisco Software License Transfer and Re-Use Policy. You must have Cisco's written consent and pay a license fee. After a transfer, the previous owner's license to the software is terminated, and the transferee's use of the software is governed by the Cisco End User License Agreement and in accordance with the original license entitlement.

- The same Cisco "relicensing" website falsely warns secondary market purchasers that Cisco's embedded software is not transferrable and that any Cisco product purchased on the secondary market must be relicensed (*Id.* ¶ 129):[4]

Q: Is a Cisco software license transferable?

A: No, unless it is specifically allowed under the Cisco Software License Transfer and Re-Use Policy. Cisco software licenses are not transferable from user to user unless otherwise stated by Cisco or required by applicable law. Any purchaser of used or secondary-market Cisco equipment is required to relicense the software. For further details read the End User License Agreement.

- Cisco's "FAQ" for "Third Party Maintenance Services and purchase of Cisco Products outside the Authorized Channel" found online falsely states that product purchased on the secondary market from a non 'Cisco Channel Partner' does not come with a valid software license (*Id.* ¶ 130):

**Q. If I buy Cisco product from a company who is not a Cisco Channel Partner, willI I have a valid software license?**

**A.** No, unless the Cisco product successfully passes an inspection and any applicable relicensing fees are paid or it meets an exception contained in Cisco's Software License Transfer and Re-Use Policy.

---

[3] https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html.

[4] https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html#q2:.

OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COUNTERCLAIMS

**App.321**

1      -   Cisco's vetted and approved form letters from its "Brand Protection Team" to
2      secondary market customers: i) falsely state that only the "initial purchasers" of
    Cisco product are entitled to the benefits of the purported embedded software license;
3      ii) define any Cisco product purchased from secondary market resellers such as
    Dexon as "unauthorized"; and iii) falsely state that "any" such "unauthorized product
4      does not have a valid software license." (*Id.* ¶¶ 131-133):

5    Please be informed Dexon is NOT a member of the Cisco Authorized Reseller Program.
6    Regardless of what Dexon claims, and regardless of whether its Cisco product is used or is in new
  sealed boxes, ANY Cisco product it supplies is considered unauthorized.

7    1.     Unauthorized product is not eligible for any Cisco OEM warranty
8    2.     Unauthorized product is not automatically eligible for SMARTnet
  3.     Unauthorized product does not have a valid software license.

9    For a detailed list of authorized Cisco Channel Partners, please refer
10   to http://www.cisco.com/go/partnerlocator.

11   The following policy statement applies, whether the product is used or is in new, unopened and
12   sealed boxes.

13   When products are not sold through Cisco's authorized sales channels, Cisco can offer no
  assurance as to the provenance, quality, or authenticity of those products.  Additionally, when
14   resellers resell Cisco products that have been sourced from outside of Cisco's authorized sales

15   channels, those products do not come with a valid software license or hardware warranty and are
  not automatically eligible for a Cisco service support contract (such as SMARTnet maintenance).
16   An overview of Cisco's policy on this subject is as follows:

17     **Licensing**.  When Cisco sells its products, software licenses (such as for Cisco IOS) are
    granted to the initial purchasers of those products.  Cisco's policy is that software may
18     not be transferred to any other purchaser of the product unless specifically authorized by
    Cisco.  To the extent that Cisco believes a customer is not an initial purchaser—or if a
19     customer expresses concern that it is not an initial purchaser—such issues will be
20     promptly addressed and Cisco is committed to resolving all licensing issues that arise. In
    full, this policy is set forth on Cisco's
21     website: http://www.cisco.com/en/US/prod/cisco_software_transfer_relicensing_policy.
    html.

22   **B.**     **DEXON'S "FIRST SALE DOCTRINE" DECLARATORY JUDGEMENT**
23     **CLAIM**

24     Based on such allegations, Dexon added a new declaratory judgment claim seeking to
25 resolve the acknowledged "disputed legal issue." Namely, Dexon seeks a declaration establishing
26 and clarifying that: i) original purchasers of Cisco products obtained the products and any associated
27 embedded software via a "sale"; ii) there is no valid or enforceable EULA governing the embedded
28 software in Cisco products sold by Dexon on the secondary market; and iii) Dexon's customers' are

1  free to use and transfer such products pursuant to the first sale doctrine codified at 17 U.S.C. §109.

2  (Dkt. 107 ¶¶ 182-192).

3      Dexon's TAC clarifies that: i) "Dexon has sold and intends to continue selling genuine Cisco

4  products, including new, unopened, in the box Cisco products" (*id.* ¶ 189); ii) "Cisco has continued

5  its longstanding practice of sending form communications to Dexon's actual and prospective

6  customers falsely advising such customers that their use and transfer of any Cisco products

7  purchased from Dexon is prohibited by a purported but invalid and unenforceable EULA" (*id.* ¶

8  190); and iii) "Unless and until Cisco's form communications and representations are deemed to be

9  false and in violation of the first sale doctrine codified at 17 U.S.C. §109, Dexon's ability to sell

10  such products will be wrongfully and unnecessarily impaired and Dexon will continue to be injured

11  and damaged thereby." (*id.* ¶ 191).

12      Dexon's TAC includes specific examples of Cisco making such false and damaging claims

13  concerning a non-existent license purporting to cover its embedded software. These include false

14  communications to Dexon customers Fort Bend Independent School District ("FBISD"). *See* (*id.*

15  ¶ 167) (Cisco Brand Protection form letter falsely warning FBISD that Dexon's products "may not

16  come with a valid software license" and that "Customers purchasing most Cisco goods outside of

17  Cisco's authorized sales channels would not automatically have a license to use the software").

18      Dexon's TAC also identifies examples of false communications to Dexon customers

19  Accuray, Inc. and Lockridge Grindal and Nauen. *See* (*id.* ¶ 173 (Cisco Brand Protection form letter

20  falsely advising Accuray that acknowledged "genuine" products purchased from Dexon "did not

21  have a valid license."); *id.* ¶ 171 (Cisco Brand Protection form letter falsely advising Lockridge that

22  no product obtained from Dexon comes with a "valid software license.")).

23      Dexon's TAC includes specific examples of damages resulting from Cisco's false

24  communications, including false representations to FBISD, Accuray and Lockridge. These include,

25  without limitation, losing a $1.3 million contract and any future business opportunities with FBISD

26  (*id.* ¶ 171), as well as losing all future business opportunities with Accuray and Lockridge (*id.* ¶¶

27  172, 174).

28

## C.   **DEXON'S LANHAM ACT AND TORT CLAIMS**

The newly alleged facts documenting the absence of any purported license, as well as Cisco's form communications falsely claiming such purported license prohibits Dexon's customers' transfer and use of Cisco's embedded software are incorporated into and included with Dexon's Lanham Act, Tortious Interference, Trade Libel and Trade Libel Per Se claims.

Dexon's TAC also adds a specific allegation and example of Cisco falsely and libelously advising Dexon customer FBISD that the $1.3 million in "brand new" Cisco products to be purchased from Dexon was not new, but rather "refurbished." *See* (*id.* ¶ 165) ("Dexon entered into a contract with Fort Bend Independent School District ("FBISD") for the sale and purchase of over $1,300,000.00 in brand new Cisco equipment. On or about June 24, 2019, Cisco representative Dan Roberts falsely advised and represented to FBISD representative Cecile Thompson that the equipment FBISD was purchasing from Dexon could not be new but rather had to 'refurbished.'").

Dexon's TAC clarifies that "[a]s a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether." (*Id.* ¶¶ 216, 224, 230).

Lastly, in response to the Court's recognition that Dexon's SAC had not *expressly* labeled or identified a trade libel "per se" claim, Dexon's TAC includes separate trade libel and trade libel "per se" counts. (*Id.* ¶¶ 226-232). Dexon's trade libel per se claim, which incorporates Cisco's false statements concerning a purported license, also includes Cisco's false claim that the products intended for FBISD were "refurbished." (*Id.* ¶¶ 226-227). The expressly identified trade libel "per se" claim clarifies that such false statements go to the "integrity and character" of Dexon's business. This includes implying that Dexon "misleads its customers as to the nature or quality of its goods" and sells "refurbished" products as "new," as well as that Dexon misrepresents that "its secondary market customers will be able to use and transfer Cisco products purchased from Dexon."

## D.   **NEWLY DISCOVERED FACTS AND DEXON'S MOTION TO AMEND**

Dexon recently discovered Cisco's purported "End User License Agreement" ("EULA") applicable to products sold by Cisco during 2012-2017 contained an "exception" expressly allowing

the transfer and use of such Cisco products on the secondary market. As detailed in Dexon's motion for leave to amend (Dkt. 116), Dexon has sold and will continue to sell Cisco products governed by Cisco's purported EULA containing this "exception." Cisco's blanket advertisements and publications directed to secondary market purchasers, including Dexon's customers, fail to delineate between products governed by such "exception" and products governed by Cisco's current purported EULA with the "exception" removed. Accordingly, such blanket advertisements are false, directly contradicted by Cisco's own purported applicable EULA, and provide further support for Dexon's claims herein, including Dexon's declaratory judgment, Lanham Act, tortious interference and trade libel per se claims.

As explained in Dexon's motion for leave to amend, the older versions of Cisco's purported EULA are not readily available due to Cisco's practice of "overwriting" their EULA's and related policies online. Dexon immediately contacted Cisco upon discovering such information and advised of its intent to amend its counterclaims. In the interests of judicial economy, Dexon proposed deferring or delaying Cisco's current motion to dismiss pending resolution of Dexon's proposed amendments. (Dkt. 116). Cisco rejected such proposal. Such newly discovered information is highly relevant to Dexon's claims herein. Further, the proposed amendments pose no unfair prejudice to Cisco considering the discovery has not yet commenced.

### III.    LEGAL STANDARD

To withstand a motion to dismiss, Dexon's Counterclaims need only contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In assessing the sufficiency of Dexon's Counterclaims, "[a]ll allegations of material fact are taken as true and are construed in the light most favorable to" Dexon. *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010).

**IV.    ARGUMENT**

    **A.    DEXON'S DECLARATORY JUDGMENT CLAIMS ARE RIPE FOR REVIEW**

The Supreme Court made clear in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007) that "a declaratory judgment plaintiff does not need to establish a reasonable apprehension of **a lawsuit** in order to establish that there is an actual controversy between the parties." *Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, 293 F. Supp. 3d 690, 697 (E.D. Mich. 2018) (emphasis added) (quoting *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1384 (Fed. Cir. 2007)), *aff'd*, 930 F.3d 1314 (Fed. Cir. 2019). Rather, the standard has been described as "more lenient." *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 902 (Fed. Cir. 2008). A party is entitled to relief if there is a "substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune*, 549 U.S. at 127.

This Court has already indicated that a "disputed legal issue" exists concerning whether or not Cisco's transactions with the original consumers and end users constitutes a "sale" or a "license" of Cisco's embedded software. (Dkt. 106 at 8). Consistent with such recognition, and as outlined above, Dexon's amended counterclaims include *detailed* allegations confirming that Cisco's original or "first" transaction constitutes a "sale" of the embedded software.

Moreover, Dexon's amended counterclaims include detailed allegations confirming that Dexon has been and will continue to be damaged by Cisco's "intentional, coordinated, formalized and ongoing" form communications and publications directed to Dexon's customers falsely advising that their transfer and use of such Cisco products is prohibited and restricted by a non-existent license. Such allegations, accepted as true, create a justiciable controversy warranting declaratory relief. *See Int'l Equip. Trading, Ltd. v. Illumina, Inc.*, 312 F. Supp. 3d 725, 729 (N.D. Ill. 2018) (denying motion to dismiss declaratory judgment claim based on embedded or "pre-installed" software, citing *Vernor v Auto Desk,* and explaining that "factually-intense analysis of the terms of the transfer of [the] software at the original sale" not properly addressed on a motion to dismiss); *Burroughs Payment Sys., Inc. v. Symco Grp., Inc.*, No. 11-cv-06268 JCS, 2012 WL

1670163, at *9 (N.D. Cal. May 14, 2012) (declining to decide at motion to dismiss stage whether the downstream sales of equipment with pre-installed or embedded software were subject to the first sale doctrine); *see also SoftMan Prod. Co., LLC v. Adobe Sys., Inc.*, 171 F. Supp. 2d 1075, 1085 (C.D. Cal. 2001) (Evidence established "sale" rather than "license" where consumers pay full value for the product, and accept the risk that the product may be lost or damaged.)

Dexon's declaratory judgment counterclaim is likewise supported by the "zone of interests" standard set out in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, in which the Supreme Court determined under the Lanham Act that a plaintiff had standing to sue despite the defendant not being a direct competitor because the plaintiff's allegations regarding its alleged injuries "—lost sales and damage to its business reputation—were injuries to precisely the sorts of commercial interests the Act protects." 572 U.S. 118, 138-39, (2014). The defendant in *Lexmark* conceded the district court had Article III standing, and rightly so. Here, Dexon has alleged lost sales and business reputation damage as a proximate result of Cisco's false and misleading statements. It has alleged an actual controversy.

Accepting Cisco's argument on its face, Cisco could continue to improperly benefit from its false publications and scare tactics with impunity simply by refraining from ever bringing an actual copyright infringement claim against secondary market resellers like Dexon or its customers. This ignores the fact that Cisco's tactics are effective for the very reason that its form advertisements and publications are akin to a cease and desist directive. *See Gart v. Logitech, Inc.*, 254 F.3d 1334, 1346 (Fed. Cir. 2001) (Use of the word "infringement" not necessary to raise apprehension of a claim because "[t]he whole point of offering a license is to insulate a licensee from infringement charges by the licensor."); *Levita Magnetics Int'l Corp. v. Attractive Surgical*, LLC, No. 19-cv-04605-JSW, 2020 WL 4580504, at *3 (N.D. Cal. Apr. 1, 2020) (citing *MedImmune*, 549 U.S. at 127) (communications denying the existence of a valid license demonstrate belief that an infringement suit could be commenced); *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813, 824 (N.D. Cal. 2019) ("Cisco directly raises the relationship between the presence or absence of a warranty and Defendants' alleged infringement."); *Shoom, Inc. v. Elec. Imaging Sys. of Am., Inc.*, No. 07-cv-05612 JCS, 2008 WL 11515251, at *5 (N.D. Cal. Apr. 10, 2008) ("Here, Plaintiff has alleged – and

**App.327**

1  presented evidence in support of its allegations – that eISA's actions with respect to the '173 and
2  '837 patents have not only threatened Shoom with economic injury, but actually resulted in such
3  injury, in the form of the loss of at least one of Shoom's major clients. This alone supports the
4  conclusion that an actual controversy exists that is sufficient to confer standing on Shoom under the
5  Declaratory Judgment Act.").

6      It has been recognized that the Declaratory Judgment Act was intended to avoid just such a
7  "racket" by intellectual property owners. 6 McCarthy on Trademarks and Unfair Competition
8  § 32:50 (5th ed.) ("The availability of declaratory relief destroyed the "racket" by which [IP owners]
9  gained unfair advantage by threatening alleged infringers or their customers with lawsuits that might
10 never be brought. ..without. . .ever having the chance to contest the validity of the [IP owners]
11 claims. The courts have stated that because of this "racket". . .declaratory relief should be liberally
12 construed to protect those threatened with infringement litigation.") (citing *Wembley, Inc. v.*
13 *Superba Cravats, Inc.*, 315 F.2d 87 (2d Cir. 1963)).

14     Cisco's attacks on the sufficiency of allegations concerning Dexon's subsequent
15 downstream transactions are a red herring. *See* (Dkt. 111 at 11 ("…Dexon cannot plausibly allege
16 that its customers own Cisco's software unless Dexon first alleges that it owns the software."); *id.*
17 at 17 ("Dexon does not identify. . .how Dexon acquired. . .or the circumstances that would give rise
18 to a transfer in title of any software. . .")). As its name implies, the "first sale" doctrine precludes a
19 copyright owner from exerting control following its original or "first" sale to the consumer or end
20 user. Unlike the plaintiff in *Adobe Sys. Inc. v. Kornrumpf*, 780 F. Supp. 2d 988, 994 (N.D. Cal.
21 2011), who did not "allege that Adobe ever sold, gave away or transferred title to the particular
22 copies of the software at issue," Dexon has painstakingly alleged that Cisco's previously transferred
23 title via an original "sale" of the embedded software.[5]

24

25  _____
26  [5] Cisco's reliance on this Court's December 9, 2021 order (Dkt. 87) is likewise misplaced. Dexon's
    prior declaratory judgment claim did not involve Cisco's alleged EULA governing its embedded
    software, the nature of Cisco's original transaction with consumers and end user, or the first sale
27  doctrine codified at 17 U.S.C. § 109. Rather, it involved Cisco's assertions that genuine Cisco
    products sold by secondary market resellers such as Dexon are ineligible for warranty service and
28  violate the Lanham Act. Accordingly, this Court's analysis in its December 9, 2021 Order is
    inapplicable.

For the above reasons, Dexon has sufficiently alleged facts establishing an actual controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

**B.     DEXON STATES A LANHAM ACT FALSE ADVERTISING CLAIM**

A false advertisement claim under Lanham Act § 43(a) requires each of the following elements:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by lessening of the goodwill associated with its products.

*Lona's Lil Eats, LLC v. DoorDash, Inc.*, No. 20-cv-06703-TSH, 2021 WL 151978 (N.D. Cal. Jan. 18, 2021) (citing *Wells Fargo & Co. v. ABD Ins. & Fin. Servs.*, 758 F.3d 1069, 1071 (9th Cir. 2014)). Lanham Act claims based on alleged false advertising are subject to the heightened pleading requirements of Rule 9(b). *Factory Direct Wholesale, LLC v. iTouchless Housewares & Products, Inc.*, 411 F. Supp. 3d 905, 923 (N.D. Cal. 2019).

**1.     Falsely Representing Purchasers' Use and Transfer Restricted**

Cisco argues that Dexon has not identified an actionable false statement of fact regarding the applicability of a license to the subject Cisco products and fails to identify any specific Cisco product. (Dkt. 111 at 10) (". . .[N]one of the new allegations even purport to relate to the Cisco equipment at issue in [Dexon's] counterclaims." Contrary to Cisco's contentions, Dexon provides detailed specific representative examples of Cisco's false communications at issue being directed to Dexon's customers and relating to the very products and embedded software at issue. (Dkt. 107 ¶¶ 135-161).

Viewing the allegations in a light most favorable to Dexon, which this court must do on a motion to dismiss, Dexon alleges actionable false statements. Cisco's undisputed published and repeating false statements of fact include advising Dexon's customers that they do not possess a valid license to transfer or use products purchased from Dexon. Such statements are false. While Cisco does in fact offer add-on "licensed" features for which it charges an independent fee, including

1  Cisco's DNA network management service, Dexon's customers are in no way legally or functionally

2  precluded from using the products purchased from Dexon and they are not required or obligated to

3  purchase a new or  additional license from Cisco.

4      Cisco's arguments are also contradictory. On the one hand, Cisco complains that Dexon's

5  allegation the original transaction is a "sale" is "a legal conclusion not presumed true on a motion

6  to dismiss," (Dkt. 111 at 5), but on the other hand argues that "Dexon does not allege what could

7  (perhaps) matter: that it obtains title to Cisco software when it purchases Cisco equipment," (*id.* at

8  11). Dexon's allegation that Cisco sells its embedded software means that Cisco no longer has any

9  ability to exert control over subsequent downstream purchasers of such embedded software, which

10  includes Dexon's customers. Further, Dexon provides painstakingly detailed facts supporting and

11  evidencing its claim that Cisco "sells" – as opposed to "license" – its embedded software. (Dkt. 107

12  ¶¶ 135-161).

13      Cisco also contends that any statement regarding the applicability of a license is mere

14  opinion, not a statement of fact. In its order dismissing Dexon's SAC, this Court relied on *Coastal*

15  *Abstract Serv., Inc. v. First Am. Title Ins. Co.*, but that case is readily distinguishable. 173 F.3d 725,

16  732 (9th Cir. 1999). There, a lower level lay employee made a one-time statement that the plaintiff

17  could not provide title insurance because the plaintiff was not licensed in California. *Id.* The court

18  determined that such non-lawyer's one time statement concerning his personal interpretation of a

19  statute or regulation did not give rise to a Lanham Act claim. *Id.* Unlike the statement in *Coastal*,

20  Cisco's statements are repeating and ongoing "intentional, coordinated [and] formalized" published

21  communications which have been vetted and approved by the company. Such publications include

22  multiple Cisco's websites, including its "relicensing" website and its "FAQ for "Third Party

23  Maintenance Services and purchase of Cisco Products outside the Authorized Channel" website, as

24  well as Cisco's form "Brand Protection Team" letters. These are official company publications.

25  Moreover, they are having their intended and desired effect – deterring actual and potential

26  customers from purchasing from Dexon.

27

28

OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COUNTERCLAIMS

### 2.    Dexon Has Alleged Harm to Support its Lanham Act and Tortious Interference Claims

To allege damages under the Lanham Act for false advertising, a plaintiff must only plead "an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140, 134 S. Ct. 1377, 1395, 188 L. Ed. 2d 392 (2014). "Lost sales and damage to business reputation are characteristic injuries under the Lanham Act." *DNA Sports Performance Lab, Inc. v. Major League Baseball*, No. 20-cv-00546-WHA, 2020 WL 4430793, at *4 (N.D. Cal. Aug. 1, 2020) (citing *Lexmark*, 572 U.S. at 133, 137). The tort of interference with prospective business advantage applies to "interference with existing noncontractual relations which hold the promise of future economic advantage." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 49 (Ct. App. 1996).

Dexon's amended allegations meet these standards because they establish an actual injury and damage as a result of Cisco's repeated and ongoing false and misleading publications. Without limitation, Dexon alleges that existing customer FBISD cancelled its contract with Dexon for the sale of $1.3 million in "brand new" equipment as a direct and proximate result of Cisco's false and misleading statements. (Dkt. 107 ¶¶ 165, 168). )  Those allegations are enough to establish a claim for damages for tortious interference and under the Lanham Act. *Lona's Lil Eats, LLC v. DoorDash, Inc.*, No. 20-cv-06703-TSH, 2021 WL 151978 (N.D. Cal. Jan. 18, 2021); *see United States, for the Use and Benefit of HCI Sys., Inc. v. Agbayani Constr. Corp.*, No. 14-cv-02503-MEJ, 2014 WL 3866095, at *4 (N.D. Cal. Aug. 5, 2014) ("HCI pleads damages based on the termination of the contracts.").

Dexon has also adequately alleged that it lost future business opportunities. For example, Dexon alleges that it lost customers (FBISD, Lockridge, Accuray, Meadowridge) who had regularly purchased products in the past as a direct and proximate result of Cisco's actions. (Dkt. 107 ¶¶ 172, 174, 178). All such customers stopped ordering from Dexon. (*Id.*).

Contrary to Cisco's argument, Dexon is not required to identify the loss of some certain, future, binding benefit. While applicable case law correctly requires a plaintiff to allege more than

1   the "hope for an economic relationship," *Westside*, 42 Cal. App. 4th at 49, Dexon has expressly

2   identified specific and actual "economic relationships." Namely, actual existing customers to whom

3   Cisco directed its false and disparaging communications. In each case, Dexon's existing relationship

4   with such customers ceased altogether as a direct result of Cisco's damaging communications,

5   resulting in Dexon losing all future business opportunities. (Dkt. 107 ¶¶ 168, 172, 174, 178).

6   Accepting Dexon's allegations as true and viewing them in the light most favorable to Dexon, as

7   this court must do on a motion to dismiss, *Iqbal*, 556 U.S. at 678, Dexon has adequately alleged

8   damages as a result of Cisco's publication of false and misleading statements, including directly to

9   Dexon's customers.

10          **C.      DEXON STATES A TRADE LIBEL PER SE CLAIM**

11          Cisco contends that Dexon's trade libel per se claim fails because the alleged false statements

12   do not rise to the level of defamatory statements. (Dkt. 111 at 14). Trade libel per se "requires

13   statements that disparage the integrity or honesty of a business, for example by alleging 'fraud and

14   deception and unfair dealing with their customers.'" *Johnstech Int'l Corp. v. JF Microtechnology*

15   *SDN BHD*, No. 14-cv-02864-JD, 2016 WL 4182402, at *3 (N.D. Cal. Aug. 8, 2016) (quoting

16   *Barnes-Hind, Inc. v. Superior Court*, 181 Cal.App.3d 377, 358 (Cal. Ct. App. 1986)), *aff'd*, 773 F.

17   App'x 623 (Fed. Cir. 2019); *Global Truss America LLC v. GLP German Light Prods.*, 2011 WL

18   13220296, *15 (C.D. Cal. Dec. 1, 2011) (finding that statements asserting that company was "guilty

19   of an act of dishonesty, infringing on Plaintiff's trademark" was libel per se).

20          Here, Cisco repeatedly tells Dexon's customers that Dexon has misrepresented the nature

21   and quality of its goods. Namely, Cisco advises Dexon's customers that Dexon sold them products

22   which they cannot use or transfer because such products lack a required license. Cisco also advises

23   Dexon's customers that Dexon sells used or "refurbished" equipment as new. Such communications

24   accuse Dexon of committing "fraud and deception and unfair dealing with [its] customers" and

25   disparage Dexon's "integrity or honesty." Accordingly, such communications undeniably rise to the

26   level of trade libel "per se." *Id. See also AK Futures v. Limitless Trading Co., LLC*, No. 21-cv-

27   01154, 2021 WL 5238588, at *4 (C.D. Cal. Oct. 6, 2021) ("Accusations that a company is selling

28   fake products, an act of dishonesty, has a natural tendency to injure its business reputation.")

OPPOSITION TO MOTION TO DISMISS THIRD AMENDED COUNTERCLAIMS

**App.332**

**V.**     **CONCLUSION**

1

2          The interests of judicial economy warrant Dexon's previously filed motion for leave to

3    amend its counterclaims being considered prior to the Court's ruling on the present motion.

4    Regardless, and for the foregoing reasons, Cisco's motion seeking a dismissal of Dexon's second

5    amended counterclaims should be denied in its entirety.

6

7    Dated: May 11, 2022                          Respectfully submitted,

8    Michael M. Lafeber                           _____/s/Amanda Washton_____
     mlafeber@taftlaw.com                         Amanda Washton
9    O. Joseph Balthazor Jr.                      a.washton@conklelaw.com
     jbalthazor@taftlaw.com                       **CONKLE, KREMER & ENGEL, PLC**
10   **TAFT STETTINIUS & HOLLISTER LLP**          3130 Wilshire Boulevard
     2200 IDS Center                              Suite 500
11   80 S. 8th St.                                Santa Monica, CA 90403
     Minneapolis, MN 55402                        Tel: (310) 998-9100
12   Tel: 612.977.8400
     Fax: 612.977.8650

13

14                                                *Attorneys for Defendant*
                                                  Dexon Computer, Inc.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit H

Amanda R. Washton (SB# 227541)
  *a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
  *mlafeber@taftlaw.com*
O. Joseph Balthazor Jr. (*pro hac vice*)
  *jbalthazor@taftlaw.com*
**TAFT STETTINIUS &**
  **HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Phone: 612.977.8400
Fax: 612.977.8650

David H. Reichenberg (*pro hac vice*)
**MANATT, PHELPS & PHILLIPS, LLP**
7 Times Square
New York, NY 10036
Direct: (212) 790-4626
Office: (212) 790-4500
Fax: (212) 790-4545
Email: DReichenberg@manatt.com

Attorneys for Defendant, Counterclaim Plaintiff
and Third-Party Plaintiff Dexon Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, INC., a California corporation,<br><br>        Plaintiffs and Counterclaim Defendants,<br><br>        v.<br><br>DEXON COMPUTER, INC., a Minnesota corporation,<br><br>        Defendant, Counterclaim Plaintiff and Third Party Plaintiff.<br><br>        v.<br><br>AND RELATED CROSS-ACTIONS | Case No. 3:20-CV-4926-CRB<br><br>**DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:    Hon. Charles R. Breyer<br>Date:     June 17, 2022<br>Time:    9:00 a.m.<br>Crtrm.:   6<br><br>Hon. Charles R. Breyer<br>Presiding Judge<br><br>Trial Date:     None |

DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S NOTICE OF MOTION AND
MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS

**App.335**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

      **PLEASE TAKE NOTICE** that on June 17, 2022 at 9:00 a.m., or as soon thereafter as this matter can be heard, in Courtroom 6 on the 17th Floor of the United States District Court for the Northern District of California, San Francisco Division, 450 Golden Gate Avenue, before the honorable Charles R. Breyer, Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") will, and hereby does, respectfully move this Court for and order granting leave to file fourth amended counterclaims against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. (together "Cisco").

      This Motion is based on this Notice of Motion and Motion; the following Memorandum of Points and Authorities below, the supporting Declaration of Michael M. Lafeber; the PROPOSED Fourth Amended Counterclaims; and such other and further papers, evidence, and argument as may be submitted to support this Motion.

Dated: May 11, 2022

Respectfully submitted,

*/s/Amanda Washton*

Michael M. Lafeber
mlafeber@taftlaw.com
O. Joseph Balthazor Jr.
jbalthazor@taftlaw.com
**TAFT STETTINIUS & HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402
Tel: 612.977.8400
Fax: 612.977.8650

Amanda Washton
a.washton@conklelaw.com
**CONKLE, KREMER & ENGEL, PLC**
3130 Wilshire Boulevard
Suite 500
Santa Monica, CA 90403
Tel: (310) 998-9100

*Attorneys for Defendant*
Dexon Computer, Inc.

**App.336**

# I.

## STATEMENT OF ISSUE PRESENTED AND REQUESTED RELIEF

Defendant and Counterclaim Plaintiff Dexon seeks leave to file its PROPOSED Fourth Amended Counterclaims against Plaintiffs and Counterclaim Defendants Cisco to incorporate newly discovered facts supporting Dexon's claims herein. Namely, Dexon recently discovered Cisco's purported "End User License Agreement" ("EULA") applicable to products sold by Cisco during 2012-2017 contains an "exception" expressly allowing the transfer and use of such Cisco products on the secondary market. As detailed in Dexon's PROPOSED Fourth Amended Counterclaims, Dexon has sold and will continue to sell Cisco products governed by Cisco's purported EULA containing this "exception." Cisco's blanket advertisements and publications directed to secondary market purchasers, including Dexon's customers, fail to delineate between products governed by such "exception" and products governed by Cisco's current purported EULA with the "exception" removed. Accordingly, such blanket advertisements are false, directly contradicted by Cisco's own purported applicable EULA, and provide further support for Dexon's claims herein, including Dexon's declaratory judgment, Lanham Act, tortious interference and trade libel per se claims.

# II.

## MEMORANDUM OF POINTS AND AUTHORITIES

### A.    Newly Discovered 2012-2017 "Exception" Allowing Transfer of Embedded Software

Dexon's current Third Amended Counterclaims ("TAC") challenge Cisco's *undisputed* practice of falsely advertising and publishing to Dexon's customers that their transfer and use of Cisco products is prohibited based upon a purported EULA allegedly covering the products' embedded software. Dexon's TAC details Cisco's selling process and highlights the absence of any proper notice of the purported EULA to, or assent to the purported EULA by, the original purchasers. Accordingly, no valid or enforceable license is created and the original transaction constitutes a "sale"; meaning subsequent downstream transactions are protected by the "first sale doctrine" codified at 17 U.S.C. § 109.

On or about April 19, 2022, Dexon learned for the first time that Cisco's purported EULA governing products sold by Cisco in 2012 included an "exception" expressly allowing the transfer

0640.002\9962                                    -3-                        Case No. 3:20-CV-4926-CRB

DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S NOTICE OF MOTION AND
MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS

**App.337**

1 and use of embedded software by secondary market purchasers.  Namely, Dexon's counsel was
2 contacted by a California attorney adverse to Cisco in another matter who disclosed the text of an
3 "exception" alleged to be included in Cisco's 2012 EULA.  The "exception" was alleged to provide:

> **Exceptions**
> 1. Software Bundled with Hardware: In situations where Products
> combine Hardware and Software and there is no separate Product code or
> License Fee charged for the Software on the applicable Cisco then-current
> published price list at the time of transfer (and therefore a separate License
> Fee for the Software cannot be determined), an exception will be made to
> allow for the transfer without the transferee being required to pay a new
> License Fee.

11 (Declaration of Michael M. Lafeber in Support of Motion For Leave to File Fourth Amended
12 Counterclaims, ¶2) ("Lafeber Dec. ¶__").

13     Dexon contacted Cisco via email on April 21, 2022 to advise of the newly discovered
14 information and Dexon's intent to amend subject to completing its evaluation and investigation.
15 Due to Cisco's practice of "overwriting" its purported online EULA and applicable policies, Dexon
16 had not yet been able to locate the earlier version of any Cisco purported EULA incorporating the
17 apparent "exception."  In the interest of judicial economy, Dexon advised that it would provide a
18 draft of any proposed amendments upon completion.  Dexon also proposed stipulating to extend the
19 April 28, 2022 due date for Cisco's anticipated motion to dismiss Dexon's TAC.  (Lafeber Dec. ¶3).

20     Dexon followed-up on April 25, 2022 and provided Cisco with the promised draft of
21 Dexon's then current PROPOSED Fourth Amended Counterclaims.  Dexon also included a draft or
22 proposed stipulation allowing the amendments and extending the schedule for Cisco's anticipated
23 motion to dismiss Dexon's TAC. (Lafeber Dec. ¶4).

24     Cisco responded that same day and confirmed that Cisco's earlier documents did in fact
25 include an apparent "exception."  According to Cisco,  "[T]he new language that Dexon has cited
26 last appeared in a 2014 document."  Cisco further advised that it was "looking for the documents
27 that would apply for the relevant time period and will share those with you, whatever they might
28 say." (Lafeber Dec. ¶4).

**App.338**

Case: 23-40257     Document: 5     Page: 343     Date Filed: 04/25/2023

Case 5:22-cv-00053-RWS-JBB-CRB Document 21 et al. Filed 06/30/21 Page 5 of 9 PageID #: 377

1    In the interest of judicial economy, Dexon responded on April 26, 2022, and again proposed
2    stipulating to extend the due date for Cisco's motion to dismiss Dexon's TAC pending a resolution
3    of Dexon's anticipated amendment.  Dexon explained that the newly discovered "exception" was
4    highly relevant regardless of whether it was last used in 2014.  Namely, Dexon noted that it has sold
5    and will continue to sell Cisco products from as early as 2009 forward – including model years
6    governed by the apparent "exception."  Further, Cisco has published, and continues to publish
7    advertisements and communications advising secondary market consumers that such products are
8    governed by a purported EULA prohibiting the sale and subsequent use of such products on the
9    secondary market. (Lafeber Dec. ¶5).

10   As explained in Dexon's April 26th response, Cisco's published communications fail to
11   distinguish products governed by earlier versions of its purported EULA containing the "exception."
12   Dexon's response reasoned that the proposed stipulation would give the parties an opportunity to
13   further investigate the facts, give Cisco more time to decide whether it was amenable to stipulating
14   to the proposed amendments, and defer Cisco's motion to dismiss Dexon's TAC until the
15   amendment issue was resolved. (Lafeber Dec. ¶5).

16   Cisco's April 27, 2022 response revealed that the "exception" was in effect for a period
17   which included 2012-2017.  Specifically, Cisco explained that the "exception" was included in
18   Cisco's "Software Transfer and Re-licensing Policy" from at least 2012 until some unknown period
19   in 2017. ("No later than 2017, Cisco's Software License Transfer and Re-Use Policy ("Policy") was
20   revised to remove the Fee Exception.")  (Lafeber Dec. ¶6).

21   Cisco also provided full versions of its   2014 "Cisco Software Transfer and Re-Licensing
22   Policy" containing the "exception" and its 2017 "Software License Transfer and Re-Use Policy"
23   with the "exception" removed.  Despite confirming that the "exception" was in effect for a
24   significantly longer relevant period of time, Cisco's response rejected the proposed stipulation
25   allowing the parties an opportunity to resolve any proposed amendments prior to Cisco filing its
26   motion to dismiss. (Lafeber Dec. ¶6).

27   By way of response dated May 2, 2022, Dexon sought clarification as to when the 2017
28   policy removing the "exception" went into effect.  ("Your email indicates that 'No later than 2017,

DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S NOTICE OF MOTION AND
MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS

**App.339**

1  Cisco's Software License Transfer and Re-Use Policy ('Policy') was revised to remove the Fee
2  Exception.'  When does Cisco claim the amended 'Policy' removing the 'Fee Exception' went into
3  effect?")  (Lafeber Dec. ¶7).

4      Cisco's May 6, 2022 response explained that it was presently unable to confirm when the
5  2017 Policy went into effect.  ("The next version of that document I was able to locate is from 2017,
6  and that document does not contain the Fee Exception.  So, the reasonable conclusion is that the Fee
7  Exception had been removed prior to or in 2017.")  (Lafeber Dec. ¶7).

8      In light of Cisco's unwillingness to stipulate, Dexon was forced to bring the present motion.
9  True and correct "redline" and "clean" versions of Dexon's PROPOSED Fourth Amended
10  Counterclaims are provided herewith.  Lafeber Dec., Exhibit B.

11  **B.    Liberal Standard for Amendment Met**

12      Granting leave to amend when in the Court's discretion should be "applied with extreme
13  liberality."  *Owens v. Kaiser Found. Health Plan, Inc*., 244 F.3d 708, 712 (9th Cir.2001).  In
14  considering whether to grant a party leave to amend, in the absence of any apparent or declared
15  reason – such as undue delay, bad faith dilatory motive on the part of the movant, undue prejudice
16  to the opposing party by virtue of allowance of the amendment, futility of amendment, and repeated
17  failure to cure deficiencies by amendments previously allowed – the leave sought should, as the
18  rules require, be "freely given".  *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222
19  (1962).

20      Not all of the factors merit equal weight.  As the 9th Circuit has articulated, it is the
21  consideration of prejudice to the opposing party that carries the greatest weight.  *DCD Programs,*
22  *Ltd. v. Leighton*, 833 F.2d 183, 185 (9th Cir.1987).  The party opposing amendment "bears the
23  burden of showing prejudice." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir.1987).
24  Though prejudice may be established by demonstrating that a motion to amend was made after
25  discovery had closed or was about to close (see *Zivkovic v. Southern Cal. Edison Co.*, 302 F.3d
26  1080, 1087 (9th Cir.2002)), "the mere prospect of additional discovery is insufficient" to constitute
27  substantial prejudice. *Newton v. Am. Debt Servs., Inc.*, No. C-11-3228 EMC, 2013 WL 5592620, at
28  *15 (N.D. Cal. Oct. 10, 2013).  Moreover, if discovery is not yet underway or if there is no "need to

DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S NOTICE OF MOTION AND
MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS

1  reopen discovery and therefore delay proceedings…" then there is no indication of undue delay or

2  prejudice. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir.1999).

3      Although a party's prior leaves to amend is a consideration in whether a court should grant

4  a party's motion for leave to amend, if the party was not aware "of the factual basis for the

5  amendment prior to a previous amendment," (quoting *Alsabur v. Autozone, Inc.*, No. CV 13-01689-

6  KAW, 2014 WL 1340730, at \*5 (N.D. Cal. Apr. 3, 2014)) then such a factor should "not weigh

7  against [the party's] motion for leave." *Harris v. Best Buy Stores, L.P.*, No. 15-CV-00657-HSG,

8  2015 WL 8527332 (N.D. Cal. Dec. 11, 2015).

9      In the present case, Dexon's proposed amendments are based on new recently discovered

10 information.  Such information was previously unavailable to Dexon in part due to Cisco's practice

11 of "overwriting" its online EULA and Software Transfer and Re-Licensing Policies.  In fact, Cisco

12 itself is apparently unable to easily ascertain when its current Software Transfer and Re-Use Policy

13 with the applicable "exception" removed went into effect. (Lafeber Dec. ¶¶3, 7).

14     Upon discovering this new information, Dexon immediately notified Cisco.  In the interest

15 of judicial economy, Dexon proposed extending the due date for Cisco's motion to dismiss Dexon's

16 TAC to allow both parties an opportunity to further investigate and evaluate Cisco's confirmed

17 "exception."  Dexon timely brought the present motion after receiving confirmation of the

18 "exception" and its extended 2012-2017 duration.

19     As alleged in Dexon's PROPOSED Fourth Amended Counterclaims, Dexon has sold and

20 continues to sell Cisco products originally sold by Cisco or authorized resellers to the original

21 purchasers or end users during the 2012-2017 and therefore governed by the applicable "exception."

22 (Dexon's PROPOSED Fourth Amended Counterclaims, Lafeber Dec., Ex. B, ¶¶184, 187, 204).

23 Further, Cisco's "published price list" at the time of such original transactions contained no separate

24 "Product code or License Fee" for the embedded software contained within such products.[1]

25 (Dexon's PROPOSED Fourth Amended Counterclaims, Lafeber Dec., Ex. B, ¶163).  As a result,

26

27 _____

28 [1] The absence of any published "license fee" for such embedded software further confirms Dexon's
primary argument that the original transaction was a "sale" and no valid software license was
created.

1    Cisco's form advertisements and publications advising secondary market purchasers, including

2    Dexon's customers, that they are prohibited from transferring and using such products are false and

3    tortious.

4        Dexon's PROPOSED Fourth Amended Counterclaims provide detailed examples of such

5    false Cisco communications directed to products governed by the 2012-2017 policy "exception,"

6    including products involved in Dexon's original counterclaims.    These include products

7    subsequently sold on the secondary market by Dexon to Accuray, Inc. and Lockridge Grindal.

8    (Dexon's PROPOSED Fourth Amended Counterclaims, Lafeber Dec., Ex. B, ¶¶184, 187)

9        As explained in Dexon's PROPOSED Fourth Amended Counterclaims, Cisco's

10   advertisement and publications fail to delineate products governed by the acknowledged earlier

11   "exception." (Dexon's PROPOSED Fourth Amended Counterclaims, Lafeber Dec., Ex. B, ¶¶164,

12   169-171).  Worse, Cisco's publications direct consumers to the current online version of their EULA

13   and Software Transfer and Re-Use Policy with the earlier applicable "exception" removed.  While

14   Dexon's primary argument is that Cisco failed to provide proper notice of its alleged EULA or

15   obtain the necessary assent to the purported EULA at the time of the original "sale," it cannot be

16   allowed to unilaterally remove the "exception" and change the terms of its purported EULA *after*

17   the original transaction.  (*Id.*)

18       Cisco has contended the  undisputed 2012-2017 "exception" was "not in effect during the

19   period relevant to Dexon's counterclaims." (April 27, 20020 Feuchtbaum email, Lafeber Dec., Ex.

20   A).  Such contention is presumably based on a misunderstanding that Dexon's has not sold or will

21   not continue to sell products governed by the 2012-2017 "exception."  On the contrary, Dexon's

22   amended counterclaims clarify that Dexon currently has in inventory Cisco products sold by Cisco

23   or Cisco's authorized resellers to the original consumers and end users in 2012-2017.  Moreover,

24   due to the nature of the secondary market, Dexon will continue to receive more such products in

25   inventory.

26       As detailed in Dexon's PROPOSED Fourth Amended Counterclaims, Dexon has previously

27   sold and will continue to sell Cisco products sold by Cisco and/or Cisco's authorized resellers to the

28   original consumers and end users in 2012-2017.  (Lafeber Dec., ¶9); (Dexon's PROPOSED Fourth

DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S NOTICE OF MOTION AND
MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS

**App.342**

1    Amended Counterclaims, Lafeber Dec., Ex. B, ¶¶184, 187, 204).  Moreover, Dexon's original
2    counterclaims involve Cisco products sold by Cisco and/or Cisco's authorized resellers to the
3    original consumers and end users in 2012-2017, including products subsequently sold on the
4    secondary market by Dexon to Accuray, Inc. and Lockridge Grindal. (*Id.*)

5        In addition to the fact that Dexon only recently learned of the "exception" and timely sought
6    the proposed amendments, discovery has not yet commenced in the present case and the proposed
7    amendments will result in no unfair prejudice to Cisco.

8                                        **III.**

9                                  <u>**CONCLUSION**</u>

10       Dexon respectfully requests that it be granted leave to file its PROPOSED Fourth Amended
11   Counterclaims incorporating the highly relevant newly discovered facts confirming an "exception"
12   expressly allowing secondary market purchasers of Cisco products, including Dexon's actual and
13   prospective customers at issue herein, to freely transfer and use Cisco's embedded software.

14

15   Dated: May 11, 2022                    Respectfully submitted,

16
                                            */s/Amanda Washton*
17   Michael M. Lafeber                      Amanda Washton
     mlafeber@taftlaw.com                    a.washton@conklelaw.com
18   O. Joseph Balthazor Jr.                 **CONKLE, KREMER & ENGEL, PLC**
     jbalthazor@taftlaw.com                  3130 Wilshire Boulevard
19   **TAFT STETTINIUS & HOLLISTER LLP**     Suite 500
     2200 IDS Center                         Santa Monica, CA 90403
20   80 S. 8th St.                           Tel: (310) 998-9100
     Minneapolis, MN 55402
21   Tel: 612.977.8400
     Fax: 612.977.8650
22                                           *Attorneys for Defendant*
                                             Dexon Computer, Inc.
23

24

25

26

27

28

DEFENDANT AND COUNTERCLAIM PLAINTIFF DEXON COMPUTER, INC.'S NOTICE OF MOTION AND
MOTION FOR LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS

Case 5:22-cv-00053-RWS-CMC   Document 21-9   Filed 06/23/22   Page 1 of 18 PageID #:  382

# Exhibit I

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CISCO SYSTEMS, INC., et al.,

           Plaintiffs,

     v.

DEXON COMPUTER, INC., et al.,

           Defendants.

Case No. 20-cv-04926-CRB

**ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS AND DENYING LEAVE TO FILE FOURTH AMENDED COUNTERCLAIMS**

Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc. (collectively "Cisco") sued Defendant Dexon Computer, Inc. ("Dexon") for trademark infringement, trademark counterfeiting, false designation of origin, unfair business practices under California law, and unjust enrichment. The Court previously dismissed Dexon's eleven counterclaims with leave to amend. The Court then dismissed Dexon's four amended counterclaims, noting that it would permit only one more chance to amend. Dexon now alleges six counterclaims: declaratory judgment, Lanham Act false advertising, intentional interference with contractual relations, intentional interference with prospective economic advantage, trade libel, and trade libel per se. Dexon also moves for leave to file a fourth amended answer, insisting that it recently uncovered new information that would strengthen its counterclaims. Cisco moves to dismiss. The Court GRANTS the motion to dismiss and DENIES the motion for leave to amend.

## I.    BACKGROUND

### A.    Facts

#### 1.    Cisco and Dexon

Cisco Systems and Cisco Technology are corporations that manufacture and sell

1    hardware products in routing, switching, and networking.  See December Order (dkt. 87) at

2    1-2.  Cisco has an "Authorized Channel Network" through which it sells products to

3    "Authorized Channel Partners" or "Authorized Resellers."  Third Am. Countercl. ("TAC")

4    ¶ 122 (dkt. 107).  "Within this 'Authorized' network, Cisco exerts strict control over how,

5    and at what prices, its 'Authorized' partners can buy and sell Cisco products."  Id.  On the

6    secondary market, Cisco hardware is sold at lower prices.  Id. ¶ 118.  Dexon is a

7    secondary-market reseller of computer networking products that sells "new, refurbished,

8    and discontinued hardware" by Cisco and others.  Id. ¶ 119.

### 2.    Alleged Misrepresentations

10         Cisco's hardware contains "embedded software" that is necessary for the hardware

11    to function.  Id. ¶ 125.  Cisco represents that secondary-market hardware is governed by an

12    "End User License Agreement" ("EULA") that restricts transfer and use of the embedded

13    software.  Id. ¶ 126.  Cisco further represents on its "relicensing website" and in its

14    communications with customers that these embedded software licenses are not

15    transferrable and that any Cisco hardware purchased on the secondary market must be

16    relicensed.  Id. ¶¶ 129-130.

17         Dexon alleges that these representations are false because the initial purchase of the

18    embedded software is a sale and not governed by the EULA.  Id. ¶ 134.  In its second

19    amended counterclaims, Dexon alleged that EULA cannot govern the products Dexon sells

20    because, when Cisco sells the initial hardware, it does not obtain assent to the license.  See

21    Second Am. Countercl. ("SAC") (dkt. 92) ¶ 146; id. ¶ 126 (alleging that Cisco makes the

22    EULA available online and informs users where it is but "does not require or mandate that

23    end users acknowledge, read, accept or provide any affirmative assent to" it); see also TAC

24    ¶ 139 (similar).

25         In its third amended counterclaims, Dexon adds some additional details in support

26    of its claim that Cisco does not obtain assent to the license.  Dexon alleges that Cisco's

27    notice to customers about the EULA has "varied through the years," from 2009 to today.

28    TAC ¶ 149.  At first, the license terms were in a "Getting Started Guide" CD and "would

1    have been routinely ignored as unnecessary or superfluous by experienced IT

2    professionals." Id. ¶¶ 150, 151.  At some "unknown time," Cisco stopped providing a

3    copy of the EULA and instead added a paper notice directing the purchaser to a website

4    URL containing the EULA. Id. ¶¶ 152-53.  Dexon includes pictures of the exterior

5    packaging for an example Cisco switch. Id. ¶ 145.  Because the EULA is only on the

6    inside of the product packaging, it can be accessed only after the product has been

7    purchased and opened. Id. ¶ 146.  Dexon alleges that, in the absence of a valid EULA,

8    every initial transaction constitutes a "sale" of both the hardware and software. Id. ¶ 157.

9    Consequently, any subsequent claim by Cisco that the embedded software is governed by

10   the license is "false or misleading." Id.  Dexon alleges that it has "lost sales of products

11   that would have been made but for" Cisco's representation that secondary-market

12   hardware is bound by the EULA and requires a new license. Id. ¶ 161.

### 3.    Cisco's Brand Protection Team

14         As in the second amended counterclaims, Dexon alleges that Cisco employs "a

15   team of 'Brand Protection' employees" who "intervene with resellers and end users in

16   cases where they are either contemplating the purchase of product, or have ordered

17   product, from the secondary market." Id. ¶ 162.  Because of Cisco's actions, Dexon's

18   customers have "refused to pay for certain Cisco goods, have returned and/or cancelled

19   orders for such goods, have removed Dexon's bids from contention for business, and have

20   ceased doing business with Dexon on other products and/or altogether." Id. ¶ 216.  Dexon

21   alleges that it has suffered damages, including the cancellation of pending orders, loss of

22   opportunity to bid on projects, and the loss of entire relationships with many of its top

23   customers. Id. ¶ 181.  Dexon describes, in nearly identical terms as in its previous

24   pleading, the following four interactions between Cisco and Dexon's customers.

25         First, as of July 2019, Fort Bend Independent School District (FBISD) had entered

26   into a written contract with Dexon for the purchase of over $1.3 million in new Cisco

27   equipment. Id. ¶ 165.  On or about July 9, Sean O'Brien, a member of Cisco's Brand

28   Protection Team, sent a letter to FBISD stating that "Dexon Computers is not a member of

United States District Court
Northern District of California

1  the Cisco authorize reseller program" and "[c]ustomers purchasing most Cisco goods

2  outside of Cisco's authorized sales channels would not automatically have a license to use

3  the software." Id. ¶¶ 166, 167.  The letter stated that the Dexon-purchased products "may

4  not come with a valid software license," so "Cisco recommends that you return these

5  goods for a refund, along with any other Cisco products received by the vendor, and

6  replace the items with authorized Cisco products sold via an authorized reseller." Id.

7  ¶¶ 166, 167.  FBISD believed that the equipment "may not be new and that it would not be

8  able to use such products due to the absence of a 'valid software license,'" so it cancelled

9  its contract with Dexon. Id. ¶ 168.  Dexon newly alleges that this was "especially

10  egregious" because, "on information and belief," these products were phones that do not

11  require a separate license to operate. Id. ¶ 169.

12        Second, on or about March 14, 2019, Tim Casto, a member of Cisco's Brand

13  Protection Team, sent a letter to Dexon customer Lockridge Grindal and Nauen

14  (Lockridge) stating that "six switches" Lockridge had purchased from Dexon were

15  "counterfeit." Id. ¶ 170.  (According to Dexon, Cisco now alleges that only four of the six

16  switches are counterfeit. Id.)  The letter stated that "Dexon is NOT a member of the Cisco

17  Authorized Reseller Program," that "[r]egardless of what Dexon claims, and regardless of

18  whether its Cisco product is used or is in new sealed boxes, ANY Cisco product it supplies

19  is consider unauthorized." Id. ¶ 171.  It then stated that no product obtained from Dexon

20  comes with a "valid software license." Id. ¶ 171.  Lockridge believed that all six of the

21  switches were counterfeit, that they would not work, and that they lacked the required

22  licenses. Id. ¶ 172.  As a result, Lockridge demanded a refund, and Dexon lost all future

23  business opportunities from Lockridge. Id.

24        Third, on or about January 27, 2020, Casto sent an email to Accuray Inc. stating

25  that some of the products it had purchased from Dexon on the secondary market "did not

26  have a valid software license." Id. ¶ 173.  The email stated that "Cisco . . . determined that

27  the items are genuine" but that the items lacked a valid software license because they

28  "show as sold to end users other than Accuray." Id.  Dexon newly alleges that due to this

4

**App.348**

correspondence, Accuray believed that the product would not work and that it lacked the required licenses necessary to work.  Id. ¶ 174.  "As a result," Accuray demanded a refund and Dexon lost all future business opportunities from Accuray.  Id.

Fourth, on or about July 12, 2021, Shuting Li, a member of Cisco's Brand Protection Team, sent an email to Dexon customer Meadowridge Networks, Inc. stating that the product purchased from Dexon was "an unauthorized unit [ ] because this unit is now in possession of end customer which is different from the reported end customer," so "it is an overseas diversion unit."  Id. ¶ 175.  Confused, Meadowridge responded: "I am the first end-user to open the box. . . This came to me in an unopened Cisco box and was not a 'used' unit in any sense of the word. . . I had every reason to think that this was a legitimate unit and no reason to believe that it wasn't."  Id. ¶ 176.  Cisco directed Meadowridge to its website, which defined "used" equipment to include all products purchased on the secondary market.  Id. ¶ 177.  Dexon alleges that Meadowridge believed that the Cisco products it had purchased from Dexon would not work.  Id. ¶ 178. Meadowridge demanded a refund and was provided a replacement or substitute product at a reduced price.  Id.  Dexon lost future business opportunities from Meadowridge.  Id.

### 4.    Newly Discovered Facts

On May 11, 2022, about five weeks after filing its third amended counterclaims on April 6, Dexon moved for leave to amend again in light of newly-discovered facts concerning an earlier version of Cisco's EULA.  Mot. for Leave (dkt. 116).  On or about April 19, 2022, Dexon states that its counsel was contacted by an attorney adverse to Cisco in another matter who shared that Cisco's 2012 EULA had an exception that expressly allowed the transfer of the embedded software.  Lafeber Decl. (dkt. 116-1) ¶ 2.  Dexon communicated this discovery to Cisco, and Cisco confirmed that the exception was in effect from 2012 until some time between 2014 and 2017.  Id. ¶¶ 3-6 & Ex A.

In its proposed fourth amended counterclaims, Dexon describes this prior Policy and the language it included.  See generally Lafeber Decl. Ex. B, Proposed Fourth Am. Countercl. ("FAC").  Dexon alleges that Cisco products sold from 2012 to 2017 were

5

Case 5:22-cv-00053-RWS-CMC   Document 21-1   Filed 06/06/21   Page 7 of 68   PageID #:  388

Case 3:20-cv-04926-CRB   Document 49   Filed 06/23/21   Page 7 of 68

1  subject to a "Software License Transfer and Re-licensing Policy" that included an

2  exception "expressly allow[ing] the use and transfer of Cisco products by secondary

3  market purchasers." Id. ¶ 162.  That Policy stated that, "[i]n situations where Products

4  combine Hardware and Software and there is no separate Product code or License Fee

5  charged for the Software on the applicable Cisco then-current published price list at the

6  time of transfer[,] . . . an exception will be made to allow for the transfer without the

7  transferee being required to pay a new License Fee." Id.  "On information and belief,"

8  Cisco's "published price list" contained no separate "Product code or License Fee" for

9  "embedded software included with products governed by Cisco's purported 2012-2017

10  'Software License Transfer and Re-licensing Policy." Id. ¶ 163.  In its communications to

11  secondary market purchasers, Cisco does not distinguish between products governed by

12  the 2012-2017 version of the Software License Transfer and Re-licensing Policy. Id.

13  ¶ 164.  A customer purchasing a secondary-market Cisco product from Dexon would, if

14  they go to Cisco's website to view the EULA or "Software License Transfer and Re-use

15  policy," see the current version, with the exception removed. Id. ¶ 170.

16      Dexon "has regularly sold and continues to sell" Cisco products from model years

17  2009 to the present. Id. ¶ 165.  "[O]n information and belief," Dexon alleges that the

18  products sold to Lockridge were originally sold to the original consumer or end user

19  between 2015 and 2017. Id. ¶ 184.  Dexon also alleges on information and belief that 23

20  out of 26 of the products sold to Accuray were sold to the original consumer or end user

21  between 2014 and 2017. Id. ¶ 187.

22      **B.    Procedural History**

23      On July 22, 2020, Cisco sued Dexon for trademark infringement, trademark

24  counterfeiting, false designation of origin, unfair business practices under California law,

25  and unjust enrichment. See Am. Compl. (dkt. 32).  The Court denied Dexon's motion to

26  dismiss Cisco's complaint for lack of personal jurisdiction. See Am. Order (dkt. 40).  In

27  December 2021, after Dexon filed an answer and eleven counterclaims, the Court granted

28  Cisco's motion to dismiss. See December Order.  Dexon filed an amended answer and

United States District Court
Northern District of California

6

**App.350**

raised four of the previously-dismissed counterclaims. See SAC. In March 2022, the Court granted Cisco's motion to dismiss the four counterclaims. See March Order (dkt. 106). Dexon now raises six counterclaims. See TAC. Cisco again moves to dismiss. See Mot. (dkt. 111); Opp. (dkt. 117); Reply (dkt. 120). On May 11, 2022, Dexon moved for leave to file a fourth amended counterclaims, which Cisco opposes. See Mot. for Leave; Opp. to Mot. for Leave (dkt. 121).

## II.     LEGAL STANDARD

### A.     Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a defendant to move to dismiss a cause of action which fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). When evaluating a Rule 12(b)(6) motion, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987). But conclusory allegations amounting only to "formulaic recitation of the elements" are not entitled to an assumption of truth. See Iqbal, 556 U.S. at 681 (quoting Twombly, 550 U.S. at 555). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 322 (2007).

A party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity requires "the who, what, when, where, and how of the misconduct charged, including what is false or misleading about a statement, and why it is false." Benavidez v. Cty. of San Diego, 993 F.3d 1134, 1145 (9th Cir. 2021)

United States District Court
Northern District of California

7

Case 5:22-cv-00512-RWS-CMC  Document 19  Filed 06/06/22  Page 8 of 38 PageID #:  390

1   (quoting United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016)).

2   Allegations must be "specific enough to give defendants notice of the particular

3   misconduct which is alleged to constitute the fraud charged so that they can defend against

4   the charge and not just deny that they have done anything wrong."  United Healthcare, 848

5   F.3d at 1180 (citation and quotation omitted).

6       **B.**    **Declaratory Judgment**

7       Courts may only adjudicate actual cases or controversies.  U.S. Const. art. III, § 2,

8   cl. 1.  "When presented with a claim for a declaratory judgment, therefore, federal courts

9   must take care to ensure the presence of an actual case or controversy."  Rhoades v. Avon

10  Prods., Inc., 504 F.3d 1151, 1157 (9th Cir. 2007) (citing Pub. Serv. Comm'n v. Wycoff,

11  Co., 344 U.S. 237, 244 (1952)).  "Absent a true case or controversy, a complaint solely for

12  declaratory relief under 28 U.S.C. § 2201 will fail for lack of jurisdiction under Rule

13  12(b)(1)."  Id. (citation omitted).  To satisfy the actual controversy requirement in a

14  trademark case, the plaintiff must show "real and reasonable apprehension" that it would

15  be liable for infringement if it continued marketing its product.  Monster Cable Prod., Inc.

16  v. Euroflex S.R.L., 642 F. Supp. 2d 1001, 1010 (N.D. Cal. 2009) (quoting Chesebrough-

17  Pond's, Inc. v. Faberge, Inc., 666 F.2d 393, 396 (9th Cir. 1982)).

18      **C.**    **Leave to Amend**

19      When dismissal is appropriate, courts "shall freely" give leave to amend the

20  complaint "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  In the Ninth Circuit,

21  district courts may deny leave to amend due to "undue delay, bad faith or dilatory motive

22  on the part of the movant, repeated failure to cure deficiencies by amendments previously

23  allowed, undue prejudice to the opposing party by virtue of allowance of the amendment,

24  and futility of amendment."  Leadsinger, Inc. v. BMG Music Pub., 512 F.3d 522, 532 (9th

25  Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  A court's discretion to

26  deny leave to amend is "particularly broad" where "the plaintiff has previously been

27  granted leave to amended and has subsequently failed to add the requisite particularity to

28  its claims."  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 1007 (9th Cir. 2009).

United States District Court
Northern District of California

8

**App.352**

**III.    DISCUSSION**

Dexon alleges six counterclaims in its third amended answer: (1) Lanham Act false advertising, (2) intentional interference with contractual relations, (3) intentional interference with prospective economic advantage, (4) trade libel, (5) trade libel per se, (6) declaratory judgment.  Dexon also moves for leave to file a fourth amended counterclaims based on newly-discovered facts.  The Court concludes that Dexon fails to state its six counterclaims and that its proposed amendment would be futile and prejudicial.

**A.    Counterclaims**

**1.    Lanham Act (Claim III)**

Dexon alleges that Cisco violated Section 43(a) of the Lanham Act by telling secondary-market purchasers that they cannot use the embedded software in their hardware unless they purchase a separate license.[1]  TAC ¶¶ 194, 197.

Section 43(a) of the Lanham Act forbids the use of false or misleading descriptions in commercial advertising.  See 15 U.S.C. § 1125(a)(1)(B).  It requires five elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement."  Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).  Although the Ninth Circuit has not yet decided the issue, "the better reasoned [district court] authority is that, where a Lanham Act claim is predicated on the theory that the defendant engaged in a knowing and intentional misrepresentation, then Rule 9(b) is applicable."  Clorox Co. v. Reckitt Benckiser Grp. PLC, 398 F. Supp. 3d 623, 634 (N.D. Cal. 2019) (quoting 23andMe, Inc. v. Ancestry.com DNA, LLC, 356 F. Supp. 3d 889, 908 (N.D. Cal. 2018)).

---

[1] In prior counterclaims, Dexon alleged an additional misrepresentation concerning Cisco's capacious definition of "used," but it no longer bases any of its claims on that allegation. See Opp. at 6 n.2, 16-17.

United States District Court
Northern District of California

1    No allegations in its newest pleading change the Court's view (expressed twice) that

2    Cisco did not make an actionable false statement in communicating that secondary-market

3    purchasers require a software license. <u>See</u> December Order at 14, 12; <u>see also</u> March

4    Order at 7, 8.  As before, Dexon alleges that Cisco neither provides notice to the original

5    purchaser that the embedded software is governed by a licensing agreement nor requires

6    affirmative assent to that agreement.  Countercl. ¶ 139, 155.  As such, in Dexon's view, the

7    EULA does not apply to the embedded software, the software is not subject to any license

8    at all, and any later statement that secondary market purchasers cannot transfer Cisco

9    products is false and misleading.  <u>Id.</u> ¶ 157.

10   The Court has twice held that the allegations do not plausibly demonstrate that

11   Cisco's statement is false or misleading.  Dexon acknowledges that there are significant

12   differences over how the EULA was communicated to original purchasers between 2009

13   and now.  <u>See</u> TAC ¶¶ 145-153.  So, too, were the circumstances of each sale by an

14   Authorized Reseller different.  Cisco's statement would be false only if the circumstances

15   surrounding each original purchase demonstrate that that purchaser lacked objective

16   understanding from the seller that the embedded software was subject to a license, <u>and</u> if

17   the circumstances surrounding Dexon's purchase indicate that it too gained title to the

18   embedded software.  But Dexon has not sufficiently alleged that the Authorized Resellers

19   provide no notice.  <u>See e.g.</u>, <u>id.</u> ¶ 139 (stating generally that "Cisco's authorized reseller[s]

20   do not provide original purchasers any notice prior to purchase that there is embedded

21   software in the product or that such embedded software is governed by a license").  Dexon

22   also has not alleged anything about when or how it gained title to the embedded software

23   as to the products that it sold to FBISD, Lockridge, Accuray, or Meadowridge.

24   Consequently, Dexon fails to allege that it held title to the embedded software in the

25   specific equipment at issue here.  <u>See</u> <u>Clorox Co.</u>, 398 F. Supp. 3d at 634.  Cisco therefore

26   did not make a false statement in communicating that these secondary purchasers had to

27   acquire licenses.

28   Moreover, a Lanham Act claim requires a misleading "statement of fact," and the

10

United States District Court
Northern District of California

1    Cisco's statement does not qualify because its truth depends on the resolution of a disputed

2    legal issue.  March Order at 8.  Whether the transactions are sales or licenses is not the sort

3    of "statement of fact" that may give rise to a false advertising claim.  See Coastal Abstract

4    Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725, 731-32 (9th Cir. 1999) (a statement

5    that a company was "not licensed in California" was not a false statement of fact under the

6    Lanham Act because it was a legal issue—and one that was still disputed).  Dexon

7    attempts to distinguish Coastal Abstract by contrasting the one-time statement there with

8    Cisco's "intentional, coordinated [and] formalized" statements.  Opp. at 17.  But even if

9    true, the fact that Cisco's statements were approved by the company does not transform it

10   from a disputed legal issue into a "statement of fact" that would give rise to a Lanham Act

11   claim.  Dexon therefore fails to plausibly allege a misrepresentation as to the embedded

12   software license.

13          **2.     Intentional Interference and Trade Libel (Claims III, IV, and V)**

14          Dexon also pleads intentional interference with contractual relations, intentional

15   interference with prospective economic advantage, and trade libel claims, all of which are

16   subject to the heightened requirement of Rule 9(b).  See Benavidez, 993 F.3d at 1145.

17   These claims are based on the general allegations that Cisco "made false and misleading

18   statements about Dexon and the products it sells to these customers in order to disrupt the

19   contractual relationship and to cause these customers to purchase product from Cisco

20   authorized resellers at a higher price."  TAC ¶ 206; see also id. ¶¶ 214, 215.

21          A claim for interference requires proof that the defendant engaged in conduct that

22   was wrongful by some legal measure other than the fact of interference itself.  Fresno

23   Motors, LLC v. Mercedes Benz USA, LLC, 771 F.3d 1119, 1125 (9th Cir. 2014).  The

24   California counterclaims require that Cisco make a false statement or otherwise commit a

25   wrongful act.  It does not violate California law to tell a party true statements about the

26   world.  See Ixchel Pharma, LLC v. Biogen, Inc., 470 P.3d 571, 580 (Cal. 2020) ("[T]o

27   state a claim for interference with an at-will contract by a third party, the plaintiff must

28   allege that the defendant engaged in an independently wrongful act."); Della Penna v.

11

**App.355**

1   _Toyota Motor Sales, U.S.A., Inc._, 902 P.2d 740, 748, 751 (Cal. 1995) (interference with an

2   economic relationship requires that the interference is "wrongful by some legal measure

3   other than the fact of interference itself"); _ComputerXpress, Inc. v. Jackson_, 93 Cal. App.

4   4th 993, 1014 (2001) ("Like the tort of trade libel, interference with prospective economic

5   advantage requires false statements of fact.").

6        Dexon still has not properly pleaded that Cisco's conduct was wrongful. Dexon

7   alleges that Cisco, through its Brand Protection Team, informed FBISD, Lockridge,

8   Accuray, and Meadowridge that the Cisco products lacked a valid software license and/or

9   were counterfeit or refurbished. TAC ¶¶ 166, 167, 170, 173, 175. As noted above, Dexon

10  has not sufficiently alleged that the statements to these customers that their hardware

11  required new licenses were misleading or false statements of fact. Nor does Dexon

12  plausibly allege that calling Dexon's secondary equipment "refurbished" was false or

13  wrongful, especially given that Dexon does in fact sell "refurbished" hardware. TAC ¶

14  119; _see Ixchel Pharma_, 470 P.3d at 580. Although Dexon alleges that Cisco labeled the

15  six switches it sold to Lockridge as "counterfeit," Dexon never alleges that this statement

16  was false and that they were in fact _not_ counterfeit. _Id._ ¶ 170. (Although Dexon alleges

17  that "[o]n information and belief" Cisco currently believes only four of the switches are

18  counterfeit, this is not the same as an allegation that they were not counterfeit. _Id._)

19       Even if it could be construed as wrongful that Cisco called some of these products

20  "counterfeit" or "refurbished," these actions were not plausibly material to purchaser

21  behavior and/or did not proximately cause Dexon's injury. To the extent that Dexon's

22  customers cancelled their contracts or otherwise changed their behavior, they did so

23  because they learned key facts that Dexon still has not plausibly alleged are false: Dexon is

24  not an authorized reseller, the products Dexon sold to them likely lack valid licenses, and

25  they must purchase new ones.

26       For these reasons, the intentional interference with contractual relations, intentional

27  interference with prospective economic advantage, and trade libel claims should be

28  dismissed.

United States District Court
Northern District of California

12

**App.356**

United States District Court
Northern District of California

### 3. Trade Libel Per Se (Claim VI)

Dexon also argues that Cisco's statements to Dexon's customers about Dexon and its business practices amount to trade libel per se.  TAC ¶ 227.  But Cisco's communications were not plausibly defamatory on their face.

Libel per se is "defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact. . . ."  Barnes-Hind, Inc. v. Superior Ct., 181 Cal. App. 3d 377, 382 (Ct. App. 1986) (quoting Slaughter v. Friedman, 32 Cal. 3d 149, 649 P.2d 886 (1982)).  Libel per se requires statements that disparage the integrity or honesty of a business, for example by alleging "fraud and deception and unfair dealing with their customers."  Johnstech Int'l Corp. v. JF Microtechnology SDN BHD, No. 14-CV-02864-JD, 2016 WL 4182402, at *3 (N.D. Cal. Aug. 8, 2016), aff'd, 773 F. App'x 623 (Fed. Cir. 2019).  It is intended to redress false statements that "seriously impugn morals, character or reputation in a way that jumps off the page without the need for further explanation."  Id.

Dexon fails to plausibly allege that any statement by Cisco amounts to trade libel per se.  Dexon alleges that Cisco damaged Dexon's integrity and character by implying Dexon misleads its customers and that Dexon misrepresents that its customers can use and transfer the products it sells.  TAC ¶ 232.  The Court has already stated that Cisco's claim about the licenses is not a false statement.  Even if it were, the implicit claim that some of Dexon's products do not work as advertised does not rise to the level of "seriously impugn[ing Dexon's] morals, character or reputation."  See Johnstech, 2016 WL 4182402, at *3.  Dexon does not allege that Cisco made any claims about what Dexon told its customers before it sold them the products or that it knowingly sold products without a valid license.  And Cisco's statement to one of Dexon's customers that it sold them a refurbished product is not the sort of claim that "disparages the integrity or honesty of a business" because Dexon does in fact sell refurbished Cisco products.  See Johnstech, 2016 WL 4182402, at *3; TAC ¶ 119 (stating that "Dexon provides new, refurbished and discontinued hardware products").

13

**App.357**

### 4.     Declaratory Judgment (Claim I)

Dexon seeks a declaratory judgment that "the original transactions involving the subject Cisco products is a 'sale' of both the hardware and any associated embedded software and that there exists no valid or enforceable license agreement governing the embedded software which prohibits the use of such products by subsequent secondary market purchasers." TAC ¶ 183.

To satisfy the "actual controversy" requirement of the Declaratory Judgment Act, the dispute must be definite and concrete as to the legal relations of parties having adverse legal interests. MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007). Declaratory judgment claims must satisfy Article III's requirements, including standing and ripeness, by pleading actual or imminent injury caused by the defendant that can be redressed by judicial relief and that is of "sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Monster Cable Prod., Inc. v. Euroflex S.R.L., 642 F. Supp. 2d 1001, 1011 (N.D. Cal. 2009). A plaintiff must show "real and reasonable apprehension" of liability. Id.

Dexon fails to plausibly allege facts showing an actual controversy that a declaratory judgment can resolve. As described above, Dexon has not alleged specific facts around the original conveyance of these specific hardware products to plausibly suggest that it held title to the embedded software in those transactions. See Adobe Sys. Inc. v. Kornrumpf, 780 F. Supp. 2d 988, 994 (N.D. Cal. 2011) (dismissing a declaratory judgment claim based on the first-sale doctrine because the plaintiff did not plead sufficient "facts to suggest that it owned any of the particular copies of [] software that it resold"). Dexon cites International Equipment Trading, Ltd. v. Illumina, Inc., 312 F. Supp. 3d 725, 736 (N.D. Ill. 2018), Levita Magnetics International Corp. v. Attractive Surgical, LLC, 2020 WL 4580504 (N.D. Cal. Apr. 1, 2020), and Shoom, Inc. v. Electronic Imaging Systems of America, Inc., 2008 WL 11515251 (N.D. Cal. Apr. 10, 2008), but in each of those cases, the court found that the litigant had plausibly alleged a dispute over the transactions at issue there. Here, having concluded that Dexon has not plausibly alleged

14

**App.358**

United States District Court
Northern District of California

1  that the initial transactions involved sales of the embedded software, the Court finds that

2  there is no concrete controversy.

3       Nor is there "real and reasonable apprehension" of liability on the basis of the

4  allegation that Cisco "continues to make false representations to actual or potential

5  secondary market purchasers, including Dexon's actual or potential customers."  TAC

6  ¶ 184.  The Court lacks power to issue a declaration on the basis that Dexon might be

7  subject to some future liability from some other transactions.  See MedImmune, 549 U.S.

8  at 127 (a controversy must be real and substantial rather than an advisory opinion based

9  upon a hypothetical state of facts).[2]

10  **B.  Leave to Amend**

11       Dexon seeks leave to file fourth amended counterclaims, even though the Court

12  already permitted multiple rounds of amendments and previously said its third

13  counterclaims would be its last.  See March Order at 13.  The Court denies this motion

14  because Dexon's amendments would be futile.  See Leadsinger, Inc., 512 F.3d at 532.

15       Cisco first argues that the Court should deny leave because of undue delay—that is,

16  because Dexon should have better investigated this theory at the outset of this litigation.

17  Cisco cites to Jordan v. County of Los Angeles, in which the Ninth Circuit affirmed denial

18  of leave to amend because the plaintiff gave no satisfactory reasons for failing to include

19  the new causes of action in the original complaint.  See Jordan v. Cty. of Los Angeles, 669

20  F.2d 1311, 1324 (9th Cir. 1982).  But it is less clear that Dexon could easily have included

21  these allegations in the original complaint.  Arguably, Dexon should have known about the

22  Re-licensing Policy because it sold Cisco products prior to 2017.  Yet although Cisco's

23  current EULA and Policies are easily accessible on Cisco's website, the older versions are

24  not—and were not on Cisco's website when Dexon was drafting these counterclaims.[3]  For

25  _____

26  [2] Dexon also argues that its declaratory judgment counterclaim is supported by the "zone
of interests" standard from Lexmark International, Inc. v. Static Control Components, Inc.,

27  572 U.S. 118, 127 (2014).  Opp. at 14.  But Lexmark decided nothing about the
Declaratory Judgment Act or Article III standing.  Dexon's other cases are inapposite for
similar reasons.  See Opp. at 14-15.

28  [3] It is unclear from the pleading when Cisco switched over from a CD in the box

United States District Court
Northern District of California

1    this reason, the Court is unpersuaded by the undue delay argument,

2        Dexon's proposed amendments would be futile because Dexon does not allege with

3    particularity that the 2012-2017 Software License Transfer and Re-licensing Policy applied

4    to the products it sold, so its counterclaims sounding in fraud would not stand.  In its

5    proposed fourth amended counterclaims, Dexon alleges "on information and belief" that

6    the exception would apply to the products it sold to Lockridge and Accuray, but it does not

7    identify which products were sold to these customers, let alone what year they were

8    manufactured or when the original sale took place.  See FAC ¶¶ 184, 187.  Dexon does not

9    allege at all whether the Policy could apply to the products it sold to FBISD or

10   Meadowridge.  Although Dexon alleges that it has inventory of Cisco products from that

11   period and will continue to receive and sell products from that time period, see id. ¶ 165,

12   Rule 9(b) requires more.  Indeed, denial of leave is especially appropriate here because

13   Dexon has repeatedly "been granted leave to amend and has subsequently failed to add the

14   requisite particularity to its claims."  See Zucco Partners, 552 F.3d at 1007; see, e.g., In re

15   Tesla Motors, Inc. Sec. Litig., 75 F. Supp. 3d 1034, 1048 (N.D. Cal. 2014), aff'd, 671 F.

16   App'x 670 (9th Cir. 2016) (denying leave to amend because plaintiff failed to comply with

17   Rule 9(b) despite previous warnings).[4]

18

19   _____

     containing the EULA to putting it online and including the URL in the box.  (The only date
20   Dexon provides is that Cisco used a CD as of 2009.)
     [4] The Court does not reach Cisco's third argument, which is that Dexon's proposed
21   amendments would cause Cisco undue prejudice.  Prejudice to the opposing party is the
     most important factor in analyzing leave to amend.  See Jackson v. Bank of Hawaii, 902
22   F.2d 1385, 1387 (9th Cir. 1990).  A party can suffer prejudice even if discovery has not
     started.  See Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149, 1161 (9th Cir. 1989).
23   Cisco has incurred substantial legal costs from defending itself against Dexon's three sets
     of counterclaims over the past year.  Opp. to Mot. for Leave at 10.  Moreover, Dexon filed
24   a new suit in the Eastern District of Texas asserting claims duplicative of those in this
     case—including some of the counterclaims that this Court has already dismissed—further
25   inflating Cisco's costs.  Id. at 6; see Dexon Computer, Inc. v. Cisco Systems, Inc. and
     CDW Corporation, No. 5:22-CV-53 (E.D. Tex.).  Dexon's apparent attempts to seek
26   repeated bites at the apple would weigh in support of denying leave.  Cf. Hernandez v.
     DMSI Staffing, LLC, 79 F. Supp. 3d 1054, 1059 (N.D. Cal. 2015) (denying motion for
27   leave in part because "the facts suggest that Plaintiff has engaged in forum-shopping"),
     aff'd, 677 F. App'x 359 (9th Cir. 2017).  It is a close question whether further amendment
28   would cause Cisco undue prejudice, but the Court need not reach it because it concludes
     that amendment would be futile.

                                    16

## IV.     CONCLUSION

For the foregoing reasons, the Court GRANTS Cisco's motion to dismiss Dexon's counterclaims without leave to amend and DENIES Dexon leave to file fourth amended counterclaims.

**IT IS SO ORDERED.**

Dated: June 21, 2022



CHARLES R. BREYER
United States District Judge

**App.361**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00053-RWS-CMC |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. and | ) | |
| CDW CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT CISCO SYSTEMS, INC.'S
## MOTION TO DISMISS UNDER RULE 12(b)(6)

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com

June 23, 2022
rfolio@kellogghansen.com

*Counsel for Cisco Systems, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ....................................................................................................... 1

STATEMENT OF THE ISSUES................................................................................. 4

FACTUAL BACKGROUND ..................................................................................... 5

    A.    Cisco's Network Equipment ......................................................... 5

    B.    Procedural History ........................................................................ 6

    C.    The Present Complaint.................................................................. 8

LEGAL STANDARD................................................................................................ 10

ARGUMENT ............................................................................................................ 11

I.     THE RULE AGAINST CLAIM-SPLITTING BARS DEXON'S CLAIMS ................ 11

II.    DEXON'S CONSPIRACY CLAIMS (COUNTS I-II, VI) FAIL BECAUSE IT
     DOES NOT ALLEGE ANY ACTIONABLE AGREEMENT ....................................... 13

    A.    Dexon Has Not Properly Alleged Any Unlawful Agreement To Replace
         Dexon With CDW As A Seller Of Cisco Products.............................................. 14

    B.    Any Agreement Not To Sell To Dexon Cannot Affect Competition .................. 16

    C.    Dexon's Parallel State Law Claim Also Fails........................................................ 17

III.   DEXON FAILS TO ALLEGE AN ACTIONABLE TYING CLAIM (COUNTS
     III & VI)..................................................................................................................... 17

    A.    The Section 1 Claim Fails Because Dexon Does Not Allege Any
         Foreclosure........................................................................................................... 17

    B.    Dexon's Parallel State Law Claim Also Fails........................................................ 23

III.   DEXON'S MONOPOLIZATION CLAIMS FAIL (COUNTS IV-VI).......................... 23

    A.    Dexon Fails To Allege Any Exclusionary Conduct ............................................ 23

    B.    Dexon's Parallel State Law Claim Also Fails........................................................ 28

IV.   DEXON LACKS ANTITRUST INJURY (COUNTS I-VI) ......................................... 28

CONCLUSION.......................................................................................................... 30

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
    2022 WL 980791 (W.D. Tex. Mar. 31, 2022) ................................................................. 17

*Anderson v. Wells Fargo Bank, N.A.*,
    953 F.3d 311 (5th Cir. 2020) ................................................................................. 11

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) ........................................................................... 23, 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................. 10, 20, 26

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)...................................................................................... 27

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)................................................................................... 8, 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................. 10, 14, 26

*Blough v. Holland Realty, Inc.*,
    574 F.3d 1084 (9th Cir. 2009) .............................................................................. 18

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ......................................................................... 18, 23

*Breaux Bros. Farms, Inc. v. Teche Sugar Co.*,
    21 F.3d 83 (5th Cir. 1994) .................................................................................. 23

*Burdett Sound, Inc. v. Altec Corp.*,
    515 F.2d 1245 (5th Cir. 1975) ....................................................................... 3, 15, 16

*Chawla v. Shell Oil Co.*,
    75 F. Supp. 2d 626 (S.D. Tex. 1999) .................................................................. 18, 22

*Cinel v. Connick*,
    15 F.3d 1338 (5th Cir. 1994) ................................................................................ 11

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
    2022 WL 2222962 (N.D. Cal. June 21, 2022).................................................................. 8

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
    2021 WL 5848080 (N.D. Cal. Dec. 9, 2021) ..................... 1, 2, 7, 8, 18, 20, 21, 22, 24, 29

*Claunch v. Bank of Am. Corp.*,
    2014 WL 4101886 (S.D. Miss. Aug. 18, 2014),
    *aff'd*, 608 F. App'x 262 (5th Cir. 2015) ............................................................. 12

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ......................................................................................... 26

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ......................................................................... 16

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
    123 F.3d 301 (5th Cir. 1997) .................................................................... 15, 16

*Eldridge v. Kohls Dep't Stores, Inc.*,
    2020 WL 1528233 (W.D. Okla. Mar. 30, 2020) .............................................. 13

*Federated Dep't Stores, Inc. v. Moitie*,
    452 U.S. 394 (1981) ....................................................................................... 12

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ......................................................................... 28

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
    789 F. Supp. 760 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993) ............... 14, 15

*Hitt v. City of Pasadena*,
    561 F.2d 606 (5th Cir. 1977) ......................................................................... 13

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
    714 F.2d 1384 (5th Cir. 1983) ....................................................................... 25

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ......................................................................................... 17

*Jebaco, Inc. v. Harrah's Operating Co.*,
    587 F.3d 314 (5th Cir. 2009) ......................................................................... 29

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ........................................................................................... 17

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
    677 F.2d 1045 (5th Cir. 1982) ....................................................................... 21

*Klo-Zik Co. v. Gen. Motors Corp.*,
    677 F. Supp. 499 (E.D. Tex. 1987) ................................................................ 17

*Kutt v. Apple Inc.*,
2020 WL 6803257 (E.D. Tex. Mar. 23, 2020) ................................................. 10

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
751 F.3d 368 (5th Cir. 2014) ............................................................... 14, 17

*MetroNet Servs. Corp. v. Qwest Corp.*,
383 F.3d 1124 (9th Cir. 2004) ...................................................................... 27

*N. Pac. Ry. Co. v. United States*,
356 U.S. 1 (1958) ............................................................................................ 21

*Norris v. Hearst Tr.*,
500 F.3d 454 (5th Cir. 2007) ................................................................. 28, 30

*Novell, Inc. v. Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) .................................................................... 27

*Olympia Co. v. Celotex Corp.*,
771 F.2d 888 (5th Cir. 1985) ........................................................................ 28

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ...................................................................................... 27

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
507 F.3d 117 (2d Cir. 2007) .......................................................................... 28

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
517 F.2d 117 (5th Cir. 1975) ........................................................................ 12

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
615 F.3d 412 (5th Cir. 2010) ........................................................................ 30

*R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*,
807 F.2d 1222 (5th Cir. 1987) ...................................................................... 25

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*,
637 F.2d 1001 (5th Cir. 1981) ...................................................................... 15

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
842 F.3d 883 (5th Cir. 2016) ................................................................. 24, 25

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC*,
532 F.3d 963 (9th Cir. 2008) ........................................................................ 22

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
802 F. Supp. 1544 (S.D. Tex. 1991) ............................................................ 18

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) ................................................................. 19, 23

*Scott v. Galusha*,
    890 S.W.2d 945 (Tex. Ct. App. 1994), *writ denied* Oct. 5, 1995 ..................... 28

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
    88 F.3d 780 (9th Cir. 1996) ................................................................. 27

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ............................................................................ 23

*Star Tobacco, Inc. v. Darilek*,
    298 F. Supp. 2d 436 (E.D. Tex. 2003) ......................................................... 21

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ................................................................................ 26

*Stearns Airport Equip. Co. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) ................................................................. 26

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*,
    200 F.3d 307 (5th Cir. 2000) ................................................................. 26

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ................................................................. 12, 13

*Transource Int'l, Inc. v. Trinity Indus., Inc.*,
    725 F.2d 274 (5th Cir. 1984) ................................................................. 24

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
    89 F.3d 233 (5th Cir. 1996) ................................................................. 22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ............................................................................ 23, 25, 27

*Walker v. U-Haul Co.*,
    747 F.2d 1011 (5th Cir. 1984) ................................................................. 29

*Whitehurst v. Showtime Networks, Inc.*,
    2009 WL 3052663 (E.D. Tex. Sept. 22, 2009) ............................................... 26

**STATUTES**

Sherman Act, 15 U.S.C. § 1 *et seq.*:

    15 U.S.C. § 1 ................................... 1, 3, 6, 9, 13, 14, 15, 17, 18, 19, 23, 28

    15 U.S.C. § 2 .............................. 1, 4, 6, 7, 9, 10, 13, 14, 17, 23, 24, 26, 28, 30

Texas Free Enterprise and Antitrust Act of 1983,
Tex. Bus. & Com. Code Ann. § 15.01 *et. seq.*........................................... 3, 4, 9, 17, 23, 28

**RULE**

Fed. R. Civ. P. 12(b)(6)................................................................................. 4, 10, 12, 13

**OTHER AUTHORITY**

X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020).................................. 21

TO COUNSEL AND THIS HONORABLE COURT:  Defendant Cisco Systems, Inc. ("Cisco") hereby brings this Motion To Dismiss Plaintiff Dexon Computer, Inc.'s ("Dexon") complaint.

## INTRODUCTION

Cisco sued Dexon in federal court in California, seeking "to hold Dexon accountable for . . . mass infringement and counterfeiting," having "uncovered a significant and willful infringement scheme by Dexon."  Ex. A (Cisco California Compl. ¶¶ 1, 2, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926 (N.D. Cal. July 22, 2020), Dkt. 1) (noting that Dexon "duped" customers "into thinking they are buying genuine Cisco-branded products").  Dexon filed counterclaims, including claims under Section 1 and Section 2 of the Sherman Act and California state antitrust law.  As here, Dexon asserted in its California counterclaims that "Cisco forces its customers to buy overpriced networking equipment they do not want by using its monopoly power in the aftermarkets for service and maintenance and foreclosing its network competitors in the process."  Ex. B (Dexon California Opp'n 7, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926 (N.D. Cal. Nov. 3, 2021), Dkt. 81); *cf.* [ECF 1] (Compl. ¶¶ 1-9).  And, as here, Dexon based its claims in part on a supposed conspiracy between Cisco and one of its distributors (there unnamed) not to sell Cisco equipment to Dexon.

The district court (Breyer, J.) dismissed Dexon's antitrust claims.  It held that Dexon had failed to allege "that the supposed tie had any adverse effect on competition" because, although Dexon asserted that "Cisco's competitors are impacted," the "alleged facts d[id] not support these conclusory assertions."  *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2021 WL 5848080, at *4 (N.D. Cal. Dec. 9, 2021).  The court also held that "the supposed tie makes no logical sense" because a customer buys SmartNet service contracts "for equipment she already has."  *Id.* at *5.

With regard to claims that Cisco "coerc[ed] purchases in the equipment markets; bull[ied] its customers to purchase through more expensive channels; [and] pressur[ed] a [distributor] not to deal with Dexon," the court found that "Dexon fail[ed] to plead that any of this alleged conduct, either singly or in the aggregate, was anticompetitive." *Id.* And the court further held that all of the antitrust claims fail "because Dexon has not pleaded antitrust injury." *Id.* at *6.

The district court gave Dexon leave to amend its counterclaims; it did so twice, but, although it continued to pursue other state and federal claims, it dropped its antitrust claims. On June 21, 2022, the district court dismissed Dexon's third amended counterclaims without leave to amend and denied Dexon's motion to file fourth amended counterclaims.

Rather than attempt to amend its antitrust claims in California, Dexon filed very similar antitrust claims in this Court. But the dismissal of Dexon's third amended counterclaims without leave to amend constitutes a final determination of those claims, which bars this suit under the doctrine of claim preclusion. Moreover, were the merits of Dexon's claims properly before this Court, they fail for the same reason that Judge Breyer dismissed Dexon's claims before. Dexon still has not pleaded facts to support its repeated but conclusory assertions that Cisco's conduct harmed competition in the relevant markets for equipment – switches, routers, and IP phones. In those markets, as Dexon concedes (Compl. ¶ 13), Cisco competes with rival manufacturers like Juniper, not with Dexon. Whatever the impact of the alleged conduct on Dexon – which claims it has lost sales of *Cisco* equipment – Dexon has not plausibly alleged any conduct that improperly interfered with rival equipment manufacturers' ability to compete for and win sales.

*First*, Dexon's conspiracy claims fail because Dexon challenges a purely vertical agreement – between Cisco and a single distributor, CDW Corporation ("CDW") – without alleging that the supposed agreement affected competition in the relevant markets. To begin, the

allegation that CDW, rather than Dexon, made sales to one customer does not imply an

anticompetitive agreement between Cisco and CDW – a distributor has every reason to make

profitable sales that its rivals would otherwise make.  Furthermore, any agreement between

Cisco and CDW not to sell to Dexon is *per se* lawful since a manufacturer has every right to

refuse to provide its products to a reseller (especially one that touts its efforts to divert sales

*away* from Cisco, *see id.* ¶ 97).  *See Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th

Cir. 1975).  And even if such an agreement were subject to antitrust scrutiny under the rule of

reason, Dexon alleges no facts to support any assertion that CDW's refusal to sell Cisco

equipment to Dexon could conceivably affect competition between Cisco and rival

manufacturers, particularly when Dexon makes no allegation that CDW has power in any

market.  Thus, Dexon's conspiracy claims (Counts I and II) and its conspiracy-based claim under

the Texas Free Enterprise and Antitrust Act (Count VI) fail.

*Second*, Dexon's effort to reassert its convoluted federal and state "tying" claims fails for

the same reasons those claims failed before:  Dexon does not allege facts to support an assertion

that the supposed tying arrangement forced a customer to buy equipment from Cisco that the

customer would have preferred to purchase from a Cisco competitor (that is, a different

manufacturer).  Absent any allegation that the tying arrangement foreclosed any *competitor's*

sales, there is no antitrust claim.  The assertion that the long lifecycle of equipment means

customers may be less likely to replace Cisco equipment with equipment from Cisco or any of its

competitors for many years simply underscores the absence of required foreclosure and

demonstrates that Dexon's assertions are conclusory speculation.  Accordingly, Dexon's claims

brought under Section 1 of the Sherman Antitrust Act (Count III) and its tying-based claim under

the Texas Free Enterprise and Antitrust Act (Count VI) fail.

*Third*, Dexon's "monopolization" and "attempted monopolization" claims fail because Dexon alleges no facts to show that Cisco's conduct excluded any competitor from the market. As noted above, and as Dexon alleges, in the supposedly monopolized markets for network equipment, Cisco's competitors are other manufacturers, such as Juniper – not Dexon.  And Dexon does not allege any facts to show that Cisco made it harder for rival equipment manufacturers to distribute their products, only that Cisco made it harder for *Dexon* to distribute *Cisco's* products.  Nor does Dexon allege facts suggesting that its success or failure as a Cisco reseller has any significance for competition in the relevant markets.  For each reason, Dexon's Section 2 claims (Counts IV and V) and its corresponding claim under the Texas Free Enterprise and Antitrust Act (Count VI) fail as a matter of law.

*Fourth*, the Court should dismiss all of Dexon's federal and state antitrust claims for failure to allege antitrust injury, consistent with the decision dismissing Dexon's California antitrust claims.  Dexon has at most alleged that Cisco's conduct harmed Dexon; Dexon does not allege, as it must, any injury flowing from reduced competition between Cisco and Cisco's competitors in the alleged relevant markets for network equipment.

For the foregoing reasons and those that follow, Dexon's claims should be dismissed in their entirety and with prejudice.

### STATEMENT OF THE ISSUES

Whether Dexon's complaint, if not transferred, should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## FACTUAL BACKGROUND

### A.     Cisco's Network Equipment

Dexon alleges (Compl. ¶ 42) that Cisco is a leading manufacturer of Internet "enterprise infrastructure[ ]" equipment.  Cisco manufactures network equipment "in the core technologies of routing and switching, along with more advanced technologies in areas such as home networking, IP telephony, optical networking, security, storage area networking, and wireless technology."  *Id.* ¶ 23.  These products "are the fundamental building blocks" of critical Internet infrastructure.  *Id.* ¶ 31.  Cisco competes against other equipment "manufacturers with product portfolios that are worldwide in scope," *id.* ¶ 34, including Juniper (*id.* ¶ 13) and Hewlett Packard Enterprise (*see id.* ¶ 28).

Cisco also services the products it manufactures (but not other manufacturers' equipment), including by offering "a program called SmartNet."  *Id.* ¶ 3.  SmartNet provides access to proprietary "bug fixes, patches and updates" to Cisco's copyrighted software that enable safe operation of Cisco hardware by protecting purchasers of that critical infrastructure from "security vulnerabilities" and "operational risks."  *Id.* ¶¶ 26-27.  Cisco does not "require[ ]" Cisco equipment customers to purchase SmartNet.  *Id.* ¶ 27.  And as Dexon further alleges (*id.* ¶ 26), "third-party maintenance and service providers" can offer Cisco's hardware customers alternatives to receive services on Cisco equipment.  Cisco's hardware customers also can purchase SmartNet "at a different time" after purchasing Cisco equipment.  *Id.* ¶ 45.  And those customers need not purchase SmartNet from Cisco directly; companies other than Cisco "sell an extremely large volume of SmartNet service packages."  *Id.* ¶ 47.

Equipment manufacturers like Cisco sell "billions of dollars" of network equipment annually.  *Id.* ¶ 105.  According to Dexon (*id.* ¶ 11), Cisco sells its equipment hardware through

a "distribution channel," which is comprised of distributors and "VARs" or value-added resellers.  *See id.* ¶ 53.  Consumers seek "the best economic and performance deal for networking equipment" available.  *Id.* ¶ 45.  And, owing to the nature of networking equipment, purchases "are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products."  *Id.* ¶ 4.

### B.  Procedural History

**1.**     This is the second lawsuit Dexon has brought challenging Cisco's relationships with its resellers of networking equipment.  After Cisco sued Dexon in the Northern District of California for using counterfeit Cisco trademarks in violation of federal and state law, Dexon filed antitrust counterclaims under federal and California law, making effectively identical allegations to those at issue here.

Dexon's California counterclaims alleged that Cisco had violated Section 1 and Section 2 of the Sherman Act and California's parallel state law, the Cartwright Act, by "tying" the purchase of new Cisco routers and switches to the provision of SmartNet service.  Ex. C (Dexon California Counterclaims ¶¶ 37-45, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926 (N.D. Cal. July 29, 2021), Dkt. 50).  Dexon alleged that the "tying" product is the service that Cisco provides to SmartNet purchasers, which Cisco supposedly uses to induce customers to purchase new Cisco equipment from resellers other than Dexon.  But Dexon failed to allege that any sales of Cisco equipment made under this supposed "tying" arrangement displaced sales by any other manufacturer.  *See*, *e.g.*, *id.* ¶ 42 (alleging a customer wanted to buy Cisco equipment and bought Cisco equipment).  Dexon also alleged that Cisco "[e]ngag[ed] in . . . pressure and bullying tactics" to dissuade several customers from doing business with Dexon.  *Id.* ¶ 71b.  And Dexon alleged that Cisco pressured an unidentified "VAR not to do business with Dexon."  *Id.*

¶ 52; *see also id.* ¶ 71c (claiming that Cisco violated Section 2 by "[p]ressuring at least one large volume VAR not to deal with Dexon").

2.      The United States District Court for the Northern District of California (Breyer, J.) granted Cisco's motion to dismiss Dexon's antitrust counterclaims – and all of its other federal- and state-law counterclaims.  *See Cisco*, 2021 WL 5848080, at *4-6.

a.      The court held that Dexon's tying claims failed "because Dexon does not allege that the supposed tie had any adverse effect on competition." *Id.* at *4.  Dexon alleged only that customers wanting to buy Cisco equipment from Dexon ended up buying Cisco equipment from another reseller – not that Cisco had foreclosed any rival equipment manufacturer (e.g., Juniper or Hewlett Packard Enterprise) from making a sale.  *See id.*  The court also found that "the supposed tie makes no logical sense," because "SmartNet exists to maintain Cisco products," meaning that customers desiring SmartNet service necessarily desired Cisco equipment and at most had a contract claim against Cisco for failing to provide SmartNet service.  *Id.* at *5.

b.      The district court also dismissed Dexon's monopolization claims, reasoning that the alleged "bullying" – "coercing purchases in the equipment markets; bullying its customers to purchase through more expensive channels; pressuring a VAR not to deal with Dexon; hurting Dexon by discontinuing its access to Cisco's service database; reversing a prior course of conduct toward Dexon" – also had not precluded rival equipment manufacturers from making sales.  *Id.*  Instead, "Cisco's conduct apparently led some customers to purchase Cisco equipment from suppliers other than Dexon."  *Id.*  For example, in one instance, Cisco's alleged conduct had "apparently <u>helped</u> its competitors:  shutting off Dexon's access to the service database led frustrated consumers to purchase products made by other manufacturers."  *Id.*; *cf.* Compl. ¶ 12 (referring to loss of access to "database . . . for maintenance services").

**c.**      Finally, Judge Breyer found that all of Dexon's antitrust counterclaims failed because "Dexon ha[d] not pleaded antitrust injury." *Id.* at *6. Dexon alleged only that Cisco's conduct harmed Dexon's ability to sell Cisco equipment or deprived SmartNet customers of contracted-for service. *See id.* Thus, "while the conduct may have violated consumers' contracts with Cisco, or it may have been unwarranted or arbitrary, any injury to Dexon was not 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" as is necessary for antitrust injury. *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

**3.**      Judge Breyer gave Dexon leave to amend its counterclaims. *See Cisco*, 2021 WL 5848080, at *9. Dexon submitted two subsequent amended federal- and state-law counterclaims, and sought leave to file yet another version of those counterclaims, but it did not re-assert its antitrust counterclaims. On June 21, 2022, the district court dismissed the third amended counterclaims "without leave to amend" and denied Dexon's motion for leave to file its fourth amended counterclaims. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962, at *9 (N.D. Cal. June 21, 2022). Accordingly, Judge Breyer has conclusively resolved Dexon's counterclaims against Cisco.

**C.      The Present Complaint**

Rather than re-assert its antitrust counterclaims in the Northern District of California, Dexon refiled claims in this Court based on substantially the same facts and legal theories that Judge Breyer rejected. In dismissing Dexon's third amended counterclaims, Judge Breyer wrote that Dexon's lawsuit here is "duplicative" and an "apparent attempt[] to seek repeated bites at the apple." *Id.* at *8 n.4. We summarize those claims below:

8

**App.376**

*First*, Count I (Section 1 of the Sherman Act), Count II (Section 2 of the Sherman Act), and Count VI (Texas Free Enterprise and Antitrust Act) depend on allegations that Cisco entered into an unlawful agreement with CDW.  One aspect of the conspiracy involves CDW simply making sales of Cisco equipment to a customer who decided not to buy Cisco equipment from Dexon.  The complaint describes (Compl. ¶¶ 59-60) an example of a hospital system in Pennsylvania that supposedly cancelled an order it had placed with Dexon after Cisco allegedly warned it would not provide service on Cisco equipment purchased from Dexon (and would "cancel immediately all SmartNet service packages which the customer had in place").  Dexon alleges "[u]pon information and belief" that Cisco and CDW agreed that CDW would make the sale instead.  *Id.* ¶ 60.  This agreement supposedly affected inter-brand competition because Dexon is more likely than CDW to sell non-Cisco equipment (although Dexon affirmatively alleges that CDW sells hundreds of products manufactured by Cisco's competitors).  *Id.* ¶ 61.  Dexon also alleges, "[u]pon information and belief," that Cisco and CDW agreed that CDW would not sell Cisco equipment to Dexon.  *Id.* ¶ 62.

*Second*, Count III (Section 1 of the Sherman Act) and Count VI (Texas Free Enterprise and Antitrust Act) rest on the claim that Cisco threatens to refuse contracted-for SmartNet service on Cisco equipment unless Cisco customers purchase new Cisco equipment – conduct that Dexon labels "tying."  *See id.* ¶¶ 102, 124.  As in its California counterclaims, Dexon does not allege that any customer purchased Cisco equipment *instead of* some other manufacturer's equipment that the customer would have preferred.  Instead, Dexon asserts here that such non-Dexon sales of Cisco equipment make it less likely that a customer would purchase some other manufacturer's equipment at some later time because networking equipment has a long expected life.  *See id.* ¶ 4.  And, as it did in its California counterclaims, Dexon alleges that customers

have the option of paying for recertification of equipment to make it eligible for SmartNet service – which does not involve any sale of new equipment.  *See id.* ¶ 49.

*Third*, Counts IV and V (Section 2 of the Sherman Act) depend on the same allegations underlying Dexon's "tying" claims, as well as allegations that Cisco pressured customers not to deal with Dexon – including pressuring a school district in Texas to cancel an order for IP phones from Dexon.  *See id.* ¶¶ 12-13, 65, 111, 117.  Dexon asserts that this conduct allows Cisco to maintain (or attempt to acquire) a monopoly in alleged product markets for network equipment and IP phones, even though Dexon does not allege any facts to support the assertion that Cisco's conduct as to Dexon interferes with any competing manufacturer's ability to win business from Cisco.  *See id.* ¶ 13 (alleging that Cisco targeted Dexon's sales of *Cisco equipment* because Dexon also sold equipment from competing manufacturers, but failing to allege that the termination interfered with sales of that non-Cisco equipment).

## LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted), and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Kutt v. Apple Inc.*, 2020 WL 6803257, at *1 (E.D. Tex. Mar. 23, 2020) (Schroeder, J.) ("The complaint need not contain detailed factual allegations, but a plaintiff must plead sufficient factual allegations to show that he is plausibly entitled to relief.").  Conclusory assertions are insufficient to survive a motion to dismiss under Rule 12(b)(6).  *See Twombly*, 550 U.S. at 556 ("a bare assertion of conspiracy will not suffice").

**ARGUMENT**

Dexon's claims fail, first of all, because they are barred by the doctrine of claim

preclusion.  Having brought its antitrust counterclaims in one court, and having failed to pursue

the opportunity to amend those claims there, the doctrine of claim preclusion bars Dexon's

attempt to split its claims by filing in this Court instead.

In any event, those antitrust claims fail on the merits.  Dexon is not a consumer or a

competitor of Cisco but an unauthorized reseller, upset that Cisco has frustrated Dexon's

attempts to profit from sales of *Cisco's* products.  Having seen its antitrust claims dismissed once

before, Dexon has filed in a new forum and added window dressing in an unavailing attempt to

avoid transfer to the Northern District of California.[1]  But *Twombly* teaches that, where facts to

support an antitrust claim are lacking, conclusory assertions cannot suffice.  The facts alleged in

Dexon's complaint, if true, establish only that Dexon incurred losses because Cisco discouraged

customers from doing business with Dexon when selling Cisco equipment.  It does not establish

any harm to competition in the equipment markets where Cisco supposedly has market power,

much less any injury to Dexon flowing from any competition-harming conduct in the equipment

markets that Dexon alleges.  As before, Dexon's complaint should be dismissed.

I.     **The Rule Against Claim-Splitting Bars Dexon's Claims**

Dexon's claims do not make it out of the starting gate because the dismissal of its

counterclaims, without leave to amend, in the California action precludes its claims here.  *See*

*Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020); *see also Cinel v.*

*Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994).  Claim preclusion applies if "(1) the parties are

identical or in privity; (2) the judgment in the prior action was rendered by a court of competent

---

[1] As explained in Cisco's Motion To Transfer (filed contemporaneously herewith), this
case should be transferred to the Northern District of California under the "first-to-file" rule.

jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981).

Those requirements are met here. *First*, Dexon cannot split its claims merely by naming CDW as an additional defendant here, because its earlier suit included allegations related to CDW.  As set out in Cisco's motion to transfer, Dexon included allegations regarding an unnamed authorized Cisco reseller in its California counterclaims; those allegations unmistakably relate to CDW.  *See* Mot. To Transfer at 6 n.4.  "[W]here plaintiff . . . had the initiative in a recognizably substantial litigation, and specifically chose to cite [defendant] as one of the alleged conspirators [in the earlier litigation], there is no suggestion of any failure of fairness in the original litigation, so as to render it unsupportive of an estoppel." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 122-23 (5th Cir. 1975).

*Second*, the United States District Court for the Northern District of California is of course a court of competent jurisdiction to adjudicate Dexon's claims.  *See Claunch v. Bank of Am. Corp.*, 2014 WL 4101886, at *4 (S.D. Miss. Aug. 18, 2014) (affording preclusive effect to a prior action in the Northern District of California), *aff'd*, 608 F. App'x 262 (5th Cir. 2015).

*Third*, the dismissal of the California lawsuit is a final adjudication on the merits that has preclusive effect because Dexon does not have leave to amend its counterclaims (including the antitrust claims at issue).  "[A] dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a judgment on the merits." *Federated Dep't Stores*, 452 U.S. at 399 n.3 (internal quotation marks omitted).  A "dismissal with prejudice [under Rule 12(b)(6)] is res judicata" and bars those same claims from being raised in any court.  *Shull v. Pilot Life Ins. Co.*,

313 F.2d 445, 446 (5th Cir. 1963).  Thus, the recent order finally dismissing Dexon's

counterclaims without further leave to amend "essentially ends the plaintiff's lawsuit" and

prevents Dexon from pursuing a claim in the same or another forum.  *Hitt v. City of Pasadena*,

561 F.2d 606, 608 (5th Cir. 1977) (per curiam).  Further, even if the court had not entered a final

order dismissing the counterclaims, Dexon's decision not to amend its California counterclaims

to include the antitrust causes of action would have prohibited its refiling those claims here.

Where, as here, a party was given leave to amend a particular claim but does not do so, the

12(b)(6) dismissal bars all dismissed claims.  *See Eldridge v. Kohls Dep't Stores, Inc*., 2020 WL

1528233, at *2 (W.D. Okla. Mar. 30, 2020).

 *Fourth*, the claims Dexon asserts here are the same as those asserted in its counterclaims

in the California action:  Dexon alleged that Cisco violated Section 1 of the Sherman Act through

an illegal tying arrangement involving Cisco's SmartNet service contracts, Section 2 of the

Sherman Act by maintaining an unlawful monopoly of the Relevant Product Markets (defined as

the markets for Ethernet switches, routers in the California lawsuit, and Ethernet switches,

routers, and IP phones in the Texas case), and it alleged violations of state antitrust laws in each

state where it brought its federal antitrust claims.  When determining whether a subsequent suit

involves the same claim as an earlier action, "a prior judgment's preclusive effect extends to all

rights of the plaintiff with respect to all or any part of the transaction, or series of connected

transactions, out of which the original action arose."  *Test Masters Educ. Servs.*, 428 F.3d at 571.

That test is plainly satisfied here.

## II. Dexon's Conspiracy Claims (Counts I-II, VI) Fail Because It Does Not Allege Any Actionable Agreement

 Dexon's claim (Compl. ¶ 57) that "Cisco and CDW conspired to exclude Dexon" from

the Relevant Networking Equipment Market fails because Dexon does not plausibly allege any

competition-harming agreement between Cisco and CDW.  Whether under Section 1 or

Section 2 of the Sherman Act, Dexon's claims require it to allege that Cisco and CDW reached

an agreement that unreasonably restricted competition in a relevant market.  *See Marucci Sports,*

*L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014) (affirming dismissal

of Section 1 claim for failure to plausibly allege facts showing restraint of trade in relevant

market); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp.

760, 778 (S.D. Miss. 1992) (same, for Section 2), *aff'd*, 986 F.2d 1418 (5th Cir. 1993).  Dexon

makes no such allegation.

### A.   Dexon Has Not Properly Alleged Any Unlawful Agreement To Replace Dexon With CDW As A Seller Of Cisco Products

Dexon's complaint about a supposed agreement between Cisco and CDW that CDW

would replace Dexon as the seller of Cisco equipment to a hospital system in Pennsylvania fails

for multiple reasons.

*First*, Dexon has not plausibly alleged any agreement between Cisco and CDW that had

any effect on Dexon.  To plausibly plead an antitrust conspiracy, a plaintiff must allege "some

factual context" excluding the possibility of "independent action."  *Twombly*, 550 U.S. at 549.

Dexon alleges no such context.  Dexon alleges (Compl. ¶ 60) that CDW sold Cisco products to a

customer, but CDW has every incentive to make profitable sales of Cisco equipment; there is no

factual allegation that such sales stemmed from an agreement between CDW and Cisco to target

Dexon.  Dexon cannot explain how there is anything unlawful about CDW making profitable

sales.

*Second*, even if Dexon plausibly alleged that Cisco discouraged the Pennsylvania hospital

system from dealing with Dexon pursuant to an agreement with CDW, such an agreement would

be *per se* lawful.  As the Fifth Circuit has long made clear, "it is simply not an antitrust violation

for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." *Burdett Sound*, 515 F.2d at 1249. That is so "even when the new dealer and the manufacturer agree before the termination of the old dealer that the substitution will occur." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 307 (5th Cir. 1997). More generally, it does not violate antitrust law for Cisco to encourage end-users to purchase Cisco equipment from one reseller rather than another. In either event, the customer is purchasing *Cisco* equipment. The alleged conduct therefore does not affect the market opportunities of other equipment manufacturers (the competitors in the markets that Dexon alleges).

   *Third*, even if any supposed agreement were subject to antitrust scrutiny, the agreement is lawful because Dexon does not and cannot allege any facts to show that any agreement between CDW and Cisco could harm market-wide competition in the markets for network equipment (or IP phones). The supposed agreement between Cisco and CDW is purely a vertical agreement between a manufacturer and a seller. *See* Compl. ¶ 56 (calling CDW a "favored reseller[ ]"). Such an agreement is subject to scrutiny (if at all) under the antitrust rule of reason: because there is nothing about such agreements that is inherently harmful to competition (unlike, say, price-fixing between horizontal competitors), the plaintiff must allege facts to show that the agreement actually harms competition. *See Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir. 1981). That, in turn, requires the plaintiff to show that the agreement affects sales in a substantial part of the relevant market. *See*, *e.g.*, *Futurevision*, 789 F. Supp. at 770 (dismissing vertical conspiracy claim under Section 1 of the Sherman Act because plaintiff "ha[d] not sufficiently pleaded substantial foreclosure of market alternatives as

a result of the . . . contracts at issue").  But Dexon does not meet that pleading burden here

because it fails to allege *anything* about CDW's share of any market.  Accordingly, as alleged, a

vertical agreement between Cisco and CDW cannot affect market-wide competition because

CDW is one reseller among many.  And that is true even if Dexon has properly alleged that

*Cisco* has power in the relevant equipment markets.  *See Dickson v. Microsoft Corp.*, 309 F.3d

193, 208 (4th Cir. 2002) (agreements between upstream software company and two downstream

PC manufacturers, "when considered individually, [we]re [not] capable of causing any

substantial harm to competition" because the downstream market was "fiercely competitive").

> **B.**      **Any Agreement Not To Sell To Dexon Cannot Affect Competition**

For related reasons, any supposed agreement between Cisco and CDW that CDW would

not sell Cisco equipment to Dexon is *per se* lawful under Fifth Circuit law.  *See Burdett Sound*,

515 F.2d at 1249; *Doctor's Hosp. of Jefferson*, 123 F.3d at 307.  But even if such an agreement

were subject to antitrust scrutiny, the same rule-of-reason analysis would doom the claim:

Dexon's failure to allege that an agreement between Cisco and CDW would affect a substantial

share of sales in any market means that no vertical agreement between them can affect

competition.

Dexon's argument that Cisco's conduct implicates inter-brand competition because

Dexon is more likely than CDW to encourage customers to purchase networking equipment from

non-Cisco manufacturers does not change this analysis.  Cisco has every right – and every

incentive – to favor "reseller[s] that [are] more likely to aggressively market its products."

Compl. ¶ 97.  Dexon's boast (*id.*) that it "convert[s] customers from Cisco products to their [sic]

competitors' products" provides all the justification that any manufacturer would need to stop

doing business with a reseller.  Even if Dexon alleged facts to suggest that its sales efforts matter

16

**App.384**

to market-wide competition – and it has not, as discussed below – Cisco would have no antitrust

duty to promote the distribution efforts of its competitors by propping up Dexon.

### C.    Dexon's Parallel State Law Claim Also Fails

Because Dexon failed to plead a conspiracy claim under Section 1 or Section 2 of the

Sherman Act, Dexon's conspiracy claim under the Texas Free Enterprise and Antitrust Act

(Compl. ¶¶ 131-137) fails for the same reasons. *See Acad. of Allergy & Asthma in Primary Care*

*v. Quest Diagnostics, Inc.*, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022) ("Because

plaintiffs have not plausibly alleged § 1 or § 2 [conspiracy] claims under the Sherman Act, their

[Texas Free Enterprise and Antitrust Act] claims must be dismissed as well.").

### III.    Dexon Fails To Allege An Actionable Tying Claim (Counts III & VI)

### A.    The Section 1 Claim Fails Because Dexon Does Not Allege Any Foreclosure

1.    Dexon's claim that Cisco engages in unlawful tying fails for multiple reasons,

most fundamentally because Dexon never alleges any facts to support its conclusory assertions

that Cisco used its supposed power in any market to foreclose sales of any competitor's

equipment.  To plead a Section 1 tying claim, Dexon must allege that Cisco "exploit[ed]. . . its

control over the tying product to force the buyer into the purchase of a tied product that the buyer

either did not want at all, or might have preferred to purchase elsewhere on different terms."

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by*

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  Further, Dexon must show that the

alleged tying foreclosed competitors' sales – because in the absence of foreclosure, there is no

impact on competition.  *See Klo-Zik Co. v. Gen. Motors Corp.*, 677 F. Supp. 499, 503 (E.D. Tex.

1987) (noting that the "underlying rationale for the rule prohibiting tying arrangements is to

prevent foreclosure of competition on the merits in the tied product market").  Failure to allege

foreclosure thus bars Dexon's tying claim.  *See*, *e.g.*, *Marucci Sports*, 751 F.3d at 376 (requiring

allegations that the defendant's conduct "actually harmed competition among . . . manufacturers"); *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 641-42 (S.D. Tex. 1999); *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1550 (S.D. Tex. 1991); *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-1202 (9th Cir. 2012) (tying claim fails absent allegations supporting foreclosure, i.e., that consumers "would" have "purchased [other] services" in the tied market from a competitor but for the tie); *Blough v. Holland Realty, Inc*., 574 F.3d 1084, 1089 (9th Cir. 2009) (no valid Section 1 tying claim where no sales in the tied market are "foreclosed to competitors by the tie") (internal quotation marks omitted).

Accepting Dexon's allegations as true, they do not support any claim that Cisco foreclosed the sale of any *competitor's* equipment (switches, routers, or IP phones). *See Cisco*, 2021 WL 5848080, at *4 (holding that Dexon's indistinguishable Section 1 tying claim failed because "Dexon does not allege that the supposed tie had any adverse effect on competition"). Here, the supposed tying product is not equipment or replacement parts, but service provided under SmartNet contracts. *See* Compl. ¶¶ 1, 3, 43, 49, 51, 53. Dexon alleges (*id*. ¶ 3) that Cisco warned a bank that Cisco would not renew service for Cisco equipment unless the bank purchased additional equipment. Dexon also alleges that Cisco threatened to withhold service unless entities – an energy company (*id*. ¶ 7), a 911-center (*id*. ¶ 8), an auto dealership (*id*. ¶ 51),[2] a hospital (*id*. ¶ 59),[3] and a school district (*id*. ¶ 65) – purchased Cisco equipment from resellers

---

[2] Dexon alleges (Compl. ¶ 51) that this auto dealership was not interested in purchasing any network equipment – from Cisco or "a competing network equipment provider" – because "the customer could not afford new Ethernet switches." Accordingly, Cisco's service-related conduct as to the auto dealership could not have foreclosed any competitive equipment sales in the Relevant Product Markets (or for IP phones).

[3] Dexon alleges (Compl. ¶ 58) that the hospital shopped between Cisco and other product "manufacturers," but ultimately selected Cisco's network equipment. Cisco's after-the-fact conduct vis-à-vis Dexon's sales of Cisco equipment to the hospital therefore did not foreclose any sale of a competitor's equipment in the Relevant Product Markets (or for IP phones).

other than Dexon.  Dexon does not allege a single instance of Cisco threatening to withhold

service from a customer that wanted to purchase *another manufacturer's* equipment.

These allegations fail to establish any foreclosure.  Dexon defines (*Id.* ¶¶ 31, 36) the

Relevant Product Markets as markets for network equipment in which Cisco competes with other

network-equipment manufacturers (*id.* ¶¶ 32, 39).  And Dexon does not allege that any customer

was coerced to forgo a purchase of any competitors' routers or switches (or IP phones) in order

to gain access to SmartNet service for Cisco equipment.  Even on the assumption that the alleged

conduct posed an obstacle to *Dexon's* resale of *Cisco* equipment, it posed no impediment to

*competition* in the Relevant Product Markets.

Dexon's failure to allege foreclosure of any competitor's sales is fatal to its tying claim.

For example, in *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir.

1994), the Fifth Circuit reversed a judgment for a plaintiff-distributor claiming tying under

Section 1 because the plaintiff could not prove "an actual adverse effect on competition."

Instead, like Dexon, the plaintiff's "claim was, ironically, that it lost customers to competitors;

that the consumer's response to the asserted high price of [the tied product] was to purchase [the

tied product] elsewhere."  *Id.*  And while "this may have cost [the plaintiff-distributor] money,"

the theory "belies its claim of injury to competition" in the tied market.  *Id.*  Similarly here,

Dexon alleges at most that Cisco's conduct dissuades customers from purchasing Cisco's

products from Dexon.  But, as in *Roy B. Taylor Sales*, the predictable consequence of the alleged

conduct would be that customers would either purchase products from a Cisco reseller other than

Dexon or encourage those customers to purchase from a Cisco competitor.

In all cases, Dexon's allegations are insufficient because there is no claim "that the tie as

it actually operated in the market harmed competition" in the Relevant Product Markets (i.e.,

harmed equipment manufacturers).  *Id.* (brackets, footnote, and internal quotation marks omitted).  Its tying allegations thus fail to state a claim.

 **2.** The district court in California dismissed Dexon's tying claims for just this reason:  Dexon failed to allege that "Cisco's competitors are impacted" despite Dexon's "conclusory assertions" to the contrary.  *Cisco*, 2021 WL 5848080, at *4.  Dexon apparently seeks to overcome this holding by claiming (Compl. ¶ 4) that Cisco "forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase."  But this allegation cannot save Dexon's tying claims because it underscores that the supposedly tied-in sales of equipment did not cause any customer to forgo a purchase from a different supplier – those customers either intended to purchase Cisco equipment all along (the hospital, *id.* ¶ 59); had no plans to purchase any equipment (the bank, *id.* ¶ 3); did not purchase any additional equipment (the 911 center, *id.* ¶ 8; and the auto dealership, *id.* ¶ 51); or are not alleged to have been required by Cisco to purchase any Cisco equipment, only to cancel an order from Dexon (the school district, *id.* ¶ 65).  Whether a customer might choose to purchase replacement equipment years later is entirely speculative.  In no instance does Dexon allege, as it must, both that (a) the customer intended to make a new equipment purchase and (b) non-Cisco manufacturers would have made those sales but for Cisco's conduct.

 The conclusory assertion (*id.* ¶ 6) that Cisco attempted "to dissuade purchases from [unnamed] resellers of other manufacturers" – like the unexplained aside (*id.* ¶ 60) that Cisco and CDW together restricted "inter-brand competition" – is unsupported by any factual allegation in the complaint.  *See Iqbal*, 556 U.S. at 678 (requiring "factual content").  In every specific instance that Dexon alleges, no customer was seeking to purchase non-Cisco equipment from another equipment manufacturer.  Indeed, Dexon now makes the contradictory allegation

(Compl. ¶ 32) that "[t]ransitioning" from Cisco equipment to another manufacturer's equipment "is an expensive process" that customers prefer to avoid because switching would, independent of the alleged tying, "requir[e] the replacement of significant amounts of hardware and the retraining of personnel."  This is far from showing actual foreclosure of competition.

**3.**     The tying claim fails for an additional reason:  Dexon has not plausibly alleged any tie between service and equipment.  To allege a tie, the plaintiff must allege "an agreement by [the seller] to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048 n.5 (5th Cir. 1982) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)); *see also Star Tobacco, Inc. v. Darilek*, 298 F. Supp. 2d 436, 441-42 (E.D. Tex. 2003).  Dexon alleges (Compl. ¶ 102) that Cisco's "SmartNet service packages" are the "tying product," but, by definition, customers purchase SmartNet to receive services for Cisco equipment.

As the leading antitrust treatise has explained, it defies logic to complain that Cisco will not agree to provide service on Cisco equipment unless a customer buys Cisco equipment.  No consumer wants Cisco service unless it wants Cisco equipment in the first place.  *See* X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1740c4 (4th ed. 2020) ("The only possible tying product is the machine.  Repair parts or service might be tied, but neither can be the tying product, for no customer could prefer the defendant's machine because of an unrequited desire for a part to repair that very machine.").  The Northern District of California agreed this "makes no logical sense" and dismissed Dexon's claim accordingly.  *Cisco*, 2021 WL 5848080, at *5 ("More broadly, the supposed tie makes no logical sense.  SmartNet exists to maintain Cisco products. The maintenance service (the supposed tying product) is only desirable to consumers

as an add-on to the underlying equipment (the supposed tied product).  Because a consumer buys SmartNet for equipment she already has, Cisco cannot exploit control over the SmartNet market to force people to buy the underlying equipment.").

In the face of that earlier dismissal, Dexon adds no factual allegations to its complaint that could overcome the illogic of its claim.  At most, the factual allegations of the complaint suggest that Cisco deprives SmartNet customers of service they have contracted to receive on Cisco equipment they already own.  Such a claim sounds in contract, not antitrust.  *See id.* ("It's true that, if Cisco improperly withheld SmartNet service from its customers, Cisco may have breached its contract.  But that is not an antitrust violation, nor would the claim be Dexon's.").  Either (a) any limitation on service was consistent with the SmartNet service contract (and the customer presumably knew about the limitation from the start, belying the allegation of after-the-fact coercion), or (b) it was not (as Dexon seems to allege).  *See* Compl. ¶ 59 (alleging Cisco will "cancel" SmartNet service agreements already "in place").  In the latter scenario, the customers Dexon identifies in its complaint – all businesses or government agencies – could simply enforce their contracts with Cisco.  Dexon never alleges any reason why the contractual remedy would be ineffective.  Thus, any condition in the service contract has nothing to do with *tying*.  *See United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("Economic power derived from contractual agreements . . . has nothing to do with market power, ultimate consumers' welfare, or antitrust.") (internal quotation marks omitted); *Chawla*, 75 F. Supp. 2d at 638-40 (similar); *see also Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 973 (9th Cir. 2008) (same).

**4.**     Finally, Dexon's allegations belie the claim that Cisco required customers to purchase new equipment as a condition of obtaining SmartNet service.  On the contrary, Dexon

alleges (Compl. ¶ 49) that Cisco's customers can receive SmartNet service for genuine Cisco

equipment by paying a "re-certification" fee – meant to ensure the equipment is not counterfeit

or vulnerable to security exploits – without purchasing new equipment.  That is not a tying claim.

*See Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) (noting, in

dicta, plaintiffs' agreement that the defendant "could have raised the rent," and stating that "[i]t

is doubtful that [the defendant's] decision to seek similar gains by controlling the choice of mills

violates the Sherman Act").  Even if this re-certification fee amounted to a price increase,

"merely enhancing the price of the tying product" "does not," as a matter of law, "threaten an

injury to competition."  *Brantley*, 675 F.3d at 1199 (internal quotation marks omitted).

### B.      Dexon's Parallel State Law Claim Also Fails

Because Dexon failed to plead a tying claim under Section 1 of the Sherman Act, its

tying claim under the Texas Free Enterprise and Antitrust Act (Compl. ¶¶ 124-130) also fails.

*See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (affirming

dismissal of federal and state law antitrust claims; "Texas courts are statutorily instructed to

interpret the [Texas Free Enterprise and Antitrust Act] in harmony with federal judicial

interpretations of equivalent federal laws"); *Roy B. Taylor Sales*, 28 F.3d at 1388 (Texas Free

Enterprise and Antitrust Act tying claim fails for the same reasons as the Section 1 claim).

## III.    Dexon's Monopolization Claims Fail (Counts IV-VI)

### A.      Dexon Fails To Allege Any Exclusionary Conduct

**1.**      Dexon does not allege actionable exclusionary conduct, as it must for a Section 2

monopolization (or attempted monopolization) claim.  *See Verizon Commc'ns Inc. v. Law

Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("the possession of monopoly power

will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*");

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) ("it is generally required that to

demonstrate attempted monopolization a plaintiff must prove . . . that the defendant has engaged in predatory or anticompetitive conduct").  Dexon's allegations (Compl. ¶¶ 111a, 117a) that Cisco unlawfully maintained a monopoly in (or attempted to monopolize) Relevant Product Markets (or for IP phones) "by withholding service in the Relevant Service Markets" – fails for the same reason that its tying claim fails:  Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's *equipment-manufacturing competitors* from making sales.  *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891-92 (5th Cir. 2016) (anticompetitive conduct, that "which excludes competitors from a market," must "impair the opportunities of rivals").  Dexon instead alleges (Compl. ¶ 133; emphases added) the opposite:  Cisco supposedly removes itself from Dexon's sales channel, in part because Dexon "has converted customers *from Cisco* products *to their competitors'* products."

2.     None of the other conduct that Dexon alleges could plausibly amount to anticompetitive or exclusionary conduct under Section 2, in any event.

a.     Dexon suggests (*id.* ¶¶ 13, 53) that Cisco restricts distribution of Cisco equipment to certain channels to maintain high prices, but even if accepted as true,[4] these restrictions have nothing to do with maintaining or attempting to acquire a *monopoly*.  For distribution restrictions to raise antitrust concerns, a monopolist must use its market power to foreclose a substantial share of distribution opportunities that its competitors would otherwise use.  *Cf. Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 283 (5th Cir. 1984) (manufacturer cannot violate

---

[4] Dexon's assertion (Compl. ¶ 13) that "resellers like Dexon" present "a competitive threat" to Cisco's success *in the equipment markets* is conclusory, unexplained, and illogical (Dexon's theory is that Cisco is *narrowing* its own sales channels, which, if true, would logically benefit competing equipment manufacturers like Juniper and Hewlett Packard Enterprise).  *See Cisco*, 2021 WL 5848080, at *5 ("In at least one case, Cisco's conduct apparently <u>helped</u> its competitors:  shutting off Dexon's access to the service database led frustrated consumers to purchase products made by other manufacturers.").

antitrust laws by maintaining a "monopoly over the distribution of its own products").  Dexon

does not allege that Cisco has denied (or even tried to deny) competitors the ability to distribute

products to end users.  *See Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1394

(5th Cir. 1983) (explaining that because a "reduction in intrabrand competition will not suffice to

demonstrate the requisite market impact," "[a]bsent proof of a diminution in interbrand market

power, . . . a manufacturer's termination of a single distributor does not contravene the antitrust

laws").

Even assuming that Dexon finds it hard to sell Cisco's network equipment, Dexon alleges

no facts that such conduct affects Dexon's ability to promote and sell other manufacturers'

equipment to customers.  *Cf. R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*,

807 F.2d 1222, 1226-27 (5th Cir. 1987).  To the extent that Dexon claims it needs access to

Cisco products in order to attract customers to then "convert[ ]" to the products of Cisco's

competitors, Compl. ¶ 97, Cisco has no antitrust obligation to assist its competitors in this

manner.  *See Trinko*, 540 U.S. at 411 (recognizing that generally "there is no duty to aid

competitors"); *Retractable Techs.*, 842 F.3d at 892 ("This distinction between unfair conduct and

anticompetitive conduct is critical to maintain because the antitrust laws do not create a federal

law of unfair competition[.] . . .  Instead, the antitrust laws were designed to protect *competition*,

*not competitors*.") (internal quotation marks omitted).

Just as important, Dexon has made no factual allegations to support any suggestion that

*Dexon's* distribution capabilities have market-wide significance.  On the contrary, Dexon alleges

(Compl. ¶ 105) that the Relevant Product Markets entail "billions of dollars" in annual sales,

without alleging anything about the volume of its own sales.  Even crediting the conclusory

allegation that Cisco's conduct somehow made it harder for Dexon to distribute competitors' products, there is no allegation that Dexon's success or failure would affect competition.

Nor does Dexon's theory even begin to make economic sense as a monopolization claim. Cisco's incentive is to ensure that its distribution chain is competitive to keep distributors' margins low while ensuring that retail customers receive service that protects Cisco's brand. *Cf. State Oil Co. v. Khan*, 522 U.S. 3, 17-18 (1997) (rejecting *per se* liability for vertical maximum price fixing, explaining that "business judgment" and self-interested maintenance of competitive distribution limit abusive conduct); *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977) ("when interbrand competition exists . . . it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product"). If prices of Cisco equipment rise because of inefficient distribution, then that can only help Cisco's competitors and hurt Cisco.

The Fifth Circuit has repeatedly warned plaintiffs that antitrust claims must "make economic sense." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir. 2000); *see also Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999). Dexon's do not; such facial implausibility warrants dismissal. *See Iqbal*, 556 U.S. at 679 (claims must be plausible in light of "judicial experience and common sense"); *Twombly*, 550 U.S. at 555-56, 558 ("a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed").

**b.**     Because Dexon's claims depend on the assertion that Cisco had some duty under the antitrust laws to deal with Dexon, the Section 2 claims fail for the additional reason that Dexon has not come close to clearing the very high bar set for such refusal-to-deal claims. *See Whitehurst v. Showtime Networks, Inc.*, 2009 WL 3052663, at *13-14 (E.D. Tex. Sept. 22, 2009)

(adopting report and recommendation) ("A refusal to deal does not, in itself, constitute an antitrust violation."). Cisco is under no duty to grant Dexon access to Cisco's distribution network – the only conduct Dexon alleges that could plausibly affect Dexon's sales. *See Trinko*, 540 U.S. at 409-11. Cisco is free to structure its distribution network in the manner it deems most efficient and economically beneficial; even a dominant firm has every incentive to promote competitive downstream distribution. Dexon's scant allegations that Cisco denied Dexon certain access are therefore "not cognizable under the Sherman Act in the absence of an antitrust duty to deal." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).

Dexon does not plead any element of any possible narrow exception to this doctrine. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-05 (1985). Specifically, Dexon does not allege that Cisco terminated a "profitable course of dealing" by refusing to provide Dexon access to a product "already sold in a retail market to other customers," *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004), nor does it allege that this conduct was "irrational but for its anticompetitive effect," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.). On the contrary, Dexon alleges the opposite (Compl. ¶ 52): denying Dexon access to the service database allowed Cisco to "pad Cisco's profits." Indeed, Dexon expressly alleges (*id.* ¶ 53) that Cisco's conduct – supposedly disfavoring access to Dexon in favor of other "resellers" that charge more – did not entail any sacrifice of "profitability" because Cisco's "margins are far higher for sales made through channels that have higher resale prices."

The restrictions that Dexon challenges are permissible means for Cisco to ensure customers receive high-quality equipment and service. *See SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (recognizing "efficiency" as a

legitimate business reason for a refusal to deal, and holding that this can be decided "as a matter of law"); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 125 (2d Cir. 2007) (affirming order granting motion to dismiss where "[t]he facts pleaded" can "suggest[ ] . . . the purpose of increasing efficiency" in a distribution channel).  Exerting control over its distribution channel is how Cisco "preserve[s] the integrity of customers' networks" – including both for equipment and service.  Compl. ¶ 83.  Dexon's claims that Cisco violated Section 2 by denying Dexon certain access to the distribution network therefore fail because Dexon itself *alleges* a "conceivable rationale" for the conduct other than "the exclusion of competition."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020).

### B.    Dexon's Parallel State Law Claim Also Fails

Dexon's failure to allege a Section 2 claim also forecloses the parallel Texas Free Enterprise and Antitrust Act claim insofar as it relies on similar monopolization (or attempted monopolization) theories.  *See Apani Sw.*, 300 F.3d at 628 (Section 1 and Section 2 claims); *see also Norris v. Hearst Tr.*, 500 F.3d 454, 463 n.13 (5th Cir. 2007) (similar).

## IV.    Dexon Lacks Antitrust Injury (Counts I-VI)

Dexon also cannot maintain its federal or Texas antitrust claims because it fails to allege antitrust injury from any supposed tying or refusal to deal.  *See* Compl. ¶ 18 ("Dexon brings this case under Section 4 of the Clayton Act[.]"); *Olympia Co. v. Celotex Corp.*, 771 F.2d 888, 891 (5th Cir. 1985) (Antitrust "[i]njury is required in section 4 actions regardless of the nature of the underlying antitrust violation."); *Scott v. Galusha*, 890 S.W.2d 945, 950 (Tex. Ct. App. 1994), *writ denied* Oct. 5, 1995 (affirming summary judgment for defendants on Texas Free Enterprise and Antitrust Act claim because plaintiff lacked antitrust injury).  To plead actionable injury, a plaintiff must allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Atl. Richfield*, 495 U.S. at 334.  But, as the

other federal court to address Dexon's claims held, Dexon lacks any such allegation.  *See Cisco*, 2021 WL 5848080, at *6 ("[a]lthough Dexon alleges that it was harmed by Cisco's conduct, it has not pleaded this harm was caused by anticompetitive conduct").

*First*, Dexon cannot plead antitrust injury from the alleged tying conduct because Dexon does not plead any injury resulting from reduced competition in the claimed Relevant Product Markets.  Tying is subject to antitrust scrutiny because it may threaten reduced competition in the market for the tied product.  Here, the tied products are networking equipment (and IP phones).  Accordingly, to establish antitrust injury, Dexon must plausibly allege that its injuries flow from reduced competition in the markets for manufacturing routers and switches (or IP phones).  But Dexon does not allege any injury from reduced competition in those markets.  Rather, Dexon repeatedly alleges (Compl. ¶¶ 3, 7, 8, 51, 58-60, 65-66, 68) that the purported tying decreased Dexon's sales of *Cisco equipment* – not other manufacturers' equipment.  Thus, none of Dexon's alleged injuries arises from the foreclosure of sales by Cisco of equipment competitors, depriving Dexon of any antitrust injury from the supposed tie.

*Second*, Dexon's additional monopolization allegations likewise fail to support any claim of antitrust injury.  The injury caused by unlawful monopolization is reduced competition in a relevant antitrust market, not mere harm to a competitor.  *See, e.g., Walker v. U-Haul Co.*, 747 F.2d 1011, 1015 (5th Cir. 1984) (affirming summary judgment for defendant because plaintiff "made no mention in the lower court of how [the defendant's] termination of a single agent for its own services" affected inter-brand competition); *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 320 (5th Cir. 2009) ("The federal antitrust laws protect competition, not competitors.").  But all Dexon alleges is harm to itself.  True enough, Dexon claims that Cisco effectively terminated Dexon as a dealer of *Cisco equipment* when Cisco diverted Dexon's sales

to CDW.  But Dexon never pleads facts to connect *its* termination (as to Cisco's own equipment

sales) on the one hand to reduced competition in the Relevant Product Markets on the other.

Dexon's allegations therefore fail to establish antitrust injury for its Section 2 claims.  *See*

*Norris*, 500 F.3d at 468 (affirming dismissal of antitrust claims because there was no "allegation

that the termination of the plaintiffs had any adverse effect" on competitors); *PSKS, Inc. v.*

*Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 419 (5th Cir. 2010) (affirming dismissal of

terminated dealer's antitrust claims because "nothing in [the] complaint plausibly allege[d] a

harm to interbrand competition").

## CONCLUSION

If not transferred, the complaint should be dismissed with prejudice.

Dated: June 23, 2022

Respectfully submitted,

/s/ Deron R. Dacus

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com

*Counsel for Cisco Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on June 23, 2022, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ Deron R. Dacus*
Deron R. Dacus

# Exhibit A

1  RICHARD J. NELSON (State Bar No. 141658)
   E-Mail:      *rnelson@sideman.com*
2  LOUIS P. FEUCHTBAUM (State Bar No. 219826)
   E-Mail:      *lfeuchtbaum@sideman.com*
3  ANGELA M. HE (State Bar No. 319351)
   E-Mail:      *ahe@sideman.com*
4  ARTUR A. MINASYAN (SBN 322248)
   E-Mail:      *aminasyan@sideman.com*
5  SIDEMAN & BANCROFT LLP
   One Embarcadero Center, Twenty-Second Floor
6  San Francisco, California 94111-3711
   Telephone:   (415) 392-1960
7  Facsimile:   (415) 392-0827
8
9  Attorneys for Plaintiffs
   Cisco Systems, Inc. and Cisco Technology, Inc.
10

11            **UNITED STATES DISTRICT COURT**

12          **NORTHERN DISTRICT OF CALIFORNIA**

13

14  CISCO SYSTEMS, INC., a California          CASE NO. 3:20-cv-4926
    corporation, and CISCO
15  TECHNOLOGY, INC., a California            **COMPLAINT FOR DAMAGES AND**
    corporation,                             **INJUNCTIVE RELIEF FOR:**
16
                  Plaintiffs,                **1. FEDERAL TRADEMARK**
17                                              **INFRINGEMENT 15 U.S.C. § 1114;**
           v.                                **2. USE OF A COUNTERFEIT MARK 15**
18                                              **U.S.C. § 1117(c);**
    DEXON COMPUTER, INC., A                  **3. UNFAIR COMPETITION 15 U.S.C. §**
19  Minnesota Corporation,                     **1125(a)(1)(A);**
20                                            **4. CALIFORNIA COMMON LAW UNFAIR**
                  Defendant.                    **COMPETITION AND TRADEMARK**
21                                              **INFRINGEMENT;**
                                             **5. UNFAIR BUSINESS PRACTICES, CAL.**
22                                              **BUS. & PROF. CODE § 17200 et seq.**
23
24                                           **JURY TRIAL DEMANDED**
25
26
27
28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   Plaintiffs Cisco Systems, Inc. ("CSI") and Cisco Technology, Inc. ("CTI") (together,

2   "Cisco" or "Plaintiffs"), hereby complain and allege against Defendant Dexon Computer, Inc.

3   ("Dexon") as follows:

4   **I.    INTRODUCTION**

5   1.    This case seeks to hold Dexon accountable for the mass infringement and

6   counterfeiting, and related unfair competition arising from Dexon's sale of counterfeit, non-

7   authentic "Cisco" products.  Cisco has engaged with Dexon many times in the past years to get

8   Dexon to stop selling counterfeit Cisco products, but to no avail.

9   2.    As set forth in detail below, Cisco has uncovered a significant and willful

10  infringement scheme by Dexon, which involves the purchase and sale of counterfeit and otherwise

11  non-genuine and infringing "Cisco"-branded products, offered to the public as genuine Cisco

12  products.  Customers purchasing such products are duped into thinking they are buying genuine

13  Cisco-branded products, causing significant harm not only to the duped customer, but also to

14  Cisco, its brand, and its established reputation for producing the highest quality networking

15  communications and information technology products and services.

16  3.    Consumers rely on Cisco products to run complex, critical and highly secured

17  networks.   But counterfeit Cisco products can cause network downtime, and substantial business

18  interruption.  Cisco brings this action to protect consumers from receiving inferior counterfeit

19  products, to recover for the significant damage Dexon's unlawful and infringing conduct has

20  caused to Cisco, to put a stop to Dexon's unlawful and infringing conduct, and to enjoin further

21  unlawful and infringing conduct.

22  **II.    THE PARTIES**

23  4.    Plaintiff Cisco Systems, Inc., is, and at all times mentioned herein was, a

24  California corporation, with its principal place of business at 170 W. Tasman Drive, San Jose,

25  California 95134.  Plaintiff Cisco Technology, Inc., is, and at all times mentioned herein was, a

26  California corporation with its principal place of business at 170 W. Tasman Drive, San Jose,

27  California 95134.

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1

Case No. 3:20-cv-4926

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

5.     On information and belief, Defendant Dexon Computer, Inc., is and was at all relevant times mentioned herein a business entity incorporated in the State of Minnesota with its principal place of business in Bloomington, Minnesota.

6.     Cisco is informed and believes, and thereon alleges, that Dexon undertook obligations or rights arising out of the subject events and happenings herein referred to, engaged in actions or omissions, either intentional or negligent, regarding the subject events and happenings herein referred to, and/or benefited unjustly from the efforts, work, and goods of Cisco.

## III.     JURISDICTION AND VENUE

7.     This is an action for violations of the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq.* (the "Lanham Act").  This Court has original subject matter jurisdiction over this action pursuant to the provision of the Lanham Act, 15 U.S.C. § 1121, as well as under 28 U.S.C. §§ 1331 and 1338(a) and (b).

8.     This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367, because these claims are so related to Cisco's claims under federal law that they form part of the same case or controversy and derive from a common nucleus of operative facts.

9.     This Court has personal jurisdiction over the defendant Dexon, because Dexon has and appears to continue to transact business within the State of California; because Dexon has caused tortious injury to Plaintiffs' trademarks within the State of California; and because Dexon has systematically directed electronic activity into the State of California with the manifest intent of engaging in business within the State of California, including the purchase for sale of counterfeit Cisco products from resellers within the State of California.  Dexon maintains a website through which it solicits business throughout the United States, including within the State of California.  Cisco alleges on information and belief that at all times relevant to this Complaint, Dexon has continuously operated that website and that Dexon has purposefully maintained contacts within the State of California for the purpose of conducting business there.

10.     Dexon has committed acts, related to the causes of action asserted in this Complaint, which demonstrate that it has purposefully directed its activities towards the State of

California.  As described more fully in this Complaint, these activities include selling counterfeit products directly into the State of California.  Dexon also sold counterfeit products that it had shipped from a location within the State of California.  Plaintiffs further allege on information and belief that Dexon regularly conducts business within the State of California, including purchasing Cisco products from resellers in California, and selling products to purchasers within the state.

11.    Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Cisco's claims occurred in this judicial district.

## IV.    INTRADISTRICT ASSIGNMENT

12.    In accordance with Civil Local Rule 3-2(c), this action is properly assigned on a District-wide basis because it relates to Intellectual Property Rights.

## V.    FACTUAL ALLEGATIONS

### A.    **Cisco's Business and History**

13.    Founded in 1984, Cisco is the worldwide leader in developing, implementing, and providing the technologies behind networking, communications, and information technology products and services.  Cisco develops and provides a broad range of networking products and services that enable seamless communication among individuals, businesses, public institutions, government agencies, and service providers.  Specifically, the thousands of engineers who work at Cisco develop and provide networking and communications hardware, software, and services that utilize cutting-edge technologies to transport data, voice, and video within buildings, across cities and campuses, and around the world.

14.    Since its founding, Cisco has pioneered many of the important technologies that created and enabled global interconnectivity.  During the past three decades, Cisco has invested billions of dollars, and the time and dedication of thousands of its engineers, in the research, development, and sale of industry-leading networking and communications products and services.

15.    Cisco has also built up tremendous goodwill and brand reputation among consumers, including corporate and government consumers, through significant investment in advertising, promoting, and delivering products, software, and services of the highest quality

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**App.405**

1  under the CISCO trademark and the family of CISCO-related trademarks (collectively, the "Cisco

2  Marks"). Cisco has used the Cisco Marks to identify goods and services as being genuine and

3  authorized, and therefore, the Cisco Marks are well-recognized signifiers of Cisco's best-in-class

4  products, software, and services.

5  **B.  Cisco's Trademarks**

6  16.  CTI owns all rights, title, and interest in the Cisco Marks, many of which are

7  included on the Principal Register of the U.S. Patent and Trademark Office ("USPTO"), and it has

8  licensed the use of the Cisco Marks to CSI. The Cisco Marks are well-known. They are used in

9  connection with Cisco's networking hardware and software products and services. They include,

10  but are not limited to, the following marks that are used in interstate commerce:

| Mark | Registration Number | Registration Date |
|---|---|---|
| CISCO | 1,542,339 | June 6, 1989 |
| CISCO SYSTEMS | 1,996,957 | August 27, 1996 |
| CISCO | 2,498,746 | October 16, 2001 |
| ı|ıılı CISCO | 3,759,451 | March 9, 2010 |
| CISCO | 3,978,294 | June 14, 2011 |
| ı|ıılı CISCO | 4,263,591 | December 25, 2012 |

17.  The Cisco Marks are distinctive, having no meaning outside of their use by Cisco

in its course of business operations and in its advertising to distinguish its products and services.

Cisco uses the Cisco Marks to advertise through a wide variety of media including television,

radio, newspapers, magazines, billboards, direct mail, and web sites.

18.  Cisco has attained one of the highest levels of brand recognition among

consumers due to its extensive advertising and promotional efforts and its continuous use of its

core Cisco Marks for the past three decades. As a result of Cisco's longstanding and widespread

use and promotion of the Cisco Marks, Cisco customers around the globe have come to rely upon

the Cisco Marks to identify Cisco's high-quality hardware, software, and services. Many of

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  Cisco's products are purchased by the U.S. government, the military, hospitals, and by other

2  industries, in critical and life-essential applications.

3          19.     Cisco's customers associate Cisco's famous and well-known trademarks,

4  including, among others, CISCO and the Cisco logo, exclusively with Cisco and Cisco's products

5  and services. When customers encounter these marks and decide to purchase goods and services

6  identified by these marks, they expect to receive genuine Cisco products that have been produced

7  by Cisco.  Moreover, when customers purchase products that are advertised as "new factory

8  sealed," they reasonably believe that they are purchasing genuine products manufactured or

9  authorized by Cisco that have not been tampered with from the time the product was sealed in its

10  shipping packaging.

11      **C.**      **Counterfeit "Cisco" Products**

12          20.     Counterfeit products that bear markings similar to the Cisco Marks provide

13  customers with a false assurance that the products they have purchased (1) are reliable and

14  conform with Cisco's high standards, (2) come with applicable warranties, (3) can be placed under

15  a Cisco service support contract (i.e., SMARTnet), and (4) come with all of the necessary

16  accessories sold with the product that have been selected and approved by Cisco for use with the

17  product.

18          21.     In addition to harm to customers, the sale of counterfeit Cisco products harms

19  Cisco in many ways.  Counterfeit Cisco products which fail or degrade create the false impression

20  that Cisco products are unreliable, thereby improperly tarnishing Cisco's reputation and causing

21  Cisco to lose control of its goodwill and suffer lost sales and future business opportunities.  When

22  customers purchase Cisco-branded parts that are counterfeit and unreliable, their image of Cisco is

23  diminished and Cisco's opportunity to sell genuine, high-quality products to those customers may

24  be lost forever.  As a result of the manufacture and distribution of such counterfeit products, Cisco

25  suffers substantial and irreparable harm to its brand, image, business, and goodwill with the

26  public.  Cisco also suffers lost sales when customers purchase counterfeit products instead of

27  genuine Cisco products.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

Case No. 3:20-cv-4926

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**D.    Impact on Health, Safety, and National Security Caused by Counterfeit Cisco Products**

22.    Cisco products are part of the backbone of the United States information technology network.  Many of Cisco's products are purchased by U.S. governmental entities, the military, hospitals, and by other industries, and used in important and life-essential applications.  Critical governmental and other infrastructure is built on, and relies upon, Cisco products to maintain the security of data storage and transfer.

23.    It would be difficult to overstate the importance that the assured quality of Cisco's products has for customers who need to ensure the reliable functioning of their critical processes.  Cisco firewalls, for example, ensure the integrity of government, medical, and business data and communications.  The U.S. government recognizes the importance of installing only genuine Cisco products.  In a criminal trial involving counterfeit Cisco products sold to the U.S. Marine Corps, Staff Sargent Lee Chieffalo, USMC, testified that he specifically demanded genuine Cisco products when he ordered them, because if the networks that the "Cisco" products were in failed due to substandard counterfeit products, "Marines could die."

**E.    Dexon's History And Practice Of Trafficking In Counterfeit Cisco Products**

24.    For each of the instances where Dexon trafficked in counterfeit Cisco products that is described in this Complaint, Cisco alleges that Dexon used a Cisco Mark, which is identical to or nearly indistinguishable from the corresponding Cisco Mark that is registered with the USPTO.  In each of those instances the Cisco Mark was used on a Cisco-branded product, which was determined to be counterfeit in that the product *appears* to be a genuine product manufactured by Cisco, but in actuality was not manufactured by Cisco, or  under its authority.  For each of those instances, Dexon used the Cisco Mark in commerce without Plaintiffs' permission or authority.

25.    From at least July 2006 through the present, Dexon has repeatedly and systematically engaged in schemes to traffic counterfeit Cisco products.  In these schemes, Dexon falsely represented to the public that various Cisco-branded products it was selling are genuine, when in fact they are not.  In that approximately fifteen year period, Cisco has repeatedly informed

Case No. 3:20-cv-4926
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1    Dexon that it was selling counterfeit products, it repeatedly demanded that Dexon cease and desist

2    selling those counterfeits, and it has requested Dexon's assistance in identifying the sources for

3    those counterfeit products so that Cisco could thwart those suppliers from further damaging its

4    brand and from defrauding the public.  In almost every instance, Dexon refused to cooperate with

5    Cisco, and refused to identify the counterfeit traffickers who supply it.

6         26.     As described more fully below, Cisco asserts that Dexon's long history of

7    counterfeit trafficking, and of repeatedly denying Cisco's requests for assistance in identifying its

8    sources for counterfeit Cisco products, provide evidence that Dexon's illegal conduct was done

9    willfully, or that Dexon has been willfully blind to the fact that it has been selling counterfeit

10   Cisco products for a period that is now approaching almost two decades.

11        F.     **Activity Prior to 2016 Demonstrating Dexon's Pattern and Practice of**

12                **Knowingly Trafficking in Counterfeit Cisco Products**

13            (1)     **Dexon's July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco**

14                  **Investigator (Reston, Virginia)**

15        27.     On or about July 27, 2006, Dexon sold three counterfeit Cisco products (Product

16   identification codes ("PID"): GLC-LH-SM, WIC-1DSU-T1-V2, and NM-4T) to an investigator,

17   who was working for Cisco.  Dexon represented that these were all genuine Cisco products and

18   that they were new.  Dexon sent two of these products (PIDs: GLC-LH-SM and WIC-1DSU-T1-

19   V2) directly from its business location in Minnesota, to the investigator in Reston, Virginia.  One

20   of these parts (PID: NM-4T) was sent by Dexon from 15330 Barranca Parkway, Irvine, California.

21   These parts were inspected by a Cisco engineer who determined that they were all counterfeit.

22            (2)     **FBI's Seizure of Counterfeit Cisco Products from Dexon on February**

23                  **26, 2008**

24        28.     On February 26, 2008, the Federal Bureau of Investigation ("FBI") executed a

25   search warrant at Dexon's business location in Minnesota.  In the course of that search, the FBI

26   seized 204 Cisco-branded products that appeared suspicious.  Cisco engineers inspected a

27   sampling of these products and determined all those sampled were counterfeit.

28

### (3)  Cisco's First Cease and Desist Letter to Dexon and its CEO

29.    On March 7, 2008, in reaction to the FBI's seizure of Cisco-branded products from Dexon during execution of its search warrant, Cisco sent a letter to Steven O'Neill ("O'Neill"), Dexon's President and CEO, demanding that Dexon cease and desist selling counterfeit Cisco products.  Cisco requested that Dexon assist it in identifying its sources of counterfeit products. On March 18, 2008, Dexon responded to that letter through counsel, denying that Dexon had been involved in any illegal conduct.  Dexon declined to assist Cisco's investigation into its sources of counterfeit Cisco products.

### (4)  Dexon's June 2010 Sale of Counterfeit Cisco Products to Wayne State University (Detroit, Michigan), and Cisco's C&D Letter

30.    On or about January 21, 2010, Dexon provided Wayne State University ("WSU") with a bid to supply it with various new Cisco products.  On or about February 9, 2010, WSU issued a $180,000 purchase order to Dexon for those products.  Dexon shipped those products to WSU during, or about, June 2010.  WSU became concerned that some of those products might not be genuine and sent thirteen of them to Cisco for inspection.  On or about July 6, 2010, engineers examined those products (twelve GLC-SX-MM's and one GLC-LH-SM) and determined that all thirteen were counterfeit.

31.    On August 6, 2010, Cisco sent a letter to Dexon's CEO, O'Neill, informing him of Dexon's sale of counterfeit Cisco products to WSU and demanding that Dexon cease and desist its illegal conduct.  In that letter, Cisco demanded that Dexon preserve all evidence regarding its procurement and sale of the counterfeit Cisco products, requested that Dexon quarantine for inspection any Cisco-branded products that it procured in the same batch as the counterfeit products, and requested Dexon's assistance in tracing the counterfeit products to the source.

32.    On August 23, 2010, Dexon responded to Cisco's Cease and Desist Letter through counsel.  Dexon denied that it knowingly engaged in the sale of counterfeit products or had any liability "for trademark counterfeiting without regard to notice, knowledge, or intent[]." Dexon also demanded that Cisco "substantiate [its claims] with more specific information about the nature of the liability.…" and requested that Cisco provide it with "all information available to

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1  substantiate [its]claim that the products listed in [Cisco's] letter are in fact counterfeit."  Dexon

2  conditioned a willingness "to discuss how it might cooperate in Cisco's investigation," upon the

3  "extent that Cisco is willing to provide the [information that Dexon requested]."

4      33.     On August 30, 2010, Cisco responded to Dexon by providing it with much of the

5  requested information.  Cisco provided Dexon with general guidelines on how to avoid purchasing

6  counterfeit products, but noted that many indicia of genuine products are maintained as trade

7  secrets because of the need to avoid educating counterfeiters.  Cisco provided Dexon with legal

8  authority to address its contention that it could not be liable for trademark counterfeiting.  Cisco

9  noted Dexon's previous refusals to identify its source for counterfeit products, and renewed its

10  request for Dexon's assistance.  Nonetheless, Dexon refused to provide Cisco with any assistance

11  in identifying the sources of these counterfeit products.

12      **(5)     Dexon's July 2010 Sale of Counterfeit Cisco Products To A Cisco
13              Investigator (Los Angeles, California)**

14      34.     On or about July 14, 2010, Dexon sold seven Cisco-branded products to an

15  investigator in Los Angeles, CA, who was working for Cisco.  Dexon represented that these were

16  genuine Cisco products and that they were all new.  On July 21, 2010, Dexon shipped these

17  products to the investigator at an address in Los Angeles, CA.  On August 9, 2010, engineers

18  completed their examination of these parts and determined that all seven were counterfeit (one

19  WS-C2960-24TC-L, four GLC-SX-MM, and two GLC-LH-SM's).

20      **G.     Dexon's Illegal Conduct Giving Rise to Its Present Liabilities**

21      35.     Dexon has continued to engage in a scheme to sell counterfeit Cisco products, and

22  to protect its suppliers of counterfeit products by concealing their identities.  On every occasion

23  when Cisco requested Dexon's assistance in providing information about people and entities who

24  supplied Dexon with counterfeit or illegally acquired Cisco products, Dexon's response would be

25  the same: Dexon would deny any wrong-doing, it would claim to be committed to maintaining the

26  integrity of the marketplace, and then it would paradoxically refuse to assist Cisco's investigations

27  into illegal conduct.

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**(1)     Dexon's Sale of Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri), and Cisco's C&D Letter**

36.     On or about December 29, 2016, Dexon sold a large quantity of Cisco transceivers to Jack Henry & Associates, Inc. ("Jack Henry") in Monett, Missouri.  In May 2017, a Cisco engineer examined three of them (a GLC-TE, a SFP-10G-LR, and a SFP-10G-SR) and determined that they were counterfeit.

37.     On June 26, 2017, Cisco sent a Cease and Desist Letter to Dexon, through its counsel.  That letter identified the counterfeit Cisco-branded transceivers that Dexon sold to Jack Henry, as well as other activities by Dexon that infringed upon Cisco's trademarks, and misleading statements that Dexon made in advertising regarding the Cisco-branded products it was selling.

38.     On July 31, 2017, Dexon responded to Cisco's June letter, largely by objecting to Cisco's claims.  It provided a list of conditions that Cisco would need to satisfy before Dexon would assist Cisco's investigation into the source of counterfeits.

**(2)     Dexon's October 2017 Sale of Counterfeit Cisco Products To A Cisco Investigator**

39.     On or about October 13, 2017, an investigator working for Cisco conducted a test purchase of the following Cisco-branded products from Dexon: a WS-C3560X-24T-E, a GLC-SX-MMD, a GLC-LH-SMD, a SFP-10G-SR, and a SFP-10G-LR.  Two of these products (the SFP-10G-SR and SFP-10G-LR) were the same model of transceivers that Cisco addressed with Dexon a few months earlier, in June 2017.  Dexon shipped those products from its business location in Minnesota to an address in Berkeley, California.  A Cisco engineer inspected each of these products and determined that they were all counterfeit.

**(3)     Dexon's April 2018 Sale of Counterfeit Cisco Products to Tucson Medical Center (Arizona)**

40.     On or about April 16, 2018, Dexon sold 20 Cisco transceivers (SFP-10G-LR) to Tucson Medical Center ("TMC") in Arizona.  These transceivers were identical to one of the models of counterfeit transceivers that Dexon had sold to Jack Henry, and that Cisco had

**App.412**

specifically addressed with Dexon's counsel in the June 2017 Cease and Desist Letter.  During June 2018, TMC sought technical assistance from Cisco to correct malfunctions with three of these transceivers.  Cisco inspected each of these three malfunctioning products and determined that they were all counterfeit.

### (4) Dexon's April 2018 Sale of Counterfeit Cisco Products to DARCARS (Maryland), and Cisco's C&D Letter

41.     On or about April 16, 2018, Dexon sold two WS-C3650-48PS-E switches, among other products, to DARCARS, a business located in Silver Spring, Maryland.  On or about May 12, 2020 DARCARS contacted Cisco for assistance because those switches were malfunctioning.  After evaluating these two switches, Cisco determined they are counterfeit.

42.     On May 13, 2020, counsel for Cisco contacted counsel for Dexon, and requested Dexon's cooperation to disclose the source of the counterfeit switches that Dexon sold to DARCARS, and to quarantine any other Cisco products from the same source.  Once again, Dexon would not provide any information about the source of the counterfeit Cisco products.

### (5) Dexon's August 2018 Sale of Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)

43.     On or about August 22, 2018, Dexon sold various Cisco-branded products to Lockridge, Grindal, Nauen, PLLP, a law firm in Minneapolis, Minnesota ("LGN").  During or about January 2019, LGN sought technical assistance from Cisco because four of the six Cisco WS-C2960X-48FPS-L switches that LGN had purchased from Dexon were malfunctioning.  Cisco inspected those four switches and determined that they are all counterfeit.

### (6) Dexon's Purchases in 2018 of Counterfeit Switches from PureFutureTech (Fremont, California)

44.     In 2018, Dexon purchased "Cisco" switches from PureFutureTech, a company in Fremont, California.  PureFutureTech purchased many "Cisco" products from Chinese sources, including a company called HongKong Sellsi.  Based upon information and belief, Cisco alleges that HongKong Sellsi sold predominately counterfeit Cisco products.  Cisco has analyzed many switches sold by HongKong Sellsi, and they have been predominantly counterfeit.  In 2019, Cisco

LAW OFFICES

SIDEMAN & BANCROFT LLP

ONE EMBARCADERO CENTER, 22ⁿᴰ FLOOR

SAN FRANCISCO, CALIFORNIA 94111-3711

LAW OFFICES

SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ⁿᵈ FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   filed a civil complaint against HongKong Sellsi in the Northern District of California, alleging that
2   HongKong Sellsi sold counterfeit Cisco products.  HongKong Sellsi did not respond, and the
3   Court entered default against it.

4   45.    Cisco sought Dexon's cooperation to locate the HongKong Sellsi switches that
5   Dexon had purchased from PureFutureTech, but Dexon refused to cooperate.  Cisco filed a motion
6   in federal court in Minnesota to compel Dexon to comply with a subpoena, and the court ordered
7   Dexon to disclose the customers to which it sold the HongKong Sellsi switches.  Dexon identified
8   two companies—one in Texas and one in Ohio.  Cisco contacted both of those companies and
9   analyzed the switches that Dexon sold to them.  Every one of the five switches that Dexon sold to
10  those companies was counterfeit.

11  46.    Dexon purchased many more products from PureFutureTech from 2017 to 2019.
12  Most of the products were "Cisco" transceivers.  Dexon placed the orders with PureFutureTech in
13  Fremont, California, and received shipments of these "Cisco" products from Fremont, California.
14  A former employee of the organization that controls PureFutureTech has testified under oath that
15  the organization sold counterfeit Cisco transceivers.  Supporting this former employee's belief that
16  PureFutureTech regularly sold counterfeit Cisco products were the facts that: the products were
17  imported from China to a receiving location in Nevada, and her personally having observed other
18  employees place counterfeit Cisco labels on the products in Fremont before selling them.  The
19  receiving location in Nevada makes no logistical sense, other than an attempt to obfuscate based
20  on the fact that U.S. Customs and Border Patrol had earlier seized shipment of counterfeit Cisco
21  products going to the Fremont address.  Cisco has analyzed dozens of transceivers sold by the
22  organization that controls PureFutureTech, and determined that they are counterfeit.  On
23  information and belief, Cisco alleges that the "Cisco" products purchased by Dexon from
24  PureFutureTech in Fremont are counterfeit.

25
26
27
28

**(7)     Dexon's Sales of Counterfeit Cisco Products to Murray State University (Murray, Kentucky) in 2018 and 2019, and Cisco's C&D Letter**

47.     On or about April 17, 2018, Dexon sold a Cisco WS-C2960X-48FPD-L switch to Murray State University in Murray, Kentucky ("Murray State").  On or about June 6, 2018, Dexon sold Murray State a Cisco WS-C2960X-48LPD-L switch.  On or about September 10, 2019, Dexon sold Murray State another Cisco WS-C2960X-48FPD-L switch.  Each of these Cisco-branded switches began malfunctioning, causing Murray State to seek technical assistance from Cisco.  After evaluating these three switches, Cisco determined that they were all counterfeit.

48.     On April 7, 2020, Cisco sent a Cease and Desist Letter to Dexon, through its counsel.  That letter identified the counterfeit Cisco switches that Dexon sold to Murray State, demanded that Dexon preserve all evidence related to its purchase of those counterfeit products, and requested Dexon's assistance in identifying others who traffic in counterfeit Cisco products.  Once again, Dexon refused to provide any information about the source of the counterfeit Cisco product.

**(8)     Dexon's July 2019 Sale of Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

49.     In or about July 2019, Dexon sold ten Cisco GLC-TE transceivers to MedRisk Inc, a healthcare organization located in King of Prussia, Pennsylvania ("MedRisk").  Eight of these products began malfunctioning, shortly after MedRisk received them from Dexon.  MedRisk sought technical assistance from Cisco.  After evaluating these eight transceivers, Cisco determined that all of them are counterfeit.

**(9)     Dexon's September 2019 Sale of Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas), and Cisco's C&D Letter**

50.     On or about September 30, 2019, Dexon sold six QSFP-40G-ER4 transceivers to Coppell Independent School District ("Coppell ISD").  These transceivers are extremely sophisticated, with a Global List Price of $37,495 each.  Dexon sold them for a remarkably low price of $2,645 each.

51.   On October 4, 2019, Coppell ISD contacted Cisco's Technical Assistance Center ("TAC") because the transceivers were not functioning.  The TAC agent obtained information about three of the transceivers, and ultimately a Cisco engineer determined that the transceivers are counterfeit.

52.   On April 13, 2020, Cisco sent a Cease and Desist Letter to Dexon, through its counsel.  That letter identified the counterfeit Cisco transceivers that Dexon sold to Coppell ISD, demanded that Dexon preserve all evidence related to its purchase of those counterfeit products, and requested Dexon's assistance in identifying others who traffic in counterfeit Cisco products.  Once again, Dexon refused to provide any information.

**(10)   Dexon's June 2020 Sale of Counterfeit Cisco Products to a Cisco Investigator**

53.   On or about June 4, 2020, an investigator working for Cisco conducted a test purchase of Cisco-branded products from Dexon, which were offered by Dexon as "new" products.  A Cisco engineer inspected these products and determined that three of them, one C3850-NM-4-10G switch and two SFP-10G-SR transceivers, were counterfeit.

**DEXON'S WILLFULNESS**

54.   Cisco asserts on information and belief that at the time of each sale noted herein, Dexon was on notice that it was selling counterfeit Cisco products.  Cisco asserts on information and belief that Dexon's continued sales of counterfeit Cisco products resulted from its willful selling of counterfeit Cisco products, or that it is the result of Dexon's willful blindness to the fact that it was selling counterfeit Cisco products.

**FIRST CLAIM FOR RELIEF**
**Federal Trademark Infringement**
**(15 U.S.C. § 1114)**

55.   Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

56.   The Cisco Marks and the goodwill of the business associated with them are tremendously valuable in the United States and worldwide because they are distinctive and

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ⁿᵈ FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1   universally associated in the public perception with the highest quality network and
2   communications technology products and services.

3         57.    Dexon has sold, offered to sell, distributed, and advertised infringing products
4   bearing Cisco Marks ("Infringing Products").

5         58.    The differences between Dexon's Infringing Products and genuine Cisco goods are
6   material.  Cisco asserts on information and belief that having all original Cisco components and
7   entitlement to warranty services are relevant to customers' decisions about whether, and from
8   whom, to purchase Cisco products.

9         59.    Dexon's actions have caused confusion, mistake, and deception as to the origin and
10   quality of Dexon's Infringing Products because they are intentionally calculated to mislead the
11   general purchasing public into believing that Dexon's Infringing Products originated from, are
12   associated with, or are otherwise authorized by Cisco, when in fact they are not.

13         60.    Upon information and belief, Dexon's infringing actions were committed
14   fraudulently, willfully, and in bad faith, with knowledge of Cisco's exclusive rights to, and
15   goodwill in, the Cisco Marks, or with willful blindness to the same, and with the intent to cause
16   confusion, to cause mistake, and/or to deceive.

17         61.    Dexon's unauthorized use of the Cisco Marks constitutes trademark infringement
18   of the federally registered Cisco Marks and has caused substantial damage to Cisco and to the
19   reputation and goodwill symbolized by the Cisco Marks in violation of Section 32 of the Lanham
20   Act, 15 U.S.C. § 1114, in an amount to be proven at trial.

21         62.    Dexon's conduct described above, including the unauthorized use of the Cisco
22   Marks in interstate commerce, has directly and proximately caused substantial, irreparable injury
23   to Cisco and to the business and goodwill represented by the Cisco Marks, which leaves Cisco
24   without an adequate remedy at law.

25   / / /
26   / / /
27   / / /
28   / / /

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**SECOND CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
**(15 U.S.C. § 1114)**

63.    Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

64.    The Cisco Marks are valid, protectable trademarks that have been registered as marks on the principal register in the USPTO.  Cisco is the owner and registrant of the Cisco Marks.

65.    As described in more detail above, Dexon has used and counterfeited the Cisco Marks in connection with the marketing, promotion, and sale of their goods and services without Cisco's consent, in a manner that is likely to cause, and has actually caused, confusion and/or mistake, or that has deceived members of the consuming public and/or the trade.  Indeed, Dexon's counterfeiting and infringing activities are likely to cause and are actually causing confusion, mistake, and deception among members of the trade and the general consuming public as to the origin, sponsorship, and quality of Dexon's infringing products, counterfeit packaging, inferior warranty, and other related commercial activities.  As of the filing of this Complaint, Dexon is continuing to infringe the Cisco Marks unabated as alleged above.

66.    Dexon has publicly advertised, sold, offered to sell, and distributed counterfeit Cisco products in interstate commerce in direct competition with Cisco and without authorization or consent to use the Cisco Marks but with full knowledge of Cisco's notorious prior rights in those marks.

67.    Dexon's counterfeit Cisco products reproduce, counterfeit, copy, and colorably imitate the Cisco Marks or display a spurious designation that is identical with, or substantially indistinguishable from, the Cisco Marks.  Dexon has applied their reproductions, counterfeits, copies, and colorable imitations of the Cisco Marks to labels, prints, and packages intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

1    advertising of Dexon's counterfeit products, which is likely to cause confusion, to cause mistake,
2    or to deceive.

3        68.    Dexon's unauthorized use of the Cisco Marks on or in connection with Dexon's
4    counterfeit products was conducted intentionally and with notice and full knowledge that the use
5    was unauthorized by Cisco.    Accordingly, Dexon's actions constitute willful trademark
6    infringement and counterfeiting of the Cisco Marks in violation of 15 U.S.C. §§ 1114 and 1117.

7        69.    Cisco has been, and continues to be, damaged by Dexon's infringement, including
8    by suffering irreparable harm through the diminution of trust and goodwill among Cisco
9    consumers and members of the general consuming public and the trade.  Cisco is entitled to an
10    injunction against Dexon, and an order of destruction of all infringing products, as well as all
11    monetary relief and other remedies available under the Lanham Act, including but not limited to
12    trebled damages and/or actual profits, reasonable attorneys' fees, costs and prejudgment interest,
13    and/or statutory damages.

**THIRD CLAIM FOR RELIEF**
**False Designation of Origin**
**(15 U.S.C. § 1125)**

17        70.    Cisco incorporates by reference each of the allegations in the preceding paragraphs
18    of this Complaint as though fully set forth here.

19        71.    Dexon resells the Infringing Products that are designed to appear identical to
20    genuine Cisco products and thereby employ the same nature, style, look, and color as genuine
21    Cisco products.  Moreover, as alleged above, Dexon sold products that had affixed counterfeit or
22    infringing versions or reproductions of the Cisco Marks to unauthorized products and/or to the
23    packaging, wrapping, etc., in which the Infringing Products are packaged.  This unauthorized use
24    of the Cisco Marks was likely to cause confusion, to deceive, and to mislead the consuming public
25    into believing that there was some affiliation, connection, or association between Dexon and Cisco
26    and was likely to cause confusion, mistake, or deception as to the origin, source, sponsorship,
27    authorization, approval, or affiliation of Dexon's Infringing Products.

28

LAW OFFICES
SIDEMAN & BANCROFT LLP
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

72. Dexon's actions, including the unauthorized use of the Cisco Marks in commerce, constitute false designation of origin, false or misleading descriptions of fact, and false or misleading representations of fact, which have caused confusion, mistake, and deception, as to Dexon's association or affiliation with Cisco, as well as to the origin, source, and sponsorship of Dexon's Infringing Products, in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

73. Dexon's unauthorized and misleading use of the Cisco Marks constitutes willful infringement of the Cisco Marks in violation of 15 U.S.C. § 1114(1)(b) and entitling Cisco to treble damages and/or enhanced statutory damages under 15 U.S.C. §§ 1117(b) and (c).

74. Dexon's conduct has directly and proximately caused Cisco to suffer damage in an amount to be proven at trial.

75. Dexon's actions described above, including its unauthorized and misleading use of the Cisco Marks in commerce have caused substantial and irreparable injury to Cisco and to the business and goodwill represented by the Cisco Marks, thereby leaving Cisco without an adequate remedy at law.

**FOURTH CLAIM FOR RELIEF**
**California Unfair Competition**
**(Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

76. Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

77. California Business and Professions Code §§ 17200 *et seq.* prohibits acts of unfair competition, which includes any unlawful business act or practice.

78. Dexon has knowingly, willfully, and unlawfully infringed the Cisco Marks, including through the sale of infringing Cisco networking hardware products in violation of the Lanham Act, 15 U.S.C. § 1114.

79. As a direct, proximate, and foreseeable result of Dexon's sale of infringing Cisco networking hardware parts, Cisco has further been deprived of lost revenue and payments, and has therefore sustained injury in fact.

80.    Dexon's practices were unlawful, and constitute unfair competition as defined by Cal. Bus. & Prof. C. §§ 17200 *et seq.*  Dexon's misconduct was unlawful because, as described herein, its misconduct constitutes violations of numerous state and federal statutes, including but not limited to Cal. Civ. Code § 1797.81, conversion, state false advertising laws such as Cal. Bus. Prof. Code § 17500, as well as the Lanham Act, 15 U.S.C. §§ 1114 and 1125, and the Federal Trade Commission Act, 15 U.S.C. § 45.  Further, their alleged conduct was unfair in that Dexon's actions, as described herein, significantly threatened and/or harmed competition through infringement, counterfeiting, and false advertising.

81.    As a direct and proximate result of Dexon's unlawful and unfair business practices, Cisco has lost money and property, and has suffered irreparable injury to its brand, business reputation, and goodwill.  As such, Cisco's remedy at law is not adequate to compensate for the injuries inflicted by Dexon.  Accordingly, Cisco is entitled to temporary, preliminary, and permanent injunctive relief against Dexon, in addition to restitution in an amount to be proven at trial.

**FIFTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

82.    Cisco incorporates by reference each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

83.    Dexon unjustly received benefits at the expense of Cisco through its wrongful conduct, as alleged further above. Dexon continues to unjustly retain these benefits at the expense of Cisco.  The unjust receipt of the benefits obtained by Dexon lacks any adequate legal basis and thus cannot conscientiously be retained by Dexon.  Therefore, the circumstances of the receipt and retention of such benefits are such that, as between Cisco and Dexon, it is unjust for Dexon to retain any such benefits.

84.    Cisco is therefore entitled to full restitution of all amounts and/or other benefits in which Dexon has been unjustly enriched at Cisco's expense, in an amount to be proven at trial.

**PRAYER FOR RELIEF**

1. WHEREFORE Cisco respectfully prays for the following relief:

2. A. For entry of judgment in favor of Cisco and against Dexon on each of Cisco's claims for relief alleged in this Complaint;

3. B. For a preliminary and permanent injunction restraining Dexon; their officers, agents, servants, employees, attorneys, and affiliated companies; assigns and successors in interest; and those persons in active concert or participation with them, from:

4. (i) importing, exporting, assisting in the importation or exportation, manufacturing, procuring, distributing, shipping, retailing, selling, offering for sale, marketing, advertising, or trafficking in any products not authorized by Cisco and bearing unauthorized simulations, reproductions, counterfeits, copies, or colorable imitations of the Cisco Marks which are likely to cause confusion, or bearing a design that is of a substantially similar appearance to the Cisco Marks listed in this Complaint;

5. (ii) From passing off, inducing, or enabling others to sell or pass off as authentic products produced by Cisco or otherwise authorized by Cisco, any product not manufactured by Cisco or produced under the control or supervision of Cisco and approved by Cisco, which uses any of the Cisco Marks listed in this Complaint; and

6. (iii) From committing any act calculated to cause purchasers to believe that products from Dexon are those sold under the control and supervision of Cisco, or are sponsored, approved, or guaranteed by Cisco, or are connected with and produced under the control or supervision of Cisco;

7. C. For a determination that Dexon's acts of trademark infringement constitute cases of willful and exceptional infringement;

8. D. For actual damages as a result of Dexon's unlawful conduct, alleged above, as well as any profits that are attributable to the alleged conduct and are not taken into account in computing Cisco's actual damages;

9. E. For maximum statutory damages available under the law to the extent Cisco elects statutory damages for any claim for relief;

20

**App.422**

1    F.    For punitive damages to the fullest extent available under the law;

2    G.    For reasonable attorneys' fees to the fullest extent available under the law;

3    H.    For treble and/or enhanced damages to the fullest extent available under the law;

4    I.    For full restitution, including restoration of all property unlawfully taken from

5    Cisco, as well as any ill-gotten gains from the unauthorized resale of Cisco's property;

6    J.    For prejudgment interest and the costs of prosecuting these claims to the fullest

7    extent available under the law;

8    K.    For any additional injunctive, specific performance, and/or other provisional

9    remedies, as appropriate; and,

10    L.    For such other and further relief as the Court deems just and proper.

11

12    DATED: July 22, 2020                    Respectfully submitted,

13                                            SIDEMAN & BANCROFT LLP

14                                            By:  */s/ Richard J. Nelson*

15                                                  Richard J. Nelson
                                                    Attorneys for Plaintiffs
16                                                  Cisco Systems, Inc. and Cisco Technology, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

SIDEMAN & BANCROFT LLP
LAW OFFICES
ONE EMBARCADERO CENTER, 22ND FLOOR
SAN FRANCISCO, CALIFORNIA 94111-3711

**App.423**

**JURY DEMAND**

Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. Proc. 38, Plaintiffs Cisco Systems, Inc. and Cisco Technology, Inc.  hereby demand a trial by a jury on all issues herein so triable.

DATED: July 22, 2020                    SIDEMAN & BANCROFT LLP

By:    /s/ *Richard J. Nelson*
Richard J. Nelson
Attorneys for Plaintiffs
Cisco Systems, Inc. and Cisco Technology, Inc.

2835-75\4390521

**App.424**

# Exhibit B

1   Amanda R. Washton (SBN 88324)          David H. Reichenberg (*pro hac vice*)
    a.washton@conklelaw.com                **COZEN O'CONNOR**
2   **CONKLE, KREMER & ENGEL, PLC**        3 WTC, 175 Greenwich Street, 56th Floor
    3130 Wilshire Boulevard                New York, New York 10006
3   Suite 500                              T: (212) 883-4900
    Santa Monica, CA 90403                 F: (646) 461-2091
4   Tel: (310) 998-9100                    dreichenberg@cozen.com

5   Michael M. Lafeber (*pro hac vice*)    Mark A. Jacobson (*pro hac vice*)
    mlafeber@taftlaw.com                   **COZEN O'CONNOR**
6   O. Joseph Balthazor Jr. (*pro hac vice*)  33 South 6th Street
    jbalthazor@taftlaw.com                 Suite 3800
7   **TAFT STETTINIUS & HOLLISTER LLP**    Minneapolis, MN 55402
    2200 IDS Center                        T: (612) 260-9000
8   80 S. 8th St.                          F: (612) 260-8026
    Minneapolis, MN 55402                  mjacobson@cozen.com
9   Tel: 612.977.8400
    Fax: 612.977.8650
10                                         Attorneys for Defendant, Counterclaim
                                           Plaintiff and Third Party Plaintiff
11                                         Dexon Computer, Inc.

12

13

14                      UNITED STATES DISTRICT COURT

15                    NORTHERN DISTRICT OF CALIFORNIA

16                                         CASE NO: 3:20-cv-04926-CRB

17  CISCO SYSTEMS, INC., a Delaware
    corporation, and CISCO TECHNOLOGY,
18  INC., a California corporation,

19          Plaintiffs and Counterclaim    **COUNTERCLAIM PLAINTIFF DEXON
            Defendants                     COMPUTER, INC.'S OPPOSITION TO
20                                         COUNTERCLAIM DEFENDANTS CISCO
            v.                             SYSTEMS, INC. AND CISCO
21                                         TECHNOLOGY, INC.'S MOTION TO
    DEXON COMPUTER, INC.,                  DISMISS**
22
            Defendant, Counterclaim
23          Plaintiff and Third Party
            Plaintiff
24
    v.
25
    ATLANTIX GLOBAL SYSTEMS
26  INTERNATIONAL, LLC, BIZCOM
    ELECTRONICS, INC., DIGI DEVICES
27  ONLINE, ENTERPRISE BUSINESS
    TECHNOLOGIES, INC., FIBER CABLE
28

---

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS
CASE NO. 3:20-CV-04926-CRB**

1   CONNECTIONS, MJSI, MULTIMODE
    TECHNOLOGIES, LLC, NETWORK
2   REPUBLIC, OPTIMUM DATA, INC.,
    PARAGON, PURE FUTURE
3   TECHNOLOGY, INC., SEASTAR IT
    TRADING LLC, SERVER TECH
4   SUPPLY, SOFTNETWORKS, INC.,
    STRADA NETWORKS, LLC,
5   TEKSAVERS, UNLIMITED NETWORK
    SOLUTIONS, and WISECOM
6   TECHNOLOGIES,

7               Third Party Defendants

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**CASE NO. 3:20-CV-04926-CRB**

**App.427**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................................- 7 -
      A.    Dexon's Antitrust Claims ..........................................................- 7 -
      B.    Dexon's UCL, Lanham Act, Tort and Declaratory Judgment Claims ................- 9 -
II.   BACKGROUND ...............................................................................- 11 -
III.  LEGAL STANDARD ........................................................................- 13 -
IV.   ARGUMENT ..................................................................................- 13 -
      A.    Dexon States A Per Se Tying Claim ..............................................- 13 -
      B.    Dexon Also States A Cartwright Act Claim ......................................- 17 -
      C.    Dexon States A Monopolization Claim ...........................................- 17 -
      D.    Dexon Sustained An Antitrust Injury ............................................- 21 -
      E.    Dexon Also States An Antitrust-Based UCL Claim ............................- 23 -
      F.    Cisco's Challenges to Dexon's UCL/Lanham Act Claims Lack Merit ............- 23 -
            1.    Cisco's Standing Argument Rejected – Direct Reliance Not
                  Required ......................................................................- 23 -
            2.    Dexon's Claims Pled With Requisite Specificity ...................- 25 -
                  a.    Cisco's Deceptive "Used Equipment" Label ............................- 25 -
                  b.    "First Sale Doctrine" - Cisco's Reliance on Unenforceable
                        EULA's ..............................................................- 25 -
                  c.    Dexon's Proper UCL Restitution Claims.................................- 26 -
      G.    N.Y Gen Bus. Law § 369-b Provides a Private Cause of Action.....................- 27 -
      H.    Justiciable Controversy Exists for Dexon's Sales of Genuine Cisco
            Products...........................................................................- 29 -
      I.    Dexon Properly Pled Tortious Interference and Defamation Claims ..............- 30 -
V.    CONCLUSION ................................................................................- 31 -

-3-
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

**App.428**

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.,*
    836 F.3d 1171 (9th Cir. 2016)........................................................................ 16

*Allergan USA Inc. v. Imprimis Pharms. Inc.,*
    2017 WL 10526121 (C.D. Cal. Nov. 14, 2017)............................................ 24

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)...................................................................................... 13

*Atlantic Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)...................................................................................... 21

*Bel Canto Design, Ltd. v. MSS Hifi, Inc.,*
    837 F. Supp. 2d 208 (S.D.N.Y. 2011)................................................... 10, 28

*Brantley v. NBC Universal, Inc.,*
    675 F.3d 1192 (9th Cir. 2012)...................................................................... 14

*Cel-Tech Communications Inc. v. Los Angeles Cellular Telephone Co.,*
    20 Cal. 4th 163 (1999) ................................................................................. 23

*Cisco Systems, Inc. et al v. Dexon Computer, Inc.,*
    3:11-cv-01455-WHA (N.D. Cal.) ................................................................ 30

*Cisco Systems, Inc. v. Beccela's Etc., LLC,*
    403 F. Supp. 3d 813 (N.D. Cal. 2019) ................................................ *passim*

*Cisco Systems Inc. v. Link US, LLC,*
    2019 WL 6682838 (N.D. Cal. Dec. 6, 2019) ...................................... *passim*

*City of Anaheim v. S. California Edison Co.,*
    955 F.2d 1373 (9th Cir. 1992)................................................................. 9, 19

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.,*
    611 F.3d 495 (9th Cir. 2010)........................................................................ 13

*Coheso, Inc. v. Can't Live Without It, LLC,*
    2017 WL 10434396 (N.D. Cal. Dec. 18, 2017) .......................................... 29

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
    370 U.S. 690 (1962).................................................................................. 9, 19

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*
    433 U.S. 36, 52 n.19 (1977) ........................................................................ 20

1

2

**TABLE OF AUTHORITIES**
**(con't)**

3

                                                                                                    **Page(s)**

*Davidowitz v. Delta Dental Plan of California, Inc.*,

4     946 F.2d 1476 (9th Cir. 1991) ........................................................................ 20

5     *Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
      504 U.S. 451 (1992) ................................................................................ *passim*

6
      *FTC v. Qualcomm*
7     969 F.3d 974, 994 (9th Cir. 2020) ................................................................. 20

8     *Graphic Prods. Distribs. v. ITEK Corp.*,
      717 F.2d 1560 (11th Cir. 1983) ...................................................................... 20
9
      *Image Technical Services Inc. v. Eastman Kodak Co.*,
10    125 F.3d 1195 (9th Cir. 1997) ........................................................................ 17

11    *Jackson v. Bank of Am.*
12    971 N.Y.S.2d 800, 819 (Sup. Ct. 2013) ......................................................... 28

13    *Korea Supply Co. v. Lockheed Martin Corp.*,
      63 P.3d 937 (Cal. 2003) ................................................................................. 27
14
      *L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*,
15    114 F. Supp. 3d 852 (N.D. Cal. 2015) ........................................................... 24

16    *Lona's Lil Eats, LLC v. DoorDash, Inc.*,
17    2021 WL 151978 (N.D. Cal January 18, 2021) ......................................... 10, 24

18    *Matoff v. Brinker Rest. Corp.*,
      439 F. Supp. 2d 1035 (C.D. Cal. 2006) .......................................................... 27
19
      *Moore v. Matthews & Co.*,
20    550 F.2d 1207 (9th Cir. 1977) ........................................................................ 13

21    *Mozart Co. v. Mercedes Benz of N.A., Inc*
22    833 F.2d 1342, 1348-50 (9th Cir. 1987) ......................................................... 21

23    *Newcal Indus., Inc. v. Ikon Office Sol.*,
      513 F.3d 1038 (9th Cir. 2008) ........................................................................ 14
24
      *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
25    507 F.3d 117, 125 (2d Cir. 2007) ................................................................... 21

26    *Pulaski & Middleman, LLC v. Google, Inc.*,
      802 F.3d 979 (9th Cir. 2015) .......................................................................... 23
27
      *San Diego Cty. Credit Union v. Citizens Equity First Credit Union*,
28    344 F. Supp. 3d 1147 (S.D. Cal. 2018) ........................................................... 29

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
Case No. 3:20-CV-04926-CRB

**TABLE OF AUTHORITIES**
**(con't)**

**Page(s)**

*Sec. Pac. Nat. Tr. Co. v. Cuevas*,
    675 N.Y.S.2d 500 (Civ. Ct. 1998) ........................................................................ 28

*Sheehy v. Big Flats Community Day*,
    541 N.E.2d 18 (1989) ............................................................................................ 28

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc*
    88 F.3d 780, 786 (9th Cir. 1996)............................................................................ 20

*SPS Techs., LLC v. Briles Aero., Inc.*,
    2019 WL 6841992 (C.D. Cal. Oct. 30, 2019) ....................................................... 24

*Twitter, Inc. v. VoIP-Pal.com, Inc.*,
    2020 WL 7342733 (N.D. Cal. Dec. 14, 2020) ....................................................... 30

*VP Racing Fuels, Inc. v. General Petroleum Corp.*,
    2010 WL 1611398 (E.D. Cal. 2010) ...................................................................... 24

*Worldhomecenter.com, Inc. v. KWC America, Inc.*,
    2011 WL 4352390 (S.D.N.Y. Sept. 15, 2011)........................................... 10, 27, 28

-6-
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

**App.431**

# I.
## INTRODUCTION AND SUMMARY OF ARGUMENT

**A.    Dexon's Antitrust Claims**

Cisco forces its customers to buy overpriced networking equipment they do not want by using its monopoly power in the aftermarkets for service and maintenance and foreclosing its network equipment competitors in the process.  Cisco does not dispute that (i) it is a monopolist in the relevant markets for Ethernet Switches and Routers (Dexon's Counterclaims, ECF No. 50 (hereinafter "CC"), ¶¶ 22-35) (ii) it is a monopolist in the relevant aftermarkets for service and maintenance on those products (*id.* ¶¶ 16-21), (iii) the relevant aftermarkets for service and maintenance are separate from the relevant equipment markets (*id.* ¶¶ 20-21), and (iv) it forced customers to buy overpriced Ethernet Switches and routers by belatedly claiming that to receive the service and maintenance customers were previously promised and had already purchased, customers were required to buy new Cisco equipment (*id.* ¶¶ 36-45). Cisco primarily argues that Dexon does not plead that Cisco's equipment competitors were harmed (Cisco's Motion to Dismiss, ECF No. 72 (hereinafter "Motion"), at 1), but that is precisely what is alleged:

> Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather need to account for the likely reaction of Cisco. Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers need to take account of what treatment it will face if it draws Cisco's disapproval. In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

> The inevitable effect of this course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives. While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases. As the [previously alleged] examples make clear, many customers are left with no practical choice other than to purchase equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

- 7 -
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1
2
3

> Throughout the time Cisco engaged in this anticompetitive conduct, [Cisco] had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Product Markets and continuing to maintain supra-competitive prices and exclude its competitors.

4 CC ¶¶ 55, 57, 79; *see also* CC ¶¶ 67, 73, 89.  Cisco does not cite, let alone address these allegations
5 which spell out how smaller competitors are foreclosed when customers are forced to buy from a
6 monopolist.

7      Cisco next argues that Dexon did not sustain an antitrust injury (Motion at 15-16), but
8 ignores that the overall purpose and effect of Cisco's scheme was to prevent resellers like Dexon
9 from offering best competitive options to its customers, including from Cisco's smaller
10 competitors.  Cisco's anticompetitive and coercive conduct steered sales to Cisco and away from
11 Cisco's competitors and also injured Dexon because customers were forced to forego new
12 purchases from Dexon as a result of Cisco's threats not to service previously installed network
13 equipment.

14      Cisco then addresses a purported "opaque refusal to deal claim," (Motion at 12) but that
15 mischaracterizes Dexon's claims.  Through the above coercion scheme, Cisco has engaged in a *per*
16 *se* violation of Section 1 of the Sherman Act and it has unlawfully maintained its network
17 equipment monopolies in violation of Section 2 of the Sherman Act. As part of that same coercion
18 scheme, Cisco also (i) engaged in bullying tactics with customers not to use resellers like Dexon
19 even though customers' needs were being met, (ii) pressured at least one value added reseller
20 (VAR) not to sell to Dexon despite the VAR's desire to do so, and (iii) intentionally sustained
21 losses to networking equipment competitors in order to drive price-cutting resellers like Dexon out
22 of the market. CC ¶¶ 43-45, 49-53. While the third of these acts includes Cisco's reversal of its
23 decision to work with Dexon and subsequent "refusal" to provide Dexon access to a database, the
24 gravamen of the Section 2 claim is that all of these acts are part of Cisco's coordinated plan to
25 maintain its equipment monopolies in the long run. The Supreme Court and Ninth Circuit have
26 made clear an anticompetitive scheme is not judged by "tightly compartmentalizing the various
27 factual components and wiping the slate clean after scrutiny of each," but rather where acts have a

28

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

**App.433**

1    combined "synergistic effect" on competition, as here, they are properly encompassed by the claim.

2    *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *City of*

3    *Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). Where one of the

4    improper acts is a *per se* antitrust violation and the others supplement a long term plan to maintain

5    supracompetitive pricing, they are all properly the subject of a Section 2 claim.

6        The balance of Cisco's antitrust arguments make improper assertions about the merits of

7    the claims without the benefit of discovery. For instance, Cisco asserts that it "has every incentive

8    to design a distribution system that is efficient – if middlemen earn large profits, that raises prices

9    for end users and hurts Cisco's sales." Motion at 1. But Cisco ignores that it is an admitted

10    monopolist, and it has resorted to the alleged tactics to force customers to buy its equipment at

11    inflated prices while foreclosing competitors at the same time. If its plan succeeds, Cisco's inflated

12    prices will yield higher profits and its foreclosure efforts will prevent customers from switching to

13    lower-priced competitors. As Dexon explains in its counterclaims, if Cisco can force ultimate

14    customers to purchase from its more expensive channels, then there is less of a need and ability for

15    Cisco's preferred dealers to negotiate for price reductions that would impact Cisco's profits. CC ¶¶

16    44-45. Cisco's anticompetitive acts seeks to preserve both its monopolies and associated

17    supracompetitive pricing, while small and medium businesses bear the brunt of the economic harm.

18    **B.**    **Dexon's UCL, Lanham Act, Tort and Declaratory Judgment Claims**

19        Dexon is an independent secondary-market reseller of computer networking products,

20    including genuine Cisco products. CC ¶¶ 95-96. As detailed in Dexon's Amended Counterclaims,

21    Cisco unfairly and anti-competitively seeks to control and defeat the secondary market in several

22    improper ways, including:

23        i)     Labeling genuine, lawfully obtained Cisco products as "used equipment" solely
24    because such products were traded on the secondary market. *Id.* ¶¶ 110-112;

25        ii)     Informing consumers they are unable to use genuine Cisco equipment purchased
26    on the secondary market because such use violates Cisco's unenforceable End User License
   Agreement ("EULA"). *Id.* ¶¶ 100-103;

27        iii)     Unilaterally voiding SmartNet service packages which Cisco originally authorized,
28    approved and accepted payment for solely because a covered product was purchased on the

1    secondary market and failing to provide any refund in violation of Cisco's own purported
2    policies. *Id.* ¶¶ 108-119.

3         Cisco's challenges to such UCL and Lanham Act claims lack merit. First, this Court has
4    rejected the direct "reliance" requirement advocated by Cisco. *Lona's Lil Eats, LLC v. DoorDash,*
5    *Inc.*, 2021 WL 151978 *11 (N.D. Cal January 18, 2021). Second, Dexon's UCL claims have been
6    pled with the requisite specificity. Without limitation, Dexon's claims concerning Cisco's
7    misleading definition of "used equipment" and Cisco's improper reliance on an unenforceable
8    EULA mirror claims previously allowed by this Court. Lastly, Dexon is not seeking lost "future"
9    profits, but rather the value of its vested interest in contracts cancelled due to Cisco's UCL
10   violations, as well as restitution for Cisco's practice of improperly cancelling previously approved
11   SmartNet contracts and retaining all prepayments.

12        Cisco's contention New York General Business Law ("GBL") § 369-b does not provide a
13   private cause of action likewise fails. Cisco relies on *Cisco Systems, Inc. v. Beccela's Etc., LLC*,
14   403 F. Supp. 3d 813 (N.D. Cal. 2019) which in turn relied exclusively on *Worldhomecenter.com,*
15   *Inc. v. KWC America, Inc.*, 2011 WL 4352390, at *8 (S.D.N.Y. Sept. 15, 2011), an unpublished
16   Southern District of New York decision. In a subsequent well-reasoned published opinion, *Bel*
17   *Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F. Supp. 2d 208, 227 (S.D.N.Y. 2011), the Southern
18   District of New York rejected *Worldhomecenter.com* and held that a policy identical to Cisco's
19   violated section 369-b.

20        Cisco's contention no "justiciable controversy" exists concerning Cisco labeling sales
21   outside "authorized" channels as infringing lacks merit. First, Cisco's own complaint asserts
22   infringement claims for sales of software licenses outside of "authorized" channels. Dkt. 32 ¶ 63,
23   71). Second, Cisco repeatedly threatens Dexon's customers that product purchased outside
24   "authorized channels" violates Cisco's intellectual property rights. Lastly, Cisco has a history of
25   commencing litigation against Dexon and similarly situated secondary market resellers alleging the
26   sale of genuine product constitutes infringement.

27

28

## II.

## BACKGROUND

Dexon's counterclaims explain, and Cisco does not challenge, its monopolies in six interconnected but separate relevant markets: (i) the worldwide and US markets for Ethernet Switches, (ii) the worldwide and US markets for routers (these four markets are jointly referred to as the Relevant Product Markets), and (iii) the worldwide and US aftermarkets for the service and maintenance of Cisco networking equipment (jointly referred to as the Relevant Service Markets). *Id.* ¶¶ 16-35. Ethernet Switches are complements (rather than substitutes) for routers because while Ethernet switches connect components to create a network, routers allow for communication between networks. *Id.* ¶ 27. The Relevant Service Markets are separate from the Relevant Product Markets because, *inter alia*, customers can and do purchase Cisco networking equipment without maintenance services, and the pricing for networking equipment is entirely independent and separate from Cisco's SmartNet service package pricing. *Id.* ¶ 20-21. Cisco does not challenge its monopolies in these markets because its market shares in the Relevant Product Markets have consistently been above 60%, and sometimes above 70%, in the last two decades, and its market shares in the Relevant Service Markets consistently exceeds 90%, and all of these markets are characterized by high barriers to entry and expansion. *Id.* ¶¶ 26, 30-35.

For at least the last six years, Cisco has used its monopolies in the Relevant Service Markets as a weapon to force customer purchases in the Relevant Product Markets. *Id.* ¶¶ 36-45. Specifically, customers buy routers and Ethernet switches manufactured by Cisco, and also separately purchase the SmartNet service package for those products for a one to five year period. *Id.* ¶ 3. At the time a SmartNet service package is purchased, Cisco approves customers' SmartNet service purchase and knows that in many cases the service package is being purchased through a secondary reseller. *Id.* SmartNet customers then receive service from Cisco for a portion of the period, but at some point before the end of the service package period, when customers contact Cisco to get the service they paid for, Cisco changes its policy and notifies customers that their SmartNet service has been terminated unless they buy entirely new routers and/or Ethernet switches from a specified Cisco reseller at a far higher price than the original network equipment purchase.

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1  *Id.* Alternatively, to preserve customers' SmartNet service, Cisco will demand a "re-certification"

2  fee on the customers' original equipment purchase, charging just as much if not more than the

3  original equipment purchase and providing no value to the customer other than restoration of

4  SmartNet. *Id.* In one case, Cisco even threatened a customer that it would not service any of the

5  customer's Cisco products pursuant to its SmartNet service package, regardless of how or when the

6  customer previously purchased those products, unless the customer made all new equipment

7  purchases. *Id.*

8       This conduct is not sporadic, but rather part of an enterprise-wide scheme to use SmartNet

9  service packages to be sure that customers purchase networking equipment at supracompetitive

10  prices to pad Cisco's profits as well as the commissions of its sales representatives. *Id.* ¶¶ 44-45.

11  As explained above, this conduct foreclosed Cisco's competitors in the Relevant Product Markets,

12  depriving customers of the free choice between vendors they would have had in the absence of

13  coercion.

14       Cisco's anticompetitive scheme is supplemented by a series of acts that further deprives

15  customers' ability to utilize aggressive reseller pricing and service, such as the type provided by

16  Dexon. Cisco has bullied customers including a 911-service center that unless it purchased new

17  equipment to replace its Dexon-supplied equipment, Cisco would not service its existing

18  equipment. *Id.* ¶¶ 43, 56. Cisco also threatened VARs which successfully worked with Dexon in

19  the past not to do business with Dexon, with a VAR being forced to reassign one of its employees

20  for refusing to comply with Cisco's demand. *Id.* ¶¶ 52-53. In addition, Cisco decided in 2016 that

21  it was willing to sustain a short term loss in order to cut off Dexon's ability to service its customers,

22  for the purpose of maintaining supracompetitive pricing for its equipment in the long run. *Id.* ¶¶

23  49-51. As explained below, Cisco is a monopolist that took a series of economically irrational acts

24  as parts of a plan to maintain its monopoly power and charge supracompetitive prices.

25       The overall purpose and effect of Cisco's actions has been to force customer purchases that

26  restrain competition and restrain price competition, and as part of that plan, to reduce or eliminate

27  customers' access to a reseller channel that is more aggressive in pricing than Cisco would prefer.

28  *Id.* ¶¶ 55, 66-68, 72-74. As Dexon explains in its counterclaims and Cisco ignores, a monopolist

- 12 -
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1    is not permitted to take coercive and other actions that do not constitute competition on the merits

2    to maintain or expand its monopolies, especially where it holds a monopoly position in a number

3    of interrelated markets. *Id.* ¶¶ 1-9.

4                                                      **III.**

5                                          **LEGAL STANDARD**

6           To withstand a motion to dismiss, Dexon's Counterclaims need only contain "sufficient

7    factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

8    *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

9    "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

10   draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. In

11   assessing the sufficiency of Dexon's Counterclaims, "[a]ll allegations of material fact are taken as

12   true and are construed in the light most favorable to" Dexon. *See Coalition for ICANN*

13   *Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010).

14                                                     **IV.**

15                                            **ARGUMENT**

16   **A.     Dexon States A *Per Se* Tying Claim**

17          The elements of a *per se* tying claim are (1) "an agreement by a party to sell one product

18   but only on the condition that the buyer also purchases a different (or tied) product", (2) the seller

19   has "appreciable economic power" in the tying product market" and (3) "the arrangement affects a

20   substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Tech. Servs.,*

21   *Inc.*, 504 U.S. 451, 461–62 (1992). Cisco does not address the second and third elements in its

22   motion, but in any event, Dexon's counterclaims provide extensive detail about Cisco's monopoly

23   power in the tying relevant markets (CC ¶¶ 16-21), and Cisco's coercion involves a substantial

24   amount of commerce as part of an enterprise-wide initiative to force supracompetitive purchases of

25   networking equipment. *Id.* ¶¶ 44-45; *see also Moore v. Matthews & Co.*, 550 F.2d 1207, 1216 (9th

26   Cir. 1977) ($60,800 in foreclosed revenue was sufficient to meet the volume requirement).

27          Cisco primarily argues that its coercive ties did not foreclose competitors (Motion at 7), but

28   the counterclaims explain that Cisco's coercion forces customers not to make purchasing decisions

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

**App.438**

1  on the merits, but rather foreclosed competitors and potential competitors by raising the already

2  high barriers to entry and expansion; in the absence of the ties, competitors would have made more

3  sales in the relevant product markets.  CC ¶¶ 55, 57, 79.  This is precisely the kind of harm affirmed

4  by the Ninth Circuit in *Brantley*, a case cited by Cisco:

> The potential injury to competition threatened by this practice is that the tying
> arrangement will either harm existing competitors or create barriers to entry of new
> competitors in the market for the tied product….or will force buyers into giving up
> the purchase of substitutes for the tied product.

8  *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012).

9  Cisco points out that a coerced customer still ultimately bought Cisco equipment, but this

10  makes the point:  while this customer was forced to buy new Cisco equipment immediately to keep

11  its previously purchased SmartNet service in place, in the absence of the coercion the customer

12  would have been able to wait to purchase new equipment until the useful life of the old equipment

13  was done and could then make a decision on the merits about whether to buy its new networking

14  equipment from Cisco or from one of its competitors.  CC ¶¶ 32, 55, 57.  Due to its coercion, Cisco

15  foreclosed that opportunity to its competitors.

16  Cisco next argues that there is no tie, but does so by ignoring the timing of its coercion.  As

17  *Kodak* and *Newcal* explain, when locked-in customers are subject to a policy reversal that results

18  in coerced purchases, that is precisely what the *per se* tying doctrine forbids. *Kodak*, 504 U.S. at

19  477-79; *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1050-52 (9th Cir. 2008).  Cisco does

20  not address the allegations that it approved customers' purchase of service packages provided by

21  secondary resellers such as Dexon, and only later reversed that decision, forcing customers to

22  immediately make unwanted purchases of new Cisco equipment. CC ¶¶ 37-41. Cisco cites *Newcal*,

23  which just like here, involved customers being hoodwinked into extended lock-in periods that were

24  not clear when they initially bought copier equipment and associated service.  *See Newcal*, 513

25  F.3d at 1043-44, 1051-52.  The Ninth Circuit held that the relevant markets for copier equipment

26  and the derivative market for service were separate (as Cisco does not challenge here for the

27  Relevant Product and Service Markets), and the defendant engaged in a coercive tie in which it was

28

- 14 -
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1   "able to force purchasers of the tying product who are locked in . . . by the [newly disclosed] Flexed

2   IKON Contract to buy the tied product." *Id.* at 1051-52. Here, Cisco reversed its prior approval

3   which customers previously relied upon when purchasing the SmartNet service package.  CC ¶¶

4   37, 41.

5         Cisco argues this "should not be confused with aftermarket claims" in which service parts

6   themselves are used as the tying product rather than repair and maintenance (Motion at 5), but this

7   is a distinction without a difference. *Kodak* and *Newcal* make clear that a monopolist's change in

8   policy that results in customers being coerced into purchases that it did not foresee at the time of

9   the original purchase violates the law. *See Kodak*, 504 U.S. at 476-77; *Newcal*, 513 F.3d at 1043-

10  44, 1051-52.  This is precisely what is alleged here, and Cisco chose to use service and maintenance

11  services as its tying product, knowing that its near-virtual monopoly in those markets (CC ¶ 20)

12  would leave customers with little choice other than to give in to Cisco's new equipment demands.

13  Cisco misleadingly cites to Areeda for the proposition that parts and service cannot be the tying

14  product, but the treatise was addressing a hypothetical scenario in which the allegedly improper tie

15  was at the time of the original purchase of equipment and service, rather than after a subsequent

16  policy change.  X Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1740c4 (4th ed. 2020)

17  ("There is no demand for parts or service before buying the machine, but the machine choice and

18  the repair parts choice are made at the same time. Hence, we must measure the defendant's power

19  . . . *at the time the alleged tying arrangement was made—namely, when the machine was*

20  *purchased*.") (emphasis added).  When speaking to the scenario at issue here regarding a subsequent

21  change in policy, Areeda makes clear:

22            By changing its policy after its customers were locked in, Kodak took advantage of
              the fact that its customers lacked the information to anticipate this change.
23            Therefore, it was Kodak's own actions that increased its customers' information
              costs. In our view, this was the evil condemned by the Court and the reason for the
24            Court's extensive discussion of information costs.

25            *Id.* at 1740c6.

26  Cisco does not address the timing of its conduct because it is fatal to its motion.

27         The counterclaims allege that Cisco engaged in a consistent variation of the *Kodak* conduct.

28

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1    In *Kodak*, customers bought equipment that could be serviced by third party technicians, but Kodak

2    changed the rules after the purchase to force those customers to obtain the service that allowed

3    them to continue to use their machines only from Kodak, using repair parts as the tying product and

4    service as the tied product. *Kodak*, 504 U.S. at 475-78. Here, customers purchased SmartNet service

5    that would be available for the life of their SmartNet service package, but Cisco changed the rules

6    after the SmartNet purchase to require those customers to purchase new Cisco equipment to

7    continue to receive the SmartNet service they had already purchased, using SmartNet service as the

8    tying product and the new Cisco equipment as the tied product. While the tying and tied products

9    were different in *Kodak*, the anticompetitive scheme is the same, and nothing in *Kodak* states that

10   tying claims exist *only* when the tying product is parts and the tied product is service.

11         Finally, Cisco also misportrays Dexon's allegations about a recertification fee, which Cisco

12   extracts from customers due to its monopoly power in the relevant aftermarkets. Dexon's

13   allegations detail a Hobson's choice that Cisco puts to its customers when it needs maintenance

14   and service:  either buy new equipment from Cisco or pay a comparable re-certification fee for the

15   customer's already purchased equipment.  As Dexon explains, where customers "choose" the fee,

16   there was no service performed that provided any value to the customer, confirming that Cisco's

17   true motive was to use its service and maintenance monopolies to maintain supracompetitive

18   pricing on its equipment and foreclose competitors in the process.  CC ¶¶ 54-55.  Cisco cites

19   *Aerotec*, but this was a case that did not involve any coercion of customers, as they were free to

20   buy the alleged tied product *a la carte. See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d

21   1171, 1179 (9th Cir. 2016) ("Aerotec does not dispute that Honeywell routinely sells [the allegedly

22   tied] APU parts to airlines without conditioning sales on [the allegedly tying] service contracts.").

23   Here, Cisco's customers were misled into believing that their service contracts would be honored,

24   only to find out later that Cisco would claim that the price for the equipment would be higher if

25   they did not buy new Cisco equipment.  This is not "merely enhancing the price of the tying

26   product" as Cisco argues (Motion at 9), but rather is a case in which Cisco uses maintenance and

27   service as an anticompetitive lever to extract supracompetitive prices for networking equipment,

28   whether purchased new or retroactively applied to previously purchased equipment. CC ¶ 40 (Cisco

"reactivated the SmartNet service package simply because the customer paid more money for the networking equipment.").

In sum, Cisco's arguments do not account for the pled facts and the controlling law that applies to those facts.[1] Cisco's motion to dismiss the *per se* tying claim should be denied.

**B.     Dexon Also States A Cartwright Act Claim**

Cisco relies on the same arguments for the Cartwright Act claim as the Sherman Act claim, and concedes that the same result holds under the Cartwright Act for *per se* tying. For that reason, the Court should deny Cisco's Motion on the Cartwright Act claim as well.

**C.     Dexon States A Monopolization Claim**

The elements of a monopolization claim are the (1) possession of monopoly power, and the defendant (2) has acquired, enhanced, or maintained that power by the use of exclusionary conduct. *Image Technical Services Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1202 (9th Cir. 1997). Cisco does not challenge that it has monopoly power in the Relevant Product Markets, but rather maintains that it has not engaged in exclusionary conduct that has enhanced or maintained that power.  Exclusionary conduct is distinguished from conduct that maintains or grows monopoly power through "growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 1208.

Cisco reiterates its argument that its coercive ties did not foreclose competitors (Motion at 10), but that argument is misplaced for the same reasons as for the *per se* tying claim. Indeed, in *Kodak*, upon remand from the Supreme Court, the plaintiff withdrew their *per se* tying claim but the same exclusionary conduct, implemented through a change in policy applied to the affected relevant market, made out a Section 2 monopolization claim.  *See Image Technical*, 125 F.3d at 1211-12 & n.10. Cisco ignores that it is a conceded monopolist in the Relevant Product Markets, and due to its coercive conduct requiring customers to make new purchases of Cisco equipment, Cisco was able to maintain its monopolies and foreclose its competitors.

---

[1] To the extent that Cisco raises new arguments on reply (as counsel has already proposed an expansion of the 10-page limit to 25 pages), Dexon reserves its right to address those arguments at an appropriate time.

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1    Rather than address these facts, Cisco appears to suggest that its coercive ties should be
2    subject to the "substantial foreclosure" standard for exclusive dealing cases. Motion at 11. There
3    is no basis for this suggestion, as Dexon does not assert exclusive dealing but rather coercive
4    practices against consumers that directly forecloses competitors. This is why this type of tying is
5    a *per se* violation of Section 1 of the Sherman Act, so long as the practice impacts a substantial
6    amount of commerce in the tied product market, which Cisco does not challenge. *See supra* at 7.
7    Indeed, Cisco's coercive conduct is not limited to certain customers, but rather pursuant to an
8    enterprise-wide scheme that forecloses competitors and forces SmartNet customers to pay
9    supracompetitive prices in markets in which Cisco is an admitted monopolist. Cisco does not,
10   because it cannot, suggest that this conduct did not improperly maintain its monopolies in the
11   Relevant Product Markets.

12        Cisco then suggests that its strategy to maintain its monopolies does not "make economic
13   sense", arguing before any discovery that "[i]f prices of Cisco equipment rise because of
14   inefficiency in distribution, that can only help Cisco's competitors and hurt Cisco." Motion at 11-
15   12. Cisco again ignores that is an admitted monopolist that has coerced its customers to accept
16   increased prices by leveraging its monopolies in the Relevant Service Markets, foreclosing
17   competitors in the process. Far from "hurt[ing] Cisco" it is a "win-win" from its perspective: it
18   forces its customers to pay more without having to face the repercussions from competitors due to
19   its monopoly position in the Relevant Service Markets.

20        The remainder of Cisco's arguments focus on its incorrectly-labeled "opaque refusal to deal
21   claim," where Dexon's monopolization claim is comprised of a series of acts that all contribute to
22   Cisco's overall plan to maintain and expand its monopolies in the Relevant Product Markets.
23   Already foreclosing its competitors directly through its coercion, Cisco has supplemented those
24   anticompetitive efforts by taking other actions that would force customers into its most expensive
25   distribution channels, including (i) bullying customers, such as a 911-operator, not to use Dexon
26   despite a successful relationship prior to that point, (ii) pressuring a major VAR not to work with
27   Dexon despite a successful relationship to that point, and (iii) discontinuing Dexon's access to a
28   database that allowed it, and Cisco, to previously profit from Dexon's service capabilities. CC ¶¶

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1  43-45, 49-53. Cisco's motion does not address its customer bullying because it contributes to its

2  long term scheme to maintain monopoly power over its customers.

3      It is long recognized that in antitrust cases "plaintiffs should be given the full benefit of

4  their proof without tightly compartmentalizing the various factual components and wiping the slate

5  clean after the scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690,

6  698-99 (1962). This is particularly the case here, where Cisco's tying scheme forecloses

7  competitors and forces customers to pay supracompetitive prices, and Cisco's specific actions

8  against Dexon illustrate its intention and ability to force customers away from price cutting resellers

9  like Dexon and toward its more expensive distribution channel. Speaking to this kind of situation,

10  the Ninth Circuit has made clear that "it would not be proper to focus on specific individual acts of

11  an accused monopolist while refusing to consider their overall combined effect. . . . We are not

12  dealing with a mathematical equation. We are dealing with what has been called the synergistic

13  effect of the mixture of the elements." *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373,

14  1376 (9th Cir. 1992). The synergistic effect here is that customers were forced to buy unwanted

15  networking equipment on the monopolist's terms, maintaining its monopoly power and ability to

16  price at supracompetitive levels.

17      Even considering Cisco's "database refusal" on its own (which still must be considered in

18  conjunction with the other anticompetitive conduct), Cisco's conduct is anticompetitive because

19  Cisco intentionally sustained short-term losses by limiting intrabrand competition between resellers

20  to preserve its long-term ability to charge monopoly prices. Specifically, Cisco previously gave

21  Dexon access to customer information from which both companies' profited, confirmed by the fact

22  that when Cisco first denied Dexon access, it reversed its decision because of the short term losses

23  it was sustaining from the denial. CC ¶¶ 49-53.[2] When Cisco subsequently revoked Dexon's access

24  again, it intentionally sustained losses by limiting intrabrand competition which would only be

25  economically rationale if it expected to make up those loses through supracompetitive prices in the

26  
_____

27  [2] Cisco's argument that Dexon must allege that it was "singled out" by Cisco's conduct for purposes
   of a motion to dismiss is not supported by the case law, but in any event, the Counterclaims allege

28  conduct that is specific to Dexon, and by logical extension, would not apply to resellers that the
   claims explain were favored by Cisco. *See, e.g.*, CC ¶¶ 62, 84..

- 19 -
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
Case No. 3:20-CV-04926-CRB

long run.  CC ¶¶ 49-51, 55.[3]  One court explained this kind of scenario vividly:

> The argument . . . that the reduction or elimination of intrabrand competition is, by itself, never sufficient to show that a trade restraint is anticompetitive must rest, at bottom, on the view that intrabrand competition — regardless of the circumstances — is never a significant source of consumer welfare. This view is simply not supported by economic analysis, or by the cases. A seller with considerable market power in the interbrand market — whether stemming from its dominant position in the market structure or from the successful differentiation of its products — will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold. Dealers, by competing against each other and bidding the retail price down, will in turn exert downward pressure on the seller's wholesale price in order to maintain their profit margins. Thus, *in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price*. Rather than promoting nonprice competition, *vertical restraints in this context may enable a manufacturer to retain monopoly profits* arising from an interbrand competitive advantage.

*Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1571-72 & n.20 (11th Cir. 1983) (emphasis added).[4]  As part of its overall scheme, Cisco maintained its monopoly power in the Relevant Product Markets by limiting the intrabrand competition that resellers like Dexon provide.

The Court should reject Cisco's suggestion that its proffered business rationales should be accepted at the pleading stage.  Motion at 14.  Cisco cites to *SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, but in that case a prior Ninth Circuit decision had already assessed the Defendant's rationale in reversing the lower court's grant of a preliminary injunction.  88 F.3d 780, 786 (9th Cir. 1996) ("The validity of Delta Dental's business reasons . . . has already been established by our decision in [*Davidowitz v. Delta Dental Plan of California, Inc.*, 946 F.2d 1476 (9th Cir. 1991)]").  Here, Cisco's overall competitive scheme has never been litigated, and as the *SmileCare* court pointed out, "the existence of valid business reasons is ordinarily a question of

---

[3] Cisco also argues, based on *FTC v. Qualcomm*, that Dexon's allegation that Cisco steered customers toward a more profitable channel is determinative.  But unlike in *Qualcomm* where after a full discovery record it was determined that "Qualcomm's purpose was greatest profits in *both the short and long terms*," 969 F.3d 974, 994 (9th Cir. 2020) (emphasis added), here Cisco intentionally sacrificed short term profits to preserve its long term monopolies.

[4] Cisco cites to *Cont'l T.V., Inc. v. GTE Sylvania Inc.* (Motion at 11), but unlike here, "when interbrand competition exists . . . it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." 433 U.S. 36, 52 n.19 (1977).

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1    fact" (*id.*), and here Dexon has already explained that Cisco's proffered business justifications are

2    pre-textual in light of the clear intent and impact of its conduct.  CC ¶¶ 54, 66, 72, 78.  Cisco also

3    cites to *Mozart Co. v. Mercedes Benz of N.A., Inc.*, but that case was after a jury verdict on a full

4    record, in which the court confirmed that it was "not free to reweigh the evidence or reach a result

5    we find more reasonable if, viewing the evidence in the light most favorable to MBNA, there is

6    substantial evidence in favor of the jury's verdict." 833 F.2d 1342, 1348-50 (9th Cir. 1987). In

7    *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, cited by Cisco, the court found that the defendant's

8    vertical expansion at issue was not pled to have any "anticompetitive purpose [apart from] than

9    for the purpose of improving efficiency," 507 F.3d 117, 125 (2d Cir. 2007), but that contrasts with

10   the facts here that a series of acts were for the purpose of foreclosing competition and maintaining

11   supracompetitive prices. In fact, Cisco advances no proffered business rationale at all for its

12   bullying of customers and threats to VARs despite their successful prior relationships with Dexon,

13   which illustrates why Cisco's contention needs to be evaluated on a full record.

14        Cisco's arguments to dismiss the monopolization counterclaims (including attempted

15   monopolization that Cisco does not substantively address in its Motion) should be rejected.

16   **D.    Dexon Sustained An Antitrust Injury**

17        Dexon suffered an antitrust injury due to Cisco's anticompetitive conduct because it is an

18   "injury of the type the antitrust laws were intended to prevent and that flows from that which makes

19   the defendant's acts unlawful." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334

20   (1990).  Dexon suffered losses as a direct byproduct of Cisco's coercion of customers into buying

21   new expensive equipment as a result of leveraging its service monopolies.  For instance, Dexon

22   lost a substantial sale to a hospital because Cisco threatened the customer that it would not honor

23   its SmartNet service packages, regardless from whom the customer had purchased them, if it chose

24   to purchase equipment at a more competitive price from Dexon. CC ¶¶ 41-42. In addition, for

25   customers (such as a 911-operator) that could not afford new equipment in the midst of Cisco's

26   coercion, Dexon suffered losses in the form of new SmartNet services packages that it purchased

27   on its own accord to avoid a service disruption. *Id.* ¶¶ 43-45, 58-60. Cisco's claim in its motion

28   that Dexon "coax[ed]" such customers into staying with Cisco (Motion at 15) strains credulity and

1    is the opposite of what the counterclaim alleges; the customers were being held hostage by Cisco

2    and Dexon provided relief, sacrificing its bottom line, from the monopoly power and policy

3    reversal Cisco was implementing. *Id.* ¶¶ 58-60.

4           Dexon also suffered goodwill and reputational losses because of Cisco's anticompetitive

5    conduct.  As part of the coercion in which Cisco told customers they needed new equipment, it

6    attempted to claim that Dexon's previously sold equipment was inadequate.  *Id.* ¶¶ 42-43. Cisco

7    either forced customers into purchasing overpriced new equipment, or at a minimum portrayed

8    Dexon as a risky or unworthy sales partner regardless of which manufacturer a customer sought.

9    *Id.* ¶¶ 58-60.  In fact, this was the intent of Cisco's overall plan: make resellers like Dexon seem

10   like the problem to customers rather than Cisco's anticompetitive conduct.  *Id.*  In addition, Cisco's

11   anticompetitive acts of bullying customers, intimidating resellers, and withdrawing database

12   access were specifically targeted at Dexon, and were done in conjunction with the coercive conduct

13   above to maintain its monopolies.  *Id.* ¶¶ 43-45, 49-53. All of these acts indisputably harmed

14   Dexon, and they directly flow from the antitrust violation because the anticompetitive purpose and

15   effect was both to eliminate interbrand competition by foreclosing Cisco's equipment

16   manufacturer competitors and to eliminate intrabrand competition by steering customers away

17   from resellers like Dexon that offered aggressive pricing and associated service.  *Id.* ¶¶ 45, 58-60.

18   Dexon customers have benefitted from Dexon's range of product options and ability to meet their

19   budgets, and Cisco's anticompetitive conduct has been designed to and did hinder that option.

20          Cisco advances two sleight of hand arguments to rebut these antitrust injuries: that Dexon

21   only lost Cisco sales rather than competitor sales, and that its losses "spring from the gain of

22   Cisco's competitors."  Motion at 15-16.  Dexon lost sales because customers were coerced into

23   buying more expensive equipment than they needed due to a *per se* antitrust violation; the fact that

24   Dexon's original sales to these customers were from Cisco is what locked customers into the

25   scheme in the first place.  *See, e.g.*, CC ¶ 40 ("Given that customers are locked into the Cisco

26   installed base they already purchased and already invested in the SmartNet service package, they

27   have little choice other than to give in to Cisco's demands.").  In addition, one effect of this scheme

28   is to foreclose Dexon from selling Cisco's competitors' products as an alternative to the coerced

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1  sale. *Id.* ¶¶ 60, 95-96. Regarding the sales that Cisco's competitors did make when shutting down
2  Dexon's access to the service database, as explained above, this short term loss by Cisco is
3  irrational but for a long term plan to maintain and expand upon Cisco's monopolies. *Supra* at 13-
4  14. Dexon suffered an antitrust injury because Cisco's scheme was specifically designed to thwart
5  Dexon from offering aggressively priced equipment in the long run, even if that meant that Cisco
6  would have to sustain some losses in the short term. CC ¶¶ 49-51, 55.

7      The Court should reject Cisco's argument that Dexon did not suffer an antitrust injury.

8  **E.   Dexon Also States An Antitrust-Based UCL Claim**

9      Cisco argues in passing that Dexon has not pled an antitrust-based UCL claim because it
10  has not alleged "any violation of the antitrust laws or any conduct that would constitute an incipient
11  violation of those laws," (Motion at 17) nor conduct that "violates the policy or spirit of one of
12  those laws because its effects are comparable to or the same as a violation of the law," or "otherwise
13  significantly threatens or harms competition." *Cel-Tech Communications Inc. v. Los Angeles
14  Cellular Telephone Co.*, 20 Cal. 4th 163, 186-87 (1999). For the reasons stated above, Dexon states
15  violations of the Sherman Act, and in any event, has detailed an overall scheme the primary
16  purposes of which are to raise prices that customers are forced to pay, hinder innovation and
17  expansion by competitors, raise barriers to entry, cut off sources of products that life-saving
18  businesses require, and significantly threaten Relevant Product and Service Markets that never face
19  meaningful competition. These facts easily state an antitrust-based UCL claim as well.

20  **F.   Cisco's Challenges to Dexon's UCL/Lanham Act Claims Lack Merit**

21
22      **1.   Cisco's Standing Argument Rejected – Direct Reliance Not Required**

23      California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent
24  business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof.
25  Code § 17200. The UCL is "'broad' and 'sweeping' to 'protect both consumers and competitors by
26  promoting fair competition in commercial markets for goods and services.'" *Pulaski & Middleman,
27  LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) (quoting *Kwikset Corp. v. Super. Ct.*, 246
28  P.3d 877 (2011)). *See also* Cal. Bus. & Prof. Code § 17200 et. seq.

Despite the statute's express protection for competitors, Cisco contends a "direct reliance" on the allegedly misleading communication is required for standing. While limited cases adopted this approach,[5] the Northern District recently aligned with both the Central and Eastern Districts[6] and correctly determined that no direct reliance is required for "competitors" injured by UCL prohibited conduct. *Lona's Lil Eats, LLC v. DoorDash, Inc.*, 2021 WL 151978, at *10 (N.D. Cal. Jan. 18, 2021). Acknowledging a disagreement among limited decisions within the District, the *Lona*'s Court correctly reasoned that requiring "direct reliance" by competitors is contrary to the purpose of the UCL. The Court explained:

> The *Allergan* court also reasoned that applying *Kwikset*'s reliance requirement to competitor claims fundamentally makes little sense because false advertising claims between competitors are fundamentally different from false advertising claims brought by consumers. Even though the predicate unlawful act for both consumer and competitor false advertising claims "is based on misrepresentation, competitor plaintiffs are not concerned with the deceptive activity simply because it's deceptive." Instead, they are concerned with the loss of sales and market share "as a result of the deceptive activity." Thus, the *Allergan* court concluded that imposing a direct reliance requirement on competitor claims would impose a "superficial hurdle" on competitor plaintiffs and determined that *Kwikset* did not appear to go so far.

*Id.* (internal citations omitted). *See also SPS Techs., LLC v. Briles Aero., Inc.*, 2019 WL 6841992, at *6 (C.D. Cal. Oct. 30, 2019) (adopting *Allergan* and holding that "a competitor plaintiff may allege UCL claims without alleging its own reliance.").[7]

---

[5] *See L.A. Taxi Cooperative, Inc. v. Uber Technologies, Inc.*, 114 F. Supp. 3d 852, 866 (N.D. Cal. 2015).

[6] *See VP Racing Fuels, Inc. v. General Petroleum Corp.*, 2010 WL 1611398 at *2 (E.D. Cal. 2010); *Allergan USA Inc. v. Imprimis Pharms. Inc.*, 2017 WL 10526121, at *13 (C.D. Cal. Nov. 14, 2017) ("Unlike consumers, however, a company is not likely to purchase its competitor's products simply because it saw and relied on an ad. Thus, imposing the reliance requirement on competitor claims would impose a superficial hurdle on competitor plaintiffs seeking to stop or recover for damages caused by their competitor's false advertising.").

[7] The Northern District implicitly adopted *Allergen*'s "no direct reliance for competitors" rule in both *Cisco Systems, Inc. v. Beccela's Etc., LLC*, 403 F. Supp. 3d 813 (N.D. Cal. 2019) and *Cisco Systems Inc. v. Link US, LLC*, 2019 WL 6682838 (N.D. Cal. Dec. 6, 2019) Both cases allowed analogous competitor claims despite no "direct reliance" by the claimant competitor.

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

**App.449**

**2.     Dexon's Claims Pled With Requisite Specificity**

    **a.     Cisco's Deceptive "Used Equipment" Label**

Cisco acknowledges this Court previously allowed UCL/Lanham Act claims for the very conduct Dexon challenges herein; namely, Cisco's practice of misleadingly informing Dexon's customers that products purchased on the secondary market are necessarily "used equipment." ECF No. 72 at 26 ("Though this Court in *Cisco Systems Inc. v. Link US, LLC* found that a similar allegation was to survive a motion to dismiss, Dexon's counterclaim does not identify where any supposed representation appeared, who was exposed to it, or what impact it had on any specific consumer."); *see Cisco Systems Inc. v. Link US, LLC*, 2019 WL 6682838 (N.D. Cal. Dec. 6, 2019).

Dexon's allegations herein parrot Cisco's identical and misleading form definition of "used equipment" at issue in *Link*; namely "previously owned equipment that is now owned by a party other than the original customer" including both "opened and unopened equipment." CC ¶ 111. Cisco is well aware that it has continued to actively promote and publish such misleading definition, including at the very URL cited in *Link* (https://www.cisco.com/c/en/us/products/hw-sw-relicensing-program.html#~tab-faq):

Q: How does Cisco define "used and secondary-market equipment" that qualifies for this program?

A: Cisco defines used equipment as previously owned equipment that is now owned by a party other than the original customer. Secondary-market equipment is any Cisco equipment–whether it is represented as new, used, or refurbished–that is purchased from a seller that is not an authorized Cisco reseller or distributor. This includes both opened and unopened equipment. Previously owned equipment purchased from an unauthorized reseller cannot be placed under a service contract without being reinspected and possibly relicensed.

    **b.     "First Sale Doctrine" - Cisco's Reliance on Unenforceable EULA's**

Cisco likewise acknowledges this Court previously allowed the identical "first sale doctrine" claims asserted by Dexon herein; namely, claims that Cisco misleadingly informs customers they are unable to use their genuine Cisco products due to purported restrictions contained in Cisco's unenforceable EULA. ECF No. 72 at 27 ("The Court in *Beccela's Etc.* noted that a software license is binding only if a consumer agrees to it" and unlike *Beccela's Etc.*, Dexon "makes no allegation that Cisco misrepresented the binding effect of its software license.").

Contrary to Cisco's contentions, Dexon makes allegations *identical* to those relied on by this Court in *Becella's* concerning the unenforceability of Cisco's EULA. *See Beccela's*, 403 F. Supp. 3d at 829 (N.D. Cal. 2019).[8] As in *Becella's*, Dexon alleges Cisco does not inform consumers until after their purchase that they are required to license the embedded software and that Cisco does not require end users to acknowledge, read, or accept the purported EULA before using the subject Cisco equipment. CC ¶ 100.[9]  As in *Becella's*, such allegations create an issue of fact inappropriate for resolution on a motion to dismiss.

### c.     Dexon's Proper UCL Restitution Claims

Cisco wrongfully categorizes Dexon's UCL claims for restitution as damage claims for "future expected sales." ECF No. 72 at 29 ("Future expected sales are not a form of restitution because they are 'merely a contingent interest.'") Contrary to Cisco's argument, Dexon's UCL claims do not seek contingent unearned future profits. Rather, Dexon seeks restitution for earned profits wrongfully lost as a direct result of Cisco's unfair conduct and competition. CC ¶ 127, 129 ("As a result of Cisco's unfair, fraudulent, and unlawful conduct, Dexon has lost sales of Cisco products they otherwise would have made, and have accordingly lost money or property as a result of Cisco's practices. . . Dexon seeks the full restitution by Cisco that is necessary and according to proof to restore any and all property and monies, including interest, acquired by Cisco, and all costs caused to Dexon as a result of Cisco's unlawful and unfair business practices.").

By way of example, such restitution claims include, without limitation, longtime Dexon customer Fort Bend Independent School District ("FBISD") *cancelling* a finalized contract for the

---

[8] *Id.* ("Defendants allege that Cisco does not inform consumers until 'after their purchases' that they will have to license the embedded software and that Cisco 'does not require end users to acknowledge, read, or accept a license agreement before using the Cisco goods sold by [Defendants]'. . .These allegations call into question whether the consumers of Cisco's products accepted the EULA such that the first sale doctrine might apply.").

[9] *Id.* ("Cisco uses the fact that its products have embedded software as an attempted end-around to the first sale doctrine. It does so by informing consumers, after their purchases, that although they have bought Cisco hardware, they are unable to use such hardware unless they license the embedded software from Cisco —software that was packaged and sold with the hardware (and without which the hardware will not function). Cisco does not require end users to acknowledge, read, or accept a license agreement before using the Cisco goods sold by Dexon. Nevertheless, Cisco purports only to license the software pursuant to the terms of its End User License Agreement, or 'EULA.'").

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1   sale of more than $1,000,000 worth of genuine new Cisco telephone equipment as a direct result of

2   Cisco's misleading and tortious statements to FBISD that: i) the phones were ""used" or

3   "counterfeit"; and ii) as a result of being purchased from a non-authorized seller, such new

4   telephone equipment would not come with the necessary "software licenses" despite the fact such

5   phones utilize no proprietary Cisco software and therefore requiring no such alleged licenses.

6       Likewise, Dexon seeks restitution for damages it has occurred as a result of Cisco

7   wrongfully retaining fully paid up SmartNet service packages despite unilaterally cancelling such

8   previously approved SmartNet service packages as a result of the covered products having been

9   sold on the secondary market[10].

10      Restitution claims of this nature are not "contingent" or "prospective future sales" of the

11  type foreclosed by *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 947 (Cal. 2003). On

12  the contrary, they represent allowable disgorgement of profits earned as the result of allegedly

13  unfair practices and/or benefits in which Dexon has an ownership interest. *See Korea Supply Co.*,

14  63 P.3d at 947 ("Under the UCL, an individual may recover profits unfairly obtained to the extent

15  that these profits represent monies given to the defendant or benefits in which the plaintiff has an

16  ownership interest."); *Matoff v. Brinker Rest. Corp.*, 439 F.Supp.2d 1035, 1038-39 (C.D. Cal. 2006)

17  (disgorgement of profits is available under the UCL only to the extent that it is restitutionary.).[11]

18  **G.    N.Y. Gen. Bus. Law § 369-b Provides a Private Cause of Action**

19      Cisco relies on *Cisco Sys., Inc. v. Beccela's Etc., LLC*, 403 F.Supp.3d 813, 826 (N.D. Cal.

20  2019), to contend no private cause of action is available to Dexon under N.Y. Gen. Bus. Law § 369-

21  b. In *Beccela*'s, the district court relied exclusively on the Southern District of New York's decision

22  in *Worldhomecenter.com, Inc. v. KWC America, Inc.*, 2011 WL 4352390, at *8 (S.D.N.Y. Sept. 15,

23  2011). Despite acknowledging the established three-part test under New York law for determining

24

[10] Dexon is routinely forced to refund its customers prior payments for such cancelled contracts
25  and/or seek to acquire replacement coverage for its customers on the open market. As alleged in
    Dexon's counterclaims, Cisco also knowingly sells duplicate SmartNet service packages covering
26  the same product and the same period to multiple customers. CC ¶¶108-109.

27  [11] Cisco's motion fails to address Dexon's additional/alternative remedies which include: i)
    injunctive relief under the UCL; and ii) traditional damages available for Dexon's Lanham Act
28  false advertising claims. CC ¶¶ 142-148.

1   whether an implied right to bring a private cause of action exists,[12] the *Worldhomecenter.com* court

2   in essence determined a private cause of action did not exist because the legislature had not

3   expressly provided for one, and instead authorized the attorney general to enforce the statute.[13]

4       The *Worldhomecenter.com* decision was subsequently rejected by the Southern District of

5   New York. *Bel Canto Design, Ltd. v. MSS Hifi, Inc.*, 837 F.Supp.2d 208, 227 (S.D.N.Y. 2011). *Bel*

6   *Canto* correctly held that section 369-b's purpose is "to prevent denial of manufacturer warranty

7   service to customers . . . because goods were sold by unauthorized dealers . . . ." *Id.* (citation

8   omitted). "In light of the statute's purpose," the district court concluded that a "stated policy of

9   refusing to honor warranties of products for the sole reason that they were sold by unauthorized

10  dealers is contrary to GBL 369–b." *Id.*

11      As in *Bel Canto*, recognizing a private right of action promotes section 369-b's purpose by

12  "prevent[ing] denial of manufacturer warranty service to customers . . . because goods were sold

13  by unauthorized dealers." *Id.* And contrary to *Worldhomecenter.com*, implying a private right of

14  action is consistent with the legislative scheme because sections 369-e, 369-ee, and 369-eee all

15  expressly charge the attorney general with prosecuting violations of those statutes; section 369-b,

16  however, does *not* include an express charge to the attorney general. Where the legislature "includes

17  particular language in one section of a statute but omits it in another section of the same Act, it is

18  generally presumed that [the legislature] acts intentionally and purposefully in the disparate

19  inclusion or exclusion." *Sec. Pac. Nat. Tr. Co. v. Cuevas*, 675 N.Y.S.2d 500, 502 (Civ. Ct. 1998)

20  (citations omitted).  Further, there is no administrative body overseeing enforcement of section 369-

21  b.  *See Jackson v. Bank of Am.*, N.A., 40 Misc. 3d 949, 976, 971 N.Y.S.2d 800, 819 (Sup. Ct. 2013)

22  (implied private right of action in absence of a "detailed scheme for administrative enforcement").

23  **H.    Justiciable Controversy Exists for Dexon's Sales of Genuine Cisco Products**

24      "The Ninth Circuit holds that 'trademark disputes have sufficiently ripened into an actual

25  controversy under the [Declaratory Judgment Act] when the plaintiff has a real and reasonable

---

[12] *Sheehy v. Big Flats Community Day*, 541 N.E.2d 18 (1989).

[13] In fact, N.Y. Gen. Bus. Law § 369-b does not expressly authorize attorney general enforcement. The court cited and relied on separate sections of N.Y. Gen. Bus. Law, §§ 369-e, -ee, and -eee.

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1   apprehension that he will be subject [to suit]." *Coheso, Inc. v. Can't Live Without It, LLC*, 2017 WL

2   10434396, at *4 (N.D. Cal. Dec. 18, 2017) (citations omitted). "[T]he Ninth Circuit adopts a

3   'flexible approach' that focuses on 'the position and perceptions of the plaintiff' and not on 'specific

4   acts or intentions of the defendant.'" *San Diego Cty. Credit Union v. Citizens Equity First Credit

5   Union*, 344 F.Supp.3d 1147, 1155 (S.D. Cal. 2018). "Under the 'flexible approach' concrete threats

6   of litigation are not required to demonstrate a reasonable apprehension of an infringement suit." *Id.*

7   (citations omitted).

8       Cisco has put the issue of alleged infringement resulting from the sale of genuine Cisco

9   products squarely at issue via its allegations "any Cisco license sold by an unauthorized source

10  [such as Dexon] is invalid. . .[and] Dexon's unauthorized use of the Cisco Marks constitutes

11  trademark infringement. . ." Dkt. 32 ¶¶63, 71. *See also Beccela's*, 403 F.Supp.3d at 829 (Cisco's

12  allegations put issue of sales of genuine product via allegedly unauthorized channels squarely

13  before the court.).

14      Moreover, Cisco repeatedly threatens end consumers, including Dexon's customers, that

15  use of genuine products purchased on the secondary market infringes upon Cisco's intellectual

16  property rights. For example, a standard form letter sent to Dexon customer Lubbock Emergency

17  Communication District threatened that use of genuine products acquired from Dexon could violate

18  Cisco's intellectual property rights:

19  Per the attached letter, it has come to our attention that Lubbock Emergency Communication District has a number of Cisco products in its network for which we

20  do not show Lubbock Emergency Communication District to be the authorized software licensee. If you have received hardware from vendors outside Cisco's authorized channel, that product does not automatically come with a valid Cisco license right to use our software.

21  As background, when Cisco sells hardware with embedded software to an original customer, that software is provided to the customer through an end user license agreement ("EULA"). The customer is therefore a *licensee* of the software, not an *owner*. Under the license, the customer-licensee does not have the right to sell

22  or transfer the software without Cisco's consent. See Cisco's EULA here: www.cisco.com/go/eula. As such, use of such copyrighted materials may result in your company running afoul of Cisco's intellectual property rights.

23  May 24, 2019 Cisco Brand Protection Team Letter, Balthazor Dec., Ex. B.

24      Cisco also has a history of commencing litigation against Dexon and similarly situated

25  secondary market resellers alleging the sale of genuine product constitutes infringement. See *Cisco

26  Systems, Inc. et al v. Dexon Computer, Inc.*, 3:11-cv-01455-WHA (N.D. Cal.) and *Cisco Systems

27  Inc. v. Link US, LLC*, 2019 WL 6682838 (N.D. Cal.). Accordingly, a justiciable controversy exists

28

- 29 -
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

**App.454**

1  concerning Cisco's efforts to improperly deter secondary market sales of genuine Cisco product.

2  *See Twitter, Inc. v. VoIP-Pal.com, Inc.*, 2020 WL 7342733, at *7 (N.D. Cal. Dec. 14, 2020).

3  **I.     <u>Dexon Properly Pled Tortious Interference and Defamation Claims</u>**

4  Dexon's common law tort claims mirror its UCL claims and for the reasons outline *supra*,

5  survive Cisco's challenges. While the full extent of Cisco's tortious conduct is in the possession

6  and control of Cisco, including all communications with Dexon customers originating from Cisco's

7  Brand Protection Team, additional representative examples of Cisco's tortious conduct includes: i)

8  Cisco falsely labeling all Dexon sales to Lockridge Grindal Nauen as "counterfeit" because

9  acquired on the secondary market. March 14, 2019 Cisco Brand Protection Letter, Balthazor Dec.,

10  Ex. C[14]; ii) Cisco informing Dexon customer Garden City that "non authorized" resellers such as

11  Dexon will "change the software and then reseal the package and make them look as new, sealed

12  boxes."; and iii) Cisco falsely implying to Dexon customer Meadowridge that new Cisco equipment

13  purchased from Dexon was "used" because purchased from an "unauthorized" seller and

14  unilaterally cancelling a previously approved SmartNet service package covering the same product.

15  July 2021 Email Exchange, Balthazor Dec., Ex. D.

16

17

18

19

20

21

22

23

24

25

26

27

28  

[14] Cisco's Complaint alleges only certain such products to be "counterfeit". ECF No. 32 ¶ 46.

- 30 -

**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**V.**

**<u>CONCLUSION</u>**

For the foregoing reasons, Cisco's motion seeking a dismissal with prejudice should be denied in its entirety.  To the extent the Court has concerns with the specifics of any of Dexon's allegations or pleadings, Dexon is amenable and willing to amend its counterclaims to address any such concerns.  *Cisco Systems Inc. v. Link US, LLC*, 2019 WL 6682838 (N.D. Cal.) (granting leave to amend to address alleged deficiencies raised in Cisco's motion to dismiss).

Dated: November 3, 2021                    Respectfully submitted,


                                           _____*/s/Amanda R. Washton*_____

Michael M. Lafeber                         Amanda R. Washton (SBN 88324)
mlafeber@taftlaw.com                       a.washton@conklelaw.com
O. Joseph Balthazor Jr.                    **CONKLE, KREMER & ENGEL, PLC**
jbalthazor@taftlaw.com                     3130 Wilshire Boulevard
**TAFT STETTINIUS &**                      Suite 500
**HOLLISTER LLP**                          Santa Monica, CA 90403
2200 IDS Center                            Tel: (310) 998-9100
80 S. 8th St.
Minneapolis, MN 55402                      David H. Reichenberg (*pro hac vice*)
Tel: 612.977.8400                          **COZEN O'CONNOR**
Fax: 612.977.8650                          3 WTC, 175 Greenwich Street, 56th Floor
                                           New York, New York 10006
Mark A. Jacobson (*pro hac vice*)          T: (212) 883-4900
**COZEN O'CONNOR**                         F: (646) 461-2091
33 South 6th Street                        dreichenberg@cozen.com
Suite 3800
Minneapolis, MN 55402
T: (612) 260-9000
F: (612) 260-8026                          *Attorneys for Defendant*
mjacobson@cozen.com                        Dexon Computer, Inc.

- 31 -
**COUNTERCLAIM PLAINTIFF'S OPPOSITION TO COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS**
**Case No. 3:20-CV-04926-CRB**

**App.456**

# Exhibit C

| | |
|---|---|
| **1** | Amanda R. Washton (SB# 227541) |
| **2** | *a.washton@conklelaw.com*<br>**CONKLE, KREMER & ENGEL** |
| **3** | Professional Law Corporation<br>3130 Wilshire Boulevard, Suite 500 |
| **4** | Santa Monica, California 90403-2351<br>Phone: (310) 998-9100 |
| **5** | Fax: (310) 998-9109 |

David H. Reichenberg (pro hac vice pending)
   *DReichenberg@cozen.com*
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006
Phone: (212) 883-4900
Fax: (646) 461-2091

Amanda R. Washton (SB# 227541)
   *a.washton@conklelaw.com*
**CONKLE, KREMER & ENGEL**
Professional Law Corporation
3130 Wilshire Boulevard, Suite 500
Santa Monica, California 90403-2351
Phone: (310) 998-9100
Fax: (310) 998-9109

Michael M. Lafeber (*pro hac vice*)
   *mlafeber@taftlaw.com*
O. Joseph Balthazor Jr. (*pro hac vice*)
   *jbalthazor@taftlaw.com*
**TAFT STETTINIUS &**
   **HOLLISTER LLP**
2200 IDS Center
80 S. 8th Street
Minneapolis, MN 55402
Phone: 612.977.8400
Fax: 612.977.8650

David H. Reichenberg (pro hac vice pending)
   *DReichenberg@cozen.com*
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006
Phone: (212) 883-4900
Fax: (646) 461-2091

Mark A. Jacobson (*pro hac vice pending*)
   *mjacobson@cozen.com*
**COZEN O'CONNOR**
33 South 6th Street
Suite 3800
Minneapolis, MN 55402
Phone: (612) 260-9000
Fax: (612) 260-8026

Attorneys for Defendant, Counterclaim
Plaintiff and Third-Party Plaintiff Dexon
Computer, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

CISCO SYSTEMS, INC., a Delaware
corporation and CISCO TECHNOLOGY,
INC., a California corporation,

   Plaintiffs,

  v.

DEXON COMPUTER, INC., a Minnesota
corporation,

   Defendant.

DEXON COMPUTER, INC., a Minnesota
corporation,

   Counterclaim Plaintiff and
   Defendant,

  v.

Case No. 3:20-CV-4926-CRB

**DEFENDANT'S AMENDED ANSWER,
AFFIRMATIVE DEFENSES,
COUNTERCLAIMS AND THIRD-
PARTY CLAIMS**

**DEMAND FOR JURY TRIAL**

Hon. Charles R. Breyer
Presiding Judge

Trial Date:  None

| | |
|---|---|
| 1 | CISCO SYSTEMS, INC., a Delaware corporation and CISCO TECHNOLOGY, |
| 2 | INC., a California corporation, |
| 3 | Counterclaim Defendants and Plaintiffs. |
| 4 | |
| 5 | DEXON COMPUTER, INC., a Minnesota corporation, |
| 6 | |
| 7 | Third-Party Plaintiff, |
| 8 | v. |
| 9 | ATLANTIX GLOBAL SYSTEMS INTERNATIONAL, LLC, BIZCOM ELECTRONICS, INC., DIGI DEVICES |
| 10 | ONLINE, ENTERPRISE BUSINESS TECHNOLOGIES, INC., FIBER CABLE |
| 11 | CONNECTIONS, MJSI, MULTIMODE TECHNOLOGIES, LLC, NETWORK |
| 12 | REPUBLIC, OPTIMUM DATA, INC., PARAGON, PURE FUTURE |
| 13 | TECHNOLOGY, INC., SEASTAR IT TRADING LLC, SERVER TECH |
| 14 | SUPPLY, SOFTNETWORKS, INC., STRADA NETWORKS, LLC, |
| 15 | STRATEGIC TELECOM SUPPLY & SOLUTIONS, TEKSAVERS, |
| 16 | UNLIMITED NETWORK SOLUTIONS, and  WISECOM TECHNOLOGIES,, |
| 17 | |
| 18 | Third-Party Defendants, |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.459**

1   Defendant Dexon Computer, Inc. ("Dexon"), by and through its undersigned counsel,

2   for its Answer, denies each and every allegation in Plaintiffs Cisco Systems, Inc. and Cisco

3   Technology Inc.'s ("Plaintiffs") First Amended Complaint ("Complaint") except as

4   expressly admitted, qualified or otherwise responded to herein and denies that Plaintiffs are

5   entitled to any of the relief requested in their Prayer for Relief.  In response to each of the

6   numbered paragraphs of the Complaint, Dexon states as follows. To the extent the headings

7   or any other non-numbered statements in the Complaint contain allegations, Dexon denies

8   each and every such allegation.

9   **INTRODUCTION**

10  1.    Dexon denies the allegations of paragraph 1 of the Complaint.

11  2.    Dexon denies the allegations of paragraph 2 of the Complaint.

12  **THE PARTIES**

13  3.    Dexon lacks sufficient information to admit or deny the allegations of paragraph 3 of

14  the Complaint, and on that basis Dexon denies those allegations.

15  4.    Dexon admits the allegations of paragraph 4 of the Complaint.

16  5.    Dexon denies the allegations of paragraph 5 of the Complaint.

17  **JURISDICTION AND VENUE**

18  6.    Admits that the Complaint purports to be one "founded upon violations of Federal

19  trademark laws" but denies any such purported claims have legal or factual merit.  The

20  remaining allegations in paragraph 6 of the Complaint are legal conclusions and questions

21  of law regarding jurisdiction to which no response is required. To the extent a response is

22  required, Dexon denies such allegations.

23  7.    Dexon denies the allegations of paragraph 7 of the Complaint.

24  8.    Dexon denies the allegations of paragraph 8 of the Complaint.

25  9.    Dexon denies the allegations of paragraph 9 of the Complaint.

26  10.   Dexon denies the allegations of paragraph 10 of the Complaint.

27  11.   Dexon denies the allegations in paragraph 11 of the Complaint.

28

| | |
|---|---|
| 1 | **FACTUAL ALLEGATIONS** |
| 2 | **Alleged Cisco Business and History** |
| 3 | 12.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 12 |
| 4 | of the Complaint, and on that basis Dexon denies those allegations. |
| 5 | 13.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 13 |
| 6 | of the Complaint, and on that basis Dexon denies those allegations. |
| 7 | 14.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 14 |
| 8 | of the Complaint, and on that basis Dexon denies those allegations. |
| 9 | **Alleged Cisco Trademarks** |
| 10 | 15.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 15 |
| 11 | of the Complaint, and on that basis Dexon denies those allegations. |
| 12 | 16.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 16 |
| 13 | of the Complaint, and on that basis Dexon denies those allegations. |
| 14 | 17.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 17 |
| 15 | of the Complaint, and on that basis Dexon denies those allegations. |
| 16 | 18.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 18 |
| 17 | of the Complaint, and on that basis Dexon denies those allegations. |
| 18 | **Alleged Counterfeit "Cisco" Products** |
| 19 | 19.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 19 |
| 20 | of the Complaint, and on that basis Dexon denies those allegations. |
| 21 | 20.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 20 |
| 22 | of the Complaint, and on that basis Dexon denies those allegations. |
| 23 | **Alleged Impact on Health, Safety, and National Security Caused by Counterfeit** |
| 24 | **Cisco Products** |
| 25 | 21.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 21 |
| 26 | of the Complaint, and on that basis Dexon denies those allegations. |
| 27 | 22.     Dexon lacks sufficient information to admit or deny the allegations of paragraph 22 |
| 28 | of the Complaint, and on that basis Dexon denies those allegations. |

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**Dexon's Alleged History and Practice of Trafficking in Counterfeit Cisco Products**

23.     Dexon admits selling product bearing the Cisco name and/or mark, but denies the remaining allegations of paragraph 23 of the Complaint, including, without limitation, any allegation such product was counterfeit.

24.     Dexon denies the allegations of paragraph 24 of the Complaint.

25.     Dexon denies the allegations of paragraph 25 of the Complaint.

**Alleged Activity Prior to 2015 Purportedly Demonstrating Dexon's Pattern and Practice of Knowingly Trafficking in Counterfeit Cisco Products**

**Alleged July 27, 2006 Sale of Counterfeit Cisco Products to a Cisco Investigator (Reston, Virginia)**

26.     Dexon denies the allegations in paragraph 26 of the Complaint.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**FBI's Seizure of Alleged Counterfeit Cisco Products from Dexon on February 26, 2008**

27.     Dexon admits the Federal Bureau of Investigation ("FBI") executed a search warrant at Dexon's business location on or about February 26, 2008, but denies the remaining allegations in paragraph 27 of the Complaint including, without limitation, any allegation, suggestion or implication any or "all" of the product taken by the FBI was determined to be counterfeit.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Cisco's March 2008 Cease and Desist Letter to Dexon and its CEO**

28.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about March 7, 2008, and that Dexon responded via a letter from its counsel on or about March 18, 2008, but Dexon denies the reminder of the allegations in paragraph 28 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of

the letters or communications which speak for themselves. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Dexon's June 2010 Sale of Alleged Counterfeit Cisco Products to Wayne State University (Detroit, Michigan) and Cisco's C&D Letter**

29.     Dexon admits selling and shipping Cisco product to Wayne State University on or about February 21, 2010 but denies the remainder of the allegations in paragraph 29 of the Complaint, including, without limitation, any allegation the product involved was counterfeit. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

30.     Dexon admits Plaintiffs sent a letter addressed to Dexon's President and CEO Steve O'Neil on or about August 6, 2010 concerning Dexon's sale of Cisco product to Wayne State University, but Dexon denies the reminder of the allegations in paragraph 30 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

31.     Dexon admits it responded via a letter from counsel to Plaintiff's Wayne State University allegations on or about August 23, 2010, but Dexon denies the reminder of the allegations in paragraph 31 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself. Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

32.     Dexon admits Plaintiffs sent a follow-up letter concerning or relating to the Wayne State University allegations on or about August 30, 2010, but Dexon denies the reminder of the allegations in paragraph 32 of the Complaint, including, without limitation, Plaintiffs'

attempted characterization of the letter which speaks for itself.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Dexon's July 2010 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Los Angeles, California)**

33.     Dexon denies the allegations in paragraph 33 of the Complaint.  Plaintiffs previously commenced a lawsuit against Dexon in 2011 including claims based directly on such allegations which were resolved via a confidential settlement agreement and dismissed with prejudice.

**Dexon's Alleged Illegal Conduct Giving Rise to the Present Lawsuit**

34.     Dexon denies the allegations in paragraph 34 of the Complaint.

**Dexon's July 2015 Sale of Alleged Counterfeit Cisco Product to Things Remembered, Inc. (Highland Heights, Ohio) and Cisco's C&D Letter**

35.     Dexon admits selling Cisco product to Things Remembered, Inc. on or about July 2015, but denies the remainder of the allegations in paragraph 35 of the Complaint, including any allegation the product was counterfeit.

36.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Things Remembered, Inc. allegations on or about August 27, 2020 and that Dexon responded thereto, but Dexon denies the reminder of the allegations in paragraph 36 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

**Dexon's December 2016 Sale of Alleged Counterfeit Cisco Products to Jack Henry & Associates, Inc. (Monett, Missouri) and Cisco's C&D Letter**

37.     Dexon admits selling Cisco product to Jack Henry & Associates, Inc. ("Jack Henry") on or about December 2016, but denies the remainder of the allegations in paragraph 37 of the Complaint, including, without limitation, any allegation the product was counterfeit.

38.    Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the Jack Henry allegations, but Dexon denies the reminder of the allegations in paragraph 38 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

39.    Dexon admits it responded to Plaintiffs' Jack Henry allegations via a letter from Dexon's counsel, but denies the reminder of the allegations in paragraph 39 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the responsive letter which speaks for itself.

### Dexon's October 2017 Sale of Alleged Counterfeit Cisco Products to a Cisco Investigator (Berkeley, California)

40.    Dexon denies the allegations in paragraph 40 of the Complaint.

### Dexon's January 2018 Sale of Alleged Counterfeit Cisco Product to Community Health Alliance (Reno, Nevada) and Cisco's C&D Letter

41.    Dexon admits selling Cisco product to Community Health Alliance ("CHA") on or about January 2018, but denies the remainder of the allegations in paragraph 41 of the Complaint, including, without limitation, any allegation the product was counterfeit.

42.    Dexon admits Plaintiffs and Dexon's counsel exchanged a series of letters or communications relating to the CHA allegations, but denies the remainder of the allegations in paragraph 42 of the Complaint, including, without limitation, Plaintiffs' attempted characterizations of the letters or communications which speak for themselves.

### Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to Tucson Medical Center (Arizona)

43.    Dexon admits selling Cisco product to Tucson Medical Center ("TMC") on or about April 2018, but denies the remainder of the allegations in paragraph 43 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's April 2018 Sale of Alleged Counterfeit Cisco Products to DARCARS (Maryland) and Cisco's C&D Letter**

44.      Dexon admits selling Cisco product to DARCARS on or about April 2018, but denies the remainder of the allegations in paragraph 44 of the Complaint, including, without limitation, any allegation the product was counterfeit.

45.      Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the DARCARS allegations, but Dexon denies the reminder of the allegations in paragraph 45 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Lockridge, Grindal, Nauen, PLLP (Minneapolis, Minnesota)**

46.      Dexon admits selling Cisco product to Lockridge, Grindal, Nauen, PLLP on or about August 2018, but denies the remainder of the allegations in paragraph 46 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's August 2018 Sale of Alleged Counterfeit Cisco Products to Regional Justice Information Service (St. Louis, MO) and Cisco's C&D Letter**

47.      Dexon admits selling Cisco product to Regional Justice Information Service ("RJIS") on or about August 2018, but denies the remainder of the allegations in paragraph 47 of the Complaint, including, without limitation, any allegation the product was counterfeit.

48.      Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the RJIS allegations, but Dexon denies the reminder of the allegations in paragraph 48 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Purchases in 2018 of Alleged Counterfeit Switches from PureFutureTech (Fremont, California)**

49.      Dexon admits purchasing Cisco product from PureFutureTech on or about 2018 and that the purported supplier of such product was HongKong Sellsi, a former authorized

Case 5:22-cv-00053-RWS-JBB Document 21-6 Filed 06/27/23 Page 1 of 66 PageID #:  506

1  licensed seller of Cisco products, but lacks sufficient information to admit or deny the

2  remaining allegations of paragraph 49 of the Complaint, and on that basis Dexon denies such

3  allegations.

4  50.     Dexon admits Plaintiffs served it with a subpoena relating to a lawsuit involving

5  Plaintiffs, PureFutureTech and HongKong Sellsi and that Plaintiffs were ultimately required

6  to file a motion relating to such non-party subpoena.  Dexon denies the remaining allegations

7  of paragraph 50 of the Complaint, including, without limitation, any allegation, suggestion

8  or implication Dexon "refused to cooperate" with, or in any way failed to meet its obligations

9  arising from, the subpoena.

10      **Dexon's Purchases in 2017 to 2019 of Alleged Counterfeit Transceivers
        from Pure Future Tech, Inc. (Fremont, California)**

11

12  51.     Dexon admits purchasing Cisco product from Pure Future Tech, Inc. in the period

13  2017-2019 but denies any such product was counterfeit.  Dexon lacks sufficient information

14  to admit or deny the remaining allegations in paragraph 51 of the Complaint and on that

15  basis denies such allegations.

16  52.     Dexon denies the allegations in paragraph 52 of the Complaint, including, without

17  limitation, any allegation Dexon knew or reasonably should have known any Cisco product

18  was allegedly counterfeit, or that Dexon was willfully blind to such alleged fact.

19      **Dexon's Sales of Alleged Counterfeit Products to Murray State University
        (Murray, Kentucky) in 2018 and 2019 and Cisco's C& Letter**

20

21  53.     Dexon admits selling Cisco product to Murray State University ("MSU") in or about

22  2018 and 2019, but denies the remainder of the allegations in paragraph 53 of the Complaint,

23  including, without limitation, any allegation the product was counterfeit.

24  54.     Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the

25  MSU allegations, but Dexon denies the reminder of the allegations in paragraph 54 of the

26  Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter

27  which speaks for itself.

28

**App.467**

**Dexon's July 2019 Sale of Alleged Counterfeit Cisco Products to MedRisk (King of Prussia, Pennsylvania)**

55.   Dexon admits selling Cisco product to MedRisk on or about July 2019, but denies the remainder of the allegations in paragraph 55 of the Complaint, including, without limitation, any allegation the product was counterfeit.

**Dexon's September 2019 Sale of Alleged Counterfeit Cisco Products to Coppell Independent School District (Coppell, Texas) and Cisco's C&D Letter**

56.   Dexon admits selling Cisco product to Coppell Independent School District ("CISD") on or about September 2019, but denies the remainder of the allegations in paragraph 56 of the Complaint.

57.   Dexon denies any allegation, suggestion or implication in paragraph 57 of the Complaint that Cisco product it sold to CISD was counterfeit.  Dexon lacks sufficient information to admit or deny the remainder of the allegations in paragraph 57 of the Complaint and on that basis denies such allegations.

58.   Dexon admits Plaintiffs sent a letter addressed to Dexon's counsel relating to the CISD allegations, but Dexon denies the reminder of the allegations in paragraph 58 of the Complaint, including, without limitation, Plaintiffs' attempted characterization of the letter which speaks for itself.

**Dexon's Alleged California Directed Conduct Identified Through Jurisdictional Discovery**

59.   Dexon admits Plaintiffs conducted jurisdictional discovery herein, but denies the remainder of the allegations in paragraph 59 of the Complaint, including, without limitation, Plaintiffs' characterization of such jurisdictional discovery, as well as any allegation such discovery revealed any "illegal and tortious" conduct by Dexon in California or elsewhere.

**Dexon's Sale of Alleged Counterfeit Cisco Products to California Customers**

60.   Dexon denies the allegations in paragraph 60 of the Complaint.

**Dexon's Sale of Alleged Counterfeit Cisco Licenses to California Customers**

61.     Dexon admits Cisco has transmitted software licenses via Product Activation Key Certificates ("PAK") and that such PAKs have included a code that allows users to utilize the subject software.  Dexon denies the remainder of the allegations in paragraph 61 of the Complaint.

62.     Dexon denies the allegations in paragraph 62 of the Complaint.

63.     Dexon denies the allegations in paragraph 63 of the Complaint.

64.     Dexon denies the allegation in paragraph 64 of the Complaint.

**FIRST PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Infringement**
**(*15 U.S.C. § 1114*)**

65.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-64 in response to the allegations in paragraph 65 of the Complaint.

66.     Dexon denies the allegations of paragraph 66 of the Complaint.

67.     Dexon denies the allegations of paragraph 67 of the Complaint.

68.     Dexon denies the allegations of paragraph 68 of the Complaint.

69.     Dexon denies the allegations of paragraph 69 of the Complaint.

70.     Dexon denies the allegations of paragraph 70 of the Complaint.

71.     Dexon denies the allegations of paragraph 71 of the Complaint.

72.     Dexon denies the allegations of paragraph 72 of the Complaint.

**SECOND PURPORTED CLAIM FOR RELIEF**
**Federal Trademark Counterfeiting**
**(*15 U.S.C. § 1114*)**

73.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-72 in response to the allegations in paragraph 73 of the Complaint.

74.     Dexon denies the allegations of paragraph 74 of the Complaint.

75.     Dexon denies the allegations of paragraph 75 of the Complaint.

76.     Dexon denies the allegations of paragraph 76 of the Complaint.

77.     Dexon denies the allegations of paragraph 77 of the Complaint.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.469**

Case 5:22-cv-00053-RWS-JBB-CRB Document 12-3t 5 Filed 06/27/21 Page 14 of 36 PageID #:  509

78.     Dexon denies the allegations of paragraph 78 of the Complaint.

79.     Dexon denies the allegations of paragraph 79 of the Complaint.

**THIRD PURPORTED CLAIM FOR RELIEF**
**False Designation of Origin**
**(15 U.S.C. *§ 1125*)**

80.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-79 in response to the allegations in paragraph 80 of the Complaint.

81.     Dexon denies the allegations of paragraph 81 of the Complaint

82.     Dexon denies the allegations of paragraph 82 of the Complaint.

83.     Dexon denies the allegations of paragraph 83 of the Complaint.

84.     Dexon denies the allegations of paragraph 84 of the Complaint.

85.     Dexon denies the allegations of paragraph 85 of the Complaint.

**FOURTH PURPORTED CLAIM FOR RELIEF**
**California Unfair Business Practices**
**(Cal. Bus. & Prof. Code *§§ 17200 et seq.*)**

86.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-85 in response to the allegations in paragraph 86 of the Complaint.

87.     The allegations in paragraph 87 of the Complaint are legal conclusions of law regarding California Business and Professions Code §§ 17200 *et seq* to which no response is required. To the extent such allegations imply or suggest Dexon has in any way violated California Business and Professions Code §§ 17200 *et seq* Dexon denies such allegations.

88.     Dexon denies the allegations of paragraph 88 of the Complaint.

89.     Dexon denies the allegations of paragraph 89 of the Complaint.

90.     Dexon denies the allegations of paragraph 90 of the Complaint.

91.     Dexon denies the allegations of paragraph 91 of the Complaint.

92.     Dexon denies the allegations of paragraph 92 of the Complaint.

**FIFTH PURPORTED CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Common Law)**

93.     Dexon restates and incorporates by reference its responses to the allegations in paragraphs 1-92 in response to the allegations in paragraph 93 of the Complaint.

**App.470**

1  94.    Dexon admits the allegations of paragraph 94 of the Complaint.

2  95.    Dexon denies the allegations of paragraph 95 of the Complaint.

3                          **AFFIRMATIVE DEFENSES**

4          Without admitting any wrongful conduct on the part of Dexon, and without admitting

5  that Plaintiffs claims have any merit or that Plaintiffs have suffered any loss, damage, or

6  injury, Dexon alleges the following affirmative defenses to the Complaint.  By designating

7  the following as affirmative defenses, Dexon does not in any way waive or limit any defenses

8  which are or may be raised by their denial, allegations, and averments set forth herein.  These

9  defenses are pled in the alternative, are raised to preserve the rights of Dexon to assert such

10  defenses, and are without prejudice to Dexon's ability to raise other and further defenses.

11  Dexon expressly reserves all rights to reevaluate their defenses and/or assert additional

12  defenses upon discovery and review of additional documents and information, upon the

13  development of other pertinent facts, and during pretrial proceedings in this action.  Dexon

14  expressly incorporate all allegations of its Answer, Counterclaims and Cross-Claims as if

15  fully set forth in each of the following affirmative defenses.

16                        **FIRST AFFIRMATIVE DEFENSE**
                   **(Res Judicata and Collateral Estoppel)**

17  96.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of

18  res judicata and collateral estoppel.

19

20                       **SECOND AFFIRMATIVE DEFENSE**
                              **(Laches)**

21  97.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of

22  laches.  Plaintiffs' have had longstanding knowledge concerning the legal open or

23  "secondary" market for its products and have proactively engaged in anticompetitive

24  behavior in an effort to selectively manipulate and control such secondary market to their

25  advantage.  Plaintiffs have had longstanding specific knowledge of Dexon's activity in the

26  legal secondary market since well before 2011, yet have failed to take timely action to assert

27  their claims herein, resulting in substantial prejudice to Defendants.

28

**App.471**

### THIRD AFFIRMATIVE DEFENSE
#### (Estoppel)

98.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of estoppel. Plaintiffs' advertises that consumers can purchase their products from their "Authorized Channel Partners" or "Authorized Resellers."  Plaintiffs have known, or should have known such "Authorized Channel Partners" and/or "Authorized Resellers" participate in and sell their products on the secondary market. Plaintiffs have allowed these "Authorized Channel Partners" and/or "Authorized Resellers" to maintain their "authorized" status despite knowledge of their participation in the secondary market, including evidence of their sale of counterfeit Cisco products.  Plaintiffs know, or should have reasonably known, that secondary market resellers such as Dexon rely upon Plaintiffs' endorsement of such "authorized" vendors when sourcing Cisco products, including, without limitation, procuring Cisco product from such "authorized vendors" end customers.  Plaintiffs also claim to have developed "tools" capable of detecting counterfeit goods.  However, unlike their competitors in the market, have intentionally failed or refused to provide or offer such "tools" to secondary market resellers such as Dexon to aid and assist in their efforts to detect and deter counterfeit goods. Plaintiffs have also actively contributed to the presence of counterfeit product in the marketplace by, without limitation, failing to properly police and control their manufacturers and failing to properly manage their product serial numbers.  As one example, Plaintiffs "authorized" vendors intentionally modify or change product serial numbers in order to ensure the subject product(s) qualify for Plaintiffs' SmartNet service packages.  Plaintiffs are therefore estopped from pursuing claims against Dexon or seeking damages related to alleged counterfeit products.

### FOURTH AFFIRMATIVE DEFENSE
#### (First Sale Doctrine and Exhaustion)

99.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the first sale doctrine, which protects secondary market resellers such as Dexon from liability for the

1  purchase, importation, and resale of genuine Cisco products and exhausts Plaintiffs' rights
2  in further transactions.

3  ### FIFTH AFFIRMATIVE DEFENSE
   **(Statutes of Limitations)**
4

5  100.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by applicable
6  statutes of limitations, including but not limited to CAL. CIV. PROC. CODE §§ 337–38,
7  CAL. BUS. & PROF. CODE § 17208, and 17 U.S.C. § 507.  Some or all of Plaintiffs' claims
8  involve conduct outside of the applicable statutes of limitations.

9  ### SIXTH AFFIRMATIVE DEFENSE
   **(Waiver)**
10

11  101.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of
12  waiver. Plaintiffs have promoted and advertised its "authorized" sellers despite having full
13  knowledge certain such "authorized" sellers: i) have been caught selling counterfeit product;
14  and ii) actively and regularly deal with secondary market resellers such as Dexon.
15  Secondary market resellers such as Dexon have understandably relied upon Plaintiffs'
16  promotion and endorsement of such "authorized" sellers when sourcing Cisco products for
17  their customers. As noted above, Plaintiffs have also intentionally failed or refused to
18  provide or offer their claimed "tools" for detecting counterfeit product to secondary market
19  resellers such as Dexon, and have actively contributed to the presence of counterfeit product
20  in the marketplace by, without limitation, failing to properly police and control their
21  manufacturers and failing to properly manage their product serial numbers.  Accordingly,
22  Plaintiffs have waived any claims related to Dexon's unwitting sale of alleged counterfeit
23  goods, including any such goods sourced directly or indirectly from Plaintiffs' "authorized"
24  vendors.

25  ### SEVENTH AFFIRMATIVE DEFENSE
   **(Unjust Enrichment)**
26

27  102.   Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrine of
28  unjust enrichment. Plaintiffs have engaged in anticompetitive practices and made

**App.473**

misrepresentations to consumers regarding: i) the quality and authenticity of products sold by secondary market resellers such as Dexon; and ii) Plaintiffs' rights to restrict consumers use and transfer of Cisco hardware and software. Such anticompetitive and inequitable conduct has improperly steered customers from Dexon to Plaintiffs and unjustly enriched Plaintiffs.

### EIGHTH AFFIRMATIVE DEFENSE
#### (Unclean Hands/Inequitable Conduct)

103.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by the doctrines of unclean hands, inequitable conduct, and similar defenses. Without limitation, Plaintiffs have: i) engaged in anticompetitive practices, (ii) intentionally misled consumers into thinking that genuine products on the secondary market are used, counterfeit, or stolen, (iii) sold products to resellers whom it knew, or should have known, were reselling the products on the secondary market, (iv) held out certain entities as "Authorized Resellers" even though Plaintiffs knew or should have known these entities sold counterfeit goods, and engaged in other inequitable practices that bar recovery on its claims.

### NINTH AFFIRMATIVE DEFENSE
#### (Redundancy)

104.    Plaintiffs' claims and/or recovery are barred, in whole or in part, because they are redundant and/or duplicative of one another.

### TENTH AFFIRMATIVE DEFENSE
#### (Abandonment)

105.    Plaintiffs' claims and/or recovery are barred, in whole or in part, by abandonment of any marks at issue. Plaintiffs' have failed to properly police and exercise adequate quality control over its marks and have thereby abandoned their rights therein.

Case 5:22-cv-00053-RWS-JBB-CRB Document 5 Filed 06/27/21 Page 19 of 66 PageID #: 514

### ELEVENTH AFFIRMATIVE DEFENSE
#### (Conduct of Others)

106.     Plaintiffs' claims and/or recovery are barred, in whole or in part, because the conduct complained of is the conduct of others, including, without limitation, Plaintiff's "authorized" vendors and/or Plaintiffs' licensed manufacturers.

### TWELVE AFFIRMATIVE DEFENSE
#### (Failure to Mitigate)

107.     Plaintiffs' claims and/or recovery are barred, in whole or in part, because Plaintiffs failed to mitigate, minimize, or attempt to avoid damages.  Without limitation, Plaintiffs could have pursued legal remedies earlier, assisted secondary market resellers like Dexon in detecting and fighting counterfeit products, and/or properly policed and prevented the manufacture and distribution of counterfeit product within their own manufacturing and distribution network.

### THIRTEENTH AFFIRMATIVE DEFENSIVE
#### (Lack of Personal Jurisdiction)

108.     Plaintiffs are barred from pursuing their claims against Dexon in this Court because the Court lacks personal jurisdiction over Dexon.

### FOURTEENTH AFFIRMATIVE DEFENSIVE
#### (Improper Venue)

109.     Plaintiffs are barred from pursuing their claims against Dexon in this Court because venue is improper.

### FIFTEENTH AFFIRMATIVE DEFENSIVE
#### (Failure to State a Claim)

110.     The Complaint, in whole or in part, fails to state any claim upon which relief can be granted.

**App.475**

**SIXTEENTH AFFIRMATIVE DEFENSIVE**
**(One Satisfaction Rule / Bar on Double Recovery)**

111.     Plaintiffs' claims and/or recovery are barred, in whole or in part, by the one satisfaction rule and/or the bar on double recoveries.

**COUNTERCLAIMS**

Counterclaim Plaintiff Dexon Computer, Inc. asserts the following counterclaims against Counterclaim Defendant Cisco Systems, Inc., and Cisco Technology, Inc. (hereinafter referred to jointly as "Cisco") alleges as follows:

1.     Cisco is a monopolist that uses whatever means necessary to keep the prices for its networking products as high as possible to the detriment of its customers.

2.     While high prices are permissible if lawfully obtained, Cisco engaged and continues to engage in coercion of its customers who purchase its SmartNet service package which is the only way for those customers to receive software and other updates for networking equipment that are often essential for the maintenance of Cisco's networking products such as routers and Ethernet switches.

3.     Specifically, customers buy routers and Ethernet switches manufactured by Cisco, and also separately purchase the SmartNet service package for those products for a one to five year period.  At the time a SmartNet service package is purchased, Cisco approves customers' SmartNet service purchase and knows that in many cases the service package is being purchased through a secondary reseller.  SmartNet customers then receive service from Cisco for a portion of the period, but at some point before the end of the service package period, when customers contact Cisco to get the service they paid for, Cisco notifies customers that their SmartNet service has been terminated unless they buy entirely new routers and/or Ethernet switches from a specified Cisco source at a far higher price than the original network equipment purchase.  Alternatively, to preserve customers' SmartNet service, Cisco will demand a "re-certification" fee, charging just as much if not more than the original equipment purchase, and providing no value to the customer other than restoration of SmartNet.  In one case, Cisco even threatened a customer that it would not

**App.476**

1  service any of the customer's Cisco products pursuant to its SmartNet service package,

2  regardless of how or when the customer previously purchased those products, unless the

3  customer made all new equipment purchases.

4  4.    This coercion works.  Customers are forced to either buy new, expensive networking

5  equipment or pay a "re-certification" fee so that they can continue receiving SmartNet

6  service, or are forced to "make the best of" a situation in which they can never be sure that

7  they will receive the service they paid for and had previously been provided.  In the latter

8  situation, Cisco has even kept the money it received for the SmartNet purchase despite not

9  providing the requested services.

10  5.    While any customer subject to this treatment has sustained an injury that should be

11  rectified, Cisco's conduct has impacted at least one local 911-emergency services provider

12  whose network could have been compromised in the midst of these threats.

13  6.    Dexon is a company that has been servicing its customers for decades, providing

14  timely and reliable services as well as selling affordable network equipment to meet the

15  budgets of hospitals, emergency services providers, public service organizations and many

16  other small and medium businesses including those providing essential services including

17  during the COVID-19 pandemic.  Dexon and its customers have been victimized by the

18  above coercion tactics.  Cisco seeks to squash a small provider like Dexon for providing

19  reliable service and products to customers at a price lower than other Cisco dealers, figuring

20  that Dexon would just succumb to Cisco's illegitimate claims of "counterfeit."  Cisco is

21  mistaken, and its anticompetitive conduct must be remedied.

22  7.    Cisco's use of its "service arm," which upon information and belief is entirely

23  separate in terms of personnel, expertise, profitability, process, and corporate structure from

24  its "products arm," to maintain and maximize profitability in its products arm, must stop.

25  8.    Cisco's course of dealing with Dexon confirms its anticompetitive motive and harm

26  to customers.  From at least 2010 to 2015, Dexon was a registered user of Cisco's service

27  database in which it could coordinate repairs and other service calls for its customers.  Both

28  parties benefitted during this time:  Dexon kept its customers happy and Cisco retained the

1   loyalty of customers who continued to buy Cisco equipment thanks to Dexon's work.  Then

2   in 2016, Cisco terminated Dexon's access to the database, but after a Dexon representative

3   called Cisco and explained how disappointed customers were, Dexon was reinstated.

4   Unfortunately however, in 2018, Cisco again terminated Dexon's access, this time without

5   reinstatement.  At that point, Cisco took a financial loss because frustrated customers went

6   to competitive networking equipment vendors to buy networking equipment manufactured

7   by Cisco's competitors.  The clear intent and effect of this course of conduct is for Cisco to

8   sustain a short term loss for the impermissible long term benefit of eliminating a low cost

9   provider in the market for its products.

10   9.     The Court must hold Cisco accountable for these anticompetitive acts that are

11   crippling small and medium businesses, including but far from limited to Dexon.

12                                        **THE PARTIES**

13   10.    Defendant and Counterclaim Plaintiff Dexon Computer, Inc. ("Dexon") is a

14   Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway,

15   Suite BB, Bloomington, Minnesota 55420.

16   11.    On information and belief, Plaintiff and Counterclaim Defendant Cisco Systems, Inc.

17   ("CSI") is a Delaware corporation with its principal place of business at 170 W. Tasman

18   Drive, San Jose, California 95134.

19   12.    On information and belief, Plaintiff and Counterclaim Defendant Cisco Technology,

20   Inc. ("CTI") is a California corporation with its principal place of business at 170 W. Tasman

21   Drive, San Jose, California 95134.

22                                        **JURISDICTION**

23   13.    This Court has subject matter jurisdiction over Dexon's counterclaims pursuant to 28

24   U.S.C. §§ 1367 and 1332.  Dexon's counterclaims arise out of the same controversy as

25   plaintiffs' Federal claims, there is complete diversity of citizenship between Plaintiffs and

26   Dexon, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00),

27   exclusive of interest and costs.

28

**FACTS**
**Cisco**

14.     Cisco is the worldwide and US leader of networking for the Internet.  Cisco offers products and related services in the core technologies of routing and switching, along with more advanced technologies in areas such as home networking, IP telephony, optical networking, security, storage area networking, and wireless technology.  On information and belief, Cisco contracts for the manufacture of a majority of its products overseas to keep costs of manufacture at a minimum.

15.     On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry as explained below.

**Cisco is Using Its Monopoly In After Market Maintenance Services to Force Subsequent Supracompetitive Network Equipment Purchases**

**A.     Cisco is a Monopolist For After-Market Maintenance Services On Cisco Equipment**

16.     Customers of networking equipment may require maintenance and service to ensure the proper functioning of their equipment.  Only Cisco is able to provide full maintenance and support on its router and Ethernet switch products.  These maintenance services include onsite visits from certified engineers, software updates, technical assistance center ("TAC") access, online resources, and hardware replacement services. Without such maintenance services, customers may not be able to address critical performance issues and address service problems that can be catastrophic to their businesses.

17.     For customers that may not have the budget to justify maintenance services provided by Cisco, they rely on third party maintenance and service providers that can provide hardware maintenance and support (for instance for a power supply or fan issue), but because of Cisco's policies described herein, cannot provide software maintenance and support.  Thus, Cisco is able to maintain a price premium for its maintenance services, including its

1   SmartNet service packages, because as Cisco highlights in its SmartNet sales materials, "no
2   Third Party Maintenance Provider can provide [customers] with an apples-to-apples match
3   with what Cisco's SmartNet provides," and "a Third Party Maintenance Provider is not
4   authorized to provide [customers] with Cisco bug fixes, patches and updates." These "bug
5   fixes, patches and updates" can be essential to the efficient, effective, and full operation of
6   Cisco's hardware – they cannot be replicated and there are no reasonably interchangeable
7   substitutes for such services.

8   18.      Although end users are not legally required to purchase SmartNet service packages
9   for their Cisco products, they are effectively compelled to do so, because the service
10  packages offered are integral to the products' functionality.  Without SmartNet service, end
11  users will not receive important software bug fixes, patches, and updates (collectively,
12  "updates") that permit Cisco products to serve their intended functions.  These updates are
13  designed to repair malfunctions or defects in the software or to combat security
14  vulnerabilities.  Consumers who do not update the software on their Cisco products are
15  potentially exposed to security and operational risks.  In addition, without the software
16  updates, their Cisco products may not function properly.

17  19.      Because Cisco products run on proprietary operating system software that is essential
18  for the products to function, these updates can be obtained only from Cisco.  It is routine in
19  the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and
20  Microsoft, to make updates available to their consumers for free.  Cisco, in contrast, provides
21  updates only to consumers who have purchased SmartNet service packages.   Upon
22  information and belief, Cisco does not routinely inform customers at the time of purchase of
23  these stifling limitations.

24  20.      Thus, the aforementioned services constitute a Relevant After-Market for
25  Maintenance Services on Cisco Equipment (hereinafter the "Relevant Service Market") in
26  which Cisco is a monopolist, and no other competitive service provider has reached a double
27  digit share.  Upon information and belief, Cisco consistently has possessed a share of the
28  Relevant Service Market in excess of 90%, and because it dictates that only it can provide

certain critical services, Cisco has erected its own high barriers to entry to prevent any meaningful penetration of its dominance by any competitive service vendor. Cisco has thus admitted that SmartNet pricing is far more expensive than that of third-party providers. The geographic market for the Relevant Service Market is (i) the United States and (ii) the world, determined by the geographic scope of customers and the extent to which they require maintenance services in the US only or worldwide. In the case of the former, customers look to service providers located in the US, whereas in the latter case, customers will require vendors with an international team and associated capabilities.

21.     The Relevant Service Market is separate and distinct from the Relevant Markets for routers, Ethernet switches and other networking equipment discussed below. Customers can and do purchase Cisco networking equipment without maintenance services, and the pricing for networking equipment is entirely independent and separate from SmartNet service package pricing. Moreover, upon information and belief, Cisco's customers in these separate markets (1) deal with different Cisco personnel teams (e.g., TAC support vs. sales managers), (2) purchase the products and services at different times/schedules based on different needs, and (3) work with different engineers because engineers on the service and maintenance team are often different than the engineers on the product manufacturing and sales teams.

**B.     Cisco is Also A Monopolist In the Router and Ethernet Switch Relevant Markets**

22.     Ethernet switches are a relevant product market. Ethernet switches are devices that control data flow within a network to enable network components to communicate efficiently. They are the fundamental building blocks of modern local area networks, deployed in virtually every modern business and government office. While Ethernet switches are differentiated across vendors and customer types, there is no adequate substitute technology that provides the same function and value within a network infrastructure.

23.     Ethernet switches are durable, high fixed cost goods with extended longevity; consumers of these Ethernet switches commonly intend to use them for many years. Transitioning from Cisco Ethernet switches to Ethernet switches made by another

1    manufacturer is an expensive process, requiring the replacement of significant amounts of

2    hardware and the retraining of personnel.

3    24.    Buyers of Ethernet switches would not be able to turn to routers or other alternative

4    technologies in response to a monopolist's price increase above the competitive level.

5    25.    The geographic markets for the sale of Ethernet switches are (i) the United States and

6    (ii) the world. The global market for Ethernet switches includes manufacturers with product

7    portfolios that are worldwide in scope and multinational customers that have a demand for

8    such global capability. There is substantial industry recognition of both a global market for

9    Ethernet switches and narrower U.S.-only market for Ethernet switches. A monopolist of

10   Ethernet switches in the United States would be able to raise prices profitably over

11   competitive levels.  Correspondingly, a monopolist of Ethernet switches globally would be

12   able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to

13   maintain prices above competitive levels both globally and in the United States.

14   26.    Cisco has monopoly power in the U.S. and global markets for Ethernet switches,

15   consistently holding shares above 60% in both markets, and protected by high barriers to

16   entry as discussed below.  Cisco's Ethernet switch market shares are commonly at least five

17   times its closest Ethernet switch competitors in the US, as well as commonly five times its

18   closest Ethernet switch competitors globally. Cisco has managed to maintain its market

19   dominance for at least twenty years, with global and U.S. market shares commonly

20   exceeding 60%, and often above 70%.

21   27.    Routers have been a technology that is complementary to, and not a substitute for,

22   Ethernet switches, and also constitute their own relevant product market.  While Ethernet

23   switches connect components to create a network, routers allow for communication between

24   networks.  The two types of devices generally operate at different logical levels in a network:

25   Ethernet switches transfer information in the data link layer using physical addresses for

26   network components, whereas routers transfer packets in the Network or IP layer using

27   virtual addresses. As technology has evolved, Ethernet switch manufacturers have begun to

28

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.482**

1  incorporate certain routing technologies into a single combined product. This confirms that
2  routers are complements for Ethernet switches and not substitutes.

3  28.     Buyers of routers would not be able to turn to Ethernet switches or other alternative
4  technologies in response to a monopolist's price increase above the competitive level.

5  29.     The geographic markets for the sale of routers are (i) the United States and (ii) the
6  world.  The global market for routers includes manufacturers with product portfolios that
7  are worldwide in scope and multinational customers that have a demand for such global
8  capability.  There is substantial industry recognition of both a global market for routers and
9  a narrower U.S.-only market for routers.  A monopolist of routers in the United States would
10 be able to raise prices profitably over competitive levels.  Correspondingly, a monopolist of
11 routers globally would be able to raise prices profitably over competitive levels. In fact,
12 Cisco itself has been able to maintain prices for routers above competitive levels both
13 globally and in the United States.

14 30.     Cisco has monopoly power in the U.S. and global markets for routers, consistently
15 holding a share in excess of 60% in both markets, and protected by high barriers to entry as
16 discussed below. Cisco's router market shares are roughly at least five times its closest router
17 competitors in the US, as well as five times its closest router competitors globally. Cisco has
18 managed to maintain its market dominance on routers for at least twenty years, with global
19 and U.S. market shares commonly exceeding 60%, and often above 70%.

20 31.     The Relevant Router and Switch Markets are both characterized by high barriers to
21 entry and expansion.  There are several factors that contribute to these high entry and
22 expansion barriers for potential new entrants and existing competitors.  To begin with, the
23 costs to develop router software and hardware as well as switch software and hardware are
24 substantial.  It requires tens of millions of dollars for initial development, and then hundreds
25 of millions more to tailor the product to specific customer needs and to build an effective
26 sales network.

27 32.     Another barrier to entry for the Relevant Router and Switch Markets lies in
28 customers' long purchase cycles when replacing or upgrading their network components to

the next technology. For example, it took approximately fifteen years for customers to widely deploy 10+ Gigabit Ethernet switches to replace 1 Gigabit Ethernet switches. These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

33. As Cisco publicly promotes, it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to Ethernet switches and routers. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new Ethernet switch or router entrant may need to offer a full line of network components.

34. Cisco's practice of holding customers hostage through their SmartNet service packages also creates a particularly pernicious barrier to entry. Any customer wishing to preserve the value of its SmartNet package would not be able to viably consider router or Ethernet switch purchases from competitive vendors to Cisco if the customers are under duress that in the absence of a Cisco purchase their maintenance service may not be provided. Even if a customer were willing to risk a period without maintenance, purchasing replacement routers or Ethernet switches from a Cisco competitor means risking the value of the SmartNet package for which the customer has already paid during the remaining service period.

35. To summarize, Cisco has monopoly power in the following relevant markets: the Relevant Service Market (both globally and limited to the U.S.), the Relevant Router Market (both globally and limited to the U.S.), and the Relevant Switch Market (both globally and limited to the U.S.). Hereinafter the Relevant Router and Switch Markets are referred to collectively as the "Relevant Product Markets." Upon information and belief, Cisco may be engaging in the same coercive tactics with respect to other Relevant Product Markets, such as optics, access points, and network management software, and should that prove to be the case Dexon will make that apparent in the course of litigation.

**App.484**

**C.      Cisco Locks In Customers Who Require Maintenance With SmartNet, and Then Uses SmartNet As A Hammer To Force Supracompetitive Purchases of Routers and Ethernet Switches**

36.      Customers seek to find the best deal for networking equipment regardless of when it is purchased.  Either around the time of such an equipment purchase or at a different time, customers may also consider purchasing a SmartNet service package for several different types of networking equipment.  Upon information and belief, the larger a particular deployment and the more legacy Cisco equipment the customer has in its network, the more likely customers will require a SmartNet package for one or more aspects of their network at any time.

37.      For those customers that require a SmartNet service package, the objective is to secure maintenance services for networking equipment that already is or will be in use for the customers' networks.  To satisfy themselves that this will be the case, SmartNet customers will provide Cisco with the precise serial numbers, part numbers, products, and customer information for which the purchased SmartNet service package will apply.  Cisco specifically approves the service package with this information, including in scenarios where Cisco can see that customer is purchasing the SmartNet service package through a secondary reseller which does not have a direct purchasing relationship with Cisco.

38.      Indeed, Cisco has full knowledge that its standard sellers or partners sell an extremely large volume of SmartNet service packages to secondary market sellers such as Dexon.  In fact, Cisco's Technical Assistance Center has and will alter or change serial numbers in order to approve and thereby receive payment for SmartNet service packages relating to secondary market equipment.  Cisco willfully turns a blind eye to such transactions because they are extremely profitable for Cisco.

39.      Upon information and belief, Cisco receives a payment from customers pursuant to this SmartNet approval process at or around the time of the SmartNet purchases.

40.      As one would expect, customers would receive the service they paid for from Cisco for anywhere from months to years into the purchased SmartNet service package.  As explained below, parties such as Dexon would facilitate such service through Cisco's service

**App.485**

1   team that would keep customers happy with both companies.  But since at least 2015 through

2   the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet

3   service package that the SmartNet service packages were no longer valid in the absence of

4   a new purchase of Cisco equipment, including at least routers and/or Ethernet switches.

5   Alternatively, Cisco has been able to force customers to pay a "re-certification" fee

6   associated with the reinstatement of its SmartNet service associated with previously

7   purchased networking products.  Upon information and belief, Cisco simply accepted this

8   payment without doing any type of "re-certification" process or other associated service, and

9   reactivated the SmartNet service package simply because the customer paid more money for

10  the networking equipment.  Given that customers are locked into the Cisco installed base

11  they already purchased and already invested in the SmartNet service package, they have

12  little choice other than to give in to Cisco's demands.

13  41.     Given the Cisco approval process associated with customers' SmartNet purchases,

14  customers had no reasonable expectation when they bought the SmartNet service package

15  that Cisco would subsequently claim that entirely new, unwanted networking equipment or

16  a "re-certification" fee would be required to preserve their service package investment.  This

17  is especially true given that Cisco has unique access to customers for the months or years

18  after it purchased the service packages, and customers received the service for which they

19  had paid during that period.  Cisco changed its conduct not because of enforcement of a

20  consistent policy, but rather because it newly disapproved, after approving previously,

21  customers' purchase of networking equipment and SmartNet service.

22  42.     One scenario involving a hospital provides a poignant example.  For several years,

23  Dexon had provided Cisco routers, Ethernet switches, line cards, access points and modules

24  to the hospital, for which the hospital also purchased a series of SmartNet service packages

25  from Dexon.  Pleased with the products and service Dexon had provided, the hospital

26  decided to make a significant investment in Cisco routers and Ethernet switches with Dexon,

27  and the deal would have been worth a significant amount of business for the hospital (on top

28  of the prior business with Dexon which was already significant).  Upon learning that the

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

1    hospital had awarded the order to Dexon, Cisco threatened the customer that if it did not

2    cancel the order for the new purchase of Cisco hardware and associated SmartNet service

3    with Dexon, that not only would Cisco not honor the contemplated new SmartNet service

4    package, but Cisco also would cancel immediately _all_ SmartNet service packages which the

5    customer had in place for the entire hospital system and clinics which the customer had been

6    receiving service and support from Cisco for years.  This tactic worked, and the customer

7    did not go through with the contemplated deal with Dexon, and never made another purchase

8    from Dexon again.  Upon information and belief, the hospital was coerced to deal on terms

9    that met with Cisco's approval, rather than what free market forces would have provided to

10   the hospital and its patients.

11   43.     These terrible tactics were also applied to at least one local 911-service center, for

12   which the center's purchase and maintenance of reliable routers and Ethernet switches can

13   be a matter of life and death.  In the midst of a five-year SmartNet service package the 911-

14   center had purchased from Cisco, when the customer checked on its account for purposes of

15   a service issue, Cisco threatened the customer that it needed to purchase new routers and

16   Ethernet switches if it wanted to receive the service it was due under its SmartNet service

17   package.  The 911-center could not afford new equipment, and Dexon at its own expense

18   purchased a new SmartNet service package for any support issues that may arise on the same

19   networking equipment.  Even at the time of this pleading, upon information and belief, Cisco

20   will not honor the original SmartNet service for which the 911-center had paid and the local

21   community is at risk due to Cisco's coercion tactics that seek to extract improper profits

22   even from the most vulnerable of situations.

23   44.     Upon information and belief, these examples are part of an overall course of conduct

24   by Cisco to hold up its SmartNet customers, at least since 2015.  As explained below through

25   Dexon's experience, upon information and belief, there has been an enterprise-wide effort

26   at Cisco to use SmartNet service packages in this way to be sure that customers purchase

27   networking equipment at supra-competitive prices to pad Cisco's profits as well as the

28   commissions of its sales representatives.  Dexon is aware of at least one of its customers that

**App.487**

1   has threatened legal action against Cisco for these tactics, but Cisco does not care, as Cisco's
2   continued profiteering from this conduct as a monopolist in the Relevant Service Market and
3   Relevant Product Markets far outweighs the costs it would face for defending itself in
4   litigation.  This Court's involvement is desperately needed to make it stop.

5   45.    Cisco draws an economic benefit from these coercion tactics to SmartNet customers
6   because, upon information and belief, its margins are far higher for sales made through
7   channels that have higher resale prices.  For instance, if Cisco can maintain the supra-
8   competitive prices it charges to major VARs by coercing customers to use that distribution
9   channel, Cisco can maintain its overall profitability.  Conversely, if major VARs can
10  negotiate lower pricing from Cisco because customers have a variety of distribution options
11  unimpacted by coercion, then Cisco's overall profitability goes down.  Cisco's sales
12  representatives also earn higher commissions for sales in the Relevant Product Markets
13  made through coercion, on the backs of their customers.

14  46.    There is a substantial amount of commerce involved in the Relevant Product Markets
15  for which Cisco is forcing supracompetitive purchases.  Each year, Cisco sells billions of
16  dollars of Ethernet switches and routers, both in the US and worldwide.

17  47.    Cisco also attempts to leverage its exclusive control of essential software updates and
18  services for Cisco products to functionally incapacitate select secondary market products.
19  Cisco provides services and updates to its products via SmartNet service packages.  End
20  users acquire these packages in order to obtain those services.

21  48.    Cisco selectively chooses when to enforce its alleged restrictions on sales of
22  SmartNet service packages by "Authorized" sellers to secondary market sellers.  In addition
23  to being contrary to well-established agency principles, on information and belief, such
24  alleged restrictions between Cisco and its "Authorized" sellers are often not properly
25  renewed or maintained and are therefore not in force and effect.

26

27

28

**App.488**

**Cisco's Conduct Toward Dexon Specifically Shows Its Anticompetitive Intent and Results in Anticompetitive Effects With No Valid Business Justification**

49.     Cisco was once on amicable terms with Dexon, even sending a Cisco representative to Dexon to aid it in its sales efforts and familiarity with its products.  For at least four years prior to 2015, Dexon had access to Cisco's online database in which it could arrange for maintenance service on behalf of its and Cisco's customers.  This served to both companies' benefit, as Dexon kept its customers happy while Cisco earned customers' loyalty to its product line.

50.     That changed in 2015 however, when Cisco deactivated Dexon's access to the service database for a period of several months.  Upon learning this from upset customers, Dexon diligently followed up with Cisco and was able to be reinstated.  The reinstatement was within Cisco's rationale economic interest because it knew it would lose both short term sales and loyalty for its networking equipment if a valuable reseller could not provide the service that customers came to expect.

51.     However, in 2018, Cisco decided that it was willing to sustain a short term loss of sales, so that in the long run customers would not have access to more aggressive pricing from Dexon.  Namely, Cisco shut off Dexon's access to the service database, and did not reinstate it despite knowing, upon information and belief, that the customers would purchase competitive networking equipment from Cisco's competitors.  Indeed, Dexon is aware of at least two customers that purchased networking equipment from a Cisco competitor due to the way the customers and Dexon were handled by Cisco.

52.     Cisco's more recent efforts to block value added resellers (VARs) like Dexon do not end there.  Major VARs (in terms of volume) will commonly supply networking equipment to smaller VARs such as Dexon because they can reach smaller and more diverse customers.  One such major VAR frequently used Dexon for this purpose, and profitably did business with Dexon for several years.  Upon information and belief, Cisco threatened the VAR not to do business with Dexon, and when the VAR representative assigned to Dexon refused to comply with the demand, he was assigned to a different region and account.  Dexon believes

1   that several such instances with larger VARs occurred, but rather than hearing about

2   representatives that were willing to stick up for customers' right to the best deal, Cisco

3   successfully coerced such VARs to limit or withdraw their business from Dexon.

4   53.     Upon information and belief, the instances described above are not isolated instances

5   of pressure, but rather part of an overall effort to force customers to only be able to access

6   both networking equipment and service through the most expensive avenues.  As explained,

7   Cisco was not always hostile to a channel that sought to give customers the best deals, likely

8   because it aided Cisco's overall effort to be known as the most ubiquitous networking

9   equipment provider regardless of the channel the networking equipment reached the

10  customer.  But that changed sometime around 2015, when Cisco apparently decided that

11  padding its own profit margins and keeping its sales representatives satisfied was more

12  important than servicing all of its customers.

13  54.     In some cases, Cisco was able to force customers to pay a "re-certification" fee

14  associated with the reinstatement of its SmartNet service associated with previously

15  purchased networking products.  Upon information and belief, Cisco simply accepted this

16  payment without doing any type of "re-certification" process or other associated service, and

17  reactivated the SmartNet service package simply because the customer paid more money.

18  This shows that any purported "business justification" Cisco advances for its practices is

19  pretextual and is merely designed to shift economic welfare from customers to itself.

20  55.     The inevitable effect of this course of conduct is to drive supra-competitive prices in

21  the Relevant Product Markets and hinder the ability for customers to find alternatives.  While

22  in theory customers could divert purchases in the Relevant Product Markets to Cisco's

23  competitors, because of Cisco's installed base for so many of its customers is a large portion

24  of their networks, it is practically difficult for many customers to make a wholesale change,

25  or to even do so over an extended period of time given the infrequency of new purchases.

26  As the above examples make clear, many customers are left with no practical choice other

27  than to purchase equipment in the Relevant Product Markets on Cisco's terms or face a

28  greater risk of a technical compromise.

56.     Indeed, in the case of a 911-operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics.  There is no justification that can be advanced to accept this needless risk to human safety.

57.     Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather need to account for the likely reaction of Cisco.  Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers need to take account of what treatment it will face if it draws Cisco's disapproval.  In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

### Dexon Has Suffered An Antitrust Injury

58.     As illustrated above, Dexon has lost customers due to the anticompetitive and coercive tactics employed by Cisco.  Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct.  Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

59.     Cisco's conduct is designed to harm VARs just like Dexon precisely because of the benefits to customers that Dexon provides, which run counter to Cisco's profit motives.  Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive channels.  If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions that would impact Cisco's bottom line.  The coercion and other conduct at issue in this case allows Cisco's monopoly power to not

**App.491**

1  only be maintained, but grown, and Dexon's losses are a direct byproduct of this
2  phenomenon.

3  60.    Dexon has also sustained loses to its goodwill and reputation in the marketplace by
4  virtue of Cisco's conduct.  Because of Cisco's monopoly position in both the Relevant
5  Service Market and the Relevant Product Markets, it has been immune to customer
6  dissatisfaction with its conduct, and has attempted to shift the problem of its own creation
7  to Dexon.  Namely, rather than respond to customer feedback and attempt to win purchases
8  by virtue of better products or terms, Cisco has attempted to portray Dexon as an unworthy
9  sales partner who is the cause of the customers' problems.  But this is not the case, as Dexon
10  has spent decades building trust and goodwill with its customers, even to the benefit of
11  Cisco.  But now that Cisco's priority is to bully and intimidate any company that stands in
12  the way of its maximum profit, Dexon is being painted in a different light.

13                              **Claims For Relief**
                                  **Count I**
14              **Violation of Section 1 of the Sherman Act:  Tying**

15  61.    Dexon repeats and realleges each of the allegations set forth in the preceding
16  paragraphs as if fully set forth herein.

17  62.    Cisco is a monopolist in the Relevant Service Market, and has used its SmartNet
18  service packages in that Market as a tying product.  Namely, after approving the terms under
19  which customers would receive a SmartNet service package, Cisco would later use the
20  SmartNet service package as a tying product in order to coerce new purchases in the
21  Relevant Product Markets on terms that are unwanted by customers but favored by Cisco.
22  Cisco conditions its continued service for SmartNet on the purchase of new equipment in
23  the Relevant Product Markets, and upon information and belief, other products that will be
24  confirmed in discovery.

25  63.    The Relevant Service Market is distinct from the Relevant Product Markets because
26  they are fundamentally different offerings that are created, marketed, sold, and accounted
27  for by providers and customers differently.  Driven by budgets and unique customer needs,
28  customers can and have bought products in the Relevant Product Markets without associated

1  service in the Relevant Service Market.  Indeed, Cisco's conduct at issue in this case
2  confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used
3  as a coercive weapon to maintain and further expand its monopolies in the Relevant Product
4  Markets, because customers often have separate demand for service on the one hand and
5  new networking equipment on the other.

6  64.  Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement
7  between customers and a provider of Cisco branded merchandise in the Relevant Product
8  Markets.  Cisco also effectuates this coercion through its direct relationship with customers
9  through the SmartNet service package, in which customers are forced to interact with Cisco
10  to request the service they were previously promised by Cisco.

11  65.  A substantial amount of commerce has been affected in the Relevant Product Markets
12  (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product
13  Markets has constituted tens or hundreds of thousands of dollars.  This is unsurprising, as
14  the total amount of commerce in the Relevant Product Markets is billions of dollars.

15  66.  Cisco does not have a legitimate business purpose for its anticompetitive conduct.
16  Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded
17  and received additional compensation for the same services it had already been providing,
18  without providing anything additional to customers. Cisco's conduct does not result in any
19  greater ability to reduce costs in producing or innovating offerings in the Relevant Product
20  Markets that it sells to customers that could result in reduced prices, higher quality, or greater
21  availability to customers. Neither does Cisco's conduct reduce barriers to other vendors'
22  entry, or otherwise result in greater competition in the Relevant Product Markets.  The only
23  "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit
24  inures only to Cisco's advantage, not to that of customers or competition on the merits.

25  67.  Cisco's conduct has injured competition in the Relevant Product Markets, suppressed
26  Dexon's sales in those markets and the products of other competitors, diminished Dexon's
27  and future sales opportunities, and increased Dexon's operating costs.

28

68.     Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

**Count II**

**Violation of Section 2 of the Sherman Act:  Unlawful Monopolization**

69.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

70.     Cisco's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Product Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

71.     For the purpose of maintaining its monopoly power, Cisco committed numerous acts, including:

     a.    Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

     b.    Engaging in associated pressure and bullying tactics pursuant to its overall goal to force purchases through Cisco's most expensive channels;

     c.    Pressuring at least one large volume VAR not to deal with Dexon or other efficient, low-cost providers in the Relevant Product Markets;

     d.    Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database for the purpose of eliminating a low cost provider from the Relevant Product Markets in the long term;

     e.    Reversing its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in which customers are penalized for using such lower-priced and efficient VARs; and

**App.494**

f.  Upon information and belief, engaging in related tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

72.  Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

73.  Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

74.  Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

### Count III
### Violation of Section 2 of the Sherman Act:  Attempted Monopolization

75.  Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

76.  Cisco acted with a specific intent to monopolize and destroy competition in the Relevant Product Markets.  Cisco devised and implemented an overall plan to force customers to pay supra-competitive prices in the Relevant Product Markets, with the associated destruction of competition in the Relevant Product Markets.

Case 5:22-cv-00053-RWS-JBB-CRB Document 22-6t 59 Filed 06/23/22 Page 40 of 63 PageID #: 535

77.    Cisco willfully engaged in a course of anticompetitive conduct to obtain a monopoly in the Relevant Product Markets, including:

    a.    Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets;

    b.    Engaging in associated pressure and bullying tactics pursuant to its overall goal to force purchases through Cisco's most expensive channels;

    c.    Pressuring at least one large volume VAR not to deal with Dexon or other efficient, low-cost providers in the Relevant Product Markets;

    d.    Intentionally sustaining short term losses by discontinuing Dexon's access to Cisco's service database for the purpose of eliminating a low cost provider from the Relevant Product Markets in the long term;

    e.    Reversing its previous course of conduct toward VARs like Dexon in which both parties benefitted, and changing to a position and associated conduct in which customers are penalized for using such lower-priced and efficient VARs; and

    f.    Upon information and belief, engaging in related tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

78.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers.  Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.496**

79.    Throughout the time Cisco engaged in this anticompetitive conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Product Markets and continuing to maintain supra-competitive prices and exclude its competitors.

80.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

81.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

### Count IV
### Violation of the California Cartwright Act

82.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

83.    Upon information and belief, Cisco's overall anticompetitive scheme was directed and executed within California, and has a direct impact upon California-based small and medium businesses.

84.    Cisco is a monopolist in the Relevant Service Market, and has used its SmartNet service packages in that Market as a tying product.  Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

85.    The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted

for by providers and customers differently.  Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Markets.  Indeed, Cisco's conduct at issue in this case confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

86.     Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets.  Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

87.     A substantial amount of commerce has been affected in the Relevant Product Markets due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars.  This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

88.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets.  The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

89.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

90.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

91.    The above phenomenon has harmed competition and resulted in loses to Dexon in California.

**Count V**
**Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.**

92.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

**The Secondary Market**

93.    As with any economic activity where there are significant profits, market forces have operated to create a "secondary" market for Cisco products. On information and belief, authentic or genuine Cisco products come to the secondary market in the United States in a variety of ways including: (a) Cisco's knowing sale of such products to secondary market suppliers in the context of either specific end user deals or when Cisco needs to move inventory; (b) Cisco's authorized resellers' purchase of product in excess of what they need for a specific end user order and subsequent resale of such product into the secondary market; (c) Cisco end user's resale of new, unused product; and (d) through importation of such product from abroad where it has been sold by distributors, resellers, or end users under similar circumstances. On information and belief, Cisco resists attempts by end users and resellers to return product, resulting in a natural supply of secondary market Cisco product.

94.    Given the substantial profits available from sale of Cisco-branded products, market forces dictate that a secondary market will develop for such products. These market forces benefit end users in that they reduce prices for such products.

95.     Dexon is an independent secondary-market reseller of computer networking products, including routers, Ethernet switches and other computer hardware.  Dexon provides new, refurbished and discontinued hardware products, including authentic or genuine products to its customers from leading manufacturers including, without limitation, Hewlett Packard, Dell, Juniper Networks and Cisco.

96.     Dexon obtains Cisco products from reliable suppliers, subjects such products to extensive quality control, and then resells such products to other resellers and to end users, at a profit but frequently at prices lower than those offered by Cisco "Authorized" sellers.

97.     Cisco has created an "Authorized Channel Network" in which Cisco sells products to entities it refers to as "Authorized Channel Partners" or "Authorized Resellers."  Within this "Authorized" network, Cisco exerts strict control over how, and at what prices, its "Authorized" partners can buy and sell Cisco products.

98.     While manufacturers like Cisco are permitted to control the initial sale of their products, they may not wield trademark or copyright protections to dictate the terms by which their products are resold by other parties.  The well-established "first sale doctrine" protects parties who engage in the subsequent resale of Cisco's products, even if those subsequent resales occur outside the "Authorized" channels. Accordingly, the "Authorized Channel Network" does not have a monopoly on the legal sale and purchase of Cisco goods in the market (unlike Cisco's monopolies in the Relevant Service and Relevant Product Markets), and Cisco may not forbid the resale of its products outside the "Authorized" network.

<u>**Cisco's Anticompetitive Interference with the Secondary Market**</u>
**EULA Misrepresentations and Abuse**

99.     Cisco products, like virtually all modern electronics, contain embedded software. And just as a car, refrigerator, or cell phone will not function properly without internal software, Cisco's products—including the Cisco products resold by Dexon—cannot function without Cisco's embedded software.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**App.500**

100.    Cisco uses the fact that its products have embedded software as an attempted end-around to the first sale doctrine.  It does so by informing consumers, after their purchases, that although they have bought Cisco hardware, they are unable to use such hardware unless they license the embedded software from Cisco —software that was packaged and sold with the hardware (and without which the hardware will not function). Cisco does not require end users to acknowledge, read, or accept a license agreement before using the Cisco goods sold by Dexon.  Nevertheless, Cisco purports only to license the software pursuant to the terms of its End User License Agreement, or "EULA."

101.    The EULA provides or has provided that Cisco will grant a license only to consumers who purchase Cisco hardware with embedded software from a so-called "Approved Source," defined as "Cisco or . . . [a] Cisco authorized reseller, distributor, or systems integrator[.]"  Cisco warns that end users are "not licensed to Use the Software on secondhand or refurbished Cisco equipment not authorized by Cisco, or on Cisco equipment not purchased through an Approved Source."

102.    In an effort to dissuade consumers from purchasing secondary market goods, Cisco informs consumers that although its hardware can be freely resold, the "embedded Cisco software that runs on the hardware" is "not transferable," and purchasers of secondary market Cisco equipment "must acquire a new license from Cisco before the software can be used." The only way to avoid having to purchase a new license, Cisco says, is to buy refurbished equipment through Cisco's own program.

103.    These representations to consumers are false.  Even if it were possible for Cisco to sell hardware but license embedded software, the EULA would not be a permissible license of that software because it operates anticompetitively by not applying to products purchased in the secondary market.

104.    Accordingly, pursuant to the first sale doctrine, consumers who purchase Cisco hardware may use embedded software.  They may also transfer the embedded software, along with the hardware, freely.  Cisco may not sidestep the first sale doctrine by refusing to license software that it builds into hardware (to which the first sale doctrine indisputably

1  applies) solely because consumers did not purchase the hardware through Cisco's more
2  lucrative supply chain. And it may not deceive consumers by telling them that although they
3  can buy secondary-market Cisco products, they will not be able to use those products without
4  buying a license from Cisco.

5  105.    Cisco's misrepresentations regarding consumers' right to buy and use secondary-
6  market Cisco products successfully deter consumers from purchasing Cisco goods on the
7  secondary market. Dexon has lost sales of products that would have been made but for
8  Cisco's false representations to consumers regarding their ownership rights for Cisco
9  hardware and embedded software purchased on the secondary market. These false
10 representations have unjustly enriched Cisco at Dexon's expense.

11 106.    Cisco has also improperly extorted license fees from consumers who are frightened
12 into believing they will not be able to use the Cisco products they have lawfully purchased.
13 On information and belief, when consumers who purchase Cisco goods on the secondary
14 market attempt to register those goods with Cisco, Cisco falsely informs the consumers that
15 their software licenses are invalid and that they cannot use their lawfully purchased hardware
16 unless they pay additional license fees to Cisco. Cisco would not have obtained these license
17 fees but for misrepresentations it makes to consumers regarding their ability to use Cisco
18 embedded software.

19 107.    On occasions where secondary market sellers obtain Cisco product directly from an
20 "Authorized" seller, Cisco threatens that the end users rights are restricted because the sale
21 was contrary to the "Authorized" seller's agreement with Cisco. Cisco's enforcement of
22 this improper policy is selective. In addition to being contrary to well-established agency
23 principles, on information and belief, such alleged agreements between Cisco and its
24 "Authorized" sellers are often not properly renewed or maintained and are therefore not in
25 force and effect.

26 108.    Relatedly, due to the robust secondary market, Cisco routinely and intentionally sells
27 multiple SmartNet service packages on the same product covering the same time period. For
28 example, it is not uncommon for a consumer to purchase a Cisco product as well as a

Case 5:22-cv-00053-RWS-JBB-CRB Document 212-3t 55 Filed 06/23/23 Page 47 of 66 PageID #: 542

1   SmartNet service package covering such product.  If the consumer ends up not using such

2   product, such product may be sold – unopened in a sealed box – on the secondary market.

3   The customer receives no refund on the SmartNet service package and may in fact

4   mistakenly renew its SmartNet service package for such product it no longer owns.  In

5   addition, the new customer who bought the unopened product may purchase its own

6   SmartNet service package for such product.

7   109.  It is common for secondary market sellers such as Dexon to purchase a duplicate

8   SmartNet service package covering the exact same product for its customers.  Despite having

9   records pairing the product's serial number to each SmartNet servce package, Cisco

10   knowingly accepts payment and fails to provide any refund on such redundant SmartNet

11   service packages.

12   **Misclassification of Cisco Products**

13   110.  As part of Cisco's anticompetitive interference in the secondary market, Cisco also

14   selectively classifies genuine, lawfully obtained Cisco products as "used," "stolen,"

15   "counterfeit," "black market," "a security risk," "malware," "scrapped," "out of compliance"

16   or "inactive" simply because these products were traded on the secondary market.  As a

17   result, end users or resellers who communicate with Cisco about the status of certain Cisco

18   products are deliberately provided with misinformation.

19   111.  Cisco's contortion of the term "used" is particularly egregious.  Rather than give the

20   term its ordinary meaning, Cisco has unilaterally decided that "used equipment" means

21   "previously owned equipment that is now owned by a party other than the original

22   customer," including both "opened and unopened equipment."  Cisco even instructs its

23   employees to tell consumers that "unopened boxes do[] not necessarily mean [that

24   equipment is] 'new.'"

25   112.  Accordingly, Cisco routinely publicly criticizes and labels secondary market product

26   which has never been used – including product contained in unopened sealed boxes – as

27   "used" contrary to consumers' well understood meaning of such term.

28

**App.503**

113.    Cisco knows that its unilateral definition of the term "used" is contrary to the common consumer understanding, and that consumers are misled by its use of the term.  Indeed, Cisco deploys its false definition of the term "used" in order to deceive consumers as to the nature of products they purchase on the secondary market.  Cisco does so in an effort to stifle competition and extract additional profits from consumers who would, but for Cisco's misrepresentations and misuse of the term "used," purchase products on the secondary market.

**Wrongful Denial of Warranty Coverage**

114.    Cisco has also wrongfully denied warranty coverage of genuine Cisco products solely as a result of the fact that those products were sold in the secondary market.  Cisco states as a general policy that products sold on the secondary market are ineligible for Cisco warranties.  Cisco's ostensible justification for this refusal is that Cisco is unsure whether products sold on the secondary market are genuine. But this is a farce: Cisco is well-aware that genuine Cisco products are commonly sold on the secondary market.

115.    Cisco has at various times asserted that these anticompetitive strictures are necessary in order to mitigate the risk of counterfeit goods being sold to unwitting customers or receiving Cisco services.  These justifications are pretextual and designed to obscure the fact Cisco seeks to minimize competition and exact more control over the market for Cisco products, to the detriment of the consuming public.

116.    Secondary market resellers of Cisco products, including Dexon, are highly incentivized to detect and stamp out the sale of counterfeit goods.  While a manufacturer such as Cisco may blame rogue actors when a dissatisfied customer confronts it with a counterfeit product, an independent reseller's own reputation suffers significantly when it sells a customer a counterfeit goods.  Unsurprisingly, most independent resellers, including Dexon, take proactive steps to detect and prevent the sale of counterfeit product.

117.    "Authorized Reseller" status is not foolproof protection against counterfeit products.  Cisco's "Authorized" sellers are likewise victimized by the presence of counterfeit product in the marketplace and have been caught selling counterfeit Cisco product.

**App.504**

118.   Cisco has contributed to and caused the presence of counterfeit product in the stream of commerce by: i) claiming to have developed "tools" capable of detecting counterfeit goods yet, unlike their competitors in the market, intentionally failing or refusing to provide or offer such "tools" to secondary market resellers such as Dexon to aid and assist their efforts to detect and deter counterfeit products; ii) failing to properly police and control their manufacturers; and iii) failing to properly manage their product serial numbers.   As one example, Plaintiffs' Technical Assistance Center will intentionally modify or change product serial numbers in order to ensure secondary market products qualify for, and Plaintiffs' receive compensation for, SmartNet.

119.   Cisco's anticompetitive behavior as alleged herein has attracted the attention of government regulators and interested parties worldwide.  Upon information and belief, Cisco has sought to avoid a wholesale dismantling of its anticompetitive practices by incrementally providing relief when compelled to do so.  For example, in 2014, when Cisco was under investigation by the Swiss Competition Commission related to Cisco's failure to provide updates and other anticompetitive behavior, Cisco was compelled to make a commitment that updates could be obtained within Switzerland and the European Union without having to purchase SmartNet service packages.  Cisco also had to implement a series of remedial measures to inform consumers of these policies.  In the United States, however, Cisco continues to pursue the anticompetitive practices alleged herein.

### Cisco's Tortious Efforts to Interfere with Dexon's Business

120.   Because Cisco regards secondary market resellers like Dexon as a threat to its excess profits, Cisco spends substantial money and effort to attack secondary market participants such as Dexon and to chill reseller and end user participation in the secondary market.  These steps include but are not limited to:

  a.  Prompting federal investigation of the secondary market on specious grounds that the secondary market presents a threat to the national security of the United States.

1  b. Employing a team of "Brand Protection" employees whose primary
2   responsibility is to intervene with resellers and end users in cases where
3   they are either contemplating the purchase of product, or have ordered
4   product, from the secondary market.  Brand Protection personnel use a
5   variety of tools to disrupt secondary market sales, including: (i) advising
6   resellers and end users that product from the secondary market is suspect,
7   may damage or jeopardize their network operations, may void Cisco
8   warranties, may be counterfeit, and is otherwise unreliable; and (ii)
9   spreading false rumors about secondary market resellers and their owners.

10  c. Instructing its account managers, assigned to specific end users: (i) to
11   convince end users to specify in RFPs the acquisition of Cisco equipment
12   through "authorized" resellers only (even if the result is materially higher
13   pricing); (ii) to advise resellers and end users of the same issues raised by
14   Brand Protection and, if necessary, invite Brand Protection into the
15   discussion.

16  d. Tortiously and erroneously insinuating to resellers and end users that
17   secondary market participants in general are engaging in illegal activity
18   when this is not the case.

19 121.  Such tortious conduct includes, without limitation, falsely advising Dexon's actual
20 and prospective customers that: i) Dexon does not sell genuine Cisco product; ii) Dexon
21 does not sell new Cisco product; iii) Dexon "repackages" used Cisco product as "new"; iii)
22 Dexon opens new Cisco product and substitutes parts or software; iv) Dexon's products are
23 "counterfeit" solely because they were sold on the secondary market despite the fact such
24 products are in fact genuine; v) Dexon products violate purported Cisco licenses even though
25 such products (such as phones) are not governed by any purported applicable Cisco licenses.

26 122.  Cisco has presented, published, and/or caused to be published the false and
27 misleading message that alleged "genuine" and/or "new" Cisco gear only comes from Cisco
28 and its "Authorized" sellers.

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

123.    Cisco has engaged in a pattern and practice of this tortious conduct with the intent to disrupt contracts between Dexon and its customers, pending opportunities with such customers, future business with such customers, and even with the apparent goal of driving Dexon out of business altogether.

124.    As a direct result of Cisco's tortious interference, Dexon has suffered significant damages, including the cancellation of numerous pending orders, loss of opportunity to bid on projects, and the loss of entire relationships with many of its top customers.

125.    California Business and Professions Code §§ 17200 et seq. prohibit acts of unfair competition, which includes any unlawful, unfair, or fraudulent business act or practice. Cisco's conduct, as set forth herein, is unlawful, unfair, and fraudulent as well as untrue and deceptive within the meaning of Cal. Bus. & Prof. Code § 17200 *et seq*.

126.    As detailed above, Cisco has taken numerous anticompetitive steps designed to afford it a greater level of control over the purchase and sale of Cisco-branded products than the law permits. These anticompetitive actions are tantamount to violations of the antitrust laws.

127.    Cisco has engaged in these unfair and wrongful actions in order to hinder the ability of those in the secondary market to compete with Cisco.  These practices harm both independent resellers like Dexon, whose ability to compete is impeded, and customers, who are forced to pay increased costs for genuine Cisco products as a result of this artificially deflated competition.  Cisco's acts, which destroy competition for its products at the expense of consumers, are tantamount to violations of the antitrust laws.  As a result of Cisco's unfair, fraudulent, and unlawful conduct, Dexon has lost sales of Cisco products they otherwise would have made, and have accordingly lost money or property as a result of Cisco's practices.

128.    Cisco's actions have caused, and unless restrained by this Court, will continue to cause irreparable injury to Dexon.  Dexon is entitled to injunctive relief to preclude Cisco's unfair competition.

**App.507**

129.    Dexon seeks the full restitution by Cisco that is necessary and according to proof to restore any and all property and monies, including interest, acquired by Cisco, and all costs caused to Dexon as a result of Cisco's unlawful and unfair business practices.

130.    Dexon's claims, including their claims under California Business & Professions Code § 17200, are brought to enforce an important right affecting the public interest. Accordingly, Dexon is entitled to recover its attorneys' fees from Cisco. CAL. CIV. PROC. CODE § 1021.5.

## Count VI
### Declaratory Judgment
### (28 U.S.C. §§ 2201-2202)

131.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

132.    Counterclaimants seeks a declaration of its rights, pursuant to 28 U.S.C. §§ 2201 & 2202, that the sale of genuine Cisco product which Cisco has unilaterally deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or ineligible for warranty services as a result thereof, do not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125.

133.    Contrary to Cisco's assertions, the first sale doctrine does not permit a trademark holder to transform non-infringing goods into infringing goods simply by fiat. The sale of genuine goods whose warranty eligibility has been unilaterally revoked by Cisco does not violate the Lanham Act.

134.    A real and actual controversy presently exists between the parties to this action which is concrete and justiciable in character, and as to which each party possesses an interest in resolving.

135.    Counterclaimant sells, and intends to continue selling, genuine Cisco products which Cisco asserts are ineligible for warranty services once they come into Counterclaimant's possession in the ordinary course of commerce. Unless and until Counterclaimant's sales of genuine Cisco products are deemed to be permissible under United States law, Counterclaimant's ability to sell such products will be wrongfully and unnecessarily

**App.508**

1   impaired, and Counterclaimant will continue to be injured and damaged by this threat.

2   Accordingly, Counterclaimant seeks declaratory relief from this Court.

3   136.   The controversy between Counterclaimant and Cisco warrants relief declaring the

4   rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that the sale of

5   genuine Cisco products whose warranty eligibility has been unilaterally revoked by Cisco

6   after entering the stream of commerce does not violate the Lanham Act.

7                                    **Count VII**
                            **Declaratory Judgment**
8                          **(28 U.S.C. §§ 2201-2202)**

9   137.   Dexon repeats and realleges each of the allegations set forth in the preceding

10  paragraphs as if fully set forth herein.

11  138.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, et seq.,

12  Counterclaimant is entitled to judgment from this Court that Counterclaimants' refusal to

13  warrant genuine Cisco products acquired outside of Cisco's "Authorized Reseller Network"

14  violates New York General Business Law § 369-b and is unenforceable in New York.

15  139.   A real and actual controversy presently exists between the parties to this action which

16  is concrete and justiciable in character, and as to which each party possesses an interest in

17  resolving.

18  140.   Counterclaimant sells, and intends to continue selling, genuine Cisco products in New

19  York which Cisco asserts are ineligible for warranty services once they come into

20  Counterclaimant's possession in the ordinary course of commerce. Cisco's claims harm

21  Counterclaimant's ability to sell these products in New York due to wrongfully representing

22  to customers that products sold by Counterclaimant are not eligible for warranties.

23  Accordingly, Counterclaimant seeks declaratory relief from this Court.

24  141.   The controversy between Counterclaimant and Cisco warrants relief declaring the

25  rights of the parties pursuant to 28 U.S.C. §§ 2201 & 2202, and finding that Cisco's refusal

26  to warrant genuine products sold in New York based on their purchase or sale in the

27  secondary market violates New York General Business Law § 369-b.

28

**Count VIII**
**Lanham Act False Advertising**
**(15 U.S.C. § 1125(a)(1)(B))**

142.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

143.   Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides that it is unlawful for any person to use a "false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."

144.   As set forth above, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding the software embedded in Cisco hardware sold on the secondary market.

145.   In addition, Cisco has published in commercial advertising and promotion, and continues to publish in commercial advertising and promotion, false or misleading representations of fact regarding whether products in the secondary market are "used."

146.   The foregoing false and misleading representations of fact are designed to mislead consumers, and do in fact mislead consumers, at the expense of Dexon, causing direct and substantial loss to Dexon of money and market share.

147.   The foregoing false and misleading representations of fact are made willfully and entitle Dexon to recover the profits obtained by Cisco thereby, in addition to Dexon's own damages suffered as a result of Cisco's false and misleading representations of fact.

148.   Cisco's misrepresentations have caused, and unless restrained by this Court, will continue to cause irreparable injury to Dexon.

**Count IX**
**Intentional Interference with Contractual Relations**

149.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

150.  Dexon secured contracts with certain customers for the sale of Cisco products on which Dexon would have earned significant profits.

151.  On information and belief, Cisco knew or should have known of these contractual relationships between Dexon and these third party customers.

152.  On information and belief, Cisco intentionally, or with reckless disregard for the truth, made false and misleading statements about Dexon and the products it sells to these customers in order to disrupt the contractual relationship and to cause these customers to purchase product from Cisco authorized resellers at a higher price.

153.  Cisco's statements in fact disrupted these contractual relationships between Dexon and its customers.

154.  Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

155.  Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

### Count X
**Intentional Interference with Prospective Economic Advantage**

156.  Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

157.  An economic relationship existed between Dexon and its actual and prospective customers, each of which contained the probability of substantial future economic benefits to Dexon.

158.  On information and belief, Cisco knew or should have known of these relationships.

159.  On information and belief, Cisco intentionally, or with reckless disregard, engaged in tortious conduct designed to disrupt Dexon's potential benefit from these relationships, including:

AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

      a.     By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that the Cisco products Dexon sold were not new, used, counterfeit, suspect, non-genuine, and/or unauthorized; and

      b.     By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that if they purchased product from secondary market resellers such as Dexon, they would jeopardize the security of their data networks.

      c.     By intentionally misrepresenting, or representing with reckless disregard for the truth, to Dexon's customers, among other things, that Dexon somehow improperly modified Cisco product, including, without limitation, by "repackaging" such products and/or substituting or replacing parts/software on such product.

160.    Cisco's statements were made with the intent to disrupt the economic relationship between Dexon and its potential and actual customers in order to put Dexon out of business and to ensure that these customers would purchase Cisco product at higher prices from "Cisco Authorized Resellers" under Cisco's control.

161.    As a result of the efforts detailed above, Dexon's relationships with its potential and actual customers have in fact been permanently disrupted and/or materially damaged in a significant number of instances, including its future relationships. As a result of Cisco's tortious efforts, Dexon's customers have refused to pay for certain Cisco goods, have returned and/or cancelled orders for such goods, have removed Dexon's bids from contention for business, and have ceased doing business with Dexon on other products and/or altogether.

162.    Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

163.    Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

**<u>Count XI</u>**
**Trade Libel**

164.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

165.    On information and belief, Dexon alleges that Cisco has repeatedly made disparaging statements about Dexon's products as detailed herein.

166.    Cisco's statements disparaged Dexon's products.  On information and belief, Dexon alleges that the claims made were false or materially misleading.

167.    Dexon has suffered and will continue to suffer irreparable harm should Cisco's trade libel be allowed to continue.

168.    As a proximate result of Cisco's statements, prospective and actual customers have been deterred from buying Dexon's products and from otherwise dealing with Dexon. Dexon has suffered substantial economic damage as a result of this wrongful conduct in an amount subject to proof at trial.

169.    Cisco's conduct, as outlined above, demonstrates that Cisco acted fraudulently, oppressively, and with malice within the meaning of Cal. Civ. Code § 3294, entitling Dexon to punitive or exemplary damages in an amount sufficient to punish Cisco and to make an example of it to the community such that Cisco will not engage in such conduct in the future.

170.    Dexon will suffer irreparable harm to its goodwill if this trade libel continues.  Dexon is entitled to injunctive relief to preclude Cisco's trade libel.

**<u>THIRD PARTY CLAIMS</u>**

Third Party Plaintiff Dexon Computer, Inc. asserts the following claims against Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and Wisecom Technologies alleges as follows:

**THE PARTIES**

171.   Third Party Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

172.   On information and belief, Third Party Defendant Atlantix Global Systems International, LLC is a Georgia limited liability corporation with its principal place of business in Georgia.

173.   On information and belief, Third Party Defendant Bizcom Electronics, Inc., is a California corporation with its principal place of business in California.

174.   On information and belief, Third Party Defendant Digi Devices Online is a foreign corporation with its principal U.S. place of business in Texas.

175.   On information and belief, Third Party Defendant Enterprise Business Technologies, Inc. is a New York corporation with its principal place of business in New York.

176.   On information and belief, Third Party Defendant Fiber Cable Connections is a Washington corporation with its principal place of business in Washington.

177.   On information and belief, Third Party Defendant MJSI is a California corporation with its principal place of business in California.

178.   On information and belief, Third Party Defendant Multimode Technologies, LLC is a Minnesota limited liability company with its principal place of business in Minnesota.

179.   On information and belief, Third Party Defendant Network Republic is a Texas corporation with its principal place of business in Texas.

180.   On information and belief, Third Party Defendant Opitmum Data, Inc. is a Nebraska corporation with its principal place of business in Nebraska.

181.   On information and belief, Third Party Defendant Paragon is a Massachusetts corporation with its principal place of business in Massachusetts.

182.   On information and belief, Third Party Defendant Pure Future Technology, Inc. is a California corporation with its principal place of business in California.

183.    On information and belief, Third Party Defendant Seastar IT Trading LLC is a Washington limited liability company with its principal place of business in Washington.

184.    On information and belief, Third Party Defendant Server Tech Supply is a Virginia corporation with its principal place of business in Pennsylvania.

185.    On information and belief, Third Party Defendant Softnetworks, Inc. is a New Jersey limited liability company with its principal place of business in New Jersey.

186.    On information and belief, Third Party Defendant Strada Networks, LLC is a foreign limited liability company with its principal place of business in British Columbia, Canada.

187.    On information and belief, Third Party Defendant Strategic Telecom Supply & Solutions is a Virginia limited liability company with its principal place of business in Virginia.

188.    On information and belief, Third Party Defendant Teksavers is a Texas corporation with its principal place of business in Texas

189.    On information and belief, Third Party Defendant Unlimited Network Solutions is a corporation with its principal place of business in California.

190.    On information and belief, Wisecom Technologies is a corporation with its principal place of business in Maryland.

**Supply of Alleged Counterfeit and Infringing Product**

191.    The Third Party Defendants are all reputable dealers and merchants with respect to the Cisco products alleged to be counterfeit and thereby infringing herein ("allegedly infringing Cisco product").

192.    Dexon obtained such allegedly infringing Cisco product from the Third Party Defendants.  While Dexon denies Cisco's allegations and believes the subject products to be genuine, Dexon relied in good faith on the Third Party Defendants in procuring or obtaining such products.

193.    Without limitation, the Third Party Defendants warranted that such products sold to Dexon would be "delivered free of the rightful claim of any third person by way of infringement or the like."  See U.C.C. §2-312(3).

**FIRST THIRD PARTY CLAIM**
**(Indemnification - All Third Party Defendants)**

194.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

195.   Dexon was named in this litigation as a direct result of product procured from and/or supplied by the Third Party Defendants.

196.   Third Party Defendants should be ordered to indemnify Dexon whether based on express agreement, implied agreement or common law.

**SECOND THIRD PARTY CLAIM**
**(Contribution - All Third Party Defendants)**

197.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

198.   Dexon was named in this litigation as a direct result of product procured from and supplied by the Third Party Defendants.

199.   Dexon is entitled to contribution from Third Party Defendants, whether based on express agreement, implied agreement or common law, to pay or defray any judgment entered against Dexon herein.

**PRAYER FOR RELIEF**

**WHEREFORE,** Defendant, Counterclaim Plaintiff and Third Party Plaintiff Dexon Computer, Inc. prays for judgment and relief against Plaintiffs and Counterclaim Defendants Cisco Systems, Inc. and Cisco Technology, Inc. ("Cisco") and Third Party Defendants Atlantix Global Systems International, LLC, Bizcom Electronics, Inc., Digi Devices Online, Enterprise Business Technologies, Inc., Fiber Cable Connections, MJSI, Multimode Technologies, LLC, Network Republic, Optimum Data, Inc., Paragon, Pure Future Technology, Inc., Seastar IT Trading LLC, Server Tech Supply, Softnetworks, Inc., Strada Networks, LLC, Strategic Telecom Supply & Solutions, Unlimited Network Solutions and Wisecom Technologies as follows:

a. An Order directing the termination of the anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1-2), the California Cartwright Act, and Section 17200 of the California Business and Professional Code;

b. Treble damages (including lost profits), in an amount to be determined at trial and that cannot now be adequately quantified before relevant discovery;

c. Dismissing Plaintiffs' Cisco Systems, Inc. and Cisco Technology, Inc. claims with prejudice, together with costs and disbursements;

d. Awarding Dexon's costs of suit herein, including its attorneys fees incurred in defending against Cisco's claims and asserting antitrust claims;

e. Declaring that Dexon's sale of genuine Cisco goods which Cisco has unilaterally deemed to be "unauthorized" or "unapproved" because sold outside of Cisco's authorized channels, sold to a secondary market reseller such as Dexon, or ineligible for warranty services as a result thereof, does not violate the Lanham Act, 15 U.S.C. §§ 1114, 1125(a);

f. Declaring that Cisco's refusal to warrant genuine products sold in New York violates New York General Business Law § 369-b;

g. Awarding Dexon restitutionary disgorgement;

h. Awarding Dexon actual damages, subject to proof at trial but in an amount in excess of $75,000.;

i. An award of punitive damages in an amount sufficient to punish Counterclaim Defendants, to make an example of them to the community, and to deter them from such conduct as to Dexon or others in the future;

j. For equitable remedial efforts by Counterclaim Defendants sufficient to rehabilitate Dexon's damaged reputation;

k. For orders restraining Cisco Systems, Inc. from engaging in similar conduct in the future;

l. Awarding Dexon damages, lost profits, and treble damages pursuant to the Lanham Act;

**App.517**

m.  Awarding Dexon its costs and expenses of litigation, including reasonable attorneys' fees;

n.  Enjoining Cisco from further violations of the laws enumerated herein;

o.  An award in Dexon's favor against Third Party Defendants sufficient to compensate Dexon for all economic loss, damages, attorney's fees and costs resulting from the claims herein; and

p.  Such other and further relief as this Court deems just and equitable.

Dated:  July 29, 2021

/s/ Amanda R. Washton
Amanda Washton
  a.washton@conklelaw.com
**CONKLE, KREMER & ENGEL, PLC**
3130 Wilshire Boulevard, Suite 500
Santa Monica, CA 90403

Michael M. Lafeber
  mlafeber@taftlaw.com
O. Joseph Balthazor Jr.
  jbalthazor@taftlaw.com
**TAFT STETTINIUS & HOLLISTER LLP**
2200 IDS Center
80 S. 8th St.
Minneapolis, MN 55402

David H. Reichenberg (*pro hac vice pending*)
  DReichenberg@cozen.com
**COZEN O'CONNOR**
3 WTC, 175 Greenwich Street, 56th Floor
New York, New York 10006

Mark A. Jacobson (*pro hac vice pending*)
  mjacobson@cozen.com
**COZEN O'CONNOR**
33 South Sixth Street, Suite 3800
Minneapolis, MN 55402

Attorneys for Defendant, Counterclaim Plaintiff and
Third-Party Plaintiff Dexon Computer, Inc.



1

**DEMAND FOR JURY TRIAL**

2

Dexon Computer, Inc. demands a trial by jury on all issues so triable.

3

4    Dated:  July 29, 2021                    /s/ Amanda R. Washton

5                                             Amanda R. Washton
                                                a.washton@conklelaw.com
6                                             **CONKLE, KREMER & ENGEL, PLC**
                                              3130 Wilshire Boulevard, Suite 500
7                                             Santa Monica, CA 90403

8                                             Michael M. Lafeber
                                                mlafeber@taftlaw.com
9                                             O. Joseph Balthazor Jr.
                                                jbalthazor@taftlaw.com
10                                            **TAFT STETTINIUS & HOLLISTER LLP**
                                              2200 IDS Center
11                                            80 S. 8th Street
                                              Minneapolis, MN 55402

12                                            David H. Reichenberg (*pro hac vice pending*)
                                                DReichenberg@cozen.com
13                                            **COZEN O'CONNOR**
                                              3 WTC, 175 Greenwich Street, 56th Floor
14                                            New York, New York 10006

15                                            Mark A. Jacobson (*pro hac vice pending*)
                                                mjacobson@cozen.com
16                                            **COZEN O'CONNOR**
                                              33 South 6th Street, Suite 3800
17                                            Minneapolis, MN 55402

18                                            Attorneys for Defendant, Counterclaim Plaintiff and
                                              Third-Party Plaintiff Dexon Computer, Inc.
19

20

21

22

23

24

25

26

27

28

0640.002\9976                           -62-                   Case No. 3:20-CV-4926-CRB
AMENDED ANSWER, AFFIRMATIVE DEFENSES, COUNTERCLAIMS AND THIRD-PARTY CLAIMS

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

**<u>DEXON COMPUTER INC.'S OPPOSITION TO DEFENDANT CISCO SYSTEMS,
INC.'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS ................................................................................ 4

      A.    Cisco Saw Dexon As A Threat To Its Monopolies And Entered Into
            A Conspiracy With CDW .................................................................... 4

      B.    Cisco Engaged In Ties And FUD To Protect Its Monopolies ............... 6

      C.    Cisco's Conduct Has Targeted Texas .................................................. 7

      D.    Procedural History And The Present Complaint .................................. 7

III.  LEGAL STANDARD ..................................................................................... 9

IV.   ARGUMENT ................................................................................................. 9

      A.    Res Judicata Does Not Bar Dexon's Complaint ................................. 9

      B.    The Cisco-CDW Conspiracy Violates Sections 1 and 2
            Of The Sherman Act ........................................................................ 14

            1.    *Section 1* ............................................................................... 14

            2.    *Section 2 Conspiracy* ........................................................... 20

      C.    Cisco Engaged In Illegal Tying In Violation of Section 1 ................... 21

      D.    Cisco's Tying and Associated FUD Also Violates
            Section 2 of the Sherman Act .......................................................... 25

      E.    Dexon States A Claim Under the Texas Free Enterprise and Antitrust Act .......... 29

      F.    Dexon Suffered Antitrust Injuries As A Result of Both Defendants' Conduct ..... 29

V.    CONCLUSION ............................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

CASES:

*Apple Inc. v. Pepper*,
    139 S. Ct. 1514 (2019) ...................................................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................9

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ......................................................................................................29

*Babyage.com v. Toys "R" Us, Inc.*,
    558 F. Supp. 2d 575 (E.D. Pa. 2008) ...........................................................................18

*Baker v. Putnal*,
    75 F.3d 190 (5th Cir. 1996) ...........................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................9

*Bodet v. Charter Commc'ns Inc.*,
    2010 WL 5094214 (E.D. La. July 26, 2010). .................................................................21

*Brown Shoe v. United States*,
    370 U.S. 294 (1962). ......................................................................................................17

*Burdett Sound, Inc. v. Altec Corp.*,
    515 F.2d 1245 (5th Cir. 1975) .......................................................................................16

*Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*,
    No. 3:29-cv-4926 (N.D. Cal.) .....................................................................................7, 8

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ..........................................................................................9

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463 (1978) ......................................................................................................10

*Davis v. Dallas Area Rapid Transit*,
    383 F.3d 309 (5th Cir. 2004) ........................................................................................13

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
    123 F.3d 301 (5th Cir. 1997) ........................................................................................16

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ..........................................................................................3, 22, 23

*Eldridge v. Equifax, Inc. et al.*,
   No. CIV-19-115-R (W.D. Okla.) ....................................................................11

*Eldridge v. Kohls Dep't Stores, Inc. et al.*,
   2020 WL 1528233 (W.D. Okla. Mar. 30, 2020) ............................................11

*Fernandez-Montes v. Allied Pilots Ass'n*,
   987 F. 2d 278 (5th Cir. 1993) ......................................................................2, 9

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
   789 F. Supp. 760 (S.D. Miss. 1992) ................................................................17

*Graphic Prods. Distribs. v. ITEK Corp.*,
   717 F.2d 1560 (11th Cir. 1983) .......................................................................18

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
   714 F.2d 1384 (5th Cir. 1983). .......................................................................26

*Image Tech. Servs. Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) .........................................................................28

*Impax Lab'ys, Inc. v. FTC*,
   994 F.3d 484 (5th Cir. 2021) ...........................................................................17

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*,
   677 F.2d 1045 (5th Cir. 1982) ...........................................................................9

*Lormand v. US Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) .............................................................................9

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
   751 F.3d 368 (5th Cir. 2014) ...........................................................................14

*Medtronic AVE, Inc. v. Cordis Corp.*,
   2004 WL 7322043 (E.D. Tex. Mar. 18, 2004) ..........................................21, 23

*Moch v. E. Baton Rouge Par. Sch. Bd.*,
   548 F.2d 594 (5th Cir. 1977) ...........................................................................14

*Moore v. Matthews & Co.*,
   550 F.2d 1207 (9th. Cir. 1977) ........................................................................27

*Nasser v. Fin. of Am. Reverse LLC.*,
    2021 WL 966007 (S.D. Tex. Mar. 15, 2021) ....................................................10

*N. Mississippi Commc'ns, Inc. v. Jones*,
    792 F.2d 1330 (5th Cir. 1986). ......................................................................20

*Pimpanit v. Phumswarng, Inc.*,
    2022 WL 866290 (5th Cir. Mar. 23, 2022) ............................................13, 14

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ..........................................................................26

*Sonnier v. State Farm Mut. Auto. Ins. Co.*,
    509 F.3d 673 (5th Cir. 2007) ............................................................................9

*Southmark Properties v. Charles House Corp.*,
    742 F.2d 862 (5th Cir. 1984) .......................................................................9, 10

*Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*,
    940 F. Supp. 1026 (E.D. Tex. 1996) ..............................................................29

*Transource Int'l, Inc. v. Trinity Indus., Inc.*,
    725 F.2d 274 (5th Cir. 1984) ..........................................................................26

*TravelPass Grp. LLC v. Caesars Ent. Corp.*,
    2019 WL 4727425 (E.D. Tex. Sept. 27, 2019)...................................... 3, 4, 27, 28

*Tunis Bros. Co. v. Ford Motor Co.*,
    696 F. Supp. 1056 (E.D. Pa. 1988) .................................................................18

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) ...........................................................................28

*U.S. ex re. Riley v. St. Luke's Episcopal Hosp.*,
    355 F.3d 370 (5th Cir. 2004) ............................................................................9

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ........................................................................17, 19

*Walker v. U-Haul Co. of Mississippi*,
    747 F. 2d 1011 (5th Cir. 1984) .......................................................................25

STATUTES:

Tex. Bus. & Com. Code Ann. § 15.04 (West). ...............................................29

**App.524**

TREATISES:

Areeda & Hovenkamp,
    *Antitrust Law* (3d ed. 2007) ............................................................................................19

Areeda & Hovenkamp,
    *Antitrust Law* (4th ed. 2020) .................................................................................. 3, 20, 23

Wright and Miller, Federal Practice and Procedure:
    Civil P 1357 (1st ed. 1969) ............................................................................................14

Defendant Dexon Computer, Inc. ("Dexon") files this opposition to Cisco Systems, Inc.'s ("Cisco") Motion to Dismiss for Failure to State a Claim (Dkt. No. 22) and shows as follows:

## I.    <u>INTRODUCTION</u>

Cisco's motion to dismiss ("MTD") relies upon one decision of a California court to argue that the Complaint should be dismissed.  But that California decision ruled upon fundamentally different counterclaims, which did not allege in detail: (i) a conspiracy between Cisco and CDW to exclude Dexon from end-user sales and maintain Cisco's monopolies that were being threatened by both inter-brand and intra-brand competition in violation of both Sections 1 and 2 of the Sherman Act (the former a conspiracy in unreasonable restraint of trade and the latter a conspiracy to monopolize) (Compl. ¶¶ 87-100), (ii) four instances of Cisco using coercion against automobile, energy, bank and school customers in Texas to rob consumers' ability to make a choice of technology on the merits (*id.* ¶¶ 1-3, 7, 51, 65-67), and thus an independent antitrust claim under Texas law (*id.* ¶¶ 122-128), (iii) Cisco's dominant, near-monopoly, positions in the US and Global Relevant Markets for IP phones, and its improper conduct designed to harm competition in these Markets (*id.* ¶¶ 69-77), and (iv) new, independent claims of damage and antitrust injury against CDW, which sought to gain Cisco's favor by agreeing to an overall deal designed to enhance CDW's sales and aid Cisco in its improper attempt to preserve its monopolies (*id.* ¶¶ 60-63, 92, 99, 135, Prayer for Relief sections i, k).  Importantly, Cisco does not challenge any of Dexon's definitions of the US and Global Relevant Markets at issue in this case, nor Cisco's monopoly power in each of them.[1]  When the Court takes account of these well-pled allegations further detailed below, rather than mischaracterizing them as a "choice of distributor" issue, "refusal to

---

[1] For ease of reference, the Relevant Networking Equipment Markets include the US and Global Markets for Ethernet Switches and Routers, the Relevant Product Markets include the Relevant Networking Equipment Markets as well as the US and Global Markets for IP Phones, and the Relevant Aftermarkets for Cisco Maintenance and Service (or Relevant Service Markets) constitute the US and Global markets for such separate from the Relevant Product Markets.

deal" or "*per se* legal agreements" as Cisco improperly attempts to do, it is apparent that Cisco's motion should be denied.

Cisco's motion also advances res judicata as a basis for dismissal, but it does so by ignoring settled Fifth Circuit law and how the binding law applies to these facts. Cisco attempts to transform a dismissal *without prejudice* of prior antitrust counterclaims into a dismissal with prejudice because non-antitrust counterclaims proposed by Dexon were subsequently dismissed with prejudice. This ignores Fifth Circuit law making clear that when an attempted amendment of a prior pleading is denied, that order does not apply to the previous claims that were not included in the proposed amendment. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F. 2d 278, 284 n.8 (5th Cir. 1993). When this Court applies this rule, it should find that Dexon's antitrust claims were not dismissed with prejudice, and thus res judicata does not apply. In addition, Dexon's Complaint forms a different nucleus of operative facts than the prior counterclaims, which also renders res judicata inapplicable.

Cisco's motion argues that there is no properly pled conspiracy with CDW, and that any such conspiracy is lawful. This argument ignores that the Complaint alleges in detail how Cisco saw an opportunity to recruit CDW in its effort to exclude the inter-brand and intra-brand competition that Dexon provided, and set up CDW to increase its sales by luring it into a conspiracy. Cisco improperly tries to rewrite these allegations as Cisco's right to choose its distributor, but it is illegal under the antitrust laws for the Defendants to engage in a common, coordinated scheme for CDW to appear as the "savior" to customers while at the same time foreclosing inter-brand and intra-brand competition from Dexon. (Compl. ¶¶ 56-63, 65-67). These are the classic and prime harms forbidden by the antitrust laws, particularly where Cisco has

monopolies in all of the Relevant Markets at issue, Markets where intra-brand competition is critical.

Cisco's motion also mischaracterizes the anticompetitive ties at issue in this case. Cisco is focused on customers' initial purchase of equipment along with SmartNet service packages (MTD at 18–19, 21-23), but the antitrust violation occurs *after* Cisco has locked in the customer for SmartNet service and demands that the customer buy new Equipment for a supra-competitive price. Put another way, the illegal tie occurs after Cisco newly refused to service Equipment after previously servicing such Equipment, which parallels what happened in *Kodak*. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 475-78 (1992); *see also* X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 1740c4, 1740c6 (4th ed. 2020). Dexon's Complaint explains how this type of anti-competitive behavior happened time and again in Texas across several industries, forcing customers to either (i) buy Cisco equipment they did not want, thus foreclosing Cisco's competitors (*see, e.g.*, Compl. ¶ 3), or (ii) suffer with technologically compromised Equipment that Cisco refuses to service, while being unable to replace the compromised Equipment with a competitor's offering until their IT budget allows the customer to do so (which often takes years). (*Id.* ¶¶ 1-2, 4, 7, 51, 65-68). Cisco engaged in this coercive scheme leaving customers in a "no-win" scenario. (*Id.* ¶¶ 4-5, 51, 65-67). Cisco's claim that this is a mere contract issue ignores that it is a monopolist in both the Relevant Aftermarkets for Service and Relevant Product Markets and is leveraging its near virtual monopoly in service to maintain monopolies in the Relevant Product Markets.

Cisco's claim that it has not engaged in tying or monopolization because its tries to charge as low a price as possible rings hollow. (MTD at 26–27). Such alleged "incentives" cannot pass muster on a motion to dismiss. *TravelPass Grp. LLC v. Caesars Ent. Corp.*, 2019 WL 4727425,

at *3 (E.D. Tex. Sept. 27, 2019) (Schroeder, J.) ("The Court may consider 'the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.'") (internal citation omitted).  In any case, the reason Cisco has engaged in this anticompetitive conduct is to maintain or even enhance its monopolies in multiple Relevant Markets.  Cisco complains that this "makes no economic sense," but in fact it does.  By weakening or even eliminating its competition at the same time as charging monopoly prices, Cisco benefits on both scores.  (Compl. ¶¶ 52-53).  Dexon and other multi-vendor resellers present customers with another choice of competitive brands and customer service, a choice that Cisco's conduct hinders.

Cisco argues that Dexon has not sustained an antitrust injury by ignoring that the intent and effect of its conduct is to eliminate a lower-priced, more diversified choice to consumers from Dexon.  Dexon has suffered lost sales and reputation that directly stem from Cisco's ties, FUD, and other exclusionary conduct.  Cisco's conspiracy with CDW represents an independent source of antitrust injury, because now one of the giants in distribution has been persuaded by a monopolist to coordinate with it so that customers do not place any significant orders with Dexon. This conspiracy deprives businesses of precisely the inter-brand and intra-brand competition that they were counting upon from Dexon, while padding the profits of both Defendants in the process.

Cisco's motion to dismiss should be denied in its entirety.

II.    **STATEMENT OF FACTS**

A.    **Cisco Saw Dexon As A Threat To Its Monopolies and Entered Into A Conspiracy with CDW**

Cisco considers resellers like Dexon who sell both Cisco networking equipment and the networking equipment of Cisco's competitors to be a prime competitive threat to its Networking

Equipment monopolies and has coerced customers using a strategy of "fear, uncertainty, and doubt" (FUD) to not purchase networking equipment and services from Dexon.  (Compl. ¶ 6).

This was not always the case.  Dexon has been a longstanding reseller of networking equipment and provider of services and was in Cisco's good graces until 2015.  (*Id.* ¶ 12.)  In fact, Dexon had access to Cisco's online database to arrange for maintenance services for its customers, and Cisco even sent a representative to Dexon to assist with sales and familiarize Dexon with Cisco's products.  (*Id.*).  When Cisco learned that Dexon "converted customers of Cisco networking equipment to customers of its competitors' networking equipment, such as from Juniper" and put pressure on Cisco to lower its prices (*id.* ¶ 13), Cisco embarked on its mission to steer customers away from Dexon and other resellers, and threatened that customers would "pay the consequences" if they did not comply.  (*Id.*).

Cisco enlisted the help of one of its favored distributors, CDW, to assist with its scheme to exclude resellers like Dexon from the Relevant Networking Equipment Markets and maintain its monopolies.  (*Id.* ¶ 14).  As part of their conspiracy, Cisco and CDW coordinated their communications and actions for a Pennsylvania hospital system, which awarded a contract to Dexon to purchase Ethernet switches and routers.  (*Id.* ¶ 59).  When Cisco learned that the hospital system awarded the order to Dexon, it threatened the customer that it would "not honor the contemplated new SmartNet service package, [and] also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics."  (*Id.*).  Instead, CDW would step in as the hospital system's "savior" and "secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment."  (*Id.* ¶ 60).

Also as part of this conspiracy, CDW agreed not to sell Networking Equipment to Dexon.  (*Id.* ¶ 62).  When one CDW representative refused to comply with this agreement, the

representative was re-assigned to a different account within CDW.  (*Id.*).  Cisco recruited CDW into the conspiracy because it favors Cisco products over those of Cisco's competitors; when one completes a search on CDW.com for 'Ethernet switches,' it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections.  (*Id.* ¶ 61).  The Cisco-CDW conspiracy has limited inter-brand and intra-brand competition, is continuing, has harmed customers nationwide, has resulted in millions of dollars of lost sales for Dexon.  (*Id.* ¶¶ 2, 61, 63, 134).

### B.     Cisco Engaged In Ties and FUD to Protect Its Monopolies

Not only has Cisco engaged in a conspiracy with CDW to protect its monopolies, it has employed a strategy of illegal tying and "fear, uncertainty, and doubt" ("FUD") to dissuade customers from buying networking equipment from Cisco's competitors like Dexon.  (*Id.* ¶¶ 1-6). For example, Cisco demanded that a Texas-based bank buy new Ethernet switches and routers to be eligible for renewal of its SmartNet package, even though the bank only sought to renew its SmartNet service.  (*Id.* ¶ 3).  The bank was forced to buy Ethernet switches and routers it did not need.  (*Id.*).  Once again in Texas, Dexon was awarded a multi-year contract for thousands of IP phones by an independent School District.  (*Id.* ¶ 65).  Upon learning of this purchase, Cisco threatened the District that if it did not cancel the order from Dexon, it would not service the other Networking Equipment already purchased by the district.  (*Id.*).  As a result, the School District was forced to use a non-preferred dealer and pay more money, further limiting its IT budget.  (*Id.*). In addition, a Texas-based energy company purchased Ethernet switches and routers from Dexon, as well as a SmartNet service package.  (*Id.* ¶ 7).  After providing SmartNet support to the company for several years, Cisco dictated that in order for the company to continue receiving the SmartNet maintenance and service, the company would have to buy new Ethernet switches and routers from

a vendor other than Dexon, even though the customer informed Dexon that it only wanted to buy networking equipment from Dexon.  (*Id.*).  Similarly, Cisco "told [a] Texas emergency 911-center it needed to purchase new routers and Ethernet switches from a non-Dexon vendor . . . if it wanted to receive the service it was due under its SmartNet service package."  (*Id.* ¶ 8).  In these latter examples as well as one involving a Texas automotive customer (*id.* ¶ 51), the customers were forced to deal with service disruptions (including where Cisco refused to service "dead" switches) and could not buy new Networking Equipment because their IT budgets had already been spent on Cisco due to Cisco's previous assurances that they would not have to buy additional equipment in the future to maintain its service.  (*Id.* ¶¶ 7, 13, 46, 50-51, 82).

As these examples illustrate, Cisco has used the SmartNet service package as a tying product in order to coerce customers to make unwanted purchases in the Relevant Product Markets, and foreclose competitors in the process.  (*Id.* ¶ 102).  Cisco has used its monopolies in the Relevant Service Markets to maintain and expand its monopolies in the Relevant Product Markets.

### C.     Cisco's Conduct Has Targeted Texas

As demonstrated in section II.B, *supra*, Cisco's anticompetitive conduct has targeted Texas through at least five different customers.  (*Id.* ¶¶ 1-3, 7-8, 51, 65-67).

### D.     Procedural History and the Present Complaint

Cisco's First Amended Complaint against Dexon was filed in the Northern District in California on March 19, 2021, asserting claims of trademark infringement, trademark counterfeiting, false designation of origin and associated state law claims.  *Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 32 (N.D. Cal.).  Dexon's motion to dismiss those claims was denied on June 1, 2021, and Dexon filed its amended counterclaims on July 29, 2021, which included both antitrust and non-antitrust claims.  *Id.* at Dkt. No. 50.  The

antitrust claims were solely against Cisco and did not include any conspiracy or Texas-based claims. *Id.* at 35-42. In an Order dated December 9, 2021, Judge Breyer granted Cisco's motion to dismiss Dexon's counterclaims, without prejudice. *Id.* at Dkt. No. 87. Dexon filed amended counterclaims on January 10, 2022 consistent with the Court's Order, but none of them were antitrust counterclaims. *Id.* at Dkt. No. 92. There have been subsequent amendments to those counterclaims, but those amendments did not assert or propose any antitrust claims.

Dexon filed a Complaint in this Court on April 27, 2022, asserting, *inter alia*, a conspiracy to monopolize claim under Section 2 of the Sherman Act, a conspiracy claim under Section 1 of the Sherman Act, an attempted monopolization claim under Section 2 of the Sherman Act against Cisco for attempting to monopolize the US and Global IP phone markets, and a claim under the Texas Free Enterprise & Antitrust Act, none of which were asserted in Dexon's prior antitrust counterclaims in California. (Compl. ¶¶ 44, 69-77, 87-100, 117(d), 122-128). CDW is detailed as a co-conspirator of Cisco, and there is injunctive and compensatory relief sought against CDW. (*Id.* ¶¶ 60-63, 92, 99, 135, Prayer for Relief sections I, k).

Cisco requested a 30-day extension to respond to Dexon's Complaint, which the Court granted on May 23, 2022. Cisco filed the instant MTD as well as a motion to transfer venue under the "first-to-file" rule. Dkt. Nos. 21, 22.

Cisco has not disputed that it has monopoly power in (i) the U.S. and Global Aftermarkets for Cisco Maintenance and Service (Compl. ¶¶ 25-30) (ii) the U.S. and Global Markets for Ethernet Switches (*id.* ¶¶ 31-35); and (iii) the U.S. and Global markets for Routers (*id.* ¶¶ 36-39). The Relevant Product Markets are characterized by high barriers to entry and expansion (*id.* ¶¶ 40-43, 75-77), and Cisco maintains in excess of a 40% share of the global and US based IP phone markets,

and has possessed in excess of a 60% share of enterprise Unified Communications (UC) purchases which include IP phones, thus resulting in market power for IP phones.  (*Id.* ¶¶ 69-77).

## III.  <u>LEGAL STANDARD</u>

In the Fifth Circuit, motions to dismiss brought under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)).  In reviewing a motion to dismiss, the Court must accept as true all well-pled facts in the complaint and view those facts in the light most favorable to the plaintiff.  *See Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  Rather than evaluate the plaintiff's ultimate likelihood of success, the Court need only determine whether the plaintiff has stated a plausible and legally cognizable claim.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *U.S. ex re. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

## IV.  <u>ARGUMENT</u>

### A.  **Res Judicata Does Not Bar Dexon's Complaint**

Cisco acknowledges that the prior dismissal on which it relies was without prejudice, and ignores Fifth Circuit law making clear that res judicata would not apply here.  In *Fernandez-Montes*, the Fifth Circuit discussed the scenario where the "plaintiff seeks to file an amended complaint, and [such] leave is denied with prejudice," as the Northern District of California did here.  987 F. 2d at 284 n.8.  In such a case, "the denial is res judicata as to any claim in the proposed amended complaint. . . . [T]he [res judicata] bar *does not extend beyond the claim or cause of action that was pleaded in the complaint.  It does not preclude a new suit on different factual allegations that call into play different legal principles*."  *Id.* (emphasis added); *see also Southmark*

*Properties v. Charles House Corp.*, 742 F.2d 862, 870 n.10 (5th Cir. 1984) ("'[A] final judgment for purposes of res judicata must finally dispose of some matter which under the substantive law to be applied and the procedural law of the forum can be, and has been, finally disposed of.'") (internal citation omitted).  Applied here, the Complaint includes a multitude of different factual allegations as well as new claims that call into play different legal principles, and the proposed amended counterclaims in California did not include antitrust counterclaims.  Thus, it is apparent that under binding Fifth Circuit law that res judicata does not apply.

This conclusion is confirmed by the holdings of the Supreme Court as well as a sister District Court.  It is long-standing precedent that a final judgment "depends on the existence of a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment."  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978).  That is not the case here.  Further applying these concepts in this Circuit, the Southern District of Texas has found that there is no "caselaw support for the proposition that simply omitting a previously pled claim from an amended complaint in federal court, without more, mandates the application of judicial estoppel to prevent a plaintiff from later pursuing this claim in a new [subsequent] court action."  *Nasser v. Fin. of Am. Reverse LLC.*, 2021 WL 966007, at *2 (S.D. Tex. Mar. 15, 2021). The *Nasser* Court found that "unlike in other cases where courts have found judicial estoppel based on pleadings, there are no deliberate, clear and unequivocal statements by [the plaintiff] that he had abandoned his force-placed insurance claims when he filed his amended complaint in the Lead Case that did not include these claims."  *Id.*  That is also the case here:  Dexon in no way abandoned its antitrust claims, let alone by "deliberate, clear and unequivocal statements," but rather investigated them further and appropriated filed suit in this Court because it is the proper venue.

Cisco's motion relies upon an out of circuit, unpublished case to argue that res judicata should apply, but it is distinguishable on its facts.  In *Eldridge v. Equifax, Inc. et al.*, No. CIV-19-115-R, Dkt. No. 57 (W.D. Okla.), Judge David Russell of the Western District of Oklahoma first dismissed the plaintiff's claims against First Premier Bank without prejudice in 2019.  *See* Russell Opinion, attached hereto as <u>Exhibit A</u>.  Cisco's motion cites Judge Russell's subsequent 2020 opinion, which found that the claims asserted again, against the same defendant, were "even more bareboned" than the same claims the Judge dismissed in the plaintiff's prior lawsuit.  *Eldridge v. Kohls Dep't Stores, Inc. et al.*, 2020 WL 1528233, at *1 (W.D. Okla. Mar. 30, 2020).  As a result, the claims were dismissed with prejudice.  Here, the opposite has occurred:  Dexon has diligently investigated its claims after a dismissal without prejudice, and asserts a host of facts and causes of action that were not asserted in its previous counterclaims, as detailed in the chart below.  Unlike the plaintiff in *Eldridge*, who failed to take "any subsequent action to resuscitate the claims," 2020 WL 1528233, at *2, Dexon has been diligent in pursuing its antitrust claims in the proper forum.

Res judicata also does not apply because the Complaint pleads a different nucleus of operative facts than the prior counterclaims.  None of the following allegations made here were in the prior antitrust counterclaims:

| Complaint Paragraphs | Allegations |
| --- | --- |
| ¶¶ 1-2 | Cisco has engaged in at least five instances of coercion in Texas, involving millions of dollars of networking equipment that has been foreclosed to Cisco's equipment competitors. |
| ¶ 3 | Cisco coerced a Texas-based bank to buy networking equipment it did not want or need, resulting in competitive foreclosure to Cisco's competitors. |
| ¶¶ 4-5 | Cisco's competitors are foreclosed from small and medium businesses which have limited IT budgets, because once Cisco has locked in customers due to its anticompetitive conduct, the limited IT budgets prevent purchases from Cisco's competitors. |
| ¶ 6 | Cisco considered certain resellers like Dexon to be a threat to its networking equipment monopolies. |

| ¶ 7 | Cisco threatened a Texas based energy company that if it bought any product through Dexon, including from competitors, Cisco would no longer service the customer's equipment. |
| --- | --- |
| ¶ 11 | Explaining how any Cisco claim that it is merely "controlling its distribution channel" or is "incentivized" to charge competitive prices is pretext for an anticompetitive practice designed to maintain its monopolies and supra-competitive prices. |
| ¶ 51 | Cisco told a Texas-based automobile dealership that it would stop providing service and replacements unless the customer bought new networking equipment.  Because the customer's limited IT budget prevented such a purchase, the customer is foreclosed from buying any replacement from Cisco competitors and is forced to deal with a service disruption. |
| ¶¶ 56-63 | Cisco and CDW entered into a conspiracy that foreclosed Dexon from making sales in the Relevant Networking Equipment Markets.  Cisco entered into this conspiracy because, *inter alia*, CDW did not promote Cisco competitors as equally as Dexon.  The conspiracy also included CDW's agreement not to sell to Dexon pursuant to Cisco's demand, and at least in one instance, Cisco portrayed CDW as the "savior" to a Pennsylvania hospital system that previously enjoyed Dexon's unbiased product selection and lower pricing. |
| ¶¶ 65-67 | Cisco coerced a Texas based School District not to buy IP phones from Dexon by threatening not to service networking equipment.  The School previously enjoyed and awarded Dexon a significant RFP based on its competitive options for IP phones and its service.  The School is now forced to use more of its IT budget, and Cisco's competitors are foreclosed due to the forced supra-competitive purchase. |
| ¶ 68 | Consistent with its overall practice, Cisco used FUD to convince a Maryland customer that line cards sold by Dexon suffered from "malware" even though line cards have no software. |
| ¶¶ 69-77 | Cisco is dominant in the US and Global Relevant Markets for IP Phones, and Cisco's positions are protected by high barriers to entry. |
| ¶ 86 | Dexon sustained Texas-specific damages and loss of goodwill as a result of Cisco's anticompetitive behavior. |
| ¶¶ 87-93 | Adding Conspiracy in Unreasonable Restraint of Trade against Cisco and CDW under Section 1 of the Sherman Act. |
| ¶¶ 94-100 | Adding Conspiracy to Monopolize Against Cisco and CDW under Section 2 of the Sherman Act. |
| ¶¶ 44, 117(d) | Attempted Monopolization Claim under Section 2 of the Sherman Act includes Cisco's anticompetitive conduct in the Relevant IP Phone Markets. |
| ¶¶ 122-128 | Adding claim under the Texas Free Enterprise & Antitrust Act, incorporating all of the Texas specific conduct and the CDW-Cisco conspiracy. |

These factual allegations and associated causes of action on their own comprise independent bases of relief apart from the counterclaims previously asserted in California.

Dexon's Complaint passes the "transactional test" applied by the Fifth Circuit to determine if later-brought claims are precluded by earlier claims. *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 313 (5th Cir. 2004). Under this test, "[w]hat grouping of facts constitutes a 'transaction' or a 'series of transactions' 'must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Id.* Applied here, Dexon's conspiracy claims under Sections 1 and 2 of the Sherman Act constitute their own trial unit, as it raises numerous questions specific to such claims, including but not limited to: actions against self-interest (Compl. ¶¶ 6, 11 51, 68-77), the length of the agreed upon conspiracy (*id.* ¶¶ 87-100), whether either party withdrew from the conspiracy at any point (*id.*), and what damages are due to Dexon because of the joint conduct. (*Id.* ¶¶ 60-61, 90, 97, 133). In addition, a jury will need to decide whether Cisco's specific misconduct in Texas result in a violation of Texas law (*id.* ¶¶ 122-128); that question also forms its own independent trial unit. *See Davis*, 383 F.3d at 313. Indeed, when one considers the "parties' expectations" (*id.*) for purposes of trial in this case, CDW has not made any independent substantive argument in favor of transfer (*see generally* Dkt. No. 21) and thus would expect, along with Dexon, to address Dexon's claims in Texas.

A recent case decided by the Fifth Circuit, reversing a dismissal on res judicata grounds, confirms that dismissal is not proper. In *Pimpanit v. Phumswarng, Inc.*, the lower court granted Defendant's motion to dismiss on res judicata grounds because the plaintiff's previous underpayment claims against her employer were deemed related to the retaliation claim against

the same employer brought in a subsequent suit.  2022 WL 866290, at *2 (5th Cir. Mar. 23, 2022).

The Fifth Circuit reversed, finding that while "the two suits involve related facts:  suspicions about

underpaid wages led to [the plaintiff's] actions that allegedly caused her firing . . . [but] [m]ere

relatedness between two sets of facts does not create one transaction."  *Id.* at *3.  Further, "[n]or

would [the plaintiff's] state and federal claims present a 'convenient trial unit' such that they

should have been litigated together . . . [and the plaintiff's] state and federal claims are 'not

different theories of recovery based on the same operative facts [] but are different causes of action

based on different operative facts.'"  *Id.*  This is also the case here:  Dexon's newly pled facts and

claims comprise an independent trial unit, and assert a multitude of different operative facts,

including new Texas-based conduct, new US and Global IP Phone Markets, and a new conspiracy

that triggers different causes of action.  While the claims may relate, the Fifth Circuit's holding

makes clear that this Court should consider the totality of circumstances.  Under this test, the Court

should find that Dexon's present Complaint is not precluded by its earlier counterclaims.

For these reasons, the Court should reject Cisco's argument that Dexon's case is barred by

res judicata. [2]

**B.     The Cisco-CDW Conspiracy Violates Sections 1 and 2 of the Sherman Act**

*1.     Section 1*

The elements of a Section 1 claim under the Sherman Act are: (1) defendants engaged in a

conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in a

relevant market.  *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th

---

[2] In any event, Cisco's res judicata argument fails because "a party cannot base a 12(b)(6) motion on res judicata. That doctrine must be pleaded as an affirmative defense."  *Moch v. E. Baton Rouge Par. Sch. Bd.*, 548 F.2d 594, 596 (5th Cir. 1977) (citing 5 Wright and Miller, Federal Practice and Procedure: Civil P 1357, at 604-610 (1st ed. 1969)).

Cir. 2014).  Cisco's motion does not challenge any of Dexon's definitions of the Relevant Markets, and thus its arguments are focused on the first two elements.

Dexon sufficiently alleges a conspiracy by explaining how Cisco and CDW engaged in concerted action, referred to as "a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Id.*  Dexon's Complaint explains how CDW helps Cisco maintain supra-competitive prices in the Relevant Networking Markets, whereas Dexon conversely puts pressure on Cisco to lower its prices.  (Compl. ¶ 56).  Faced with the prospect of competition from Dexon, because of its lower prices and equal treatment of competing manufacturers, Cisco recruited CDW to join a conspiracy in which Dexon would be excluded from at least the Relevant Networking Equipment Markets.  (*Id*. ¶ 57).  The Complaint details how Cisco and CDW coordinated their communications and actions for a Pennsylvania hospital system, whereby CDW would be portrayed as the savior to the customer, and concurrently, Cisco would tell the customer that any purchases from Dexon would put all of the hospital's maintenance services at risk.  (*Id.* ¶ 60).  Also as part of this conspiracy, CDW agreed not to sell Networking Equipment to Dexon, and when one CDW representative refused to comply with this agreement, the representative was re-assigned to a different account within CDW.  (*Id.* ¶ 62).  The Cisco-CDW conspiracy is on-going, has harmed customers across the country, and given CDW's favoritism of Cisco, may also apply to other multi-vendor resellers that provide inter-brand and intra-brand competition.  (*Id.* ¶¶ 63, 88).

Cisco attempts to rewrite these allegations by claiming that "CDW has every incentive to make profitable sales of Cisco equipment" and that there is nothing "unlawful about CDW making profitable sales."  (MTD at 14).  This argument omits the fact that Cisco and CDW agreed on a coordinated scheme to displace Dexon with CDW, when customers should have been able to

benefit from Dexon's lower prices and more diverse product offerings. (Compl. ¶ 60). This plainly satisfies the conspiracy element of a Section 1 claim.

Cisco's next argument that this is mere "dealer substitution" (MTD at 14-15) also ignores the coordinated aspect of this conspiracy. Cisco's motion relies on *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975), in which the manufacturer defendant was accused of replacing one distributor for another. 515 F.2d at 1246. In affirming the lower court's grant of summary judgment, the Court ruled that "[it] is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient *to itself*[]" and further, "[a] mere *unilateral* change of distributors is not an unusual business practice, nor is it a violation of the antitrust laws." *Id.* at 1258 (emphasis added). This holding has no application to the present case, where Cisco did not merely change distributors unilaterally, as it never had a direct supply relationship with Dexon. Rather, the Cisco-CDW conspiracy was a coordinated effort designed to rob businesses of the choice it otherwise would have made between distributors on the merits. In addition, in *Burdett Sound*, the Court found that there was "no effort by either [defendant] to establish market dominance, no restrictive trade practices, and no anti-competitive intent or effect[]" (*id.*), whereas here, the Cisco-CDW conspiracy was intended to and did result in all of these market harms. *See* Compl. ¶ 62, 78-82, 122-128, 133-136.

Cisco's reliance on *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997) is also misplaced, as the Court affirmed a grant of summary judgment in which none of the defendants possessed market power in the relevant market at issue (*id.* at 310), and there was no coordinated effort to change consumers' ultimate buying choices. *Id.* at 312.

Finally, Cisco argues that the conspiracy did not harm competition, but ignores Dexon's allegations that the conspiracy has cost consumers and Dexon millions of dollars, and has allowed

Cisco to maintain its monopolies, discussed further below.  (Compl. ¶¶ 2, 63).  Aware of these facts, Cisco attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this case, but there are no exclusive dealing claims alleged by Dexon.  Cisco's motion cites to *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 770 (S.D. Miss. 1992), claiming that the plaintiff there "ha[d] not sufficiently pleaded substantial foreclosure of market alternatives as a result of the . . . contracts at issue."  MTD at 22–23.  But Cisco's ellipsis omits that the agreements at issue were exclusive agreements, not at issue in this case.  The Supreme Court has distinguished between exclusive agreements and other types of potentially anticompetitive conduct, such as tying, which unlike exclusive dealing, directly coerces ultimate consumers.  *See Brown Shoe v. United States*, 370 U.S. 294, 329-330 (1962).  The Supreme Court noted that the foreclosure needed for exclusive dealing is greater than for tying, because the latter involves direct coercion of customers.  *Id.*  To our knowledge, no Court has applied the substantial foreclosure requirement outside of the exclusive dealing context, and Cisco provides no basis for the Court to do so here.

Dexon explains in detail how the Cisco-CDW conspiracy significantly harms both inter-brand and intra-brand competition, because Dexon provides price and quality competition to other Cisco resellers, and provides an opportunity for Cisco's competitors to penetrate the Relevant Product Markets.  (Compl. ¶¶ 60-61, 90-92).  "At the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the alleged relevant markets."  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010) ("*West Penn*"); *see also Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021) ("Anticompetitive effects are those that harm consumers.  Think increased prices, decreased output, or lower quality goods.").  Cisco does not acknowledge, let alone dispute, the harm to intra-

brand competition that results in the Relevant Product Markets when Cisco, a monopolist manufacturer, conspires with a large distributor to exclude a lower-priced distributor.  As one Court explained in detail:

> The argument . . . that the reduction or elimination of intrabrand competition is, by itself, never sufficient to show that a trade restraint is anticompetitive must rest, at bottom, on the view that intrabrand competition — regardless of the circumstances — is never a significant source of consumer welfare.  This view is simply not supported by economic analysis, or by the cases.  A seller with considerable market power in the interbrand market — whether stemming from its dominant position in the market structure or from the successful differentiation of its products — will necessarily have some power over price.  In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold.  Dealers, by competing against each other and bidding the retail price down, will in turn exert downward pressure on the seller's wholesale price in order to maintain their profit margins.  Thus, in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price.  Rather than promoting nonprice competition, vertical restraints in this context may enable a manufacturer to retain monopoly profits arising from an interbrand competitive advantage.

*Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n.20 (11th Cir. 1983); *see also Babyage.com v. Toys "R" Us, Inc.*, 558 F. Supp. 2d 575, 583 (E.D. Pa. 2008) ("the U.S. Supreme Court and the leading treatise in the field expressly recognize that harm to intrabrand competition is cognizable when brought about by the demands of a 'dominant' retailer"); *Tunis Bros. Co. v. Ford Motor Co.*, 696 F. Supp. 1056, 1061 (E.D. Pa. 1988) (genuine dispute on the merits existed as to competitive effect of diminution in intra-brand competition in an oligopolistic market).

This harm to intra-brand competition was precisely a goal and effect of the Cisco-CDW conspiracy, in Relevant Markets where Cisco concedes it is a monopolist for purposes of its motion.

Cisco's argument that CDW's favoring of Cisco over other Networking Equipment manufacturers does not harm inter-brand competition (MTD at 16-17) ignores the fact that the

harm results from a conspiracy to block such competition.  Cisco decided to recruit CDW into the

conspiracy precisely because when customers go to CDW's website looking for Ethernet switches,

customers will find 1,440 selections for Cisco and less than 250 selections (and most under 100

selections) for any other competitive brand.  (Compl. ¶ 61).  Conversely, other resellers such as

Dexon more equally promote Cisco compared to its competitors.  (*Id.*).  Thus, when a conspiracy

is reached to foreclose a "price cutting" distributor, it will harm inter-brand competition and

preserve Cisco's monopolies in the Relevant Product Markets.

The Third Circuit's analysis of a Section 1 claim between a dominant insurer and a hospital

provides a poignant example.  In *West Penn*, the dominant insurer was alleged to conspire with a

hospital to favor that hospital for purposes of referring patients over one of the hospital's

competitors (the plaintiff).  627 F.3d at 100.  In evaluating the conspiracy under Section 1, the

Court noted that "[a]nticompetitive conduct can come in too many different forms, and is too

dependent upon context, for any court or commentator ever to have enumerated all the varieties[]

. . . [but] [f]or present purposes, it is sufficient to note that anticompetitive conduct can include a

conspiracy to exclude a rival."  *Id.* at 109 (citing IIA Phillip E. Areeda, Herbert Hovenkamp et al.,

*Antitrust Law* ¶ 806f3, at 428 (3d ed. 2007)).  The Court found that the conspiracy between the

insurer and hospital sufficiently alleged that the plaintiff-hospital was forced to forego certain

projects and investments, and resulted in increased prices and decreased competition for the

monopolist's offerings.  *Id.* at 100-01.  So too here:  the conspiracy resulted in sales loses to Dexon

and resulted in improper losses of goodwill, which has had the effect of lowering intra-brand and

inter-brand competition to Cisco in the upstream market.

Cisco's final argument that it has "no duty to promote the distribution efforts of its

competitors by propping up Dexon" (MTD at 16-17) misses the point.  Dexon does not seek to be

"propped up," but rather not to be the target of an unlawful conspiracy that forecloses both inter-brand and intra-brand competition that it sought to provide.  (Compl. ¶¶ 60-61, 90-91, 97-98, 133-134).  In this absence of the conspiracy, Dexon would have provided such competition and made sales on its own by virtue of the qualities and offerings for which customers have valued Dexon for decades (and which even Cisco valued until it decided that Dexon was a competitive threat).  (*Id.* ¶¶ 6, 13, 57).  Cisco's conspiracy to eliminate these phenomena violates the antitrust laws.

### 2.     *Section 2 Conspiracy*

Cisco's motion mentions the conspiracy to monopolize under Section 2 of the Sherman Act in passing but does not meaningfully engage in the analysis.  The elements of such a claim are "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce."  *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

Each of those elements are met here for the Cisco-CDW conspiracy: (1) Cisco has had a specific intent to monopolize the Relevant Product Markets (Compl. ¶¶ 60, 110, 116), (2) entered into a conspiracy with CDW to achieve that end (*id.* ¶¶ 87-100), (3) both Defendants took overt actions in furtherance of the conspiracy to block inter-brand and intra-brand competition (*id.* ¶¶ 60-62, 87-100), and (4) the conspiracy had an effect upon a substantial amount of interstate commerce, at least millions of dollars for interstate customers.  (*Id.* ¶ 63).

Cisco's failure to engage on these elements shows that its conspiracy with CDW is actionable under both Section 1 and Section 2 of the Sherman Act.  As Areeda explains:  "[T]here are some kinds of situations where 'agreement' might be made out and yet where attempt to monopolize seems more accurately to describe the offense and the real offender."  Areeda & Hovenkamp, ¶ 806f3 at 455 (4th ed.).  "It is thus desirable to permit pleading both §1 and attempt

[to monopolize] in appropriate[ly] close cases." *Id.* While it will be determined in discovery which violation(s) accurately describe the Defendants' conduct, for purposes of this motion, the fact that Cisco does not meaningfully contest Section 2 conspiracy liability on its own is telling.

### C.     Cisco Engaged In Illegal Tying In Violation of Section 1

To state a *per se* claim for tying under Section 1 of the Sherman Act, the elements are: "'(1) two separate products, the tying product and the tied product; (2) sufficient market power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market.'" *Bodet v. Charter Commc'ns Inc.*, 2010 WL 5094214, at *5 (E.D. La. July 26, 2010). Cisco does not challenge the first element, nor that it possesses monopoly power in each of the Relevant Service Markets for purposes of the second element, nor does it challenge that a not insubstantial amount of interstate commerce was involved for the third element.

Cisco's argument that it did not coerce purchases in the tied product markets (MTD at 22-23) ignores the examples of coercion detailed in the Complaint. A Texas-based bank was forced to purchase Ethernet switches and routers that it did not want or need, in order to maintain service it needed from Cisco due to its near-virtual monopoly in the Relevant Aftermarkets for Maintenance and Service. (Compl. ¶ 3). Cisco forced a Texas School District to buy IP phones for a supra-competitive price because of Cisco's threat that it would not service the other Networking Equipment the School had purchased. (*Id.* ¶¶ 65-67). Cisco's argument that the School "still purchased Cisco" misses the point: a tying violation is made out when a monopolist in the tying product "'force[s] the buyers into the purchase of [the tied] product that the buyers either did not want at all, or might have preferred to purchase elsewhere on different terms.'" *Medtronic AVE, Inc. v. Cordis Corp.*, 2004 WL 7322043, at *3 (E.D. Tex. Mar. 18, 2004) (quoting

*Eastman Kodak*, 504 U.S. at 464 n.9).  Both scenarios apply here:  the bank was forced to buy products it did not want, and the School was forced to purchase supra-competitively priced products for which it had already executed a RFP to buy on more favorable terms.  Paralleling this Court's holding in *Bodet*, the Complaint "contains allegations that [Cisco] actually threatened customers by stating that [maintenance and service] would not be available to them in a reasonable time unless they purchased [IP phones]" from a non-preferred source.  2010 WL 5094214, at *4.

Another critical error made by Cisco's motion is the timing at issue of the alleged tie, in which Cisco incorrectly argues that the accused tie is at the time customers *initially* purchase both the Relevant Products and the aftermarket maintenance and service.  (MTD at 21-22).  This misses the anticompetitive aspect of Cisco's conduct.  Cisco initially lured customers into buying both the products and service because of Cisco's assurance to the customers that they would receive the maintenance and service it had purchased without purchasing anything else, and customers would maintain their freedom to choose whichever manufacturer it sought for a subsequent purchase of Equipment.  (Compl. ¶¶ 46, 50-51, 82); *see also, e.g., id.* at ¶¶ 7, 13 (regarding subsequently lost choices).  Cisco's pre-purchase assurance was critical to customers' initial purchases given their limited budgets for IT equipment.  (*Id*. ¶¶ 4, 46, 50-51, 82).  Cisco subsequently reversed these assurances and demanded that (a) customers must buy new, supra-competitively priced equipment in order to receive the service, and (b) any purchases from a disfavored reseller including any purchases of competitive products would not suffice to restore the service.  (*Id*. ¶¶ 4-7, 49-51).  As in *Eastman Kodak*, it is the *timing* of withholding service that makes Cisco's conduct anticompetitive, because it is abusing its monopoly power in the Relevant Service Markets in order to force Relevant Product purchases and terms on customers that they would not have agreed to in

the first place.  *See Eastman Kodak*, 504 U.S. at 475-78; *see also* Areeda & Hovenkamp, ¶¶ 1740c4, 1740c6 (4th ed.).

Cisco also asserts that there is no anticompetitive effect in the tied Product Markets, because there is no alleged foreclosure of Cisco's competitors.  (MTD at 17-18).  Once again, Cisco ignores Dexon's detailed allegations that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives.  (Compl. ¶¶ 4-5, 51).  As an illustrative example, take a customer who wishes to purchase a hot dog on a bun, and the seller of hot dogs is a monopolist, but there are plenty of competitors that only sell buns for a lower price than the monopolist.  If the hot dog monopolist coerces the purchase of a bun through a tying arrangement, and the customer only has enough money for one hot dog on a bun from the monopolist, all of the bun-only competitors have been foreclosed.  So too here:  if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when they bought the equipment and service.  (*Id*. ¶¶ 7, 13, 46, 50-51, 82).  Instead, Cisco subsequently takes advantage of a locked-in customers because of Cisco's virtual monopoly in Service, forcing the customer to spend more of their limited budget to eliminate competitive alternatives in the process.  (*Id*. ¶¶ 4-5, 26, 51, 103, 125).  This Court has confirmed in such circumstances that "[w]hen there is an alleged per se illegal tying claim an injury to competition is presumed." *Medtronic*, 2004 WL 7322043, at *4.

Indeed, Cisco's conduct results in competitive foreclosure and anticompetitive harm the moment it withholds aftermarket service and maintenance.  Cisco attacks the examples in the

Complaint where a 911-center, energy company, and automobile company are threatened with service disruptions by Cisco, because according to Cisco, these customers did not intend to buy products from Cisco's competitors.  (MTD at 20).  But this argument ignores that these customers *asked for and received initial assurances from Cisco* that they would receive the service they needed without additional purchases or threats, and thus would be free to purchase competitive alternatives in the future.  (Compl. ¶¶ 7, 13, 46, 50-51, 82).  This Cisco assurance was critical given customers' limited IT budgets that would prevent them from "re-doing" these purchases.  (*Id*. ¶¶ 4-5, 51).  Thus, when Cisco threatens these customers with a service disruption, it inevitably leads to competitive foreclosure because the customers have already spent the limited budget they had for Cisco's equipment.  (*Id*. ¶¶ 4-5, 26, 51, 83, 103, 125).  In the case of the Texas automotive dealership, the customer was left with unusable (or "dead") switches that could not be replaced due to a limited IT budget.  (*Id*. ¶ 51).  Cisco's competitors are thus foreclosed when Cisco withholds service, because customers were duped by Cisco into using their IT budgets to maintain Cisco's Relevant Product monopolies rather than purchasing from a Cisco competitor.

There can be no serious claim that when a customer is left with dead switches from the monopolist, and needs to wait until its IT budget is refreshed to buy a replacement, that there is no competitive harm to the customer who would have purchased elsewhere if it knew about Cisco's coercion in the first place.  (*Id*. ¶¶ 4-7, 67, 84).  Indeed, the converse is precisely what customers have appreciated about Dexon for decades:  it offers a full range of competitors at low prices, without favoritism to any manufacturer, to meet the needs and budgets of customers without misleading or coercive practices.  (*Id*. ¶¶ 61, 90).  Cisco engaged in coercive tying to prevent customers from taking advantage of this procompetitive choice.

Cisco also attempts to justify its use of a "re-certification fee" to accomplish the same end as the other anticompetitive ties. (MTD at 22-23). Customers are presented with a Hobson's choice: either buy new equipment pursuant to Cisco's threats, or pay a re-certification fee that is often as much as the replacement equipment. Under either scenario, more of the customers' limited IT budget is used that precludes consideration of Cisco's competitors. Cisco mis-portrays this as "merely enhancing the price of the tying product" (MTD at 23), but customers are forced to spend more money on Equipment so that it can maintain the service it needs. (Compl. ¶¶ 3-5, 7, 49, 79). Cisco's suggestion that its conduct is legal so long as re-certification only applies to service is belied by the Complaint, and contradicts settled antitrust law that the Court should look to market realities rather than formalistic distinctions that are advanced by a party. *See generally Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1526 (2019) (Defendant's suggestion would "replace[] a rule of proximate cause and economic reality with an easily manipulated and formalistic rule of contractual privity. That's not how antitrust law is supposed to work[.]").

For these reasons, the Court should find that Dexon has stated a *per se* tying claim under Section 1 of the Sherman Act.

### D. Cisco's Tying and Associated FUD Also Violates Section 2 of the Sherman Act

In order to make out a claim of monopolization or attempted monopolization under Section 2 of the Sherman Act, "the plaintiff must prove only the existence of monopoly power and the willful continued maintenance of that power." *Walker v. U-Haul Co. of Mississippi*, 747 F. 2d 1011, 1013 (5th Cir. 1984). The statute "does not explicitly require a plaintiff to prove an injury to competition[, rather] [i]njury to competition is presumed to follow from the conduct proscribed by Section 2." *Id.* Cisco does not challenge Dexon's pleading that Cisco possesses monopoly power in each of the Relevant Markets. Thus, the only question for purposes of Section 2 is whether the accused conduct resulted in willful maintenance of Cisco's monopoly power.

Cisco's reiteration of its argument that its ties do not foreclose competitive purchases (MTD at 23-24) fails for the same reasons as the Section 1 claim.  As Cisco does not challenge, it has monopoly power in each of the Relevant Product Markets, and when customers purchase unwanted or unneeded products from Cisco as a result of the anticompetitive ties, that necessarily maintains or even enhances Cisco's monopoly power in those Relevant Product Markets.  (Compl. ¶¶ 43-44, 50-51, 80, 102-103, 125).  This conduct violates Section 2 because it '"tends to impair the opportunities of rivals, [and] also either does not further competition on the merits or does so in an unnecessarily restrictive way.'"  *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891–92 (5th Cir. 2016) (internal citation omitted).

Cisco's motion also contorts Dexon's Section 2 claims as challenges to Cisco's "restriction of distribution," and its alleged "obligation to assist its competitors."  (MTD at 24-25).  These arguments do not address Dexon's claims[3]; Cisco's monopolization and attempted monopolization are comprised of coercive attempts to lock customers into purchases they do not want, foreclosing competitors in the process, and maintaining or enhancing its monopolies in each of the Relevant Product Markets.  (Compl. ¶¶ 111, 129-137).  Put another way, Cisco's monopolistic conduct is targeted at *customers themselves*, which are the direct purchasers in each of the Relevant Markets; this is not a mere "choice of distribution" case.  (*Id.* ¶¶ 1, 3, 7, 13, 49, 80, 82, 93).  Dexon is not in need of any assistance from Cisco to compete, but rather brings this case so that customers are free to choose from Dexon's offerings on the merits.  (*Id.* ¶¶ 61, 82, 90).

---

[3] This includes Cisco's citation to *Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274 (5th Cir. 1984), which had to do with an improper allegation of a single-brand market, whereas Cisco here does not challenge Dexon's definitions of the Relevant Markets.  Similarly, Cisco's citation to *Hornsby Oil Co. v. Champion Spark Plug Co.*, applies to the case of a mere "terminated distributor," which is not what Dexon claims.  714 F.2d 1384, 1394 (5th Cir. 1983).  Moreover, *Hornsby* confirms that where "interbrand competition continues to function as a significant check on the exploitation of intrabrand market power," then there may not be a competitive issue.  *Id.*  But here, Cisco is a monopolist that does not have appropriate checks on its inter-brand and intra-brand market power.

Cisco's failure to address the FUD (fear, uncertainty, and doubt) tactics it uses with end-user customers reveals the true intent and effect of its conduct, undermining its unsupported claim in its motion that it is "incentiv[ized]" to charge competitive prices.  (MTD at 26).  Cisco uses FUD to (i) dissuade customers from purchasing from resellers with lower prices and high quality service (Compl. ¶¶ 64-67), (ii) accomplish its coercion strategies (*id*.), and (iii) even falsely claim that offerings from certain distributors contain malware when there is no software associated with the purchase.  (*Id*. ¶ 68).  It simply makes no sense to engage in this type of conduct other than to intimidate customers to only pursue options that would maintain Cisco's monopolies (*id*. ¶¶ 84, 91, 98, 106, 112); any suggestion that Cisco is incentivized to charge competitive prices is belied by the allegations and improperly goes outside the pleadings.  *See TravelPass*, 2019 WL 4727425, at *3 ("The Court may consider 'the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.'") (internal citation omitted).

Cisco makes an out of context reference to the billions of dollars at issue in the Relevant Markets (MTD at 25-26) to support its motion, but the remainder of the cited Complaint paragraph makes clear that a single forced purchase due to Cisco's improper ties in the Relevant Product Markets constitutes tens or hundreds of thousands of dollars.  (Compl. ¶ 105).  In the context of tying, Cisco does not challenge that its ties involve a "not insubstantial amount of commerce in the tied product market," because anything more than a de minimis amount states an antitrust claim.  *Moore v. Matthews & Co.*, 550 F.2d 1207, 1214, 1216 (9th. Cir. 1977) ($60,800 in foreclosed revenue was sufficient to meet the volume requirement).  These ties also accomplish improper maintenance of Cisco's monopolies, as was the case in *Kodak*.  *See Image Tech. Servs. Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1211-12 & n.10 (9th Cir. 1997) (alleged tying made

out a Section 2 claim).  Dexon further pleads that it has lost millions of dollars in sales across nationwide customers and industries due to Cisco's misconduct, which was designed to and had the effect of maintaining Cisco's monopolies.  (Compl. ¶ ¶ 2, 63).

As a final effort on the Section 2 claims, Cisco asserts that they do not "make economic sense" (MTD at 26), and attempts to mis-portray them as a refusal to deal, when those terms do not even appear in the Complaint.  Cisco's tying and related FUD tactics only makes economic sense as a business strategy where it would maintain or enhance Cisco's monopoly power.  As has been long observed, "no monopolist monopolizes unconscious of what he is doing" (*United States v. Aluminum Co. of Am.*, 148 F.2d 416, 432 (2d Cir. 1945)), which is the case here when Cisco coerces and threatens its own customers.  Also, Dexon does not allege a refusal to deal, for which Cisco has a duty to deal with Dexon.  Rather, Dexon pleads facts to show how its relationship with Cisco went from friend to foe in the eyes of Cisco (Compl. ¶¶ 12-13, 57-63), and as a result, Cisco took the above anticompetitive actions to foreclose Dexon from selling to customers in the Relevant Product Markets.  While Cisco may attempt to portray its treatment of Dexon in a different light, such as that its conduct represents "permissible means for Cisco to ensure customers receive high-quality equipment and service" (MTD at 27), these are properly the subject of discovery and not to be debated on a motion to dismiss.  *TravelPass*, 2019 WL 4727425, at *3.

For these reasons, the Court should find that Dexon states monopolization and attempted monopolization claims under Section 2 of the Sherman Act.

### E.    Dexon States A Claim under the Texas Free Enterprise and Antitrust Act

The Texas legislature has directed that the provisions of the Texas Free Enterprise and Antitrust Act are to be construed in harmony with federal judicial interpretation of comparable

federal antitrust statutes.  *See* Tex. Bus. & Com. Code Ann. § 15.04 (West).  Here, Dexon alleges

Texas-specific conduct in support of all of its allegations that also state a claim under the Act.

> **F.     Dexon Suffered Antitrust Injuries As A Result of Both Defendants' Conduct**

Cisco's motion claims that Dexon did not suffer antitrust injury, or "injury of the type the

antitrust laws were intended to prevent and that flows from that which makes defendants' acts

unlawful."  *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 334 (1990).  Cisco makes this

argument without meaningfully addressing Dexon's Section 1 and Section 2 conspiracy claims

against it and CDW, which comprises a conspiracy that was intended to and did foreclose Dexon

from making substantial sales in the Relevant Networking Equipment Markets.  (Compl. ¶¶ 60-

63).  Cisco's reiteration of its argument that this is a unilateral distributor termination (MTD at 30)

fails for the same reasons discussed above (section IV.B, *supra*), as the Cisco-CDW conspiracy

was a coordinated plan to foreclose inter-brand and intra-brand competition from resellers like

Dexon.  These are precisely the type of injuries the antitrust laws were intended to prevent.  *See*

*Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*, 940 F. Supp. 1026, 1035 (E.D. Tex. 1996).

Cisco asserts that Dexon did not sustain an antitrust injury due to tying because "it does

not allege any injury from reduced competition in [the Relevant Product] Markets."  (MTD at 29).

This is incorrect, because Cisco engaged in its anticompetitive ties precisely to foreclose resellers

like Dexon from making sales into the Relevant Product Markets.  (Compl. ¶¶ 83-86).  When Cisco

employed its coercive ties, the purpose and effect of them were to force customers to return the

products they previously purchased from Dexon (resulting in direct losses), and to dissuade

customers from taking advantage of any of Dexon's competitive offerings in the future, which

customers valued from Dexon.  (*Id.*; *see also id.* ¶¶ 7, 12, 58, 61).  Moreover, Dexon has sustained

goodwill losses including in Texas, for example when a School District was led to believe that

**App.554**

Dexon was the problem rather than Cisco illegally utilizing its monopoly power over Service to force supra-competitive purchases of IP phones.  (*Id.* ¶ 86).

Cisco's final argument on antitrust injury again mischaracterizes Dexon's claims as a "dealer termination" that does not harm competition.  Again, this is not a case where Cisco merely decided to stop doing business with Dexon, but rather Cisco monopolized several Relevant Product Markets by engaging in a conspiracy, ties, and FUD for the explicit purpose of foreclosing lower-priced and more diversified competition.  (*Id.* ¶¶ 1-4, 8-9, 11, 51, 83-86, 111).  Dexon's injuries are a direct byproduct of this misconduct because Cisco saw Dexon as a threat to its inter-brand and intra-brand market power, and Cisco's conduct was designed to eliminate that threat across various geographies, Markets, and circumstances detailed in the Complaint.

## V.    <u>CONCLUSION</u>

For these reasons, Cisco's motion to dismiss should be denied in its entirety.

Dated:  July 7, 2022

Respectfully submitted,

By:  */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF
DEXON COMPUTER, INC.**

### CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic

service are being served on July 7, 2022, with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

PLAINTIFF'S RESPONSE TO CISCO MOTION TO DISMISS

1

**App.556**

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **DAVID S. ELDRIDGE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. CIV-19-115-R** |
| | ) |
| **EQUIFAX, INC.,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

Before this Court is Defendant First Premier Bank's Motion to Dismiss (Doc. 32). Plaintiff has responded (Doc. 39), Defendant has replied (Doc. 44), and the matter is fully briefed and at issue.[1] For the reasons stated herein, Defendant's motion is GRANTED.

A plaintiff's complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).[2] Operationalizing the Rule, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This standard "is 'a middle ground between heightened fact pleading . . . and allowing complaints that are no more than labels and conclusions or a formulaic recitation of the elements of a cause of action.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir.

---

[1] On March 6, 2019, Plaintiff filed a "*Riposte* to First Premier Bank's *Reply*" brief. *See* Doc. 54. The Court construes this document as a surreply and declines to consider it, as Plaintiff may not file a surreply without leave of court. *See* LCvR7.1(i) ("Supplemental briefs may be filed only upon motion and leave of court.").

[2] A legally-sufficient complaint must also include "a short and plain statement of the grounds for the court's jurisdiction" and "a demand for the relief sought." *Id.*

1

**App.558**

2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). That is, the plaintiff's complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Id*. at 1192 (internal quotation marks and citations omitted). While assessing plausibility is "a context-specific task . . . requir[ing] . . . court[s] to draw on [their] judicial experience and common sense," *Iqbal*, 556 U.S. at 679, complaints "'plead[ing] factual content that allows the court to . . . reasonabl[y] infer[] that the defendant is liable for the misconduct alleged'" are facially plausible. *See S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to the plaintiff." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013). And though the Court liberally construes Plaintiff's *pro se* complaint, it "will not construct arguments or theories for the plaintiff in the absence of any discussion of those issues." *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991); *see also Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989) ("Although we must liberally construe plaintiff's factual allegations, we will not supply additional facts, nor will we construct a legal theory for plaintiff that assumes facts that have not been pleaded." (citations omitted)).[3]

---

[3] Plaintiff lists himself as "Esquire Emeritus," *see* Doc. 1-1, at 4, and the Oklahoma Bar Association's website shows that he has a suspended senior membership. Thus, it is unclear whether Plaintiff is still a licensed attorney, though it would appear he once was. Regardless, the Court liberally construes his filings, even though *pro se* attorneys are typically not entitled to such construal. *See Smith v. Prati*, 258 F.3d 1167, 1174 (10th Cir. 2001) ("While we are generally obliged to construe pro se pleadings liberally, we decline to do so here because [plaintiff] is a licensed attorney." (citations omitted)).

According to the sparse allegations in Plaintiff's complaint, Defendant contends Plaintiff owes it money and has reported this contention to credit reporting agencies Equifax, Experian, and TransUnion. *See* Doc. 1-1, at 1–2. According to Plaintiff, Defendant's actions violate the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*; and the Oklahoma Consumer Protection Act ("OCPA"), 15 O.S. § 751 *et seq. See* Doc. 1-1, at 2–3. As well, Plaintiff alleges that Defendant's conduct constitutes common-law fraud. *Id.*

Plaintiff's complaint fails to meet Rule 8's standard. Notably, Plaintiff seems to admit in his response that his complaint is deficient, stating, "First Premier Bank . . . is the only one out of . . . 19 parties in this lawsuit who figured out that . . . the Plaintiff did not comply with Fed. R. Civ. P. 8(a)(2)." Doc. 39, at 1. If this is sarcasm, it does not leap off the page. Regardless, the complaint's sufficiency turns not on Plaintiff's editorializing: the complaint is inadequate on its own. First, Plaintiff pleads insufficient factual content to show that Defendant violated the OCPA. Plaintiff claims Defendant has violated Section 753(20) of the statute by committing "unfair or deceptive trade practice[s] as defined in Section 752." 15 O.S. § 753(20). A "[d]eceptive trade practice" is "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person," while an "[u]nfair trade practice" is "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* § 752(13)–(14). This Court has held that Oklahoma "intended to limit application of the [OCPA] to problems arising between buyers and sellers," such that debt collection activities do not fall within

3

**App.560**

its ambit. *See Melvin v. Nationwide Debt Recovery, Inc.*, No. 00–CV–212, 2000 WL 33950122 (W.D. Okla. Aug. 24, 2000).[4] Plaintiff offers hardly any facts at all, but to the extent that he does implicate Defendant in some activity, that activity appears to be related to debt collection—or, more broadly, conduct between a lender and borrower. Thus, such a claim would not fall within the OCPA's scope. Accordingly, Plaintiff fails to state a claim under the OCPA against Defendant.[5]

Plaintiff's additional claims against Defendant fare no better. Plaintiff's FCRA claim fails because he lacks a private right of action against Defendant for the purported violations he has pled. *See Whisenant v. First Nat'l Bank & Tr. Co.*, 258 F. Supp. 2d 1312 (N.D. Okla. 2003). The "FCRA places distinct obligations on three types of entities: (1) consumer reporting agencies; (2) users of consumer reports; and (3) furnishers of information to consumer reporting agencies." *Aklagi v. Nationscredit Fin.*, 196 F. Supp. 2d 1186, 1192 (D. Kan. 2002). As Plaintiff only alleges that Defendant falsely claimed it was owed money and reported this false claim to credit reporting agencies, Plaintiff seems to be asserting a FCRA claim based on Defendant's purported status as a furnisher of information. The FCRA imposes two duties on furnishers of information: "(1) the duty to provide accurate information; and (2) the duty to investigate the accuracy of reported

---

[4] The OCPA's emphasis on "consumer transactions," defined as "advertising, offering for sale or purchase, sale, purchase, or distribution of any services or any property, tangible or intangible, real, personal, or mixed, or . . . thing of value wherever located, for purposes that are personal, household, or business oriented," along with the OCPA's failure to mention debt collection, led the Court to interpret the statute narrowly. *See Melvin*, 2000 WL 33950122; *see also* 15. O.S. § 752(2).

[5] This Court's reading of the OCPA is also fatal to Plaintiff's fifth claim—that Defendant's failure to register with the Oklahoma Secretary of State to do business in Oklahoma constitutes an unfair and deceptive trade practice. *See* Doc. 1-1, at 3. Apart from pleading insufficient facts to state this claim, Plaintiff does not show how such a failure to register relates to the OCPA's focus on consumer transactions.

information upon receiving notice of a dispute." *Ilodianya v. Capital One Bank USA NA*, 853 F. Supp. 2d 772, 773 (E.D. Ark. 2012) (citing 15 U.S.C. § 1681s-2(a)–(b)). But the FCRA creates no private right of action for an information furnisher's violation of its duty to provide accurate information. *Id.* at 774 (citing 15 U.S.C. § 1681s-2(c)(1)); *Whisenant*, 258 F. Supp. 2d at 1316. And while a private right of action exists for violations of an information furnisher's duty to investigate the accuracy of reported information, this duty only arises after the furnisher receives notice of a dispute from a consumer reporting agency. *Id.* at 1316–17. Plaintiff offers no facts indicating Defendant received any notice. Thus, Plaintiff's attempts to state a FCRA claim fail.

As to the FDCPA, Plaintiff's complaint is deficient. The FDCPA applies to "debt collectors," a defined term in the statute, but Plaintiff fails to allege that Defendant is a debt collector. *See* 15 U.S.C. §§ 1692a(6), 1692k. Indeed, Plaintiff's conclusory averment that Defendant "violat[ed] . . . the [FDCPA] in attempting to collect debts that are not owed," Doc. 1-1, at 3, is simply insufficient to meet Rule 8's threshold. Finally, Plaintiff unsuccessfully pleads a fraud claim against Defendant. The Federal Rules of Civil Procedure require parties "alleging fraud" to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). Plaintiff's factual contentions are anything but particular.

Plaintiff fails to state any claim against Defendant. Accordingly, Defendant First Premier Bank's motion to dismiss (Doc. 32) is hereby GRANTED, and Plaintiff's complaint against First Premier Bank is DISMISSED without prejudice.[6]

IT IS SO ORDERED this 13th day of March, 2019.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[6] If Plaintiff moves to amend his pleadings or file a new complaint in light of this order, he should do so with more professionalism and sincerity than he has demonstrated to this point. Rather than addressing the merits of Defendant's motion or assisting the Court in adjudicating this matter, Plaintiff used his filings to opine on (1) *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); (2) Jesus Christ's expulsion of the money changers from the temple; (3) the Field Code; (4) dancing bears; (5) the thirteenth-century English Chancery Court; (6) the expression "King's X"; (7) the fictional children's characters Winnie the Pooh and Tigger; (8) Defendant's "sin," "chutzpah," and "élan"; and (9) a 1990 Chicago Tribune article detailing Citibank's investments in South Dakota. *See* Docs. 39, 54. Such irrelevant musings, frequently offered in a cavalier and snide tone, are unhelpful and frowned upon—to put it mildly. Given that other defendants remain in this suit, Plaintiff should consider how he conducts himself going forward.

**App.563**

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

<u>**DEXON COMPUTER INC.'S OPPOSITION TO DEFENDANT CISCO**</u>
<u>**SYSTEMS, INC.'S MOTION TO TRANSFER VENUE**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

I.      INTRODUCTION ................................................................................................1

II.     FACTS AND PROCEDURAL HISTORY .........................................................3

III.    ARGUMENT .......................................................................................................4

        A.      The First-to-File Rule Does Not Apply to These Facts ...........................4

        B.      In Any Event, the Prior Antitrust Counterclaims and the Present
                Case Have Substantial Differences ...........................................................7

        C.      The Other FTF Factors Also Do Not Support Transfer ........................10

                1.  CDW cannot be minimized as an insignificant addition ................10

                2.  There is no forum shopping or risk of inconsistent outcomes .........10

                3. There are no efficiencies associated with litigating Cisco's California
                claims in the same court as the antitrust case ......................................11

IV.     CONCLUSION..................................................................................................12

## <u>TABLE OF AUTHORITIES</u>

CASES:

*Acceleron, LLC v. Egenera, Inc.*,
   2010 WL 11474372 (E.D. Tex. Jan. 26, 2010) ........................................................................ 6

*Cadle Co. v. Whataburger of Alice*,
   174 F.3d 599 (5th Cir. 1999) ................................................................................... 2, 4, 9

*California Sec. Co-Op, Inc. v. Multimedia Cablevision, Inc.*,
   897 F. Supp. 316 (E.D. Tex. 1995) ....................................................................................... 6

*Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*,
   No. 3:29-cv-4926 (N.D. Cal.) ........................................................................................ 3

*Clarendon Nat'l Ins. Co. v. Nat'l Trust Ins. Co.*,
   2018 WL 11258139 (E.D. Tex. Aug. 15, 2018) .............................................................. 5, 6

*Integra Tech. Int'l, Inc. v. Durst Image Tech. US LLC*,
   2009 WL 10669338 (W.D. Tex. Aug. 20, 2009) ................................................................ 6

*Mosaid Techs. Inc. v. Micron Tech., Inc.*,
   2008 WL 11348413 (E.D. Tex. July 2, 2008) .................................................................... 6

*Needbasedapps, LLC v. Robbins Research Int'l, Inc.*,
   926 F. Supp. 2d 907 (W.D. Tex. 2013) ............................................................................. 6

*Save Power Ltd. v. Syntek Fin. Corp.*,
   121 F.3d 947 (5th Cir. 1997) ............................................................................................. 6

*SIPCO, LLC v. Emerson Elec. Co.*,
   2016 WL 7743496 (E.D. Tex. July 1, 2016) ................................................................ 2, 5, 6

*Tichy v. Hyatt Hotels Corp.*,
   376 F.Supp.3d 821 (N.D. Ill. Mar. 22, 2019) .................................................................... 9

*TravelPass Grp. LLC v. Caesars Ent. Corp.*,
   No. 5:18-CV-153-RWS-CMC, 2019 WL 3806056 (E.D. Tex. May 9, 2019) ..................... 10

*TravelPass Grp. LLC v. Caesars Ent. Corp.*,
   2019 WL 4071784 (E.D. Tex. Aug. 29, 2019) ......................................................... 2, 8, 9, 10

*West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*,
   751 F.2d 721 (5th Cir. 1985) ............................................................................................. 6

RULES:

Fed. R. Civ. P. 12(b)(6)................................................................................................................ 4

I.      **INTRODUCTION**

Defendant Cisco Systems, Inc. ("Cisco") asks the Court to transfer this case to the Northern District of California (the "Motion") because that is where Cisco has sued Dexon Computer, Inc. ("Dexon") for alleged trademark and false designation of origin claims, and because Dexon previously filed counterclaims in that venue.  But Cisco's Motion omits that the present Complaint includes a host of facts and causes of action that were not asserted in California, including:  (i) a conspiracy to monopolize claim under Section 2 of the Sherman Act between Cisco and CDW Corporation ("CDW"), who is not a party in the California matter (Compl. ¶¶ 94-100), (ii) an overarching conspiracy under Section 1 of the Sherman Act between Cisco and CDW to suppress inter-brand and intra-brand competition from entities like Dexon (*id.* ¶¶ 87-93), (iii) detailing the entirely new US and Global Relevant Markets for IP phones and an associated claim that Cisco attempted to monopolize those Markets under Section 2 of the Sherman Act (*id.* ¶¶ 44, 69-77, 117(d)), (iv) four new examples of illegal Cisco coercion against Texas-based businesses and a new claim under the Texas Free Enterprise & Antitrust Act (*id.* ¶¶ 3, 7, 51, 65-67, 122-128), and (v) injunctive relief and damages pursued specifically against CDW, as well as Texas-specific antitrust damages against Cisco (*id.* ¶¶ 60-63, 86, 92, 99, 135).  Cisco omits these facts and allegations from its Motion because they bear no resemblance, let alone substantial similarity, to the claims currently being litigated in California.  Cisco does not, because it cannot, assert that the claims at issue here are compulsory counterclaims in California that require this case to be transferred.

Cisco relies on a single basis for its Motion:  the first-to-file (FTF) rule.  It asks the Court to apply the FTF rule in a way no Texas court or Fifth Circuit decision has to Dexon's knowledge: transferring the current case to a Court where the allegedly substantially similar claims are no longer at issue, and there is no similarity whatsoever between the case currently pending in the

first court and the case sought to be transferred.  Indeed, all of the cases Cisco relies upon in its

Motion confirm that FTF is meant to be applied where the first filed, substantially similar claims

*are still pending*.  *See, e.g.*, *Cadle Co. v. Whataburger of Alice*, 174 F.3d 599 (5th Cir. 1999);

*SIPCO, LLC v. Emerson Elec. Co.*, 2016 WL 7743496 (E.D. Tex. July 1, 2016).  Apart from

Cisco's desire to keep all claims against it in its home state, there is no case law supporting transfer

where the first-filed claims are no longer pending.

   Even if one compares the Complaint against the previously filed antitrust counterclaims,

there are substantial differences, including the claims and facts referenced above and discussed in

detail below.  Cisco cites, but does not meaningfully discuss, a decision by this Court applying the

FTF rule to an antitrust matter that makes the analysis clear.  In *TravelPass Grp. LLC v. Caesars*

*Ent. Corp.*, 2019 WL 4071784 (E.D. Tex. Aug. 29, 2019) (Schroeder, J.), there was an already

pending antitrust case in Illinois, and a subsequent case was filed in this Court alleging the same

conspiracy between five of the Defendants under the same statute (Section 1 of the Sherman Act).

2019 WL 4071784, at *2.  The Court denied the Defendants' joint motion to transfer based on the

FTF rule because even though the conspiracy alleged was against five overlapping Defendants,

there were still meaningful differences between the cases because the action filed in Texas alleged

"more details of the alleged conspiracy" including new parties, the claimed damages differed, and

the nature of antitrust injury differed.  *Id.* at *6.  The actions here are far less similar, and unlike

in *TravelPass*, there is no pending antitrust claim in the first filed court.

   Once the Court finds that the cases are not substantially similar, it can deny Cisco's Motion

on that basis alone.  *See Cadle Co.*, 174 F.3d at 606.  But even should the Court consider Cisco's

other arguments about CDW, allegedly inconsistent results, and alleged forum shopping, each of

those arguments is belied by the facts.  CDW was referenced in the prior counterclaims, but there

were no pled facts nor asserted claims against it, whereas here, the allegations against CDW comprise a significant portion of Dexon's antitrust injury.  Cisco asserts that should this Court deny Cisco's concurrent motion to dismiss that will necessarily conflict with the Northern District of California's ruling dismissing the antitrust counterclaims without prejudice, but that is misleading:  no Court has ruled upon the current Complaint and its newly pled facts and claims. Cisco can and has made arguments specific to this Complaint that the Court will consider, including Cisco's argument that Dexon does not adequately plead a conspiracy (for which Dexon disagrees).  *See* Dkt. No. 22 at 13-17.  Finally, Dexon brought its Complaint in this Court because it belongs in Texas.  Even before discovery, Dexon has already located five examples of coercion in the State, and has discovered additional facts that led to entirely new claims being asserted against both Cisco and a new party that encompass independent harms to Dexon and small businesses.  Cisco employees based in Texas will need to testify at trial, as well as potentially third parties who would now be within the Court's subpoena power.  Dexon appropriately filed a suit in this forum because that is where trial belongs under the facts.

## II.    **FACTS AND PROCEDURAL HISTORY**

Cisco's First Amended Complaint against Dexon was filed in the Northern District in California on March 19, 2021, asserting claims of trademark infringement, trademark counterfeiting, false designation of origin and associated state law claims.  *Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 32 (N.D. Cal.).  Dexon's motion to dismiss those claims was denied on June 1, 2021, and Dexon filed its amended counterclaims on July 29, 2021, which included both antitrust and non-antitrust claims.  *Id.* at Dkt. No. 50.  The antitrust claims were solely against Cisco, and did not include any conspiracy or Texas-based claims.  *Id.* at 35-42.  In an Order dated December 9, 2021, Judge Breyer granted Cisco's motion to dismiss Dexon's counterclaims, without prejudice.  *Id.* at Dkt. No. 87.  Dexon filed amended

counterclaims on January 10, 2022 consistent with the Court's Order, but none of them were antitrust counterclaims.  *Id.* at Dkt. No. 92.  There have been subsequent amendments to those counterclaims, but those amendments did not assert or propose any antitrust claims.

Dexon filed a Complaint in this Court on April 27, 2022, asserting, *inter alia*, a conspiracy to monopolize claim under Section 2 of the Sherman Act, a conspiracy claim under Section 1 of the Sherman Act, an attempted monopolization claim under Section 2 of the Sherman Act against Cisco for attempting to monopolize the US and Worldwide IP phone markets, and a claim under the Texas Free Enterprise & Antitrust Act, none of which were asserted in Dexon's prior antitrust counterclaims in California.  (Compl. ¶¶ 44, 69-77, 87-100, 117(d), 122-128).  CDW is detailed as a co-conspirator of Cisco, and there is injunctive and compensatory relief sought against CDW. (*Id.* ¶¶ 60-63, 92, 99, 135, Prayer for Relief sections i, k).

Cisco requested a 30-day extension to respond to Dexon's Complaint, which the Court granted on May 23, 2022.  Cisco filed the instant Motion as well as a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  Dkt. Nos. 21, 22.  The latter motion does not include any argument that Dexon's current claims are compulsory counterclaims in the California case brought by Cisco.  *See* Dkt. No. 22.

III.    **ARGUMENT**

A.    **The First-to-File Rule Does Not Apply To These Facts**

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap."  *Cadle Co.*, 174 F.3d at 603.  "The rule rests on principles of comity and sound judicial administration."  *Id.*  "'The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result.'"  *Id.* (internal citation omitted).

For these reasons, the FTF rule applies to cases in which the substantially similar claims

filed in the first Court are still pending.  As the Fifth Circuit case Cisco cites explains:

> The first-to-file rule, by contrast, is essentially a forward-looking doctrine. Courts
> use this rule to maximize judicial economy and minimize embarrassing
> inconsistencies by prophylactically refusing to hear a case raising issues that might
> substantially duplicate those raised by a *case pending* in another court.

*Id.* (emphasis in original).  Indeed, if the allegedly substantially similar claims are not pending in

the first-filed Court, as is the case here, then hearing the claims in the second court will not harm

judicial economy nor "substantially duplicate those [issues] raised by a *case pending* in another

court."[1]  *Id.* at 604.

Another case relied upon by Cisco confirms the inapplicability of the FTF rule to these

facts.  In *SIPCO, LLC v. Emerson Elec. Co.*, Magistrate Judge Mitchell transferred a patent case

pursuant to the FTF rule to the Northern District of Georgia, where patents in the "same patent

families" were being litigated.  2016 WL 7743496, at *4-5 (E.D. Tex. July 1, 2016).  In arguing

against the application of the FTF rule, SIPCO asserted that if the FTF rule were to apply, "every

patent in its portfolio must now be litigated in the [transferee Court in Georgia]."  *Id.* at *4.  This

Court clarified that this is "only true if every patent in SIPCO's portfolio is substantially similar

to the patents *currently at issue* in the Georgia court."  *Id.* (emphasis added).  Applied here, the

trademark claims "currently at issue" in California have nothing to do with Dexon's antitrust

claims, as Cisco tacitly concedes in its Motion.[2]

Confirming this result, in each additional case Cisco cites granting transfer under the FTF

rule, the substantially similar claims were currently pending in the transferee court.  *See Clarendon*

---

[1] Cisco asserts in its motion to dismiss that Dexon's present claims are precluded by res judicata (Dkt. No. 22 at 12-13), but for the reasons explained in our opposition to that motion, that argument is misplaced under well-established Fifth Circuit and Supreme Court precedent.

[2] Cisco asserts in passing that it will assert affirmative defenses that are relevant to its California action, but this attempt to invent an overlap has not been approved by any Court, nor could it result in substantial similarity between the cases given all of the antitrust specific issues at play.

PLAINTIFF'S RESPONSE TO CISCO MTV

**App.572**

*Nat'l Ins. Co. v. Nat'l Trust Ins. Co.*, 2018 WL 11258139, at *1 (E.D. Tex. Aug. 15, 2018) (Schroeder, J.) ("The Court believes that the issues for which Companion seeks relief are substantially similar, if not identical, to the issues in the underlying Oklahoma suit.  National Trust has filed a motion for summary judgment in the Oklahoma case [relating to the same issues] . . ."); *SIPCO*, 2016 WL 7743496, at *4-5 (currently pending IP claims were substantially similar); *Mosaid Techs. Inc. v. Micron Tech., Inc.*, 2008 WL 11348413, at *2 (E.D. Tex. July 2, 2008) (overlapping pending patents between two patent cases); *Acceleron, LLC v. Egenera, Inc.*, 2010 WL 11474372, at *2 (E.D. Tex. Jan. 26, 2010) ("Because the two actions involve substantially overlapping questions and core issues, including claim construction and invalidity, one court should decide them to avoid duplication and a conflicting resolution of issues that require a consistent result."); *California Sec. Co-Op, Inc. v. Multimedia Cablevision, Inc.*, 897 F. Supp. 316, 317-18 (E.D. Tex. 1995) (where all except two of the plaintiff's claims were the same as pending counterclaims in first-filed action, "it is unquestionable that the two actions are duplicative and overlap substantially if not completely.").[3]

The case law dictates that the FTF rule does not apply when the allegedly substantially similar claims are not pending before the potential transferee court.  Accordingly, this Court should deny Cisco's Motion to transfer the instant case to the Northern District of California.

---

[3] *See also West Gulf Mar. Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir. 1985) (declining to decide issues that will be decided by the Second Circuit); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 951 (5th Cir. 1997) ("Both the Original Action and the present case center on the question whether Save Power can proceed with foreclosure on any or all of its security interest in the assets of Pursuit under the terms of the Subordination Agreement."); *Needbasedapps, LLC v. Robbins Research Int'l, Inc.*, 926 F. Supp. 2d 907, 915 (W.D. Tex. 2013) ("[B]oth [cases] arise from the very same transactions and occurrences, the same fight over who owns the applications and related intellectual property."); *Integra Tech. Int'l, Inc. v. Durst Image Tech. US LLC*, 2009 WL 10669338, at *1 (W.D. Tex. Aug. 20, 2009) (the cases involved the same parties, the same product, and similar questions about that product, and "[d]iscovery in these cases will largely involve…the same witnesses").

PLAINTIFF'S RESPONSE TO CISCO MTV

**App.573**

**B.      In Any Event, The Prior Antitrust Counterclaims and the Present Case Have Substantial Differences**

Even should the Court consider Cisco's argument that Dexon's previous counterclaims mandate transfer of the present case, the Court can easily find that there are substantial differences between the cases.   None of the following allegations were at issue in the prior antitrust counterclaims:

| Complaint Paragraphs | Allegations |
|---|---|
| ¶¶ 1-2 | Cisco has engaged in at least five instances of coercion in Texas, involving millions of dollars of networking equipment that has been foreclosed to Cisco's equipment competitors. |
| ¶ 3 | Cisco coerced a Texas-based bank to buy networking equipment it did not want or need, resulting in competitive foreclosure to Cisco's competitors. |
| ¶¶ 4-5 | Cisco's competitors are foreclosed from small and medium businesses which have limited IT budgets, because once Cisco has locked in customers due to its anticompetitive conduct, the limited IT budgets prevent purchases from Cisco's competitors. |
| ¶ 6 | Cisco considered certain resellers like Dexon to be a threat to its networking equipment monopolies. |
| ¶ 7 | Cisco threatened a Texas-based energy company that if it bought any product through Dexon, including from competitors, Cisco would no longer service the customer's equipment. |
| ¶ 11 | Explaining how any Cisco claim that it is merely "controlling its distribution channel" or is "incentivized" to charge competitive prices is pretext for an anticompetitive practice designed to maintain its monopolies and supra-competitive prices. |
| ¶ 51 | Cisco told a Texas-based automobile dealership that it would stop providing service and replacements unless the customer bought new networking equipment.   Because the customer's limited IT budget prevented such a purchase, the customer is foreclosed from buying any replacement from Cisco competitors and is forced to deal with a service disruption. |
| ¶¶ 56-63 | Cisco and CDW entered into a conspiracy that foreclosed Dexon from making sales in the Relevant Networking Equipment Markets.   Cisco entered into this conspiracy because, *inter alia*, CDW did not promote Cisco competitors as equally as Dexon.   The conspiracy also included CDW's agreement not to sell to Dexon pursuant to Cisco's demand, and at least in one instance, Cisco portrayed CDW as the "savior" to a Pennsylvania hospital system that previously enjoyed Dexon's unbiased product selection and lower pricing. |

| ¶¶ 65-67 | Cisco coerced a Texas-based School District not to buy IP phones from Dexon by threatening not to service networking equipment. The School previously enjoyed and awarded Dexon a significant RFP based on its competitive options for IP phones and its service. The School is now forced to use more of its IT budget, and Cisco's competitors are foreclosed due to the forced supra-competitive purchase. |
| --- | --- |
| ¶ 68 | Consistent with its overall practice, Cisco used FUD to convince a Maryland customer that line cards sold by Dexon suffered from "malware" even though line cards have no software. |
| ¶¶ 69-77 | Cisco is dominant in the US and Global Relevant Markets for IP Phones, and Cisco's positions are protected by high barriers to entry. |
| ¶ 86 | Dexon sustained Texas-specific damages and loss of goodwill as a result of Cisco's anticompetitive behavior. |
| ¶¶ 87-93 | Adding Conspiracy in Unreasonable Restraint of Trade against Cisco and CDW under Section 1 of the Sherman Act. |
| ¶¶ 94-100 | Adding Conspiracy to Monopolize Against Cisco and CDW under Section 2 of the Sherman Act. |
| ¶¶ 44, 117(d) | Attempted Monopolization Claim under Section 2 of the Sherman Act includes Cisco's anticompetitive conduct in the Relevant IP Phone Markets. |
| ¶¶ 122-128 | Adding claim under the Texas Free Enterprise & Antitrust Act, incorporating all of the Texas specific conduct and the CDW-Cisco conspiracy. |

These factual allegations and causes of action on their own comprise independent bases of relief apart from the antitrust counterclaims previously asserted in California. Dexon's Complaint explains to this Court how:  (i) Texas is a key jurisdiction in which Cisco has focused its anticompetitive conduct tailored to customers across industries, including in entirely new Relevant IP Phone Markets, (ii) an inter-company conspiracy between two of the largest companies in the world plays an important role in Dexon's antitrust injury, (iii) and to that end, the Cisco-CDW conspiracy is aimed to prevent both inter-brand and intra-brand competition, with the latter being just as critical to competition in monopolized markets, and (iv) Dexon has suffered new and added damage as a result of CDW's participation in this conspiracy.

This Court's prior analysis of substantial similarity between antitrust cases in *TravelPass* shows that transfer is not warranted under any circumstance. In *TravelPass*, the Court

acknowledged that "Defendants [had] demonstrated that similar issues may arise in both this case and the *Tichy* action," because five of the Defendants were the same, and they were alleged in both cases to violate Section 1 of the Sherman Act through a conspiracy involving online bids.  2019 WL 4071784, at *6.  Still, this Court found that the plaintiff pled "more details of the alleged conspiracy," and that the defendants "failed to show any substantial likelihood of conflicting rulings," which weighed against transfer.  *Id*.

In this case, Dexon alleges an *entirely new* conspiracy, and several of the other case differences observed in *TravelPass* also exist here:  a different legal claim under the Texas Free Enterprise and Antitrust Act driven by independent facts (*compare TravelPass*, 2019 WL 4071784, at *6 *with* Compl. ¶¶ 122-128), different claimed damages (*compare* 2019 WL 4071784, at *6 *with* Compl. ¶ 86, Prayer for Relief), different types of antitrust injury resulting from harm to intra-brand competition (*compare* 2019 WL 4071784, at *6 *with* Compl. ¶¶ 60-61, 90, 97, 133), and different parties.  *Compare* 2019 WL 4071784, at *6 *with* Compl. ¶¶ 56-63, 87-100, 122-128. In addition, this Court in *TravelPass* assesses a first-filed case for which the claims had already survived a motion to dismiss, and thus this Court had to predict the likelihood of conflicting rulings.  *See* 2019 WL 4071784, at *9; *Tichy v. Hyatt Hotels Corp.*, 376 F.Supp.3d 821 (N.D. Ill. Mar. 22, 2019).  Here, the antitrust counterclaims in California are no longer asserted.

For these reasons, the Court should conclude that Cisco cannot satisfy the necessary requirement of the FTF rule that the cases are substantially similar to warrant transfer to the Northern District of California.  *See Cadle Co.*, 174 F.3d at 606 ("[O]nce the district court f[inds] that the issues might substantially overlap, the proper course of action [i]s for the court to transfer the case to the [first-filed] court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed.").

### C.     The Other FTF Factors Also Do Not Support Transfer

Although not necessary for the Court's analysis, Cisco's other arguments do not support transfer.

#### 1.     CDW cannot be minimized as an insignificant addition.

Cisco argues that because the parties are "virtually identical," that supports transfer under the FTF rule.  But the Complaint does not merely reference CDW as a favored distributor, but rather alleges an entirely new set of facts and circumstances that warranted naming it as a co-conspirator and independent claims that meaningfully contributed to Dexon's antitrust injuries.  In *TravelPass*, the second-filed Complaint alleged that new additional Defendants had joined the previously alleged conspiracy against the overlapping Defendants (*TravelPass Grp., LLC v. Caesars Ent. Corp.*, No. 5:18-CV-153-RWS-CMC, 2019 WL 3806056, at *9 (E.D. Tex. May 9, 2019), *report and recommendation adopted*, No. 5:18-CV-00153-RWS, 2019 WL 4071784 (E.D. Tex. Aug. 29, 2019)), whereas here, no conspiracy was alleged in the first place.  The Court should account for all of Dexon's allegations, not a minority of them as Cisco suggests.

#### 2.     There is noforum shopping or risk of inconsistent outcomes.

Cisco accuses Dexon of forum shopping because Dexon's previous antitrust counterclaims were dismissed without prejudice.  (Motion at 10).  This is false, because it ignores all of the new facts and claims Dexon asserts that clearly make Texas the appropriate forum.  Many Texas-based Cisco witnesses will need to testify at trial, as well as potential Texas-based third parties who would now be within the subpoena power of the Court.  A jury will also be asked to assess a claim under Texas law for Texas damages.  For these reasons, Dexon thought it appropriate to file in this Court, not because this Court would act as a "super appellate Court."  (Motion at 12).  This Court

is perfectly capable of assessing Dexon's instant Complaint and take account of the Northern District of California's prior ruling on fundamentally different counterclaims.

Thus, Cisco's related assertion that there would be inconsistent outcomes is misguided, because no Court has considered many of the arguments Cisco makes (and all arguments CDW will make) to dismiss the current Complaint.  For example, in its motion to dismiss, Cisco asserts that the Cisco-CDW conspiracy is insufficiently pled, does not harm competition, and results in no antitrust injury.  Dkt. No. 22 at 13-17.  Cisco also asserts that Dexon's new allegations do not show competitive foreclosure on the tying and monopolization claims against Cisco.  Dexon disagrees with these arguments for the reasons stated in its opposition to Cisco's motion to dismiss, but for purposes of this Motion, the Court should find that its rulings on Dexon's Complaint will not be "inconsistent" with an order on the previous counterclaims.

### 3.   There are no efficiencies associated with litigating Cisco's California claims in the same court as the antitrust case.

Cisco finally argues that its "ongoing litigation [against Dexon] has been pending for nearly two years, and both the parties and the court have spent significant resources."  (Motion at 13).  This is misleading, because those resources have been spent due to Cisco's decision to pursue its claims in California.  The scope of this antitrust case is far broader, including both US and Global Relevant Markets, and requires an entirely different set of discovery than Cisco's alleged trademark claims, including but not limited to transactional data on all the Relevant Markets, party discovery, third-party discovery, and expert testimony on the specific requirements for antitrust claims.  Cisco does not, because it cannot, argue that there are substantial efficiencies generated by trying the cases in the same Court.  Cisco's assertion that Dexon "should not be afforded an opportunity to file" (Motion at 13) a case that belongs in Texas, in Texas, should be rejected.

PLAINTIFF'S RESPONSE TO CISCO MTV

IV.     **CONCLUSION**

Based upon the foregoing arguments, Dexon respectfully requests that Cisco's Motion to transfer venue based upon the FTF rule be denied.

Dated:  July 7, 2022

Respectfully submitted,

By:  */s/ David H. Reichenberg w/ permission
William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF
DEXON COMPUTER, INC.**

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on July 7, 2022, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | |
|---|---|
| **DEXON COMPUTER, INC.,** | |
| *Plaintiff,* | **CASE NO.:  5:22-CV-00053-RWS-JBB** |
| **v.** | |
| **CISCO SYSTEMS, INC. and CDW CORPORATION,** | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

**DEFENDANT CDW CORPORATION'S NOTICE OF JOINDER TO DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO TRANSFER VENUE TO THE <u>NORTHERN DISTRICT OF CALIFORNIA</u>**

Defendant CDW Corporation ("CDW") respectfully submits this notice of joinder to Defendant Cisco Systems, Inc.'s Motion to Transfer Venue to the Northern District of California (the "Motion to Transfer") (Doc. No. 21).  By doing so, CDW joins in, and adopts as its own, the arguments and assertions made in the Motion to Transfer.  Accordingly, CDW respectfully requests that the claims be transferred back to the Northern District of California.

Respectfully submitted,

/s/ *Jennifer H. Doan*

Jennifer H. Doan
Texas Bar No. 08809050
Cole A. Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile:  (903) 255-0800
Email:  jdoan@haltomdoan.com
Email:  criddell@haltomdoan.com

James A. Reeder, Jr.
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Fax:  (832) 239-3600
Email:  jareeder@jonesday.com

Thomas D. York
Texas Bar No. 24095531
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone:  (214) 969-4523
Fax:  (214) 969-5100
Email:  tdyork@jonesday.com

**ATTORNEYS FOR DEFENDANT
CDW CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing document has been served via the Court's ECF system on July 8, 2022.

/s/ *Jennifer H. Doan*
Jennifer H. Doan

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | |
|---|---|
| **DEXON COMPUTER, INC.,** | |
| *Plaintiff*, | |
| **v.** | **CASE NO.:  5:22-cv-00053-RWS-JBB** |
| **CISCO SYSTEMS, INC. and CDW CORPORATION,** | **JURY TRIAL DEMANDED** |
| *Defendants*. | |

### DEFENDANT CDW CORPORATION'S
### MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

## TABLE OF CONTENTS

**Page**

SUMMARY OF THE ARGUMENT .................................................................... 1

STATEMENT OF THE ISSUES........................................................................ 2

STANDARD OF REVIEW ............................................................................... 3

FACTUAL BACKGROUND ............................................................................ 3

    A.    CDW Distributes Products Manufactured by Third-Party OEMs, Including Cisco ............................................................................ 3

    B.    Cisco's Networking Equipment and Service Products ......................................... 4

    C.    Dexon is a Networking Equipment Reseller Who Competes Directly With CDW ............................................................................ 6

    D.    The Complaint Describes Vigorous Competition Between CDW and Dexon ............................................................................ 6

    E.    Cisco's California Lawsuit Alleging Dexon Sold Counterfeit Cisco Products.......................................................................... 7

ARGUMENT ................................................................................................... 9

I.    COLLATERAL ESTOPPEL BARS DEXON FROM RE-ASSERTING ITS ANTITRUST CLAIMS HERE AGAINST CDW ............................................. 9

II.    DEXON'S SHERMAN ACT CLAIMS AGAINST CDW (COUNTS I, II) SHOULD BE DISMISSED ...................................................................... 12

    A.    Dexon Has Not Plausibly Alleged An Anticompetitive Agreement Between Cisco and CDW ................................................... 12

    B.    Dexon Fails to Allege Harm to Competition ..................................... 15

    C.    Dexon Fails to Allege Specific Intent by CDW to Monopolize ........................ 17

III.    DEXON FAILS TO ESTABLISH ANTITRUST INJURY ........................... 19

IV.    DEXON'S PARALLEL TFEAA CLAIM AGAINST CDW (COUNT VI) SHOULD BE DISMISSED ...................................................................... 20

V.    DEXON'S PRE-2018 CLAIMS ARE TIME-BARRED............................... 20

CONCLUSION ............................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**                                                                                                                                    **Page**

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.,*
    300 F.3d 620 (5th Cir. 2002) ...............................................................................................12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)....................................................................................................3, 16

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*
    472 U.S. 585 (1985)...........................................................................................................17

*Atlantic Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990)....................................................................................................11, 19

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................................. passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977)...........................................................................................................19

*Capstead Mortg. Corp. Sec. Litig.,*
    258 F. Supp. 2d 533 (N.D. Tex. 2003) ...............................................................................4

*Cisco Sys., Inc. v. Dexon Computer, Inc.,*
    2021 WL 5848080 (N.D. Cal. Dec. 9, 2021)................................................................ passim

*Cisco Sys., Inc. v. Dexon Computer, Inc.,*
    2022 WL 2222962 (N.D. Cal. June 21, 2022)..................................................................8, 11

*Clay v. Sunrise Breach Corp.,*
    2011 WL 13217901 (E.D. Tex. July 29, 2011) (Craven, M.J) .................................................4

*Cornett v. Longois,*
    871 F. Supp. 918 (E.D. Tex. 1994)........................................................................................9

*Dickson v. Microsoft Corp.,*
    309 F.3d 193 (4th Cir. 2002) ..............................................................................................17

*Doctor's Hospital of Jefferson, Inc. v. Southwest Medical Alliance, Inc.,*
    123 F.3d 301 (5th Cir. 1997) ..............................................................................................16

*Hicks v. Quaker Oats Co.*,
    662 F.2d 1158 (5th Cir. 1981) ............................................................9, 11

*Johnson v. Hosp. Corp. of Am.*,
    95 F.3d 383 (5th Cir. 1996) ..........................................................................12

*Johnson v. United States*,
    576 F.2d 606 (5th Cir. 1976) ...............................................................9, 11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007).........................................................................................15

*Marucci Sports, L.L.C. v. NCAA*,
    751 F.3d 368 (5th Cir. 2014) .............................................................13, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).........................................................................................18

*Metro Ford Truck Sales, Inc. v. Ford Motor Co.*,
    145 F.3d 320 (5th Cir. 1998) ......................................................................13

*Microsoft Corp. Antitrust Litig.*,
    127 F. Supp. 2d 728 (D. Md. 2001) ...........................................................17

*N. Miss. Comm'ns v. Jones*,
    792 F.2d 1330 (5th Cir. 1986) .......................................................3, 12, 17

*Norris v. Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007) ......................................................................19

*Rios v. City of Del Rio, Tex.*,
    444 F.3d 417 (5th Cir. 2006) ......................................................................13

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) ......................................................................16

*Rx.com v. Medco Health Sols., Inc.*,
    322 F. App'x 394 (5th Cir. 2009)................................................................20

*Salts v. Moore*,
    107 F. Supp. 2d 732 (N.D. Miss. 2000)....................................................12

*Shushan v. Allwaste, Inc.*,
    992 F.2d 517 (5th Cir. 1993) ......................................................................21

**App.586**

*State Farm Fire & Cas. Co. v. Fullerton*,
    118 F.3d 374 (5th Cir. 1997) ...............................................................................10

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997).................................................................................................6

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs.*,
    200 F.3d 307 (5th Cir. 2000) ...........................................................................3, 12

*Test Masters Educational Serv., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ................................................................................9

*Thomas v. Beaumont Indep. Sch. Dist.*,
    No. 1:15-cv-112, 2016 WL 922182 (E.D. Tex. Feb. 12, 2016), *report and
    recommendation adopted*, 2016 WL 899870 (E.D. Tex. Mar. 8, 2016)...................5

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ..........................................................................18

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
    540 U.S. 398 (2004)...........................................................................................14

*Wehling v. Columbia Broad. Sys.*,
    721 F.2d 506 (5th Cir. 1983) ................................................................................9

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
    401 U.S. 321 (1971)...........................................................................................20

**STATUTES**

15 U.S.C. § 1 ....................................................................................3, 8, 10, 12

15 U.S.C. § 2 ................................................................................3, 10, 11, 12, 17

15 U.S.C. § 15b ..................................................................................................20

Tex. Bus. & Com. Code § 15.04 ..........................................................................20

Tex. Bus. & Com. Code § 15.25(a) ......................................................................20

Defendant CDW Corporation ("CDW") submits this Motion to Dismiss the Complaint for failure to state a claim against CDW pursuant to Fed. R. Civ. P. 12(b)(6).[1]

## SUMMARY OF THE ARGUMENT

CDW is a technology hardware and software distribution company that sells products produced by a wide variety of original equipment manufacturers ("OEMs"), including those made by Defendant Cisco Systems, Inc. ("Cisco"), to end-customers. Dexon Computer, Inc. ("Dexon") is a rival reseller who also sells Cisco products to end-customers, in direct competition with CDW.

In recent years, Dexon has fallen out of favor with Cisco after Dexon allegedly sold "counterfeit," "bootleg," or otherwise non-genuine Cisco products to end-customers. According to the Complaint, Cisco has warned customers that it would be unable to offer product and service warranties on Cisco equipment sold by Dexon, and has encouraged customers to purchase genuine Cisco products from its authorized distributors (like CDW) instead of from unauthorized resellers (like Dexon), to avoid malfunctions and other potential defects.

The principal basis of Dexon's claims against CDW is that CDW violated federal and state antitrust laws when it agreed to sell Cisco networking equipment to end-customers who might have otherwise purchased the same Cisco equipment from Dexon. But under established Fifth Circuit precedent, Cisco is free to control the distribution of its own products, including working with a favored distributor (CDW) to replace a disfavored reseller (Dexon) for a specific customer.

This is not the first time Dexon has asserted these claims. In July 2020, Cisco filed a lawsuit against Dexon in the Northern District of California seeking, among other things, to enjoin Dexon from selling counterfeit Cisco equipment to customers. In response, Dexon asserted

---

[1] In filing this motion, CDW also joins in, and adopts as its own, the arguments and assertions made in Defendant Cisco Systems, Inc.'s Motion to Dismiss Under Rule 12(b)(6) (Dkt. No. 22) (hereinafter "Cisco MTD"). To avoid duplication, CDW files this separate brief to focus on the facts most relevant to the claims against it.

**CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** – Page 1

counterclaims against Cisco alleging, among other things, that Cisco violated federal and state antitrust laws when it coerced customers not to purchase from Dexon and agreed with an unnamed distributor—evidently, CDW—to replace Dexon for sales of Cisco products.

On December 9, 2021, Judge Breyer dismissed Dexon's antitrust counterclaims. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 5:22-cv-4926, 2021 WL 5848080 (N.D. Cal. Dec. 9, 2021). In his 15-page opinion, Judge Breyer found that Dexon failed to plausibly plead that any of Cisco's conduct was anticompetitive, and Dexon failed to plead it had suffered an antitrust injury. Judge Breyer gave Dexon 30 days to amend those claims, and while Dexon chose to pursue other counterclaims, it did not re-assert its antitrust claims.

Dexon had a different strategy in mind. Rather than re-litigating the same antitrust claims before Judge Breyer, Dexon let the 30-day deadline lapse and then filed this substantively-identical Complaint before this Court, apparently hoping for a different result. But like its California claims, Dexon's Complaint here fails to state a Sherman Act claim, for four reasons. *First*, Dexon is precluded by the doctrine of collateral estoppel from re-litigating issues that have already been decided by Judge Breyer. *Second*, Dexon fails to plausibly allege an anticompetitive agreement between CDW and Cisco, instead alleging conduct that is equally consistent with vigorous competition by CDW to capture sales from Dexon and other networking equipment resellers. Nor has Dexon plausibly alleged such an agreement harmed competition. *Third*, Dexon's claim that CDW conspired to monopolize a market in which it is not a competitor makes no sense. *Finally*, Dexon's claimed injuries—lost sales and opportunities to supply customers—reflect harm to a competitor, not competition, and thus are not injuries the antitrust laws were designed to prevent.

## STATEMENT OF THE ISSUES

The issues set forth for consideration are (1) whether the doctrine of collateral estoppel

precludes Dexon from re-litigating its antitrust claims against CDW before this Court; (2) whether under the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the facts pled in the Complaint plausibly suggest a viable claim for an unreasonable restraint of trade in violation of Section 1 and Section 2 of the Sherman Act; and (3) whether the facts pled in the Complaint plausibly suggest that Dexon has suffered an antitrust injury to establish antitrust standing.

## STANDARD OF REVIEW

To state a Section 1 violation under the Sherman Act, a plaintiff must allege: (1) an agreement, conspiracy, or combination among two or more independent business entities; (2) that is intended to harm or unreasonably restrain competition; and (3) that actually causes injury to competition. *See* 15 U.S.C. § 1; *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs.*, 200 F.3d 307, 312 (5th Cir. 2000). To state a conspiracy to monopolize claim under Section 2 of the Sherman Act, a complaint must allege (1) the existence of a conspiracy; (2) an overt act in furtherance of that conspiracy; and (3) specific intent to monopolize. *See* 15 U.S.C. § 2; *N. Miss. Comm'ns v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

A complaint may not merely recite the elements of the cause of action. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555-56). "'Labels and conclusions' . . . will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are no better. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## FACTUAL BACKGROUND

A.     CDW Distributes Products Manufactured by Third-Party OEMs, Including Cisco

CDW is a distributor of information technology ("IT") products and solutions to business, government, education, and healthcare customers located around the world. Compl. ¶¶ 56, 61.

CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) – Page 3

CDW is a multi-brand provider, offering more than 100,000 products and services from over 1,000 leading and emerging brands, including hardware, software, services, and end-to-end IT solutions. CDW Corporation, Annual Report (Form 10-K) (Feb. 24, 2022).[2]  CDW does not itself make products but instead sells products and services produced by leading original equipment manufacturers ("OEMs"), including Cisco and many others, to end-customers.  Compl. ¶¶ 56, 61.

CDW competes with other distributors and resellers to sell this OEM-manufactured equipment to end-customers.  *Id.*  At times, CDW competes with these other distributors and resellers to supply the same networking equipment, manufactured by the same OEMs, to the same end-customers, for the same applications.  *Id.*  As a result, CDW must distinguish itself through premium service, competitive resale prices, and a robust multi-brand product portfolio.  *Id.*

B.    Cisco's Networking Equipment and Service Products

Cisco manufactures a range of networking equipment and related products, including products used for "home networking, IP telephony, optical networking, security, storage area networking, and wireless technology."  Compl. ¶ 23.  These products include routers, Ethernet switches, and IP phones, among many others.  *Id.* ¶¶ 35, 39, 69.  In each category, Cisco competes with a wide variety of other OEMs who offer similar products, including Juniper Networks, Hewlett Packard, and Dell.  *Id.* ¶ 13; Cisco MTD Ex. C ¶ 50 (Dexon's Amended Answer and Counterclaims in *Cisco v. Dexon* California litigation).[3]  Cisco sells equipment to end-customers

---

[2] Because the Complaint contains very few allegations relating to CDW, CDW offers additional information on its background from its Annual Report for the Court's edification, though none is necessary to resolve this Motion.  This Court may refer to matters of public record, including SEC filings, when deciding a motion to dismiss.  *Clay v. Sunrise Breach Corp.*, No. 5:10-cv-224, 2011 WL 13217901, at *3 (E.D. Tex. July 29, 2011) (Craven, M.J); *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 543 (N.D. Tex. 2003).

[3] Dexon provided more details on Cisco's alleged conduct in the substantively-identical antitrust claims it previously filed against Cisco in the Northern District of California, discussed further below.  Dexon's Complaint here omits several allegations from its California complaint that provide helpful background on these markets and Cisco's alleged conduct.  As public filings, this Court may take judicial notice of Dexon's prior allegations.  *See Thomas v. Beaumont Indep. Sch. Dist.*, No. 1:15-cv-112, 2016 WL 922182, at *3 (E.D. Tex. Feb. 12, 2016), *report and recommendation adopted*, 2016 WL 899870 (E.D. Tex. Mar. 8, 2016).

CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) – **Page 4**

through an Authorized Channel Network using a number of Authorized Resellers, like CDW, who in turn compete to sell networking equipment to end-customers.  Cisco MTD Ex. C ¶¶ 52, 95, 97.

In addition to networking equipment, Cisco offers to end-customers contracts for maintenance services to "ensure the proper functioning of their [Cisco] equipment."  Compl. ¶ 25. These services, known as SmartNet, are designed to repair malfunctions or defects in Cisco's software or to combat security vulnerabilities, and may include onsite visits from certified engineers, software updates, access to the technical assistance center, online resources, and hardware replacement services.  *Id.* ¶¶ 25, 27.  Cisco does not require customers to purchase SmartNet.  *Id.* ¶¶ 25, 26.  While Dexon alleges that end-customers are "effectively compelled to [purchase SmartNet]," it also concedes that "[c]ustomers can and do purchase Cisco networking equipment without maintenance services," and those same customers can rely on "third-party maintenance and support providers" instead of Cisco.  *Id.* ¶¶ 26, 30.

Before it will agree to the SmartNet service packages, Cisco "specifically approves the service package" with the precise serial numbers, part numbers, and products to be covered. Compl. ¶ 46.  Cisco maintains a policy of refusing to warranty or service products that Cisco cannot verify are genuine Cisco products.  Cisco MTD Ex. C ¶ 114.  If a customer attempts to purchase unverified Cisco products from "unfavored resellers" and add them to the customer's network, Cisco may not honor the SmartNet service and warranties on those products or other Cisco products on the network.  Compl. ¶¶ 6, 49.

Cisco may require customers to pay a re-certification fee so that it can verify the secondary products qualify for the SmartNet service package.  Compl. ¶¶ 49, 50; Cisco MTD Ex. C ¶ 114.

Distributors and resellers like CDW and Dexon may facilitate these SmartNet service agreements but are not themselves a party to the contract.  Cisco MTD Ex. C ¶ 40.  Thus, any

dispute over the scope and terms of SmartNet service packages would be between Cisco and the end-customers, not with distributors or resellers like CDW and Dexon.

C.     Dexon is a Networking Equipment Reseller Who Competes Directly With CDW

Dexon is not an authorized CDW distributor or reseller but instead is a "secondary market seller" of Cisco equipment.  Compl. ¶ 47.  Elsewhere, Dexon has explained that this means it purchases and resells new or refurbished equipment manufactured by Cisco, as well as new or refurbished equipment manufactured by Cisco's competitors, including Hewlett Packard, Dell, and Juniper Networks.  *See* Cisco MTD Ex. C ¶¶ 52, 95.  Dexon also resells Cisco SmartNet packages that it purchases from Cisco's "standard sellers or partners."  Compl. ¶ 47.

Cisco has raised issues with the quality of Cisco products being re-sold by Dexon, and has claimed to some customers that the products may include "malware."  *See, e.g.*, *id.* ¶ 68.  In fact, Dexon is currently engaged in a lawsuit with Cisco regarding Dexon's sales of "counterfeit" Cisco products.  *See* Cisco MTD Ex. A (Cisco's Complaint in *Cisco v. Dexon*).  Cisco has warned some customers that it cannot honor SmartNet service packages if customers purchase Cisco products from Dexon or other secondary market resellers.  Compl. ¶¶ 51, 59.  Instead, customers can either purchase verified Cisco products from Cisco's authorized distributors, *see id.* ¶ 8, or in some circumstances pay a "re-certification fee" to cover non-verified Cisco products, *see id.* ¶¶ 5, 49.

D.     The Complaint Describes Vigorous Competition Between CDW and Dexon

Dexon alleges it competes directly with CDW for sales of networking equipment to end-consumers, including products manufactured by Cisco and those manufactured by other OEMs.  Compl. ¶¶ 56, 61.  As one "example" of this competition, Dexon alleges that it and CDW competed to supply networking equipment to a hospital system in Pennsylvania.  *Id.* ¶ 58. There, the hospital system "selected Cisco" routers and Ethernet switches, and then "awarded the order to Dexon." *Id.* ¶ 59.  However, Cisco allegedly "threatened the customer" that if it purchased Cisco products

**CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** – **Page 6**

from Dexon, Cisco would not honor the new SmartNet service package or any other SmartNet

service packages for the existing Cisco equipment used by the hospital system.  *Id.*  Instead, "upon

information and belief," Dexon alleges that Cisco "agreed" with CDW that "CDW would instead

secure those sales and assure the customer that SmartNet service would be provided for all of its

Cisco equipment."  *Id.* ¶ 60.  Dexon further alleges that Cisco and CDW "agreed" that "Cisco

would portray CDW as the 'savior' to the hospital system . . . , when in fact the intention and

purpose of the scheme was to exclude . . . Dexon."  *Id.*  The hospital system is alleged to have

eventually purchased the Cisco equipment from CDW, "at a higher price than had been negotiated

with Dexon."  *Id.*

As additional evidence of the alleged conspiracy, Dexon claims that Cisco and CDW

"agreed" that CDW would "stop selling networking equipment and associated services to Dexon."

*Id*. ¶ 62.  Dexon alleges that "no CDW sales representative has fulfilled a Cisco order from Dexon

since March 2021," though Dexon does not allege that it actually attempted to purchase Cisco

products from CDW, either directly or via CDW's website, nor does Dexon state whether it has

attempted to purchase non-Cisco products from CDW.  *Id.*  In addition, Dexon alleges "upon

information and belief" that when the "CDW representative previously assigned to Dexon"

continued to sell Cisco products to Dexon, the representative was "assigned . . . to a different

region and account."  *Id*.

     E.    <u>Cisco's California Lawsuit Alleging Dexon Sold Counterfeit Cisco Products</u>

This is not the first dispute between Cisco and Dexon.  On July 22, 2020, Cisco filed suit

against Dexon in the U.S. District Court for the Northern District of California, alleging Dexon

sold counterfeit Cisco products in violation of the Lanham Act and California state antitrust law.

*See* Cisco MTD Ex. A (Cisco's Complaint in *Cisco v. Dexon*).  On July 29, 2021, in response to

Cisco's Complaint, Dexon filed its Answer including several counterclaims against Cisco.  *See*

<u>**CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**</u> **– Page 7**

**App.594**

Cisco MTD Ex. C (Dexon's Amended Answer and Counterclaims in *Cisco v. Dexon*).  These counterclaims included allegations that Cisco violated Section 1 and Section 2 of the Sherman Act and related state laws by engaging in "coercion of its customers who purchase its SmartNet service package" by threatening to cancel SmartNet service "unless they buy entirely new routers and/or Ethernet switches from a specified Cisco source at a far higher price than the original network equipment purchase."  *See generally* Cisco MTD Ex. C.

On October 13, 2021, Cisco filed a motion to dismiss Dexon's counterclaims in the California lawsuit, and on December 9, 2021, Judge Breyer granted Cisco's motion and dismissed all of Dexon's counterclaims, including all four of Dexon's antitrust counterclaims.  *Cisco Sys., Inc.*, 2021 WL 5848080.  Judge Breyer found, among other things, that "Dexon fail[ed] to allege that Cisco's coercion or 'bullying' of its consumers harmed Cisco's competitors in the equipment markets" and that Dexon did not suffer an antitrust injury.  *Id.* at *5.

Judge Breyer gave Dexon leave to amend its counterclaims, and Dexon filed two amended federal and state law counterclaims but never re-asserted its antitrust counterclaims.  On June 21, 2022, the district court dismissed Dexon's third amended counterclaims "without leave to amend."  *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962, at *9 (N.D. Cal. June 21, 2022).  As such, Dexon's antitrust counterclaims against Cisco have been conclusively considered and rejected.[4]

---

[4] On July 5, 2022, acting "out of an abundance of caution" and notwithstanding the "high standard" for such an order, Judge Breyer granted Dexon leave to file a motion to reconsider the court's order dismissing Dexon's third amended counterclaims and denying leave to file a fourth amended counterclaim.  *See Cisco Sys. Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-4926, Dkt. No. 132.  Dexon's motion for leave did not argue that Judge Breyer's ruling on the antitrust claims was incorrect, nor has Dexon made any effort to seek reconsideration of that ruling.  *See Cisco Sys. Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-4926, Dkt. No. 130.

## ARGUMENT

### I.  COLLATERAL ESTOPPEL BARS DEXON FROM RE-ASSERTING ITS ANTITRUST CLAIMS HERE AGAINST CDW

At the outset, this Court need not wade into the merits of Dexon's allegations because, under the doctrine of collateral estoppel, Judge Breyer's orders dismissing Dexon's antitrust claims in the California litigation bar Dexon from re-litigating those same claims here. Collateral estoppel precludes re-litigation of issues that were already litigated in an earlier suit, "whether or not the second suit is based on the same cause of action." *Johnson v. United States*, 576 F.2d 606, 611 (5th Cir. 1976); *see Cornett v. Longois*, 871 F. Supp. 918, 923 (E.D. Tex. 1994) ("Collateral estoppel prevents a plaintiff from re-litigating issues which he has previously lost in other suits."). Collateral estoppel applies when (1) the issue at stake is identical to the issue in the prior litigation; (2) the issue at stake was actually litigated in the prior litigation; and (3) determination of the issue in the prior litigation was a critical and necessary part of the judgment. *Test Masters Educational Serv., Inc. v. Singh*, 428 F.3d 559, 572 (5th Cir. 2005).[5]

Collateral estoppel applies equally in force when a plaintiff attempts to relitigate the same issues by merely "switching adversaries." *Hicks v. Quaker Oats Co*., 662 F.2d 1158, 1171 (5th Cir. 1981) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329-30 (1979)). Complete identity of parties is not required. *Wehling v. Columbia Broad. Sys*., 721 F.2d 506, 508 (5th Cir. 1983) (collateral estoppel precludes relitigation of an issue "regardless of whether his present adversary was a party to the previous lawsuit").

Collateral estoppel precludes Dexon's claims against CDW.  *First*, the issues in this litigation and the California matter are identical.  In both lawsuits, Dexon alleged:

---

[5] Collateral estoppel (or issue preclusion) is similar to res judicata (or claim preclusion) asserted by Cisco in the Cisco MTD.  Collateral estoppel goes further than res judicata to bar re-litigating identical claims by simply adding new parties, as Dexon attempts to do here.

- Cisco threatened customers that it would terminate their SmartNet service unless they purchased new Cisco equipment from Cisco resellers other than Dexon (*e.g.*, Cisco MTD Ex. C ¶¶ 40, 41);[6]
- For one such customer (Pennsylvania Health System), Cisco threatened to "cancel immediately all SmartNet service packages which the customer had in place" if it purchased Cisco products from Dexon (Cisco MTD Ex. C ¶ 42);
- Cisco engaged in "pressure and bullying tactics" to dissuade customers from doing business with Dexon (*e.g.*, Cisco MTD Ex. C ¶¶ 71, 77);
- Cisco pressured a "value added reseller" (*there* unnamed, *here* identified as CDW) to stop doing business with Dexon (Cisco MTD Ex. C ¶ 52);
- The same reseller (*i.e.*, CDW) reassigned a representative to a different region and account when the representative "refused to comply with the demand" (Cisco MTD Ex. C ¶ 52).

These are the same core allegations that Dexon now asserts against CDW (and Cisco) here. And in both lawsuits, Dexon claims this conduct was anticompetitive in violation of Section 1 and Section 2 of the Sherman Act. The issues in the two lawsuits are identical.

*Second*, Dexon's antitrust claims were plainly litigated in the California matter. *See State Farm Fire & Cas. Co. v. Fullerton*, 118 F.3d 374, 383 (5th Cir. 1997) (issues are litigated for purposes of collateral estoppel once they are properly raised, submitted for determination, and determined by the court). Dexon's antitrust counterclaims were briefed extensively by Dexon and considered by Judge Breyer on Cisco's motion to dismiss. And Judge Breyer's 15-page opinion dismissing those claims is detailed and reasoned. *See Cisco Sys., Inc.*, 2021 WL 5848080 at *4–5 (dismissing Section 1 claim because "Dexon does not allege that the supposed tie [of Cisco's SmartNet service package to new Cisco equipment] had any adverse effect on competition"), *5–6 (dismissing Section 2 claim because "Dexon fails to plead that any of this alleged conduct . . . was anticompetitive"), *6 (dismissing both Section 1 and Section 2 claims because "Dexon has not pleaded antitrust injury").

---

[6] In fact, the Pennsylvania Health System example in Dexon's Complaint is lifted almost word-for-word from the California complaint. *Compare* Compl. ¶¶ 59, 60 *with* Cisco MTD Ex. C ¶ 42 (Dexon California counterclaims).

<u>CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u> – **Page 10**

*Third,* Dexon's antitrust allegations were plainly "necessary" to Judge Breyer's decision to dismiss Dexon's antitrust counterclaims in the California matter. Judge Breyer's extensive opinion determined that Dexon failed to plead that any of Cisco's alleged conduct—including "coercing purchases in the equipment market; bullying its customers to purchase through more expensive chances; [and] pressuring a [value-added reseller] not to deal with Dexon," among others—"was anticompetitive." *Cisco Sys., Inc.*, 2021 WL 5848080 at *5. Similarly, Judge Breyer determined that Dexon lacked antitrust standing because its injuries did not result from anticompetitive conduct, and thus were "not 'of the type the antitrust laws were intended to prevent.'" *Id.* at *6 (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

The Complaint seemingly recognizes this bar, and tries to avoid the issue and claim preclusion by adding CDW as a defendant, adding new Sherman Act causes of action, and adding new examples of customers lost to other Cisco resellers. None succeed. Because the issues are the same in both matters, collateral estoppel still applies despite Dexon now asserting claims against CDW, *see Hicks*, 662 F.2d at 1171, and adding new Sherman Act claims against Cisco, *see Johnson*, 576 F.2d at 611. Likewise, any "new" factual allegations—such as lost Dexon sales to other Cisco resellers at five Texas customers—are still part of the same nucleus of facts considered and rejected by Judge Breyer; namely, that Dexon failed to state a Sherman Act claim relating to Cisco's ServiceNet contracts. Dexon cannot salvage its flawed claims by setting its sights on a new defendant who was, in any event, already identified in the prior lawsuit.

Dexon was afforded the opportunity to amend its claims against Cisco twice, and it failed to amend both times. Judge Breyer since dismissed Dexon's counterclaims with prejudice, and Dexon has not attempted to re-assert them. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962 (N.D. Cal. June 21, 2022) (order dismissing third amended counterclaims). As Dexon

has now had multiple opportunities to amend its pleadings, Dexon should not yet have a fourth time to relitigate those same issues that were already adjudicated in the Northern District of California. Dexon's gamesmanship is precisely what collateral estoppel is designed to prevent.

## II.   DEXON'S SHERMAN ACT CLAIMS AGAINST CDW (COUNTS I, II) SHOULD BE DISMISSED

### A.   Dexon Has Not Plausibly Alleged An Anticompetitive Agreement Between Cisco and CDW

A complaint alleging a conspiracy in violation of Section 1 of the Sherman Act must allege that Defendants (1) engaged in a conspiracy, (2) that restrained trade, (3) in the relevant market. *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002). Similarly, a complaint alleging conspiracy to monopolize in violation of Section 2 must allege (1) the existence of a conspiracy, (2) an overt act in furtherance of that conspiracy, and (3) specific intent to monopolize. *N. Miss. Comm'ns*, 792 F.2d at 1335. For both claims, Dexon must allege an *agreement* to restrain trade, because "unilateral conduct is excluded from [Section 1's] purview." *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996); *see also Stewart Glass*, 200 F.3d at 316 ("joint action" is required element for both Section 1 and Section 2 conspiracy to monopolize claims).[7]

To survive a motion to dismiss, a "conclusory allegation of agreement at some unidentified point" is not sufficient. *Twombly*, 550 U.S. at 557. Likewise, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id*. at 556. Instead, Dexon must plead factual allegations sufficient for this Court to draw a reasonable inference that CDW and Cisco made a

---

[7] Because Dexon's conspiracy to monopolize claim likewise requires Dexon to plausibly allege joint action by Cisco and CDW, this brief will combine the analyses for these two causes of action. *See Stewart Glass*, 200 F.3d at 316 (granting summary judgment on Section 2 conspiracy claim for failure to offer facts showing joint action based on previous Section 1 analysis demonstrating the same); *see also Salts v. Moore*, 107 F. Supp. 2d 732, 743 (N.D. Miss. 2000) (same on motion to dismiss).

<u>CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u> – **Page 12**

"conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 373–74 (5th Cir. 2014) (quotation omitted); *see also Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 325 (5th Cir. 1998) ("Independent action is not proscribed.  Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of a combination or agreement.").

Dexon fails to meet this burden.  At the outset, Dexon fails to plausibly allege any direct evidence of an anticompetitive agreement between CDW and Cisco.  *See Twombly*, 550 U.S. at 565.  Instead, Dexon asks this Court to *infer* a conspiracy to restrain trade based solely on circumstantial evidence and allegations Dexon made on "information and belief."  *E.g.*, Compl. ¶¶ 60, 61, 62, 63.  But speculative or conclusory assertions are not entitled to any presumption of truth on a motion to dismiss.  *Twombly*, 550 U.S. at 555; *see Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").

Considered individually or as a whole, Dexon's allegations are more consistent with CDW's independent actions and its individual interests than with a conspiracy.  Indeed, Dexon's conspiracy allegations boil down to the unremarkable assertions that (1) Cisco unilaterally threatened to cancel certain customers' SmartNet service package if they purchased products from Dexon, because Dexon was allegedly selling "bootleg" or "unauthorized" Cisco products; (2) Cisco asked CDW to sell one customer (Pennsylvania Health System) certain Cisco networking equipment "*after* the hospital cancelled the equipment order with Dexon"[8]; (3) CDW has not sold any Cisco products to Dexon since March 2021; and (4) CDW advertises more Cisco Ethernet

---

[8] While Dexon also alleges "five examples…in Texas" where it lost out on sales of Cisco products, Dexon does not allege CDW had any involvement in any of them.

**CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** – Page 13

switches on its website than Ethernet switches made by other OEMs.

None of these allegations remotely suggests an unlawful agreement to restrain trade. *First*, any allegations as to Cisco's unilateral conduct—including claims that "Cisco has coerced customers not to purchase from these customers' desired resellers" and "Cisco threatened the customer" that it would cancel their SmartNet packages—do not suggest any involvement by CDW whatsoever and cannot be used to infer a conspiracy between CDW and Cisco.

*Second*, the Complaint itself identifies the independent, non-conspiratorial reason CDW would sell Cisco products to Dexon's customers—*CDW and Dexon are competitors*. At most, the Complaint alleges that Cisco threatened to cancel Pennsylvania Health System's SmartNet service packages if they purchased "bootleg" or "unauthorized" products from Dexon, and CDW stepped in to fill the competitive gap. Even if true, this is precisely what CDW would be expected to do: compete for sales to end-customers. *See Twombly*, 550 U.S. at 554 (conduct that is "just as much in line with a wide swath of rational and competitive business strategy" cannot be used to infer a conspiracy). More, the Complaint admits CDW and Cisco did not "agree[]" that CDW would supply products to the customer until *after* the customer cancelled its order with Dexon (Compl. ¶ 60), a concession which belies any inference that CDW "agreed" to do anything other than supply Cisco products to an end-customer.

*Third,* Dexon's allegation that "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021" (Compl. ¶ 62) is equally unsurprising. Dexon admits that it competes with CDW (*see* Compl. ¶ 56). As such, CDW has clear unilateral incentives not to supply its rivals. *See also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 409-11 (2004) (under the Sherman Act, a firm has no duty to supply its rivals). In addition, these allegations are wholly implausible to state a Sherman Act conspiracy, because (a) Dexon

never alleges that it actually attempted to purchase Cisco products from CDW and was repudiated, and (b) Dexon admits that CDW sells Cisco products directly from its website, which Dexon could have purchased at any time.  Compl. ¶ 61.

*Finally*, the fact that CDW displays Cisco products prominently on its website demonstrates CDW's efforts to compete with rival distributors (like Dexon), and does not suggest an anticompetitive agreement with Cisco to do anything, much less restrain trade.  In any event, Dexon admits that CDW advertises hundreds of non-Cisco Ethernet switches from multiple non-Cisco OEMs on its website, demonstrating CDW's active commitment to selling non-Cisco products.  This, too, is wholly inconsistent with an anticompetitive conspiracy.

At bottom, Dexon's conspiracy allegations rest not on facts but on conclusory statements strung together with antitrust jargon.  It is axiomatic, however, that merely reciting labels and conclusions "will not do." *Twombly*, 550 U.S. at 555.  Having failed to plausibly allege an anticompetitive agreement between Cisco and CDW, Dexon's Sherman Act claims fail.

B.    Dexon Fails to Allege Harm to Competition

Dexon's Sherman Act claims also fail because Dexon fails to plausibly allege that the CDW/Cisco agreement harmed *competition*.  Under the Sherman Act, so-called vertical agreements—*i.e.*, agreements among firms at different levels of the distribution chain—must be evaluated under the "rule of reason," under which a restraint is unlawful only if "it has an anticompetitive impact on the relevant market." *In re Pool Prods. Distrib. Market Antitrust Litig.*, 988 F. Supp. 2d 696, 708 (E.D. La. 2013).

Notably, the Supreme Court affords wide latitude to a manufacturer on how its products are sold across various distribution channels (*i.e.*, "intrabrand" competition) so that it can protect and enhance the paramount competition between a seller and its competitors (*i.e.*, "interbrand" competition).  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007).

**CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** – **Page 15**

**App.602**

Accordingly, the antitrust laws permit a seller to harmonize its distribution networks to avoid "free-riding" and "undercutting" by discounters.  *Id.*; *see also Doctor's Hospital of Jefferson, Inc. v. Southwest Medical Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997) (under the Sherman Act, a manufacturer is afforded the "virtual absolute right to choose to whom it sells its goods").  This includes circumstances where a manufacturer agrees with a new dealer to terminate an old dealer; even there, "there is no antitrust violation."  *Doctor's Hospital*, 123 F.3d at 307.

The Complaint contains no well-pleaded allegations as to how Cisco's alleged agreement with CDW harmed competition for networking equipment.  Instead, according to the Complaint, the alleged conduct merely shifted sales of Cisco products from one Cisco reseller to another, a classic, lawful restriction on intrabrand competition to promote interbrand competition—"the primary purpose of the antitrust laws."  *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997).  If anything, the Complaint suggests the alleged agreement *increased* interbrand competition, because CDW "is more likely to aggressively market [Cisco's] products" compared to Dexon, who "does not prioritize any particular brand."  Compl. ¶¶ 61, 97.

At best, the Complaint alleges that "Cisco's conduct . . . has a direct impact on its [OEM] competitors" because "customers are not free to make a product choice on the merits."  Compl. ¶ 82.  But this allegation is entirely conclusory and afforded no weight at this stage.  *Iqbal*, 556 U.S. at 678; *see Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects are not enough.").  Further, this speculative assertion is inconsistent with Dexon's admission that SmartNet is an *optional* service; customers can choose between Cisco's SmartNet or service contracts offered by other third-party maintenance and service providers.  Compl. ¶ 26.  At most, this descibes a contract interpretation issue between Cisco and its customers over the scope of Cisco's SmartNet service agreement.

Dexon is not the proper party to assert those claims, nor is CDW the proper party against whom those claims could be asserted.

      C.     <u>Dexon Fails to Allege Specific Intent by CDW to Monopolize</u>

Dexon's Section 2 claim fails for yet another reason: the Complaint fails to plausibly allege specific intent by CDW to monopolize the relevant market.[9] Specific intent is an essential element to a conspiracy to monopolize claim. *See N. Miss. Commc'ns*, 792 F.2d at 1335. Specific intent goes beyond "the mere intent to do the act." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985). Instead, the defendant must have intended to achieve an illegal monopoly.

The Complaint alleges no such intent by CDW. As a threshold matter, CDW cannot monopolize the Relevant Networking Equipment Market because it is not a participant in that market. Instead, CDW—like Dexon—is merely a reseller of other manufacturers' equipment. In other words, any claim related to monopolization of the Relevant Networking Equipment Market must be premised on *Cisco*'s purported monopoly. But even if Dexon plausibly alleged that *Cisco* intended to monopolize this market—and it has not—there are no plausible, factual allegations suggesting *CDW* specifically intended the same.

Importantly, in this context, specific intent "signifies something more than willing, voluntary, and knowing participation in the illegal course of conduct that [the monopolist] is alleged to have pursued." *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002). Instead, "[i]t means participating in that course of conduct for the specific, shared purpose of maintaining [the

---

[9] Count II asserts that "*Cisco* pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets." Compl. ¶ 96. It is silent as to CDW's intent, nor does it challenge CDW's conduct with respect to any other relevant market.

<u>CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u> – **Page 17**

monopolist's] monopolies." *Id.*  Thus, to state a Section 2 claim, Dexon must allege that CDW "stepped back and concluded that maintaining [Cisco's] monopol[y] was a goal that they themselves desired to accomplish." *Id.*  On this, the Complaint falls woefully short.

Nowhere does the Complaint plausibly allege that CDW had specific intent to further Cisco's monopoly.  Indeed, any assertion that CDW chose to further Cisco's monopoly should be rejected as facially implausible.  Because Cisco is CDW's supplier, any attempt to expand Cisco's market power would give Cisco the "power and incentive to charge [CDW] supracompetitive prices" on Cisco's networking products.  *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026–27 (10th Cir. 1992).[10]  As courts have recognized, middlemen like CDW "would have no rational motive to create such an environment." *Id.* (granting motion to dismiss based on lack of specific intent); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986) ("[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.").  In fact, the Complaint admits CDW actively promotes hundreds of Cisco's competitor's products on its website (Compl. ¶ 61), inconsistent with any inference CDW had specific intent to further Cisco's alleged monopoly.

Instead, the Complaint provides the "obvious alternative explanation" for CDW's actions: CDW was vigorously competing against other Cisco resellers to increase its own sales, not to maintain Cisco's alleged monopoly.  *See Twombly*, 550 U.S. at 567.  This is conduct encouraged by the Sherman Act, not prohibited by it.

---

[10] As discussed in Cisco's motion to dismiss, the Complaint does not make a plausible allegation that Cisco's conduct would further its monopoly because "[i]f prices of Cisco equipment rise because of inefficiency in distribution, then that can only help Cisco's manufacturing competitors and hurt Cisco." Cisco MTD at 33.

<u>CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u> – **Page 18**

**App.605**

### III.   DEXON FAILS TO ESTABLISH ANTITRUST INJURY

Dexon's Sherman Act claims fail for yet another reason:  Dexon fails to establish it has suffered an antitrust injury.  To state a Sherman Act violation, Dexon must demonstrate that it suffered an antitrust injury, *i.e.*, "the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  This requires that Dexon trace its injury to the anticompetitive effects of the alleged antitrust violation. *Id.; see also Atlantic Richfield,* 495 U.S. at 339 ("Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct.").

None of Dexon's allegations establish injury to *competition* in the relevant markets.  The Complaint alleges the purported conspiracy has "injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs." Compl. ¶¶ 92, 99.  But none of these alleged injuries resulted from harm to *competition*.  Dexon is not an end-customer of Cisco's products and is not a competing network equipment manufacturer.  Any supposed harm to competition in the relevant markets would injure either end-customers— *i.e.*, those purchasing products from Dexon or CDW—or from rival OEMs who are allegedly foreclosed from selling their equipment.  Dexon is neither an end-customer nor a rival OEM, and thus cannot suffer an antitrust injury.  *See Norris v. Hearst Trust*, 500 F.3d 454, 466 (5th Cir. 2007).[11]  Indeed, Dexon's predominant focus on its own lost sales to CDW and other Cisco resellers demonstrates why its antitrust claims are misguided:  "because antitrust laws are designed to protect competition, not competitors." *Marucci Sports*, 751 F.3d at 376.

---

[11] Dexon does not claim any injury—much less an *antitrust* injury—from the implausible allegation that CDW refused to sell Cisco products to Dexon.

**CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** – **Page 19**

## IV.    DEXON'S PARALLEL TFEAA CLAIM AGAINST CDW (COUNT VI) SHOULD BE DISMISSED

Since the Texas Free Enterprise & Antitrust Act ("TFEAA") is analyzed under the same standards as the Sherman Act, Dexon's TFEAA claim should be dismissed for the same reasons as Dexon's Sherman Act claims. *See* Tex. Bus. & Com. Code § 15.04 (TFEAA "shall be construed in harmony with federal judicial interpretations" of the Sherman Act).

## V.    DEXON'S PRE-2018 CLAIMS ARE TIME-BARRED

A Sherman Act claim is subject to a four-year statute of limitations that runs from the date of injury. *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *Rx.com v. Medco Health Sols., Inc.*, 322 F. App'x 394, 396 (5th Cir. 2009). The TFEAA likewise contains a four-year statute of limitations. Tex. Bus. & Com. Code § 15.25(a). Because Dexon filed its Original Complaint on April 27, 2022, claims against CDW based on injuries allegedly incurred before April 27, 2018 (hereinafter "pre-2018 claims") are time-barred.[12]

Dexon does not argue that the statute of limitation should be tolled. Nor could it. The Complaint alleges a clear, and very public, pattern of conduct by Cisco, including "coerc[ing]" customers not to purchase Dexon equipment through a "fear, uncertainty and doubt" campaign, in which Cisco "wrongfully claim[ed] to customers that unfavored resellers sell 'bootleg,' 'unauthorized,' or goods with 'malware' or 'spyware'" to dissuade customers from purchasing from Dexon. Compl. ¶ 6. These allegations belie any notion that any part of Cisco's conduct was "secret." There can be no plausible claim by Dexon that it could not have discovered that conduct through reasonable diligence to toll the statute of limitations. *See, e.g., Pool Prods.*, 988 F. Supp.

---

[12] Dexon alleges that Cisco's "overall course of conduct" to "hold up" its SmartNet customers has been continuing "at least since 2015." Compl. ¶ 52. The Complaint does not allege the date of any of the specific alleged acts by CDW, except that "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* ¶ 62. Regardless, any pre-2018 claims against CDW are barred by the statute of limitations.

<u>CDW'S MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)</u> – **Page 20**

2d at 724; *see also Shushan v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) ("allegations of fraud must meet a higher, or more strict, standard than the basic notice pleading required by Rule 8"). As such, Dexon's pre-2018 claims must be dismissed.

## CONCLUSION

For these reasons, CDW respectfully requests the Court dismiss Dexon's claims against CDW with prejudice. In the alternative, Dexon's claims should be transferred back to the Northern District of California, as set forth in CDW's Notice of Joinder to Defendant Cisco Systems, Inc.'s Motion to Transfer Venue filed concurrently with this motion.

Respectfully submitted,

/s/ *Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
Cole A. Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile:  (903) 255-0800
Email:  jdoan@haltomdoan.com
Email:  criddell@haltomdoan.com

James A. Reeder, Jr.
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Fax:  (832) 239-3600
Email:  jareeder@jonesday.com

Thomas D. York
Texas Bar No. 24095531
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone:  (214) 969-4523
Fax:  (214) 969-5100
Email:  tdyork@jonesday.com

**ATTORNEYS FOR DEFENDANT
CDW CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing document has been served via the Court's ECF system on July 8, 2022.

/s/ *Jennifer H. Doan*_____
Jennifer H. Doan

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 5:22-cv-00053-RWS-JBB |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. and CDW CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

### REPLY IN SUPPORT OF DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO TRANSFER

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com

July 14, 2022

*Counsel for Cisco Systems, Inc.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

I.    INTRODUCTION ....................................................................................... 1

II.   ARGUMENT ............................................................................................... 2

      A.    The First-To-File Rule Applies ............................................................. 2

      B.    The California Lawsuit Is Substantially Similar .................................... 4

            1.    The Facts, Issues, and Parties Substantially Overlap ................................ 4

            2.    There Is a Risk of Forum-Shopping, Piecemeal Litigation, and
                  Inconsistent Outcomes ................................................................. 7

III.  CONCLUSION ............................................................................................ 8

ii
**App.612**

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Franklin Res., Inc.*,
  2007 WL 518859 (N.D. Cal. Feb. 14, 2007) ....................................................... 7

*Am. Can! Cars for Kids v. Kars 4 Kids, Inc.*,
  2016 WL 3688631 (N.D. Tex. July 11, 2016) .................................................. 2

*Cadle Co. v. Whataburger of Alice, Inc.*,
  174 F.3d 599 (5th Cir. 1999) ........................................................... 3, 4

*Cal. Sec. Co-Op, Inc. v. Multimedia Cablevision, Inc.*,
  897 F. Supp. 316 (E.D. Tex. 1995) ........................................................5

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
  2021 WL 5848080 (N.D. Cal. Dec. 9, 2021) ....................................................... 1

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
  2022 WL 2222962 (N.D. Cal. June 21, 2022)........................................................1

*TravelPass Grp. LLC v. Caesars Entm't Corp.*,
  2019 WL 4071784 (E.D. Tex. Aug. 29, 2019) .................................................. 6

*Young v. L'Oreal USA, Inc.*,
  526 F. Supp. 3d 700 (N.D. Cal. 2021) ........................................................ 3, 4

## I.    INTRODUCTION

Dexon opposes transfer even though Dexon itself first filed its antitrust claims in a different federal court, where litigation between the parties is still pending.  No precedent supports that result.  Had Judge Breyer allowed Dexon's counterclaims to proceed, Dexon doubtless would have pursued them in that court.  But Judge Breyer dismissed those claims, *see Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2021 WL 5848080, at \*5 (N.D. Cal. Dec. 9, 2021), and Dexon's decision to file materially identical claims in this Court is forum shopping, apparently motivated by the hope of achieving a different outcome.  We have found no case where any federal court has ever allowed a litigant to engage in such conduct, and Dexon cites none.

The first-to-file rule exists to prevent far less egregious tactics, and Dexon's attempts to avoid the rule fail.  Dexon first argues that Judge Breyer's dismissal of its antitrust counterclaims means that its counterclaims are no longer "pending," and that the first-to-file rule therefore does not apply.  But Dexon ignores that the *case* in which it filed its antitrust counterclaims *is* pending – to be sure, its counterclaims have been dismissed, but the case continues.  Moreover, when a litigant loses in its first-chosen federal court, its remedy is to appeal, not to file the same case in a different federal court.  In these circumstances, the first-to-file rule would apply even if the California case were no longer pending.

Dexon next argues (at 7-9) that the existence of "substantial differences" means the first-to-file rule does not apply.  That argument strains credulity.  *See Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962, at \*8 n.4 (N.D. Cal. June 21, 2022) (referencing this lawsuit as an "attempt[ ] to seek repeated bites at the apple").  Dexon makes the exact same claim under Section 1 (for tying), the exact same claims for monopolization (of markets for network equipment), and relies on the same factual allegations (often in the very same words) in support of all of its claims. Even Dexon's allegations about IP Phones – an unsupported claim intended to create the

**App.614**

appearance of something new where nothing new exists – were previously asserted to support other (now dismissed) counterclaims in California.  In any event, the limited additions to Dexon's complaint in this Court are not *material* differences – Dexon confirms, for example, that CDW was the value-added reseller whose conduct it challenged in the California Lawsuit, and its tale about a single customer in Pennsylvania has no legal relevance at all.  Cosmetic changes such as naming a party (already the subject of the prior complaint) or applying a new legal label ("Conspiracy To Monopolize") to the same alleged conduct are insubstantial as a matter of law.  The relevant standard is substantial *similarity*.  Dexon does not and cannot deny that the two complaints are substantially similar.

Finally, Dexon downplays (at 10-11) the risk of forum shopping and conflicting judgments, but, whatever its subjective motivations, when a litigant files a claim in one court, has it dismissed, and then tries to assert the same claim in a different court, that's forum shopping.  And that's what Dexon has done here.

## II.    ARGUMENT

The first-to-file rule applies even though Judge Breyer dismissed Dexon's counterclaims in the California Lawsuit (which is ongoing).  Dexon does not negate the substantial similarity between that lawsuit and Dexon's current complaint.  And comity and the sound administration of justice demand that Dexon's complaint be transferred.

### A.    The First-To-File Rule Applies

Dexon's argument (at 6) that the first-to-file rule applies only if the first-filed case remains pending is misplaced because the California Lawsuit *is* pending.  The first-to-file rule focuses on an "action," "case[]," or "matter," not on a particular party's claims.  *See*, *e.g.*, *Am. Can! Cars for Kids v. Kars 4 Kids, Inc.*, 2016 WL 3688631, at *3 (N.D. Tex. July 11, 2016) (parties' dispute over whether first-filed action remained "pending" was moot because district

court reopened the "matter").[1]  Dexon is thus wrong to equate (at 6) its antitrust counterclaims –
which it chose to assert as part of the California Lawsuit, and which Judge Breyer dismissed –
with the California Lawsuit itself.  The latter remains pending because Cisco has claims against
Dexon, and because Dexon has claims against third parties.[2]

In any event, the status of the California Lawsuit does not control the application of the
first-to-file rule.  "[A] court is not stripped of its discretion to apply the first-to-file rule even
though the first-filed action is no longer pending."  *Young v. L'Oreal USA, Inc.*, 526 F. Supp. 3d
700, 706 (N.D. Cal. 2021).  "Rather, a court must see if the three pillars supporting the first-to-
file rule – economy, consistency, and comity – still warrant a transfer, stay, or dismissal of the
subsequently filed action."  *Id.*

Dexon cites no case contradicting this rule.  Nor do "the cases Cisco relies upon," Opp. at
2, contradict it.  It is true that, in those cases, as "[i]n most circumstances, courts . . . applied the
first-to-file rule when the first-filed action [wa]s still pending in the district court or was
dismissed pending resolution on appeal."  *Young*, 526 F. Supp. 3d at 706.  But that does not
mean (as Dexon argues (at 5-6)) those cases held that the first-to-file rule applies *only if* the
counterpart to the later-filed claims remain pending in the first-filed case.  None of the cases
addresses that issue, and *Young* explains why Dexon's reliance on this distinction makes little

---

[1] Indeed, Dexon alleged that the counterclaims arose out of the "same controversy" as
Cisco's claims.  *See* Dexon's Am. California Counterclaims, Ex. B to Mot. ¶ 13 ("Dexon's
counterclaims arise out of the same controversy as plaintiffs' Federal claims[.]").

[2] If the complaint is not transferred, Cisco could raise Dexon's distribution of counterfeit
and unlicensed Cisco products as defenses before this Court, just as Dexon's repeated
counterfeiting is at the heart of the Lanham Act claims Cisco brought against Dexon in the
California Lawsuit.  Dexon criticizes (at 5 n.2) this argument as an "attempt to invent an
overlap," but the first-to-file doctrine is inherently "forward-looking" – "[c]ourts use [it] . . .
prophylactically," to "refuse[] to hear a case raising issues that *might* substantially duplicate
those raised" in another case.  *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 604 (5th
Cir. 1999) (emphasis added).

sense:  it would allow a litigant to file claims in one federal court and – a few "months after [an] adverse ruling" – file a new lawsuit in a different federal court "with similar parties, similar legal issues, alleging the same predicate facts, and relying on a nearly identical legal theory." *Young*, 526 F. Supp. 3d at 707.  That is the situation here.

Dexon chose to file its counterclaims in the California Lawsuit and, months after Judge Breyer's adverse ruling, it filed this complaint against the same defendant, alleging the same predicate facts, and relying on the same legal theories.  Accordingly, "there is little doubt that [Dexon] and [Dexon's] counsel seek to avoid [Judge Breyer's] adverse ruling and to [e]licit a favorable, yet inconsistent, judgment." *Id.*  Because "[t]hat very conduct is exactly what the first-to-file rule is intended to prevent," placing it beyond reach of the first-to-file rule would undermine the rule's core purpose.  *Id.*  Dexon cites no case suggesting anything to the contrary.

### B.     The California Lawsuit Is Substantially Similar

The first-to-file rule applies because the California Lawsuit is substantially similar to Dexon's current complaint.  *Cadle*, 174 F.3d at 606.  Because Dexon's opposition does nothing to negate those similarities, the first-to-file rule applies and supports transfer.

### 1.     The Facts, Issues, and Parties Substantially Overlap

The facts and issues in Dexon's complaint and the California Lawsuit overlap substantially.  Dexon does not dispute the similarities that Cisco's motion identified.  It concedes that it asserted most of its antitrust claims for the first time in the California Lawsuit, Mot. at 3; that it copied many of its complaint's allegations from the California counterclaims verbatim, *id.* at 4-5 (table); and that those allegations arise from the same business practices as the California Lawsuit and seek nearly identical damages, *id.* at 8-9.

Dexon likewise has no effective response to the argument (*id.* at 10) that the parties are substantially identical.  It concedes that CDW is the value-added reseller whose conduct it

4
**App.617**

challenged in its California counterclaims.  *See* Opp. at 2-3.  And it does not even try to distinguish

cases (Mot. at 10-11) holding that the first-to-file rule does not require identity of parties.  *See*, *e.g.*,

*Cal. Sec. Co-Op, Inc. v. Multimedia Cablevision, Inc.*, 897 F. Supp. 316, 318 (E.D. Tex. 1995)

(cases substantially similar where later-added defendant was included in the first-filed "action by

reference even though it was not included as a party").  Dexon contends (at 10) that CDW is "not

merely . . . a favored distributor," and instead "a co-conspirator," but it alleged the same thing in

the earlier suit and gives no reason why this rhetorical flourish should matter.

Not only are the "substantial differences" that Dexon identifies (at 7-9) between the

earlier and later antitrust claims actually insubstantial, they are hardly even differences.  Dexon

provides a table of allegations that it says "were [not] at issue in the prior antitrust

counterclaims," but that table includes allegations that were at issue in California – like

paragraphs 122-128, which appear verbatim in Dexon's California counterclaims (*see* Ex. B to

Mot. ¶¶ 82-88).  The only change Dexon made was replacing "California" with "Texas,"

(Compl. ¶ 123 & Ex. B. to Mot. ¶ 83) and the word "Neither" with "Nor" (Compl. ¶ 128 & Ex.

B. to Mot. ¶ 88).

Regardless, Dexon's *additional* allegations do not change the fundamental character of

the counterclaims in the California Lawsuit.  For example, Dexon states that Texas is "*a key

jurisdiction.*"  Opp. at 8 (emphasis added).  But Dexon will not say that Texas is "the" key,

because its counterclaims challenge all the same conduct that the California counterclaims did,

plus new conduct primarily occurring in Pennsylvania.  Likewise, when Dexon says (*id.*) it

added an "entirely new Relevant IP Phone Market[ ]," it means its counterclaims allege the same

Router and Ethernet Switch Relevant Markets alleged in its California counterclaims, plus an IP

Phone Market.[3]  Even the allegations it makes about Cisco's conduct in that "IP Phone Market" were included in Dexon's non-antitrust tort counterclaims in California.  *Compare* Compl. ¶ 86 ("Dexon lost a major award for IP phones from a public school district" in Texas) *with* Dexon's Third Am. California Counterclaims, Ex. F to Mot. ¶¶ 165-169 (identifying the school district as Fort Bend Independent School District).  Nor does Dexon explain its puzzling assertion (at 8) that its antitrust conspiracy claims against Cisco and CDW entitle it to "new and added damage[s]," when the same conduct supported its earlier counterclaims.

Nor does Dexon try to distinguish cases (Mot. at 8-10) explaining why these "differences" are insignificant.  Instead, it stakes its opposition on an analogy to this Court's decision in *TravelPass Group LLC v. Caesars Entertainment Corp.*, 2019 WL 4071784 (E.D. Tex. Aug. 29, 2019).  But in *TravelPass*, the first- and later-filed cases were brought by *different plaintiffs*:  the first-filed case was a consumer class action seeking to recover out-of-pocket costs, whereas the later-filed case was brought by businesses seeking to recover alleged diminution in the value of their businesses.  *Id.* at *1-2.  A plaintiff's choice of forum ordinarily is entitled to weight, and the multi-district litigation process exists to relieve defendants of the need to litigate the same conduct in a multiplicity of forums.  By contrast, Dexon already chose its forum:  the Northern District of California.  It has no right to pick a second.  And, unlike the later-filed case in *TravelPass*, Dexon's complaint does not allege "different claimed damages, different types of antitrust injury . . . , and different parties" – the damages, asserted injury, and parties are essentially identical.  Opp. at 9 (citations omitted).  Dexon suggests (*id.*) it is better situated than

---

[3] Dexon's assertion that Cisco is attempting to monopolize this highly competitive and fractured "market" is without any factual merit.  Indeed, the only alleged conduct related to IP Phones (Compl. ¶¶ 65, 86) involved Cisco supposedly *dissuading* a customer from purchasing *Cisco* phones (from Dexon).  That has nothing to do with attempted monopolization.

the parties in *TravelPass* because the claims in the first-filed case "had already survived a motion to dismiss, and thus this Court had to predict the likelihood of conflicting rulings." But that distinction cuts against Dexon – the fact that Judge Breyer has already granted Cisco's motion to dismiss Dexon's antitrust counterclaims means that the survival of Dexon's antitrust case here would require this Court to disagree with Judge Breyer's rulings.

> **2.    There Is a Risk of Forum-Shopping, Piecemeal Litigation, and Inconsistent Outcomes**

Finally, Dexon's complaint should be transferred because such tactics are abusive and undermine the sound administration of justice.

Dexon denies that it is forum shopping, arguing (at 10) that Cisco "ignores all of the new facts and claims Dexon asserts that clearly make Texas the appropriate forum." *See also* Opp. at 3. But the objective facts point in the other direction. It was not until after Judge Breyer dismissed Dexon's antitrust claims that Dexon filed the current complaint. Because it filed these claims in one court, failed, and filed them in another court, it is forum shopping, plain and simple. *See*, *e.g.*, Mot. at 10 (citing *Alexander v. Franklin Res., Inc.*, 2007 WL 518859, at *4 (N.D. Cal. Feb. 14, 2007) ("One could reasonably infer forum shopping here, where the same plaintiff represented by the same law firm filed a similar lawsuit in New Jersey, and after receiving unfavorable rulings from that court, filed the instant case.")).

Dexon's response to the risk of piecemeal litigation and inconsistent outcomes is also unpersuasive. Dexon cannot bring itself to say (at 11) that no Court has considered *Cisco's arguments* to dismiss the complaint – it instead says that no Court has considered "many of the arguments." *See also* Opp. at 3 ("no Court has ruled upon the current Complaint and its newly pled facts and claims. Cisco can and has made arguments specific to this Complaint."). But every later-filed case will give a defendant the opportunity to make *some* new arguments. It is

the overlapping arguments – of which there are many here – that create the potential for inconsistent outcomes that the rule is intended to avoid.

Finally, Dexon is simply incorrect (at 11) that any resources spent in California "have been spent due to Cisco's decision to pursue its claims" there.  As has been emphasized, Dexon chose to file its antitrust counterclaims in California.  And considerable sums have since been spent opposing Dexon's amended counterclaims in that forum.

### III.   CONCLUSION

For the foregoing reasons, and any others that this Court may consider just, Dexon's lawsuit should be transferred to the Northern District of California.

Dated:  July 14, 2022                       Respectfully submitted,

                                            /s/ Deron R. Dacus
                                            DERON R. DACUS (Bar No. 00790553)
                                            THE DACUS FIRM, PC
                                            821 ESE Loop 323, Suite 430
                                            Tyler, TX 75701
                                            (903) 705-1177
                                            ddacus@dacusfirm.com

                                            AARON M. PANNER (pro hac vice)
                                            ALEX A. PARKINSON (pro hac vice)
                                            KYLIE C. KIM (pro hac vice)
                                            RYAN M. FOLIO (pro hac vice)
                                            KELLOGG, HANSEN, TODD,
                                               FIGEL & FREDERICK, P.L.L.C.
                                            1615 M Street, N.W., Suite 400
                                            Washington, D.C. 20036
                                            (202) 326-7900
                                            apanner@kellogghansen.com
                                            aparkinson@kellogghansen.com
                                            kkim@kellogghansen.com
                                            rfolio@kellogghansen.com

                                            RICHARD J. NELSON (pro hac vice)
                                            LOUIS P. FEUCHTBAUM (pro hac vice)
                                            SIDEMAN & BANCROFT LLP
                                            One Embarcadero Center
                                            Twenty-Second Floor

8

**App.621**

San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Attorneys for Defendant Cisco Systems, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on this July 14, 2022 with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.


*/s/ Deron R. Dacus*
Deron R. Dacus

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 5:22-cv-00053-RWS-JBB |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. and CDW CORPORATION, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

### REPLY IN SUPPORT OF DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO DISMISS UNDER RULE 12(b)(6)

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com

July 14, 2022

*Counsel for Cisco Systems, Inc.*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 1

I. The Rule Against Claim-Splitting Bars Dexon's Claims (Counts I-VI) ........................... 1

II. Dexon's Conspiracy Claims Fail (Counts I-II, VI) ............................................................ 3

III. Dexon Fails To Allege An Actionable Tying Claim (Counts III & VI) ............................ 6

IV. Dexon's Monopolization Claims Fail (Counts IV-VI) ...................................................... 8

V. Dexon Lacks Antitrust Injury (Counts I-VI) ................................................................. 10

CONCLUSION ........................................................................................................ 10

**App.625**

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple Inc. v. Pepper*,
 139 S. Ct. 1514 (2019)................................................................ 8

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009)..................................................................... 9

*Atl. Richfield Co. v. USA Petroleum, Co.*,
 495 U.S. 328 (1990).................................................................. 10

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007)............................................................... 4, 8

*Bodet v. Charter Commc'ns Inc.*,
 2010 WL 5094214 (E.D. La. July 26, 2010) .............................. 6

*Brown v. Barrett Burke Wilson Castle Daffin & Frappier, L.L.P.*,
 2006 WL 3300047 (N.D. Tex. Oct. 13, 2006) ........................... 3

*Burdett Sound, Inc. v. Altec Corp.*,
 515 F.2d 1245 (5th Cir. 1975) ................................................... 4

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
 123 F.3d 301 (5th Cir. 1997) ..................................................... 4

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
 504 U.S. 451 (1992).................................................................... 7

*Eldridge v. Kohls Dep't Stores, Inc.*,
 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020).......................... 2

*Federated Dep't Stores, Inc. v. Moitie*,
 452 U.S. 394 (1981).................................................................... 1

*Fernandez-Montes v. Allied Pilots Ass'n*,
 987 F.2d 278 (5th Cir. 1993) ..................................................... 2

*Graphic Prods. Distribs., Inc. v. ITEK Corp.*,
 717 F.2d 1560 (11th Cir. 1983) ................................................. 6

*H & B Equip. Co. v. Int'l Harvester Co.*,
 577 F.2d 239 (5th Cir. 1978) ..................................................... 5

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
 677 F.2d 1045 (5th Cir. 1982) ................................................... 8

*Marucci Sports, L.L.C. v. NCAA*,
 751 F.3d 368 (5th Cir. 2014) ................................................. 4, 6

*Medtronic AVE, Inc. v. Cordis Corp.*,
 2004 WL 7322043 (E.D. Tex. Mar. 18, 2004) ........................... 6

*Moch v. E. Baton Rouge Par. Sch. Bd.*,
548 F.2d 594 (5th Cir. 1977) ............................................................. 1

*Nasser v. Fin. of Am. Reverse LLC*,
2021 WL 966007 (S.D. Tex. Mar. 15, 2021).......................................... 2

*Pimpanit v. Phumswarng, Inc.*,
2022 WL 866290 (5th Cir. Mar. 23, 2022)............................................ 3

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
517 F.2d 117 (5th Cir. 1975) ............................................................. 3

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*,
637 F.2d 1001 (5th Cir. 1981) ........................................................... 5

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
28 F.3d 1379 (5th Cir. 1994) ............................................................. 6

*Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*,
940 F. Supp. 1026 (E.D. Tex. 1996) ................................................. 10

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*,
200 F.3d 307 (5th Cir. 2000) ............................................................. 9

*Test Masters Educ. Servs., Inc. v. Singh*,
428 F.3d 559 (5th Cir. 2005) ........................................................ 1, 3

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
89 F.3d 233 (5th Cir. 1996) ............................................................. 8

*United States ex rel. Paul v. Parsons, Brinkerhoff, Quade & Douglas, Inc.*,
860 F. Supp. 370 (S.D. Tex. 1994) ................................................... 3

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004).......................................................................... 9

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
627 F.3d 85 (3d Cir. 2010)................................................................ 6

## INTRODUCTION

Dexon has no antitrust claims – under Section 1, Section 2, or state law; whether styled as a conspiracy or single-firm conduct – because it fails to allege that Cisco's conduct foreclosed competitors' sales in the supposed relevant markets.  That is why Judge Breyer dismissed Dexon's nearly identical claims; that dismissal now carries preclusive effect.  And it is why, res judicata aside, Dexon's failure to allege that a single customer was forced to buy Cisco's equipment *rather than a competitor's equipment* (i.e., conduct that *foreclosed competition*) is just as fatal here.  Moreover, Dexon has failed to establish antitrust injury:  it does not and cannot allege that Dexon was harmed as a result of sales supposedly lost *by Cisco's competitors in the equipment markets*.  Dexon is an unhappy would-be reseller that Cisco decided to exclude from its distribution chain because it engaged in business practices that harmed Cisco's brand; it has no legitimate antitrust claims.

## ARGUMENT

### I.    The Rule Against Claim-Splitting Bars Dexon's Claims (Counts I-VI)

Claim preclusion bars Dexon's claims (Counts I-VI), which are indistinguishable from those the court dismissed in the California action.  *See* Cisco Br. 11-13.[1]

A.    Dexon concedes that the dismissal of the California counterclaims is a final adjudication on the merits.  *See Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981).  That preclusive ruling followed the California court's dismissal of Dexon's nearly identical antitrust claims, *see* Mot. To Transfer 4-6, which Dexon did not replead when given the

---

[1] Dexon relies (at 14 n.2) on dicta to argue that preclusion cannot be decided on the pleadings – but the case it cites recognized that district courts have discretion to resolve this issue on a motion under Rule 12(b)(6).  *See Moch v. E. Baton Rouge Par. Sch. Bd.*, 548 F.2d 594, 596 n.3 (5th Cir. 1977); *see also, e.g.*, *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 576 (5th Cir. 2005) (affirming dismissal).

chance.  Dexon's argument (at 9-11) that its failure to amend leaves it free to file its antitrust claims in a *different* court has no precedential support and is contrary to the only case either party cites that addresses this scenario.  *See Eldridge v. Kohls Dep't Stores, Inc.*, 2020 WL 1528233, at *2 (W.D. Okla. Mar. 30, 2020) (holding that a dismissal "without prejudice" takes on preclusive effect when "Plaintiff did not seek leave to amend his petition").  Dexon contends (at 11) that *Eldridge* is distinguishable because Dexon "investigated its claims" and refiled before this Court, but Dexon did not do so *in the California action* – giving that court's adjudication preclusive effect.  *See id.* (failure to "resuscitate the claims" in the initial lawsuit makes that earlier dismissal res judicata).

Dexon has no support for its effort to split its claims.  It cites (at 9) *Fernandez-Montes v. Allied Pilots Association*, 987 F.2d 278, 284 n.8 (5th Cir. 1993), where the court said only (and in dicta) that denial of leave to amend with prejudice is res judicata as to any claim in a proposed amended complaint.  That statement – which identifies one situation when res judicata *does* apply – says nothing about this scenario, where a court dismissed Dexon's antitrust claims with leave to amend, Dexon chose not to, and the court subsequently dismissed Dexon's lawsuit with prejudice.  And *Nasser v. Finance of America Reverse LLC*, 2021 WL 966007 (S.D. Tex. Mar. 15, 2021) (cited by Dexon at 10), is likewise inapposite.  There the court held that dismissal of an amended complaint was not preclusive as to claims in the original complaint that the plaintiff abandoned in the amendment before any adjudication (i.e., no court ever dismissed the abandoned claims, with or without prejudice, unlike here).  *See id.* at *2.

**B.**     Dexon's assertion (at 11-14) that its claims here are distinguishable from those in the California lawsuit is no better supported.  Its claims involve the same markets and the same conduct and thus obviously arise from the same "transaction, or series of connected transactions,

out of which the original action arose," *Test Masters Educ. Servs.*, 428 F.3d at 571, as Cisco has shown, *see* Mot. To Transfer 4-6.  Adding additional (meritless) allegations that it could have raised before cannot change that.  Even accepting Dexon's spurious distinctions (tbl. at 11-12), Dexon concedes that the majority of its complaint is copied from its California complaint.  The naming of a new defendant – particularly one admittedly referenced in the original action – does not undermine claim preclusion.  *See Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 122-23 (5th Cir. 1975).  *Pimpanit v. Phumswarng, Inc.*, 2022 WL 866290, at \*2-3 (5th Cir. Mar. 23, 2022) (per curiam) does not support Dexon because the court there found that allegations supporting separate claims of unpaid wages and labor retaliation – unlike Dexon's related antitrust claims here – did "not create one transaction."  Dexon cites no support for its assertion (at 13) that conspiracy allegations involving CDW – already alleged in support of its earlier Section 2 claim – require "their own trial unit"; all claims would require similar proof of market definition and market power, the Cisco conduct Dexon alleges was exclusionary (cutting Dexon out of its distribution chain), and market-wide effects.[2]  *See Brown v. Barrett Burke Wilson Castle Daffin & Frappier, L.L.P.*, 2006 WL 3300047, at \*5 (N.D. Tex. Oct. 13, 2006).

## II.    Dexon's Conspiracy Claims Fail (Counts I-II, VI)

Cisco showed that the conspiracy claims fail under Section 1 (Count I), Section 2 (Count II), and state law (Count VI) for three independent reasons.  *See* Cisco Br. 14-17.[3]

---

[2] Dexon draws its "trial unit" standard from state law.  *See Pimpanit*, 2022 WL 866290, at \*2 (applying "Texas law" to determine the preclusive effect of a state court's adjudication).  In any event, "whether two claims could have formed a 'convenient trial unit' is a jurisdictional question" – and there is no doubt as to whether the California court could have exercised jurisdiction over all claims Dexon asserts.  *United States ex rel. Paul v. Parsons, Brinkerhoff, Quade & Douglas, Inc.*, 860 F. Supp. 370, 374 (S.D. Tex. 1994) (granting dismissal).

[3] Dexon asserts (at 20-21) that Cisco did not "engage" on the Section 2 conspiracy claim, but Cisco demonstrated that the deficiencies of Dexon's allegations are fatal to both; Dexon does not claim that the Section 2 conspiracy claim can survive if the Section 1 claim is dismissed.

**A.** Dexon's conspiracy claims fail because Dexon makes no *factual* allegations of any actionable agreement between Cisco and CDW. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Dexon cites (at 14-15) *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368 (5th Cir. 2014), which confirmed that "posit[ing], without further detail, that [defendants] have engaged in a conspiracy which consisted of an understanding and concert of action" fails after *Twombly*. *Id.* at 375 (cleaned up). The sparse allegations Dexon cites (at 15; Compl. ¶¶ 56-57, 60, 62-63) provide no more than what *Twombly* and *Marucci* held to be insufficient: assertion on "information and belief" (*id.* ¶ 60) that there was an agreement – without any who, what, where, when, or why facts. That is fatal because the conduct alleged – CDW's rational decision to sell Cisco's equipment to a customer that wanted Cisco equipment after Cisco decided not to supply Dexon – "could just as well be independent action." *Twombly*, 550 U.S. at 557.

**B.** In any event, an agreement between Cisco and its distributor governing sales of Cisco equipment would be *per se* lawful. *See* Cisco Br. 14-15. Dexon (at 16) mischaracterizes *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975), as a unilateral refusal-to-deal case. In fact, the Fifth Circuit stated that allegations "tend[ing] to show only an agreement between [a manufacturer] and [a distributor]," and "no horizontal conspiracy among competitors," are insufficient to state a claim. *Id.* at 1248. The court held a vertical distribution agreement is "simply not an antitrust violation" because such a "unilateral" agreement involves no "horizontal" agreement among competitors. *Id.* at 1248-49. And *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301, 307-08 (5th Cir. 1997), considered market effects of an alleged *horizontal* conspiracy *among competitors*, "unlike the typical dealer substitution case where the manufacturer is acting unilaterally in its best interests or pursuant to a vertical agreement with the new supplier." The court made clear that the latter

4

**App.631**

type of agreement – which is all that Dexon alleges – is *per se* lawful.  *See id.*

    **C.**    Dexon acknowledges its failure to allege that the supposed conspiracy had any market-wide effect, instead arguing (at 16-18) that such a showing is unnecessary.  That is contrary to controlling law, such as *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981), where the Fifth Circuit confirmed that "a plaintiff must show that the defendants' conduct" in a vertical conspiracy "has an adverse effect on competition."  *Id.* at 1005.  Dexon tries evading this law by noting (at 17) that one of Cisco's cases is about exclusive dealing.  But for conduct to be unlawful under the Sherman Act, it must impair the opportunities of rivals – otherwise, there is no effect on *competition*.  *See H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978).[4]

    Dexon posits (at 17-18) that its sales are significant to competition because Dexon "provides an opportunity for Cisco's competitors to penetrate the Relevant Product Markets." But it does not allege that other distributors cannot do the same; in any event, Dexon's assertion ignores that the supposed purpose of the asserted conspiracy was *not* to prevent Dexon from selling rival manufacturers' equipment but to prevent Dexon from selling *Cisco's equipment*.  If Dexon were an effective distributor, then its removal from Cisco's distribution chain would *benefit* Cisco's equipment competitors.  *See* Cisco Br. 24 n.4.  Tellingly, Dexon draws support (at 18) from a footnote in an inapposite Eleventh Circuit case about territorial divisions that – in the next paragraph, which Dexon omits – undermines Dexon's position:  "We have emphasized

---

[4] Dexon asserts (*e.g.*, at 3) that because it claims Cisco has a monopoly in certain network equipment, *intra*brand competition – that is, competition among distributors to sell Cisco equipment – also matters.  But it does not (and cannot) explain how or why, particularly when distributors can continue to sell other manufacturers' products, whether or not they sell Cisco products.  And even if it could matter, Dexon does not allege any *distributor-level* market for any product.  It asserts only claims implicating *inter*brand competition among Cisco and its rival manufacturers; its failure to allege any harm to *that* competition is thus fatal.

time and again that mere termination of a dealer – *even an arbitrary and unfair termination* –

does not constitute an antitrust violation." *Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717

F.2d 1560, 1571-72 & n.20 (11th Cir. 1983) (emphasis added).[5]

### III.     Dexon Fails To Allege An Actionable Tying Claim (Counts III & VI)

Dexon does not contest that, unless Cisco *foreclosed* the sale of competitors' equipment

in the tied markets – i.e., a customer wanted to purchase *another* manufacturer's equipment but

was blocked from doing so because of Cisco's conduct – the tying claims fail under federal law

(Count III) and state law (Count IV).  *See* Cisco Br. 17-23.

**A.**     Dexon's opposition confirms that it has no allegation of foreclosure.  It highlights

(at 6-7) a bank that bought equipment "it did not need" (from any manufacturer), a school district

that had to "*cancel*" an order (of Cisco equipment), an energy company that wanted Cisco

equipment and bought Cisco equipment ("from a vendor other than Dexon"), and an auto dealer

that "could not buy" any new equipment (so it never did).  In no instance does Dexon allege that

Cisco's conduct foreclosed any sale of any competitor's equipment.  Dexon instead focuses

(at 21-22) on coercion – a separate element from foreclosure.  *See, e.g., Marucci Sports*, 751

F.3d at 376; *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994);

*Klo-Zik Co. v. Gen. Motors Corp.*, 677 F. Supp. 499, 503 (E.D. Tex. 1987); *cf. Bodet v. Charter

Commc'ns Inc.*, 2010 WL 5094214, at *5-6 (E.D. La. July 26, 2010) (cited by Dexon at 21-22;

defendant disputed coercion, not foreclosure).  For example, Dexon cites (at 21) *Medtronic AVE,*

---

[5] Dexon also cites (at 19) an out-of-circuit discussion of a Section 2 attempted monopolization claim in *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85, 109 (3d Cir. 2010), ignoring that – as to the Section 1 conspiracy claim – the plaintiff had alleged that the conspiracy "resulted in increased premiums and reduced output in the market for health insurance," *id.* at 100-01 – that is, a market-wide effect.  Here, Dexon does not (and cannot) allege that *its* loss of a single sale of *Cisco* equipment to another distributor of Cisco equipment had a market-wide effect on prices or output in the alleged markets.

*Inc. v. Cordis Corp.*, 2004 WL 7322043, at *4 (E.D. Tex. Mar. 18, 2004), where the court noted the plaintiff alleged coercion *and* "that competition was substantially foreclosed in the market."

Dexon's two attempts to manufacture foreclosure allegations both fail:

**1.**     *First*, Dexon's argument (at 22-23) about the "timing at issue" does nothing to address its failure to allege foreclosure.  There is no allegation that Cisco conditions the provision of service on previously purchased Cisco equipment on a customer agreeing to purchase new Cisco equipment *instead of* a competitor's new equipment.  Any such allegation would make little sense:  if a customer were considering abandoning old Cisco equipment for a competitor's new equipment, threatening to withhold service on the old Cisco equipment would hardly stop them.  *See* Cisco Br. 21-22.  This case is thus nothing like *Kodak*, in which the plaintiffs claimed foreclosure of competitors' sales in the tied market – for after-market service – as a direct result of the alleged tie.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 475-78 (1992).  In *Kodak*, there was no preexisting contract giving independent servicers of Kodak copiers the right to purchase Kodak parts, which was the alleged tying product.  Also, the timing of the alleged tying was relevant there because, unlike what is alleged here, customers were forced to purchase service (the tied product) to obtain parts; it makes no sense to allege that Cisco forced customers to purchase equipment in order to obtain service on *that equipment*.

**2.**     *Second*, Dexon asserts (at 23) that *any* sale of Cisco equipment "inevitably leads to the foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent."  But that allegation gets Dexon nowhere in the context of its tying claims: the majority of customers Dexon identifies either already planned to purchase Cisco equipment (the energy company, Compl. ¶ 7; the hospital, *id.* ¶ 59; the school district, *id.* ¶ 65) or did not buy any additional equipment (the 911 center, *id.* ¶ 8; the auto dealership, *id.* ¶ 51).  That leaves

Dexon with a single-paragraph allegation about a bank that bought Cisco equipment (*id.* ¶ 3), but no allegation that this preexisting Cisco customer would *ever* have preferred to purchase non-Cisco equipment.  *See Twombly*, 550 U.S. at 555 (speculation fails).  Dexon's allegations even make such naked speculation implausible:  it asserts that preexisting Cisco customers (like the bank) do not prefer "[t]ransitioning" to other manufacturers because the process is "expensive." Compl. ¶ 32.  Nor does Dexon allege that *this* bank has a limited IT budget, such that it could not choose equipment on the merits down the road.  *Cf.* Dexon Br. 23.

        **B.**      Dexon cannot evade the foreclosure requirement by asserting (at 22) that it brings a *per se* tying claim.  To start, there is no factual allegation that Cisco denied contracted-for service unless the customer buys new Cisco equipment – i.e., no actual tie.  *See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048 n.5 (5th Cir. 1982).  Dexon's argument (at 24) that "customers asked for and received initial assurances from Cisco that they would receive the service," on which Cisco subsequently reneged, sounds in contract – not antitrust.  *See United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996).  And Dexon gives away the game on its "per se" claim by acknowledging (at 25) that customers can evade any tie by paying a higher price *for the service* (i.e., the "recertification fee").  Dexon's response is only to cite (at 25) the dissent in *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1526 (2019) (Gorsuch, J., dissenting) – which concerned standing, not substantive tying law, *see id.* at 1519 – ignoring the Fifth Circuit's statement that a price increase is not a tie as a matter of law.  *See* Cisco Br. 23.  In the absence of any allegation that any customer was forced to buy Cisco equipment *rather than* a competitor's, there is no tie.

**IV.    Dexon's Monopolization Claims Fail (Counts IV-VI)**

        To make out a claim under Section 2 for monopolization (Count IV) or attempted

monopolization (Count V) – or the state law equivalents (Count VI) – Dexon must allege

exclusionary conduct. *See* Cisco Br. 23-24 (citing *Verizon Commc'ns Inc. v. Law Offices of*

*Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (requiring "anticompetitive conduct")).[6]

    **A.**    Dexon makes *no* factual allegation that Cisco's conduct prevented a single rival

manufacturer's selling equipment in any of the alleged markets. Dexon instead asserts (at 26)

that Cisco's conduct – removing Dexon from its distribution chain – "tends to impair the

opportunities of rivals" without explaining how or why. Cisco showed that Dexon's unsupported

conclusion "make[s] no economic sense," *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass*

*Discount Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir. 2000), because Cisco's incentive is to keep its

distribution chain competitive with low distributor margins, *see* Cisco Br. 26. Dexon does not

contest that logic, but instead claims (at 27) it "improperly goes outside the pleadings" – ignoring

that dismissal on the pleadings is proper if a claim is not plausible in light of "judicial experience

and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). And Dexon does not dispute

Cisco's showing, *see* Cisco Br. 26-27, that it may lawfully terminate Dexon as a distributor –

even if it might harm Dexon or Cisco's equipment-manufacturing rivals (as in *Trinko*).

    **B.**    In any event, there is no competitive effect alleged here. Dexon agrees (at 27)

that the relevant markets entail billions in annual sales; the complaint highlights six sales that at

most each constituted "tens or hundreds of thousands of dollars." Dexon thus alleges no facts to

support any claim that Dexon is a competitively significant seller in any alleged relevant market.

Much more is required to plead a claim under Section 2.

---

[6] Dexon asserts (at 25) that Cisco "does not challenge" that "Cisco possesses monopoly power" – that is misleading at best. Cisco has already challenged the legal sufficiency of the monopolization claims; should Cisco be required to answer, it will deny the untrue allegations of the complaint (accepted as true on a motion to dismiss), including allegations that Cisco possesses monopoly power in any well-defined market.

## V.     Dexon Lacks Antitrust Injury (Counts I-VI)

Dexon's failure to allege antitrust injury warrants dismissal of all of its federal and state antitrust claims.  *See* Cisco Br. 28-30.  Dexon does not dispute that it must plausibly allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Atl. Richfield Co. v. USA Petroleum, Co.*, 495 U.S. 328, 334 (1990).  Nor does Dexon contest that it must plead an injury resulting from reduced competition *among manufacturers* in the alleged Relevant Product Markets (but Dexon says only that it was harmed by losing sales of *Cisco's equipment*).  *See* Cisco Br. 29.  Dexon instead asserts (at 29) that it was harmed when it could not sell *Cisco's equipment* – losing sales of Cisco equipment (and goodwill) – by a supposed conspiracy to sell Cisco equipment to a customer that had already decided to purchase Cisco equipment.  That is nothing like the case Dexon cites (at 29) – *Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*, 940 F. Supp. 1026 (E.D. Tex. 1996) – in which the plaintiffs competed with the defendants in the alleged markets for glass repair.  *See id.* at 1029 ("Plaintiffs and Defendants are competitors in the business of repair and replacement of auto glass[.]").  There, an effect of the conspiracy was to foreclose competitors' sales of their services in the markets alleged.  *See id.* at 1035.  By contrast, Dexon does not allege, as it must, that (a) any conduct foreclosed competition in the equipment markets alleged and, (b) that such foreclosure in those equipment-manufacturing markets somehow harmed Dexon.

### CONCLUSION

For the foregoing reasons, if Dexon's lawsuit is not transferred to the Northern District of California, the complaint should be dismissed with prejudice.

Dated:  July 14, 2022

Respectfully submitted,

*/s/ Deron R. Dacus*
DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Attorneys for Defendant Cisco Systems, Inc.*

11

**App.638**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on this July 14, 2022 with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first class mail on this same date.


_/s/ Deron R. Dacus_
Deron R. Dacus

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

### DEXON COMPUTER INC.'S SURREPLY IN OPPOSITION TO DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

I.     INTRODUCTION ....................................................................................... 1

II.    ARGUMENT ............................................................................................... 1

       A.    Res Judicata Does Not Bar Dexon's Complaint ....................................... 1

       B.    The Cisco-CDW Conspiracy Violates Sections 1 and 2
             Of The Sherman Act ....................................................................................... 4

       C.    Cisco Engaged In Illegal Tying In Violation of Section 1 and
             Monopolization of the Relevant Product Markets in Violation of Section 2 .......... 7

       D.    Dexon Has Sustained An Antitrust Injury ............................................. 10

III.   CONCLUSION............................................................................................ 10

## <u>TABLE OF AUTHORITIES</u>

CASES:

*Burdett Sound, Inc. v. Altec Corp.*,
   515 F.2d 1245 (5th Cir. 1975) ............................................................................5

*Carpenters Loc. Union No. 1846 of United Bhd. of Carpenters & Joiners of Am.,*
*AFL-CIO v. E.I. Dupont De Nemours & Co.*,
   1981 WL 2221 (E.D. La. May 28, 1981).............................................................4

*Coopers & Lybrand v. Livesay*,
   437 U.S. 463 (1978) ............................................................................................2

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
   123 F.3d 301 (5th Cir. 1997) ..............................................................................5

*Eldridge v. Kohls Dep't Stores, Inc. et al.*,
   2020 WL 1528233 (W.D. Okla. Mar. 30, 2020) ................................................2

*Fernandez-Montes v. Allied Pilots Ass'n*,
   987 F. 2d 278 (5th Cir. 1993) .........................................................................1, 2

*Graphic Prods. Distribs. v. ITEK Corp.*,
   717 F.2d 1560 (11th Cir. 1983) ..........................................................................6

*Image Tech. Servs. Inc. v. Eastman Kodak Co.*,
   125 F.3d 1195 (9th Cir. 1997) ............................................................................9

*Kan. Reinsurance Co. v. Mortg. Corp. of Tex.*,
   20 F.3d 1362 (5th Cir. 1994) ..............................................................................4

*Moch v. E. Baton Rouge Par. Sch. Bd.*,
   548 F.2d 594 (5th Cir. 1977) ..............................................................................4

*Murry v. Gen. Servs. Admin.*,
   553 F. App'x 362 (5th Cir. 2014) .......................................................................4

*Nasser v. Fin. of Am. Reverse LLC.*,
   2021 WL 966007 (S.D. Tex. Mar. 15, 2021) .....................................................2

*N. Mississippi Commc'ns, Inc. v. Jones*,
   792 F.2d 1330 (5th Cir. 1986). ..........................................................................7

*Perington Wholesale, Inc. v. Burger King Corp.*,
   631 F.2d 1369 (10th Cir. 1979) ..........................................................................4

*Pimpanit v. Phumswarng, Inc.*,
    2022 WL 866290 (5th Cir. Mar. 23, 2022) ......................................................3

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ...........................................................................9

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ...........................................................................4

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
    89 F.3d 233 (5th Cir. 1996). ............................................................................9

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ...............................................................................5

*Walker v. U-Haul Co. of Mississippi*,
    747 F. 2d 1011 (5th Cir. 1984) ......................................................................10


TREATISES:

Areeda & Hovenkamp,
    *Antitrust Law* (4th ed. 2020) ..........................................................................7

## I.    INTRODUCTION

Cisco's reply makes the same arguments it made in its original motion, but without accounting for the facts and law that render its arguments meritless.  Cisco argues that res judicata precludes Dexon's suit but fails to engage with Fifth Circuit law confirming that the Northern District of California's prior rulings have no preclusive effect on Dexon's antitrust claims.  Cisco reasserts that its conduct has not foreclosed competition, but ignores that its anticompetitive ties have forced purchases of its own products precluding sales by its Networking Equipment competitors, especially where small, victimized businesses do not have sufficient IT budgets to replace the Cisco equipment that Cisco refuses to service.  Finally, Cisco claims before discovery that its "deci[sion] to exclude [Dexon] from its distribution chain" (Dkt. 32 ("Reply") at 1) does not result in an antitrust injury, but again overlooks that it conspired with CDW to restrain inter-brand and intra-brand competition and coerce customers away from Dexon.  Cisco also forced Dexon to lose sales because Cisco would starve customers of needed service if customers did not comply with Cisco's demands to withdraw their purchases from Dexon.  These are prototypical examples of antitrust injury, and the Court should not permit Cisco to mischaracterize the facts on a motion to dismiss.

## II.    ARGUMENT

### A.    Res Judicata Does Not Bar Dexon's Complaint

Dexon's opposition to Cisco's motion explains that when the Northern District of California denied Dexon's motion to amend its counterclaims, that order did not address Dexon's antitrust claims.  (Dkt. 24 ("Opp.") at 9-10.)  Thus, under binding Fifth Circuit law, "when [such] leave is denied with prejudice, the denial is res judicata as to any claim in the proposed amended complaint [but] the bar does not extend beyond the claim or cause of action that was pleaded in the complaint." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F. 2d 278, 284 n.8 (5th Cir. 1993).

Cisco claims this holding "says nothing about this scenario" (Reply at 2), but the Fifth Circuit specifically confirmed that the denial of such an amendment "does not preclude a new suit on different factual allegations that call into play different legal principles." *Fernandez-Montes*, 987 F. 2d at 284 n.8. Cisco does not, because it cannot, contest that this Complaint is precisely such a new suit, involving claims that were not compulsory in California. Cisco also does not challenge that a final judgment "depends on the existence of a decision by the District Court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment," which does not exist here. (Opp. at 10 (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 467 (1978).)

Cisco carries through its error in its reading of *Nasser v. Finance of America Reverse LLC*, 2021 WL 966007 (S.D. Tex. Mar. 15, 2021). In *Nasser*, the Southern District found that it was unaware of any "caselaw support for the proposition that simply omitting a previously pled claim from an amended complaint in federal court, without more, mandates the application of judicial estoppel to prevent a plaintiff from later pursuing this claim" in a new action. *Id.* at *2. Cisco argues that this case is inapposite because the court did not dismiss Nasser's original complaint (Reply at 2), but that is a red herring. *Nasser* premised its holding on whether the plaintiff made "clear and unequivocal statements [] that he had abandoned" his prior claims (2021 WL 966007, at *2), and even noted that the Defendants "could not have reasonably relied on the amended complaint to believe that Dr. Nasser had completely abandoned these claims." *Id.* at 2 n.2. Cisco also could not rely on Dexon's amended complaint, and Cisco does not dispute that Dexon made no such clear and unequivocal statements withdrawing its antitrust claims.

Cisco's continued reliance on the Western District of Oklahoma's opinion in *Eldridge v. Kohls Dep't Stores, Inc.* disregards the circumstances of that case. 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020). In *Eldridge*, the re-asserted claims were dismissed with prejudice because they

were "more bareboned" than the same claims the Judge previously dismissed.  *Id.* at *1.  To that end, the court dismissed Eldridge's claims with prejudice because the plaintiff "fail[ed] to identify any facts against Defendant First Premier from which the Court could discern that it violated" any law at issue.  *Id.* at *2.  Cisco argues that Dexon did not "resuscitate" its claims but ignores that Dexon *added claims* and provided a host of further details about Texas-based antitrust violations.  (Opp. at 11-12.)  The Court should find that Cisco's reliance on an out-of-district, distinguishable case instead of binding authority is misguided.

Finally, Cisco argues that res judicata applies because the Complaint and the prior counterclaims "involve the same markets and the same conduct and thus obviously arise from the same 'transaction, or series of connected transactions, out of which the original action arose.'"  (Reply at 2-3.)  This argument fails on every score:  there are wholly new US and Global Markets alleged in the Complaint (Compl. ¶¶ 69-77), the prior counterclaims in no way pled a conspiracy or an antitrust violation specific to Texas (*id.* ¶¶ 87-100, 131-137), and there are no "connected transactions" alleged between the cases.  Cisco further claims that "all claims would require similar proof of market definition and market power" (Reply at 3), but that is belied by the fact that each Market and Cisco's monopoly power in each Market can be shown with its own proof, as Cisco states in a footnote that "should [it] be required to answer, [Cisco] will deny . . . that [it] possesses monopoly power in any well-defined market."  (Reply at 9, n.6.)  Cisco further adds that the prior counterclaims and Complaint both require proof of exclusionary conduct (Reply at 3), but all the new and different types of exclusionary conduct across the country will be brought to bear in this case.  (Opp. at 11-12.)  Cisco's broad-brush arguments about general antitrust requirements are insufficient to show that the cases are a single "trial unit," and Cisco does not contest the Fifth Circuit's holding in *Pimpanit v. Phumswarng, Inc.* that mere "relatedness" is insufficient to show

that a prior case has a preclusive effect on a subsequent case.  2022 WL 866290, at *2-3 (5th Cir. Mar. 23, 2022).

For these reasons, Cisco's argument that Dexon's claims are precluded should be rejected.[1]

B.     **The Cisco-CDW Conspiracy Violates Sections 1 and 2**

Cisco's motion to dismiss argues that Dexon did not plead a conspiracy.  In response Dexon explains how Cisco and CDW conspired to take coordinated steps to foreclose Dexon from making sales in the Relevant Networking Equipment Markets by, *inter alia*, portraying CDW as a "savior" to a Pennsylvania hospital system while Cisco simultaneously threatened the customer, as well as entering into an agreement whereby CDW would not sell to Dexon.  (Opp. at 15.)  On reply, Cisco does not address any of these allegations, but instead suggests that allegations made upon "information and belief" are insufficient.  (Reply at 4.)  But it has been "consistently recognized [by courts] that a conspiracy is difficult to prove because much of the necessary information is in the hands of the defendants, and much of the proof is by inference."  *Carpenters Loc. Union No. 1846 of United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. E.I. Dupont De Nemours & Co.*, 1981 WL 2221, at *7 (E.D. La. May 28, 1981).  "In such cases, some information and a reasonable belief is adequate on which to base a complaint."  *Id.*; *see also Perington Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1372 (10th Cir. 1979) ("In antitrust actions such as this, where the proof is in the hands of the alleged conspirators . . . allowing such pleading when the conduct complained of is otherwise fairly noticed seems appropriate.").  Dexon's allegations detail (i) the

---

[1] Cisco's reliance on *Moch v. E. Baton Rouge Par. Sch. Bd.*, 548 F.2d 594 (5th Cir. 1977) and *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559 (5th Cir. 2005) for the proposition that "district courts have discretion to resolve th[e res judicata] issue on a motion under Rule 12(b)(6) motion."  (Reply at 1, n.1.)  In *Moch*, the district court entertained the res judicata argument because it "held a hearing and treated defendants' motion more like a motion for summary judgment than like a 12(b)(6) motion."  548 F.2d at 596 n.3.  In *Test Masters*, the Fifth Circuit found that the plaintiff's action was not estopped by res judicata, 428 F.3d at 572, and although the district court did resolve the issue of res judicata on a 12(b)(6) motion, such dismissal is appropriate only "when the elements of *res judicata* are apparent on the face of the pleadings."  *Murry v. Gen. Servs. Admin.*, 553 F. App'x 362, 364 (5th Cir. 2014) (citing *Kan. Reinsurance Co. v. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994)).

co-conspirators, (ii) the conspirators' respective motivations and intent, (iii) the sequencing of their coordinated conduct, (iv) the impact of that conduct, and (v) how, most recently, CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest).  (Compl. ¶¶ 56-63, 87-100.)  These facts are more than sufficient at this stage to plead a conspiracy.

Cisco's next argument that the conspiracy was either "per se legal" or did not harm competition (Reply at 4-5) rests on a mischaracterization of the allegations.  Cisco overlooks that *Burdett Sound, Inc. v. Altec Corp.* was a case involving a "mere unilateral change of distributors," 515 F.2d 1245, 1248 (5th Cir. 1975), which is fundamentally distinct from a distributor conspiring with a monopolist to coerce customers away from the vendor they wanted to use.  (Compl. ¶¶ 60-61.)  Cisco also does not engage with the facts of *Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F.3d 301 (5th Cir. 1997), in which no defendant had market power (*id.* at 310), and there was "no opportunity to dominate, much less to attempt or conspire to monopolize." *Id.* at 312.  Here, the object and result of the Cisco-CDW conspiracy was to maintain Cisco's monopoly power while giving CDW a profit boost at the same time.

Cisco's failure to engage with case law that bears upon these facts confirms the correct result.  In *W. Penn Allegheny Health Sys., Inc. v. UPMC*, the Third Circuit sustained an antitrust conspiracy in which a dominant insurer allegedly conspired with a favored hospital to disadvantage the plaintiff hospital, finding that such "conspiracies to exclude a rival" are one type of anticompetitive conduct.  (Opp. at 19.)  Cisco's only response in a footnote is that the *West Penn* conspiracy "resulted in increased premiums and reduced output," and Dexon does not make such allegations. (Reply at 6, n.5).  But Dexon does make these allegations:  the Cisco-CDW conspiracy maintains supra-competitive prices to customers of Networking Equipment, harms innovation, and

otherwise deprives customers of their ability to make an unfettered choice of technology on the merits." (Compl. ¶ 100; *see also id.* at ¶ 63 (the conspiracy resulted in millions of dollars of overcharges across the country, including for the Pennsylvania Health System).) Cisco cannot credibly claim that its conspiracy with a company that had more than $18 billion in annual revenue (*id.* at ¶ 56) to exclude lower priced competition did not have an anticompetitive effect.

Dexon also explained in its opposition that under *Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560 (11th Cir. 1983) and a consistent line of cases, harm to intra-brand competition is cognizable under Section 1. (Opp. at 18.) Cisco attempts to distinguish this case by rewriting Dexon's claim as a "mere termination of a dealer" (Reply at 5-6), but for the reasons discussed this ignores Dexon's allegations. As the *Graphic Prods.* Court made abundantly clear, "in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect of consumer welfare by eliminating an importance source of competitive pressure on price." 717 F.2d at 1572 n.20. Cisco's conspiracy with CDW precisely targeted this intra-brand competition between CDW and Cisco, seeking to advantage CDW over Dexon, and thus having a substantial harmful effect on consumer welfare.

Finally, Cisco also buries in a footnote its failure to engage on the elements of a Section 2 conspiracy claim, arguing that "the deficiencies of Dexon's allegations are fatal to both [claims]; [and] Dexon does not claim that the Section 2 conspiracy claim can survive if the Section 1 claim is dismissed." (Reply at 3, n.3.) But it was *Cisco's burden* to raise any arguments it thought it had against Dexon's Section 2 conspiracy claim, and Cisco's footnote necessarily states that it has no independent, specific arguments against Dexon's Section 2 conspiracy claim. Indeed, the first three elements of Dexon's Section 2 conspiracy claim are independent and distinct from a Section 1 claim: Cisco had a "specific intent to monopolize," entered into "a combination or conspiracy

to achieve that end," and completed "overt acts in furtherance of the combination or conspiracy." *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). As a result, Cisco concedes these elements for purposes of its motion. The fourth element of a Section 2 conspiracy claim, regarding a sufficient impact on interstate commerce, has been satisfied for the reasons discussed above. (Supra at 5-6.)

The Court should conclude that Dexon has stated Section 1 and Section 2 conspiracy claims.

### C.     Cisco Engaged In Illegal Per Se Tying In Violation of Section 1 and Monopolization of the Relevant Product Markets In Violation of Section 2

*Tying.* Dexon's opposition to Cisco's motion explains that its allegations satisfied all elements of a *per se* tying claim: (1) two separate products, the tying product and the tied product, (2) sufficient market power in the tying market to coerce purchase of the tied product, (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market. (Opp at 21.) Dexon also disputes Cisco's suggestion that Dexon must plead "substantial foreclosure" in the tied product market, because as the Supreme Court made clear, that standard only applies to exclusive dealing claims. (*Id.* at 17.)

On reply, Cisco does not dispute these points, but rather rests its argument on the premise that a harmed customer must be seeking a competitive alternative to Cisco at the precise time of the anticompetitive tie. (Reply at 6.) Cisco cites no case law for this proposition because there is none: foreclosure is assessed with reference to actual *market realities* that result from the imposed restraint. *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1709e3 (4th ed.) ("The practical duration of a tie depends on how soon and in what degree the tied buyer will be free to patronize a rival supplier."). Cisco thus resorts to arguing that "if a customer were considering abandoning old Cisco equipment for a competitor's new

equipment, threatening to withhold service on the old Cisco equipment would hardly stop them." (Reply at 7.)  But that is not what Dexon asserts.  Customers are not "abandoning" their old equipment, but rather are being held hostage by Cisco because customers need service that only Cisco can give them, and the customers either do not have a sufficient budget to buy a competitive alternative or are forced to buy new Networking Equipment that forecloses competitors for even longer.  (*E.g.*, Compl. ¶¶ 4-5, 43, 51, 53.)  Cisco also attempts to rewrite Dexon's allegations to suggest that "Cisco forced customers to purchase equipment in order to obtain service on that equipment" (Reply at 7), but the Complaint alleges that Cisco has threatened to withhold service on an entire installed base of products (regardless of product or utilized vendor), to extract supra-competitive purchases of specific tied products.  (*E.g.*, Compl. ¶¶ 49, 52, 59, 67, 80.)

Cisco also improperly attempts to recast the facts involving each harmed customer suggesting that there is no evidence that each customers "would ever have preferred to purchase non-Cisco equipment."  (Reply at 7-8.)  But customers were counting on the fact, before Cisco's service withdrawal, that they would be free to purchase from whomever they wanted despite agreeing to the initial service package.  (Compl. ¶¶ 7, 13, 46, 50-51, 82.)  Moreover, the reason Cisco identified Dexon as a competitive threat is precisely because Dexon is able to make reliable recommendations to customers that have led to purchases from Cisco's equipment competitors.  (*Id.* at ¶ 13.)  Cisco suggests that Dexon does not plead that the harmed bank had a limited IT budget, but this misses the point:  the bank was forced to spend its budget on Networking Equipment it did not want or need, and thus precluded Cisco's competitors from selling products the customer wanted with the same budget.  (*Id.* at ¶ 3 (expanding Cisco's grip over the customer).)

Finally, Cisco suggests that the tying claim "sounds in contract, not antitrust" (Reply at 8), but in the case Cisco relies, the Court found that the defendant did not have market power in the

tying product and "[m]arket power is a necessary prerequisite to an illegal tie." *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233 (5th Cir. 1996). Here, Cisco concedes that it has monopoly power in the tying Service Markets. The plaintiff in *United Farmers* also contended that the defendant's market power "derived from contractual arrangements" (*id.*), whereas here, Cisco does not dispute that the Relevant Service Markets are validly separate markets from the Relevant Product Markets, and Cisco's Monopolies are derived from its access to customers and high barriers to entry. (Compl. ¶¶ 29-30, 35, 39-44.)

***Monopolization***.   Cisco reiterates its arguments about competitive foreclosure and its alleged right to "lawfully terminate Dexon as a distributor" to contest liability for monopolization and attempted monopolization (Reply at 9), but these arguments fail for the same reasons. Cisco in no way addresses Dexon's arguments that Cisco's customer-focused coercion and FUD-based strategies "'tend[ed] to impair the opportunities of rivals, [and] also either does not further competition on the merits or does so in an unnecessarily restrictive way.'" (Opp. at 26-27 (quoting *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891–92 (5th Cir. 2016).) Rather than attempt to address its conduct, Cisco suggests that the Court use its "judicial experience and common sense" to find that Cisco is incentivized to charge competitive prices. (Reply at 9.) The Court should use its judicial experience and common sense to find that Cisco's (i) threats against its own customers, (ii) supra-competitive sales to those customers and/or service disruptions, and (iii) FUD including false claims (Compl. ¶¶ 111-12, 117-18), are acts of monopolization.

Cisco also does not contest that the same Section 1 conduct that *Image Tech. Servs. Inc. v. Eastman Kodak Co.*, 125 F.3d 1195 (9th Cir. 1997) found to be an antitrust violation was also found to violate Section 2, because *per se* tying is anticompetitive so long as the commerce at issue is not de minimis. (Opp. at 27-28.) Cisco also does not contest that under Section 2, "the plaintiff

must prove only the existence of monopoly power and the willful continued maintenance of that power." *Walker v. U-Haul Co. of Mississippi*, 747 F. 2d 1011, 1013 (5th Cir. 1984).  Cisco's alleged actions plainly meet that standard.

      D.    **Dexon Has Sustained An Antitrust Injury**

Dexon's opposition illustrates that every facet of Cisco's anticompetitive conduct injured competition, and harmed Dexon as a direct biproduct of that harm to competition.  (Opp. at 29-30.)  In response, Cisco suggests that Dexon's losses are somehow unrelated to Cisco's anticompetitive conduct, including Dexon's loses related to "a supposed conspiracy to sell Cisco equipment to a customer that had already decided to purchase Cisco equipment."  (Reply at 10.)  This argument appears to reassert that the Cisco-CDW conspiracy is not anticompetitive, which is incorrect for the reasons above (*supra* at II.C), and overlooks the fact that Dexon was the explicit target of the Cisco-CDW conspiracy that aimed to preclude both inter-brand and intra-brand competition from Dexon.  (Compl. ¶¶ 57-63.)  Cisco enlisted co-conspirator CDW because CDW favors Cisco amongst competitive manufacturers and seeks to sell Cisco equipment for higher prices than Dexon.  (*Id.* ¶¶ 56-57, 61.)  Cisco also repeats its claim that its ties and FUD do not foreclose competitors (Reply at 10), but this is also incorrect for reasons above (*supra* at II.B).  Dexon was forced to sustain sales and goodwill losses as a direct result of competitive foreclosure when Cisco threatened customers not to use Dexon, despite the procompetitive inter-brand and intra-brand benefits the customers had enjoyed until Cisco's misconduct.  (Compl. ¶¶ 13 (Cisco identified Dexon as a competitive threat), 61 (Dexon has earned the respect of customers for not prioritizing certain manufacturers), 85 (Cisco seeks to undue the trust Dexon has earned with customers), 90, 97.)

**III.    CONCLUSION**

For these reasons, Cisco's motion to dismiss should be denied in its entirety.

Dated:  July 21, 2022

Respectfully submitted,

By:  */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF**
**DEXON COMPUTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic

service are being served on July 21, 2022, with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

## <u>DEXON COMPUTER INC.'S  SURREPLY IN OPPOSITION TO DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO TRANSFER VENUE</u>

I.    **INTRODUCTION**

Cisco does not want to defend an antitrust case in Texas centered on Texas-based instances of harm (Compl. ¶¶ 2-3, 7-8, 51, 65-67, 81), but wants to defend it in California.  To accomplish this goal, Cisco relies on a single basis for transfer:  the first-to-file (FTF) rule.  Dexon's opposition to Cisco's Motion explains that under *binding, undisputed* Fifth Circuit law, as well as the law of this Court, the FTF rule does not apply because the allegedly similar claims were no longer pending in the first filed court.  (Opp. at 4-5.)  Dexon also explains how in every case Cisco relies upon, the allegedly substantially similar claims were still pending in the first-filed court at the time of the transfer order, further confirming this principle.  (*Id.* at 5-6 & n.3).  In response, Cisco does not (i) dispute the binding law, (ii) cite the law of this Court, nor (iii) dispute Dexon's discussion of Cisco's authority.  Instead, Cisco cites to a new case from the Northern District of Texas in which the Court found that it was undisputed that the first-filed case was still pending, an important distinction which supports Dexon's position.  Cisco also cites another new case from the Northern District of California in which there was a pending appeal of the first court's order dismissing an identical first-filed case with prejudice.  The new California case has no application to the present case, nor disputes in any way the binding law of the Fifth Circuit or the law of this Court.

Cisco attempts to distinguish this Court's decision in *TravelPass Group LLC v. Caesars Entertainment Corp.*, 2019 WL 4071784 (E.D. Tex. Aug. 29, 2019) on the basis that it involved two different plaintiffs, but does not engage in all the ways the cases were substantively dissimilar preventing application of the FTF rule.  Critically, Cisco also does not address that in *TravelPass*, the first-filed case alleging the same core conspiracy was still pending, further supporting Dexon's position.  Cisco repeatedly accuses Dexon of forum shopping, but without addressing any of the Texas-based facts in the Complaint that control the outcome and make Texas appropriate.  In

addition, rather than engaging with the Cisco-CDW conspiracy that states new and independent causes of harm to Dexon (Opp. at 7-8), Cisco merely calls it a "tale about a single customer." (Reply at 2.)

For these reasons, Dexon requests that the Court deny Cisco's Motion.[1]

## II.    ARGUMENT

### A.    The First-to-File Rule Does Not Apply

As Dexon explained in its Opposition, the Fifth Circuit in *Cadle* confirmed that the FTF rule applies when the second filed case "rais[es] issues that might substantially duplicate those raised by a *case pending* in another court."   174 F.3d 599, 603 (5th Cir. 1999) (emphasis in original).  Cisco's reply cites *Cadle* (Reply at 4 & 3, n.2) and does not dispute the holding that the FTF rule only applies when the currently pending case involves substantially similar issues.  As *Cadle* explained, the FTF rule is meant to achieve comity and efficiency between pending cases. 174 F.3d at 603.  Cisco does not address this Court's consistent holding in *SIPCO*, finding that the FTF rule only applied where "currently at issue" patents were similar between cases.  (Opp. at 5.)

Cisco instead relies on out-of-district authority to argue that the first-filed case need only be pending in any form, rather than that the pending case address substantially similar issues. Cisco's citation to *Am. Can! Cars for Kids v. Kars 4 Kids, Inc.* supports Dexon, because there it was undisputed that (i) the first-filed case was still pending due to vacatur of a prior order (2016 WL 3688631, at *3 (N.D. Tex. July 11, 2016)), (ii) the plaintiff conceded the second case was duplicative (*id.*), and (iii) the Court agreed that the pending claims were substantially similar.  *Id.* This confirms that Cisco must show that its currently pending trademark and false designation claims in California are substantially similar to Dexon's antitrust claims.

---

[1] We note that Cisco did not follow the Local Rules of this Court, filing an eight-page reply brief when LR CV-7(a)(2) states that any reply brief to a non-dispositive motion may not exceed five pages.

Cisco also relies on *Young v. L'Oreal USA, Inc.*, 526 F. Supp. 3d 700 (N.D. Cal. 2021), but the facts there have no application to this case. In *Young*, the first-filed consumer protection class action was filed in the Southern District of New York two years before the second-filed consumer action. *Id.* at 702-03. For a year and a half after the New York action was filed, the parties engaged in extensive discovery, referring discovery disputes to a Magistrate Judge who issued orders on those disputes. *Id.* at 703. The District Judge then granted the defendant's motion to dismiss with prejudice. *Critcher v. L'Oreal USA, Inc.*, 2019 WL 3066394 (S.D.N.Y. July 11, 2019). That final order was then appealed by plaintiffs to the Second Circuit. *Young*, 526 F. Supp. 3d at 704. While that appeal was pending, the plaintiffs' law firm filed an identical lawsuit in California. *Id.* The Northern District of California found that the FTF rule applied, because the case that was pending before the Second Circuit was substantially similar to the California action. *Id.* at 705-06. Specifically, the court found that the plaintiffs filed its second operative complaint that was "almost word for word the same" as the first while "the Second Circuit's pending decision [was] looming above their heads," and the Second Circuit later affirmed the dismissal. *Id.* at 707.

This case presents fundamentally different circumstances because there is no pending case before any court that is substantially similar to Dexon's antitrust Complaint. *Young* in no way supports the premise that counterclaims *not* pending in California can be compared to claims currently pending in this Court under the FTF rule. Cisco has argued in its motion to dismiss that res judicata applies to the prior dismissal, which is incorrect for the reasons stated in Dexon's opposition, but Cisco improperly tries to use the FTF rule in a way that no Court has endorsed, and the Courts of this Circuit have specifically rejected.

Under binding law, once the Court finds that Cisco's pending trademark and false designation claims against Dexon are not substantially similar to Dexon's pending antitrust claims against Cisco, this concludes the analysis under the FTF rule.  (Opp. at 2.)

### B.     Cisco Does Not Rebut *TravelPass*

Assuming *arguendo* that the Court considers Dexon's prior California counterclaims, Dexon also explained how this Court's ruling in *TravelPass* involving two pending antitrust cases confirmed that under any circumstance, the FTF rule does not apply.  Dexon explained that in *TravelPass*, this Court found that "Defendants [had] demonstrated that similar issues may arise in both this case and the *Tichy* action," because five of the Defendants were the same, and they were alleged in both cases to violate Section 1 of the Sherman Act through a conspiracy involving online bids.  2019 WL 4071784, at *6.  Still, this Court found that the plaintiff pled "more details of the alleged conspiracy," and the theories, facts, damages, and antitrust injuries differed between the cases, precluding application of the FTF rule.  (Opp. at 8-9.)

Cisco's only response to *TravelPass* is to point out that the plaintiffs were different, and that *Tichy* already involved a denial of a motion to dismiss, neither of which provide a meaningful distinction.   (Reply at 6-7.)   The plaintiffs in *TravelPass* were different, but they alleged overlapping conspiracies, and the Court found that the differences between how the plaintiffs were allegedly affected by the conspiracy were sufficiently distinct for transfer purposes.  2019 WL 4071784, at *6.  Here it is clear:  this case involves a conspiracy with a host of different facts that were not present at all in the prior counterclaims.  (Opp. at 9.)  Regarding the denial of a motion to dismiss in *Tichy*, Cisco's argument that this favors its position strains credulity, as this Court in *TravelPass* had to determine if two pending antitrust conspiracy cases could result in inconsistent rulings on any score, finding that there was not a substantial likelihood of such a conflict.  2019

**App.659**

WL 4071784, at *9.  Cisco does not dispute that this Court is capable of accounting for the prior ruling on Dexon's previous counterclaims to rule upon Cisco's present motion to dismiss.

Cisco's argument that Dexon only made "cosmetic changes" (Reply at 2) to its prior counterclaims is rebutted by Cisco's own briefing.  Cisco has spent two sections of its motion to dismiss briefs attempting to dismiss the conspiracy claims, and Cisco also attempts to improperly re-write the new Texas-based instances of coercion and anticompetitive harm in its briefs.  (*See* Dkt. 22 at 13-17; Dkt. 32 at 3-8).  Those arguments are misguided for the reasons stated in Dexon's oppositions, but Dexon's substantive allegations warrant serious consideration by this Court.  Cisco's related assertion that Dexon does not allege different damages, different types of antitrust injury, and different parties is incorrect, as Dexon alleges different damages from an alleged conspiracy (Compl. ¶¶ 92, 99) as well as Texas-specific damages (*id.* at ¶¶ 2-3, 7, 51, 65-67, 137), different types of antitrust injury by virtue of restrained intra-brand competition (*id.* at ¶¶ 60-61, 90, 97, 133), and CDW is a significant party.  (*Id.* at ¶¶ 56-63, 87-100, 131-137.)

Cisco's claim of forum shopping ignores that the present Complaint alleges a host of Texas-specific facts and different causes of harm that no Court has ruled upon.  (Opp. at 11.)  Cisco's reliance on *Alexander v. Franklin Res., Inc.* is inapposite.  In that case, the plaintiff claimed that they filed the second case in California because it was where the defendants were located, but the court found that the "defendants have always resided in this district." 2007 WL 518859, at *4 (N.D. Cal. Feb. 14, 2007).  Here, Cisco does not address that there are numerous examples of harm in Texas, third parties that will now be under the subpoena power of the Court for trial, and Texas-based Cisco witnesses that will need to testify at trial.  (Opp. at 11.)

III.    **CONCLUSION**

Cisco's Motion to transfer this case to the Northern District of California should be denied.

Dated:  July 21, 2022

Respectfully submitted,

By:  */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF
DEXON COMPUTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic

service are being served on July 21, 2022, with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

**App.661**

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

## <u>DEXON COMPUTER INC.'S OPPOSITION TO DEFENDANT CDW CORPORATION'S MOTION TO DISMISS</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

I.     INTRODUCTION ...............................................................................................1

II.    STATEMENT OF FACTS ...................................................................................5

       A.     Cisco Saw Dexon As A Threat To Its Monopolies And Entered Into
              A Conspiracy With CDW .......................................................................5

       B.     Procedural History and the Present Complaint .......................................6

III.   STANDARD OF REVIEW ..................................................................................7

IV.    ARGUMENT .......................................................................................................8

       A.     Dexon States Conspiracy Claims Against CDW Under Sherman Act §§ 1, 2 ........8

              1.   Dexon Has Sufficiently Alleged the Cisco-CDW Conspiracy .........................8

              2.   The Cisco-CDW Conspiracy Has Harmed Competition ................................13

              3.   Dexon Has Sufficiently Alleged CDW's Intent................................................15

       B.     Dexon Has Sustained An Antitrust Injury ............................................18

       C.     Dexon Also States a Claim Under the Texas Free Enterprise & Antitrust Act .....19

       D.     Collateral Estoppel Does Not Apply to Dexon's Complaint  ................19

       E.     The Statute of Limitations Does Not Preclude Dexon's Claims ..........................23

V.     CONCLUSION....................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

CASES:

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..........................................................................................8

*Baker v. Putnal*,
    75 F.3d 190 (5th Cir. 1996) ...........................................................................8

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..........................................................................................8

*Bodet v. Charter Commc'ns Inc.*, 2010 WL 5094214,
    (E.D. La. July 26, 2010) ................................................................................21

*Brister v. A.W.I., Inc.*, 946 F.2d 350
    (5th Cir. 1991) ...........................................................................................4, 20

*Carpenters Loc. Union No. 1846 of United Bhd. of Carpenters &*
    *Joiners of Am., AFL-CIO v. E.I. Dupont De Nemours & Co.*,
    1981 WL 2221(E.D. La. May 28, 1981) .......................................................9

*Carpet Group Int'l v. Oriental Rug Imps. Ass'n*,
    256 F.Supp.2d 249 (D.N.J. 2003) .......................................................3, 15, 16

*Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*,
    No. 3:29-cv-4926 (N.D. Cal.) .......................................................... 5, 6, 20, 22

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ...........................................................................7

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) .........................................................................1, 11, 22

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
    123 F.3d 301 (5th Cir. 1997) .....................................................4, 13, 18

*Gainesville Utilities Dept. v. Florida Power & Light Co.*,
    573 F.2d 292 (5th Cir. 1978) ...................................................................3, 16

*Golden Bridge Tech. v. Nokia Inc.*,
    416 F.Supp.2d 525 (E.D. Tex. 2006) .......................................................21

*Graphic Prods. Distribs. v. ITEK Corp.*,
    717 F.2d 1560 (11th Cir. 1983) .............................................................13, 16

*In Re Dairy Farmers,*
    767 F.Supp.2d 880 (N.D. Ill. 2011). ................................................................15

*In re Microsoft Corp. Antitrust Litig.,*
    127 F. Supp. 2d 728 (D. Md. 2001) ..........................................................17, 18

*Intell. Ventures II LLC v. Sprint Spectrum, L.P.,*
    2018 WL 11363408 (E.D. Tex. Sept. 18, 2018) ...........................................21

*Kaiser Aluminum & Chem. Sales v. Avondale Shipyards,*
    677 F.2d 1045 (5th Cir. 1982) ........................................................................7

*Lartigue v. Northside Indep. Sch. Dist.,*
    2022 WL 2392647 (W.D. Tex. July 1, 2022) ................................................21

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007) .......................................................................................13

*Lormand v. US Unwired, Inc.,*
    565 F.3d 228 (5th Cir. 2009) ..........................................................................7

*Norris v. Hearst Trust,*
    500 F.3d 454 (5th Cir. 2007) ........................................................................19

*N. Mississippi Commc'ns, Inc. v. Jones,*
    792 F.2d 1330 (5th Cir. 1986). ....................................................3, 16, 21, 22

*Perington Wholesale, Inc. v. Burger King Corp.,*
    631 F.2d 1369 (10th Cir. 1979) ......................................................................9

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.,*
    517 F.2d 117 (5th Cir. 1975) ........................................................................23

*Sonnier v. State Farm Mut. Auto. Ins. Co.,*
    509 F.3d 673 (5th Cir. 2007) ..........................................................................8

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997) ..........................................................................................13

*TravelPass Grp. LLC v. Caesars Ent. Corp.,*
    2019 WL 4727425 (E.D. Tex. Sept. 27, 2019) .............................................. 12

*U.S. ex re. Riley v. St. Luke's Episcopal Hosp.,*
    355 F.3d 370 (5th Cir. 2004) ..........................................................................8

*W. Penn Allegheny Health Sys., Inc. v. UPMC,*
    627 F.3d 85 (3d Cir. 2010) ...............................................................................3, 13, 14, 23


STATUTES:

Tex. Bus. & Com. Code Ann. § 15.04.............................................................................................19

Defendant Dexon Computer, Inc. ("Dexon") files this opposition to CDW Corporation's ("CDW") Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 28) and shows as follows:

## I.    INTRODUCTION

CDW's motion to dismiss makes arguments that are similar to Cisco's parallel motion, and they are meritless for analogous reasons. Most fundamentally, like Cisco, CDW attempts to re-write Dexon's allegations to change a well-supported and anticompetitive conspiracy into benign, unilateral actions that have no impact on competition. This is improper on a motion to dismiss, as the long-standing holding of the Supreme Court makes clear that in conspiracy cases, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962).

CDW attempts to compartmentalize Dexon's allegations and wipe the slate clean in between each of its arguments that (i) its alleged actions are unilateral (Dkt. No. 28 ("Motion") at 13), (ii) any alleged conspiracy was not in effect until CDW charged supra-competitive prices (*id.*), and (iii) Dexon does not allege that it could not purchase from CDW's website. (*Id.* at 14-15.) Each of these arguments is misguided on its own, because Dexon alleges (i) a detailed, coordinated plan to exclude a competitor (Dkt. No. 1 ("Compl.") at ¶¶ 56-60), (ii) facts showing that the conspiracy was in effect throughout Defendants' plan to coerce and overcharge customers (*id.* ¶¶ 59-61), and (iii) facts showing that a CDW sales representative was penalized for attempting to act in CDW's unilateral economic interest rather than following a conspiracy with an upstream monopolist. (*Id.* ¶ 62.) But most importantly, all of Dexon's allegations must be read as a whole, rather than as CDW suggests. When the Court does so, it should find that Dexon has amply pled a conspiracy in violation of Sections 1 and 2 of the Sherman Act.

CDW also attempts to change Dexon's Complaint by arguing that CDW is "committ[ed]" to selling non-Cisco Networking Equipment, and that any restraint on intra-brand competition does not show a conspiracy.  (Motion at 15.)  But the reason Cisco sought out CDW as a co-conspirator is because CDW *favors* Cisco, both in terms of promoting Cisco against other Networking Equipment manufacturers, and by charging customers supra-competitive prices that keep Cisco's profit margins at inflated levels.  (Compl. ¶¶ 56-57, 61.)  Dexon employs a different business strategy:  it does not favor any Networking Equipment manufacturer, and seeks to charge customers as low a price as possible rather than attempting to appease a monopolist's desire to maintain high prices.  (*Id.* ¶¶ 13, 61, 85, 90, 97.)  For these reasons, Cisco and CDW came to an agreement that would help them both:  CDW would coordinate its customer-directed actions with Cisco in order to maintain Cisco's monopolies in the Relevant Networking Equipment markets, while CDW would increase its sales by agreeing to this plan, even accounting for CDW's agreement to lose the sales it had been making to Dexon.  (*Id.* at ¶¶ 56-63, 90, 98.)  Like Cisco, CDW attempts to change these allegations to a mere "unilateral change of distributor" case, but the Court should not permit this effort on a motion to dismiss.

CDW reasserts Cisco's argument that the conspiracy is not anticompetitive, but does not take account of the case law or facts bearing on this scenario (despite Dexon's already-filed briefs addressing this point).  CDW does not address the fact that it teamed up with a monopolist to curry its favor and help achieve the ends the monopolist aimed for and secured.  (*Id.* ¶¶ 56-62.)  CDW's motion highlights this phenomenon by acknowledging Dexon as a competitor, because once CDW secured the coordinated help of a powerful monopolist, it would stand to gain in the long run on the backs of end-users.

**App.668**

CDW also argues that the Court should treat the alleged conspiracy as merely an issue about the "scope of [Cisco's] SmartNet service" packages, and thus a matter in which CDW is not a proper Defendant as it does not approve these packages. (Motion at 16-17.) This is incorrect, because a conspiracy that aims to maintain or enhance monopoly power through coordinated actions is anticompetitive, and not merely a terms issue. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100-01, 109 (3d Cir. 2010) ("*West Penn*"). Here, CDW agreed to play the role of a pro-Cisco distributor who agreed to favor Cisco even more by coordinating on a plan that achieved both of their objectives.

CDW's related assertion that Dexon does not plead a specific intent to monopolize is misguided on the facts, especially when taking account of the law. First, the most extensive discussion of intent for purposes of a conspiracy to monopolize claim makes clear that if a monopolist intends to maintain its monopoly through a conspiracy, that intent can be imputed to the other conspirators. *See Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 256 F.Supp.2d 249, 285-87 (D.N.J. 2003). Fifth Circuit law is consistent with this holding, finding that "[i]t is enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Gainesville Utilities Dept. v. Florida Power & Light Co.*, 573 F.2d 292, 300 (5th Cir. 1978). Moreover, the Fifth Circuit has made clear that a party's intent is inherently a fact-specific inquiry that must be assessed on a full discovery record. *See N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). CDW proposes a standard for intent from the District of Maryland that is inconsistent with these holdings, but should the Court adopt it, Dexon's pleading satisfies that standard as well. This is a case in which a monopolist and its co-conspirator agreed and intended to coordinate their actions to reinforce the

monopolist's position and exclude an entity that represents a competitive threat to both of them (intra-brand competition to Cisco and CDW and inter-brand competition to Cisco).

CDW next argues that Dexon cannot have suffered an antitrust injury because it is neither a Networking Equipment manufacturer nor an end user (Motion at 19), but this argument is disingenuous. As the Fifth Circuit has explained, a conspiracy to foreclose a price cutting and neutral recommender of Networking Equipment will result in an antitrust injury to the victim when that conspiracy is carried out successfully. *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305-06 (5th Cir. 1997). Dexon is in the direct line of fire of the anticompetitive conduct, especially where customers had grown to respect and trust Dexon for its diversity of products, efficient pricing, and quality of service that served to the benefit of users. (Compl. ¶¶ 13, 56-62, 85, 90, 97.)

In an attempt to leverage the Northern District of California's prior dismissal without prejudice of Dexon's antitrust counterclaims, CDW argues that collateral estoppel applies to Dexon's conspiracy claims. (Motion at 9-11.) But CDW does not address that for the collateral estoppel rule to apply it requires that "[n]ot only the facts, but also the legal standard used to assess them, must be *identical*" between the cases. *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 n.1 (5th Cir. 1991) (emphasis added) (finding that the standards of knowledge in a prior suit and the current proceeding differed). Neither the facts nor the legal standard used are identical here, because it is plain from the above discussion that none of the legal standards for conspiracy were at issue in California, and the majority of the facts relevant to these claims were not litigated in California. Dexon alleged in California that Cisco's unilateral anticompetitive conduct resulted in losing the business to the Pennsylvania hospital, but not that its broader damages are the subject of an inter-corporate conspiracy involving a host of facts and circumstances that were not before the Court in

California. (*Compare Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 50 at Counterclaim ¶ 42 *with* Compl. ¶¶ 56-62.)

CDW's motion to dismiss should be denied.

## II.     STATEMENT OF FACTS

### A.     Cisco Saw Dexon As A Threat To Its Monopolies and Entered Into A Conspiracy with CDW

Cisco considers resellers like Dexon who sell both Cisco networking equipment and the networking equipment of Cisco's competitors to be a prime competitive threat to its Networking Equipment monopolies and has coerced customers using a strategy of "fear, uncertainty, and doubt" (FUD) to not purchase networking equipment and services from Dexon.  (Compl. ¶ 6.)

This was not always the case.  Dexon has been a longstanding reseller of networking equipment and provider of services and was in Cisco's good graces until 2015.  (*Id.* ¶ 12.)  In fact, Dexon had access to Cisco's online database to arrange for maintenance services for its customers, and Cisco even sent a representative to Dexon to assist with sales and familiarize Dexon with Cisco's products.  (*Id.*)  When Cisco learned that Dexon "converted customers of Cisco networking equipment to customers of its competitors' networking equipment, such as from Juniper" and put pressure on Cisco to lower its prices (*id.* ¶ 13), Cisco embarked on its mission to steer customers away from Dexon and other resellers, and threatened that customers would "pay the consequences" if they did not comply.  (*Id.*)

Cisco enlisted the help of one of its favored distributors, CDW, to assist with its scheme to exclude resellers like Dexon from the Relevant Networking Equipment Markets and maintain its monopolies.  (*Id.* ¶ 14.)  As part of their conspiracy, Cisco and CDW coordinated their communications and actions for a Pennsylvania hospital system.  (*Id.* ¶¶ 57-60.)  When Cisco had learned that the hospital system awarded the order to Dexon, pursuant to the Defendants' plan, it

**App.671**

threatened the customer that it would "not honor the contemplated new SmartNet service package, [and] also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics." (*Id.*) Instead, CDW would, per the parties' conspiracy, step in as the hospital system's "savior" and "secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment." (*Id.* ¶ 60.)

Also as part of this conspiracy, CDW agreed not to sell Networking Equipment to Dexon, despite the fact that previous such sales were to both parties' benefit. (*Id.* ¶ 62.) When one CDW sales representative refused to comply with this agreement, the representative was re-assigned to a different account within CDW. (*Id.*) Cisco recruited CDW into the conspiracy because it favors Cisco products over those of Cisco's competitors; when one completes a search on CDW.com for 'Ethernet switches,' it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections. (*Id.* ¶ 61.) The Cisco-CDW conspiracy has limited inter-brand and intra-brand competition, is continuing, has harmed customers nationwide, has resulted in millions of dollars of lost sales for Dexon. (*Id.* ¶¶ 2, 61, 63, 134.)

**B.    Procedural History and the Present Complaint**

Cisco's First Amended Complaint against Dexon was filed in the Northern District in California on March 19, 2021, asserting claims of trademark infringement, trademark counterfeiting, false designation of origin and associated state law claims. *Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 32 (N.D. Cal.). Dexon's motion to dismiss those claims was denied on June 1, 2021, and Dexon filed its amended counterclaims on July 29, 2021, which included both antitrust and non-antitrust claims. (*Id.* at Dkt. No. 50.) The antitrust claims were solely against Cisco and did not include any conspiracy or Texas-based claims. (*Id.* at 35-42.) In an Order dated December 9, 2021, Judge Breyer granted Cisco's motion to dismiss Dexon's counterclaims, without prejudice. (*Id.* at Dkt. No. 87.) Dexon filed amended

counterclaims on January 10, 2022 consistent with the Court's Order, but none of them were antitrust counterclaims.  (*Id.* at Dkt. No. 92.)  There have been subsequent amendments to those counterclaims, but those amendments did not assert or propose any antitrust claims.

Dexon filed a Complaint in this Court on April 27, 2022, asserting, *inter alia*, a conspiracy to monopolize claim under Section 2 of the Sherman Act, a conspiracy claim under Section 1 of the Sherman Act, and a claim under the Texas Free Enterprise & Antitrust Act, none of which were asserted in Dexon's prior antitrust counterclaims in California. (Compl. ¶¶ 44, 69-77, 87-100, 117(d), 122-137.)  CDW is detailed as a co-conspirator of Cisco, and there is injunctive and compensatory relief sought against CDW.  (*Id.* at ¶¶ 60-63, 92, 99, 135, Prayer for Relief sections I, k).

CDW requested a 30-day extension to respond to Dexon's Complaint, which the Court granted on May 23, 2022.  CDW requested an additional 15-day extension to respond to Dexon's Complaint, which the Court granted on June 15, 2022.  CDW filed the instant motion as well as a joinder to Cisco's motion to transfer venue.  Dkt. Nos. 27-28.

## III.    STANDARD OF REVIEW

In the Fifth Circuit, motions to dismiss brought under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009); *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (quoting *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards*, 677 F.2d 1045, 1050 (5th Cir. 1982)).  In reviewing a motion to dismiss, the Court must accept as true all well-pled facts in the complaint and view those facts in the light most favorable to the plaintiff.  *See Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996).  Rather than evaluate the plaintiff's ultimate likelihood of success, the Court need only determine whether the plaintiff has stated a plausible and legally cognizable claim.  *See Ashcroft*

*v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *U.S. ex re. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004).

## IV.     ARGUMENT

### A.     Dexon States Conspiracy Claims against CDW Under Sherman Act §§ 1, 2

#### 1.     Dexon Has Sufficiently Alleged the Cisco-CDW Conspiracy

Dexon's Complaint details a conspiracy between Cisco and CDW in which Cisco recruited CDW to execute a joint plan pursuant to which Dexon would be excluded from at least the Relevant Networking Equipment Markets.  (Compl. ¶ 57.)  The Complaint details how Cisco and CDW coordinated their communications and actions for a Pennsylvania hospital system, whereby CDW would be portrayed as the savior to the customer, and concurrently, Cisco would tell the customer that any purchases from Dexon would put all of the hospital's maintenance services at risk.  (*Id.* ¶¶ 59-60.)  Also as part of this conspiracy, CDW agreed not to sell Networking Equipment to Dexon, and when one CDW representative refused to comply with this agreement, the representative was re-assigned to a different account within CDW.  (*Id.* ¶ 62.)  The Cisco-CDW conspiracy is on-going, has harmed customers across the country, and given CDW's favoritism of Cisco, may also apply to other multi-vendor resellers that provide inter-brand and intra-brand competition.  (*Id.* ¶¶ 62-63, 88.)

CDW's first argument against these allegations is to mimic Cisco's argument that allegations made upon "information and belief" are somehow insufficient. (Motion at 13; Dkt. No. 32 at 4.)  It has been "consistently recognized [by courts] that a conspiracy is difficult to prove because much of the necessary information is in the hands of the defendants, and much of the proof is by inference."  *Carpenters Loc. Union No. 1846 of United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. E.I. Dupont De Nemours & Co.*, 1981 WL 2221, at *7 (E.D. La. May 28, 1981).  "In such cases, some information and a reasonable belief is adequate on which to base a complaint."

*Id.*; *see also Peringron Wholesale, Inc. v. Burger King Corp.*, 631 F.2d 1369, 1372 (10th Cir. 1979) ("In antitrust actions such as this, where the proof is in the hands of the alleged conspirators . . . allowing such pleading when the conduct complained of is otherwise fairly noticed seems appropriate."). Dexon's allegations detail (i) the co-conspirators, (ii) the conspirators' respective motivations and intent, (iii) the sequencing of their coordinated conduct, (iv) the impact of that conduct, and (v) how, most recently, CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest). (Compl. ¶¶ 56-63, 87-100.) These facts are more than sufficient at this stage to plead a conspiracy.

CDW's next argument to rebut a conspiracy is to re-write Dexon's allegations to suggest that each alleged action by Cisco and CDW was unilateral and not consistent with a conspiracy. The following table illustrates the differences between CDW's arguments and the allegations themselves:

| CDW's Argument | What Dexon Alleges |
|---|---|
| "Cisco unilaterally threatened to cancel certain customers' SmartNet service package if they purchased products from Dexon, because Dexon was allegedly selling 'bootleg' or 'unauthorized' Cisco products." (Motion at 13.)<br><br>"Cisco asked CDW to sell one customer (Pennsylvania Health System) certain Cisco networking equipment 'after the hospital cancelled the equipment order with Dexon.' (*Id.*) | "Cisco's agreement with CDW to exclude Dexon from at least the Relevant Networking Equipment Market facilitated this outcome . . . [whereby] the sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the 'savior' to the hospital system so that the customer could keep its service for all of its Networking Equipment." (Compl. ¶ 60.)  One part of this plan was "Cisco threaten[ing] the customer that if it did not cancel the order for the new purchase of hardware and associated SmartNet service with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire |

| | hospital system." (*Id.* ¶ 59.) "[T]he intention and purpose of the scheme was to exclude resellers like Dexon, so that the customer would pay more for the equipment with CDW as the sole supplier." (*Id.* ¶ 60.) The Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon. (*Id.*) |
|---|---|
| "CDW has not sold any Cisco products to Dexon since March 2021." (Motion at 13.) | "The conspiracy between Cisco and CDW continues through the present day." (*Id.* ¶ 62.) "[W]hen the CDW representative previously assigned to Dexon refused to comply with the Cisco's demand [not to sell to Dexon], CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy. This worked. Pursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021. (*Id.*) |
| "CDW advertises more Cisco Ethernet switches on its website than Ethernet switches made by other OEMs." (Motion at 13-14.) | "The conspiracy also had the dual effect of limiting inter-brand competition between Cisco and its competitors in the Relevant Networking Equipment Markets, because not all resellers prioritize or promote competitive products in the Relevant Networking Equipment Market in the same way. As an example, on CDW's website, when one completes a search for "Ethernet switches," it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections (and most below 100). Upon information and belief, this is because CDW believes it will receive favorable treatment by Cisco by showing so many of its offerings and portraying its competitors as more limited." (*Id.* ¶ 61.) "Thus, when Cisco conspired with CDW, Cisco knew that it would tilt the competitive playing field in its favor, limiting the opportunities of its competitors to make sales through resellers like Dexon which does not favor any particular Network Equipment competitor." (*Id.*) |

CDW seeks to "tightly compartmentaliz[e] the various factual components and wip[e] the slate clean after scrutiny of each," in violation of *Cont'l Ore*, as well as seeks to change the alleged facts themselves.  On this basis alone, the Court can reject CDW's arguments.  Moreover, CDW's contention that Dexon's Complaint "do[es] not suggest any involvement by CDW whatsoever" and that any conspiracy did not apply "until after the customer cancelled its order with Dexon" (Motion at 14) is belied by the Complaint.  These arguments ignore the circumstances and motivations for Cisco to successfully recruit CDW into the conspiracy, because Cisco knew that CDW would favor its products over other competitors and charge higher prices than Dexon. (Compl. ¶¶ 56-57.)  Pursuant to the conspiracy, Cisco and CDW coordinated their actions vis-a-vis the Hospital System to extract a supra-competitive sale, so that Cisco's threat could be backed up by a friendly "savior."  (*Id.* ¶¶ 59-60.)  Put another way, in the absence of the conspiracy, CDW would not have known that the customer would be likely to accept its supra-competitive price. CDW's attempt to cabin Dexon's allegations as only alleging a conspiracy after the supra-competitive sale is inconsistent with the allegations, and improperly seeks to inject facts into the Complaint.

CDW also argues that because it is a competitor of Dexon and it has the right not to fulfill Dexon orders (Motion at 14-15), there is no alleged conspiracy, but again these arguments artificially compartmentalize the allegations.  The fact that CDW and Dexon can compete for customers is precisely why Cisco recruited CDW into the conspiracy to achieve its ends.  (Compl. ¶¶ 56-57.)  CDW also ignores that when it withdrew its sales to Dexon, it is precisely *because of the conspiracy*, as the CDW sales representative wanted to make sales to Dexon if that plan was not prevented by the conspiracy.  (*Id.* ¶ 62.)  CDW had previously sold Networking Equipment and services to Dexon to both companies' benefit, and the re-assignment of the account

representative within CDW speaks to a conspiracy to achieve that outcome.  (*Id.*)  This is a classic example of an action against a co-conspirator's unilateral economic interest, confirming the alleged conspiracy.  *See, e.g.*, *TravelPass Grp., LLC v. Caesars Ent. Corp.*, No. 5:18-CV-153-RWS-CMC, 2019 WL 5691996, at *32-33 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, No. 518CV00153RWSCMC, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019).

CDW's final argument that "display[ing] Cisco products prominently on its website" (Motion at 15) does not show a conspiracy misses the point of these allegations.  Given CDW's favoritism of Cisco, that motivated Cisco to solicit CDW's involvement in the conspiracy (Compl. ¶¶ 56-57, 61), and when that conspiracy was successful, it served to maintain Cisco's monopolies in at least the Networking Equipment Markets because it would exclude a company that does not seek to favor or appease Cisco.  (*Id.* ¶¶ 60-63, 90, 98.)  In addition, these allegations confirm Dexon's antitrust injury (further discussed below):  Dexon is being foreclosed by two giant companies who conspired to eliminate a source of inter-brand and intra-brand competition that customers had grown to appreciate from Dexon.  (*Id.* ¶¶ 92-93, 98-100.)

The Court should find that Dexon has pled a conspiracy under Sections 1 and 2 of the Sherman Act, as CDW concedes that its arguments are the same under either statute.

## 2.     The Cisco-CDW Conspiracy Has Harmed Competition

CDW carries through its error about its favoring of Cisco to argue that the Cisco-CDW conspiracy does not harm competition.  As Dexon explained in its opposition to Cisco's motion on the same grounds, when a monopolist conspires with one of its distributors to foreclose the distributor's competitor, that is a type of anticompetitive conspiracy that in this case harms both inter-brand and intra-brand competition.  (Dkt. No. 34 at 5-6 (citing *West Penn* and *Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560 (11th Cir. 1983)).)  Notably, CDW's motion does not even discuss any of Dexon's cited cases or analysis.  CDW re-cites *Doctor's Hospital* relied upon by

**App.678**

Cisco, but without addressing that the Court found that the defendant was not a monopolist in any relevant market. 123 F.3d 301, 312 (5th Cir. 1997).

Instead, CDW points to the Supreme Court's cases about minimum vertical resale price maintenance that have no relevance to the facts here. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) and *State Oil Co. v. Khan*, 522 U.S. 3 (1997) both stand for the settled proposition that the *per se* rule of illegality no longer applies to minimum vertical resale price maintenance, but no such resale price maintenance allegations are made in this case. Rather, Dexon alleges that Cisco recruited CDW into a conspiracy for the purpose and effect of foreclosing both inter-brand and intra-brand competition. (Compl. ¶¶ 56-63, 90, 98.) Dexon previously cited to opinions by several Courts of Appeals explaining how under these circumstances, customers will be forced to sustain the impact of a conspiracy that is designed to foreclose this type of competition. (Dkt. 34 at 5-6.) In fact, *Graphic Prods.* confirms the circumstances, not at issue in *Khan* and *Leegin*, that an agreement involving a monopolist to forestall intra-brand competition can be particularly damaging. 717 F.2d 1560, 1572 n.20. Nothing in CDW's motion rebuts these cases and their application here, which confirms the correct outcome.

As a final attempt to rebut the conspiracy, CDW argues that Dexon's allegations about anticompetitive effects are conclusory and involve a "contract interpretation issue between Cisco and its customers" (Motion at 16-17) that does not involve CDW. CDW's arguments ignore that Cisco has monopoly power in the Relevant Networking Equipment Markets, such that a conspiracy that has the intention and effect of maintaining these monopolies will be anticompetitive. (*Id.* ¶¶ 56-63, 90, 98.)[1] Dexon further alleges that when a monopolist recruits a powerful co-conspirator that favors its products over that of its far smaller competitors, it will lead to anticompetitive effects

---

[1] Indeed, CDW's argument about "contract interpretation" parallels Cisco's argument, and both are misguided because of these undisputed market facts.

**App.679**

in terms of price, innovation, and choice, as was the case in *West Penn*.  (*Id.* ¶¶ 63, 92-93, 99-100.)  Indeed, in the absence of the conspiracy, Dexon would have made millions of dollars in sales to a major hospital that would have *increased* intra-brand competition on a monopolist's products; instead, the conspiracy eliminated that prospect and permitted Cisco to maintain its supra-competitive profit margins.  (*Id.* ¶ 63.)

CDW's related point that SmartNet is an optional service, and thus cannot form the basis of harm is misleading, because in theory any product that has been monopolized is still "optional."  Cisco has monopolies in the Service and Networking Equipment Markets, and CDW has agreed to aid Cisco's efforts to maintain its monopoly over those who require Cisco's Services, which include the Pennsylvania Hospital system as well as other customers around the country.  (*Id.* ¶¶ 56-63, 90, 98.)  The anticompetitive harm occurs to those who have no choice other than to deal with the Monopolist.

The Court should reject CDW's argument that the Cisco-CDW conspiracy did not harm competition.

### 3.    Dexon Has Sufficiently Alleged CDW's Intent

CDW points out that a specific intent to monopolize is one of the elements of a Section 2 conspiracy offense; however, we are unaware of Fifth Circuit authority bearing upon which co-conspirator must be alleged to have specific intent on a motion to dismiss.  CDW relies upon a District of Maryland case inconsistent with Fifth Circuit law, but as explained below, Dexon still meets that standard.

The most extensive discussion of a specific intent to monopolize on a conspiracy claim is by the District of New Jersey in *Carpet Group*, finding that "[i]n order to show Defendants' intent to monopolize-either through direct evidence, or as an inference from their possession of monopoly power-Plaintiffs must produce evidence demonstrating that Defendants had the ability

**App.680**

to exclude competition from the relevant market, or that Defendants retained a dominant share of the market."  256 F.Supp.2d at 285-87 (collecting cases).  In finding that a conspiracy to monopolize had been sufficiently pled, the *Carpet Group* Court critically found:  "Defendants do not cite, nor could this Court find, any case law requiring that Plaintiffs prove a specific intent as to each individual member of the conspiracy.  To the contrary, because this Court has already found a genuine dispute as to the [conspirator's] knowing participation in the ORIA conspiracy, evidence suggesting that other ORIA members possessed an intent to monopolize the oriental rug industry may be imputed to the [other] [d]efendants."  *Id*.  Applying this holding, the Northern District of Illinois in *In re Dairy Farmers* found that despite insufficient allegations for a monopolization claim (unlike here), the plaintiffs still stated a claim for conspiracy to monopolize pursuant to the *Carpet Group* standard.  767 F.Supp.2d 880, 907-08 (N.D. Ill. 2011).

Fifth Circuit law is in accord with the *Carpet Group* standard.  In addressing the standard for joining a conspiracy under Section 1, the Fifth Circuit has held that proof of a conspiracy "does not require the existence of an express agreement. . . . It is enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it."  *Gainesville Utilities Dept.*, 573 F.2d at 300 (internal citation and quotation marks omitted).  This standard is consistent with *Carpet Group*, in which the court utilized the standard for a Section 1 conspiracy to determine requisite intent to be pled in a Section 2 conspiracy case.  256 F.Supp.2d at 285-87.  This Court should similarly follow the Fifth Circuit's holding that "adherence to the scheme and participat[ion] in it" is sufficient to show CDW's agreement, such that any of the conspirators' intent to monopolize can be imputed to the other conspirators.  *See id*.  In addition, the Fifth Circuit has confirmed that the specific intent of a conspirator is a fact question to be assessed based upon the credibility of the witnesses.  *See N.*

**App.681**

*Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).  Thus, to the extent that each co-conspirators' specific intent is ultimately relevant to the merits of a Section 2 conspiracy claim, that should be determined on a full discovery record.

Should the Court adopt the *Carpet Group* standard, as we contend is appropriate, there is no question that Cisco's specific intent to monopolize the Relevant Networking Markets in conjunction with CDW's acquiescence to the conspiracy is sufficient for the Section 2 conspiracy claim.  CDW very briefly suggests that Dexon had not pled such a specific intent against Cisco (Motion at 17), but overlooks that as explained in Dexon's response to Cisco's parallel motion, Cisco concedes that Dexon has adequately pled specific intent on the Section 2 conspiracy claim. (Dkt. No. 34 at 6-7.)

In addition, CDW's reliance on *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728 (D. Md. 2001) is misplaced on the facts.  In *In re Microsoft*, the court found that it was insufficient to allege that "confronted with demands made upon them by Microsoft by virtue of its monopoly power, [the alleged co-conspirators] decided to accede to those demands in order to gain advantage over their rivals in the markets in which they competed."  *Id.* at 731.  These alleged demands allegedly consisted of a variety of restrictive agreements including "per-processor licensing fees, long-term distribution contracts, the bundling of Microsoft operating system software with Internet Explorer to exclude browser and Java competition, and the bundling of Microsoft operating system software and application software."  *Id.* at 729.  Thus, the facts in *In re Microsoft* were fundamentally distinct from this case:  Cisco did not demand extensive restrictions from CDW, but rather enticed CDW into the conspiracy with the promise of greater profits if it acceded to the plan.  (Compl. ¶¶ 56-63.)  Indeed, that is precisely what occurred, when a customer gave into Cisco's portrayal of CDW as a savior.  (*Id.* ¶ 60.)  The *In re Microsoft* court also pointed out that

its inquiry on intent was specific to "the context of this case." 127 F. Supp. 2d at 731. In the context of this case, there is evidence of specific coordination between the Defendants to coerce customers, which was not present in *In re Microsoft*. Thus, the Court can find that CDW's authority is distinguishable on its facts.

Should the Court nonetheless apply *In re Microsoft*, Dexon's allegations are sufficient when accounting for the circumstances under which CDW agreed to the conspiracy. CDW had already favored Cisco over other Networking Equipment manufacturers at the time of the conspiracy, charging supra-competitive prices that were both to Cisco's and CDW's benefit. (Compl. ¶¶ 56-57, 61.) It can thus be inferred that CDW had no issue with or otherwise supported Cisco's monopoly power, as it had already made the choice to promote Cisco's products far more than Cisco's competitors. (*See id.*) When it joined the conspiracy, CDW re-affirmed that favoritism, and intended to exclude a distributor that was a threat to Cisco's Networking Equipment monopolies. (*Id.* ¶¶ 56-63, 90, 98.) Thus under *In re Microsoft* (despite its facts), these allegations are sufficient to conclude that "maintaining [Cisco's] monopolies was a goal that [CDW] themselves desired to accomplish." 127 F. Supp. 2d at 731.

For these reasons, the Court should find that under either standard, Dexon has sufficiently alleged CDW's intent.

### B.  Dexon Has Sustained An Antitrust Injury

CDW next suggests that Dexon has not sustained an antitrust injury, despite the fact that the explicit purpose and effect of the Cisco-CDW conspiracy was to foreclose Dexon. (Compl. ¶¶ 56-63, 90, 98.) CDW's own authority rebuts its argument:

> [A]ntitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace. . . . So viewed, [the plaintiff's] alleged losses and competitive disadvantage because of its exclusion from [the defendant's network] fall easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case. [The plaintiff] is a would-be provider of services for

**App.683**

> [the defendant] and a direct competitor of [the other defendant], the alleged
> monopolist.  [The plaintiff] has asserted that [the defendants] conspired to remove
> [the plaintiff] from [the network] in response to [the defendant's] market power and
> in order to weaken it as a competitor for [the defendant].  [T]hese theories of
> antitrust violations . . . are hardly novel, and [the plaintiff] is no remote or indirect
> victim of the alleged scheme.  [The plaintiff's] alleged injury flows from the
> allegedly exclusionary conduct of its competitor [] and is exactly the kind of
> anticompetitive effect that [the defendant] sought.

*Doctor's Hosp.*, 123 F.3d at 305-06.  Although it was ultimately found on the merits that the

defendant did not possess market power and the alleged conduct did not harm competition,

distinguishing it from the facts here, *Doctor's Hospital*'s holding on antitrust injury is on point.

Dexon's "alleged injury flows from the allegedly exclusionary conduct of its competitor and is

exactly the kind of anticompetitive effect" that the Defendants sought.  *Id.*  CDW also does not

dispute any of the arguments made by Dexon explaining its antitrust injuries in response to Cisco's

motion on the same score.  (Dkt. No. 24 at 29-30; Dkt. No. 34 at 10.)

Instead, CDW relies on an inapposite case involving the unilateral termination of a

distributor.  In *Norris v. Hearst Trust*, "[t]he *only* harm or injury to plaintiffs alleged in the

complaint is that [defendant] terminated them as distributors of the [defendant] because they

refused (or complained of) its requests that they certify . . . falsely inflated numbers of 'Home

Delivery Subscribers.'"  500 F.3d 454, 463-64 (5th Cir. 2007) (emphasis in original).  The

plaintiffs were "not producers or sellers of competing publications" of the defendant, and the

plaintiffs only claimed that they sustained an antitrust injury because of their "refusal to participate

in the antitrust violations."  *See id.* at 466.  The facts here are the opposite, where Dexon was

targeted precisely because of the way it promoted Cisco's competitors, and it is the direct victim

of the antitrust conspiracy, rather than someone who Cisco sought to have "participate" in the

alleged antitrust violation.  (Compl. ¶¶ 56-63, 90, 98.)

The Court should reject CDW's suggestion that Dexon has not sustained an antitrust injury.

C.      **Dexon's Also States A Claim Under the Texas Free Enterprise & Antitrust Act**

CDW and Cisco acknowledge that the Texas Free Enterprise & Antitrust Act is construed in accordance with the Sherman Act (Tex. Bus. & Com. Code § 15.04), and thus Dexon's antitrust claims also state an antitrust claim under Texas law specifically.

D.      **Collateral Estoppel Does Not Apply to Dexon's Complaint**

CDW relies on the Northern District of California's order dismissing Dexon's previous antitrust counterclaims without prejudice to argue that this Complaint is subject to collateral estoppel, but does so without acknowledging that the word "conspiracy" (or any similar derivation) does not appear a single time in the prior counterclaims, whereas the term appears thirty-six times in the Complaint. (*Compare Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 50 *with* Compl. ¶¶ 57-58, 61-63, 88-93, 95-100, 131-136.) This is because a host of new facts about the conspirators, their motivations, their agreement and coordinated conduct, and the effects of the conspiracy have been alleged under new causes of action. Indeed, these allegations result in all of the above points about how conspiracy law applies to the present facts that were never before the California Court. CDW acknowledges that issues between the cases must be identical, but omits that this requirement applies to "[n]ot only the facts, but also the legal standard used to assess them." *Brister*, 946 F.2d at 354 n. 1 ("[C]ollateral estoppel is limited to matters distinctly put in issue, litigated, and determined in the former action.") (internal citation and quotation marks omitted). CDW's argument fails on both scores.

CDW attempts a sleight of hand in suggesting that Section 1 claims under the Sherman Act were at issue in California (*E.g.*, Motion at 10 ("And in both lawsuits, Dexon claims this conduct was anticompetitive in violation of Section 1")) without mentioning that prior counterclaims were for *tying*, rather than an inter-corporate conspiracy that gives rise to two new claims against CDW,

**App.685**

separate and apart from Dexon's claims against Cisco for tying.  (*Compare Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 50 at ¶¶ 61-68 *with* Compl. ¶¶ 87-100, 131-136.)  CDW cites to no case, and Dexon is unaware of any case stating that tying claims are identical to inter-corporate conspiracy claims for purposes of collateral estoppel.  This is because the facts and issues to be determined under the claim elements are distinct, as illustrated below:

| Sherman Act Section 1 Tying Claim | Sherman Act Section 1 Conspiracy Claim | Sherman Act Section 2 Conspiracy Claim |
|---|---|---|
| The plaintiff alleges "(1) two separate products, the tying product and the tied product; (2) sufficient market power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market.'" *Bodet v. Charter Commc'ns Inc.*, 2010 WL 5094214, at *5 (E.D. La. July 26, 2010). | The plaintiff alleges that "(1) defendants engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in a relevant market." *Golden Bridge Tech. v. Nokia Inc.*, 416 F.Supp.2d 525, 529 (E.D. Tex. 2006). | The plaintiff alleges "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). |

CDW's suggestion that all of the issues of fact and of law discussed above on the conspiracy claims are being "re-litigated" or is merely the product of "switching adversaries" (Motion at 9-10), for purposes of this Complaint is without merit.  The conspiracy issues and the facts illustrating the existence and effect of the conspiracy are new.

Confirming the correct result here, this Court has found that similar, but not identical, language in patents between cases precluded a finding of collateral estoppel.  *See Intell. Ventures II LLC v. Sprint Spectrum, L.P.*, 2018 WL 11363408, at *4 (E.D. Tex. Sept. 18, 2018) ("While the claim elements 'low peak to average ratio,' . . . and 'small peak-to-average ratio,' . . . are certainly

similar, such similarity is insufficient to render the terms equivalent. . . . an initial inference [concluding that they are equivalent] would itself be tantamount to construing the claims and be the very act that a Rule 12 motion to dismiss is meant to preclude."); *see also Lartigue v. Northside Indep. Sch. Dist.*, 2022 WL 2392647, at *5 (W.D. Tex. July 1, 2022) ("The legal standards applied by the hearing officer in Lartigue's due process hearing and the Court in this case are significantly different" finding that an ADA claim was not precluded by the due process hearing and not barred by collateral estoppel).  If similar language between patents does not result in collateral estoppel, then far more global differences such as the existence of a conspiracy, the anticompetitive impact of such, the alleged intent of the conspirators, the antitrust injury resulting from such, and the statute of limitations applying to such (discussed below) are also not subject to collateral estoppel. *See infra* at Section IV.E and *supra* at Sections IV.A and B.

CDW's argument is premised on a minority of overlapping facts between the prior counterclaims and the Complaint (Motion at 10), but this ignores that all of the newly pled facts establishing an illegal conspiracy and its effects were not and could not have been litigated in California, let alone with facts that now further inform the conspiracy.  (Compl. ¶¶ 56-58, 60-63, 87-100.)  As one example, while Dexon alleged in California that it lost a sale to a Pennsylvania hospital due to Cisco's unilateral monopolization, in no way did the Court consider that the lost sale was the result of a conspiracy to accomplish that end.  (*Compare Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 50 at Counterclaim ¶ 42 *with* Compl. ¶¶ 56-62.)  The Northern District of California's prior order could not have considered any of Dexon's allegations in the context of conspiracy claims, which as discussed is subject to a different standard in which allegations are not "dismember[ed] and view[ed] in its separate parts" as CDW implicitly suggests in its current motion.  *Cont'l Ore*, 370 U.S. 690 at 698-99.  CDW's

further attempt to homogenize Dexon's prior monopolization claims against Cisco with Dexon's conspiracy to monopolize claims against CDW is also improper, as it is undisputed that a core difference between the legal standards is the presence of a conspiracy to achieve the unlawful result, as well as actions taken by CDW to accomplish that result.  *See N. Mississippi Commc'ns*, 792 F.2d at 1335.

The Court should conclude that Dexon's Complaint is not barred by collateral estoppel.

### E.    The Statute of Limitations Does Not Preclude Dexon's Claims

CDW suggests that Dexon's "claims against CDW based on injuries allegedly incurred before April 27, 2018" are time-barred.  As CDW acknowledges in a footnote, it is alleged to have taken an action in furtherance of the Cisco-CDW conspiracy in March 2021 that resulted in an independent injury to Dexon.  (Compl. ¶ 62.)  This act is clearly within the statute of limitations, and discovery is required to determine how long the Cisco-CDW conspiracy has been in effect. CDW's suggestion that Cisco's unilateral anticompetitive conduct has not been "secret" (Motion at 20) is misleading, because if its conspiracy with CDW was purposely hidden to avoid detection by Dexon, those are circumstances in which a finding of tolling, fraudulent concealment or a continuing violation may be appropriate.  Thus, CDW's argument on a motion to dismiss that there cannot have been tolling is premature, as it is undisputed that Dexon sustained an antitrust injury due to the Cisco-CDW conspiracy in the limitations period.  *See West Penn*, 627 F.3d at 107-08 (an anticompetitive act within the limitations period is sufficient for statute of limitations purposes) (citing *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 127-28 (5th Cir. 1975)).

### V.    CONCLUSION

For these reasons, CDW's motion to dismiss should be denied in its entirety.

**App.688**

Dated:  August 1, 2022

Respectfully submitted,

By:  */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF**
**DEXON COMPUTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic

service are being served on August 1, 2022, with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

**DEXON COMPUTER INC.'S RESPONSE TO DEFENDANT CDW CORPORATION'S**
**NOTICE OF JOINDER TO DEFENDANT CISCO SYSTEMS, INC.'S MOTION TO**
**<u>TRANSFER VENUE TO THE NORTHERN DISTRICT OF CALIFORNIA</u>**

In response to Defendant CDW Corporation's notice of joinder to Defendant Cisco Systems, Inc.'s Motion to Transfer Venue to the Northern District of California (Dkt. No. 27), Dexon Computer Inc. adopts in their entirety, and respectfully refers the Court to, Dexon's Opposition and Sur-Reply to Cisco's Motion to Transfer Venue (Dkt. Nos. 25, 35).

Dated:  August 1, 2022

Respectfully submitted,

By: */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF
DEXON COMPUTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on August 1, 2022, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

DEXON COMPUTER, INC.,

     *Plaintiff*,

v.

CISCO SYSTEMS, INC. and CDW
CORPORATION,

     *Defendants*.

CASE NO.:  5:22-cv-00053-RWS-JBB

JURY TRIAL DEMANDED

## DEFENDANT CDW CORPORATION'S REPLY IN SUPPORT OF ITS
## MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

Dexon's Opposition fails to overcome the numerous flaws in its Complaint, including its most central defect:  Dexon fails to explain why Judge Breyer's order dismissing Dexon's identical antitrust claims in California (now, with prejudice) should not bind both this Court and Dexon in this matter.  Dexon's excuse is that it now asserts nominally different legal theories, but that rings hollow when Judge Breyer's Order found (1) for its Section 1 claim, Dexon failed to allege harm to competition; (2) for its Section 2 claim, Dexon failed to plead the alleged conduct was anticompetitive; and (3) for all of its antitrust claims, Dexon failed to plead antitrust injury.  *See Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2021 WL 5848080 (N.D. Cal. Dec. 9, 2021).  These are identical elements of the antitrust claims Dexon now asserts against CDW, independent of whether Dexon alleged an antitrust conspiracy in its California claims, and Judge Breyer's reasoning and decision applies in equal force.  There is only one explanation for Dexon continuing to assert identical claims (and for adding CDW to its long-running dispute with Cisco):  it is hoping this Court will offer a different opinion on the merits of its claims.  This is blatant forum shopping and should not be condoned.

Nor does Dexon address the other elephant in the room:  Dexon's alleged sales of unauthorized or otherwise non-genuine Cisco equipment, which fully explains both Cisco's lawful conduct protecting its distribution system and CDW's lawful conduct selling genuine Cisco equipment to Dexon's would-be customers.  Nor does Dexon address the binding Fifth Circuit precedent that confirms Cisco's right to control its distribution network, other than citing to inapposite out-of-circuit case law.  As a matter of law, Dexon cannot state a Sherman Act claim under these allegations, as Judge Breyer has already determined.

Dexon's other arguments fall equally flat.  Dexon asks this Court to avoid "compartmentalizing" its conspiracy allegations, Opp. at 11, but this Court has already considered this argument and concluded it does not bar a "probing analysis of antitrust claims."  *Travelpass Group LLC v. Caesars Enter. Corp.*, 2019 WL 5691996 at *16 n.20 (E.D. Tex. Aug. 29, 2019) (Craven, M.J.), (*report & recommendation adopted*, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019) (Schroeder, J.).  And while Dexon tries to claim it does not need to allege CDW had a specific

intent to monopolize the Networking Equipment Market, it overlooks the fact that CDW has no rational motive to contribute to Cisco's market power because doing so could only harm CDW.

This Court should put an end to these meritless claims and dismiss Dexon's Complaint with prejudice, or transfer it back to Judge Breyer and let that Court dispose of it.

## ARGUMENT

### I.     Dexon's Claims Against CDW Are Foreclosed By Collateral Estoppel.

Dexon is barred from re-asserting the same antitrust claims against CDW as those already dismissed in California.  Dexon does not dispute that it previously filed antitrust claims against Cisco, and that they arose from substantially overlapping facts.  Dexon also does not deny that the claims asserted here involve some of the same elements and same thresholding standing issues as those it asserted in California.  The issues in both matters are identical; they were actually litigated before Judge Breyer; and Judge Breyer dismissed them on the merits.  *See Test Masters Educational Serv., Inc. v. Singh*, 428 F.3d 559, 572 (5th Cir. 2005).  Dexon's claims against CDW are thus barred by collateral estoppel.

Dexon makes no excuse and provides no justification for why it re-filed its antitrust claims in this Court.  None.  Instead, it asks this Court to sanction its forum-shopping by arguing that because it nominally changed its antitrust theories and added CDW as a defendant, it can side-step the principles of estoppel.

But that is not the law.  As noted, Judge Breyer's Order considered key elements of each of Dexon's claims it brought against Cisco, each of which is an identical key element of the Section 1 and Section 2 claims Dexon now brings against CDW.  Because these findings apply equally to the same elements of Dexon's claims against CDW (as well as its identical TFEAA claim), it does not matter that Dexon now asserts nominally different theories under those statutes.  *See C.I.R. v. Sunnen*, 333 U.S. 591, 601–02 (1948) (collateral estoppel bars claims that involve the "same set of events or documents" and the "same bundle of legal principles").  Nor does it matter that CDW was not named as a party in the California matter, because Dexon cannot avoid collateral estoppel

by merely "switching adversaries."  *See Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329

(1979).  Collateral estoppel thus bars Dexon's antitrust claims against CDW in this lawsuit.

None of Dexon's other arguments hold water.  *First*, Dexon's assertion that "the facts

illustrating the existence and effect of the conspiracy are new" in this lawsuit, Opp. at 20, is

staggering.  CDW's Motion to Dismiss cited the specific paragraphs in (a) Dexon's Complaint and

(b) Dexon's counterclaims in California that discuss the alleged Cisco/CDW agreement and

Cisco's general "pressure and bullying tactics."  *See* MTD at 10.  At most, Dexon has now

unmasked CDW as the "value added reseller" it cited in its California counterclaims, but that is an

irrelevant detail for purposes of those claims.

*Second*, Dexon relies on cases that involved distinctly different legal theories between the

first and second matters, and thus carry no weight here.  For example, this Court's decision in

*Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*, a patent case, determined that claims

construction was necessary "to determine whether or not 'low' is synonymous with 'small,'" and

thus there was no identicality of issues between the two matters.  2018 WL 11363408, at *4 (E.D.

Tex. Sept. 18, 2018).  *Lartigue v. Northside Indep. Sch. Dist.* likewise found no estoppel when the

plaintiff asserted legal claims under an entirely different statute.  2022 WL 2392647 at *4–5 (W.D.

Tex. July 1, 2022) (initial claim under Individuals with Disabilities Act; second claim under

Americans with Disabilities Act).  And in *Brister v. A.W.I.*, the Fifth Circuit determined that

statutory negligence under the Jones Act and "privity or knowledge" for purposes of limitation of

liability were "distinct" legal theories that made "collateral estoppel especially inappropriate."  946

F.2d 350, 357 (5th Cir. 1991).  None of these holdings apply here, where Judge Breyer's Order

addressed the same elements of the same legal claims Dexon now asserts against CDW.

To be clear, Dexon was not without a remedy.  It could have amended its antitrust claims

in the California litigation and sought to add CDW as a party there.  But Dexon chose not to do

so.  Instead, Dexon waited until *after* Judge Breyer dismissed its claims and *after* the expiration of

its permitted time to amend before filing its claims here, presumably to take advantage of certain

procedural aspects of this District.  *See Realtime Adaptive Streaming LLC v. Netflix, Inc.*, 2022

WL 2961668, at *5 (Fed. Cir. 2022) (affirming fee award where plaintiff "was aware that its lawsuit in [the first forum] was undeniably tanking" and "r[a]n off to another jurisdiction in hopes of getting a more favorable forum" (cleaned up)).  Dexon's conduct should not be condoned.

**II.     Dexon's Antitrust Claims Fail As A Matter Of Law.**

> 1.     <u>Dexon Has Not Plausibly Alleged An Agreement To Restrain Trade (Counts I, II, VI).</u>

Dexon's Opposition fails to save its Complaint as a matter of law.  CDW's (and Cisco's) motion to dismiss established why Dexon's Complaint fails to plausibly allege an agreement in restraint of trade cognizable under the Sherman Act that harmed competition.

Dexon's Opposition fares no better.  *First*, Dexon urges this Court to accept its conclusory allegations made "upon information and belief," Opp. at 13–14, in direct contravention of its requirement under *Twombly* to assert "enough *factual* allegations (taken as true) to suggest an agreement was made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 566 (2007); *see also Marucci Sports*, 751 F.3d at 37374; *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006).  Dexon relies on *Carpenters Local Union* and *Perington Wholesale*, but both are bad law.  Both *Carpenters* and *Perington* relied on the "no set of facts" notice pleading standard described in *Conley v. Gibson*, 355 U.S. 41 (1957), but *Conley* was explicitly abrogated by *Twombly* in 2007.  *See* 550 U.S. at 55963.  And *Twombly* requires Dexon to plead *factual* allegations, not conclusory allegations "masquerading as factual conclusions."  *Rios*, 444 F.3d at 421.  This Court must disregard all of Dexon's conclusory assertions.

*Second*, Dexon points to *Continental Ore* to say that Dexon can string together a series of *lawful* conduct to support an inference of *unlawful* conduct. Opp. at 9–11.  Not so.  As Magistrate Judge Craven previously recognized, "the Supreme Court never intended [this oft-quoted] language [in *Continental Ore*] to bar a probing analysis of antitrust . . . claims." *Travelpass*, 2019 WL 5691937 at *16 n.20, *report & recommendation adopted*, 2019 WL 4727425 (Schroeder, J.); *see also Eatoni Ergonomics, Inc. v. Research in Motion*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011) ("*Continental Ore* does not stand for the unworkable proposition that business conduct that does

<u>**CDW'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS**</u> **– Page 4**

not offend the antitrust laws may violate the Sherman Act once it is combined with other lawful business conduct."). Stated differently, zero plus zero still equals zero.

Further, nothing in Dexon's Reply addresses the obvious, non-conspiratorial reasons for CDW's alleged conduct. As a competitor to Dexon, CDW is unilaterally motivated to (a) compete with Dexon and to win its customers, including the Pennsylvania Health System example described in the Complaint (¶¶ 59–60), and (b) not sell Cisco products to its direct competitor (*id.* ¶ 62). An inference of conspiracy under these circumstances is barred by *Twombly.* Dexon points to this Court's decision in *Travelpass*, but there, the allegations included "numerous nonconclusory factual allegations that go beyond allegations of mere parallel conduct," including "with independent third-party factual support—why Defendants *needed* to conspire to accomplish their illegal ends." 2019 WL 5691996 at *32. By contrast, Dexon cannot explain why an anticompetitive agreement was *needed* for CDW to sell Cisco products to end-customers. Nor can it, when it concedes CDW is its direct competitor and stands to benefit from capturing Dexon's customers for itself. Compl. ¶ 61. No inference of an anticompetitive agreement may be drawn under these circumstances.

2.     Dexon Has Not Alleged Harm To Competition (Counts I, II, VI).

Even if Dexon plausibly alleged an agreement between Cisco and CDW, Dexon's Opposition fails to explain how such an agreement harmed *competition* given the substantial freedom afforded to manufacturers like Cisco on how its products are sold under both U.S. Supreme Court and Fifth Circuit precedent. MTD at 15–17; *see Doctor's Hospital of Jefferson, Inc. v. Southwest Medical Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997). Stated simply, even if Cisco had implemented restrictions on the sales of its products to "secondary market resellers" like Dexon, such an agreement is not a Sherman Act violation because Cisco is afforded the "virtually absolute right to choose to whom it sells its goods." *Doctor's Hospital*, 123 F.3d at 307. Such an agreement only impacts *intrabrand* competition (i.e., competition between Cisco resellers), not *interbrand* competition (i.e., competition between Cisco and other original

equipment manufacturers ("OEMs")).[1]  As a matter of law, Dexon cannot state a Sherman Act claim under these allegations.

Dexon points to *Graphics Products* and *West Penn*, but neither controls here.  *Graphics Products* is an Eleventh Circuit decision whose reasoning has been squarely rejected by the Fifth Circuit, which has firmly stated that "abstract lessening of intrabrand competition is not enough" to state a Sherman Act claim.  *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1116 (5th Cir. 1979); *see also H&B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978) (conspiracy between supplier and distributor to eliminate another distributor does not violate the Sherman Act because *de minimis* loss of intrabrand competition does not impact "healthy" interbrand rivalry from other suppliers); *Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 767–68 (S.D. Miss. 1992) (collecting cases).[2]  Likewise, *West Penn* involved a conspiracy to cause a loss of interbrand competition between rival hospitals and has no bearing here.  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010).

Nor is Dexon's insistence of vague "harm to inter-brand competition" sufficient.  As noted above, Dexon is required to allege *facts* to survive a motion to dismiss.  Neither Dexon's Complaint nor its Opposition identifies a single OEM who was harmed by the alleged conspiracy, nor do they allege facts as to how that OEM was harmed.  The only *factual* allegation is that Dexon lost sales of Cisco products to authorized Cisco resellers.  *See, e.g.*, Opp. at 13–14 ("Dexon would have made millions of dollars in sales to a major hospital that would have increased intra-brand competition").  Even if pursuant to an agreement, lost sales do not reflect harm to competition.

If anything, the alleged conspiracy would only *increase* inter-brand competition by incentivizing resellers—including Dexon (and CDW)—to compete more aggressively with networking equipment from other OEMs, such as Juniper.  And according to Dexon's own

---

[1] Dexon does not allege a relevant distributor market.  Instead, Dexon alleges—and must allege harm to competition to—the Relevant Networking Equipment market.

[2] Nor does Dexon meet the *Graphics Products* standard, which required it to allege facts that "the interbrand market structure was such that intrabrand competition was a critical source of competitive pressure on price" and consumer welfare.  717 F.2d 1560, 1573 (11th Cir. 1983).

allegations, that is precisely what has happened.  *See* Cisco MTD Ex. C ¶ 51 ("Indeed, Dexon is aware of at least two customers that purchased networking equipment from a Cisco competitor due to the way the customers and Dexon were handled by Cisco.").

### 3. Dexon Fails To Allege CDW's Specific Intent To Monopolize (Counts II, VI).

As explained in CDW's motion to dismiss, Dexon further fails to plausibly allege a Section 2 claim because the Complaint contains no factual allegations that CDW had specific intent to further Cisco's purported monopoly.  In fact, because CDW is a reseller for Cisco, any allegation that CDW would intend to increase Cisco's market share and further enable Cisco to charge supra-competitive prices—*including to CDW*—is facially implausible.

Dexon concedes that specific intent is an element of a conspiracy to monopolize claim, but argues that it does not need to allege *anything* as to CDW's intent because it already alleged that *Cisco* intended to monopolize the market.  Dexon is wrong.  The two circuit courts who have considered the issue have rejected conspiracy to monopolize claims when a defendant has no rational motive to monopolize a market in which it is not a participant.  For example, in *TV Communications Network, Inc. v. Turner Network Television, Inc.*, the defendant cable operators "would have no rational motive" to aid a television video programming company's monopoly because the goal of the alleged conspiracy "would actually be contrary to the interests of the cable operators."  964 F.2d 1022, 1026–27 (10th Cir. 1992).  Likewise, the Ninth Circuit agreed that there can be no specific intent when "the logical result of [the alleged] monopoly would be an increase in prices" charged by the monopolist to its alleged conspirator (here, CDW).  *Truck-Rail Handling, Inc. v. Burlington N. & Santa Fe Ry. Co.*, 244 F. App'x 130, 132 (9th Cir. 2007); *see also Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir. 1984) (allegations that defendant "in essence . . . conspired to injure itself" are "inherently implausible").  As in those cases, here, CDW has "no rational motive" to increase Cisco's ability to charge "supra-competitive prices," "harm innovation," and "deprive customers of their ability to make an unfettered choice of technology," Compl. ¶ 100, because each of those potential harms would apply equally to CDW. Dexon cannot infer any specific intent by CDW under these allegations.

Dexon's Opposition contains no response.  Instead, Dexon goes about trying to show how it has pled that CDW "maintaining [Cisco's] monopolies was a goal that [CDW] themselves desired to accomplish."  *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001).  To this point, it claims that because CDW had already "favored" Cisco over other manufacturers, "[i]t can . . . be inferred that CDW had no issue with or otherwise supported Cisco's monopoly power."  Opp. at 17.  But this is not a *factual* allegation; it is conjecture at best.

Moreover, *Carpet Group* is not even followed within its own district.  Five years after *Carpet Group*, the District of New Jersey revisited the issue in *Black Box Corp. v. Avaya, Inc.*, and concluded that a plaintiff must "allege[] facts that would support a finding that [defendants] had a specific intent to monopolize."  2008 WL 4117844, at *14 (D. N.J. Aug. 29, 2008).  The fact scenario in *Black Box* is identical to the instant scenario:  there, a telecommunications company was alleged to have conspired to monopolize with one of its resellers when it terminated the contract of a different reseller.  As here, the plaintiff—the terminated reseller—did not allege specific facts that the other resellers had a "conscious commitment to monopolize," and thus failed to state a Section 2 claim.  *See id.* at *14 (citing *In re Microsoft*, 127 F. Supp. 2d at 731).  Dexon— like the terminated reseller in *Black Box*—has alleged no facts to show that CDW had a "conscious commitment to monopolize," and therefore fails to allege a key element of its claim.[3]

Nor does Dexon's reliance on *Gainesville* fare any better.  That case involved horizontal market allocation, a *per se* violation of Section 1 of the Sherman Act.  *Gainesville Utilities Dept. v. Florida Power & Light Co.*, 573 F.2d 292, 300 (5th Cir. 1978).  That has nothing to do with a Section 2 conspiracy to monopolize claim.

In the end, Dexon is left to say that by pleading that CDW posted more Cisco products on its website than those of other OEMs, CDW "had no issue with or otherwise supported Cisco's

---

[3] Dexon also cites to *In re Dairy Farmers*, but that case involved a conspiracy among horizontal competitors, not firms in a vertical relationship, and the individual officers and directors did not dispute that they shared the same specific intent as their company.  *See* 767 F. Supp. 2d 880, 90708 (N.D. Ill. 2011). The unexplained concession by the individual defendants alone renders the case inapplicable.  *See Ochoa-Salgado v. Garland*, 5 F.4th 615, 620 (5th Cir. 2021).

monopoly power" and thus had "intended to exclude a distributor that was a threat to Cisco's" market power. Opp. at 17. These are new allegations found nowhere in the Complaint. Regardless, the connection between this new allegation about relative website listings and CDW's intent could not be more tenuous or implausible. Dexon fails to allege a Section 2 claim.

## III.     Dexon Fails To Establish Antitrust Injury.

CDW's Motion to Dismiss established why Dexon failed to suffer an antitrust injury, a requisite showing for each of its antitrust claims. Remarkably, Dexon continues to assert the same arguments here that were squarely rejected by Judge Breyer in *Cisco v. Dexon*. There, Judge Breyer concluded Dexon's lost sales were not an injury the antitrust laws were designed to protect because they did not result from any harm by Cisco and (then-unnamed) CDW to *competition* in the relevant market. *Cisco Sys.*, 2021 WL 5848080 at *5.

As Dexon has not materially changed its allegations or theories, Judge Breyer's analysis continues to hold. To state an antitrust injury, Dexon must allege an injury from reduced competition *in the relevant market*. For example, in *Doctor's Hospital*, the plaintiff hospital competed with the defendant hospital (the "alleged monopolist") in the alleged relevant market, and thus stated an antitrust injury when it alleged it was excluded from that market. 123 F.3d at 305–06. Here, by contrast, Dexon does not allege it was a competitor in the Relevant Networking Equipment Market, because the "competitors" in that market are the OEMs. *See* Compl. ¶ 44 (alleging "Cisco has market power" in the Relevant Router Market and Relevant Switch Market). Nor does Dexon allege it was foreclosed from selling networking equipment to end-customers in an (undefined) downstream market, as Dexon admits it sells product from OEMs other than Cisco, such as Juniper. *Id.* ¶¶ 13, 61.

Instead, Dexon merely asserts it lost sales of Cisco equipment to other Cisco resellers, such as CDW. But this is competition in its purest form. Nowhere does Dexon plausibly allege it was foreclosed from selling networking equipment of its Cisco's rivals to the same end customers. As Judge Breyer already determined, Dexon has not suffered an antitrust injury.

**IV.     Dexon Cannot Overcome The Four-Year Statute of Limitation In Antitrust Actions.**

The Court should dismiss Dexon's antitrust claims against CDW to the extent they are based on injuries allegedly incurred before April 27, 2018.  As explained in the motion to dismiss, the Complaint makes no claim that the statute of limitations should be tolled, so the Sherman Act's four-year limitations period applies from the date of the filing of the Complaint.  Nor does Dexon's Opposition show why tolling or some other exception would apply.  Rather, it claims that it has alleged at least one action *within* the statute of limitations period and that it is entitled to pursue discovery "to determine how long the Cisco-CDW conspiracy has been in effect."  Opp. at 22.

CDW is aware of no authority that would support the proposition that Dexon is entitled to pursue claims that are time-barred by the allegations *in its own Complaint*, where Dexon has asserted the alleged conduct began "by at least 2015."  Compl. ¶ 13; *but see Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) ("A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like.").  Dexon's pre-April 27, 2018 claims are time-barred.

## CONCLUSION

For the foregoing reasons, Dexon's Complaint should be dismissed with prejudice.

Respectfully submitted,

/s/ *Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
Cole A. Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile:  (903) 255-0800
Email:  jdoan@haltomdoan.com
Email:  criddell@haltomdoan.com

James A. Reeder, Jr.
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Fax:  (832) 239-3600
Email:  jareeder@jonesday.com

Thomas D. York
Texas Bar No. 24095531
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone:  (214) 969-4523
Fax:  (214) 969-5100
Email:  tdyork@jonesday.com

**ATTORNEYS FOR DEFENDANT
CDW CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing document
has been served via the Court's ECF system on August 8, 2022.

/s/ *Jennifer H. Doan*
Jennifer H. Doan

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | |
| **CDW CORPORATION** | § | **JURY TRIAL DEMANDED** |
| *Defendants* | § | |

**<u>DEXON COMPUTER INC.'S SUR-REPLY IN FURTHER OPPOSITION TO</u>**
**<u>DEFENDANT CDW CORPORATION'S MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT .......................................................................................................2

    A.  Dexon States Conspiracy Claims against CDW Under Sherman Act §§ 1, 2 ...............2

        1.   Dexon Has Sufficiently Alleged the Cisco-CDW Conspiracy ...............................2

        2.   The Cisco-CDW Conspiracy Has Harmed Competition .........................................4

        3.   Dexon Has Sufficiently Alleged CDW's Intent.......................................................6

    B.  Dexon Has Sustained An Antitrust Injury ....................................................................8

    C.  The Statute of Limitations Does Not Preclude Dexon's Claims ..................................9

    D.  Collateral Estoppel Does Not Apply to Dexon's Complaint ........................................9

IV.    CONCLUSION....................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

*Aladdin Oil Co. v. Texaco, Inc.*,
     603 F.2d 1107 (5th Cir. 1979) ........................................................................4

*Bell Atl. Corp. v. Twombly*,
     550 U.S. 544 (2007) ........................................................................3

*Black Box Corp. v. Avaya, Inc.*,
     2008 WL 4117844 (D.N.J. Aug. 29, 2008) ........................................7

*Brister v. A.W.I., Inc.*,
     946 F.2d 350 (5th Cir. 1991) ........................................................9

*Carpet Group Int'l v. Oriental Rug Imps. Ass'n*,
     256 F.Supp.2d 249 (D.N.J. 2003) ...........................................6, 7

*Cont'l Ore Co. v. Union Cabide & Carbon Corp.*,
     370 U.S. 690 (1962) ........................................................................2

*Doctor's Hosp. of Jefferson v. Se Medical Alliance, Inc.*,
     123 F.3d 301 (5th Cir. 1997) ...................................................4, 8

*ES Dev., Inc. v. RWM Enters., Inc.*,
     939 F.2d 547 (8th Cir. 1991) ........................................................3

*Gainesville Utilities Dept. v. Florida Power & Light Co.*,
     573 F.2d 292 (5th Cir. 1978) ...................................................6, 7

*Graphics Products* in *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
     615 F.3d 412 (5th Cir. 2010) ........................................................4

*In re Dairy Farmers of America, Inc. Cheese Antitrust Litigation*,
     767 F. Suppl. 2d 880 (2011) ........................................................6

*In re Microsoft Corp. Antitrust Litig.*,
     127 F. Supp. 2d 728 (D. Md. 2001) ..............................................6

*Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*,
     2018 WL 11363408 (E.D. Tex. Sept. 18, 2018) .........................10

*Norris v. Hearst Trust*,
     500 F.3d 454 (5th Cir. 2007) ........................................................8

*TravelPass Grp., LLC v. Caesars Ent. Corp.*,
    2019 WL 5691996 (E.D. Tex. Aug. 29, 2019) ........................................................3, 5, 10

*Truck-Rail Handling, Inc. v. Burlington Northern & Santa Fe Ry. Co.*,
    244 F. App'x 130 (9th Cir. 2007) ..........................................................................................7

*Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*,
    496 F.3d 403 (5th Cir. 2007) ................................................................................................3

*TV Commc'ns Network v. Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ..............................................................................................7

*W. Penn Allegheny Health Syst., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ..............................................................................................5, 9

## I.    INTRODUCTION

Dexon's opposition to CDW's motion to dismiss explains how CDW's arguments re-write or ignore Dexon's factual allegations establishing a conspiracy to harm both inter-brand and intra-brand competition.  In its reply, rather than address these allegations, CDW continues the same tact and creates a strawman with Cisco's distribution system.  Perhaps most revealingly, CDW does not, because it cannot, address that it took actions against its unilateral self-interest that confirm its conspiracy with Cisco, and also does not meaningfully address case law establishing the resulting anticompetitive effect and antitrust injury.

CDW argues that Dexon does not address the specific intent requirement of a Section 2 conspiracy claim, but the reality is that Cisco has conceded that it had a specific intent to monopolize for purposes of the claim, and CDW actively joined a conspiracy in which Cisco's intent is imputed to CDW.  Multiple courts have adopted this approach, and CDW does not dispute that its reliance on *Microsoft* is misplaced.  CDW argues on the pleadings that it is a victim of its own conspiracy, but this is belied by the fact that customers were *coerced through the Cisco-CDW conspiracy* into completing supra-competitive purchases from CDW to CDW's benefit.

Dexon also explains in its opposition that the statute of limitations on a Section 1 claim is satisfied once an anticompetitive act pursuant to the conspiracy is completed in the limitations period.  Dexon cites a Third Circuit case relying on the Fifth Circuit to confirm this principle, and CDW does not address the authority at all.  Instead, CDW reiterates that Dexon has not shown tolling, but as explained by Dexon, this is not necessary and is premature at this stage.

CDW's primary argument continues to be that collateral estoppel bars Dexon's claim because the Northern District of California assessed prior counterclaims, even though the word "conspiracy" and most facts supporting such were not asserted in California.  Dexon explains in

its opposition that CDW attempts a sleight of hand by equating a *per se* tying claim with a rule of reason conspiracy claim, even though there is no case law support for such a comparison.  Rather than address this, CDW makes the same argument about general antitrust concepts that apply to all antitrust cases regardless of the alleged markets, with no legal support.  CDW continues to mis-portray Dexon's allegations and fails to show that the legal framework and the facts are identical between the cases for purposes of collateral estoppel.

CDW's motion to dismiss should be denied.

## II.    ARGUMENT

### A.    Dexon States Conspiracy Claims against CDW Under Sherman Act §§ 1, 2

#### 1.    Dexon Has Sufficiently Alleged the Cisco-CDW Conspiracy

Dexon's response to CDW's motion explains in detail how CDW's arguments do not replace Dexon's factual allegations that, *inter alia*, (i) Cisco sought a conspirator that would uphold its supra-competitive prices and maintain its monopolies (Compl. ¶¶ 56-57), (ii) found such a conspirator in CDW who had already favored Cisco's products over that of its competitors (*id.* ¶ 61), (iii) Cisco's sales representatives coordinated in detail with CDW's sales representatives about how to coerce a customer who wished to purchase from Dexon to instead buy from "savior" CDW at supra-competitive prices (*id.* ¶¶ 59-60), and (iv) CDW took actions against its unilateral self interest in furtherance of the conspiracy, confirming the improper conduct.  (*Id.* ¶ 62.)  In its reply, CDW continues to ignore these allegations, and argues without any support that it is "unilaterally motivated to [] compete with Dexon and to win its customers, [and] not sell Cisco products to its direct competitor[.]" (Reply at 5.)  But this is precisely the type of "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" analysis that *Continental Ore* forbids.

The Court should credit Dexon's factual allegations that CDW used to sell products to Dexon to both companies' benefit, and only stopped when a CDW sales representative sought to violate the conspiracy, and was transferred to a different region and account. (Compl. ¶ 62.) CDW cites to *TravelPass*, which favors Dexon.  In *TravelPass*, the Court affirmed that actions against a party's self-interest support a conspiracy and found that the fact that one defendant allegedly changed its course of conduct after profitably dealing with the plaintiff was enough to establish joining a conspiracy.  *TravelPass Grp., LLC v. Caesars Ent. Corp.*, 2019 WL 5691996, at *32-33 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, 2019 WL 4727425, at *4 (E.D. Tex. Sept. 27, 2019).  Here, Dexon pleads facts showing that CDW agreed to the conspiracy because even though it would lose Dexon sales, it stood to gain the favor of a monopolist, make additional sales, and continue to push the monopolist's agenda.  (Compl. ¶¶ 87-100.)

CDW also suggests that cases before *Twombly* are "bad law," even though a host of cases, including post-*Twombly*, observe that direct evidence of a conspiracy is hard to come by, and thus allegations based on information and belief are sufficient.  *See, e.g.*, *ES Dev., Inc. v. RWM Enters., Inc.*, 939 F.2d 547, 553 (8th Cir. 1991) ("[I]t is axiomatic that the typical conspiracy is 'rarely evidenced by explicit agreements,' but must almost always be proved by inferences that may be drawn from the behavior of the alleged conspirators."); *accord Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007).  *Twombly* did not change this law, but rather affirmed that the type of allegations Dexon makes here are sufficient.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.")  CDW suggests that "Dexon cannot explain why an anticompetitive agreement was needed for CDW" (Reply at 5), but Dexon does:  a coerced customer would have bought the same products at a better

price from Dexon in the absence of the conspiracy, because the customer would not have been subject to a coordinated threat by Cisco, and CDW's resulting ability to charge the customer supra-competitive prices.  (Compl. ¶¶ 59-60.)

The Court should find that Dexon has pled a conspiracy under Sections 1 and 2.

### 2.    The Cisco-CDW Conspiracy Has Harmed Competition

Dexon's opposition explains that the purpose and effect of the Cisco-CDW conspiracy was to tilt the inter-brand playing field in Cisco's favor and rob consumers of the ability to benefit from intra-brand competition between CDW and Dexon.  (Opp. at 12-14.)  Moreover, CDW's cited authority regarding vertical resale price maintenance has no application to these facts, and CDW's argument that this is a "contract interpretation issue" rather than an antitrust issue is belied by the authority on which it relies.  (*Id.* at 13.)  On reply, CDW retreats from its arguments; instead, it re-cites to case law in which the Court found that the defendant had no monopoly power.  *Doctor's Hosp. of Jefferson v. Se Medical Alliance, Inc.*, 123 F.3d 301, 312 (5th Cir. 1997).

CDW boldly asserts that the Fifth Circuit "squarely rejected" the reasoning of *Graphics Products* regarding harm to intra-brand competition (Reply at 6), but the Fifth Circuit did not do so.  In *Aladdin*, the Court found that "[a] reduction in intrabrand competition is not pernicious as long as there exists interbrand competition, which acts as a significant check on the exploitation of intrabrand market power."  *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1116 (5th Cir. 1979). This is true, and the reason there *is* anticompetitive harm here is because Cisco concedes it is a monopolist in the Networking Equipment Markets (Comp. ¶¶ 56-63, 90, 98), and thus there is no "significant check on the exploitation of intrabrand market power."  *See id.*[1]

---

[1] Moreover, the Fifth Circuit has already cited approvingly to *Graphics Products* in *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418 n.5 (5th Cir. 2010).

CDW also attempts to distinguish *West Penn* by merely stating that "a conspiracy to cause a loss of interbrand competition between rival hospitals [has] no bearing" (Reply at 6), but the case is squarely on point.  In *West Penn*, an upstream monopolist was alleged to have conspired with its downstream purchaser to disadvantage the purchaser's rival, because the rival did not favor the monopolist.  627 F.3d 85, 91 (3d Cir. 2010).  Likewise here, Cisco is an upstream monopolist that conspired CDW for the purpose of excluding its rival distributor (Dexon), with the goal and effect of maintaining Cisco's upstream monopolies.  (Comp. ¶¶ 56-63, 90, 98.)

As a final attempt to argue that there is no harm to competition, CDW argues that "[t]he only factual allegation is that Dexon lost sales of Cisco products to authorized Cisco resellers" (Reply at 6), but this ignores the allegations.  Cisco and CDW entered a conspiracy for their mutual gain because (i) CDW, unlike Dexon, favors Cisco over other Networking Equipment manufacturers and charged supra-competitive prices consistent with Cisco's objectives (Compl. ¶¶ 56-57, 61), and (ii) CDW was willing to accept Cisco's coordinated help to secure sales at inflated prices when the customer otherwise sought to benefit from the intra-brand competition that Dexon attempted to provide.  (*Id.* ¶¶ 59-60.)  Dexon has lost sales, but critically, it is a direct biproduct of the competition harm aimed for and achieved by the Cisco-CDW conspiracy.  CDW's final suggestion that its conspiracy would "increase inter-brand competition by incentivizing resellers . . . to compete more aggressively with networking equipment from other OEMs" (Reply at 6) makes no sense, because the reason Cisco lured CDW into the conspiracy is precisely because CDW *did not want to* promote competitive Network Equipment manufacturers equally.  (Compl. ¶ 61.)  Put another way, CDW attempts to insert into the pleadings that a conspiracy designed to thwart inter-brand and intra-brand competition did the opposite, which is inappropriate on a motion to dismiss.  *See TravelPass*, 2019 WL 4727425, at *3.

### 3.    Dexon Has Sufficiently Alleged CDW's Intent

Dexon's opposition to CDW's motion explains that *Carpet Group Int'l v. Oriental Rug Imps. Ass'n*, 256 F.Supp.2d 249 (D.N.J. 2003), the leading case regarding intent in the Section 2 conspiracy context, held that a monopolist's intent to monopolize through a conspiracy can be imputed to the other conspirators.  (Opp. at 14-15.)  Fifth Circuit law is consistent with this analysis, and that other recent case law confirms this premise.  (*Id.* at 15 (citing *Gainesville Utilities Dept. v. Florida Power & Light Co.*, 573 F.2d 292 (5th Cir. 1978).)  And the case upon which CDW relies, *Microsoft*, is distinguishable on its facts.  *See id*. at 16.  In response, CDW (i) cites new case law that does not address the question of which co-conspirator must be plead to have a specific intent, (ii) in no way addresses how *Microsoft* is distinguishable, (iii) does not address that CDW still benefitted from the conspiracy because it would secure more supra-competitive sales, and (iv) CDW does not address Cisco's important concession on its motion that it had a specific intent to monopolize for purposes of the Section 2 conspiracy claim.  (*Id.*)

The only suggestion CDW makes for the Court not to apply *Carpet Group* is to argue that the Northern District of Illinois and the District of New Jersey did not follow *Carpet Group* (Reply at 8), but both courts endorsed the case.  In *Dairy Farmers*, the court followed *Carpet Group* to find the individual defendants could participate in a conspiracy to monopolize.  767 F. Supp. 2d 880 (N.D. Ill. 2011).  CDW suggests that *Dairy Farmers* is off point because "the individual officers and directors did not dispute that they shared the same specific intent as their company" (Reply at 8 n.3), but Dexon is unable to find any such concession in the opinion; rather, the court found that the individual defendants had willingly entered into a conspiracy.  767 F. Supp. 2d at 898-900.  But even if there was such a concession, that is akin to Cisco's admission here that it had a specific intent to monopolize, and Cisco's admitted intent should be imputed to CDW.

In *Black Box Corp. v. Avaya, Inc.*, the District of New Jersey cited approvingly to the *Carpet Group* opinion and addressed an alleged conspiracy to monopolize that consisted of two agreements in which the conspirators allegedly agreed not to solicit maintenance business from each other's customers and not to replace each other's service contracts.  2008 WL 4117844, at *8, *14 (D.N.J. Aug. 29, 2008).  *Black Box* is thus nothing like the facts here, as there is no alleged market allocation.  The Court should find that *Carpet Group* is the correct statement of law, consistent with the Fifth Circuit's holding in *Gainsville* that a co-conspirator need only "adhere[] to the scheme and participate[] in it."

CDW now also attempts to argue that it would be a victim of its own conspiracy (Reply at 7), but this again ignores the allegations.  Through the Cisco-CDW conspiracy, CDW would *gain sales* at supra-competitive prices that Cisco sought to charge down the distribution chain.  (Compl. ¶¶ 57-60.)  CDW aimed to and used the conspiracy to foreclose intra-brand competition from Dexon, while Cisco would maintain its monopoly position by conspiring with a distributor that had already decided to favor it over its Networking Equipment competitors.  (*Id.* ¶¶ 57-61.)  In *TV Commc'ns Network v. Turner Network Television, Inc.*, a new case relied upon by CDW, the court addressed "a bare bones accusation of conspiracy without any supporting facts" (964 F.2d 1022, 1026 (10th Cir. 1992)), which stands in direct contrast to the facts here, where Cisco purposely recruited CDW to a conspiracy that would stand to benefit them both.  In *Truck-Rail Handling, Inc. v. Burlington Northern & Santa Fe Ry. Co.*, an unpublished Ninth Circuit case also newly cited by CDW, the court affirmed summary judgment on a full discovery record in which the plaintiff "failed to adduce evidence of an anticompetitive act."  244 F. App'x 130, 132 (9th Cir. 2007).  Even before discovery, Dexon has explained how CDW has benefited from the conspiracy even though Cisco would continue to maintain its monopoly.

The Court should find that Dexon has sufficiently alleged CDW's intent.

**B.      Dexon Has Sustained An Antitrust Injury**

Dexon's opposition explains that its injury is precisely what the Cisco-CDW conspiracy intended and is part and parcel of the injury to competition.  (Opp. at 17-18.)  Under binding Fifth Circuit law, this is the type of antitrust injury in which the harm was "exactly the kind of anticompetitive effect that [the defendants] sought."  *Doctor's Hosp.*, 123 F.3d at 305-06.  Dexon further explained that CDW's reliance on *Norris v. Hearst Trust*, 500 F.3d 454 (5th Cir. 2007) is inapposite, because unlike the plaintiff in that case, Dexon was targeted precisely because it did not favor the monopolist over other Networking Equipment manufacturers and sought to sell Networking Equipment at lower prices.  (Opp. at 18.)

In its reply, CDW withdraws its reliance on *Norris*, and argues that *Doctor's Hospital* disproves Dexon's antitrust injury.  (Reply at 9.)  The case confirms Dexon's injury, as once the Court "view[s] [antitrust injury] from the perspective of the plaintiff's position in the marketplace," it is apparent that Cisco and CDW "conspired to remove [Dexon] from [the marketplace] in response to [Cisco's] market power and in order to weaken it as a competitor for [CDW]." *Doctor's Hosp.*, 123 F.3d at 305-06.  CDW further suggests that Dexon is not a competitor in the Relevant Networking Equipment markets, but this is also incorrect as *Norris* makes clear that a seller of the allegedly monopolized product is a competitor for purposes of antitrust injury.  *Cf.* 500 F.3d at 463-64.  Dexon is indisputably a seller in the Relevant Networking Equipment markets (*e.g.*, Compl. ¶¶ 83-86), and the purpose and effect of the conspiracy was to eliminate the inter-brand and intra-brand competition that Dexon would provide.  (*Id.* ¶¶ 56-63, 90, 98.)  While CDW suggests that OEMs are also competitors in the Networking Equipment Markets, Dexon is best

positioned to pursue these claims because there is no one who has been more directly impacted by the conspiracy.

### C.     The Statute of Limitations Does Not Preclude Dexon's Claims

Dexon's opposition explains that when anticompetitive acts pursuant to a conspiracy are taken within the statute of limitations, that is sufficient for purposes of timeliness.  (Opp. at 22.) CDW suggests that because Defendants' anticompetitive conduct is alleged to have started in 2015, this is a bar to Dexon's claims, but this ignores that Dexon specifically alleged that CDW took independent actions pursuant to the conspiracy in March 2021, when it re-assigned a sales representative to a different account and region for seeking to sell to Dexon in violation of the conspiracy.  (Compl. ¶ 62.)  CDW does not dispute *West Penn*'s holding (quoting the Supreme Court) that "in the context of a continuing conspiracy to violate the antitrust laws, each time a plaintiff is injured by an act of the defendants a cause of action accrues to it . . . [and] the statute of limitations runs from the commission of the act."  627 F.3d at 106.  CDW previously recognized in its motion that Dexon pled such an act (Opening Br. at 20 n.12), and now does not address its own statement.  Dexon's claims are timely, and any argument on tolling is premature.

### D.     Collateral Estoppel Does Not Apply to Dexon's Complaint

CDW's reply cites to the Fifth Circuit's opinion in *Brister v. A.W.I., Inc.*, but does not engage in its finding that for collateral estoppel to apply between cases "[n]ot only the facts, but also the legal standard used to assess them, must be identical."  946 F.2d 350, 354 n.1 (5th Cir. 1991).  When this Court does so, it should conclude that Dexon's conspiracy claims are first being advanced in this Court.

CDW's repeated accusations of "re-litigation" and "switching adversaries" ring hollow when one assesses the facts that establish the Cisco-CDW conspiracy.  In no way, shape or form

did the Northern District of California consider facts establishing that CDW's actions against its self-interest confirm a conspiracy, and Cisco specifically sought out CDW as a conspirator because it favors Cisco's products over those of its competitors, which would preserve Cisco's monopolies. *See supra* at Section II.A(1).   Thus, not only are these facts different from Dexon's prior counterclaims, but the legal standard to assess them under *TravelPass* is different.   This is equally true with respect to Dexon's factual allegations regarding anticompetitive effect (Section II.A(2), *supra*), antitrust injury (Section II.B, *supra*), specific intent to monopolize (Section II.A(3), *supra*), and the statute of limitations (Section II.C, *supra*).   While these concepts are regularly litigated in antitrust cases, the precise facts and alleged Markets can differ with each case, as is the case here.

CDW's claim that a *per se* tying claim against Cisco is equivalent to a conspiracy claim against CDW finds no support in the law or the facts.   CDW asserts that the elements of the claims are the same (Reply at 2), even though Dexon's opposition included a chart showing how the elements and facts that bear upon these claims differ.   (Opp. at 20.)  CDW suggests that this Court's analysis of collateral estoppel in *Intellectual Ventures II LLC v. Sprint Spectrum, L.P.*, 2018 WL 11363408 (E.D. Tex. Sept. 18, 2018) is distinguishable (Reply at 3), but in no way rebuts that Dexon's conspiracy and prior unilateral conduct claims are at least as differentiated from one another as the same patent language analyzed between the cases in *Intellectual Ventures*.   The Court should reject CDW's suggestion that Dexon asserts "nominally different theories," when in reality the facts and legal standards applicable to Dexon's conspiracy claims are new and should not barred by collateral estoppel.

## V.     CONCLUSION

For these reasons, CDW's motion to dismiss should be denied.

Dated:  August 15, 2022

Respectfully submitted,

By:  */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
Tina P. Lapsia (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
tlapsia@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF**
**DEXON COMPUTER, INC.**

### CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic

service are being served on August 15, 2022, with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| DEXON COMPUTER, INC. | § | |
| | § | |
| v. | § | Case No. 5:22-cv-53-RWS-JBB |
| | § | |
| CISCO SYSTEMS, INC. and CDW | § | |
| CORPORATION | § | |

ORDER

The above-referenced case was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following pending motion is before the Court:

**Defendant Cisco Systems, Inc.'s Motion to Transfer (Dkt. No. 21), and Defendant CDW Corporation's joinder thereto (Dkt. No. 27).**

The Court, after considering the relevant briefing and hearing arguments of counsel September 7, 2022, is of the opinion Cisco's motion to transfer should be **DENIED**.

## I. BACKGROUND

**A.    The current Texas Lawsuit**

On April 27, 2022, Plaintiff Dexon Computer, Inc. ("Plaintiff" or "Dexon") filed the above antitrust case in the U.S. District Court for the Eastern District of Texas, Texarkana Division (the "Texas Lawsuit"). Plaintiff alleges Defendant Cisco Systems, Inc. ("Cisco") is a monopolist in several Worldwide and U.S. markets related to networking equipment and services for the Internet and locks in customers who require maintenance with Cisco's SmartNet program to make supracompetitive purchases of routers and Ethernet switches. *See, e.g.*, Dkt. 1 (Original Complaint), ¶¶ 23-49. Plaintiff claims that Cisco employed FUD (fear, uncertainty, and doubt) tactics, especially in Texas, to foreclose competitive purchases of any product and maintain

supracompetitive pricing for its products. *Id.*, ¶ 67. According to Plaintiff, in carrying out its scheme, Cisco conspired with Defendant CDW Corporation ("CDW") to sell Cisco equipment in the Relevant Networking Markets to maintain its supracompetitive pricing in those Markets and exclude other resellers from making sales in the Relevant Networking Equipment Markets to end user customers in violation of federal and state antitrust laws. *Id.*, ¶¶ 56-57.

Plaintiff asserts the agreement between Cisco and CDW (collectively, "Defendants") reflects an unreasonable restraint of trade and a conspiracy to monopolize that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g.*, *id.* at ¶¶ 87-100. Plaintiff also asserts claims under Section 1 of the Sherman Act for *per se* tying in the Relevant Product Markets, under Section 2 of the Sherman Act for unlawful monopolization of the Relevant Networking Equipment Markets and for unlawful attempted monopolization of the Relevant Product Markets against Cisco, and under the Texas Free Enterprise and Antitrust Act against Cisco and CDW. *Id.*, ¶¶ 87-128. Plaintiff seeks injunctive relief, damages, and costs in connection with such violations. *See* Prayer for Relief.

**B.    The first-filed California Lawsuit**

On July 22, 2020, almost two years before Plaintiff filed its current case, Cisco filed suit against Dexon in the U.S. District Court for the Northern District of California. *Cisco Systems, Inc. and Cisco Technology, Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-4926 (the "California Lawsuit").[1] In the California Lawsuit, Cisco's First Amended Complaint against Dexon was filed on March 19, 2021, asserting claims of trademark infringement, trade counterfeiting, false

---

[1] The Court takes judicial notice of the docket entries and judicial documents filed in the California Lawsuit. *See Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 327 (E.D. Tex. 2021) ("Documents in judicial actions and cases' dockets are public records of which any court can take judicial notice."(citations omitted)); *see also* FED. R. EVID. 201.

**App.720**

designation of origin, and associated state law claims. Specifically, Cisco alleges Dexon sells counterfeit Cisco products (including switches and transceivers) in violation of the Lanham Act and California state law.

On July 29, 2021, Dexon filed its Amended Answer, Affirmative Defenses, Counterclaims and Third Party Claims ("Dexon's California Counterclaims"). California Lawsuit, Dkt. No. 50; *see also* Texas Lawsuit, Dkt. No. 21-2. Dexon asserted various antitrust counterclaims[2] among other trademark and tort counterclaims.[3] On motion from Cisco, the California Court dismissed Dexon's California Counterclaims, but the court granted Dexon leave to amend. *See Cisco Sys. Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926-CRB, 2021 WL 5848080, at *1, *9 (N.D. Cal. Dec. 9, 2021). In its amended pleading, Dexon did not re-assert the dismissed antitrust counterclaims. California Lawsuit, Dkt. No. 92 ("Dexon's Second Amended Counterclaims"); *see also* Texas Lawsuit, Dkt. No. 21-4 (same).

On a further motion from Cisco, the California Court dismissed Dexon's Second Amended Counterclaims *See Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926-CRB, 2022 WL 797015, at *1 (N.D. Cal. Mar. 16, 2022). According to the California Court, although Dexon provided more detail than it did in its prior complaint, Dexon still failed "to state these claims," and gave Dexon "leave to amend one last time." *Id.* at *4, *8.

On April 6, 2022, Dexon filed its Third Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims ("Dexon's Third Amended Counterclaims"). Once again, Dexon chose not to re-plead any antitrust claims. California Lawsuit, Dkt. No. 107; *see also* Texas

---

[2] *See* California Lawsuit, Dkt. No. 50, ¶¶ 61-68 (tying), monopolizing (¶¶ 69-74), ¶¶ 75-81 (attempted monopolizing), ¶¶ 82-91 (violations of the California Cartwright Act), and ¶¶ 92-130 (violations of the California Unfair Competition Law).
[3] *See* California Lawsuit, Dkt. No. 50, ¶¶ 131-141 (declaratory judgment concerning the Lanham Act and state law), ¶¶142-148 (Lanham Act false advertising), ¶¶ 149-155 (intentional interference with contractual relations), ¶¶ 156-163 (intentional interference with prospective economic advantage), and ¶¶ 164-170 (trade libel).

**App.721**

Lawsuit, Dkt. No. 21-6 (same). On April 27, 2022, Cisco moved to dismiss Dexon's Third

Amended Counterclaims pursuant to Rule 12(b)(6). California Lawsuit, Dkt. No. 117; *see also*

Texas Lawsuit, Dkt. No. 21-7. That same day, Dexon filed its Original Complaint in this Court,

asserting antitrust causes of action.[4]

## II. CISCO'S MOTION

In its current motion, Cisco requests this case be transferred to the Northern District of

California pursuant to the first-to-file rule. Cisco asserts most of the antitrust claims that Dexon

asserts in this matter are nearly identical to the counterclaims that the Northern District of

California dismissed in the California Action almost nine months earlier.[5] Cisco further asserts

that the factual allegations in the present complaint are materially the same as the allegations

contained in Dexon's California Counterclaims which were later amended without the antitrust

---

[4] By way of further background, on May 11, 2022, before Judge Breyer had ruled on Cisco's motion to dismiss Dexon's Third Amended Counterclaims, Dexon filed in the California Lawsuit a Motion for Leave to File Fourth Amended Counterclaims. Texas Lawsuit, Dkt. No. 21-8. On June 21, 2022, Judge Breyer entered an Order granting Cisco's motion to dismiss the six counterclaims asserted in the Third Amended Counterclaims and denying Dexon's motion for leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-CV-04926-CRB, 2022 WL 2222962, at *1 (N.D. Cal. June 21, 2022). In a footnote, the court noted that Dexon had filed this lawsuit in the Eastern District of Texas "asserting claims duplicative of those in this case—including some of the counterclaims that this Court has already dismissed—further inflating Cisco's costs." *Id.* at *8, n. 4 (citing *Dexon Computer, Inc. v. Cisco Systems, Inc. and CDW Corporation*, No. 5:22-CV-53 (E.D. Tex.)) (noting "Dexon's apparent attempts to seek repeated bites at the apple" and citing a case about forum-shopping).

According to Cisco's August 2, 2022 Notice of Supplemental Authority, on July 26, 2022, Judge Breyer denied Dexon's Motion for Leave To File a Motion For Reconsideration of the court's order dismissing its counterclaims against Cisco without leave to amend. Dkt. No. 40 (attaching Order 138, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-04926 (N.D. Cal. July 26, 2022) (Breyer, J.)).

[5] According to Cisco, in both actions, Dexon alleges (or alleged) the following: violations of the Sherman Act Section 1 for tying (*compare* Compl. ¶¶ 101-108, *with* Dexon's California Counterclaims, Dkt. No. 21-2, ¶¶ 61-68); unlawful monopolization under Section 2 of the Sherman Act (*compare* Compl. ¶¶ 109-114, *with* Dexon's California Counterclaims, Dkt. No. 21-2, ¶¶ 60-74); attempted monopolization in violation of Section 2 of the Sherman Act (*compare* Compl. ¶¶ 115-121, *with* Dexon's California Counterclaims, Dkt. No. 21-2, ¶¶ 75-98); and parallel state-law antitrust claims (*compare* Compl. ¶¶ 122-137, *with* Dexon's California Counterclaims, Dkt. No. 21-2, ¶¶ 82-91). Cisco asserts the "only arguable differences between Dexon's California Counterclaims and the present complaint are that, while Dexon's California Counterclaims include allegations regarding conduct involving an unnamed value added reseller, the present Complaint identifies that reseller as CDW, adds allegations related to CDW, and names CDW as a defendant." Dkt. No. 21 at 5-6 (specifically allegations that Cisco and a reseller, CDW, conspired to violate Section 1 of the Sherman Act by unreasonably restraining trade (Compl., ¶¶ 87-93), and Section 2 of the Sherman Act by maintaining Cisco's alleged monopoly in certain equipment markets (Compl., ¶¶ 94-100)).

**App.722**

allegations. Cisco contends the two pleadings are substantially similar, and "comity and sound administration of justice demand that Dexon's complaint be transferred." Dkt. No. 31 at 2.

### III. "FIRST-TO-FILE" RULE

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Zurich Am. Ins. Co. v. Carter & Carter Constr., LLC*, No. 4:22-CV-00196, 2022 WL 17330463, at *3 (E.D. Tex. Nov. 29, 2022) (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999)). This rule exists to support "comity and sound judicial administration" among the federal courts. *Id.* (quoting *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997); also citing *Wapp Tech Ltd. P'ship v. Micro Focus Int'l, PLC*, 406 F. Supp. 3d 585, 599 (E.D. Tex. 2019) ("The first-to-file rule is a venue and efficiency consideration, not an adjudication on the merits or a question of jurisdiction.")). "The rule's ultimate aim is to avoid three potential, undesirable outcomes: (1) 'the waste of duplication,' (2) 'rulings which may trench upon the authority of sister courts,' and (3) 'piecemeal resolution of issues that call for a uniform result.'" *Id.* (quoting *In re Toyota Hybrid Brake Litig.*, No. 4:20-CV-127, 2020 WL 6161495, at *5 (E.D. Tex. Oct. 21, 2020) (quoting *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 729 (5th Cir. 1985))).

To determine if substantial overlap exists, courts in the Fifth Circuit examine "whether 'the core issue was the same' or if 'much of the proof adduced would likely be identical.'" *Id.* (quoting *Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp.*, 665 F.3d 671, 678 (5th Cir. 2011) (footnote and ellipses omitted) (first quoting *W. Gulf Mar. Ass'n*, 751 F.2d at 730; then quoting *Mann Mfg., Inc. v. Hortex Inc.*, 439 F.2d 403, 407 (5th Cir. 1971))). Though the cases need not be identical for the first-to-file rule to apply, *In re Amerijet Int'l, Inc.*, 785 F.3d 967, 976 (5th Cir. 2015) (per

**App.723**

curiam), they "must be 'more than merely related.'" *Id.* (quoting *Brocq v. Lane*, No. 3:16-CV-2832, 2017 WL 1281129, at *2 (N.D. Tex. Apr. 6, 2017) (quoting *Buckalew v. Celanese, Ltd.*, No. G-05-315, 2005 WL 2266619, at *2 (S.D. Tex. Sept. 16, 2005))). If overlap between the cases is less than complete, courts have looked to additional factors, such as "the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." *Id.* (quoting *Save Power Ltd.*, 121 F.3d at 951 (internal quotation marks omitted) (quoting *TPM Holdings, Inc. v. Intra-Gold Indus., Inc.*, 91 F.3d 1, 4 (1st Cir. 1996))). If substantial overlap exists, "the proper course of action is for the court to transfer the case to the first-filed court to determine which case should, in the interests of sound judicial administration and judicial economy, proceed." *Id.* (quoting *Wells Fargo Bank, N.A. v. W. Coast Life Ins.*, 631 F. Supp. 2d 844, 847 (N.D. Tex. 2009) (citing *Cadle*, 174 F.3d at 606; also citing *Tex. Health Mgmt. LLC v. HealthSpring Life & Health Ins. Co., Inc.*, 380 F. Supp. 3d 580, 588 n.6 (E.D. Tex. 2019) (affirming that district courts should not act as "super appellate court[s]" when applying the first-to-file rule))).

But a finding of substantial overlap does not end the inquiry. *Id.* (citing *In re Toyota Hybrid Brake Litig.*, 2020 WL 6161495, at *6). Mechanical application of the first-to-file rule is not required on every occasion and may very well be inappropriate in specific instances. *Id.* (citing *Hunt-Collin Elec. Co-op, Inc. v. Rayburn Country Elec. Co-op, Inc.*, No. S-87-211, 1988 WL 428654, at *2 (E.D. Tex. Feb. 5, 1988) ("Blindly applying the first-to-file rule only on the basis of the actual filing dates. . . would not further the goals of the rule." (cleaned up in *Zurich*))). Only "[i]n the *absence* of compelling circumstances" should it be employed. *Id.* (citing *Mann Mfg., Inc.*, 439 F.2d at 407 (emphasis added in *Zurich*)). While the Fifth Circuit has provided limited "guidance or examples as to what sort of circumstances it would consider 'compelling,'" *Twin*

*City Ins. Co. v. Key Energy Servs., Inc.*, No. H-09-0352, 2009 WL 1544255, at \*4 (S.D. Tex. June 2, 2009), rigidly applying the first-to-file rule when compelling circumstances present themselves leads to the abandonment of the "comity principles that underlie the. . . rule" itself. *Id.* (quoting *W. Gulf Mar. Ass'n*, 751 F.2d at 730; also citing *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 n.8 (5th Cir. 1985)).

## IV. DISCUSSION

### A.    Parties' assertions

Cisco contends the Court should transfer Dexon's complaint pursuant to the first-to-file rule because Dexon already asserted the similar, now dismissed, counterclaims in the California Lawsuit. According to Cisco, the facts and issues substantially overlap as evidenced by a redline comparison of Dexon's California Counterclaims (which are no longer pending) and the present complaint, attached as Exhibit A to Cisco's motion. *See* Dkt. No. 21-1. Cisco further asserts the parties are substantially identical and there is a risk of piecemeal litigation and inconsistent outcomes, noting the risk is significant here because the Northern District of California has already examined and dismissed Dexon's antitrust claims. Dkt. No. 21 at 10-13. According to Cisco, Dexon should not be afforded an opportunity to file substantially the same claims here that a federal court has already considered and dismissed. *Id.* at 13.

In its response, Dexon first asserts the first-to-file rule does not apply to these facts. According to Dexon, the first-to-file rule, and the policy considerations of the rule, apply to cases in which the allegedly substantially similar claims "*are still pending*" in the first court. Dkt. No. 25 at 1-2, 5 (emphasis original). Dexon argues that even if one considered the first-to-file rule, the Court should not transfer the case due to the substantial differences between the claims in the

present complaint and the antitrust counterclaims that were dismissed in the California lawsuit. Dkt. No. 25 at 2, 7-10.

In its reply, Cisco asserts the case between Cisco and Dexon is still pending in California, even if the antitrust claims are not, and that should be sufficient to apply the first-to-file rule to prevent "the risk of forum shopping and conflicting judgments." Dkt. No. 31 at 1-2.

**B.      Analysis**

The parties dispute whether the first-to-file rule should be applied in this situation, where the first-filed lawsuit is still pending, though the at-issue claims were dismissed with leave to amend. A survey of the relevant caselaw, as well as the underlying purposes of the first-to-file rule, shows that the first-to-file doctrine should not be applied here, where the antitrust claims are not pending in the California suit.

The Court finds instructive a case from this district, one with facts very similar to those involved here. In *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, No. 2:20-CV-00003-JRG, 2020 WL 6889173 (E.D. Tex. Nov. 24, 2020), the SIMO plaintiffs filed suit in the U.S. District Court for the Eastern District of Texas, alleging, inter alia, misappropriation of trade secrets by the uCloudlink defendants. *Id.* at *1. Previously, SIMO had filed trade secret counterclaims against Hong Kong uCloudlink in a separate action in the Northern District of California. *Id.* However, the California court dismissed those counterclaims with prejudice on September 12, 2019, but the case remained pending. Cause No. 2:20-cv-0003, Dkt. No. 27-1. In the Texas case, Defendant Hong Kong uCloudlink moved to transfer the plaintiffs' trade secret claims to California under the first-to-file rule and 28 U.S.C. § 1404. *SIMO Holdings*, 2020 WL 6889173 at *4-5.

According to the motion, the California court initially dismissed its trade secret claims without prejudice, giving SIMO leave to amend and re-plead with more specificity. Cause No. 2:20-cv-0003, Dkt. No. 27 at 4-5. "SIMO re-pled these trade secret claims, focusing on a conspiracy between Wang Bin and uCloudlink. Again, the California court dismissed them, this time with prejudice, finding 'they do not establish a *plausible* allegation of a conspiracy.'" *Id.* (emphasis original). Hong Kong uCloudlink argued that SIMO's trade secret claims in the Texas case, to the extent they were not dismissed, should be transferred to California under the first-to-file rule. *Id.* at 9 ("Similarly, there is substantial overlap between the trade secret claims brought here and the trade secret claims disposed of by the California court. And the California action is indisputably the first-filed action with respect to these same trade secret claims.").

Like Dexon here, the SIMO plaintiffs opposed transfer of the trade secret claims, asserting the first-to-file rule was inapplicable because the "trade secret counterclaims were dismissed in the California Action." Cause No. 2:20-cv-0003, Dkt. No. 38 at 1-2. Thus, the plaintiffs argued there were "no overlapping pending claims in California and therefore no risk of duplication." *Id.* at 2. In its reply, Hong Kong uCloudlink argued, similar to Cisco here, that the plaintiffs, not liking the resolution in California, brought the same trade secret claims in Texas. Cause No. 2:20-cv-0003, Dkt. No. 43 at 2. According to Hong Kong uCloudlink, "SIMO's forum shopping and attempted re-litigation are the very concerns underlying the first-to-file rule." *Id*.

Chief Judge Gilstrap addressed the issue in his order, holding as follows:

Hong Kong uCloudlink moved for the transfer of Plaintiffs' trade secret claims to California on the basis that "there is substantial overlap between the trade secret claims brought [in the Eastern District of Texas] and the trade secret claims disposed of by the California court." . . . . In response, Plaintiffs point out that the California Action is no longer pending, and thus the first-to-file rule is inapplicable. (Dkt. No. 38 at 1–2).

As Hong Kong uCloudlink admits in its Motion to Transfer, the trade secret claims were disposed of by the California court. The first-to-file rule only applies in instances where there are concurrent, pending proceedings in different federal courts, and moreover, the Court responding to the motion has discretion to apply the rule. *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976) ("[T]here are principles ... which govern in situations involving the *contemporaneous* exercise of concurrent jurisdictions ...") (emphasis added); *see also Cadle Co.*, 174 F.3d at 603 ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it ..."). Accordingly, the Court is not compelled to transfer the trade secret claims under the first-to-file rule and does not do so here.

*SIMO Holdings*, 2020 WL 6889173, at *4.[6]

Likewise here, although the California Lawsuit is still pending, Dexon's antitrust claims are no longer pending in California. Thus, the California Lawsuit does not contain a co-pending legal action which is sufficiently similar to the claims contained in the current case to justify invoking the first-to-file rule and transferring this suit to California. Similar to Chief Judge Gilstrap, the Court is not compelled to transfer the antitrust claims under the first-to-file rule. Other authority supports *SIMO's* reasoning to decline to apply the first-to-file rule if the at-issue claims are not pending in the first-filed suit. *See United States v. Texas*, No. EP-21-CV-173-KC, 2022 WL 499861, at *1 (W.D. Tex. Jan. 11, 2022) ("Defendants argue that the issues presented substantially overlap with those in *Texas v. Biden*. . . . However, Defendants base that argument on the content of the original Complaint in *Texas v. Biden*. . . . As discussed, that Complaint is no longer operative, as Texas has filed an Amended Complaint in *Texas v. Biden* that challenges a different set of federal government actions. Because the allegations in the case before the Northern

---

[6] In a motion for reconsideration, Hong Kong uCloudlink asserted, like Cisco here, that other claims remained pending in the California case, although the trade secret claims had been dismissed with prejudice. Cause No. 2:20-cv-0003, Dkt. No. 55 at 4-5. Hong Kong uCloudlink further argued the overlap between the Texas case and the California case extended beyond the trade secret claims and attached as Exhibit C to the motion for reconsideration examples of the pleadings from the two cases in an attempt to demonstrate substantial overlap (including a reference to SIMO's live answer and counterclaims in the California case). Judge Gilstrap denied the motion for reconsideration, stating Hong Kong uCloudlinks' arguments either were or could easily have been raised in the motion to transfer. Cause No. 2:20-cv-0003, Dkt. No. 77 at 5.

**App.728**

District have changed, Defendants' Motion . . . is DENIED as moot."); *L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. CIV A 307-CV-0341-B, 2008 WL 89659 (N.D. Tex. Jan. 8, 2008) (denying to transfer a second-filed lawsuit between the parties involving antitrust claims to a "first filed" suit in Georgia because the Georgia action did not contain pending antitrust claims).

Cisco's cited authority does not counsel a different outcome. For example, the analysis in *SIPCO, LLC v. Emerson Elec. Co*., No. 6:15-CV-907, 2016 WL 7743496 (E.D. Tex. July 1, 2016) shows the relevant focus is on the currently pending claims in the first-filed case. *Id.* at *4 (explaining that the first-to-file rule, in a patent case, looks to whether the patents "currently at issue" in the first case are substantially similar to the patents in the second case).

Cisco (and Dexon) also cites to *Cadle Co. v. Whataburger of Alice, Inc*., 174 F.3d 599 (5th Cir.1999), but that case stands for the fact that there must be two actions "pending *at the same time*." *Olaoye v. Wells Fargo Bank NA*, No. 3:12-CV-4873-M-BH, 2013 WL 5422888, at *1 (N.D. Tex. Sept. 27, 2013) (citing *Akins v. Worley Catastrophe Response*, LLC, 921 F.Supp.2d 593, 598 (E.D. La. 2013) (emphasis original)). Neither party disputes that requirement. As discussed above, the relevant question is whether the co-pending actions must also have co-pending claims that are substantially similar. Cisco's reliance on *Am. Can! Cars for Kids v. Kars 4 Kids, Inc*., No. 3:15-CV-3648-B, 2016 WL 3688631 (N.D. Tex. July 11, 2016) fares no better. There, the parties admitted the first and second cases were substantially similar, but the plaintiff in the second-filed case argued the first-to-file rule should not apply because the parties had dismissed the first-filed case. *Id.* at *3. However, the first court subsequently vacated its dismissal order such that both cases were pending, and, at that point, the second court transferred the case. *Id*. at *3-*4. That

**App.729**

scenario does not support transferring Dexon's antitrust claims to the California Lawsuit which does not have any pending antitrust claims.

Finally, Cisco cites *Young* for the proposition that the Court still has "discretion to apply the first-to-file rule even though the first-filed action is no longer pending." Dkt. No. 31 at 3 (citing *Young v. L'Oreal USA, Inc.*, 526 F.Supp.3d 700, 706 (N.D. Cal. 2021)).[7] However, the court in *Young* transferred a second-filed action to the court that dismissed the "nearly identical" claims after the first court's order was affirmed on appeal and noted the preclusive issues at play. *Id*. at 706-07. Here, there are no risks of inconsistent judgments seeing as the first-filed antitrust counterclaims were dismissed without prejudice. Although the California court issued a substantive ruling, it also allowed Dexon leave to amend. Dexon's amended counterclaims did not include the antitrust claims that are now alleged in this case. Those counterclaims were not part of the operative complaint which was eventually dismissed with prejudice in California. Because there are no longer two pending antitrust "actions," there is little risk of duplicative work or unnecessary burden on the judiciary in refusing to transfer.

Cisco also makes a policy argument by arguing Dexon is attempting to avoid an adverse ruling, and the first-to-file rule exists to "prevent far less egregious tactics." Dkt. No 31 at 1; Dkt. No. 62 at 50:17-20 (arguing that this behavior, if allowed, could potentially result in "serial conflicting litigations if the Plaintiff can jump from forum to forum until they find a favorable one."). While avoiding inconsistent rulings concerning issues already decided by other courts is a

---

[7] The court in *Young* also explained that "[i]n most circumstances, courts have applied the first-to-file rule when the first-filed action is still pending in the district court or was dismissed pending resolution on appeal" and explained that the two cases it found addressing the issue both declined to apply the first-to-file rule. *Young*, 526 F.Supp.3d at 706-07 (citing *Exec. Law Grp., Inc. v. Exec. Law Grp. PL*, No. SACV 13-01823 MMM (RNBx), 2014 WL 12577090, at *3 (C.D. Cal. Mar. 24, 2014), which declined to transfer a second-filed case because, in part, "there was no concern of duplicative work or any unnecessary burden on the judiciary because the first-filed case was dismissed," and *Alul v. Am. Honda Motor Co., Inc.*, No. 16-cv-04384-JST, 2016 WL 7116934, at *1, 6 (N.D. Cal. Dec. 7, 2016), which declined to transfer a second-filed case because doing so would "not serve the purpose of 'sound judicial administration'" given that plaintiffs dismissed without prejudice the first case (citation omitted)).

**App.730**

valid concern, it is not one that the first-to-file rule, which is a forward-looking doctrine to avoid unnecessary duplication and inconsistent outcomes from co-pending actions, is meant to address. *See Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603-04 (5th Cir.1999).

Trying to apply the first-to-file rule to these facts shows it is inappropriate to do so. As explained above, the relevant inquiry is whether the two actions substantially overlap. *Int'l Fid. Ins. Co. v. Sweet Little Mex. Corp.*, 665 F.3d 671, 678 (5th Cir. 2011). "'Where the overlap between two suits is less than complete, the judgment is made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute.'" *Id.* (quoting *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 951 (5th Cir. 1997) (quoting *TPM Holdings, Inc. v. Intra–Gold Indus., Inc.,* 91 F.3d 1, 4 (1st Cir. 1996))). In arguing the facts and issues substantially overlap between the two cases, Cisco focuses on the redline comparison of Dexon's California Counterclaims and the present complaint, attached as Exhibit A to Cisco's motion. *See* Dkt. No. 21-1. However, the proper comparison is between Cisco's pending trademark infringement and counterfeiting claims in California and the Sherman Antitrust claims currently alleged by Dexon in this Court.

In the California Lawsuit, Cisco alleges claims of trademark infringement, trademark counterfeiting, false designation of origin, and associated state law claims, asserting that Dexon allegedly "engaged in schemes to traffic counterfeit Cisco products." *Cisco Sys., Inc. v. Dexon Computer, Inc*., 541 F. Supp. 3d 1009, 1013 (N.D. Cal. June 1, 2021). In the current Texas Lawsuit, Dexon alleges five claims under the Sherman Antitrust Act and one claim under the Texas Free Enterprise and Antitrust Act, including allegations of a conspiracy between Cisco and CDW to monopolize and to suppress inter-brand and intra-brand competition from entities like Dexon.

13

**App.731**

The "core issues" in the two forums are not the same, and the "proof adduced" will not be identical. *See Sweet Little Mex. Corp.*, 665 F.3d at 678. Moreover, Cisco has not shown how any ruling by this Court will affect the California Lawsuit, which concerns different issues, much less the risk of piecemeal litigation or inconsistent outcomes.[8] *See Cadle Inc.*, 174 F.3d at 604; *BNSF Ry. Co. v. OOCL (USA), Inc.*, 667 F. Supp. 2d 703, 709 (N.D. Tex. 2009).

For all these reasons, the Court concludes that the first-to-file rule does not apply.

## V. CONCLUSION

Based on the foregoing, it is **ORDERED** that Defendant Cisco Systems, Inc.'s Motion to Transfer (Dkt. No. 21) is **DENIED**.

SIGNED this the 22nd day of December, 2022.

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE

---

[8] Cisco appears to acknowledge this by reframing the first-to-file rule as a tool to prevent this Court from issuing rulings that are inconsistent with the reasoning expressed in the dismissal of Dexon's California Counterclaims with leave to amend. Dkt. No. 21 at 11-13. Broadly expanding the first-to-file rule to look *backward* as Cisco urges is not the appropriate solution for that concern. As explained at the hearing, this Court will not be a "super appellate court" to the California Court. Dkt. No. 62 at 74:6-22.

**App.732**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00053-RWS-JBB |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. and | ) | |
| CDW CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS CISCO SYSTEMS, INC. AND CDW CORPORATION'S OBJECTION**
**TO THE ORDER DENYING CISCO'S MOTION TO TRANSFER**

Defendants Cisco Systems, Inc. and CDW Corporation object to the Order denying Cisco's Motion To Transfer, *see* Dkt. 94, and respectfully request that this Court sustain the objection, grant the Motion, and transfer this action to the Northern District of California.

## INTRODUCTION

The Order does not dispute that the claims Dexon filed here are duplicative of counterclaims it filed in California, in a case that is still pending.  The Order nevertheless held (at 10) that, because the California court dismissed Dexon's counterclaims, the first-to-file rule does not apply.  That misconstrues the scope of the first-to-file rule:  the action in which Dexon first pursued its claims is still pending, and a ruling on the legal sufficiency of Dexon's claims here "would either conflict with a ruling already made [or] rehash an issue already decided" in that first-filed case.  *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 604 (5th Cir. 1999). Furthermore, even if transfer were not "compelled" under the first-to-file rule, denial of the motion under these circumstances – when Dexon has sought to circumvent the authority of a sister court – is clearly erroneous.

## ARGUMENT

The Court may reconsider a magistrate judge's order on any pretrial matter when the order is "clearly erroneous or contrary to law."  28 U.S.C § 636(b)(1)(A).   The "contours of the [first-to-file] rule . . . is a purely legal matter," *Cadle*, 174 F.3d at 603, subject to "plenary" review, *Network-1 Techs., Inc. v. Alcatel-Lucent USA, Inc.*, 2017 WL 11630561, at *1 (E.D. Tex. June 14, 2017).  A discretionary decision on transfer is subject to review for clear error. 28 U.S.C. § 636(b)(1)(A); *see In re Renaissance Hosp. Grand Prairie Inc.*, 713 F.3d 285, 293 (5th Cir. 2013) (clear error exists when a court has a "definite and firm conviction that a mistake has been committed").

1

**App.734**

## I.  THE FIRST-TO-FILE RULE APPLIES NOTWITHSTANDING THE DISMISSAL OF DEXON'S COUNTERCLAIMS

The Order's determination that the first-to-file rule does not apply because Dexon's virtually identical counterclaims were dismissed – even though the case in which they were filed is pending – is legally incorrect.  It ignores both the express language of the governing case and the clear purposes of the rule.  As the Fifth Circuit held in *Cadle*, the doctrine applies when "a case rais[es] issues that might substantially duplicate those raised by a **case** *pending* in another court."  *Cadle*, 174 F.3d at 604 (first emphasis added).  That is the situation here:  Dexon's antitrust claims overlap with (indeed, are virtually identical to) those it brought in the Northern District of California.  Accordingly, this Court will be required to determine the legal sufficiency of antitrust allegations that the California court has already dismissed for failure to state a claim.

The Order states (at 12-13) that "avoiding inconsistent rulings concerning issues already decided by other courts" is not a concern addressed by the first-to-file rule, which is "forward-looking."  But *Cadle* makes clear that when the first-filed action is still pending, that *is* among the concerns that the first-to-file rule addresses:  as the Fifth Circuit explained, the first-to-file rule avoids the possibility of a (future) ruling that either "conflict[s] with" or "rehash[es] an issue already decided" by the first-filed court.  174 F.3d at 604.  Again, that is the situation here:  Cisco and CDW's pending motions to dismiss will require this Court to revisit the very issues already decided in the pending California case.  Moreover, because Dexon's misconduct in selling counterfeit Cisco products is at issue in both cases – as the basis for Cisco's affirmative claims in California and as a potential defense to Dexon's antitrust claims here – both courts may continue to be called on to address the same legal and factual issues throughout the litigation, a point that the Order failed to address.  *See* Dkt. 21 at 13 (making this argument).

**App.735**

The Order's contrary construction would frustrate the rule's purposes, which – as the Order acknowledges (at 5) – are to avoid the risk of inconsistent rulings and piecemeal litigation, and to discourage forum shopping.  Those concerns are implicated in any case in which a litigant files a claim in one court, loses on the merits, and refiles a closely related claim in another court while the first case is still pending.[1]  Whether any differences in the newly filed claim suffice to avoid the ruling of the first court is a matter that only the first court should decide.  The only reason for filing in the new forum is to gain a tactical advantage:  if the new forum were more convenient, the litigant would have filed there in the first place.[2]  Accordingly, exempting litigants from the first-to-file rule undermines comity among district courts, conflicts with the efficient administration of justice, increases litigation costs, and invites abusive conduct.  This case implicates each of these concerns.

*SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Technology Ltd*., 2020 WL 6889173, at \*4 (E.D. Tex. Nov. 24, 2020), does not support the Order's construction of the first-to-file rule.  In *SIMO*, the defendant sought to transfer the plaintiff's case to the Northern District of California, where related counterclaims had been filed and dismissed.  *See id.* at \*1.  In denying the motion, the Court squarely held that the rule was inapplicable because there were *no* "concurrent, pending proceedings" between the parties in California.  *See id.* at \*4 (heading:

---

[1] In cases where a prior claim is subject to a final judgment, claim preclusion or issue preclusion may be available as a bar to the renewed claim; Cisco and CDW have moved to dismiss Dexon's claims because preclusion applies.  *See* Cisco's Mot. To Dismiss, Dkt. 22 at 11-13 (claim preclusion); CDW's Mot. To Dismiss, Dkt. 28 at 9-12 (issue preclusion).  *Cadle* makes clear, however, that when the first-filed case is pending, all such matters should be decided by the first-filed court.  *See* 174 F.3d at 605-06 (explaining that once "the likelihood of substantial overlap" between two suits has been demonstrated, immediate transfer is appropriate).

[2] The Order suggested (at 1) that the challenged conduct allegedly occurred "especially in Texas," but that is not true:  two incidents took place in Texas, most elsewhere; no conduct involving CDW allegedly occurred in Texas; no party is based in Texas; and Dexon alleged all of the Texas-based conduct in the earlier-filed California action.

**App.736**

"the California action is no longer pending"). Here, however, there *are* "concurrent, pending proceedings" between the parties in California.[3]  To be sure, as the Order points out (at 8), the statement that no action was pending was incorrect – the counterclaims but not the case had been dismissed – but the movant failed to make that clear until *after* transfer was denied.  The Court denied reconsideration because the argument came too late, and did not address the legal merits.[4]

The other cases cited in the Order are inapposite.  In *United States v. Texas*, the United States did not assert claims in the first-filed case; moreover, any overlapping claims brought by Texas in the first-filed case were mooted before an adjudication on the merits.  *See* 2022 WL 499861, at *1 (W.D. Tex. Jan. 11, 2022).  Similarly, in *L-3 Communications Integrated Systems, L.P. v. Lockheed Martin Corp.*, the plaintiff in the second-filed case did not assert its claims in the first-filed one.  *See* 2008 WL 89659, at *1 (N.D. Tex. Jan. 8, 2008).

## II.     DENIAL OF TRANSFER IN THESE CIRCUMSTANCES IS CLEARLY ERRONEOUS

Even if transfer were not "compelled" under the first-to-file rule, the denial of the motion was clear error because it "undercut the values of economy, consistency, and comity that the rule is designed to maximize."  *Cadle*, 174 F.3d at 604.  As to consistency and comity:  the Order's assertion (at 12) that "there are no risks of inconsistent judgments" is incorrect.  Not only did the

---

[3] The *SIMO* Court declined to exercise its discretion to transfer the case in part because the claims "could not have been properly brought . . . in the transferee court" because it lacked jurisdiction over one of the defendants.  2020 WL 6889173, at *4-5.  That is not true here. Moreover, the Court found that the plaintiff's claims did not arise out of the same "core or nucleus of operative facts" as the earlier action.  *Id.*  Dexon's claims against Cisco and CDW here, by contrast, are virtually identical to those dismissed in the pending California action. Dexon itself alleged that its counterclaims in the California action – including its antitrust claims – "arise out of the same controversy as [Cisco's pending] Federal claims."  Dkt. 21-2 at 21.

[4] The movant sought reconsideration because "the California case remains pending," *see* Case No. 2:20-cv-00003, Dkt. 55 at 4 (Dec. 18, 2020), and the Court declined, explaining that the movant did not raise this argument in its transfer motion, *see id.* Dkt. 77 at 5 (Mar. 16, 2021).

4

**App.737**

California court dismiss Dexon's antitrust claims (and characterize those it filed here as "duplicative"), but it also stated that Dexon's third-amended counterclaims would be its "last." *See* Mot. To Transfer, Dkt. 21 at 3-6; Order 4 n.4.  Allowing Dexon to evade these rulings would "trench[] on the authority of [a] sister court."  *Cadle*, 174 F.3d at 606.

To the extent the Order relied on the fact that there is no technically preclusive judgment in the earlier filed action, as its reference (at 12) to dismissal "without prejudice" suggests, that too is incorrect – because Dexon failed to re-assert its antitrust counterclaims in three successive amendments, the later dismissal with prejudice applies to its antitrust counterclaims as well.  *See* Mot. To Dismiss, Dkt. 22 at 11-13.  More importantly, it is beside the point.  Transfer is not limited to circumstances where preclusion applies.  *See*, *e.g.*, *Cadle*, 174 F.3d at 603-04 (distinguishing preclusion and the first-to-file rule).

The Order's statement (at 12) that there is "little risk of duplicative work or unnecessary burden" from allowing this case to proceed is also clear error.  Cisco has already moved to dismiss the same claims twice in different courts; this Court will have to address a motion to dismiss hardly different from one that the California court already granted; and the parties are engaged in discovery on claims the California court has held are legally insufficient.  Moreover, Dexon's illegal conduct – the basis for Cisco's claims in the California court – is a defense to Dexon's antitrust claims.  Cisco should not be forced to litigate those intertwined questions in two different courts, and Dexon should be barred from changing the locus of that controversy.

## CONCLUSION

The Court should vacate the Order and grant the Motion To Transfer.  Because Cisco and CDW are incurring substantial costs in defending this case, which is set for trial in October 2023, they respectfully request that the Court render a decision on this Objection expeditiously.

5

**App.738**

Dated: January 3, 2022

Respectfully submitted,

*/s/ Jennifer H. Doan*
JENNIFER H. DOAN
Texas Bar No. 08809050
COLE A. RIDDELL
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
(903) 255-1000
jdoan@haltomdoan.com
criddell@haltomdoan.com

JAMES A. REEDER, JR.
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
(832) 239-3939
jareeder@jonesday.com

THOMAS D. YORK
Texas Bar No. 24095531
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
(214) 969-4523
tdyork@jonesday.com

*Counsel for CDW Corporation*

*/s/ Deron R. Dacus*
DERON R. DACUS
Texas Bar No. 00790553
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ANDREW E. GOLDSMITH (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
CAROLINE A. SCHECHINGER (*pro hac vice*)
D. CHANSLOR GALLENSTEIN (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
agoldsmith@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com
cschechinger@kellogghansen.com
cgallenstein@kellogghansen.com

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center Twenty-
Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Counsel for Cisco Systems, Inc.*

**App.739**

### CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on January 3, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ Deron R. Dacus*
Deron R. Dacus

**App.740**

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | **JURY TRIAL DEMANDED** |
| **CDW CORPORATION** | § | |
| *Defendants* | § | |

**DEXON COMPUTER, INC.'S OPPOSITION TO CISCO'S OBJECTION TO JUDGE
BAXTER'S RULING ON CISCO'S MOTION TO TRANSFER**

## I.    INTRODUCTION

Cisco's objection to Judge Baxter's Order denying the motion to transfer this case to the Northern District of California (the "Transfer Order") reiterates the same arguments Cisco previously made but without addressing Judge Baxter's reasoning.[1]  Cisco relies on a sole ground for its transfer motion—the first-to-file rule ("FTF rule")—and fails to recognize that not a single case supports its argument.  Rather, as Judge Baxter explains in detail, courts recognize that the FTF rule only applies when allegedly substantially similar claims are pending before *both* the first-filed court and the court from which transfer is sought.  Indeed, this requirement is confirmed by the fundamental rationale of the FTF rule:  to avoid potentially inconsistent future rulings on the same issues and to avoid duplication.  *See, e.g., Cadle Co. v. Whataburger of Alice*, 174 F.3d 599, 603 (5th Cir. 1999); *SIPCO, LLC v. Emerson Elec. Co.*, 2016 WL 7743496, at *4-5 (E.D. Tex. July 1, 2016).  When, as here, the allegedly substantially similar claims are not pending before the first-filed court, the FTF rule does not apply.

Cisco's objection does not address Judge Baxter's ruling that the FTF rule is a forward-looking rule, rather than a backward-looking rule, despite Judge Baxter's proper finding that Cisco improperly asks the Court to look "*backward*[*s*]."  (Dkt. 94 ("Order") at 12-14, n.8 (emphasis in original).)  Cisco also does not address Judge Baxter's determination that Cisco's intellectual property case against Dexon in California addresses different core issues, and the proof adduced will not be identical.  (*Id.* at 14)

Thus, under all precedents addressing the FTF rule as well as given the specific circumstances of this case, Cisco's transfer motion should be denied.

---

[1] While co-Defendant CDW signed the objection, only Cisco made substantive arguments in support of the motion for transfer.  (Dkt. 21.)  CDW joined Cisco's transfer motion in form only.  (Dkt. 27.)

## II.    BACKGROUND

Cisco correctly states that for the Court to reverse Judge Baxter's Transfer Order, the ruling must be "clearly erroneous or contrary to law."  28 U.S.C § 636(b)(1)(A).

Judge Baxter's Transfer Order discusses the circumstances under which Cisco sued Dexon in California for alleged intellectual property claims, and how Dexon's previous antitrust counterclaims solely against Cisco were dismissed without prejudice.  (Order at 1-4.)  Judge Baxter's opinion also discusses the law and policy of the FTF rule, including the fact that without a finding of substantial overlap the FTF rule does not warrant transfer.  (*Id.* at 5-7.)  Cisco does not challenge any of these findings of law; thus on this basis alone, the Court can find that Judge Baxter's Transfer Order is not "contrary to law."  28 U.S.C § 636(b)(1)(A).

Judge Baxter then reviews many precedents discussing and applying the FTF rule, including those of this Court as well as those cited by Cisco, and finds that the FTF rule applies to cases in which currently pending claims in both cases substantially overlap.  (Order at 8-13.)  Accordingly, the proper analysis to determine substantial similarity is to compare (i) Cisco's currently pending IP claims against Dexon in California and (ii) Dexon's present antitrust claims in this Court.  (*Id.* at 13.)  In doing so, Judge Baxter concludes that there is no core similarity between these claims.  (*Id.* at 14.)  Thus, even though Dexon explained in prior briefing that its prior antitrust counterclaims are not substantially similar to its present Complaint (Dkt. 25 at 7-9), it was not necessary for the Court to undertake that analysis to make its ruling.  Finally, Judge Baxter confirms that this Court would not be a "super appellate court" in reviewing Cisco's and CDW's motions to dismiss, which address substantially different law and facts than were previously at issue in California.  (Order at 14 & n.8.)

## III.    ARGUMENT

### A.    No Legal Authority Supports Cisco's Position

Judge Baxter reviews case law both within and outside of this District to find that the FTF rule only applies where currently pending claims substantially overlap. (*Id.* at 8-13.) The Transfer Order discusses how the holdings of *SIPCO, LLC v. Emerson Elec. Co.*, No. 6:15-CV-907, 2016 WL 7743496 (E.D. Tex. July 1, 2016), *Am. Can! Cars for Kids v. Kars 4 Kids, Inc.*, No. 3:15-CV-3648-B, 2016 WL 3688631 (N.D. Tex. July 11, 2016), and *Young v. L'Oreal USA, Inc.*, 526 F.Supp.3d 700, 706 (N.D. Cal. 2021), all cases cited by Cisco, support its analysis. (*Id.* at 11-12.) The fact that Cisco's present objection does not address its own authority supporting the Court's ruling (*compare id. with* Dkt. 96) is sufficient on its own to overrule Cisco's objection. As Dexon pointed out in the original briefing, all of Cisco's cited cases, including those discussed by Judge Baxter, support Dexon's position. (*See* Dkt. 25 at 5-6 & n.3.)

Now Cisco asserts, as it did in prior briefing, that *Cadle* supports its position, but the case confirms why transfer is not warranted. *Cadle* confirmed that the FTF rule "is essentially a forward-looking doctrine [used] to maximize judicial economy and minimize embarrassing inconsistencies by prophylactically refusing to hear a case raising issues that might substantially duplicate those raised by a case pending in another court." 174 F.3d at 603. Illustrating this principle, when this Court previously assessed whether an antitrust case alleging "more details of [an] alleged conspiracy" should be transferred under the FTF rule to another court presiding over an overlapping conspiracy, the Court denied the transfer motion. *See TravelPass Grp. LLC v. Caesars Ent. Corp.*, 2019 WL 4071784 (E.D. Tex. Aug. 29, 2019) (Schroeder, J.). Despite the similarities between the cases, the Court found that transfer was not proper because there was no likelihood of conflicting rulings. (*Id.* at *6.) The actions here are far less similar, and unlike in

*TravelPass*, there is no pending antitrust claim in the first-filed court.  Judge Baxter properly finds that "Cisco has not shown how any ruling by this Court will affect the California Lawsuit, which concerns different issues, much less the risk of piecemeal litigation or inconsistent outcomes." (Order at 14; *see also id.* at n.8.)

The only other authority Cisco substantively discusses in its objection is this Court's holding in *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 2020 WL 6889173 (E.D. Tex. Nov. 24, 2020), but Cisco does not explain why Judge Baxter's application of this precedent is incorrect.  In *SIMO*, the Court denied transfer under the FTF rule because the allegedly substantially similar claims were no longer pending in the first court.  *Id.* at *10.  This case is thus consistent with all other precedents analyzing the FTF rule.  (*See* Dkt.  25 at 5-6 & n.3.)  Cisco appears to attack *SIMO*'s holding on the basis that other claims were still pending in the first filed court, but again, Cisco does not argue that its presently pending claims in California are substantially similar to Dexon's antitrust claims.  Thus, there is nothing supporting Cisco's argument regarding *SIMO*.

Finally, Cisco argues in passing that its unpled affirmative defenses based on its IP claims render the cases substantially similar, but again, no authority supports this argument.  As Judge Baxter correctly finds, "the core issues in the two forums are not the same, and the proof adduced will not be identical."  (Order at 14.)  As Dexon will explain should Cisco plead affirmative defenses based on its IP claims, Cisco's IP claims are not a valid affirmative defense to Dexon's antitrust claims.  Cisco attempted to defend the last monopolization case it faced with IP-based affirmative defenses, and the Court correctly found that they were not valid affirmative defenses. *See Arista Networks Inc. v. Cisco Sys., Inc.*, No. 5:16-cv-00923, Dkt. 205 (N.D. Cal. Feb. 14, 2018).

**B.    Cisco Cannot Challenge That The Cases Do Not Overlap and Application of the FTF Rule Is Inappropriate**

There are several important differences between Dexon's present antitrust claims and its prior counterclaims (Dkt. 25 at 7-9), but Judge Baxter correctly finds that the proper comparison for application of the FTF rule is between Cisco's presently pending IP claims and Dexon's antitrust claims.  (Order at 13.)  The Transfer Order found that this comparison is "made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." (*Id.*)  Judge Baxter analyzes each of these factors and found that there was no substantial overlap.

Cisco does not because it cannot object to any of these findings.  Cisco repeats its claim about alleged forum shopping, but as Dexon explained to the Court, it filed the present claims in Texas because they belong in Texas.  Even before discovery, Dexon located five examples of monopolistic coercion in the State.  (*See, e.g.*, Dkt. 1 at ¶¶ 3, 7-8, 51, 65-67, 129-137.)  Despite Cisco's abuse of the discovery process, the limited discovery Dexon has received has confirmed its use of intimidation to preserve its monopolies.  (*See* Dkt. 97.)  Cisco employees based in Texas will need to testify at trial, as well as potentially third parties who will be within the Court's subpoena power.  All of these facts are relevant to "the comparative advantage and the interest of each forum in resolving the dispute" under the FTF rule (Order at 13), and Dexon appropriately filed suit in this forum because that is where trial belongs under the facts.

**IV.    CONCLUSION**

For the foregoing reasons, Cisco's objection should be overruled.

Dated:  January 17, 2023

Respectfully submitted,

By:  */s/ David H. Reichenberg w/ permission*

*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
Tina P. Lapsia (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
tlapsia@manatt.com
Phone:  (212) 790-4626

**ATTORNEYS FOR PLAINTIFF
DEXON COMPUTER, INC.**

### CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on January 17, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| | § | |
| **v.** | § | **Case No. 5:22-cv-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and CDW** | § | |
| **CORPORATION** | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced case was referred to the undersigned United States Magistrate Judge

for pretrial purposes in accordance with 28 U.S.C. § 636. The following pending motions are

before the Court:

> **Defendant Cisco Systems, Inc.'s Motion to Dismiss Under Rule 12(b)(6) (Dkt.
> No. 22); and**

> **Defendant CDW Corporation's Motion to Dismiss the Complaint Pursuant to
> FED. R. CIV. P. 12(b)(6) (Dkt. No. 28).**

The Court, after considering the relevant briefing and hearing arguments of counsel September 7,

2022, recommends Cisco's motion be **DENIED,** with the part of the motion seeking dismissal

under true res judicata being **DENIED WITHOUT PREJUDICE**. The Court recommends

CDW's motion be **DENIED**, with the parts of the motion seeking dismissal for failure to plead

with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018

claims as time-barred being **DENIED WITHOUT PREJUDICE**.

# Contents

Contents ........................................................................................................... 2

I.    BACKGROUND .......................................................................................... 4

      A.    The current Texas Lawsuit............................................................... 4

      1.    Allegations, generally........................................................................ 4

      2.    Allegations regarding the three antitrust claims against Cisco (Counts III, IV, and V) .. 6

      3.    Allegations regarding alleged conspiracy claims against Cisco and CDW (Counts I and II)……………………………………………………………………………11

      4.    Allegations of antitrust injury ......................................................... 14

      B.    The California Lawsuit ................................................................... 15

      C.    Defendants' current motions to dismiss.......................................... 18

II.   LEGAL STANDARD ................................................................................ 19

III.  MOTIONS TO DISMISS UNDER "RES JUDICATA"................................. 21

      A.    Cisco's motion to dismiss under true res judicata or claim preclusion................. 21

      1.    Parties' assertions ......................................................................... 21

      2.    Applicable law .............................................................................. 21

      3.    Analysis ....................................................................................... 22

      B.    CDW's motion to dismiss under collateral estoppel or issue preclusion............. 26

      1.    Parties' assertions ......................................................................... 26

      2.    Applicable law .............................................................................. 27

      3.    Analysis ....................................................................................... 28

IV.   MOTIONS TO DISMISS UNDER RULE 12(b)(6) ..................................... 29

      A.    Dexon's antitrust claims ................................................................ 30

      1.    Sherman Act § 1 claims .................................................................. 30

      2.    Sherman Act § 2 claims .................................................................. 30

      3.    Texas Free Enterprise and Antitrust Act claims............................... 30

      B.    Applicable law .............................................................................. 31

      1.    Sherman Act § 1 ............................................................................ 31

      2.    Sherman Act § 2 ............................................................................ 32

      C.    Conspiracy claims against Cisco and CDW under Sherman Act §§ 1, 2 (Counts I, II)……………………………………………………………………………33

      1.    Dexon plausibly alleges the existence of an agreement between Cisco and CDW ....... 34

2. The alleged agreement is not *per se* lawful ...................................................... 36

3. Dexon plausibly alleges competitive harm ...................................................... 38

4. Dexon fails to plausibly allege specific intent by CDW to monopolize for purposes of the Sherman Act § 2 conspiracy to monopolize claim ...................................................... 42

    D. Tying claim against Cisco under Sherman Act § 1 (Count III) ............................ 44

1. Dexon's allegations in the current Texas Lawsuit ...................................................... 44

2. Applicable law ...................................................... 46

3. Parties' assertions ...................................................... 50

4. Dexon's *Kodak* theory of *per se* tying liability ...................................................... 52

    E. Monopolization and attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V) ...................................................... 66

1. Parties' assertions ...................................................... 66

2. Applicable law ...................................................... 66

3. Discussion ...................................................... 67

    F. Antitrust injury for Counts I-VI ...................................................... 70

1. Parties' assertions ...................................................... 70

2. Applicable law ...................................................... 70

3. Discussion ...................................................... 71

    G. Texas Free Enterprise and Antitrust Act (Count VI) ...................................................... 77

    H. Statute of Limitations concerning Dexon's pre-2018 claims against CDW ......... 77

1. Parties' assertions ...................................................... 77

2. Applicable law ...................................................... 78

3. Discussion ...................................................... 79

V. RECOMMENDATION ...................................................... 81

**App.750**

# I. BACKGROUND

## A. The current Texas Lawsuit

### 1. Allegations, generally

On April 27, 2022, Plaintiff Dexon Computer, Inc. ("Plaintiff" or "Dexon") filed the above antitrust case in the U.S. District Court for the Eastern District of Texas, Texarkana Division (the "Texas Lawsuit"). Dexon alleges Defendant Cisco Systems, Inc. ("Cisco") is a monopolist in several Worldwide and U.S. markets related to networking equipment and services for Internet equipment. *See, e.g.*, Dkt. No. 1 (Original Complaint), ¶¶ 1-14. According to Dexon, Cisco locks in customers who require maintenance on such equipment with Cisco's SmartNet program, forcing customers to make supracompetitive purchases of routers and Ethernet switches. *Id.*, ¶¶ 23-49. In total, Dexon alleges separate and distinct markets for routers, Ethernet switches, IP phones, and the maintenance services for such products. *Id.*, ¶¶ 29-30. Dexon alleges the Relevant Network Equipment Markets (ethernet switches and routers) and the Relevant IP Phone Market are referred to collectively as the "Relevant Product Markets." *Id.*, ¶ 44.

Dexon resells network equipment manufactured by Cisco and Cisco competitors in addition to providing maintenance services for network equipment. *Id.*, ¶¶ 7-8, 11-13. Dexon alleges its business model allowed customers to replace Cisco networking equipment with non-Cisco networking equipment and also "put pressure on Cisco to lower prices and improve its service" *Id.*, ¶ 13. Dexon alleges that by at least 2015, Cisco deemed multi-vendor resellers like Dexon a competitive threat. *Id.*

Dexon claims that Cisco thereafter engaged in a multi-prong strategy, including to threaten customers not to do business with resellers like Dexon or else pay the consequences in the service market where Cisco has complete control. *Id.* "In the process, Cisco has constrained its network

4

**App.751**

equipment competitors and thus customer choice and has maintained its supra-competitive pricing in several relevant product markets." *Id*. Specifically, Dexon claims that Cisco employed fear, uncertainty, and doubt ("FUD") tactics, especially in Texas, to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products. *Id.*, ¶ 67.

According to Dexon, in carrying out its scheme, Cisco conspired with Defendant CDW Corporation ("CDW") to sell Cisco equipment in specific network equipment markets to exclude resellers like Dexon and maintain its network equipment monopolies in violation of federal and state antitrust laws. *Id.*, ¶¶ 56-57; *see also id.*, ¶ 13. CDW is a distributor of information technology ("IT") products and services produced by leading original equipment manufacturers, including Cisco and others, to end-customers. *Id.*, ¶¶ 56 (alleging reseller CDW sells Cisco equipment in the Relevant Networking Markets and had revenue of $18.47 billion in fiscal year 2020 compared with Cisco's $49.8 billion in the same time period), 61 (alleging a search for "Ethernet switches" on CDW's website pulls up 1,440 selections for Cisco with no other Ethernet switch competitor).

Dexon asserts the agreement between Cisco and CDW (collectively, "Defendants") reflects an unreasonable restraint of trade and a conspiracy to monopolize that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g.*, *id.*, ¶¶ 87-100 (Counts I and II). Dexon also asserts claims against Cisco under § 1 of the Sherman Act for *per se* tying in the Relevant Product Markets, under § 2 of the Sherman Act for unlawful monopolization of the Relevant Networking Equipment Markets, and under § 2 of the Sherman Act for unlawful attempted monopolization of the Relevant Product Markets (Counts III, IV, and V). Dexon asserts claims under the Texas Free Enterprise and Antitrust Act against Cisco and CDW (Count VI). *Id.*, ¶¶ 87-128. Dexon seeks injunctive relief, damages, and costs in connection with such violations. *See* Prayer for Relief.

2.      **Allegations regarding the three antitrust claims against Cisco (Counts III, IV, and V)**

In Count III, Dexon asserts a Sherman Act § 1 *per se* tying claim against Cisco, alleging Cisco, a monopolist in the Relevant Services Market,[1] has used its SmartNet services package in that Market as a tying product. Dkt. No. 1, ¶ 102. Dexon alleges Cisco locks in customers who require maintenance with SmartNet and then uses SmartNet as a "hammer to force supracompetitive purchases of routers and Ethernet switches," the tied products. *Id*. at 15 (emphasis removed). According to Dexon, "after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery." *Id.*, ¶ 102.

Dexon alleges the Relevant Service Market is distinct from the Relevant Product Markets because they are "fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently." *Id.*, ¶ 103 ("Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Market. Indeed, Cisco's conduct at issue in this case confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking

---

[1] Dexon alleges Cisco is a monopolist for after-market maintenance services on Cisco equipment. These services constitute a "Relevant After-Market for Maintenance Services on Cisco Equipment" (hereafter "Relevant Service Market") (both globally and limited to the U.S.) in which "Cisco is a monopolist, and no other competitive service provider has reached a double-digit share. Dkt. No. 1, ¶¶ 29, 44.

equipment on the other."). Dexon alleges a substantial amount of commerce has been affected in the Relevant Product Markets (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. *Id.*, ¶ 105; *see also id.*, ¶ 106 ("Cisco does not have a legitimate business purpose for its anticompetitive conduct. . . .").[2]

Dexon alleges it is aware of at least five examples, involving millions of dollars in equipment sales, "in Texas in order to keep networking prices high and to foreclose competition

---

[2]Dexon alleges the anticompetitive effects of Cisco's conduct are overwhelming. Dkt. No. 1 at 25. According to Dexon's complaint, Cisco engaged in "an overall effort to force customers to only be able to access networking equipment, IP phones and service through the most expensive avenues, while foreclosing Cisco's equipment competitors." *Id.*, ¶ 78. Specifically, Dexon alleges as follows:

> In some cases, Cisco was able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. There is no "business justification" to this, and Cisco practices are merely designed to shift economic welfare from customers to itself.

> The inevitable effect of this overall course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives. While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases. As the above examples make clear, many customers are left with no practical choice other than to purchase unwanted and overpriced equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

> Indeed, in the case of a Texas-based 911 operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics. There is no justification that can be advanced to accept this needless risk to human safety.

> Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather are forced to acquiesce to Cisco's pressure. Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers cannot afford to risk the services it needs that only Cisco provides. In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

*Id.*, ¶¶ 79-82 (internal numbering omitted).

from competing providers of networking equipment." *Id.*, ¶ 2. One example is "a Texas-based bank" that bought Ethernet switches and routers as well as SmartNet. *Id.*, ¶ 3. According to Dexon, when the SmartNet service package came up for renewal, "the customer sought only to renew the package, but Cisco demanded that it must also buy new Ethernet switches and routers to be eligible for the renewal. The customer did not want or need any new networking equipment, but had no choice other than to give into Cisco's demand to obtain and keep the maintenance and support it needed." *Id.*

Dexon alleges another "instance of Texas-based coercion illustrates Cisco's FUD strategy." *Id.*, ¶ 7. "An energy company headquartered in Texas bought Ethernet switches and routers from Dexon, and also bought a multi-year SmartNet maintenance and service package through one of Cisco's preferred dealers." *Id.* "After providing the promised maintenance and service support to the customer for several years, Cisco then changed its course of conduct and demanded that the customer purchase new Ethernet switches and routers from a vendor other than Dexon to continue receiving the SmartNet maintenance and service." *Id.* Dexon further alleges as follows:

> The customer informed Dexon that it still desired to buy networking equipment from Dexon now and in the future, due to the attractive pricing and competitive options Dexon is able to provide, but it could no longer do so because Cisco's new position was that Cisco no longer provide the maintenance support the customer needed. As a result, Cisco's networking equipment competitors selling through Dexon or any other reseller have been foreclosed for at least the lifespan of the products and services Cisco forced the customer to purchase, and the customer has been forced to restrict its choices and ability to make future purchasing decisions on the merits.

*Id.*

A third example of Cisco's alleged anticompetitive conduct is "a local Texas emergency 911-center which had purchased networking equipment from Dexon." *Id.*, ¶ 8. Regarding this example, Dexon alleges as follows:

> In the midst of a five-year SmartNet service package the 911-center had purchased from Cisco, Cisco told the Texas emergency 911-center it needed to purchase new routers and Ethernet switches from a non-Dexon vendor when the customer checked on its account for purposes of a service issue if it wanted to receive the service it was due under its SmartNet service package. Cisco had never notified the customer of a cancellation of the SmartNet service package in the absence of a new equipment purchase. The 911-center cannot afford new equipment, and thus continues to face Cisco's threat that it will not receive the previously paid for service unless it chooses a different vendor for new product purchases, even if that means human lives are put at risk due to a network support issue. This FUD based strategy intends to and successfully: (1) forecloses Cisco's networking equipment competitors from reaching customers through resellers like Dexon, and (2) forces customers to pay more for products that it sought to purchase from less expensive resellers like Dexon.

*Id.*

Another example is a "Texas based automobile dealership purchased Ethernet switches through Dexon as well as a SmartNet service package through another vendor, all with the knowledge and approval of Cisco." *Id.*, ¶ 51. "Pursuant to the SmartNet service package, Cisco first provided maintenance services and support for the Ethernet switches, including with software updates. However, one of Cisco's software updates had a critical flaw that, when deployed by Cisco, rendered the Ethernet switches useless. . . ." *Id.* Although Cisco first replaced the Ethernet switches pursuant to the SmartNet service package, "Cisco then claimed it would not replace other defective Ethernet switches or complete any maintenance unless the customer bought entirely new Ethernet switches from a vendor other than Dexon." *Id.* According to Dexon, because "the customer could not afford new Ethernet switches, due to a limited IT budget, the customer was forced to deal with a network disruption on its own and without any ability to switch to a competing network equipment provider." *Id.* "Because the customer relied on Cisco's original assurance that

the customer would receive the service and maintenance for which it had paid, when Cisco changed its position, it robbed the customer of the ability to make a free choice about its equipment manufacturer and reseller. Thus, both Cisco's competitors in the Relevant Networking Products were improperly foreclosed, as well as Dexon because the customer is under a new impression that any use of its products or services will put any Cisco service in jeopardy." *Id.*

As another example of FUD, Dexon alleges "Cisco recently claimed to a Maryland customer that line cards sold by Dexon suffered from 'malware,' even though there is no software associated with the sale of line cards." *Id.*, ¶ 68 (further alleging "Cisco is essentially immune from any criticism it may receive from customers due to these false statements because it knows that customers still require so many of its services").

In Counts IV and V, Dexon asserts Sherman Act § 2 claims against Cisco for unlawful monopolization of the Relevant Network Equipment Markets (Dkt. No. 1, ¶¶ 109-14) and for unlawful attempted monopolization of the Relevant Product Markets (*id.*, ¶¶ 115-21). For both claims, Dexon alleges Cisco committed numerous acts, including (1) coercing purchases in the relevant markets by withholding service in the relevant service market; (2) engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels; and (3) engaging in related FUD tactics which resulted in additional revenue and goodwill losses and stunted overall competition in the relevant markets.

Specific to Count V, Dexon further alleges Cisco interfered "with the proper award of at least one major RFP to Dexon, and denigrat[ed] Dexon for the purpose of securing a direct sales relationship with an important Texas public entity." *Id.*, ¶ 117(c). Earlier in the complaint, Dexon alleges Cisco expanded its successful "FUD and coercion campaign" for the Relevant Networking

Equipment Markets into the IP Phone Market.  *Id.*, ¶ 65. Dexon provides the following specific

example:

> Once again in Texas, an Independent School District awarded Dexon a multi-year exclusive contract to provide IP phones to the District, after several years of successful dealings with Dexon. Dexon was awarded the most recent business after an exhaustive RFP process, in which Dexon was rated the clear winner for every criterion being considered by the School Board. Indeed, several of the evaluation criteria related to the reputation and quality of Dexon's goods and services, which would include the products of several IP phone manufacturers. As a result, the School Board approved the award of the contract to Dexon for thousands of IP phones. Upon information and belief, Cisco threatened the School District that if it did not cancel the order from Dexon, it would not service the other Networking Equipment already purchased by the District. Once again, this coercion worked, and the customer was forced to cancel its order with Dexon, and upon information and belief, the District paid more for the same exact equipment from another reseller.
>
> As a result, upon information and belief, not only was the Texas School District forced to spend more for an RFP that was already completed and approved, but it forecloses any competitive product purchase that would have been considered from Dexon due to the successful execution of FUD.

*Id.*, ¶¶ 65-66 (internal numbering omitted).

### 3.     Allegations regarding alleged conspiracy claims against Cisco and CDW (Counts I and II)

Dexon alleges Cisco recruited CDW, one of its "favored resellers," to aid in its plan. *Id.*, ¶

56. Dexon alleges CDW sells Cisco equipment in the Relevant Networking Markets. *Id.* Whereas

"resellers like Dexon provide attractive service and pricing to customers that puts pressure on

Cisco to charge lower prices to its favored resellers," "Cisco favors CDW because CDW's resale

prices in the Relevant Networking Markets allow Cisco to maintain its supra-competitive pricing

in those Markets." *Id.* Dexon alleges "[o]nce Cisco deemed Dexon a competitive threat, it also

determined that CDW could be an ally in its plan to foreclose resellers like Dexon from providing

superior service, pricing, and competitive network equipment options for its customers." *Id.*, ¶ 57.

"To this end, Cisco and CDW conspired to exclude Dexon from making sales in at least the Relevant Networking Equipment Market to end user customers." *Id.*

According to Dexon, Dexon's attempt to sell Relevant Networking Equipment to a hospital system in Pennsylvania provides an example of how the alleged conspiracy works:

> For several years, Dexon had provided routers, Ethernet switches, line cards, access points and modules to the hospital. The customer was open to purchasing products from manufacturers apart from Cisco, and valued the fact that Dexon provided those options, because it led to better pricing and service.
>
> Pleased with the products and service Dexon had provided, the hospital decided to make a significant investment in routers and Ethernet switches, and the deal would have been worth a significant amount of business for Dexon (on top of the prior business with Dexon which was already significant). Upon learning that the hospital had selected Cisco for the purchase and had awarded the order to Dexon, Cisco threatened the customer that if it did not cancel the order for the new purchase of hardware and associated SmartNet service with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics which the customer had been receiving service and support from Cisco for years. This tactic worked, and the customer did not go through with the contemplated deal with Dexon, and never made another purchase from Dexon again.
>
> Cisco's agreement with CDW to exclude Dexon from at least the Relevant Networking Equipment Market facilitated this outcome, which restricted both inter-brand competition (between Cisco and its competitors in the Relevant Network Markets) and intra-brand competition (between Cisco resellers). Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment. The sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the "savior" to the hospital system so that the customer could keep its service for all of its Networking Equipment, when in fact the intention and purpose of the scheme was to exclude resellers like Dexon, so that the customer would pay more for the equipment with CDW as the sole supplier. Upon information and belief, the Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon.

*Id.*, ¶¶ 58-60 (internal numbering omitted).

Dexon alleges this Cisco-CDW conspiracy has "limited intra-brand competition between resellers selling Cisco Networking Equipment in the Relevant Markets, because its purpose and effect is to prevent end user customers' from having access to Dexon which offers top quality service at more aggressive pricing than other resellers." *Id.*, ¶ 61. According to Dexon, the "conspiracy also had the dual effect of limiting inter-brand competition between Cisco and its competitors in the Relevant Networking Equipment Markets, because not all resellers prioritize or promote competitive products in the Relevant Networking Equipment Market in the same way." *Id.* Specifically, Dexon alleges as follows:

> As an example, on CDW's website, when one completes a search for "Ethernet switches," it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections (and most below 100). Upon information and belief, this is because CDW believes it will receive favorable treatment by Cisco by showing so many of its offerings and portraying its competitors as more limited. By contrast, Dexon has earned the respect and trust of its customers precisely because it does not prioritize any particular brand or make assumptions about what a customer wants, and merely seeks to guide the customer to the best option. Thus, when Cisco conspired with CDW, Cisco knew that it would tilt the competitive playing field in its favor, limiting the opportunities of its competitors to make sales through resellers like Dexon which does not favor any particular Network Equipment competitor.

*Id.*

Dexon alleges that as part of the conspiracy, which continues through the present day, "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." *Id.*, ¶ 62. "Confirming this agreement, upon information and belief, when the CDW representative previously assigned to Dexon refused to comply with the Cisco's demand, CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* According to the complaint, "[p]ursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* Dexon alleges the conspiracy "has

foreclosed a substantial amount of interstate commerce to Dexon by virtue of the Pennsylvania Health System alone, but upon information and belief, millions of dollars of purchases across the country have been foreclosed to Dexon due to the Cisco-CDW conspiracy." *Id.*, ¶ 63.

**4.      Allegations of antitrust injury**

Dexon further alleges "Cisco's overall course of conduct is specifically designed (i) to foreclose or otherwise eliminate distribution options through which customers can purchase from manufacturers competitive to Cisco, and (ii) to eliminate the option a customer would have to secure such a product for a lower price that puts upstream pressure on Cisco to lower its own prices should customers opt for a Cisco product." Dkt. No. 1, ¶ 83. Dexon alleges its antitrust injury "illustrates both of these phenomenon" as follows:

> Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

> Cisco's conduct is designed to harm resellers like Dexon precisely because of the benefits to customers that Dexon has provided for decades, which run counter to Cisco's profit motives. Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive, exclusive channels. If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions or quality improvements that would impact Cisco's bottom line. The coercion and other conduct at issue in this case allows Cisco's monopoly power to not only be maintained, but grown, and Dexon's losses are a direct byproduct of this phenomenon.

> Dexon has also sustained loses to its goodwill and reputation in the marketplace by virtue of Cisco's conduct. Because of Cisco's monopoly position in both the Relevant Service Market and the Relevant Product Markets, it has been immune to customer dissatisfaction with its conduct and has attempted to shift the problem of its own creation to Dexon. Namely, rather than respond to customer feedback and attempt to win purchases by virtue of better service or terms, Cisco has attempted

to portray Dexon as an unworthy sales partner who is the cause of the customers' problems. But this is not the case, as Dexon has spent decades building trust and goodwill with its customers, even to the benefit of Cisco. But now that Cisco's priority is to bully and intimidate any company that stands in the way of its maximum profit, Dexon is being painted in a different light.

Dexon's reputation has been unjustifiably harmed due to Cisco's antitrust violations in the United States and in Texas specifically. Dexon lost a major award for IP phones from a public school district, was forced to sustain losses so that a 911 operator could continue to serve citizens, was forced to stop doing business with an automobile chain, and no longer can do business with an energy company all because of Cisco's FUD and associated coercive tactics. Texans should be able to benefit from the competition options and service that Dexon can offer, but instead Cisco has employed anticompetitive tactics specific to the State to deprive its businesses and public entities of those benefits.

*Id.*, ¶¶ 83-86 (internal numbering omitted).

## B.      The California Lawsuit

On July 22, 2020, almost two years before Dexon filed its current case, Cisco filed suit against Dexon in the U.S. District Court for the Northern District of California. *Cisco Systems, Inc. and Cisco Technology, Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-4926 (the "California Lawsuit").[3] In the California Lawsuit, Cisco's First Amended Complaint against Dexon was filed on March 19, 2021, asserting claims of trademark infringement, trade counterfeiting, false designation of origin, and associated state law claims. Specifically, Cisco alleges Dexon sells counterfeit Cisco products (including switches and transceivers) in violation of the Lanham Act and California state law.

On July 29, 2021, Dexon filed its Amended Answer, Affirmative Defenses, Counterclaims and Third Party Claims ("Dexon's California Counterclaims"). California Lawsuit, Dkt. No. 50;

---

[3] The Court takes judicial notice of the docket entries and judicial documents filed in the California Lawsuit. *See Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 327 (E.D. Tex. 2021) ("Documents in judicial actions and cases' dockets are public records of which any court can take judicial notice."(citations omitted)); *see also* FED. R. EVID. 201.

*see also* Texas Lawsuit, Dkt. No. 21-2. Dexon asserted various antitrust counterclaims[4] among other trademark and tort counterclaims.[5] On motion from Cisco, the California Court dismissed Dexon's California Counterclaims, but the court granted Dexon leave to amend. *See Cisco Sys. Inc. v. Dexon Computer, Inc.* ("*Cisco I*"), No. 20-cv-04926-CRB, 2021 WL 5848080, at *1, *9 (N.D. Cal. Dec. 9, 2021). In its amended pleading, Dexon did not re-assert the dismissed antitrust counterclaims. California Lawsuit, Dkt. No. 92 ("Dexon's Second Amended Counterclaims"); *see also* Texas Lawsuit, Dkt. No. 21-4 (same).

On a further motion from Cisco, the California Court dismissed Dexon's Second Amended Counterclaims. *See Cisco Sys., Inc. v. Dexon Computer, Inc.* ("*Cisco II*"), No. 20-cv-04926-CRB, 2022 WL 797015, at *1 (N.D. Cal. Mar. 16, 2022). According to the California Court, although Dexon provided more detail than it did in its prior complaint, Dexon still failed "to state these claims," and gave Dexon "leave to amend one last time." *Id.* at *4, *8.

On April 6, 2022, Dexon filed its Third Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims ("Third Amended Counterclaims"). Once again, Dexon chose not to re-plead any antitrust claims. California Lawsuit, Dkt. No. 107; *see also* Texas Lawsuit, Dkt. No. 21-6 (same). On April 27, 2022, Cisco moved to dismiss Dexon's Third Amended Counterclaims pursuant to Rule 12(b)(6). California Lawsuit, Dkt. No. 117; *see also*

---

[4] *See* California Lawsuit, Dkt. No. 50, ¶¶ 61-68 (tying), monopolizing (¶¶ 69-74), ¶¶ 75-81 (attempted monopolizing), ¶¶ 82-91 (violations of the California Cartwright Act), and ¶¶ 92-130 (violations of the California Unfair Competition Law).

[5] *See* California Lawsuit, Dkt. No. 50, ¶¶ 131-141 (declaratory judgment concerning the Lanham Act and state law), ¶¶142-148 (Lanham Act false advertising), ¶¶ 149-155 (intentional interference with contractual relations), ¶¶ 156-163 (intentional interference with prospective economic advantage), and ¶¶ 164-170 (trade libel).

Texas Lawsuit, Dkt. No. 21-7. That same day, Dexon filed its Original Complaint in this Court, asserting antitrust causes of action.[6]

Like it did in the California Lawsuit, Dexon brings against Cisco a *per se* tying claim under § 1 of the Sherman Act (Dkt. No. 1, Count III) and monopolization claims under § 2 of the Sherman Act (Dkt. No. 1, Counts IV, V). As explained at the hearing on the motions, and in the December 22, 2022 Order denying Cisco and CDW's transfer request,[7] this Court will not serve as a "super appellate" court to the California Court. Dkt. No. 94 at 14, n. 8. Accordingly, the following reasoning will not be revisited absent a highly compelling reason to do so, such as a difference in controlling law, citation to prior rulings of this Court, or substantive factual allegations not pleaded in the California Court:

That Dexon's tying counterclaims in the California Lawsuit fail because "Dexon does not allege that the supposed tie had any adverse effect on competition." *Cisco I*, 2021 WL 5848080, at *4 (specifically noting that the allegations concerning the hospital and 911 call center examples

---

[6] By way of further background, on May 11, 2022, before District Judge Breyer had ruled on Cisco's motion to dismiss Dexon's Third Amended Counterclaims, Dexon filed in the California Lawsuit a Motion for Leave to File Fourth Amended Counterclaims. Texas Lawsuit, Dkt. No. 21-8. On June 21, 2022, Judge Breyer entered an Order granting Cisco's motion to dismiss the six counterclaims asserted in the Third Amended Counterclaims and denying Dexon's motion for leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.* ("*Cisco III*"), No. 20-CV-04926-CRB, 2022 WL 2222962, at *1 (N.D. Cal. June 21, 2022). In a footnote, the court noted that Dexon had filed this lawsuit in the Eastern District of Texas "asserting claims duplicative of those in this case—including some of the counterclaims that this Court has already dismissed—further inflating Cisco's costs." *Id.* at *8, n. 4 (citing *Dexon Computer, Inc. v. Cisco Systems, Inc. and CDW Corporation*, No. 5:22-CV-53 (E.D. Tex.)) (noting "Dexon's apparent attempts to seek repeated bites at the apple" and citing a case about forum-shopping).

According to Cisco's August 2, 2022 Notice of Supplemental Authority, on July 26, 2022, Judge Breyer denied Dexon's Motion for Leave To File a Motion For Reconsideration of the court's order dismissing its counterclaims against Cisco without leave to amend. Dkt. No. 40 (attaching Order 138, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-04926 (N.D. Cal. July 26, 2022) (Breyer, J.)).

[7] Cisco filed a motion to transfer this case to the Northern District of California pursuant to the first-to-file rule, and CDW joined Cisco's motion. Dkt. Nos. 21, 27. According to Cisco, "there is a pending action (the California lawsuit) in which the issues presented by Dexon can be resolved, and in fact where substantially similar antitrust claims have *already been* resolved." Dkt. No. 21 at 13 (emphasis original). On December 22, 2022, the Court denied Cisco's motion to transfer. *See* Dkt. No. 94. Defendants' objection to the December 22 Order denying Cisco's motion to transfer is pending before District Judge Schroeder. Dkt. No. 96.

showed those customers simply buying Cisco equipment from non-Dexon sources, leaving Cisco competitors, "such as Hewlett Packard, Dell, and Juniper Networks unaffected").

That the alleged tie in the California Lawsuit "makes no logical sense" because "Cisco cannot exploit control over the SmartNet market to force people to buy the underlying equipment" since the customer "already has" the equipment in question. *Id.* at *5.

That Dexon's monopolization claims fail because Dexon did not plead the supposed conduct by Cisco (including "Cisco's coercion or 'bullying' of its consumers" and "pressure[ing] another VAR not to deal with Dexon") was *anticompetitive* due to Dexon's failure to allege the conduct "harmed Cisco's competitors in the equipment markets." *Id.*

That "Dexon's theory for why Cisco took action against Dexon makes little economic sense" because Dexon's unsupported assertion that "Cisco gets a higher margin out of more expensive distributors" is "implausible" without pleading "specific facts in support of this assertion." *Id.*

## C.     Defendants' current motions to dismiss

In its motion to dismiss, Cisco first asserts Dexon's present claims are precluded by the res judicata rule against claim splitting. Dkt. No. 22 at 12-13. Cisco further asserts Dexon's antitrust claims fail on the merits. Specifically, Cisco asserts as follows: (1) Dexon fails to allege an actionable conspiracy claim and parallel state law claim (Counts I-II, VI) because Dexon does not allege any actionable agreement; (2) Dexon fails to allege an actionable tying claim and parallel state law claim (Counts III, VI) because Dexon does not allege any foreclosure; (3) Dexon fails to allege an actionable monopolization claim and parallel state law claim (Counts IV-VI) because Dexon fails to allege any exclusionary conduct; and (4) Dexon lacks antitrust injury (Counts I-VI).

CDW filed its own motion to dismiss, in which it joins in and adopts as its own, the arguments and assertions made by Cisco and also focuses on the facts most relevant to Dexon's claims against it. Dkt. No. 28 at 1, n. 1. Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. *Id.* at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

On the merits, CDW contends Dexon's Sherman Act (and parallel state law) claims against CDW (Counts I, II) should be dismissed for the following reasons: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to allege specific intent by CDW to monopolize. CDW further asserts Dexon fails to establish antitrust injury. Finally, CDW argues Dexon's pre-2018 claims are time-barred.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The court must then determine whether the complaint states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III. MOTIONS TO DISMISS UNDER "RES JUDICATA"

**A.     Cisco's motion to dismiss under true res judicata or claim preclusion**

**1.     Parties' assertions**

Cisco argues that claim preclusion[8] bars Dexon's claims in the Original Complaint because the following elements are met: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." Dkt. No. 22 at 11-13; *see also* Dkt. No. 32 at 1-3. Dexon challenges the finality element (3) and the same claim or cause of action element (4). Dkt. No. 24 at 9-14; Dkt. No. 34 at 1-4.

**2.     Applicable law**

True res judicata, or claim preclusion, is a "venerable legal canon" that "insures the finality of judgments and thereby conserves judicial resources and protects litigants from multiple lawsuits." *Clyce v. Farley*, 836 Fed. Appx. 262, 267-68 (5th Cir. 2020) (quoting *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 (5th Cir. 2004) (internal quotation marks and citation omitted in *Clyce*)). As noted above, claim preclusion applies where (1) the parties to both actions are identical or are in privity; (2) the first judgment is rendered by a court of competent jurisdiction; (3) the first action resulted in a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits. *Id.* at 268 (citing *Procter*, 376 F.3d at 499).

---

[8] Cisco frequently uses the term "claim splitting" (or similar) interchangeably with "claim preclusion." *See, e.g.*, Dkt. No. 22 at 11. The Court notes there are nuances between "traditional claim preclusion" and claim splitting. *See Hlavaty v. Integrated Prod. Servs., Inc.*, No. 5:16-CV-949-DAE, 2017 WL 10699610, at *2 (W.D. Tex. Jan. 27, 2017); *see also Katz v. Gerardi*, 655 F.3d 1212, 1218-19 (10th Cir. 2011). However, neither party addresses those distinctions in their briefing, which relies on argument and caselaw focused on the doctrine of claim preclusion. Accordingly, the Court will use the term claim preclusion in this order.

The Fifth Circuit uses the transactional test to determine whether two suits involve the same claim or cause of action as required by the fourth element above.[9] *Warren v. Mortg. Elec. Registration Sys., Inc*., 616 Fed. Appx. 735, 738 (5th Cir. 2015) (citing *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir.2007) (citation omitted in *Warren*)). This test requires the court to consider whether the two cases are based on "the same nucleus of operative facts." *Id.* (quoting *Davenport*, 484 F.3d at 326 (citation and quotations omitted in *Warren*)). "The nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted, defines the claim." *Id.* (citation omitted in *Warren*). If both cases are based on the same nucleus of operative facts, "the prior judgment's preclusive effect extends to all rights the original plaintiff had with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose." *Id.* (citation and internal quotations omitted in *Warren*).

3.      **Analysis**

The Fifth Circuit Court of Appeals recently stated that "[a]lthough res judicata generally cannot be raised in a motion to dismiss and should instead 'be pleaded as an affirmative defense,' dismissal under Rule 12(b)(6) is appropriate if the res judicata bar is apparent from the complaint and judicially noticed facts and the plaintiff fails to challenge the defendant's failure to plead it as an affirmative defense." *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020) (citing *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005) (citations omitted in *Anderson*)). In *Anderson*, the court granted the motion to dismiss on res judicata grounds, in part, because the plaintiff did not raise such a challenge. *Id.*

---

[9] The Fifth Circuit Court of Appeals recently stated the transactional test is used only to determine which claims that *could have been brought* in the first suit are precluded by judgment in that suit. *Hammervold v. Blank*, 3 F.4th 803, 809 (5th Cir. 2021) (emphasis original).

Here, Dexon has challenged Cisco's raising its res judicata argument through a Rule 12(b)(6) motion rather than as an affirmative defense. Dkt. No. 24 at 14, n. 2.  Given Dexon's challenge, the undersigned is not convinced it would be proper at this time for the Court to address the issue of true res judicata, taking judicial notice of the prior rulings of the California Court. The Court finds Cisco's res judicata arguments fail because they are premature. *Giddy Holdings, Inc. v. Kim*, No. 1:20-CV-434-DAE-ML, 2021 WL 2773019, at *4 (W.D. Tex. June 7, 2021), *report and recommendation adopted as modified*, No. 1:20-CV-434-DAE, 2021 WL 8442028 (W.D. Tex. July 2, 2021); *see also Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018) (finding that "Plaintiffs have a plausible claim and res judicata would be better addressed at a later stage in the proceeding").

Even if the Court were to address the applicability of true res judicata at this stage, the Court would have serious concerns as to whether Cisco, on its current briefing, could show the third and fourth elements for true res judicata. Regarding the third element, the procedural posture must be considered. The California Court dismissed Dexon's initial set of counterclaims (which included its California antitrust counterclaims) with leave to amend. Dexon's next amended counterclaims did not include any antitrust allegations. The California Court eventually dismissed with prejudice Dexon's amended counterclaims. Cisco claims that final dismissal with prejudice meets the finality requirement of claim preclusion because Dexon could have, but chose not to, replead its initial set of antitrust counterclaims. Dkt. No. 32 at 1-2. To argue that "a dismissal 'without prejudice' takes on preclusive effect when 'Plaintiff did not seek leave to amend his petition,'" Cisco relies on *Eldridge v. Kohls Dep't Stores, Inc.*, No. CIV-20-158-R, 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020), an unpublished case involving application of federal common law.

In *Eldridge*, the court considered the defendant's motion to dismiss based on res judicata grounds in light of the court's previous dismissal without prejudice of the plaintiff's claims for failure to state a claim in a prior case. *Eldridge*, 2020 WL 1528233 at *1. The *pro se* plaintiff did not respond to the defendant's motion to dismiss. *Id*. However, the court "considered the merits of the motion" and dismissed the plaintiff's case on alternative grounds. *Id.* Concerning res judicata, the court found that its previous dismissal without prejudice "results in dismissal with prejudice" for res judicata purposes because the plaintiff failed to take any action in the prior action to resuscitate his claims. *Id.* at *2. Importantly, that holding was after the court explained that "[t]he undersigned previously dismissed Plaintiff's claims against First Premier Bank, finding he had failed to state a claim. The petition in this case is more bareboned than the petition in Plaintiff's prior action." *Id.* at *1. Just as importantly, the court further stated that "even if Plaintiff's claims were not barred, the Petition herein simply lacks sufficient factual allegations to state a claim against Defendant First Premier Bank." *Id.* at *2 (dismissing the case because "Plaintiff fails to identify any facts against Defendant First Premier from which the Court could discern that it violated either the Fair Credit Reporting Act or the Oklahoma Consumer Protection Act").

The above unique circumstances in *Eldridge*, specifically the fact that the court granted a motion on alternative grounds without any written opposition from the *pro se* plaintiff, limits its application to the instant dispute. Moreover, unlike the plaintiff in *Eldridge*, who filed a subsequent case with less factual allegations than the case that was initially dismissed for failure to state a claim, Dexon, as explained in more detail below, added new claims, legal theories, and non-trivial factual allegations in the Texas Lawsuit.

Regarding the fourth element, whether the same claim or cause of action is involved in both suits, the critical question in applying the transactional test is "whether the two actions were

based on the same nucleus of operative facts." *Bank of New York Mellon as Tr. of Registered Holders of CWABS, Inc., Asset-Backed Certificates, Series 2004-5 v. Riley*, No. 21-40383, 2022 WL 1773364, at *3 (5th Cir. June 1, 2022) (quoting *Eubanks v. F.D.I.C.*, 977 F.2d 166, 171 (5th Cir. 1992) (quotation marks and citations omitted in *Bank of New York Mellon*)). Although Cisco asserts Dexon alleges three of the same legal theories here as alleged in Dexon's California Counterclaims,[10] the Court evaluates the "factual predicate of the claims asserted, not the legal theories upon which the plaintiff relies." *Id.* (quoting *Eubanks*, 977 F.2d at 171). Importantly, there are new claims and facts in this lawsuit which were not alleged in California. *See, e.g.*, Dkt. No. 1, ¶ 61 (new allegations regarding the Cisco/CDW conspiracy); *see also id.*, ¶ 3 (new allegations regarding the Texas bank), ¶ 7 (new allegations regarding the Texas energy company), ¶ 51 (new allegations regarding the Texas automobile dealership), ¶¶ 65-67 (new allegations regarding the Texas school district); ¶¶ 69-77 (detailed allegations of global and U.S. IP phones); and ¶ 4 (more specific allegations regarding limited IP budgets). Given these new claims and facts, Cisco fails to show that the claims here arise out of the same nucleus of operative facts as its initial counterclaims in California. *See, e.g.*, *Hammervold v. Blank*, 3 F.4th 803, 809 (5th Cir. 2021) (holding that a denial of a motion for attorney's fees in a prior suit did not bar a subsequent suit for malicious prosecution and abuse of process because, even though the two suits "make essentially identical factual assertions," res judicata only applies when the claims of the second suit "might have been litigated in the first suit").

---

[10] At the hearing, Cisco's counsel referenced a redline comparison of Dexon's California Counterclaims and the present complaint, attached as Exhibit A to Cisco's motion to transfer under the first-to-file rule. *See* Dkt. No. 21-1. A review of the redline comparison reveals Count 1 of Dexon's California Counterclaim is the same as Count 3 of the complaint in this case (Sherman Act § 1: tying); Count 2 of Dexon's California Counterclaim is the same as Count 4 of the complaint in this case (Sherman Act § 2: unlawful monopolization); Count 3 of Dexon's California Counterclaim is the same as Count 5 of the complaint in this case (Sherman Act § 2: attempted monopolization).

Because Cisco's motion for dismissal based on res judicata grounds would fail on the merits but is also premature, the undersigned recommends denying the request without prejudice to refiling.

**B.     CDW's motion to dismiss under collateral estoppel or issue preclusion**

**1.      Parties' assertions**

CDW, who was not a party to the California Lawsuit, asserts collateral estoppel bars Dexon from re-asserting its antitrust claims here against CDW. According to CDW, in both lawsuits, Dexon alleged: (1) Cisco threatened customers that it would terminate their SmartNet service unless they purchased new Cisco equipment from Cisco resellers other than Dexon (*e.g.*, Ex. C, ¶¶ 40, 41); (2) For one such customer (Pennsylvania Health System), Cisco threatened to "cancel immediately all SmartNet service packages which the customer had in place" if it purchased Cisco products from Dexon (*id.*, ¶ 42); (3) Cisco engaged in "pressure and bullying tactics" to dissuade customers from doing business with Dexon (*id.*, ¶¶ 71, 77); (4) Cisco pressured a "value added reseller" (*there* unnamed, *here* identified as CDW) to stop doing business with Dexon (*id.*, ¶ 52); and (5) The same reseller (*i.e.*, CDW) reassigned a representative to a different region and account when the representative "refused to comply with the demand." (*id.*). Dkt. No. 28 at 9-10 (emphasis original). Asserting Dexon's Sherman Act § 1 claims were at issue in California, CDW argues the core issues in the two lawsuits are identical. *Id.* at 10.

In response, Dexon asserts CDW fails to mention that Dexon's California Counterclaims were for tying rather than an "inter-corporate conspiracy that gives rise to two new claims against CDW, separate and apart from Dexon's claims against Cisco for tying." Dkt. No. 37 at 19-20. Dexon points out the word "conspiracy" (or any similar derivation) does not appear in Dexon's California Counterclaims, "whereas the term appears thirty-six times in the Complaint" in the

Texas Lawsuit. *Id.* at 19. According to Dexon, in this case, a "host of new facts about the conspirators, their motivations, their agreement and coordinated conduct, and the effects of the conspiracy have been alleged under new causes of action." *Id.* Dexon asserts the issues in both cases are not identical, and collateral estoppel does not apply to Dexon's complaint here.

## 2.    Applicable law

"Issue preclusion or collateral estoppel prevents a party from litigating an issue it previously 'litigated and lost' in another action" and thus "'prevent[s] repetitious litigation of what is essentially the same dispute,'" in addition to "'conserving judicial resources, [] maintaining consistency, and [] avoiding oppression or harassment of the adverse party.'" *Hacienda Records, L.P. v. Ramos*, 718 Fed. Appx. 223, 228 (5th Cir. 2018) (per curiam) (quoting *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 (1979); RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmts. c, e. (1982)). Collateral estoppel can be used defensively—a plaintiff may be estopped from asserting a claim that the plaintiff has previously litigated and lost against another defendant—or can be used offensively—a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against another plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 788 F. Supp. 2d 523, 532 (S.D. Tex. 2011) (citing *Parklane Hosiery*, 439 U.S. at 328). This is a case of defensive non-mutual collateral estoppel.

Under Fifth Circuit law, collateral estoppel or issue preclusion requires that: (1) the issue in the current litigation is identical to the one in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the determination of the issue in the prior action was necessary to the judgment in that prior action and (4) there are no special circumstances that would render estoppel inappropriate or unfair. *Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co., Ltd*, 403 F. Supp. 3d 571, 601 (E.D. Tex. 2019) (citing *State Farm Mut. Auto. Ins. Co. v.*

*LogistiCare Solutions*, 751 F.3d 684, 689 (5th Cir. 2014)). Courts do not consider special circumstances when "both parties were involved" in the prior suit. *ETC Sunoco Holdings, L.L.C. v. United States*, 36 F.4th 646, 649 (5th Cir. 2022) (citing *Bradberry v. Jefferson Cty.*, 732 F.3d 540, 549 (5th Cir. 2013); also citing *Kariuki v. Tarango*, 709 F.3d 495, 506 (5th Cir. 2013)).

**3.    Analysis**

Collateral estoppel "is limited to matters distinctly put in issue, litigated, and determined in the former action." *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991) (quoting *Diplomat Electric, Inc. v. Westinghouse Electric Supply Co.*, 430 F.2d 38, 45 (5th Cir.1970)). An important aspect of determining whether a previously litigated matter has collateral estoppel effect is the identity of that matter with the issue currently before the court. *Id.* For an issue to be identical, both the facts and "legal standard used to assess them" must be identical. *Hammervold v. Blank*, 3 F.4th 803, 810–11 (5th Cir. 2021) (quoting *Brister*, 946 F.2d at 354 n.1).

This requirement is fatal to CDW's collateral estoppel defense. Dexon pleads factual allegations here, not found in the California Lawsuit, to allege CDW and Cisco entered into a conspiracy that violated §§ 1 and 2 of the Sherman Act. *See, e.g.*, Dkt. No. 1, ¶¶ 56-58, 60-63, 87-100. For example, while Dexon alleged in California that it lost a sale to a Pennsylvania hospital due to Cisco's unilateral monopolization, the California Court did not consider that the lost sale could have been the result of a conspiracy to accomplish that end. Dkt. No. 37 at 21 (comparing *Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 50 at Counterclaim ¶ 42 with Dkt. No. 1, ¶¶ 56-62). As Dexon notes, the California Court's prior order could not have considered any of Dexon's allegations in the context of conspiracy claims, claims which are subject to "different standard in which allegations are not 'dismember[ed] and view[ed]

in its separate parts' as CDW implicitly suggests in its current motion." *Id.* (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699(1962)).

In its surreply, Dexon asserts not only are the facts here different from its California Counterclaims, but the legal standard to assess those facts is also different. Dkt. No. 48 at 9. Dexon reiterates the differences between a *per se* tying claim at issue in Dexon's California Counterclaims and a rule of reason conspiracy claim added here. *Id.* at 1-2; *see also id.* at 10. Dexon asserts this "is equally true with respect to Dexon's factual allegations regarding anticompetitive effect . . ., antitrust injury. . ., specific intent to monopolize. . ., and the statute of limitations. . . ." *Id.* at 10. According to Dexon, although "these concepts are regularly litigated in antitrust cases, the precise facts and alleged Markets can differ with each case, as is the case here." *Id.*

At oral argument, counsel for Dexon elaborated as follows:

> The circumstances of CDW, how it favored . . . Cisco, how it distributes its products, how it plays in the market for interbrand and intrabrand competition are all entirely different. Those are different facts. There's different law that applies to those facts. And, finally, there is no -- there is no law equating a *per se* tying claim with a Section 1 and Section 2 conspiracy claim because it's never been argued and that is because they are entirely different claims while under technically the same statute of the Sherman Act.

Dkt. No. 62 (Transcript) at 130:10-20.

The Court, having carefully considered the parties' arguments and the relevant case law, does not find the facts, and the legal standard used to assess the facts, identical in both lawsuits. For this reason, the undersigned recommends the Court deny CDW's motion to dismiss under collateral estoppel or issue preclusion.

### IV. MOTIONS TO DISMISS UNDER RULE 12(b)(6)
### FOR FAILURE TO STATE A CLAIM

Cisco and CDW separately argue (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon

fails to establish antitrust injury. The Court will address the first two arguments in the context of Dexon's Sherman Act § 1 claim (Count I) and will then address CDW's separate argument specific to Dexon's Sherman Act § 2 conspiracy claim (Count II), namely whether Dexon fails to allege specific intent by CDW to monopolize.  Because Cisco asserts Dexon's failure to allege antitrust injury applies to Counts I-VI (all of which have been asserted against Cisco), the Court will address antitrust injury following the Court's discussion of Counts III, IV, and V against Cisco.

## A.      Dexon's antitrust claims

### 1.      Sherman Act § 1 claims

In Count I, Dexon alleges a Sherman Act § 1 violation against Cisco and CDW for conspiring to restrain trade. In Count III, Dexon alleges a Sherman Act § 1 violation against Cisco for illegal *per se* tying.

### 2.      Sherman Act § 2 claims

In Count II, Dexon alleges a Sherman Act § 2 claim against Cisco and CDW for conspiracy to monopolize. In Counts IV and V, Dexon asserts Sherman Act § 2 claims against Cisco for monopolization and attempted monopolization. Counts IV and V include the same allegations underlying Dexon's § 1 "tying" claim against Cisco, as well as allegations of Cisco's use of FUD (fear, uncertainty, and doubt) tactics to lock customers into purchases they do not want, foreclosing competitors in the process, and maintaining or enhancing Cisco's monopolies in each of the Relevant Product Markets. *See* Dkt. No. 24 at 25-27.

### 3.      Texas Free Enterprise and Antitrust Act claims

In Count VI, Plaintiff alleges state-law antitrust claims against Cisco and CDW under the Texas Free Enterprise and Antitrust Act ("TFEAA"). Because the TFEAA is modeled after the Sherman Act, Texas courts interpret its provisions "in harmony with federal judicial

interpretations of equivalent federal laws." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest III*"), No. 5:17-CV-1295-RCL, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022) (quoting *Apani Sw., Inc. v. Coca–Cola Enters., Inc.,* 300 F.3d 620 (5th Cir. 2002); also citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) (interpreting § 15.05(a) in accordance with Sherman Act § 1); *Caller–Times Publ'g Co. v. Traid Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (interpreting TEX. BUS. & COMM. CODE § 15.05(b) in tandem with Sherman Act § 2)).

**B.     Applicable law**

**1.     Sherman Act § 1**

Section 1 of the Sherman Act provides as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting 15 U.S.C. § 1). "Although § 1 could be read to outlaw all contracts, it has long been interpreted to only proscribe unreasonable restraints." *Id.* (citing *Leegin Creative Leather Prods. v. PSKS, Inc.,* 551 U.S. 877 (2007)). As opposed to § 2 of the Sherman Act, § 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action. *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015).

To establish a violation of § 1 of the Sherman Act, a plaintiff must demonstrate that: "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (quoting *Apani*, 300 F.3d at 627). To satisfy the conspiracy element of a Sherman Act claim, a plaintiff must show "that the defendants engaged in

concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 373–74 (quoting *Golden Bridge Tech.,* 547 F.3d at 271 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984))). Concerted action requires "evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.,* 496 F.3d 403, 409 (5th Cir. 2007) (quoting *Monsanto,* 465 U.S. at 768). In other words, "[t]here must be evidence that tends to exclude the possibility of independent action." *Id.; see also Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently.").

**2.    Sherman Act § 2**

Section 2 of the Sherman Act condemns three actions: monopolization, attempt to monopolize, and conspiracy to monopolize. *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce. *Id.*

Section 2 of the Sherman Act bans attempts to monopolize or monopolization of "any part of the trade or commerce among the several States." *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 528 (5th Cir. 2022) (quoting 15 U.S.C. § 2). Unlike § 1, § 2 "covers both concerted and independent action." *Id.* (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010)). Monopolization is harder to establish than the mere restraint

of trade that suffices in the § 1 context. *Id.* at 528-29.  That is because "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place." *Id.* at 529 (quoting *Verizon Commc'ns Inc. v. Law Off. of Curtis v. Trinko, L.L.P.*, 540 U.S. 398, 407 (2004)).

## C.     Conspiracy claims against Cisco and CDW under Sherman Act §§ 1, 2 (Counts I, II)

Both sides acknowledge that to establish its conspiracy clams, Dexon must sufficiently allege that Cisco and CDW reached an agreement that unreasonably restricted competition in a relevant market. *See* Dkt. No. 22 at 13-14; Dkt. No. 24 at 14-15, 20-21. Cisco argues that Dexon's conspiracy claims should be dismissed because the complaint fails to plead sufficient facts to allege an unlawful agreement between Cisco and CDW; that if there were such an agreement, it should not be analyzed because it is "per se" lawful to replace one distributor with another; and that if analyzed, it is not actionable because Dexon fails to allege the agreement had a market-wide effect harming competition. Dkt. No. 22 at 13-17; Dkt. No. 32 at 3-6.

As explained below, Dexon plainly sufficiently alleges an agreement between Cisco and CDW and the complaint does not allege a "mere unilateral change of distributors," so the alleged agreement is not *per se* legal. However, Dexon's allegations of competitive harm is closer. On the whole, Dexon's allegations, in combination with the specific examples provided in the complaint, survive a motion to dismiss (other than Dexon's allegation that CDW had specific intent to monopolize). CDW's similar arguments that Dexon does not plausibly allege an agreement that harms competition (*see, e.g.*, Dkt. No. 28 at 12-17, 19; Dkt. No. 44 at 4-6, 9) are unpersuasive for the same reasons as Cisco's.

1. **Dexon plausibly alleges the existence of an agreement between Cisco and CDW**

Dexon alleges Cisco conspired with one of its favored distributors, CDW, "to help it exclude resellers like Dexon and maintain its network equipment monopolies." Dkt. No. 1, ¶ 13. The complaint provides a specific example of the conspiracy involving a Pennsylvania hospital system. *Id.*, ¶¶ 58-63.[11] According to the complaint, when Cisco learned that the hospital system awarded the order to Dexon, Cisco threatened the customer that it would "not honor the contemplated new SmartNet service package, [and] also would cancel immediately <u>all</u> SmartNet service packages which the customer had in place for the entire hospital system and clinics. . . ." *Id.*, ¶ 59 (emphasis original). "Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment." *Id.*, ¶ 60. Dexon alleges the "sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the 'savior' to the hospital system in that the customer would keep its service for all of its Networking Equipment." *Id.* Dexon alleges "Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon." *Id.*

Dexon further alleges that as part of the conspiracy, CDW agreed not to sell Networking Equipment to Dexon. *Id.*, ¶ 62. Specifically, Dexon claims that "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." *Id*. According to Dexon, "when the CDW representative previously assigned to Dexon refused to comply with" Cisco's demand that CDW stop selling Networking Equipment and associated services to Dexon, "CDW assigned the representative to a

---

[11] The complaint alleges several similar examples of Cisco "favor[ing]" certain resellers to the harm of Dexon and the end-customers (Dkt. No. 1, ¶¶ 64-82), but those do not contain any facts identifying CDW.

different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* Dexon alleges that, pursuant to the conspiracy, "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* Dexon claims that Cisco recruited CDW into the conspiracy because it favors Cisco products over those of Cisco's competitors; when one completes a search on CDW's website for Ethernet switches, it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections. *Id.*, ¶ 61.

At this stage in the litigation, plaintiffs need only allege facts that "state a claim to relief that is plausible on its face." *Quest III*, 2022 WL 980791, at *6 (quoting *Twombly*, 550 U.S. at 570). Importantly, antitrust cases are not subject to a heightened pleading standard. *Torrey v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *7 (E.D. Tex. Sept. 27, 2018) (citing *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010)). The factual allegations in the complaint, taken as true, sufficiently explain the who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco.

Defendants' arguments to the contrary are not persuasive. Cisco characterizes the Pennsylvania hospital situation as "CDW simply making sales of Cisco equipment to a customer who decided not to buy Cisco equipment from Dexon." Dkt. No. 22 at 9 (citing Dkt. No. 1, ¶¶ 59-60); *see also id.* at 14 ("CDW has every incentive to make profitable sales of Cisco equipment; there is no factual allegation that such sales stemmed from an agreement between CDW and Cisco to target Dexon."). CDW similarly argues that "Dexon's allegations are more consistent with CDW's independent actions and its individual interest than with a conspiracy." Dkt. No. 28 at 13. Such arguments improperly ask the Court to interpret the factual allegations in their favor. Similarly, the Court finds any argument that Dexon's allegations rely too heavily on "information and belief" is insufficient. *See, e.g.*, Dkt. No. 28 at 7. At this stage, the Court finds Dexon has

sufficiently alleged the co-conspirators, the conspirators' respective motivations and intent, the sequencing of their coordinated conduct, the impact of that conduct, and how, most recently, "CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest)." *See* Dkt. No. 1, ¶¶ 56-63, 87-100.[12]

## 2.    The alleged agreement is not *per se* lawful

Defendants argue that under the law a manufacturer can choose who to use as distributor, therefore any agreement between Cisco and CDW is *per se* lawful. *See, e.g.*, Dkt. No. 22 at 14-15 (arguing it would be "per se lawful" for Cisco to enter into a distribution agreement with CDW to the exclusion of Dexon); Dkt. No. 44 at 1 (CDW arguing Cisco has a "right to control its distribution network"). Cisco cites two cases to support its argument that even if plausibly pled, the actions with the Pennsylvania hospital system do not show an agreement that would violate antitrust law. Dkt. No. 22 at 16 (citing *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975); also citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997)).

*Burdett Sound*, the first case relied upon by Cisco, stands for the proposition that "it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." *Burdett Sound*, 515 F.2d at 1249. As explained by the Fifth Circuit in that case, it is settled law that a manufacturer has the right to

---

[12] Since oral argument, the Fifth Circuit explained an agreement can be shown by a threat and accession theory, which appears to support Dexon. *See BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 526 (5th Cir. 2022) (explaining that threat-and-accession theory may show an actionable agreement when three things are plausibly plead: "first, that A made a threat; second, that B subsequently did what A wanted; and third, that B did so because of A's threat."). However, the parties did not address this case, which was issued after oral argument.

36

select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. *Id.* at 1248 (citations omitted).

The problem for Defendants is that Dexon does not merely allege that Cisco substituted one distributor for another within the scope of *Burdett Sound* and other dealer termination cases. To start, Cisco never had a direct supply relationship with Dexon to terminate. *See* Dkt. No. 274 at 16. But even if it had, Dexon does not present claims based on a "mere unilateral change of distributors" *i.e.*, a claim that Dexon was excluded from Cisco's distribution and nothing more. *See Burdett Sound*, 515 F.2d at 1248. Instead, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). Dkt. No. 1, ¶¶ 56, 60-61, 90-91. The alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices and reduced technology choices for customers. *Id.*; *see also id.*, ¶¶ 63, 100.

Further, case law supports the view that a monopolist manufacturer who conspires with a large distributor to exclude a lower-priced distributor can survive a motion to dismiss. *See Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n. 20 (11th Cir. 1983) ("A seller with considerable market power in the interbrand market — whether stemming from its dominant position in the market structure or from the successful differentiation of its products — will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold."). The court in *Graphic Prods.* explained that "in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive

pressure on price" and in that scenario, vertical restraints "may enable a manufacturer to retain monopoly profits arising from an Interbrand competitive advantage." *Id.* Dexon alleges this precise scenario: a Cisco-CDW conspiracy enabling Cisco to maintain its monopoly profits. The Third Circuit Court of Appeals similarly found a well-pled conspiracy alleging a dominant insurer conspired with a dominant hospital to exclude a smaller rival due to allegations of increased prices and decreased competition for the co-conspirators' services. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010).

Neither Defendant shows that the alleged agreement was "per se" lawful or that the alleged conspiracy falls exclusively within Cisco's "right to control its distribution network."

### 3. Dexon plausibly alleges competitive harm

Cisco argues that Dexon fails to state a claim because it does not show that "any agreement between CDW and Cisco could harm market-wide competition in the markets for network equipment (or IP phones)." Dkt. No. 22 at 15. CDW similarly argues that "Dexon fails to plausibly allege that the CDW/Cisco agreement harmed *competition*." Dkt. No. 28 at 15 (emphasis by CDW). Defendants acknowledge that Dexon alleges harm to both inter- and intra-brand competition, though they argue that Dexon's claims are limited to interbrand competition. Dkt. No. 32 at 5, n. 4 (Cisco stating that "Dexon does not allege any *distributor*-level market for any product. It asserts only claims implicating *inter*brand competition among Cisco and its rival manufacturers. . . ." (emphasis by Cisco)); Dkt. No. 44 at 6, n. 1 (CDW stating that "Dexon does not allege a relevant distributor market"). Defendants further argue that the allegations of harm to interbrand competition fail because Dexon does not show any harm to Cisco's competitors (*i.e.*, other equipment manufacturers). *See* Dkt. No. 32 at 5; Dkt. No. 44 at 6 (CDW arguing that Dexon fails to identify "a single OEM who was harmed by the alleged conspiracy").

Dexon's complaint alleges that the Cisco-CDW conspiracy had the "dual effect" of "both inter-brand and intra-brand competition." Dkt. No. 1, ¶¶ 60-61, 90-91. Concerning intrabrand competition, the complaint alleges that the Cisco-CDW conspiracy required customers to pay more for Cisco equipment from CDW and limited customers' choices for the services for Cisco products. The conspiracy allegedly harmed interbrand competition by removing Dexon who "does not prioritize" Cisco products, thereby "limiting the opportunities of its competitors to make sales through resellers like Dexon." *Id.*, ¶ 61. As discussed above, Dexon provided an example of this conspiracy involving a Pennsylvania hospital system wherein the hospital bought equipment from CDW at a higher price than had been negotiated with Dexon. *Id.*, ¶ 60. This alleged conspiracy supposedly allows Cisco to maintain its monopoly position and its supra-competitive prices. *Id.*, ¶¶ 90-93. Not only do these inter- and intra-brand allegations (which were not pleaded with this level of specificity in the California Lawsuit) explain how the conspiracy harms competition, but the alleged facts also mirror those in *Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n. 20 (11th Cir. 1983) and *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010), discussed above.

Defendants are correct that Dexon does not define the distributor market or squarely address the market size of CDW or itself. *See, e.g.*, Dkt. No. 22 at 16; *see also* Dkt. No. 62 (Transcript) at 82:4-16 (stating that for Dexon to allege "market-wide effect, they would have to say something about Dexon's position in the market to show that there's some market-wide impact from whatever happens to Dexon. They never said that."). And as CDW points out, Dexon's example of the Pennsylvania hospital system does not actually show harm to a Cisco competitor, rather it shows a customer buying Cisco products from CDW rather than Dexon. Dkt. No. 44 at 6 (further stating Dexon's complaint does not identify a single OEM who was harmed by the alleged

conspiracy or facts as to how that OEM was harmed). Further, Dexon's factual support for its allegation that it "does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products" (*see* Dkt. No. 1, ¶ 90) is based on isolated examples of encouraging customers to switch manufacturers (*see*, *e.g.*, *id.*, ¶¶ 58, 65; *see also id.* at ¶¶ 13, 90, 97) and the allegation that CDW's website portrays Cisco's competitors as having more limited equipment options than Cisco. *Id.*, ¶ 61. This support is not particularly compelling given that other distributors also sell non-Cisco products and CDW's website might simply reflect the fact that Cisco has more products given its dominant position in that market.

However, the Court is considering a motion to dismiss, and "[a]t the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the alleged relevant markets." Dkt. No. 24 at 17 (quoting *West Penn*, 627 F.3d at 100).[13] Given the state of litigation, Dexon's factual allegations are sufficient.

In arguing otherwise, Cisco cites *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981). Dkt. No. 22 at 15. But that case evaluated the record following a jury trial, not a motion to dismiss. *Red Diamond*, 637 F.2d at 1006. Instead, *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013) is more analogous. In that case, the court found the plaintiffs' allegations sufficient to state a plausible Sherman Act § 1 claim against Pool Defendant, the country's largest distributor of Pool Products, and the Manufacturer

---

[13] In *West Penn*, the defendants made a "half-hearted argument" that the Sherman Act § 1 claim did not allege that the conspiracy unreasonably restrained trade. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010). The court held the complaint plausibly suggested "that by denying West Penn capital, the conspiracy caused West Penn to cut back on its services (including specialized hospital services) and to abandon projects to expand and improve its services and facilities" and also plausibly suggested "that by shielding Highmark from competition, the conspiracy resulted in increased premiums and reduced output in the market for health insurance." *Id.* at 100-01. According to the court, these allegations were sufficient to suggest that the conspiracy produced anticompetitive effects in the relevant markets. *Id.* at 101.

Defendants, the three largest manufacturers of Pool Products in the country, even though the complaint did not allege that Pool Defendants possessed any specific share of the Pool Products Distribution Market. *Id.* at 373, 383, 399.

Although the complaint did not allege that Pool Defendants possessed any specific share of the Pool Products Distribution Market, *id.* at 383, the allegations that the Manufacturer Defendants had "substantial market clout" combined with the "market power" of the distributor "allow[ed] the Court to draw the reasonable inference" that the conspiracy was "capable of causing substantial harm to competition." *Id.* at 398. Notably, the court pointed out the Fifth Circuit has stated that the reason for looking at market power is to determine "whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market." *Id.* (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001); also citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)).

Similarly here, Dexon has alleged facts sufficient to create a reasonable inference of Cisco's market power in the relevant markets. *See, e.g.*, Dkt. No. 1, ¶¶ 1 ("Cisco is a monopolist. . . ."); 24 ("On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry. . . . Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceed 40% or more with its closest competitors half its size, in markets with high barriers to entry."); 29 ("Upon information and belief, Cisco consistently possessed a share of the Relevant Service Market in excess of 90%. . . ."). Dexon has also pleaded factual content that allows the Court to draw the reasonable inference that CDW has "substantial clout in the industry." *In re Pool*

*Prod.*, 940 F. Supp. 2d at 398; *see* Dkt. No. 1, ¶ 56 (alleging CDW's 2020 annual revenue was $18.47 billion compared to Cisco's $49.8 billion in the same time period); *see also Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc*., No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *11 (W.D. Tex. Oct. 15, 2015) ("At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share." (quoting *Scooter Store, Inc. v. Spinlife.Com*., 777 F.Supp.2d 1102, 1117 (S.D. Ohio 2011))). Considering the allegations regarding CDW, combined with Dexon's allegations regarding Cisco as a monopolist, the complaint allows the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition.

The Court recommends this part of Defendants' motions be denied.

### 4. Dexon fails to plausibly allege specific intent by CDW to monopolize for purposes of the Sherman Act § 2 conspiracy to monopolize claim

CDW additionally argues that Dexon "fails to plausibly allege specific intent by CDW to monopolize the relevant market" to support Dexon's § 2 conspiracy to monopolize claim against it. Dkt. No. 28 at 17. Dexon responds that it need not plead CDW (as opposed to Cisco) had the requisite specific intent to monopolize, but that the complaint contains sufficient allegations even if Dexon was required to so plead. Dkt. No. 37 at 14-16.

The elements of a Sherman Act § 2 conspiracy to monopolize claim are "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

Based on the arguments in the briefing, and the facts of this case, the Court disagrees with Dexon's contention that it need only plausibly allege Cisco had intent to monopolize. Dexon

primarily relies on a case from the District of New Jersey that stated "Defendants do not cite, nor could this Court find, any case law requiring that Plaintiffs prove a specific intent as to each individual member of the conspiracy." Dkt. No. 37 at 15 (citing *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 287 (D.N.J. 2003)). However, *Carpet Group* concerned different facts. There, the plaintiff alleged, among other claims, that three members of an oriental rug trade association conspired to restrain trade and to monopolize the importing and wholesale distribution of oriental rugs in the United States. *Carpet Group*, 256 F. Supp. 2d at 260. The alleged co-conspirator Etessami moved for summary judgment that plaintiff failed to show he knowingly participated in the conspiracy and that he had the specific intent to monopolize. *Id.* at 279, 284-87. The court rejected Etessami's argument that the plaintiffs were required to show each member of the trade association had the specific intent to monopolize by relying on (1) a Third Circuit ruling that the district court interpreted as a finding that the trade association had specific intent to monopolize and (2) that the court already ruled there was a genuine dispute of fact as to Etessami's knowing participation in the ORIA conspiracy. *Id.* at 287.

Unlike the co-conspirators in *Carpet Group*, CDW is a reseller of Cisco network equipment, not a co-member with Cisco of a wholesale trade association whose specific intent was already found. Dexon also argues that Fifth Circuit law is "in accord with" *Carpet Group*, but offers cases that are even more attenuated than *Carpet Group* without addressing the factual differences between this conspiracy and the one at issue in *Carpet Group*. *See* Dkt. No. 37 at 15-16. This reasoning in *In re Microsoft* is more instructive to this situation. *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001). There, the court concluded that for a plaintiff to aver OEM computer manufacturers conspired with Microsoft to maintain Microsoft's monopolies in various markets, the plaintiffs would need to show that the OEM defendants

"stepped back and concluded that maintaining Microsoft's monopolies was a goal that they themselves desired to accomplish." *Id.* at 731.

Finding this case is more similar to *In re Microsoft* than *Carpet Group*, Dexon must show CDW intended to maintain Cisco's monopolies in the Relevant Networking Equipment Markets. Dexon fails to do so. Dexon argues that it can be "inferred that CDW had no issue with or otherwise supported Cisco's monopoly power" from Dexon's allegations that Cisco's supra-competitive pricing benefited CDW (Dkt. No. 37 at 17) and that CDW "used the conspiracy to foreclose intra-brand competition." Dkt. No. 48 at 7. Neither of these allegations plausibly shows CDW's intent for Cisco to maintain its monopoly position against other network equipment manufacturers.

Although the Court does not find Dexon has plausibly alleged specific intent by CDW to monopolize for purposes of its Sherman Act § 2 conspiracy to monopolize claim against CDW, the undersigned does not recommend the Court dismiss this claim without allowing Dexon an opportunity to amend its original complaint. The Court is not convinced such an opportunity would be futile. Accordingly, the Court recommends this part of CDW's motion be denied without prejudice to refiling. If this portion of the Report and Recommendation is ultimately adopted by the District Judge, Dexon shall replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised herein regarding CDW's specific intent to monopolize.  This shall be done within thirty days from the date of the Order Adopting this Report and Recommendation, if one is entered.

**D.      Tying claim against Cisco under Sherman Act § 1 (Count III)**

**1.      Dexon's allegations in the current Texas Lawsuit**

In its complaint, Dexon alleges "Cisco is a monopolist threatening and coercing customers into buying overpriced networking equipment because of the market power Cisco holds over

customers, especially small and medium businesses" with limited IT budgets for networking products "that have no choice but to give into Cisco's demands." Dkt. No. 1, ¶¶ 1, 4. According to Dexon's theory, "after customers pay for necessary network equipment maintenance and service, Cisco changes its course of conduct and demands that customers must buy new overpriced equipment in order to avoid a technologically compromised network, and foreclosing its networking equipment competitors in the process." *Id.*, ¶ 1.

Dexon alleges "purchases of networking products are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products." *Id.*, ¶ 4. "As a result, when Cisco forces customers to purchase overpriced equipment through its coercive tactics, Cisco forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase." *Id.* Additionally, Cisco has "forced customers to pay a higher price for networking equipment they had already purchased through a 're-certification fee,' by threatening not to service that equipment unless customers pay the additional equipment fees." *Id.*, ¶ 5. Dexon alleges that "customers' limited budgets are restrained further" when they pay that re-certification fee. *Id.*

Dexon alleges Cisco is a monopolist for after-market maintenance services on Cisco equipment. According to Dexon, only Cisco can provide full maintenance and support on its router and Ethernet switch products, and without such maintenance services, "customers cannot address critical performance issues and address service problems that can be catastrophic to their businesses." *Id.*, ¶ 25. Dexon alleges customers without the budget to justify maintenance services provided by Cisco rely on third-party maintenance and service providers to provide hardware maintenance and support, "but because of Cisco's policies . . . cannot provide software maintenance and support. Thus, Cisco is able to maintain a price premium for its maintenance

services, including its SmartNet service packages." *Id*., ¶ 26. Although "end users are not required to purchase SmartNet service packages for their Cisco products," Dexon alleges "they are effectively compelled to do so, because the service packages offered are integral to the products' functionality." *Id*., ¶ 27 (alleging that customers who do not update the software on their Cisco products are potentially exposed to security and operational risks, and without the software updates, "their Cisco products may not function properly").

Dexon alleges Cisco locks in customers who require maintenance with SmartNet and then uses SmartNet as a "hammer to force supracompetitive purchases of routers and Ethernet switches." Dkt. No. 1 at 15 (emphasis removed). Specifically, "since at least 2015 through the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet service package that the SmartNet service packages were no longer valid in the absence of a new purchase of Cisco equipment, including at least routers and/or Ethernet switches." *Id*. "Alternatively, Cisco forced customers to pay a 're-certification' fee for previously purchased networking equipment so that SmartNet service would not be withheld, as Cisco threatened." *Id*. Dexon alleges "Cisco changed its course of conduct not because of enforcement of a consistent policy, but rather because it newly disapproved, after approving previously, customers' purchase of networking equipment and SmartNet service." *Id*., ¶ 50.

## 2. Applicable law

### a. Tying restraints

Two types of restrictions on competition may be challenged: tying restraints and exclusive dealing arrangements. *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 625 (5th Cir. 2002) (citing *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974)). Tying restraints occur when a seller agrees to sell one product on the condition that

the buyer also agree to purchase a different, or tied product, or the buyer agrees that he will not purchase the same product from another supplier. *Id*. (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc*., 677 F.2d 1045, 1048 n. 5 (5th Cir.1982)). Tying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization. *Avaya Inc., RP v. Telecom Labs, Inc*., 838 F.3d 354, 397 (3d Cir. 2016) (citing Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 17.01, at 17–13 (4th ed. Supp. 2015); also citing 15 U.S.C. §§ 1–2).

Not all tying arrangements are illegal. *Rick-Mik Enterprises, Inc. v. Equilon Enterprises L.L.C.*, 532 F.3d 963, 971 (9th Cir. 2008). Rather, ties are prohibited where a seller "exploits," "controls," "forces," or "coerces" a buyer of a tying product into purchasing a tied product. *Id.* (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink*, 547 U.S. 28 (2006). The injury is reduced competition in the market for the tied product. *Id.* (citing *Jefferson Parish*, 466 U.S. at 12 ("When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.")). As the Supreme Court reiterated in *Illinois Tool Works*, "the justification for the challenge [against ties] rested on either an assumption or a showing that the defendant's position of power in the market for the tying product was being used to restrain competition in the market for the tied product." *Id.* (quoting *Illinois Tool Works*, 547 U.S. at 34). Thus, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Id.* (quoting *Illinois Tool Works*, 547 U.S. at 46).

In *Kodak*, the Supreme Court expressed a "lock-in" tying arrangement in this way:

"[A]n agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992). Although the majority opinion did not mention either *per se* or rule of reason in the analysis, *Kodak* was apparently decided under the *per se* rule.[14] *Id.* at 503 (Scalia, J., dissenting).

Courts in this circuit have also noted that while tying arrangements are often included in the list of *per se* violations of the Sherman Act, not all tying arrangements are *per se* unlawful.[15] *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240, at *18 (N.D. Tex. Aug. 1, 2019) (citing *N. Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008); also citing *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 344 n. 15, 102 S. Ct. 2466, 2473, 73 L. Ed. 2d 48 (1982)). To state a claim for *per se* tying, a plaintiff must plausibly allege facts showing:

(1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce.

---

[14] According to the Sixth Circuit Court of Appeals, the *per se* and rule of reason analysis for tying arrangements have, in effect, merged in recent years, with market power in the tying product market being an indispensable requirement under either *per se* or rule of reason analysis. *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 815 n. 2 (6th Cir. 1997) (further noting the "merger of these two theories is apparent in the majority opinion in *Kodak*, which does not even mention the terms 'per se' or 'rule of reason,' even though *Kodak* was technically a per se case").

[15] The Fifth Circuit Court of Appeals has noted this odd use of the term "per se" is descriptive of a rule located between a *per se* and a rule of reason inquiry. *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1382 (5th Cir. 1994). According to the court, the best that can be said for it is that it reflects the intermediate danger tying arrangements pose to the market: unlike other *per se* illegal arrangements, "not every refusal to sell two products separately can be said to restrain competition." *Id.* (citation omitted). Rather, there must be proof "as a threshold matter . . . [of] a substantial potential for impact on competition in order to justify *per se* condemnation" of a tie." *Id.* (citation omitted).

*Id.* (quoting *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th Cir. 1996) (citation omitted in *EuroTec*)).

Tying arrangements that do not meet the criteria for *per se* illegality are evaluated under the rule of reason. *Honeywell Int'l Inc. v. MEK Chem. Corp.*, No. 3:17-CV-1390-M, 2018 WL 6737514, at *6 (N.D. Tex. July 5, 2018) (citing *United Farmers*, 89 F.3d at 235 n. 2). To state a claim for a tying arrangement that is illegal under a rule of reason analysis, a plaintiff must plausibly allege that the "tying arrangement had an actual adverse effect on competition in the tied product market." *Id.* (quoting *Wilson v. Mobil Oil Corp.*, 940 F. Supp. 944, 954 (E.D. La. 1996); also citing *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 88 (5th Cir. 1994)).

**b.    Exclusive dealing arrangements**

Exclusive dealing, in contrast, occurs when a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller. *Apani*, 300 F.3d at 625 (citation omitted). When assessing whether an exclusive dealing arrangement has the probable effect of substantially lessening competition, the Supreme Court has identified a three-part inquiry. *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961)). First, the relevant product market must be identified by considering interchangeability and cross-elasticity of demand. *Id.* Second, the relevant geographic market must be identified, "by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies." *Id.* (quoting *Tampa Elec. Co.*, 365 U.S. at 327–28). Finally, a plaintiff must show that the "competition foreclosed by the arrangement constitutes a 'substantial share of the relevant market.'" *Id*. That is, "the opportunities for other traders to enter into or remain in that market must be significantly limited." *Id.*

In addressing a Sherman Act § 2 claim for actual and/or attempted monopolization, the Fifth Circuit recently stated that substantial foreclosure is a prerequisite for every exclusive dealing § 2 claim. *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 530 (5th Cir. 2022) (citing *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 410 (5th Cir. 1962) (citing *Tampa Elec. Co.*, 365 U.S. at 329; also citing *OJ Com., L.L.C. v. KidKraft, Inc*., 34 F.4th 1232, 1249-50 (11th Cir. 2022) (applying the substantial-foreclosure requirement to a § 2 claim and rejecting the argument that substantial foreclosure sometimes is not required))).

## 3.    Parties' assertions

Cisco asserts Dexon's tying claim fails for three reasons, two of which relate to the California Court's earlier dismissal of Dexon's California Counterclaims with leave to amend. Dkt. No. 22 at 17-23. Cisco first asserts Dexon never alleges any facts to support its conclusory allegations that Cisco used its market power to foreclose sales of any competitor's equipment, and cites the California Court's dismissal of Dexon's tying claim for failure to allege "Cisco's competitors are impacted." Dkt. No. 22 at 17-21 (citing *Cisco I*, 2021 WL 5848080, at *4). Cisco next asserts Dexon has not plausibly alleged any tie between service and equipment. *Id*. at 21-22. Again, Cisco references the California Court's decision, noting District Judge Breyer found the supposed tie "makes no logical sense." *Id.* at 21 (citing *Cisco I*, 2021 WL 5848080, at *5). Finally, unrelated to the California Court's decision, Cisco argues Dexon's allegations state that customers can pay a "'re-certification fee" to forego the purchase of new equipment as a condition of obtaining SmartNet service, and that is not a tying claim. *Id.* at 22-23.

Dexon makes at least two arguments in response to Cisco's motion, both of which would distinguish the reasoning provided by Judge Breyer based on the factual allegations contained in Dexon's California Counterclaims. First, Dexon disputes that it is required to plead "substantial

foreclosure" in the tied product market. Dkt. No. 24 at 17. Dexon asserts Cisco improperly attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this *per se* tying claim. *Id.*

Second, unlike in the California Lawsuit, here Dexon says "lock-in" is key to its *per se* tying claim. Apparently relying on a *Kodak* "lock-in" theory of tying, Dexon states it alleges Cisco has threatened to withhold service on an entire installed base of products "to extract supra-competitive purchases of specific tied products." Dkt. No. 34 at 8. Pursuant to this theory, Dexon states it has sufficiently alleged anticompetitive effects in the tied product markets by providing "detailed allegations that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding considering of competitive alternatives." Dkt. No. 24 at 23; *see also id.* at 22-23 (further stating Cisco "takes advantage" of "locked-in customers" who had been assured they would receive maintenance and service without purchasing anything else, "forcing the customer to spend more of their limited budget to eliminate competitive alternatives in the process"). According to Dexon, as in *Kodak,* it is the timing of the withholding service that makes Cisco's conduct anticompetitive. *Id.* at 22.

In its reply, Cisco states Dexon's opposition confirms Dexon has no allegation of foreclosure. Dkt. No. 32 at 6 ("It highlights (at 6-7) a bank that bought equipment "it did not need" (from any manufacturer), a school district that had to "*cancel*" an order (of Cisco equipment), an energy company that wanted Cisco equipment and bought Cisco equipment ("from a vendor other than Dexon"), and an auto dealer that "could not buy" any new equipment (so it never did).") (emphasis original). Regarding Dexon's argument that the "substantial foreclosure" requirement

applies to exclusive dealing claims which are not at issue in this case, Cisco asserts Dexon focuses on coercion, a separate element from foreclosure. *Id.* (citations omitted). Cisco further asserts this case is nothing like *Kodak*, the Supreme Court case involving "lock-in." *Id.* at 7.

The parties' arguments reflect differences in how the parties view Dexon's tying claim. Dexon alleges a *Kodak* "lock-in" theory of tying liability, arguing it does not need to allege substantial foreclosure to competitors because that is only applicable to exclusive dealing claims. The Court first considers whether Dexon plausibly states a *Kodak* theory (or other alternative theory) of *per se* tying liability.

**4.      Dexon's *Kodak* theory of *per se* tying liability**

During oral argument, counsel for Dexon focused on the four new examples of customers detailed in the complaint, making it clear that the tying claim in this case is about "lock-in," something that it did not allege in the California Lawsuit. Dkt. No. 62 (Transcript) at 90:2-92:13. Specifically, counsel argued as follows:

> Lock-in means a customer needs switches, and it's going out and wants to make sure that it has money and has options after it buys its initial round of Cisco switches. And so they say, I'm going to buy from you, Cisco, your switches, and I'm going to buy from you service, but I want to make sure that I can continue to get service on those switches I'm going to buy, and I can also buy from a competitor for less money down the road. They are -- customers are critically relying -- and we detailed this in the complaint. Cisco's representations that it will receive service on the switches for which it bought SmartNet, for which it bought services. When Cisco changes that policy, . . . and it threatens withholding that service, you're stuck. You're stuck as the customer. You are not able to then redo your original switch purchase. You're out of money. This is where IT budgets is a really important concept for lock-in and this claim.
>
> I just did a search, the only allegation on budget that we made in California was why a customer might buy SmartNet in general. It was not about lock-in. It was not about how once you've sunk your IT budget on original switches, you then -- it may be a multi-year period before you have an opportunity to buy from a competitor.

So once you have an installed base of Cisco switches, which as you can imagine would occur for hundreds of thousands of customers across this country, you then can't get your service, and your only option for getting the service you need is to buy more Cisco's switches, that means Cisco's competitors have been foreclosed.

And there are four new examples, and this is Slide 5 under "Tying Boxed Out Cisco's Competition." If the Court will indulge me, I'd like to walk through these four examples nowhere found in the California counterclaims.

*Id.* at 90:3-91:13. Those four examples are a Texas (1) bank, (2) automotive dealership, (3) energy company, and (4) school district. Dexon hearing slides at 5.

Not only were the four examples not alleged in Dexon's California Counterclaims, but the "IT budget phenomenon" is also absent from the California Lawsuit. Dkt. No. 62 (Transcript) at 102:9-15. According to Dexon's counsel, the "lock-in combined with the limited IT budget really brings that to the fore as to . . . why this is *Kodak*." *Id.* at 102:18-20.

Generally speaking, an impermissible "tie-in" occurs if a seller enjoys either a monopoly or "appreciable economic power" ("AEP") in the "tying" product (or service) market, and uses its considerable market leverage to "coerce" a buyer—already intent on purchasing the tying product from the seller—into buying a second, "tied" product that the buyer would not have bought based solely on the quality or price of the tied product itself. *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 16 (1st Cir. 1994) (citing *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503 (1969)). As noted above, in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), the Supreme Court explained a theory of "lock-in" tying. *See also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016).

In *Kodak*, Kodak sold photocopier equipment, as well as maintenance service and replacement parts. *Avaya*, 838 F.3d at 398 (citing *Kodak*, 504 U.S. at 455). The parts were of proprietary design and were not interchangeable with other manufacturers' parts. *Id.* (citing *Kodak*, 504 U.S. at 456–57). Kodak sold both parts and service, using different contract arrangements to

charge different prices to different customers. *Id.* (citing *Kodak*, 504 U.S. at 457). The dispute concerned Kodak's policy of selling machines and parts only to purchasers who would also use Kodak to service their machines. *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat. Distribution Co.*, 520 F.3d 393, 405 (5th Cir. 2008) (citing *Kodak*, 504 U.S. at 458). Kodak agreed with original equipment manufacturers that parts fitting Kodak equipment would only be sold to the Kodak company, limited the availability of used Kodak machines, and pressured companies not to sell Kodak parts to independent service providers. *Id.* The result of Kodak's efforts was that customers were forced to obtain service and repairs from Kodak because the independent service providers were unable to obtain parts. *Id.*

Independent service providers sued Kodak, alleging that Kodak had violated §§ 1 and 2 of the Sherman Act by tying the sales of parts and service together for Kodak machines. *Avaya*, 838 F.3d at 398-99 (citing *Kodak*, 504 U.S. at 458-59). The district court's grant of summary judgment to Kodak was appealed to the Supreme Court. In ultimately concluding that the plaintiffs had put forward a strong enough case to proceed to trial, the Court expounded a theory whereby high information and switching costs would allow the seller to exploit customers who had already purchased the equipment and were then "locked in" to the aftermarkets. *Id.* at 399 (citing *Kodak*, 504 U.S. at 476). It explained that "[l]ifecycle pricing of complex, durable equipment is difficult and costly," and that the information needed for such lifecycle pricing "is difficult—some of it impossible—to acquire at the time of purchase." *Id.* (quoting *Kodak*, 504 U.S. at 473). Because "[a]cquiring the information is expensive[, i]f the costs of service are small relative to the equipment price, . . . [consumers] may not find it cost efficient to compile the information." *Id.* (quoting *Kodak*, 504 U.S. at 474–75). Additionally, competitors may not provide that information, either because they do not have it themselves or because they may wish to

collusively engage in the same behavior with their own customers so that "their interests would [not] be advanced by providing such information to consumers." *Id.* (quoting *Kodak*, 504 U.S. at 474 & n.21 (citation omitted in *Avaya*)). In other words, tying liability may exist in an aftermarket where the seller can exploit customers who have already purchased the equipment and cannot easily shift to another brand. *Id.*

Not only was that theory sufficient to support § 1 liability, but the Supreme Court also held it could support § 2 liability for unlawful monopolization. *Kodak*, 504 U.S. at 480–86. In that analysis, the Court incorporated the § 1 analysis but explained that a § 2 claim additionally requires showing the use of that monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Avaya*, 838 F.3d at 400 (quoting *Kodak*, 504 U.S. at 482– 83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948))). Therefore, in defending against a § 2 claim, the seller has the opportunity to justify its actions so that "[l]iability turns. . . on whether 'valid business reasons' can explain [its] actions." *Id.* (quoting *Kodak*, 504 U.S. at 483 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985))). The Court did not consider the record in *Kodak* as sufficient to warrant summary judgment. *Id.* (citing *Kodak*, 504 U.S. at 483–86).

Here, Dexon's complaint contains sufficient allegations concerning a *Kodak* lock-in theory of tying. As the First Circuit Court of Appeals explained, *Kodak* involved three types of products: the purchased Kodak copiers (the "lock-in" product), Kodak copier replacement parts (the tying product), and Kodak copier servicing and repair (the tied product). *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 17 (1st Cir. 1994). Dexon's complaint contains similar allegations: the installed networking equipment already purchased (the "lock-in" product), SmartNet service (the tying product), and new networking equipment in the Relevant Product Markets (the tied product). Dkt.

No. 1, ¶¶ 45-46, 67 (regarding installed base of networking equipment), 102 (alleging the tying product is Cisco's SmartNet services package in the Relevant Services Market, and the tied products are new networking equipment in the Relevant Product Markets); *see also id.* at 15 ("Cisco locks in customers who required maintenance with SmartNet, and then uses SmartNet as a hammer to force supracompetitive purchases of routers and ethernet switches.") (emphasis removed).

In line with a "lock-in" tying claim under *Kodak*, Dexon alleges a change in policy. Dkt. No. 1, ¶ 1 ("after customers pay for necessary network equipment maintenance and service, Cisco changes its course of conduct and demands that customers must buy new overpriced equipment in order to avoid a technologically compromised network, and foreclosing its networking equipment competitors in the process"); *see also id.*, ¶ 102 ("after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco").

Other factors courts consider in assessing "lock-in" claims include "evidence of (1) supracompetitive pricing, (2) [the seller's] dominant share of the relevant aftermarket, (3) significant information costs that prevent[ ] lifecycle pricing, and (4) high 'switching costs' that serve[ ] to 'lock in' [the seller's] aftermarket customers." *Avaya*, 838 F.3d at 402 (quoting *Harrison Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005)). Dexon has allegations regarding these factors as well. According to the Third Circuit, "it is possible that those factors may support a theory of antitrust liability that is not necessarily predicated on lock-in exploitation." *Id.* at 404. However, any such alternative theory must satisfy the more general rule that an antitrust

theory needs to "make[ ] . . . economic sense" and be supported by the evidence.[16] *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

Dexon's allegations further comport with the Fifth Circuit's requirements to state a *per se* tying claim,[17] which require a plaintiff to plausibly allege facts showing the following:

> (1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce.

*EuroTec*, 2019 WL 3503240, at *18 (quoting *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th Cir. 1996) (citation omitted in *EuroTec*)). Similarly, Dexon alleges that (1) the service and new networking equipment are tied together and (2) customers are coerced. *See* Dkt. No. 1, ¶¶ 1, 4 ("Cisco is a monopolist threatening and coercing customers into buying overpriced networking equipment because of the market power Cisco holds over customers, especially small and medium business" with limited IT budgets for networking products "that have no choice but to give into Cisco's demands."); *see also* Dkt. No. 62 (Transcript) at 100:19-23 ("Cisco has created a market by its design where you can only get critical IT updates and patches from it, and it's also a monopolist in the market where it is trying to lock in additional purchases and prevent competitors."); *see also id.* at 101:7-11 (stating "the only

---

[16] The requirement that a plaintiff make out an economically coherent theory of antitrust liability applies just as much to the pleading stage, where, to "make a § 1 claim," a plaintiff must "identify[ ] facts that are suggestive enough to render a § 1 [violation] plausible," with sufficient "context" to "raise[] a suggestion" of unlawful anticompetitive conduct. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 403 (3d Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[17] As noted above, the Fifth Circuit has noted this odd use of the term "per se" is descriptive of a rule located between a *per se* and a rule of reason inquiry. *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1382 (5th Cir. 1994).

reason a school district would pull out of this commitment is because it was afraid that it would lose the service on other pieces of networking equipment that Cisco had sold to the school district").

Dexon alleges Cisco possesses (3) substantial economic power over the tying product and (5) the alleged tie involves more than an insubstantial volume of commerce.[18] Dkt. No. 1 at 8-14 (alleging Cisco is a monopolist for both the Router and Ethernet Switch relevant product markets (Relevant Network Equipment Markets) and the after-market maintenance services on Cisco equipment (Relevant Service Market)).

Dexon alleges (4) the tie has an anticompetitive effect on the tied market, asserting the timing of Cisco's withholding service makes Cisco's conduct anticompetitive. Dkt. No. 24 at 22. Dexon further argues as follows:

> Cisco initially lured customers into buying both the products and service because of Cisco's assurance to the customers that they would receive the maintenance and service it had purchased without purchasing anything else, and customers would maintain their freedom to choose whichever manufacturer it sought for a subsequent purchase of Equipment. (Compl. ¶¶ 46, 50-51, 82); *see also, e.g., id.* at ¶¶ 7, 13 (regarding subsequently lost choices). Cisco's pre-purchase assurance was critical to customers' initial purchases given their limited budgets for IT equipment. (*Id.* ¶¶ 4, 46, 50-51, 82). Cisco subsequently reversed these assurances and demanded that (a) customers must buy new, supra-competitively priced equipment in order to receive the service, and (b) any purchases from a disfavored reseller including any purchases of competitive products would not suffice to restore the service. (*Id.* ¶¶ 4-7, 49-51). As in *Eastman Kodak*, it is the *timing* of withholding service that makes Cisco's conduct anticompetitive, because it is abusing its monopoly power in the Relevant Service Markets in order to force Relevant Product purchases and terms on customers that they would not have agreed to in the first place.

*Id.* at 22-23 (emphasis original). Accordingly, Dexon sufficiently alleges facts to support its tying claims.

---

[18] According to Dexon's response, "Cisco does not challenge the first element, nor that it possesses monopoly power in each of the Relevant Service Markets for purposes of the [third] element, nor does it challenge that a not insubstantial amount of interstate commerce was involved. . . ." Dkt. No. 24 at 21.

a.    **Economic sense and "timing"**

In attempting to distinguish *Kodak*, Cisco argues that "it makes no sense to allege that Cisco forced customers to purchase equipment in order to obtain service on *that equipment*." Dkt. No. 32 at 7 (emphasis original). Cisco argues the California Court in *Cisco I* similarly concluded that "the supposed tie makes no logical sense" because:

> SmartNet exists to maintain Cisco products. The maintenance service (the supposed tying product) is only desirable to consumers as an add-on to the underlying equipment (the supposed tied product). Because a consumer buys SmartNet for equipment she already has, Cisco cannot exploit control over the SmartNet market to force people to buy the underlying equipment.

*Cisco I*, 2021 WL 5848080, at *5.

First, it is not evident that the California Court ruled on a *Kodak* "lock-in" theory of tying liability. District Judge Breyer stated in a footnote it "is at least theoretically possible for a firm to harm competitors by locking customers into a costly long-term service plan and then requiring purchases in a tied equipment market that customers en masse (for some set of reasons) cannot refuse." *Id.* at *5, n. 2. But he then noted that "the conditions necessary" for such an arrangement were "far away from the facts alleged here." *Id.* Dexon claims it has now pleaded such conditions. *See, e.g.*, Dkt. No. 62 (Transcript) at 73:4-7 (stating an "important fact" that was not before the California Court "that is littered throughout these [new] examples but also pled more generally are limited IT budgets"); *see also id.* at 90:22-24 ("I just did a search, the only allegation on budget that we made in California was why a customer might buy SmartNet in general. It was not about lock-in"). Second, and more fundamentally, Dexon does not allege that the already owned network equipment is the tied product; rather, as explained above, Dexon alleges here that the equipment the customer already owns is the lock-in product while the *new* equipment is the tied product.

Cisco relatedly argues *Kodak* does not help Dexon because the alleged tying product in *Kodak* was parts and the tied product was service. *See* Dkt. No. 32 at 7; Dkt. No. 62 (Transcript) at 103:1-6 (Dexon's counsel acknowledged at oral argument that here the order of the tie is switched ("service then tied product") from that alleged in *Kodak*). However, *Kodak* does not require any specific order of tying, i.e., "product then tied service." And as noted above, the complaint sufficiently alleges that Cisco has threatened to withhold service on an entire installed base of products to extract supra-competitive purchases of specific tied products. *See also* Dkt. No. 1, ¶¶ 49, 52, 59, 67, 80. As Dexon's counsel explained during oral argument, a customer (like the Texas Bank) that only wants to renew SmartNet for its already installed base, per Cisco's new policy, could only be eligible for renewal if it bought more Cisco switches and routers.[19] Dkt. No. 62 (Transcript) at 91:21-92:1.

In sum, the Court finds Dexon has sufficiently alleged facts in the complaint from which the Court could infer that discovery would produce evidence to support a *per se* tying claim predicated on "lock-in" under at least a *Kodak* theory. The Court finds, at this stage of the proceeding, Cisco has not shown Dexon's antitrust theory fails to make economic sense.

**b.    Foreclosure and re-certification fee**

Cisco additionally argues that Dexon's tying claim fails "because Dexon never alleges any facts to support its conclusory assertions that Cisco used its supposed power in any market to foreclose sales of any competitor's equipment." Dkt. No. 22 at 17; *see also id.* at 19 (stating that "Dexon does not allege a single instance of Cisco threatening to withhold service from a customer that wanted to purchase another manufacturer's equipment"). In response, Dexon asserts Cisco

---

[19] The Court does not address any argument raised by Cisco during oral argument that such a claim should have been brought by the bank, for example, instead of by Dexon. Cisco did not brief the issue of whether Dexon is a proper plaintiff for purposes of antitrust standing.

improperly attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this (*Kodak* lock-in) *per se* tying case. Dkt. No. 24 at 17; Dkt. No. 34 at 7. According to Dexon, the Supreme Court has distinguished between exclusive agreements, not at issue here, "and other types of potentially anticompetitive conduct, such as tying, which unlike exclusive dealing, directly coerces ultimate consumers." Dkt. No. 24 at 17 (citing *Brown Shoe v. United States*, 370 U.S. 294, 329-30 (1962) (stating the Supreme Court noted that foreclosure needed for exclusive dealing is greater than for tying)). To Dexon's knowledge, "no court has applied the substantial foreclosure requirement outside of the exclusive dealing context." *Id.* As explained below, Cisco has failed to show Dexon fails to allege the requisite level of foreclosure to survive a motion to dismiss.

During oral argument, both parties referenced "foreclosure." Whereas Cisco states Dexon must allege substantial foreclosure of competitors' sales, Dexon focuses first on the anticompetitive effect on customers. However, Dexon asserts it has also sufficiently alleged that Cisco's competitors are foreclosed when Cisco withholds service because "customers were duped by Cisco into using their IT budgets to maintain Cisco Relevant Product monopolies rather than purchasing from a Cisco competitor." Dkt. No. 24 at 24. During oral argument, for example, after going through the four new examples of "foreclosure," Dexon's counsel stated as follows:

> So to go back to this Slide 5 and these examples of foreclosure, the automobile dealership, an update went out. It rendered the switch inactive. Cisco at first honored . . . the SmartNet service package but then said, I'm not going to do it until you buy new switches. **The automobile dealership, again the limited IT budget, couldn't buy new switches, so it's stuck with dead switches until it's -- until its IT budget is refreshed and it could consider HP and the other vendors**.

> So this is how foreclosure occurs. It doesn't need to occur at, you know, the exact time, and Cisco's argument is essentially at the moment of the tie, they need to have been in the market for a competitive switch. That's not the law. The law is what is the practical effect of the tie of -- in the coerced -- in the coerced product market? **If you're forced to buy something new if you don't have any money that you**

> **wouldn't have spent in the first place to buy the competitive product, competitors have been foreclose[ed].** That's what foreclosure looks like.

Dkt. No. 62 (Transcript) at 96:3-21 (emphasis added).

Cisco's counsel stated at oral argument that courts in this circuit have held that a tying claim requires that there be an allegation of foreclosure of sales that competitors otherwise would have made. Dkt. No. 62 (Transcript) at 85:12-17. In support of this proposition, Cisco cites – both in its briefs (Dkt. Nos. 22 and 32) and at oral argument (Dkt. No. 62 at 85:18-21) – the Fifth Circuit's decision in *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994), *cert. denied*, 513 U.S. 1103 (1995). *See* Dkt. No. 22 at 19; *see also* Dkt. No. 62 (Transcript) at 85:18-20. Importantly, *Roy B. Taylor Sales* concerned a reversal of a jury finding based on a full record, which is procedurally different from Cisco's motion to dismiss. Just as importantly, the court's reasoning tends to support Dexon's argument that the law does not require plaintiffs to plead the same level of foreclosure in tying claims.

*Roy B. Taylor Sales* is a case "involving an exclusive dealing line-forcing arrangement" where a manufacturer was forcing the dealer to buy its full line to the exclusion of other competitors. *Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.*, 917 F. Supp. 1208, 1226 (W.D. Tenn. 1995). The case concerned product line restraints imposed on a dealer of hamburger patty machines and patty paper (Taylor) by its patty product manufacturer and supplier (Hollymatic). *Roy B. Taylor Sales*, 28 F.3d at 1380; *see also NIBCO Inc. v. Viega L.L.C.*, 354 F. Supp. 3d 566, 581 (M.D. Pa. 2018) (summarizing *Roy B. Taylor Sales* and finding it did not support the defendant's argument that the plaintiff's claim of *per se* tying must be dismissed for failure to show harm to competition). Hollymatic and Taylor had a contractual agreement that Taylor would use its "best efforts" to sell and service the full line of Hollymatic products. *Roy B. Taylor Sales*, 28 F.3d at 1381. Implicit in that agreement was that Taylor would not purchase patty paper from

any of Hollymatic's competitors. *Id.* After selling only Hollymatic patty paper for several years, Taylor began to purchase a substitute, and Hollymatic confronted Taylor about its purchases from Hollymatic's competitors. *Id.* When they could not come to an agreement over the amount of patty paper that Taylor would be required to purchase each month, Hollymatic severed its relationship with Taylor. *Id.* Taylor then brought suit against Hollymatic, alleging it unlawfully tied the sale of hamburger patty machines to patty paper. *Id.*

In its opinion, which was issued on appeal after a full trial record had been developed by the district court, the Fifth Circuit found that Taylor (the dealer) had not proven that the tying arrangement foreclosed consumer choice because consumers were free to look to other distributors and "purchase the two goods separately." *Id.* at 1382-84; *see also NIBCO*, 354 F. Supp. 3d at 581. The Fifth Circuit reversed the jury's finding of an unlawful tie and instead held in favor of the defendant manufacturer. *Roy B. Taylor Sales*, 28 F.3d at 1388.

In so ruling, the Fifth Circuit noted tying arrangements that threaten competition come in myriad industries, and cited *Kodak* as an example of a seller of machines conditioning the availability of parts on the purchase of repair services. *Id.* at 1383 & n.19 (citing *Kodak*, 504 U.S. 451). The Fifth Circuit stated the common ground is "consumers have to buy one product or service to receive another, removing them from the market for the tied good." *Id.* In *Roy B. Taylor Sales*, the claimed arrangement between Hollymatic and Taylor constituted a vertical nonprice restraint between a manufacturer and a dealer on goods that the dealer offered to customers independently. *Id.* at 1384.

The court in *Roy B. Taylor Sales* noted the situation was "analogous to others in which a manufacturer requires a *dealer* to carry one product in its line to receive another." *Id.* (emphasis

added). The court cited a Tenth Circuit case that explained how "traditional tying arrangements"

and "typical line forcing situations" differ with respect to foreclosure:

> [W]here a dealer is serving as an intermediate link in a distribution chain, if one manufacturer is foreclosed from selling to a dealer because of [an] arrangement, it is likely going to find another way to take its product to market, providing a profit potential continues to exist. In such a case, there is no ultimate foreclosure to the consumer of a choice of goods. In other more traditional tying arrangements there is an ultimate foreclosure of choice to the ultimate consumer. Thus, a foreclosure of choice to an ultimate consumer appears to be the principal key to a tie that is illegal per se. No such foreclosure occurs or is threatened in a typical line forcing situation such as that at bar.

*Id.* (quoting *Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290, 1297 (10th Cir. 1989)) (internal

citations omitted).

The claim in *Roy B. Taylor Sales* was not a *Kodak* "lock-in" theory of tying liability which

would result in an ultimate foreclosure of choice to the ultimate consumer. Rather, the case

involved "an exclusive dealing line-forcing arrangement" where a manufacturer was forcing the

dealer to buy its full line to the exclusion of other competitors. *Paul E. Volpp Tractor Parts*, 917

F. Supp. at 1226. According to the Fifth Circuit, such an arrangement did not threaten competition

to the extent as tying arrangements that bind ultimate customers and thus did not warrant *per se*

analysis. *Roy B. Taylor Sales*, 28 F.3d at 1385; *see also Pulse Network, L.L.C. v. Visa, Inc.*, 30

F.4th 480, 490 (5th Cir. 2022) (noting "the well-established proposition that exclusive-dealing

arrangements are not *per se* antitrust violations").

The court noted the alleged tie would nevertheless be illegal if it "had an adverse effect on

competition." *Roy B. Taylor Sales*, 28 F.3d at 1385. Under the rule of reason, Taylor had to show

that the tie "as it actually operate[d] in the market" harmed competition. *Id.* (quoting *Jefferson

Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29, 104 S. Ct. 1551, 1567, 80 L. Ed. 2d 2 (1984),

*abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S. Ct.

1281, 164 L. Ed. 2d 26 (2006)). The record in *Roy B. Taylor Sales* did not indicate that consumers continued to purchase Hollymatic patty paper at prices above the market. *Id.*

In this case, Dexon alleges a *Kodak* "lock-in" theory of *per se* tying liability. As noted by the Fifth Circuit in *Roy B. Taylor Sales*, the common ground to those types of tying arrangements is "consumers have to buy one product or service to receive another, removing them from the market for the tied good." *Id.* at 1383 (citing *Kodak*, 504 U.S. 451). As noted by the Fifth Circuit, a *per se* condemnation requires proof that the tying arrangement involved "the use of market power to force [consumers] to buy [goods] they would not otherwise purchase."[20] *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) (quoting *Jefferson Parish*, 466 U.S. at 26). Likewise, here, Dexon has sufficiently alleged a tying arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase.

Having found Dexon plausibly alleges such a theory, Cisco fails to persuasively show that such a theory of tying liability requires a showing of substantial market foreclosure of competitors' sales that it argues for in its briefing. In any event, the Court further finds Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. Dkt. No. 24 at 23 (citing Dkt. No. 1, ¶¶ 4-5, 51). According to Dexon, "if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when

---

[20] The *per se* rule obviates the need for full consideration of actual market conditions but does require a finding of "significant market power" in the tying market. *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994).

they bought the equipment and service." *Id.* (citing Dkt. No. 1, ¶¶ 7, 13, 46, 50-51, 82). Dexon alleges Cisco subsequently takes advantage of locked-in customers because of Cisco's virtual monopoly in service, forcing the customers to spend more of their limited budget to eliminate competitive alternatives in the process. *Id.* (citing Dkt. No. 1, ¶¶ 4-5, 26, 51, 103, 125).

Cisco briefly argues that Dexon's tying claims also fail because Dexon alleges that customers can avoid purchasing new equipment by instead paying a "re-certification fee," apparently arguing that because no new equipment is purchased, there is no tie. Dkt. No. 22 at 23. Dexon responds that under its allegations, the "re-certification fee" accomplishes the same end as the other anticompetitive ties, that is, customers are still forced to spend money on equipment they already own, limiting their ability to buy additional equipment from a competitor. Dkt. No. 24 at 25. Cisco's argument is not well developed, and the extent, effect, and details of any re-certification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile.

For all these reasons, the Court finds Dexon has plausibly stated a *per se* tying claim under Sherman Act § 1. The Court recommends this part of Cisco's motion be denied.

## E. Monopolization and attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V)

### 1. Parties' assertions

Dexon further alleges Cisco's tying and associated FUD tactics violate Sherman Act § 2. Regarding Dexon's monopolization claims, Cisco asserts Dexon fails to allege actionable exclusionary conduct. Dkt. No. 22 at 23-28.

### 2. Applicable law

Section 2 of the Sherman Act condemns three actions: monopolization, attempt to monopolize, and conspiracy to monopolize. *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). According to the Fifth Circuit, Sherman Act § 2, which prohibits

monopolies and attempted monopolies, "does not explicitly require a plaintiff to prove an injury to competition; the plaintiff must prove only the existence of monopoly power and the willful continued maintenance of that power." *Walker v. U–Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984). Injury to competition is presumed by proof of the elements of monopolization. *Id.*; *see also Major Mart, Inc. v. Mitchell Distrib. Co.*, 46 F. Supp. 3d 639, 662 (S.D. Miss. 2014).

The Fifth Circuit recently addressed a § 2 monopolization claim and noted the first element is "possession of monopoly power." *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 (5th Cir. 2022) (quoting *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992)). The second element is anticompetitive (or "exclusionary") conduct, which is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* (quoting *Kodak*, 504 U.S. at 482–83 (quotation omitted in *BRFHH*); also citing *United States v. Griffith*, 334 U.S. 100, 108 (1948) (similar)). Attempted monopolization is similar but allows for liability even if the monopoly never came to fruition. *Id.* (citing *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993) (A defendant commits attempted monopolization if it "(1) . . . has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.")).

**3.    Discussion**

Cisco does not challenge Dexon's pleading regarding the first element, that Cisco possesses monopoly power in each of the Relevant Markets. Cisco disputes the second element, the anticompetitive (or "exclusionary") conduct element. Dexon alleges two theories to establish anticompetitive conduct: tying and FUD tactics.

Dexon's allegations regarding Cisco's tying-related conduct and FUD strategies towards the end-users of its equipment are sufficient to defeat a motion to dismiss. As noted above, the

Court in *Kodak* stated the second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482–83 (citations omitted). According to the Court, if Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2. *Id*. The Court further stated respondents had presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market; liability turned, then, on whether "valid business reasons" could explain Kodak's actions. *Id.* at 483 (citations omitted). Finally, the Court considered Kodak's "three valid business justifications for its actions," concluding factual questions existed "about the validity and sufficiency of each claimed justification, making summary judgment inappropriate." *Id*. at 483. Like the ISOs in *Kodak*, Dexon alleges Cisco's tying conduct supports a § 2 claim as well.

Further, Dexon's allegations concerning Cisco's FUD strategies also plausibly show exclusionary conduct by Cisco to support Dexon's § 2 claims. *See* Dkt. No. 1, ¶¶ 6-9, 64-68 (alleging Cisco uses FUD to dissuade customers from purchasing from resellers with lower prices and to accomplish its coercion strategies). The Third Circuit previously rejected a defendant's attempt to claim such conduct does not show anticompetitive conduct, specifically "in the context of a *Kodak* claim." *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) (holding that "the allegedly predatory acts—e.g., terminating dealings with TLI; sending 'fear, doubt, and uncertainty' letters to TLI's maintenance customers; and trespassing and spying on TLI's customers" was "sufficient to show exclusionary conduct for purposes of § 2" and to support the jury's judgment on the issue). For its part, Cisco's briefing does not specifically address Dexon's FUD's allegations.

Instead, Cisco first argues that the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's equipment-manufacturing competitors from making sales." Dkt. No. 22 at 24. For the reasons explained with respect to Dexon's tying claims, Cisco's argument that Dexon fails to plausibly plead harm to competition is rejected. Further, Cisco does not address Fifth Circuit law holding that "injury to competition is presumed to follow from the conduct proscribed by § 2." *Walker*, 747 F.2d at 1013.

Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. Dkt. No. 22 at 24. Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted to maintain its monopoly position by having distributors charge higher prices does not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id.* at 24-28. None of these arguments are proper at this stage. Dexon does allege a mere change of distributor or refusal to deal dispute, and assuming the allegations are true, Cisco's tying and FUD strategies make economic sense, at least in terms of a *Kodak* claim, as long as those actions maintain or enhance Cisco's monopoly power as alleged. *See* Dkt. No. 24 at 27 (citing Dkt. No. 1, ¶¶ 84, 91, 98, 106, 112).

The Court, viewing Dexon's allegations collectively and in the light most favorable to Dexon, finds Dexon plausibly states monopolization and attempted monopolization claims against Cisco under Sherman Act § 2. The Court recommends this part of Cisco's motion be denied.

### F.      Antitrust injury for Counts I-VI

#### 1.      Parties' assertions

Both Cisco and CDW assert Dexon fails to establish antitrust injury, which is a component of antitrust standing. *BRFHH*, 49 F.4th at 525 (citing *Atl. Richfield Co. v. USA Petroleum Co*. ("*ARCO*"), 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). Cisco asserts Dexon cannot plead antitrust injury from the alleged tying conduct because Dexon does not plead any injury resulting from reduced competition in the claimed Relevant Product Markets. Dkt. No. 22 at 29. CDW likewise argues none of Dexon's allegations establish injury to competition in the relevant markets. Dkt. No. 28 at 19 (stating Dexon's focus on its own lost sales to CDW and other Cisco resellers is misguided because the antitrust laws are designed to protect competition, not competitors). Additionally, CDW states any supposed harm to competition in the relevant markets would injure either end-customers (those purchasing products from Dexon or CDW) or from rival original equipment manufacturers ("OEMs") who are allegedly foreclosed from selling their equipment, but not Dexon, which is neither. *Id.*

#### 2.      Applicable law

Antitrust injury is a component of antitrust standing. *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 589 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022). Antitrust standing, in turn, is a judicially-created set of threshold requirements that a private plaintiff must show before a court can entertain its antitrust claims. *Id.* (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 & n.31 (1983)). The three antitrust standing requirements are "1) injury-in-fact, [i.e.,] an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff

status, which assures that other parties are not better situated to bring suit."[21] *Id.* (quoting *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (citing *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009))). The second component of antitrust standing, antitrust injury, requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The injury should reflect "the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Anago, Inc. v. Tecnol Med. Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) (citing *Brunswick,* 429 U.S. at 489).

### 3.    Discussion

Defendants both cite *Norris v. Hearst Trust*, 500 F.3d 454 (5th Cir. 2007) for the proposition that dismissal is appropriate if there is no allegation of an adverse effect on competitors. *See id.* at 468 (affirming dismissal for lack of antitrust injury and antitrust standing where there was no allegation "that the termination of the plaintiffs had any adverse effect on anyone else, either by increasing the price or decreasing the availability of the Chronicle to its subscribers or other readers or by damaging competitors or otherwise"). Under CDW's suggested interpretation of *Norris*, only through pleading that Dexon was an end-customer or a rival OEM can Dexon establish the requisite antitrust injury.

The Fifth Circuit has not held as a matter of law that antitrust standing is limited to competitors and consumers exclusively. *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,

---

[21] These requirements, which supplement Article III standing requirements, ensure that successful antitrust claims only redress the types of harm that antitrust law was designed to prevent, rather than create a fortuitous windfall for all parties proximate to the defendant, regardless of whether they were injured by anticompetitive conduct. *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 589 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022) (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 (1983)).

No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *12 (W.D. Tex. Oct. 15, 2015). Rather, it has recognized that the Sherman Act is "comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices." *Id.* (quoting *American Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 Fed. Appx. 1, 7 (5th Cir. 2004) (quoting *Blue Shield v. McCready*, 457 U.S. 465, 472 (1982))). In *American Central*, the Fifth Circuit rejected the argument that the plaintiff lacked standing because it was a distributor, not a competitor. *Id.* The court held that "[c]ompetitor status is not required to establish standing" and "[r]elief for antitrust claims is not confined to consumers, or to purchasers, or to competitors, or to sellers." *Id.* (quoting *American Central*, 93 Fed. Appx. at 7).

As explained in *Universal Hospital*, the court in *Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*, Civil Action No. 10–00124, 2010 WL 3488244 (E.D. La. Aug.26, 2010) rejected the argument that the antitrust requirement is met only when an injury is inflicted on a business consumer or competitor of a defendant as an "inaccurate" reading of *Norris*:

> Such a reading of *Norris* is inaccurate. It drastically oversimplifies the question of whether the defendants' activities resulted in antitrust injury. In that case, the Fifth Circuit was commenting less on the dynamics of anticompetitive conduct and more on which parties are most likely to bring suit under the federal antitrust laws. Thus, it was focused on the third element of the standing injury-the issue of whether the plaintiff is a proper party to an antitrust claim. *See Norris*, 500 F.3d at 466 (noting that consumers and competitors are appropriate parties to bring antitrust claims because they are often the only parties injured by the harm to competition caused by antitrust violations). The Fifth Circuit was not stating a bright-line rule for gauging the occurrence of an antitrust injury. While it is typically consumers and competitors who suffer as a result of calculated anticompetitive conduct, this fact alone does not reflexively manifest an antitrust injury.

*Id.* (quoting *Vaughn*, 2010 WL 3488244 at *12).

This Court also addressed *Norris* in *TravelPass* and held that even if the Court were to accept the defendants' argument that TravelPass was not a competitor, that "would not be determinative of the issue." *TravelPass Grp., L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-153-

RWS-CMC, 2019 WL 5691996, at *23 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, No. 5:18-CV-00153-RWS-CMC, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019). Similarly, here, the Court does not find this argument persuasive.

Both Defendants further contend that Dexon has not alleged antitrust injury because Dexon does not allege injury to or reduced competition in the Relevant Product Markets. Again, Defendants' argument is unpersuasive.

The Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *Torrey v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *8 (E.D. Tex. Sept. 27, 2018) (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997) ("Since 1983, we have pointed out a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability.")). "And in 1984, th[e] court explained, albeit in a motion for rehearing, that the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing."[22] *Doctor's Hosp.,* 123 F.3d at 305 (citing *Walker v. U–Haul Co.,* 747 F.2d 1011, 1016 (5th Cir.), *modifying,* 734 F.2d 1068 (5th Cir.1984)). Injury to competition then, while often a necessary component to substantive liability, need not be pleaded as an element of standing for a plaintiff's antitrust claims to survive a motion to dismiss.[23] *TravelPass*, 2019 WL 5691996,

---

[22] In 2015, the Fifth Circuit stated in a footnote that the antitrust injury requirement of antitrust standing is sometimes confused with "injury to competition[,] . . . which is often a component of substantive liability." *Waggoner v. Denbury Onshore, L.L.C.*, 612 Fed. Appx. 734, 736 n. 3 (5th Cir. 2015) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)). The Fifth Circuit in *Waggoner* stated that in the standing context, injury "should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Id.* Recently, the Fifth Circuit again cited *Doctor's Hospital* for the same proposition. *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 493 n. 18 (5th Cir. 2022) (citing *Doctor's Hosp.*, 123 F.3d at 305 (explaining "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace")).

[23] The California Court found no injury based on its finding of no competitive harm. As noted above, Dexon's new allegations plausibly plead competitive harm; moreover, Defendants have not adequately addressed the Fifth Circuit's cases distinguishing between antitrust injury and injury to competition.

at *24 (citing *Games People Play, Inc. v. Nike, Inc.*, No. 1:14-CV-321, 2015 WL 13657672, at *5 (E.D. Tex. Feb. 13, 2015) (citing *Doctor's Hosp.*, 123 F.3d at 305)); *see also Torrey*, 2018 WL 10124894, at *8.

As noted above, antitrust injury does require that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89 (1977). In finding Dexon has sufficiently shown antitrust injury, the Court finds *Pulse Network* instructive. In that case, the Fifth Circuit held Pulse had not shown antitrust injury as to its first theory (PAVD), but it had shown antitrust injury as to its second and third theories (FANF and volume-based agreements). *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491-95 (5th Cir. 2022). In its FANF theory, Pulse alleged the FANF pricing structure used by Visa caused merchants to use its debit network less, decreasing Pulse's revenue. *Id.* at 491. According to Pulse, "Visa uses its market dominance to foist on merchants a high fixed fee they wouldn't ordinarily accept" and "then uses the revenues from that unavoidable upfront fee to artificially lower its per-transaction fees, which effectively forecloses rivals like Pulse from competing." *Id.* In arguing there was no antitrust injury, Visa argued that Pulse was "really harmed only by the increased competition created by FANF (i.e., cheaper per-transaction fees), rather than some anticompetitive aspect of the pricing structure." *Id.* The Fifth Circuit held as follows:

> Pulse claims more than price competition is afoot, though. After the Durbin Amendment loosened Visa's grip on the debit network market, Visa began shedding merchants to Pulse and other networks because its pricing wasn't competitive on a per-transaction basis. Instead of improving its product or competing on price, however, VISA began charging the FANF to merchants—and then using some of those revenues to reduce per-transaction fees. This integrated fee structure, argues Pulse, forces merchants to pay a higher total cost (fixed plus per-transaction fees) than before, and yet Visa's market share and profits have recovered.

This alleged scheme inflicts antitrust injury on Pulse. Under Pulse's theory, it doesn't lose customers to Visa in a fair fight over per-transaction fees. Rather, Pulse loses customers because Visa abuses its dominance in the debit card market. Merchants have no choice but to pay Visa's high fixed monthly fee. They recoup that expense by routing more transactions through Visa's network, which charges lower per-transaction fees than competitors. But Visa can achieve that only by leveraging the upfront fees to artificially deflate its per-transaction fees. We must assume this pricing structure violates the antitrust laws. *See Sanger Ins. Agency* [*v. HUB Intern, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015)]; *Doctor's Hosp.*, 123 F.3d at 306. When we do, the link between Pulse's injury and Visa's alleged anticompetitive conduct becomes plain. Pulse is squeezed out of the market because Visa exploits its dominance to impose supra-competitive prices on merchants and simultaneously undercut competitors' per-transaction fees. That is textbook antitrust injury. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor ... suffers a distinct injury if it is prevented from selling its product.").

*Id.*

Similar to CDW (Dkt. No. 28 at 19), Visa quoted the Supreme Court's decision in *ARCO*, 495 U.S. 328, for the proposition that antitrust injury does not arise unless a private party is affected by an *anticompetitive* aspect of the defendant's conduct. *Pulse Network*, 30 F.4th at 492. The Fifth Circuit explained that in *ARCO*, the antitrust injury was absent because the plaintiff competitor was not harmed (and instead was benefited) by the anticompetitive aspects of the alleged antitrust violation. *Id.* (further noting *ARCO* discussed predatory pricing in the context of antitrust claims targeting the low prices set by a price-fixing agreement). In *Pulse Network*, Pulse was "injured precisely by the anticompetitive aspects of Visa's conduct, *i.e.*, the integrated FANF structure that excludes Pulse from the market." *Id.* Additionally, Pulse was not challenging FANF because it imposes low or below-cost pricing; rather, it argued that "FANF abuses Visa's market power, specifically by imposing supra-competitive prices on merchants while manipulating prices in a way that excludes competitors from the market." *Id.* at 493.

The Fifth Circuit stated the "Supreme Court has time and again reminded us that analysis 'rest[ing] on formalistic distinctions rather than actual market realities are generally disfavored in

antitrust law.'" *Id.* (quoting *Ohio v. Am. Express Co.*, 201 L. Ed. 2d 678, 138 S. Ct. 2274, 2285 (2018) (citation omitted in *Pulse Network*)). The Fifth Circuit would not separate the FANF into separate components when assessing antitrust injury, noting that "Pulse's claimed injury stems directly from the combined effect of those two components—the fixed fee allowing Visa to subsidize its per-transaction fee, imposing supra-competitive overall costs on merchants while excluding competitors from the market."[24] *Id*.

Here, for purposes of this analysis, the Court assumes a violation of the antitrust laws. *See Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) (stating in the context of exclusive dealing that "[i]n analyzing this [antitrust] standing issue, we assume that [plaintiffs'] allegations of exclusive dealing amount to an antitrust violation" (citing *Doctor's Hosp.*, 123 F.3d at 306)). At this stage of the litigation, viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Court finds Dexon has adequately claimed an antitrust injury.

The alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the "conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hosp.*, 123 F.3d at 305;[25] *see also Pulse Network*, 30 F.4th at 491 (finding Pulse's incremental exclusion from the relevant market because

---

[24] With regard to the volume-based agreements, which Pulse alleged constituted "exclusive-dealing or quasi-exclusive-dealing agreements" which Visa used to suppress competition and reduce Pulse's market share in PINless transactions, the Fifth Circuit similarly found the district court erred in ruling Pulse lacked antitrust standing to challenge those agreements. *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 494-95 & n.24 (5th Cir. 2022) (holding that Visa's argument "that the agreements merely amount to 'non-predatory price competition'" to be "a merits question" not appropriately resolved on a motion to dismiss.).

[25] In *Doctor's Hospital*, when the antitrust injury was viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition, the plaintiff's "alleged losses and competitive disadvantage because of its exclusion from SMA [fell] easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

of defendant's alleged anticompetitive conduct "is textbook antitrust injury"); *see also Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor. . . suffers a distinct injury if it is prevented from selling its product.")). The Court finds Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommends this part of Defendants' motions be denied.

## G. Texas Free Enterprise and Antitrust Act (Count VI)

The Texas Free Enterprise and Antitrust Act ("TFEAA") provides, among other things, that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." *Constr. Cost Data, L.L.C. v. Gordian Grp., Inc.*, No. CV H-16-114, 2017 WL 2266993, at *13 (S.D. Tex. Apr. 24, 2017), *report and recommendation adopted*, No. 4:16-CV-114, 2017 WL 2271491 (S.D. Tex. May 22, 2017) (citing TEX. BUS. & COM. CODE § 15.05(b)). The Texas legislature has directed that the provisions of the Texas Free Enterprise and Antitrust Act are to be construed in harmony with federal judicial interpretation of comparable federal antitrust statutes. *See* TEX. BUS. & COM. CODE ANN. § 15.04 (West). Dexon asserts it has alleged Texas-specific conduct in support of all of its allegations that also state a claim under the TFEAA.

For the reasons outlined above, Dexon's claims under the TFEAA should not be dismissed. The Court recommends this part of Defendants' motions be denied.

## H. Statute of Limitations concerning Dexon's pre-2018 claims against CDW

## 1. Parties' assertions

In its motion, CDW asserts the statute of limitations precludes Dexon's pre-2018 claims. According to CDW, because Dexon filed its complaint on April 27, 2022, claims against CDW based on injuries allegedly incurred before April 27, 2018 ("pre-2018 claims") are time-barred.

Dkt. No. 28 at 20. CDW asserts Dexon does not and cannot argue that the statute of limitations should be tolled because Dexon's allegations of a public pattern of conduct by Cisco belie any notion that any part of Cisco's conduct was "secret." *Id.* Dexon responds that CDW is alleged to have taken an action in further of the Cisco-CDW conspiracy in March 2021, which is "clearly within the statute of limitations," and discovery is needed "to determine how long" the conspiracy has been in effect. Dkt. No. 37 at 22.

## 2.    Applicable law

The statute of limitations for antitrust claims is four years. 15 U.S.C. § 15b; *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest II*"), 998 F.3d 190, 196 (5th Cir. 2021). "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 338 (1971). "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date. . . ." *Id.* at 339.

"Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 126–27 (5th Cir. 1975). However, under the continuing conspiracy theory, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . the statute of limitations runs from the commission of the act." *Zenith*, 401 U.S. at 338 ("[I]f a plaintiff feels the adverse impact of an

antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date. . . ."); *see also Poster Exchange*, 517 F.2d at 124-25.

To toll the statute of limitations, the plaintiff must show "some act of the defendants during the limitations period [that injured plaintiff's business.]" *Rx.com, Inc. v. Medco Health Sols., Inc*., No. 5:04-CV-227-DF, 2008 WL 11449354, at *6 (E.D. Tex. Mar. 11, 2008), *aff'd sub nom. Rx.com v. Medco Health Sols., Inc.*, 322 Fed. Appx. 394 (5th Cir. 2009) (quoting *Poster Exchange*, 517 F.2d at 128-29 (Where plaintiff complained that defendant excluded it from participation in the standard accessory industry, the Fifth Circuit held that plaintiff failed to demonstrate that it had been refused access to standard accessories within the limitation period, and remanded to the district court to determine "whether there was. . . a mere absence of dealing or whether there was some specific act or word precluding [plaintiff] from obtaining supplies."); also citing *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc*., 677 F.2d 1045, 1051 (5th Cir. 1982) ("a cause of action accrue[s] whenever the defendant commits an overt act in furtherance of an antitrust conspiracy."); also citing *Bell v. Dow Chemical Co*., 847 F.2d 1179, 1187 (5th Cir. 1988); also citing *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp*., 546 F.2d 570, 572 (4th Cir. 1976) ("[E]ven when the plaintiff charges a continual refusal to deal, the statute of limitations commences to run from the last overt act causing injury to the plaintiff's business.")). "[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Id.* (quoting *Poster Exchange*, 517 F.2d at 127-28) (other citation omitted).

### 3.    Discussion

CDW's statute of limitations argument is premature. Arguing that a claim is time-barred under the statute of limitations is an affirmative defense. *Dollery v. Post Acute Med. Mgmt., L.L.C.*,

No. 6:18-CV-00104, 2022 WL 161333, at *1 (S.D. Tex. Jan. 18, 2022) (citing FED. R. CIV. P. 8(c)(1)). As a general rule, then, the statute of limitations is normally "an issue that must be resolved through discovery and summary judgment or trial." *Id.* (quoting *Frame v. City of Arlington*, 657 F.3d 215, 240 (5th Cir. 2011) (en banc)). This is because "a Rule 12(b)(6) motion typically cannot rely on evidence outside the complaint." *Id.* (quoting *C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank*, 838 F.3d 655, 660 (5th Cir. 2016)) (other citation omitted). Accordingly, dismissal at the 12(b)(6) stage is proper only "where it is evident from the [complaint] that the action is barred and the [complaint] fail[s] to raise some basis for tolling." *Jaso v. The Coca Cola Co.*, 435 Fed. Appx. 346, 351 (5th Cir. 2011) (quoting *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir.2003)); *Quest II*, 998 F.3d at 196 ("[D]ismissal for failure to state a claim based on the statute of limitations defense should be granted only when the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint." (quoting *Jaso*, 435 Fed. Appx. at 352 (internal quotation marks omitted in *Quest II*))).

With only the complaint to rely on, the Court concludes it is not evident that Dexon's pre-2018 claims are time-barred. Dexon's arguments "at best raise fact questions not suitable for disposition under Rule 12(b)(6)." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021) (citing *Quest II*, 998 F.3d at 200 (reversing 12(b)(6) dismissal on statute-of-limitations grounds because Defendants failed to conclusively establish that Plaintiffs should have discovered their injury through a diligent inquiry); cf. *Abdul-Alim Amin v. Universal Life Ins. Co. of Memphis*, 706 F.2d 638, 640 (5th Cir. 1983) ("While a statute-of-limitations defense may be raised in a motion to dismiss under Fed. R. Civ. P. 12(b)(6), such a motion should not be granted unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief.'" (quoting *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977)))). The Court recommends this part of CDW's motion be denied without prejudice.

## V.  RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendant Cisco Systems, Inc.'s Motion to Dismiss Under Rule 12(b)(6) (Dkt. No. 22) be **DENIED,** with the part of the motion seeking dismissal under true res judicata being **DENIED WITHOUT PREJUDICE**. It is further

**RECOMMENDED** that Defendant CDW Corporation's Motion to Dismiss the Complaint Pursuant to FED. R. CIV. P. 12(b)(6) (Dkt. No. 28) be **DENIED**, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being **DENIED WITHOUT PREJUDICE**.

<u>Objections</u>

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that

such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**App.829**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00053-RWS-JBB |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. and | ) | |
| CDW CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANT CISCO SYSTEMS, INC.'S OBJECTION TO REPORT AND RECOMMENDATION DENYING CISCO'S MOTION TO DISMISS

Cisco Systems, Inc. ("Cisco") objects to the Report and Recommendation (Dkt. 107, the "Report") denying its Motion To Dismiss (Dkt. 22) and respectfully requests that this Court sustain the objection and dismiss with prejudice the Complaint of Dexon Computer, Inc. ("Dexon").

## I.     INTRODUCTION

The Report does not deny that Dexon's California counterclaims challenged the same conduct that it now challenges before this Court or that the California court dismissed Dexon's counterclaims in a case that remains pending before Judge Breyer.  Under these circumstances, the Court should immediately grant Defendants' objection to the order denying Cisco's *Motion To Transfer* (Dkt. 96), which is fully briefed and would effectively moot this objection.

If the Court reaches Cisco's Motion To Dismiss, the Motion should be granted.  Claim preclusion bars the Complaint because it arises out of the same conduct as Dexon's California counterclaims.  *See* Dkt. 127.  The Report's acceptance (at 25) of Dexon's argument that it added "new claims and facts" is erroneous:  none of the supposedly new content in Dexon's Complaint involves new *conduct*.  The Report also misunderstands (at 23) Cisco's argument for the finality of the California court's rulings:  those rulings are preclusive not only because Dexon failed to amend its antitrust counterclaims when given the chance, *see* Dkt. 87, but also because the California court dismissed Dexon's remaining counterclaims with*out* leave to amend, *see* Dkt. 127.  On the merits, under Fifth Circuit law, Dexon's failure to allege harm to competition in the alleged product markets means that it has no proper antitrust claim.  Dismissal is proper.

## II.     ARGUMENT

This Court reviews the Report *de novo*.  28 U.S.C. § 636(b)(1); *see, e.g.*, *SynQor, Inc. v. Vicor Corp.*, 2022 WL 5212967, at *2 (E.D. Tex. Oct. 5, 2022).

## A.    Claim Preclusion Bars Dexon's Claims

This Court can decide claim preclusion at the dismissal stage because the Report took judicial notice of the filings in the California lawsuit (at 15 n.3) and "all of the relevant facts are contained in the record before [the court] and are uncontroverted." *R&R Motorsports, LLC v. Textron Specialized Vehicles, Inc.*, 2022 WL 4379515, at \*2 (E.D. La. Sept. 22, 2022) (brackets in original) (granting 12(b)(6) motion on res judicata grounds); *see also McIntyre v. Ben E. Keith Co.*, 754 F. App'x 262, 264-65 (5th Cir. 2018) (per curiam) (affirming 12(b)(6) dismissal on res judicata grounds).  In *Anderson v. Wells Fargo Bank, N.A.*, the Fifth Circuit *affirmed* a dismissal based on claim preclusion; its holding does not support the Report's conclusion that Dexon can prolong this case simply by objecting.  *See* 953 F.3d 311, 314-15 (5th Cir. 2020).[1]

Dexon's claims are barred because they challenge the same conduct as Dexon's California counterclaims, which were dismissed without leave to amend.  That dismissal is a final adjudication on the merits with preclusive effect.  The Report does not suggest otherwise and, for that reason alone, it errs in holding that Cisco does not meet the finality requirement.  Regardless, the California court's *earlier* dismissal of Dexon's antitrust counterclaims "with leave to amend" (Dkt. 87 at 15) also has preclusive effect because Dexon did not re-assert its antitrust counterclaims.  *See Hoffman v. Nordic Naturals, Inc.*, 837 F.3d 272, 279-80 (3d Cir. 2016) (affirming dismissal because "[f]iling a new action in a different court does not prevent" a dismissal with leave to amend "from ripening into a final order"); 18A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure:  Jurisdiction* § 4439 (3d ed., Apr. 2022

---

[1] The Report's other cited authorities (at 23), are unpersuasive.  *See Giddy Holdings, Inc. v. Kim*, 2021 WL 2773019, at \*4 (W.D. Tex. June 7, 2021) (misreading *Anderson*), *adopting report and recommendation as modified*, 2021 WL 8442028 (W.D. Tex. July 2, 2021); *Stonecoat of Texas, LLC v. Procal Stone Design, LLC*, 2018 WL 324446, at \*9 (E.D. Tex. Jan. 8, 2018) (deferring claim-preclusion argument because not all relevant facts were in the record).

Update) ("If leave to amend is granted but then ignored, preclusion also is appropriate.");

*Eldridge v. Kohls Dep't Stores, Inc.*, 2020 WL 1528233, at *2 (W.D. Okla. Mar. 30, 2020).[2]

The Complaint arises out of the same nucleus of operative facts as the California counterclaims. As the Report recognizes (at 25), a court must assess the "factual predicate of the claims asserted" – that is, the conduct at issue – and preclusion extends not only to claims actually litigated in the first suit, but also to those that "might have been." Under that standard, preclusion applies because the Complaint – just like Dexon's California counterclaims – challenges Cisco's supposed efforts to interfere with Dexon's sale of Cisco routers, switches, and IP phones. *See* Dkt. 21 at 4-5 (noting that Dexon copied dozens of allegations from its California counterclaims into the current Complaint verbatim).

The "claims and facts" that the Report labels (at 25) as "new" do not defeat preclusion because they do not correspond to new conduct. To begin, how Dexon labels its claims is beside the point – the rule against claim splitting requires the Court to disregard the legal labels Dexon uses. And none of the differences change the nature of the conduct alleged; indeed, most are not even differences: Dexon's California counterclaims included allegations about the Cisco-CDW conspiracy, limited IT budgets, IP phones, and the Texas school district.[3] The Report's

---

[2] The Report's distinction of *Eldridge* (at 24) fails. The *Eldridge* court noted that the later-filed complaint was "bareboned" to explain its "assum[ption]" that the claims the complaint asserted were "either identical to [the] prior claims" or "could have been pursued in the earlier action." 2020 WL 1528233, at *1. The same is true here – the Report concedes (at 25 n.10) that three of Dexon's claims are "the same as" counterclaims it asserted in the California lawsuit. And the only arguable differences are factual allegations that Dexon could have pursued there.

[3] *See* Dkt. 50 ¶ 52 ("Cisco threatened the VAR not to do business with Dexon, and when the VAR representative assigned to Dexon refused to comply with the demand, he was assigned to a different region and account."); *id.* ¶ 32 ("Another barrier to entry for the Relevant Router and Switch Markets lies in customers' long purchase cycles . . . ."); *id.* ¶ 36 ("Customers seek to find the best deal for networking equipment regardless of when it is purchased."); *id.* ¶ 43 ("The 911-center could not afford new equipment . . . ."); *id.* ¶ 63 (stating that customers are "[d]riven by budgets"); Dkt. 92 ¶¶ 146, 148 (alleging that the school district "cancelled [a] contract with

statement (*id.*) that Dexon added "more specific" allegations about this conduct implicitly concedes that Dexon already challenged it in California. And although the California counterclaims did not include allegations about the Texas bank, energy company, or car dealership, that conduct is of a piece with the conduct that Dexon did allege, pre-dates the California court's ruling, and could have been asserted there.[4]

### B. Dexon's Failure To Allege That Cisco's Conduct Hindered Competitors From Making Sales Is Fatal To Its Claims

#### 1. Dexon's Claims Require Allegations Of Foreclosure

As the California court held, Dexon's claims require it to allege *foreclosure* – that is, that Cisco's conduct prevented Cisco's competitors from making sales in the alleged relevant markets. *See Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2021 WL 5848080, at *4-5 (N.D. Cal. Dec. 9, 2021). The Report's refusal to apply this requirement to Dexon's tying and monopolization claims misapplies Fifth Circuit law and conflicts with the California court.

*First*, the Report fails (at 50-51) to "distinguish" Judge Breyer's ruling on the tying claim on the ground that the Complaint relies on "a *Kodak* 'lock-in' theory of tying." Dexon's California counterclaims pleaded this theory – stating "Cisco Locks In Customers Who Require Maintenance With SmartNet." Dkt. 50 at 28 (heading). Dexon then briefed the theory, stating, "As *Kodak* and *Newcal* explain, when locked-in customers are subject to a policy reversal that results in coerced purchases, that is precisely what the *per se* tying doctrine forbids." Dkt. 81 at

---

Dexon"); Dkt. 107 ¶ 169 (the contract pertained to "Cisco phones rather than networking equipment").

[4] In *Test Masters Educational Services, Inc. v. Singh*, the later-filed case did "not involve the . . . central dispute in the previous litigation," and "all the claims at issue in th[e later-filed case] arose from facts that occurred on or after" the first-filed court ruled. 428 F.3d 559, 571-72 (5th Cir. 2005). Here, the central dispute is the same because the California lawsuit addressed whether Cisco's conduct toward Dexon plausibly violated the antitrust laws (among others), and Dexon alleges no conduct post-dating the California court's ruling.

**App.834**

14. The California court rejected the theory, citing *Kodak*. *See* Dkt. 87 at 7.

The Report cites no case supporting its holding that a plaintiff need not allege harm to competition in the relevant market, and it ignores relevant cases Cisco cited. *See*, *e.g.*, *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 641 (S.D. Tex. 1999) ("*Kodak* . . . does not excuse failure of a plaintiff to allege an effect on competition in the tied product's market."). The Report's distinction (at 62) of one case that Cisco cited because it "concerned a reversal of a jury finding" fails – facts that support the legal elements that must be proven at trial must first be plausibly alleged to survive dismissal. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).

*Second*, the Report cites no case holding that a plaintiff can state a monopolization claim without alleging foreclosure. It inaccurately states (at 69) that "Cisco does not address Fifth Circuit law holding that 'injury to competition is presumed to follow from the conduct proscribed by § 2.'" (quoting *Walker v. U-Haul Co.*, 747 F.2d 1011, 1013 (5th Cir. 1984)). But the Report ignores that, in *Walker*, the Fifth Circuit *affirmed* summary judgment for the defendant, precisely because the plaintiff "made no mention in the lower court of how" the defendant's conduct affected the sales of its competitors. 747 F.2d at 1015.

## 2. Dexon Does Not Allege Foreclosure

As the California court held, Dexon's claims fail because it does not allege that any customer wanted to buy networking equipment or IP phones made by Cisco's competitors and that Cisco prevented them from doing so. *See Cisco*, 2021 WL 5848080, at *4-5.

The Report does not identify such an allegation. It instead adopts (at 65) Dexon's speculative theory, relevant only to the tying claim, that when "customers are forced to" spend their "limited IT budgets" on Cisco products because of the purported tie, that precludes them from "consider[ing]" products made by Cisco's competitors. Neither Dexon nor the Report cites

any cases applying this theory, which would convert any bundled sale into an illegal tie. The cases instead confirm that Dexon must allege what it does not: that a customer wanted to purchase a competitor's product and was prevented from doing so. *Cf. Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 465 (1992) ("consumers have switched to Kodak service even though they preferred [independent] service").

Finally, the Report errs in devising a theory supporting Dexon's conspiracy claim that Dexon neither pleaded nor argued. The Report reasons (at 41-42) that because Dexon has pleaded that Cisco and CDW Corporation have market power, competitive harm can be inferred. That is incorrect. The vertical conspiracy that Dexon alleges cannot harm competition because it cannot conceivably prevent Cisco's *competitors* from making sales – Dexon instead alleges that the conspiracy caused *it* to specifically lose sales of *Cisco* equipment. Compl. ¶¶ 56-63.[5]

### C. Dexon's Claims Fail For Additional, Independent Reasons

#### 1. Dexon Does Not Allege An Agreement

Independently, Dexon's conspiracy claim fails because it does not allege any "factual context suggesting agreement, as distinct from . . . independent action." *Twombly*, 550 U.S. at 549. Because CDW has every incentive to compete with Dexon for sales, CDW's alleged sale of Cisco products to a Pennsylvania hospital (and its alleged refusal to supply Dexon) could "just as well be independent action." *Id.* at 557; *see also* Compl. ¶¶ 58-63. The Report's refusal (at 35) to consider these incentives – on the ground that doing so would impose a heightened pleading standard or give defendants the benefit of favorable inferences – conflicts with *Twombly*, which

---

[5] The primary case on which the Report relies (at 40-42) did not infer competitive harm from market power alone. *See In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 398-99 (E.D. La. 2013). The other cases are distinguishable because, unlike Dexon, the plaintiffs proved or plausibly alleged that the agreements affected market-wide prices or output. *See* CDW Corp.'s Obj. To Report & Recommendation at 6 (Feb. 21, 2023) ("CDW Br.").

considered and rejected both of these concerns. *See* 550 U.S. at 556, 569 n.14.

Regardless, any agreement would be *per se* legal under *Burdett Sound, Inc. v. Altec Corp.*, which holds that a manufacturer does not violate the antitrust laws by contracting with a new distributor and terminating its relationship with a former distributor. *See* 515 F.2d 1245, 1249 (5th Cir. 1975). The Report's effort to distinguish *Burdett* fails: its application does not depend on defendants' market power, the existence of an agreement, or a distributor's size. *See* CDW Br. at 5.

### 2. Dexon Does Not Allege A Tie Or Monopolization

Dexon fails to allege a *Kodak* "lock-in" theory of tying. In *Kodak*, customers were forced to purchase service to obtain equipment parts; Dexon alleges that its customers were forced to purchase equipment to obtain service. The California court held that this reverse-*Kodak* theory "makes no logical sense" because no consumer wants Cisco service unless it wants Cisco equipment in the first place. *See Cisco*, 2021 WL 5848080, at *5. The Report's opposite conclusion (at 60) conflicts with the California court's ruling. And while the Report states (at 59) that the California court did not "rule[] on a Kodak 'lock-in' theory," that is mistaken – in the California lawsuit, Dexon alleged that "Cisco . . . use[d] the SmartNet service package as a tying product in order to coerce new purchases . . . ." Dkt. 50 ¶ 62.

The tying claim also fails because Dexon does not allege a tie – on the contrary, Dexon recognizes (Compl. ¶ 49) that Cisco's customers can receive SmartNet service for genuine Cisco equipment by paying a re-certification fee *without* purchasing new equipment from a Cisco-authorized reseller. The Report has no meaningful response to this argument.

Finally, as the California court held, Dexon's monopolization claims fail because "Dexon's theory for why Cisco took action against Dexon [*i.e.* that Dexon is a price-cutter]

7

**App.837**

makes little economic sense." *Cisco*, 2021 WL 5848080, at *5. The Report identifies no new allegation supporting its contrary conclusion (at 18, 69); indeed, the Report *rejects* Dexon's attempted explanation that Cisco targeted Dexon because it does not "preference" Cisco products over those of competing manufacturers. Report 40 (Dexon's allegation is "not particularly compelling"). Because antitrust claims must make economic sense, *see id.* at 56-57, and Dexon's do not, dismissal is proper.

### 3. Dexon Does Not Allege Antitrust Injury

All of the antitrust-law theories that Dexon asserts exist to protect competition in the alleged relevant markets, not competitors. Contrary to the Report (at 74-77), Dexon has not alleged any harm to competition because the gravamen of its claims is that it was denied sales of *Cisco* products, not products manufactured by Cisco's competitors. To the extent Dexon alleges that it lost sales to Cisco-authorized resellers like CDW, those losses result *from competition*, not the lack thereof. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (compensating this "type of injury" "is inimical to the purposes of" the antitrust laws). Accordingly, Dexon cannot show that its injuries flow from that which makes conspiracy, tying, or monopolization unlawful, and it lacks antitrust injury. *See Cisco*, 2021 WL 5848080, at *6.[6]

### III. CONCLUSION

This Court should sustain Cisco's objection and grant its Motion To Dismiss the Complaint. Because the Complaint fails to overcome deficiencies that the California court identified, further amendment would be futile, and dismissal should be with prejudice.

---

[6] For all the above reasons, Dexon's claim under the Texas Free Enterprise and Antitrust Act ("TFEAA") (Compl. ¶¶ 131-137) fails. *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (affirming dismissal of federal and state law antitrust claims; "Texas courts are statutorily instructed to interpret the TFEAA in harmony with federal judicial interpretations of equivalent federal laws").

8

**App.838**

Dated: February 21, 2023                    Respectfully submitted,


                                            /s/ Deron R. Dacus
                                            ───────────────────────────
                                            DERON R. DACUS
                                            Texas Bar No. 00790553
                                            THE DACUS FIRM, PC
                                            821 ESE Loop 323, Suite 430
                                            Tyler, TX 75701
                                            (903) 705-1177
                                            ddacus@dacusfirm.com

                                            AARON M. PANNER (*pro hac vice*)
                                            ANDREW E. GOLDSMITH (*pro hac vice*)
                                            KELLOGG, HANSEN, TODD,
                                              FIGEL & FREDERICK, P.L.L.C.
                                            1615 M Street, N.W., Suite 400
                                            Washington, D.C. 20036
                                            (202) 326-7900
                                            apanner@kellogghansen.com
                                            agoldsmith@kellogghansen.com

                                            RICHARD J. NELSON (*pro hac vice*)
                                            LOUIS P. FEUCHTBAUM (*pro hac vice*)
                                            SIDEMAN & BANCROFT LLP
                                            One Embarcadero Center Twenty-
                                            Second Floor
                                            San Francisco, CA 94111-3711
                                            (415) 392-1960
                                            rnelson@sideman.com
                                            lfeuchtbaum@sideman.com

                                            *Counsel for Cisco Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on February 21, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ Deron R. Dacus*
Deron R. Dacus

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

DEXON COMPUTER, INC.,

     *Plaintiff,*

v.

CISCO SYSTEMS, INC. and CDW
CORPORATION,

     *Defendants.*

CASE NO.: 5:22-CV-00053-RWS-JBB

JURY TRIAL DEMANDED

## DEFENDANT CDW CORPORATION'S OBJECTIONS TO MAGISTRATE JUDGE BAXTER'S FEBRUARY 7, 2023 REPORT AND RECOMMENDATION

Pursuant to Federal Rule of Civil Procedure 72(b)(2), Defendant CDW Corporation ("CDW") objects to certain aspects of Magistrate Judge Baxter's February 7, 2023 Report and Recommendation ("R&R") relating to CDW's Motion to Dismiss the Complaint (Dkt. No. 28) ("Motion") and respectfully requests that the Court sustain the Objections and grant the Motion. CDW respectfully requests a hearing on these objections under Civil Local Rule CV-7(g).

## INTRODUCTION

CDW is a technology hardware and software distribution company that sells networking equipment manufactured by a variety of original equipment manufacturers ("OEMs"). One such OEM is Cisco Systems, Inc. ("Cisco"), for whom CDW is an authorized reseller. Dexon is a rival reseller of networking equipment and a direct competitor to CDW. But unlike CDW, Dexon is not an authorized Cisco reseller, meaning Dexon purchases the Cisco equipment it sells from sources other than Cisco. In this lawsuit, Dexon complains that CDW—as an authorized Cisco reseller—enjoys certain benefits that Dexon does not. But the Complaint describes nothing more than lawful, head-to-head competition between rival networking equipment resellers.

The R&R summarizes Dexon's claim as follows:

> Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant market).

R&R at 37. Dexon's chief complaint is that, because Dexon is not an authorized Cisco reseller and buys Cisco equipment from non-Cisco sources, its Cisco products are not eligible for Cisco's optional SmartNet service. Because of this, Dexon believes it is less competitive than CDW and other authorized Cisco resellers, who can offer SmartNet on the Cisco equipment they sell. But that is competition in its purest form. As the Complaint admits, customers can choose Dexon's lower-priced, "secondary market" products, or CDW's higher-priced, authorized products.

The central defect in Dexon's pleadings is that it does not plausibly allege that this perceived competitive disadvantage stems from a cognizable antitrust conspiracy—i.e., a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373-74 (5th Cir. 2014). It is rational and lawful for CDW to sell its authorized Cisco equipment against Dexon. It is equally rational for CDW (and Cisco) to claim CDW's ***authorized*** products are better than Dexon's ***unauthorized*** ones. And while Dexon insists it is anticompetitive that some customers chose CDW's higher-priced products, this Court is not required to don blinders to the obvious, non-conspiratorial explanation: they preferred authorized products eligible for SmartNet. If Dexon believes it is disadvantaged, that is a result of Dexon's own business decisions.

Dexon's claims against CDW should be dismissed, for four reasons.

***First***, Dexon fails to state a Sherman Act Section 1 claim because the Complaint relies on conduct that is "just as much in line with a wide swath of rational and competitive business strategy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). It is rational for CDW to compete for sales of Cisco equipment and equally rational why CDW might choose not to sell Cisco equipment to Dexon—its direct competitor. It is also rational for Cisco to support its authorized resellers to sell new Cisco equipment, rather than the unauthorized equipment sold by Dexon on which Cisco would allegedly make less profit. At a minimum, the Complaint lacks the "further circumstance pointing toward a meeting of the minds" to sustain a Section 1 claim, and so Dexon's allegations "stay[] in neutral territory" and must be dismissed. *Twombly*, 550 U.S. at 557.

***Second***, the Complaint is utterly devoid of factual allegations to explain how the alleged conspiracy harmed ***competition***. At most, Dexon relies on conclusory allegations of "loss of interbrand" and "intrabrand" competition. But these are antitrust buzzwords, not factual allegations, and Dexon does not plausibly explain how interbrand competition was harmed. More

critically, any suggestion that interbrand competition was harmed is contradicted by the simple fact that ***Dexon never alleges it was prevented from selling its secondary Cisco equipment to end-customers***.  Customers remain free to choose Dexon's lower-priced products, CDW's higher-priced products (backed by Cisco), or other OEM equipment sold by Dexon, CDW, and many other resellers.  This increases, not eliminates, competition and is precisely why the Fifth Circuit—like other circuits—has held distribution arrangements like this to be *per se* lawful.  Dexon cannot whitewash its own allegations through conclusory assertions.

***Third***, Dexon has not suffered an antitrust injury because it has not plausibly alleged its injuries resulted from harm to competition. Dexon was not foreclosed from selling Cisco products.  At most, Dexon lost sales to CDW because the customer preferred CDW's authorized products.  But this is not harm to ***competition***; this is simply a lost customer opportunity, as Judge Breyer previously concluded in the California litigation.  *Cisco Sys., Inc. v. Dexon Comput., Inc.*, 2021 WL 5848080, at *6 (N.D. Cal. Dec. 9, 2021); *see Marucci Sports*, 751 F.3d at 376 ("antitrust laws are designed to protect competition, not competitors").  Judge Breyer's analysis should hold.

***Finally***, Dexon's claims against CDW are barred by collateral estoppel.  The Sherman Act claims asserted by Dexon here and in California both require a showing of two identical elements:  harm to competition and antitrust injury.  Judge Breyer's prior decision found Dexon failed to plausibly plead both of these elements, and Dexon offers no new factual allegations to support them.  Thus, collateral estoppel bars Dexon from reasserting these claims against CDW.

## STANDARD OF REVIEW

CDW's Motion to Dismiss pursuant to Rule 12(b)(6) is a dispositive motion.  As such, this Court's review of the R&R is *de novo*.  Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1).

## CDW'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

CDW objects to the R&R's findings relating to (1) Dexon's failure to plausibly allege an anticompetitive conspiracy between CDW and Cisco (pgs. 33-38); (2) Dexon's failure to allege harm to competition (pgs. 38-42); (3) Dexon's failure to allege antitrust injury (pgs. 71-77); and (4) collateral estoppel (pgs. 28-29). CDW also joins in Cisco's objections to the R&R.

## I.   THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE AN ANTICOMPETITIVE AGREEMENT

First, Dexon fails to plausibly allege an anticompetitive agreement because its allegations are equally consistent with legitimate competition between CDW and Dexon. Under *Twombly*, to survive a motion to dismiss, Dexon cannot rely on conduct that is "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy." 550 U.S. at 554. Instead, Dexon must allege *facts* that "tend[] to exclude independent self-interested conduct as an explanation" for the alleged conduct. *Id.* at 552. "Without more," ambiguous conduct and conclusory assertions "[do] not supply facts adequate to show illegality." *Id.* at 557.

The R&R did not undertake this analysis because it interpreted defendants to "improperly ask the Court to interpret the factual allegations in their favor." R&R at 35. But, respectfully, that is not the standard. Instead, the Court must look to the Complaint to determine whether it states facts that "raise[] a suggestion of a preceding [anticompetitive] agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557. That requires this Court to look beyond the Complaint's conclusory labels and determine whether the alleged conduct is "just as much in line" with rational, competitive business strategy. *Id.* at 554. If so, the Complaint fails to state a Section 1 claim. *See Marucci Sports*, 751 F.3d at 375 (dismissing Section 1 claim that "present[ed] various conclusory allegations that support one of many inferential possibilities" because "[t]he Supreme Court instructs that such a complaint falls short").

As set forth in CDW's Motion, that is precisely the case here. At best, Dexon alleges that Cisco worked with CDW, one of its many authorized resellers, to compete for end-customers against Dexon by emphasizing that Dexon's unauthorized Cisco equipment would not be eligible for SmartNet. Compl. ¶¶ 59, 60. Nowhere does Dexon allege CDW or Cisco **prevented** Dexon from selling its Cisco equipment to the Pennsylvania customer. The customer simply chose CDW. That is competition on the merits—nothing more.

Likewise, CDW's decision not to sell Cisco equipment to its direct competitor does not raise the suggestion of an unlawful agreement. Under *Burdett Sound* and *Doctor's Hospital*, an equipment manufacturer has the absolute right to control its distribution network, including to sell through one reseller (here, CDW) over another (Dexon). *E.g.*, *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 307 (5th Cir. 1997) (citing *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975)) (a manufacturer is afforded the "virtual[] absolute right to choose to whom it sells its goods."). The R&R suggests that *Burdett Sound* is inapplicable because it is a "dealer termination case," but that is ***exactly*** what is before this Court: Dexon alleges it was prevented from effectively reselling Cisco equipment by Cisco (the manufacturer) and replaced with CDW (the new reseller). Under *Burdett Sound*, any loss of *intrabrand* competition—i.e., the loss of Dexon as a Cisco reseller—is immaterial because the purpose of the antitrust laws is to promote *interbrand* competition. This is true even where a manufacturer and distributor allegedly have "enormous market power," *Habitat, Ltd. v. Art of Muse, Inc.*, 2009 WL 803380, at *2, 8 (E.D.N.Y. Mar. 25, 2009) and "even when the new dealer and the manufacturer agree before the termination of the old dealer." *Doctor's Hosp.*, 123 F.3d at 307. And this case does not even reach *Burdett Sound* because Dexon never plausibly alleges it was actually removed from the market— just that it was at a competitive disadvantage to CDW.

The R&R also relies on the *Graphics Products* and *West Penn* cases, but both of those involved situations where the disfavored distributor was actually **excluded** from the market, affecting prices or output market-wide. In *West Penn*, a hospital allegedly colluded with an insurer to prevent a competitor from obtaining financing for expanding. *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 101 (3d Cir. 2010). In *Graphic Products*, a manufacturer imposed geographic restrictions that prohibited its distributors from competing with one another. *Graphic Prod. Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560, 1565 (11th Cir. 1983). By contrast, Dexon does not allege it was excluded from selling its Cisco products (or those of other OEMs) to end-customers or that a few lost sales opportunities had a market-wide effect. And to the extent there is any tension between these cases and *Burdett Sound*, Fifth Circuit precedent controls.

## II.     THE COMPLAINT FAILS TO ALLEGE HARM TO COMPETITION

Second, Dexon fails to plausibly allege harm to competition because its Complaint relies on conclusory assertions devoid of any factual support. The R&R summarizes Dexon's allegations on this critical element as follows:

> The conspiracy allegedly harmed interbrand competition by removing Dexon who "does not prioritize" Cisco products, thereby "limiting the opportunities of its competitors to make sales through resellers like Dexon."

R&R at 39. There are three problems with this theory (which the R&R itself calls "not particularly compelling," *id.* at 40). First, Dexon's allegations are entirely conclusory. Nowhere does Dexon allege **how** the conspiracy prevented the unidentified "competitors" from making sales. But under *Twombly* and *Iqbal*, Dexon must allege **facts**—not just theories—to show how competition was harmed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Graphic Prods.*, 717 F.2d at 1571 ("[A]bstract lessening of interbrand competition is not enough [to establish a cause of action for violation of the antitrust laws].") (citation omitted). Dexon fails to do so.

Second, these conclusory labels are inconsistent with Dexon's own allegations. Even if Dexon were "remove[d]" from selling Cisco equipment, Dexon could have sold networking equipment manufactured by other OEMs to the Pennsylvania Health System or to any other customer. Dexon alleges nothing more than a classic, lawful restriction on intrabrand competition to promote interbrand competition, which is presumptively lawful under the Sherman Act. *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997). That a customer chose to purchase CDW's authorized equipment, rather than roll the dice with Dexon, does not reflect harm to competition.

Finally, as Judge Breyer concluded, any suggestion that Cisco wrongly interpreted its SmartNet contracts with end-customers is a matter of contract interpretation, not antitrust law.

## III. THE COMPLAINT FAILS TO ALLEGE DEXON SUFFERED AN ANTITRUST INJURY

Dexon also fails to allege it has suffered an antitrust injury—*i.e.*, injury to competition itself—because Dexon does not allege it has been prevented from selling its products to customers. *See Brunwick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The R&R relies on Dexon's assertion that it is at a "competitive disadvantage" to CDW and other authorized Cisco resellers, citing the recent *Pulse Network* decision. *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 490-91 (5th Cir. 2022). But *Pulse* involved allegations that the defendant "manipulat[ed] prices in a way that excludes competitors from the market." *Id.* at 493. By contrast, Dexon does not allege it has been excluded from anything. No alleged action by CDW or Cisco prevented Dexon from selling either Cisco or other OEM products. Dexon argues that CDW is more competitive because it can offer Cisco products with SmartNet, and customers are willing to pay higher prices for those assurances. But Dexon's business model was its own choice, not a result of harm to competition.

Further, as Judge Breyer previously highlighted, Dexon's assertion that customers cannot buy SmartNet on Cisco equipment purchased from Dexon is not an antitrust claim. Any injury suffered by the customers is not from harm to competition, but (allegedly) breach of contract.

## IV. JUDGE BREYER'S PRIOR DECISION BARS DEXON'S CLAIMS IN THIS COURT UNDER COLLATERAL ESTOPPEL

Finally, Dexon's claims should be barred by collateral estoppel. Judge Breyer dismissed Dexon's antitrust claims in the California matter for failure to plausibly allege harm to competition or that Dexon suffered an antitrust injury. These are *also* elements in Dexon's claims against CDW. As such, Dexon should be barred from re-asserting them.

The R&R concluded that the "legal standard used to assess the facts" and the "factual allegations" are different here than in the California lawsuit. R&R at 29. But this gives too much weight to Dexon's argument that a "*per se* tying claim" and a "Section 1 and Section 2 conspiracy claim" are "entirely different claims," *id.*, and Dexon's conclusory allegations relating to loss of interbrand competition. First, the legal standards for assessing both harm to competition and antitrust injury are identical in tying claims and conspiracy claims. Dexon cites no authority for the proposition otherwise—because there is none. To be sure, there are other elements that are not identical. But Dexon already had an opportunity to litigate these two common elements in California. Judge Breyer dismissed them. Dexon should not be permitted to relitigate them here.

Second, as established in CDW's Motion, every single factual allegation—including the entire Pennsylvania Health System narrative—was present in the California lawsuit. *See* Motion at 10. The only "new" allegations relating to loss of interbrand competition are entirely conclusory for the reasons stated above and should be disregarded here for the same reasons.

## CONCLUSION

For the foregoing reasons, CDW respectfully requests that its objections to the R&R be sustained and that Counts I, II, and VI of the Complaint be dismissed against it.

Respectfully submitted,

*/s/ Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
Cole A. Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-1008
Email: jdoan@haltomdoan.com
Email: criddell@haltomdoan.com

James A. Reeder, Jr. (lead counsel)
jareeder@jonesday.com
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  +1.812.239.3939
Facsimile:  +1.812.239.3600

Thomas D. York
tdyork@jonesday.com
Texas Bar No. 24095531 (*pro hac vice*)
JONES DAY
2727 North Harwood St.
Dallas, Texas 75201
Telephone:  +1.214.969.3939
Facsimile:  +1.214.969.5100

**COUNSEL FOR DEFENDANT CDW
CORPORATION**

## CERTIFICATE OF SERVICE

I certify that on this 21st day of February, 2023, the foregoing was electronically filed with the Clerk of the District Court of the Eastern District of Texas using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Jennifer H. Doan
Jennifer H. Doan

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | **JURY TRIAL DEMANDED** |
| **CDW CORPORATION** | § | |
| *Defendants* | § | |

**DEXON COMPUTER, INC.'S OPPOSITION TO CISCO'S OBJECTION TO JUDGE BAXTER'S REPORT AND RECOMMENDATION ON CISCO'S MOTION TO DISMISS**

## I.  INTRODUCTION

Dexon's Complaint in this case details how Cisco has used intimidation, coercion, and other bullying tactics to maintain multiple monopolies, and recruited a favored distributor in the process to aid it in its scheme.  Cisco's objection to Judge Baxter's Report and Recommendation on its motion to dismiss (Dkt. 107 ("R&R")) regurgitates arguments it made to Judge Baxter that were properly rejected.  Cisco ignores that a dismissal without prejudice of claims filed in another Court does not result in res judicata dismissal of fundamentally different claims properly filed in this Court.  Judge Baxter also correctly found that Cisco's multiple forms of anticompetitive conduct resulted in foreclosure of Cisco's Networking Equipment Competitors, and resulted in a textbook antitrust injury to Dexon.  (R&R at 76-77.)  The Court should overrule Cisco's objection and adopt the R&R.

## II.  BACKGROUND

Judge Baxter's R&R considered Dexon's Complaint allegations in detail and properly found that the Court must accept as true all well-pleaded facts in the Complaint and view those facts in the light most favorable to Dexon.  (*Id.* at 19.)  In doing so, Judge Baxter found that Cisco is a monopolist in the Relevant Networking Equipment Markets (*id.* at 41), the Relevant IP Phone Markets (*id.*), (together the "Relevant Product Markets"), and the Relevant Service Markets (collectively the "Relevant Markets").  (*Id.* at 41-42.)  Judge Baxter also found that Dexon properly stated claims under Sections 1 and 2 of the Sherman Act as well as under the Texas Free Enterprise Act due to Cisco's use of fear, uncertainty and doubt ("FUD") and other related anticompetitive tactics, including its recruitment of CDW into a conspiracy.  Cisco's objection (Dkt. 119) does not challenge the grand majority of these findings of law and fact, except for its assertions that the R&R:  (1) did not properly apply res judicata to claims dismissed without prejudice, (2) did not find

that Cisco's Networking Equipment Competitors were foreclosed from the anticompetitive conduct, (3) did not correctly assess the allegations of agreement between Cisco and CDW, (4) did not correctly determine a tie between Cisco's Relevant Service offering and Relevant Products, and (5) improperly found that Dexon sustained an antitrust injury. Each of these arguments lacks merit.

## III. ARGUMENT

### A. The R&R Correctly Found that Res Judicata Does Not Apply

Judge Baxter correctly determined that Cisco's res judicata argument is premature, as Dexon has challenged Cisco's assertion of the doctrine in its 12(b)(6) motion. (R&R at 23.) Cisco does not substantively challenge the R&R's citation to *Giddy Holdings, Inc. v. Kim*, in which the plaintiff, like Dexon, "*ha*[*d*] challenged [the Defendant's] failure to plead res judicata as an affirmative defense[.]" 2021 WL 2773019, at *4 (W.D. Tex. June 7, 2021) (emphasis in original). Nor does Cisco address that in *Stonecoat of Texas, LLC v. Procal Stone Design, LLC*, also cited by the R&R, the Court deferred the issue of res judicata because the plaintiff argued that the claims were not identical between the two cases. 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018). That is also the case here, as the R&R correctly found that Dexon's present Complaint contains a host of new facts and claims that were not present in its prior counterclaims. (R&R at 24.) Accordingly, the Court should adopt the R&R's holding that Cisco's res judicata argument is premature.

In any event, the Court can also adopt the R&R's finding that Cisco's res judicata argument fails on the merits. The R&R correctly determined that a dismissal without prejudice does not result in preclusive effect (*id.* at 23), as it is black letter law that "the [res judicata] bar does not extend beyond the claim or cause of action that was pleaded in [a prior] complaint. It does not preclude a new suit on different factual allegations that call into play different legal principles." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F. 2d 278, 284 n.8 (5th Cir. 1993); *see also Nasser v. Fin. of Am.*

*Reverse LLC.*, 2021 WL 966007, at *2 (S.D. Tex. Mar. 15, 2021) (There is no "caselaw support for the proposition that simply omitting a previously pled claim from an amended complaint in federal court, without more, mandates the application of judicial estoppel to prevent a plaintiff from later pursuing this claim in a new [subsequent] court action."). That is precisely the case here, as the R&R correctly determined that Dexon has asserted "new claims, legal theories, and non-trivial factual allegations." (R&R at 24.)

Cisco buries in a footnote the R&R's analysis of *Eldridge v. Kohls Dep't Stores, Inc.*, 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020), an unpublished, out-of-Circuit case on which Cisco primarily relied. The R&R correctly found that an opinion involving a *pro se* plaintiff that filed a "more bareboned" complaint after an initial dismissal has little application to the instant case, because the holding was on an alternative ground after no opposition from the plaintiff. (R&R at 24.) Cisco's objection does not meaningfully address this analysis. Cisco also cites *Hoffman v. Nordic Naturals, Inc.* for the first time (not briefed before Judge Baxter), but that case is even more distinguishable because after an initial dismissal, the plaintiff decided to "stand on its complaint," and the court entered a judgment on the prior complaint that had "facts identical" to the subsequently filed case. 837 F.3d 272, 276, 279-80 (3d Cir. 2016). This is in clear contrast to the circumstances here, where Dexon indisputably amended its counterclaims, no judgment was entered on the prior antitrust counterclaims, and the instant Complaint contains new facts and claims. Even should the Court consider Cisco's new authority, it should be rejected.

Cisco finally challenges the R&R's holding that the current Complaint contains a different nucleus of facts than the prior counterclaims, but Cisco's argument that the prior counterclaims "did not include allegations about the Texas bank, energy company, or car dealership" (Dkt. 119 at 5) confirms the correct result. Cisco argues without any authority that these instances of

anticompetitive conduct "do not correspond to new conduct" (*id.* at 4) and are "of a piece with the conduct that Dexon did allege [sic]" (*id.* at 5), but this does not change the fact these admitted examples of coercion in Texas *are* new factual allegations that state a claim under the Sherman Act. Cisco also claims that the Cisco-CDW conspiracy, customers' limited IT budgets and the Relevant IP Phone Markets are not new, but as the R&R correctly found, these allegations are also not in the prior counterclaims. (R&R at 25.) Cisco does not validly challenge the R&R's holding that the claims asserted in this Court are fundamentally different.

For these reasons, Cisco's objection on the basis of res judicata should be rejected.

## B.      The R&R Correctly Found Competitive Foreclosure

The R&R considered Cisco's argument that Dexon did not allege foreclosure of Cisco's Networking Equipment competitors and properly rejected it:

> [T]he Court further finds Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. According to Dexon, "if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when they bought the equipment and service." Dexon alleges Cisco subsequently takes advantage of locked-in customers because of Cisco's virtual monopoly in service, forcing the customers to spend more of their limited budget to eliminate competitive alternatives in the process.

(R&R at 65-66 (citations omitted).) Cisco's objection calls this a "speculative theory" (Dkt. 119 at 5), but in reality these are pled facts that easily illustrate competitive foreclosure on a motion to dismiss. Moreover, Cisco's claim that no law supports the R&R is meritless, as it is settled Fifth Circuit law that this type of conduct is anticompetitive because it "tends to impair the opportunities of rivals, [and] also either does not further competition on the merits or does so in an unnecessarily

restrictive way."  (Dkt. 24 at 32 (citing *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891–92 (5th Cir. 2016) (internal citation omitted).)

Cisco also attempts a sleight of hand in claiming that the R&R did not properly consider whether Cisco's conduct resulted in foreclosure (Dkt. 119 at 4), but what the R&R found is that the "*substantial* foreclosure" requirement does not apply to *per se* tying claims.  (R&R at 65.)  Cisco does not, because it cannot, object to this finding, because under Supreme Court and Fifth Circuit precedent that Judge Baxter analyzed, the substantial foreclosure requirement only applies to exclusive dealing claims under the rule of reason that Dexon does not allege in this case.  (*Id.* at 49-50.)  Rather, Dexon properly alleges *per se* tying that inevitably results in competitive foreclosure due to unwanted and forced purchases from a monopolist.

For these reasons, Cisco's objection on the basis of foreclosure should be rejected.[1]

## C.      The R&R Correctly Found a Cisco-CDW Agreement

Cisco next repeats CDW's argument that because it has an "incentive" to make sales in the Relevant Product Markets, the R&R improperly found an alleged agreement between the Defendants.  This argument ignores the core of Judge Baxter's holding:

> The factual allegations in the complaint, taken as true, sufficiently explain the who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco . . . [including] the co-conspirators, the conspirators' respective motivations and intent, the sequencing of their coordinated conduct, the impact of that conduct, and how, most recently, "CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest)."

(R&R at 35-36 (citations omitted).)  Cisco does not, because it cannot, address these findings because they are a proper application of *Bell Atl. Corp. v. Twombly*, which requires the Court "not to impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a

---

[1] Cisco reiterates CDW's objection to the R&R based on alleged competitive harm (Dkt. 119 at 6 n.5), and for the reasons explained in Dexon's opposition to CDW's objection, that argument should also be rejected.

reasonable expectation that discovery will reveal evidence of illegal agreement." 550 U.S. 544, 556 (2007). That is precisely what Judge Baxter did in the R&R, and did not attempt to weigh Defendants' "incentive" argument against the well-pled facts. (R&R at 35.)

Next, Cisco reiterates its argument that its agreement with CDW is *per se* legal because it is free to change distributors, but Cisco ignores the thrust of the R&R:

> The problem for Defendants is that Dexon does not merely allege that Cisco substitute one distributor for another within the scope of *Burdett Sound* and other dealer termination cases. To start, Cisco never had a direct supply relationship with Dexon to terminate. But even if it had, Dexon does not present claims based on a "mere unilateral change of distributors" *i.e.*, a claim that Dexon was excluded from Cisco's distribution and nothing more. Instead, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). The alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices and reduced technology choices for customers.

(*Id.* at 37-38 (citations omitted).) Cisco's argument that *Burdett Sound* "does not depend on defendants' market power, the existence of an agreement, or a distributor's size" (Dkt. 119 at 7) is a red herring. Judge Baxter correctly found that a conspiracy to forestall inter-brand and intra-brand competition is a violation of the Sherman Act. (R&R at 37-40.)

For these reasons, Cisco's objection on the basis of the pled conspiracy should be rejected.

### D. The R&R Correctly Found Tying

Cisco challenges the R&R's finding of *per se* tying on the basis that it conflicts with the Northern District of California's prior ruling on Dexon's previous counterclaims. This is erroneous, because as the R&R explains in detail, there are four new pled examples of anticompetitive conduct involving tying in this Complaint, and the prior counterclaims did not explain "the IT budget phenomenon" in which customers no longer have the ability to shop for competitive alternatives once Cisco changes its policy. (R&R at 52-53.) As the R&R explains in detail and Cisco does not

6

**App.858**

address, these new examples of anticompetitive conduct satisfy all the elements of a *per se* tying claim. (*Id.* at 53-58.)

The only specific argument Cisco makes regarding tying is its contention that some customers can pay a recertification fee to receive SmartNet service, but as the R&R explained, "Cisco's argument is not well developed, and the extent, effect, and details of any recertification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile." (*Id.* at 66.) Indeed, highlighting this fact, the R&R correctly observed that in the case of the Texas Bank, it could only be eligible for SmartNet renewal if it bought more Cisco switches and routers. (*Id.* at 60.) Cisco improperly asks the Court to go beyond the pleadings to make inferences in its favor regarding the circumstances of tying.

Finally, Cisco rehashes its argument that Dexon's claims do not make economic sense without addressing Judge Baxter's extensive discussion that they do make economic sense. (*Id.* at 59-60.) As the R&R explains, *inter alia*, "fundamentally, Dexon does not allege [as Cisco contends] that the already owned network equipment is the tied product; rather, as explained above, Dexon alleges here that the equipment the customer already owns is the lock-in product while the new equipment is the tied product." (*Id.* at 59.) In addition, "the Complaint sufficiently alleges that Cisco has threatened to withhold service on an entire installed base of products to extract supra-competitive purchases of specific tied products." (*Id.*) The only conclusion one can draw from these allegations is that a monopolist improperly maintained its dominance by threatening and coercing customers, which satisfies the Fifth Circuit standard for monopolization. *See Retractable Techs.*, 842 F.3d at 891–92.

For these reasons, Cisco's R&R objection on the basis of tying should be rejected.

### E.     The R&R Correctly Found Antitrust Injury

The R&R explains that when "viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Court finds Dexon has adequately claimed an antitrust injury." (R&R at 76.)  Namely, "[t]he alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case."  (*Id.* (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)).)  As the R&R points out, Dexon's allegations of antitrust injury include the facts that:

> Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

(*Id.* at 14; *see also id.* at 15.)

Cisco's argument that Dexon's loses result from competition rather than anticompetitive conduct ignores the R&R's findings of anticompetitive conduct that directly result in Dexon's injuries.  (*Id.* at 71-77.)  Cisco also repeats its misguided contention that Cisco's competitors were not foreclosed through its anticompetitive conduct, but as explained above, Cisco's conduct was specifically designed to maintain its dominance over its smaller competitors. *See supra* at 4-5.  As the R&R also pointed out and Cisco ignores, Dexon alleges that its reputation as a trusted multi-vendor reseller was harmed because of Cisco's illegal conduct.  (R&R at 10-11, 14-15.)

For these reasons, Cisco's R&R objection on the basis of antitrust injury should be rejected.

## IV.     CONCLUSION

Cisco's objection to the R&R should be overruled.

Dated: March 7, 2023

Respectfully submitted,

By: */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
Tina P. Lapsia (*pro hac vice*)
Matthew F. Bruno (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
tlapsia@manatt.com
Phone: (212) 790-4626

**ATTORNEYS FOR PLAINTIFF**
**DEXON COMPUTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic

service are being served on March 7, 2023, with a copy of this document via the Court's CM/ECF

system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail,

facsimile transmission, and/or first-class mail on this same date.

*/s/ David H. Reichenberg*
David H. Reichenberg

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| *Plaintiff* | § | |
| **v.** | § | **CASE NO. 5:22-CV-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and** | § | **JURY TRIAL DEMANDED** |
| **CDW CORPORATION** | § | |
| *Defendants* | § | |

**DEXON COMPUTER, INC.'S OPPOSITION TO CDW'S OBJECTION TO JUDGE**
**BAXTER'S REPORT AND RECOMMENDATION ON CDW'S MOTION TO DISMISS**

## I.    INTRODUCTION

Dexon's Complaint explains that as part of Cisco's anticompetitive scheme to exclude resellers like Dexon and maintain its monopolies, it enlisted the help of one of its favored distributors, CDW.  CDW's objection to Judge Baxter's Report and Recommendation on its motion to dismiss (Dkt. 107 ("R&R")) improperly asks this Court to make findings of fact rather than apply the correct standard on a Rule 12(b)(6) motion.  Specifically, CDW asserts that the Complaint "describes nothing more than lawful, head-to-head competition between rival networking equipment resellers" (Dkt. 120 at 1) while ignoring Judge Baxter's findings that:

> The factual allegations in the complaint, taken as true, sufficiently explain the who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco . . . [including] the co-conspirators, the conspirators' respective motivations and intent, the sequencing of their coordinated conduct, the impact of that conduct, and how, most recently, CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest).

(R&R at 35-36 (citations omitted).)  CDW does not, because it cannot, address any of these findings because they are fatal to its motion.  As this Court held in *TravelPass*, actions against self-interest, like CDW did here to gain the favor of a monopolist, support a conspiracy under the Sherman Act.  *See TravelPass Grp., LLC v. Caesars Ent. Corp.*, 2019 WL 5691996, at *32-33 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, 2019 WL 4727425, at *4 (E.D. Tex. Sept. 27, 2019).

CDW's objection even highlights why Cisco selected it for its conspiracy:  CDW charges higher prices that would allow Cisco to maintain its supra-competitive prices in the Relevant Network Equipment Markets.  (R&R at 69.)  To accomplish this end, Cisco and CDW specifically coordinated their plan so that Cisco would threaten to cut off necessary maintenance services unless a hospital did not buy Networking Equipment from Dexon.  (*Id.* at 12.)  As planned, CDW

would then be portrayed by Cisco as the "savior" so that the hospital was coerced to buy higher priced Networking Equipment it had intended to buy from Dexon. (*Id.*) This is not "simply a lost customer opportunity" as CDW suggests (Dkt. 120 at 3), but rather a coordinated scheme involving millions of dollars of sales that violates the Sherman Act.

CDW next argues that its conspiracy did not produce an anticompetitive effect, but fails to address the critical fact Cisco is an admitted monopolist that has the ability to control price and exclude competition in the Relevant Markets. (R&R at 6, 41-42.) Under these circumstances, it is fatal to CDW's motion that it does not meaningfully address the case law cited by the R&R, including *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, which held that when a monopolist conspires with a distributor with substantial clout in the industry to exclude a disfavored distributor, that states a claim under the Sherman Act. 940 F. Supp. 2d 367, 398 (E.D. La. 2013); *see also West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010); *Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n.20 (11th Cir. 1983). Relatedly, CDW's argument that Dexon did not sustain an antitrust injury from a conspiracy that explicitly targeted it is contradicted by the case law relied upon by the Defendants. *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

CDW's final suggestion that collateral estoppel applies to the instant Complaint is baseless, because Dexon's prior counterclaims did not even use the word "conspiracy"—let alone detail allegations of it—and Fifth Circuit law makes clear that the legal standard to assess these conspiracy claims is different than Dexon's prior counterclaims. CDW reasserts that the Northern District of California assessed harm to competition and antitrust injury, but as the above makes clear, these concepts were not, and could not, have been addressed in the context of conspiracy

claims that carry their own facts and legal standard. CDW does not challenge the R&R's correct holding that both the facts and legal standard need to be identical for collateral estoppel apply.

For these reasons, the Court should overrule CDW's objection and adopt the R&R.[1]

## II.   BACKGROUND

Judge Baxter's R&R considered Dexon's Complaint allegations in detail and found that Dexon adequately pled a conspiracy between Cisco and CDW. (R&R at 35-36.) Judge Baxter rejected Defendants' contention that it should weigh its theory about economic incentives rather than accept as true all well-pleaded facts in the Complaint and view those facts in the light most favorable to Dexon. (*Id.*) Judge Baxter further found that an agreement between a monopolist and a favored distributor to exclude inter-brand and intra-brand competition from Dexon stated a claim, and that collateral estoppel does not apply to claims that were never previously pled. (*Id.* at 28-29.) CDW's objection asserts that the R&R: (1) did not correctly assess the allegations of agreement between Cisco and CDW (the same argument made by Cisco), (2) did not correctly determine a harm to competition from the conspiracy, (3) improperly found that Dexon sustained an antitrust injury, and (4) did not properly apply collateral estoppel. Each of these arguments lacks merit.

## III.   ARGUMENT

### A.   The R&R Correctly Found an Agreement Between Cisco and CDW

To argue against the existence of a conspiracy, CDW makes the same error it did in briefing before Judge Baxter. It re-writes Dexon's allegations, and now the R&R's findings, to argue that the alleged conduct is merely independent conduct rather than coordinated behavior. (*See, e.g.,* Dkt. 37 at 14-15 (illustrating the difference between CDW's arguments and what Dexon actually

---

[1] Should the Court adopt the R&R, per Judge Baxter's recommendation, Dexon will plead additional facts illustrating that CDW had a specific intent to monopolize for purposes of the Section 2 conspiracy claim.

alleges).)  As a more recent example, CDW now argues that "Dexon alleges that Cisco worked with CDW, one of its many authorized resellers, to compete for end-customers against Dexon." (Dkt. 120 at 6.)  But what the R&R correctly observed is that "Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the savior to the hospital system in that the customer would keep its service for all of its Networking Equipment." (R&R at 34.)  In addition, "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." (*Id.*) Further, "when the CDW representative previously assigned to Dexon refused to comply with Cisco's demand that CDW stop selling Networking Equipment and associated services to Dexon, CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." (*Id*. at 34-35.)  These and other findings led Judge Baxter to correctly conclude that the facts alleged sufficiently explain the "who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco."  (*Id*. at 35.)  CDW's renewed argument that the Court should re-write or ignore these allegations is meritless.

Another iteration of CDW's misplaced argument is its contention that "Dexon alleges it was prevented from effectively reselling Cisco equipment by Cisco (the manufacturer) and replaced with CDW (the new reseller)."  (Dkt. 120 at 5 (citing *Burdett Sound*).)  But this is not what Dexon alleges, as the R&R makes clear:

> The problem for Defendants is that Dexon does not merely allege that Cisco substitute one distributor for another within the scope of *Burdett Sound* and other dealer termination cases.  To start, Cisco never had a direct supply relationship with Dexon to terminate.  But even if it had, Dexon does not present claims based on a "mere unilateral change of distributors" i.e., a claim that Dexon was excluded from Cisco's distribution and nothing more.  Instead, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for

Cisco's competitors to penetrate the relevant markets). The alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices and reduced technology choices for customers.

(R&R at 37-38 (citations omitted).)  CDW's failure to meaningfully engage in this holding confirms the correct result.

For these reasons, CDW's objection on the basis of the pled conspiracy should be rejected.

### B.    The R&R Correctly Found Anticompetitive Harm

CDW challenges the R&R's finding regarding anticompetitive harm, but does not discuss Judge Baxter's application of *In re Pool*, which confirms the correct result.  In *In re Pool*, "the allegations that the Manufacturer Defendants had 'substantial market clout' combined with the 'market power' of the distributor 'allow[ed] the Court to draw the reasonable inference' that the conspiracy was 'capable of causing substantial harm to competition.'"  (R&R at 41 (citation omitted).)  The case here is even more compelling, because Cisco is an admitted monopolist in several Relevant Markets (including a near-virtual monopoly in the Relevant Service Markets), and with CDW's annual revenue of $18.47 billion, it commands substantial clout that it used to coerce a hospital to purchase supra-competitive Networking Equipment with Cisco's help.  CDW also misses the point of *West Penn* and *Graphics Prods.*, both of which illustrate that when a monopolist allegedly uses its power to foreclose inter-brand and intra-brand competition from an unfavored dealer, that amounts to a claim under the Sherman Act.  (*Id.* at 37-38.)

CDW next argues that "Dexon could have sold networking equipment manufactured by other OEMs to the Pennsylvania Health System or to any other customer" (Dkt. 12 at 8), but this misses the point:  an illegal conspiracy that is designed to foreclose the inter-brand and intra-brand competition that customers rely upon, especially for monopolized Relevant Markets, is illegal.  *See Graphic Prods.*, 717 F.2d at 1572 n.20.  As the Complaint confirms and the R&R noted, in the

case of the hospital, it "was open to purchasing products from manufacturers apart from Cisco, and valued the fact that Dexon provided those options, because it led to better pricing and service." (R&R at 12.) An illegal conspiracy that intended to, and did, thwart lower-priced and more reliable competition is a violation of the Sherman Act. *In re Pool*, 940 F. Supp. at 398. Relatedly, CDW's final (one-sentence) suggestion that this is a matter of contract interpretation and not antitrust law is inconsistent with the holdings in *In re Pool*, *West Penn*, and *Graphic Prods.* confirming that a monopolist who teams up with a distributor to forestall more aggressive competition is a violation of the Sherman Act, rather than a mere contract claim.

For these reasons, CDW's R&R objection on the basis of harm to competition should be rejected.

## C.    The R&R Correctly Found Antitrust Injury

CDW contends, along with Cisco, that Dexon did not sustain an antitrust injury because "it does not allege it has been prevented from selling its products to consumers." (Dkt. 120 at 7.) But as the Complaint alleges and the R&R confirms, that is precisely what Dexon alleges:

> Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

(R&R at 14; *see also id.* at 15.) In view of these allegations, the R&R correctly found that "[t]he alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the 'conceptual bounds of antitrust injury, whatever the ultimate merits of its case.'" (*Id.* at 76 (citation omitted).) CDW's own authority confirms Judge Baxter's finding that this determination is made by "viewing the alleged antitrust injury from the

perspective of Dexon's position in the marketplace." (*Id.* at 76 n. 25 (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)).) Properly applying this law to Dexon's allegations, it is clear that Dexon sustained a "textbook antitrust injury." (*Id.* at 76-77.)

For these reasons, CDW's R&R objection on the basis of antitrust injury should be rejected.

### D.    The R&R Correctly Analyzed Collateral Estoppel

Judge Baxter's correctly held that "[f]or an issue to be identical, both the facts and 'legal standard used to assess them' must be identical . . . [and] [t]his requirement is fatal to CDW's collateral estoppel defense." (*Id.* at 28 (citation omitted.) CDW does not dispute this legal standard, but instead asserts that a "per se tying claim" and a "Section 1 and Section 2 conspiracy claims" carry the same standard and the same facts, but neither assertion is true. As one illustrative example, although both claims require a showing of antitrust injury, for a *per se* tying claim, that injury must be a biproduct of an "anticompetitive effect in a tied market" resulting from a tie, *Bodet v. Charter Commc'ns Inc.*, 2010 WL 5094214, at *5 (E.D. La. July 26, 2010), whereas for a Section 1 conspiracy claim the injury must have resulted from a "conspiracy [that] had the effect of restraining trade." *Golden Bridge Tech. v. Nokia Inc.*, 416 F.Supp.2d 525, 529 (E.D. Tex. 2006). CDW does not, because it cannot, challenge this and other authority referenced by the R&R (R&R at 28-29); rather it advocates for a result not supported by any law.

CDW finally asserts that every alleged fact concerning the conspiracy was alleged in the prior counterclaims, but in no way disputes Judge Baxter's illustrative example that "while Dexon alleged in California that it lost a sale to a Pennsylvania hospital due to Cisco's unilateral monopolization, the California Court did not consider that the lost sale could have been the result of a conspiracy to accomplish that end." (*Id.* at 28.) In addition, "the California Court's prior

order could not have considered any of Dexon's allegations in the context of conspiracy claims, claims which are subject to different standard in which allegations are not dismembered and viewed in its separate parts as CDW implicitly suggests in its current motion." (*Id.* at 28-29 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).)

For these reasons, CDW's R&R objection on the basis of collateral estoppel should be rejected.

## IV. CONCLUSION

CDW's objection to the R&R should be overruled.

Dated: March 7, 2023

Respectfully submitted,

By: */s/ David H. Reichenberg w/ permission*
*William E. Davis, III*
William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
**The Davis Firm PC**
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Phone: (903) 230-9090
Facsimile: (903) 230-9661

David H. Reichenberg (*pro hac vice*)
Tina P. Lapsia (*pro hac vice*)
Matthew F. Bruno (*pro hac vice*)
**Manatt, Phelps, & Phillips LLP**
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
tlapsia@manatt.com
Phone: (212) 790-4626

**ATTORNEYS FOR PLAINTIFF
DEXON COMPUTER, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on March 7, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

/s/ *David H. Reichenberg*
David H. Reichenberg

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| DEXON COMPUTER, INC., | § | |
| | § | |
| Plaintiff | § | |
| | § | CASE NO. 5:22-CV-00053-RWS-JBB |
| v. | § | |
| | § | |
| CISCO SYSTEMS, INC. AND CDW | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## ORDER

Before the Court is Defendants' Objection to the Order Denying Cisco's Motion to Transfer (Docket No. 96), Defendant Cisco's Objection to the Report and Recommendation Denying Cisco's Motion to Dismiss (Docket No. 119), and Defendant CDW's Objections to the February 7, 2023 Report and Recommendation (Docket No. 120). The objections have been fully briefed (Docket Nos. 102, 121, 122), and the Court has heard oral argument regarding them. Docket No. 130.

## BACKGROUND

On April 27, 2022, Plaintiff Dexon filed the above-captioned antitrust case in the Eastern District of Texas (the "Texas Lawsuit"). Plaintiff alleges Defendant Cisco is a monopolist in several worldwide and U.S. markets related to networking equipment and services for the internet and locks in customers who require maintenance with Cisco's SmartNet program to make supracompetitive purchases of routers and ethernet switches. *See, e.g.*, Docket No. 1 (Original Complaint), ¶¶ 23–49. Plaintiff claims that Cisco employed FUD (fear, uncertainty, and doubt) tactics, especially in Texas, to foreclose competitive purchases of any product and maintain

supracompetitive pricing for its products. *Id.*, ¶ 67. According to Plaintiff, in carrying out its scheme, Cisco conspired with Defendant CDW to sell Cisco equipment in the Relevant Networking Markets to maintain its supracompetitive pricing in those Markets and exclude other resellers from making sales in the Relevant Networking Equipment Markets to end-user customers in violation of federal and state antitrust laws. *Id.*, ¶¶ 56–57.

Plaintiff asserts the agreement between Cisco and CDW (collectively, "Defendants") reflects an unreasonable restraint of trade and a conspiracy to monopolize that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g., id.* at ¶¶ 87–100. Plaintiff also asserts claims under Section 1 of the Sherman Act for *per se* tying in the Relevant Product Markets, under Section 2 of the Sherman Act for unlawful monopolization of the Relevant Networking Equipment Markets, and for unlawful attempted monopolization of the Relevant Product Markets against Cisco and under the Texas Free Enterprise and Antitrust Act against Cisco and CDW. *Id.*, ¶¶ 87–128. Plaintiff seeks injunctive relief, damages, and costs in connection with such violations. *Id.*, ¶ 137.

## I. California Lawsuit

Almost two years before Plaintiff filed its current case, Cisco filed suit against Dexon in the Northern District of California. *Cisco Systems, Inc., et al. v. Dexon Computer, Inc.*, Case No. 3:20-cv-4926 (N.D. Cal. filed July 22, 2020) [hereinafter "California Lawsuit"]. In the California Lawsuit, Cisco's First Amended Complaint against Dexon was filed on March 19, 2021, asserting claims of trademark infringement, trade counterfeiting, false designation of origin, and associated state law claims. California Lawsuit, Docket No. 32. Specifically, Cisco alleges Dexon sells counterfeit Cisco products (including switches and transceivers) in violation of the Lanham Act and California state law. *Id.*

On July 29, 2021, Dexon filed its Amended Answer, Affirmative Defenses, Counterclaims and Third Party Claims ("Dexon's California Counterclaims"). California Lawsuit, Docket No. 50; *see also* Texas Lawsuit, Docket No. 21-2. Dexon asserted various antitrust counterclaims among other trademark and tort counterclaims. *Id.* On motion from Cisco, the California Court dismissed Dexon's California Counterclaims, but the court granted Dexon leave to amend. *See Cisco Sys. Inc. v. Dexon Computer, Inc.* (*Cisco I*), No. 20-cv-04926-CRB, 2021 WL 5848080, at *1, *9 (N.D. Cal. Dec. 9, 2021). In its amended pleading, Dexon did not re-assert the dismissed antitrust counterclaims. California Lawsuit, Docket No. 92 ("Dexon's Second Amended Counterclaims"); *see also* Texas Lawsuit, Docket No. 21-4 (same).

On a further motion from Cisco, the California Court dismissed Dexon's Second Amended Counterclaims. *See Cisco Sys., Inc. v. Dexon Computer, Inc.* (*Cisco II*), No. 20-cv-04926-CRB, 2022 WL 797015, at *1 (N.D. Cal. Mar. 16, 2022). According to the California Court, although Dexon provided more detail than it did in its prior complaint, Dexon still failed "to state these claims," and gave Dexon "leave to amend one last time." *Id.* at *4, *8.

On April 6, 2022, Dexon filed its Third Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims ("Dexon's Third Amended Counterclaims"). California Lawsuit, Docket No. 107. Once again, Dexon chose not to re-plead any antitrust claims. *See id.*; *see also* Texas Lawsuit, Docket No. 21-6 (same). On April 27, 2022, Cisco moved to dismiss Dexon's Third Amended Counterclaims pursuant to Rule 12(b)(6). *See* California Lawsuit, Docket No. 117; *see also* Texas Lawsuit, Docket No. 21-7.

That same day, Dexon filed its Original Complaint in this Court, asserting antitrust causes of action. As it did in the California Lawsuit, Dexon brings against Cisco a *per se* tying claim under § 1 of the Sherman Act (Docket No. 1, Count III) and monopolization claims under § 2 of

the Sherman Act (Docket No. 1, Counts IV, V). On June 21, 2022, the California Court entered an Order granting Cisco's motion to dismiss the six counterclaims asserted in the Third Amended Counterclaims and denying Dexon's motion for leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.* (*Cisco III*), No. 20-CV-04926-CRB, 2022 WL 2222962, at *1 (N.D. Cal. June 21, 2022).

## II.     Cisco's Motion to Transfer

On June 23, 2022, Cisco filed its motion to transfer, requesting the case be transferred to the Northern District of California pursuant to the first-to-file rule. Docket No. 21.  Cisco argues most of the antitrust claims that Dexon asserts in this matter are nearly identical to the counterclaims that the Northern District of California dismissed in the California Lawsuit almost nine months earlier. *Id.* at 3–4. Cisco further asserts the factual allegations in the present complaint are materially the same as the allegations contained in Dexon's California Counterclaims which were later amended without the antitrust allegations. *Id.* at 4. Cisco contends the two pleadings are substantially similar, and "comity and sound administration of justice demand that Dexon's complaint be transferred." Docket No. 31 at 2. CDW filed a notice of joinder to Cisco's motion, joining in, and adopting as its own, the arguments made in Cisco's motion to transfer. Docket No. 27.

On December 22, 2022, the Magistrate Judge entered an order denying Cisco's motion to transfer. Docket No. 94 [hereinafter "Order"]. After setting forth the law applicable to the first-to-file rule (*id.* at 5–7) and the parties' assertions (*id*. at 7–8), the Order stated a "survey of the relevant caselaw, as well as the underlying purposes of the first-to-file rule, shows that the first-to-file doctrine should not be applied here, where the antitrust claims are not pending in the California

suit." *Id.* at 8. Defendants have filed an objection (Docket No. 96), and Dexon has filed a response to the objection (Docket No. 102).

### III. Defendants' Motions to Dismiss

Cisco filed a motion to dismiss asserting Dexon's present claims are precluded by true res judicata or claim preclusion. *See* Docket No. 22 at 12–13. Cisco further asserts Dexon's antitrust claims fail on the merits. Specifically, Cisco asserts as follows: (1) Dexon fails to allege an actionable conspiracy claim and parallel state law claim (Counts I–II, VI) because Dexon does not allege any actionable agreement; (2) Dexon fails to allege an actionable tying claim and parallel state law claim (Counts III, VI) because Dexon does not allege any foreclosure; (3) Dexon fails to allege an actionable monopolization claim and parallel state law claim (Counts IV–VI) because Dexon fails to allege any exclusionary conduct; and (4) Dexon lacks antitrust injury (Counts I–VI).

CDW filed its own motion to dismiss in which it joins in and adopts as its own the arguments and assertions made by Cisco and also focuses on the facts most relevant to Dexon's claims against it. Docket No. 28 at 1, n. 1. Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. *Id.* at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

On the merits, CDW contends Dexon's Sherman Act (and parallel state law) claims against CDW (Counts I, II) should be dismissed for the following reasons: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to allege specific intent by CDW to monopolize. CDW further

asserts Dexon fails to establish an antitrust injury. Finally, CDW argues Dexon's pre-2018 claims are time-barred.

The Magistrate Judge issued a Report and Recommendation, recommending Defendant Cisco's Motion to Dismiss (Docket No. 22) be denied, with the part of the motion seeking dismissal under true res judicata being denied without prejudice. Docket No. 107 [hereinafter "R&R"] at 81. The R&R further recommended Defendant CDW's Motion to Dismiss (Docket No. 28) be denied, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being denied without prejudice. *Id.* As to CDW's specific intent to monopolize, the Magistrate Judge recommended that, if the R&R is adopted, Dexon be ordered to replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, within thirty days from the date of entry of any such Order Adopting, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize. *Id.* at 44. Dexon has not filed objections to the R&R. Both Cisco and CDW have filed objections to the R&R. Docket Nos. 119, 120. Dexon has filed responses to the Defendants' objections. Docket Nos. 121, 122.

## LEGAL STANDARD

### I.      Standard of Review

Defendants' objection to the Magistrate Judge's Order is governed by Rule 72(a), which provides, in pertinent part, that "[t]he district judge . . . must . . . modify or set aside any part of the [magistrate judge's] order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

A district court conducts a *de novo* review of any portion of a magistrate judge's report and recommendation to which any party files an objection. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3); *Warren v. Miles*, 230 F.3d 688, 694 (5th Cir. 2000). After conducting a *de novo* review,

the district court may accept, reject, or modify, in whole or in part, the findings or recommendations of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); Fᴇᴅ. R. Cɪv. P. 72(b)(3).

## II. First-to-File Rule

The first-to-file rule is a discretionary doctrine resting on "principles of comity and sound judicial administration." *Encore Wire Corp. v. Copperweld Bimetallics, L.L.C.*, No. 4:22-CV-232-SDJ, 2023 WL 123506, at *4 (E.D. Tex. Jan. 6, 2023) (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997)). It has long been recognized that "the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *Id.* (quoting *Save Power*, 121 F.3d at 950 (quoting *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985))). "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* (quoting *W. Gulf Maritime Ass'n*, 751 F.2d at 729). As applied, the first-to-file rule is "forward-looking," seeking to preserve judicial resources and avoid inconsistent results by ensuring that "substantially overlap[ping]" issues are decided in the same federal forum. *Id.* (quoting *Cadle*, 174 F.3d at 603–04).

Application of the first-to-file rule does not require that the cases at issue be identical or that all of the same parties be involved in both actions. *Id.* (citing *Save Power*, 121 F.3d at 950–51). Instead, to decide whether substantial overlap exists, courts have looked at factors such as whether the core issue in each case is the same or if much of the proof adduced would likely be identical. *Id.* (citing *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011) (citing *W. Gulf Maritime Ass'n*, 751 F.2d at 729; *Mann Mfg., Inc. v. Hortex Inc.*, 439 F.2d

403, 407 (5th Cir. 1971))). When the overlap between claims is less than complete, courts consider several additional factors, including the extent of the overlap, the likelihood of conflict, and the "comparative advantage and interest of each forum in resolving the dispute." *Id.* (citing *Sweet Little Mexico*, 665 F.3d at 678) (internal quotations omitted). These additional factors are applied on a "case by case" basis. *Id.* (internal quotations omitted).

### III.    Res Judicata, Generally

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as "res judicata." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Clyce v. Farley*, 836 Fed. Appx. 262, 267 (5th Cir. 2020). "The rule of res judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1087 (5th Cir. 2022). "True res judicata bars the litigation of claims that either have been litigated or should have been raised in an earlier suit, while collateral estoppel precludes relitigation of only those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action." *Oyekwe v. Rsch. Now Grp., Inc.*, 542 F. Supp. 3d 496, 505–06 (N.D. Tex. 2021), *appeal dismissed*, No. 21-10580, 2021 WL 8776378 (5th Cir. Dec. 28, 2021) (internal citations and quotations omitted).

Res judicata is an affirmative defense principally raised in a party's responsive pleading. *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 571 (5th Cir. 2021) (citing Fed. R. Civ. P. 8(c)(1)) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . res judicata."); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570

n.2 (5th Cir. 2005) ("[G]enerally a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense."). "Although courts have considered res judicata and related preclusion principles on a motion to dismiss under Rule 12(b)(6), the Fifth Circuit has held that generally a res judicata contention cannot be brought in a motion to dismiss." *Parker v. Buckley Madole, P.C.*, No. 4:17-CV-00307-ALM-CAN, 2018 WL 1704079, at *4 (E.D. Tex. Jan. 11, 2018), *report and recommendation adopted*, No. 4:17-CV-307, 2018 WL 1625670 (E.D. Tex. Apr. 4, 2018) (citing *Segatto v. JPMorgan Chase Bank, N.A.*, No. 4:16-CV-00712-ALM, 2016 WL 7664306, at *3 (E.D. Tex. Dec. 16, 2016), *report and recommendation adopted*, No. 4:16-CV-712, 2017 WL 67944 (E.D. Tex. Jan. 6, 2017) (Mazzant, J.) (citing *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Test Masters*, 428 F.3d at 570 n.2)). Claim preclusion is generally an affirmative defense best resolved at summary judgment or trial. *Seven Networks, L.L.C. v. Motorola Mobility L.L.C.*, No. 3:21-CV-01036-N, 2022 WL 426589, at *2 (N.D. Tex. Feb. 10, 2022).

However, the Fifth Circuit has held that "[d]ismissal under Rule 12(b)(6) on res judicata grounds is appropriate when the elements of *res judicata* are apparent on the face of the pleadings." *Stevens*, 17 F.4th at 571 (quoting *Murry v. Gen. Servs. Admin.*, 553 Fed. Appx. 362, 364 (5th Cir. 2014) (per curiam) (unpublished) (citing *Kansa Reinsurance Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994))); *see also Kansa*, 20 F.3d at 1366 ("[W]hen a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate."). "With respect to a specific affirmative defense such as res judicata, the rule seems to be that if the facts are admitted or are not controverted or are conclusively established so that nothing further can be developed by a trial of the issue, the matter must be disposed of upon a motion to dismiss." *Madison v. Health Care Servs. Corp.*, No. W-20-CV-00835-ADA-DTG, 2022

WL 14225447, at *2 (W.D. Tex. Oct. 24, 2022), *report and recommendation adopted*, No. 6:20-CV-00835-ADA-DTG, 2022 WL 17732718 (W.D. Tex. Dec. 9, 2022) (quoting *Larter & Sons, Inc. v. Dinkler Hotels Co*., 199 F.2d 854, 855 (5th Cir. 1952)).

## IV. Claim Preclusion (True Res Judicata)

Claim preclusion, or true res judicata, is a "venerable legal canon" that "insures the finality of judgments and thereby conserves judicial resources and protects litigants from multiple lawsuits." *Clyce*, 836 Fed. Appx. at 267–68. Claim preclusion applies where (1) the parties to both actions are identical or are in privity; (2) the first judgment is rendered by a court of competent jurisdiction; (3) the first action resulted in a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits. *Id.* at 268.

The Fifth Circuit uses the transactional test to determine whether two suits involve the same claim or cause of action as required by the fourth element above. *Warren v. Mortg. Elec. Registration Sys., Inc*., 616 Fed. Appx. 735, 738 (5th Cir. 2015). This test requires a court to consider whether the two cases are based on "the same nucleus of operative facts." *Id*. "The nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted, defines the claim." *Id.* If both cases are based on the same nucleus of operative facts, "the prior judgment's preclusive effect extends to all rights the original plaintiff had with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose." *Id.*

## V. Issue Preclusion (Collateral Estoppel)

"Issue preclusion or collateral estoppel prevents a party from litigating an issue it previously 'litigated and lost' in another action" and thus "'prevent[s] repetitious litigation of what is essentially the same dispute,'" in addition to "'conserving judicial resources, [] maintaining

consistency, and [] avoiding oppression or harassment of the adverse party.'" *Hacienda Records, L.P. v. Ramos*, 718 Fed. Appx. 223, 228 (5th Cir. 2018) (per curiam) (internal quotations and citations omitted). Collateral estoppel can be used defensively—a plaintiff may be estopped from asserting a claim that the plaintiff has previously litigated and lost against another defendant—or can be used offensively—a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against another plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 788 F. Supp. 2d 523, 532 (S.D. Tex. 2011) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 328 (1979)). CDW's arguments here concern defensive non-mutual collateral estoppel.

Under Fifth Circuit law, collateral estoppel or issue preclusion requires that: (1) the issue in the current litigation is identical to the one in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the determination of the issue in the prior action was necessary to the judgment in that prior action and (4) there are no special circumstances that would render estoppel inappropriate or unfair. *Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co., Ltd*, 403 F. Supp. 3d 571, 601 (E.D. Tex. 2019) (citing *State Farm Mut. Auto. Ins. Co. v. LogistiCare Solutions*, 751 F.3d 684, 689 (5th Cir. 2014)). Courts do not consider special circumstances when "both parties were involved" in the prior suit. *ETC Sunoco Holdings, L.L.C. v. United States*, 36 F.4th 646, 649 (5th Cir. 2022).

## VI.     Rule 12(b)(6) Pleading Standard

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The court may consider "the

complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The court must then determine whether the complaint states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

**DISCUSSION**

**I.      Cisco's Motion to Transfer**

The Court now reviews for clear error the Magistrate Judge's Order (Docket No. 94)

denying the motion to transfer in light of Defendants' objections (Docket No. 96) to the Order.

The issue is whether to apply the first-to-file rule here, where there are no antitrust claims

pending in the California Lawsuit. In the December 22, 2022 Order, the Magistrate Judge pointed

out that Cisco and Dexon both rely upon *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599

(5th Cir.1999). Order at 11. Courts have recognized that *Cadle* stands for the proposition that there

must be two actions "pending *at the same time.*" *Olaoye v. Wells Fargo Bank NA*, No. 3:12-CV-

4873-M-BH, 2013 WL 5422888, at *1 (N.D. Tex. Sept. 27, 2013) (emphasis in original) (citing

*Akins v. Worley Catastrophe Response, L.L.C.*, 921 F.Supp.2d 593, 598 (E.D. La. 2013); *J2 Global*

*Communications, Inc. v. Protus IP Solutions, Inc.*, 2008 WL 5378010, *3 n. 3 (E.D. Tex. Dec.23,

2008)). Pointing out that neither party disputes that requirement, the Magistrate Judge stated the

relevant question is whether the co-pending actions must also have co-pending claims that are

substantially similar. Order at 11.

According to Cisco's reply in support of its motion to transfer, although Dexon's antitrust

counterclaims are no longer pending in the California Lawsuit, "Dexon ignores that the *case* in

which it filed its antitrust counterclaims *is* pending—to be sure, its counterclaims have been

dismissed, but the case continues." Docket. No. 31 at 1 (emphasis in original). However, according

to the Magistrate Judge, a "survey of the relevant caselaw, as well as the underlying purposes of

the first-to-file rule, shows that the first-to-file doctrine should not be applied here, where the

antitrust claims are not pending in the California suit." Order at 8.

In so finding, the Magistrate Judge found instructive *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd*., Case No. 2:20-CV-00003-JRG, 2020 WL 6889173 (E.D. Tex. Nov. 24, 2020). In that case, the SIMO plaintiffs filed suit in the Eastern District of Texas, alleging misappropriation of trade secrets by the uCloudlink defendants. *SIMO Holdings*, 2020 WL 6889173 at *1. Previously, SIMO had filed trade secret counterclaims against Hong Kong uCloudlink in a separate action in the Northern District of California. *Id.* However, the California court dismissed those counterclaims with prejudice on September 12, 2019, but the case remained pending. *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd*., Case No. 2:20-cv-0003 [hereinafter "*SIMO* Texas Case"], Docket No. 27-1 (E.D. Tex. July 8, 2020). In the Texas case, Defendant Hong Kong uCloudlink moved to transfer the plaintiffs' trade secret claims to California under the first-to-file rule and 28 U.S.C. § 1404. *SIMO Holdings*, 2020 WL 6889173 at *4–5.

The procedural posture here tracks *SIMO Holdings*. The *SIMO Holdings* California court initially dismissed SIMO's trade secret claims without prejudice, giving SIMO leave to amend and re-plead with more specificity. *SIMO* Texas Case, Docket No. 27 at 4–5. "SIMO re-pled these trade secret claims, focusing on a conspiracy between Wang Bin and uCloudlink. Again, the California court dismissed them, this time with prejudice, finding 'they do not establish a plausible allegation of a conspiracy.'" *Id.* (emphasis in original). Hong Kong uCloudlink argued that SIMO's trade secret claims in the Texas case, to the extent they were not dismissed, should be transferred to California under the first-to-file rule. *Id.* at 9 ("Similarly, there is substantial overlap between the trade secret claims brought here and the trade secret claims disposed of by the California court. And the California action is indisputably the first-filed action with respect to these same trade secret claims."). Like Dexon, the SIMO plaintiffs opposed transfer of the trade secret

claims, asserting the first-to-file rule was inapplicable because the "trade secret counterclaims were dismissed in the California Action." *SIMO* Texas Case, Docket No. 38 at 1–2 (E.D. Tex. Sept. 9, 2020). Thus, the plaintiffs argued there were "no overlapping pending claims in California and therefore no risk of duplication." *Id*. at 2. In its reply, Hong Kong uCloudlink argued, similar to Cisco here, that the plaintiffs, not liking the resolution in California, brought the same trade secret claims in Texas. *SIMO* Texas Case, Docket No. 43 at 2 (E.D. Tex. Sept. 16, 2020). According to Hong Kong uCloudlink, "SIMO's forum shopping and attempted re-litigation are the very concerns underlying the first-to-file rule." *Id*. The *Simo Holdings* Court addressed the issue, holding as follows:

> Hong Kong uCloudlink moved for the transfer of Plaintiffs' trade secret claims to California on the basis that "there is substantial overlap between the trade secret claims brought [in the Eastern District of Texas] and the trade secret claims disposed of by the California court." . . . In response, Plaintiffs point out that the California Action is no longer pending, and thus the first-to-file rule is inapplicable. (Dkt. No. 38 at 1–2). As Hong Kong uCloudlink admits in its Motion to Transfer, the trade secret claims were disposed of by the California court. The first-to-file rule only applies in instances where there are concurrent, pending proceedings in different federal courts, and moreover, the Court responding to the motion has discretion to apply the rule. *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976) ("[T]here are principles ... which govern in situations involving the contemporaneous exercise of concurrent jurisdictions ...") (emphasis added); *see also Cadle Co.*, 174 F.3d at 603 ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it ..."). Accordingly, the Court is not compelled to transfer the trade secret claims under the first-to-file rule and does not do so here.

*SIMO Holdings*, 2020 WL 6889173, at *4.

Although the California Lawsuit is still pending, Dexon's antitrust claims are no longer pending in California. Thus, the California Lawsuit does not contain a co-pending legal action that is sufficiently similar to the claims contained in the current case to justify invoking the first-to-file rule and transferring this suit to California. Like *SIMO Holdings*, the Magistrate Judge held the Court is not compelled to transfer the antitrust claims under the first-to-file rule. Order at 10.

In their objections, Defendants assert *SIMO Holdings* does not support the Order's construction of the first-to-file rule because *SIMO Holdings* did not substantively rule on the precise issue before this Court. *See* Docket No. 21 at 3. Defendants acknowledge that *SIMO Holdings* held the first-to-file rule was inapplicable in a situation where the counterclaims (but not the entire case) had been dismissed in the first-filed action. *See id.* at 3–4. The Magistrate Judge noted that Hong Kong uCloudlink had filed a motion for reconsideration, asserting the court's decision was based on an incorrect premise (*SIMO* Texas Case, Docket No. 68 at 1 (E.D. Tex. Jan. 25, 2021) because other claims remained pending in the California case. Order at 10, n. 6. Notably, the Magistrate Judge further pointed out that Hong Kong uCloudlink argued in urging reconsideration that the overlap between the Texas case and the California case extended beyond the trade secret claims and attached examples of the pleadings from the two cases in an attempt to demonstrate substantial overlap, including a reference to SIMO's live answer and counterclaims in the California case. *Id.*

In their objection, Defendants state the *SIMO Holdings* Court denied reconsideration because the movant's argument that "the California case remains pending" came too late; thus, Defendants assert the *SIMO Holdings* Court did not rule on the merits. Docket No. 96 at 4. However, Defendants do not address the Magistrate Judge's larger point as raised in the footnote and throughout the December 22, 2022 Order. Namely, the proper point of comparison for purposes of determining substantial similarity is between the presently pending claims in California and Dexon's antitrust claims.[1] Indeed, nowhere in their objections do Defendants argue

---

[1] Although not raised in Defendants' objections, Cisco also cited *Young v. L'Oreal USA, Inc.,* 526 F.Supp.3d 700, 706 (N.D. Cal. 2021), and *Am. Can! Cars for Kids v. Kars 4 Kids, Inc.*, No. 3:15-CV-3648-B, 2016 WL 3688631 (N.D. Tex. July 11, 2016) in support of their motion to transfer arguments. But those cases do not address the scenario here. *See* Order at 11–12.

their presently pending claims in California are substantially similar to Dexon's antitrust claims in this case.

In their objections, Defendants assert, as they did in their prior briefing, that *Cadle* supports their position. Defendants contend *Cadle* makes clear that when the first-filed case is still pending, avoiding inconsistent rulings concerning issues already decided by other courts "is among the concerns that the first-to-file rule addresses: as the Fifth Circuit explained, the first-to-file rule avoids the possibility of a (future) ruling that either 'conflict[s] with' or 'rehash[es] an issue already decided' by the first-filed court." Docket No. 96 at 2 (quoting *Cadle*, 174 F.3d at 604). According to Defendants, "Dexon's antitrust claims overlap with (indeed, are virtually identical to) those it brought in the Northern District of California. Accordingly, [Defendants argue] this Court will be required to determine the legal sufficiency of antitrust allegations that the California court has already dismissed for failure to state a claim." *Id.*

In the December 22, 2022 Order, the Magistrate Judge held as follows:

Here, there are no risks of inconsistent judgments seeing as the first-filed antitrust counterclaims were dismissed without prejudice. Although the California court issued a substantive ruling, it also allowed Dexon leave to amend. Dexon's amended counterclaims did not include the antitrust claims that are now alleged in this case. Those counterclaims were not part of the operative complaint which was eventually dismissed with prejudice in California. Because there are no longer two pending antitrust "actions," there is little risk of duplicative work or unnecessary burden on the judiciary in refusing to transfer.

Order at 12. According to Defendants' objection, the Magistrate Judge erred in concluding "there are no risks of inconsistent judgments" because the first-filed antitrust counterclaims were dismissed without prejudice. Order at 12. Specifically, Defendants assert as follows:

Not only did the California court dismiss Dexon's antitrust claims (and characterize those it filed here as "duplicative"), but it also stated that Dexon's third-amended counterclaims would be its "last." *See* Mot. To Transfer, Dkt. 21 at 3–6; Order 4 n.4. Allowing Dexon to evade these rulings would "trench[] on the authority of [a] sister court." *Cadle*, 174 F.3d at 606.

To the extent the Order relied on the fact that there is no technically preclusive judgment in the earlier filed action, as its reference (at 12) to dismissal "without prejudice" suggests, that too is incorrect—because Dexon failed to re-assert its antitrust counterclaims in three successive amendments, the later dismissal with prejudice applies to its antitrust counterclaims as well. *See* Mot. To Dismiss, Dkt. 22 at 11–13. More importantly, it is beside the point. Transfer is not limited to circumstances where preclusion applies. *See, e.g., Cadle*, 174 F.3d at 603–04 (distinguishing preclusion and the first-to-file rule).

The Order's statement (at 12) that there is "little risk of duplicative work or unnecessary burden" from allowing this case to proceed is also clear error. Cisco has already moved to dismiss the same claims twice in different courts; this Court will have to address a motion to dismiss hardly different from one that the California court already granted; and the parties are engaged in discovery on claims the California court has held are legally insufficient. Moreover, Dexon's illegal conduct—the basis for Cisco's claims in the California court—is a defense to Dexon's antitrust claims. Cisco should not be forced to litigate those intertwined questions in two different courts, and Dexon should be barred from changing the locus of that controversy.

Docket No. 96 at 5.

Defendants' objection to the December 22, 2022 Order reiterates the same arguments Cisco previously made but without addressing the Magistrate Judge's reasoning indicating the first-to-file rule does not fit here. As suggested by the Magistrate Judge, Defendants' argument fails to address that the first-to-file rule is a "forward-looking doctrine" used to "maximize" "the values of economy, consistency, and comity."[2] *Cadle*, 174 F.3d at 604. And Defendants' citations

---

[2] In a footnote, the Magistrate Judge stated as follows:

> Cisco appears to acknowledge this by reframing the first-to-file rule as a tool to prevent this Court from issuing rulings that are inconsistent with the reasoning expressed in the dismissal of Dexon's California Counterclaims with leave to amend. Dkt. No. 21 at 11–13. Broadly expanding the first-to-file rule to look *backward* as Cisco urges is not the appropriate solution for that concern. As explained at the hearing, this Court will not be a "super appellate court" to the California Court. Dkt. No. 62 at 74:6–22.

Order at 14, n. 8.

to *Cadle* in their objections actually address the Fifth Circuit's decision declining to add a jurisdictional requirement to the first-to-file rule—not any statement that the first-to-file rule functions as a backward-looking doctrine. *See* Docket No. 96 at 2 (citing *Cadle*, 174 F.3d at 604). Moreover, it bears noting that the portion of *Cadle* that Defendants cite, entitled "The Relationship Between the First–To–File Rule and Collateral Estoppel," distinguishes the forward-looking first-to-file rule from the backward-looking doctrine of collateral estoppel. *Id.* (citing *Cadle*, 174 F.3d at 603–04).

Defendants also fail to address the Magistrate Judge's determination that the proper analysis to determine substantial similarity is to compare (i) Cisco's currently pending IP claims against Dexon in California and (ii) Dexon's present antitrust claims in this Court. According to Dexon's response to Defendants' objection, the first-to-file rule does not apply when, as here, "the allegedly substantially similar claims are not pending before the first-filed court." Docket No. 102 at 1. The Court agrees.

The Magistrate Judge correctly found that the proper comparison for application of the forward-looking first-to-file rule is between Cisco's presently pending IP claims in California and Dexon's antitrust claims in this Court. *See United States v. Texas*, No. EP-21-CV-173-KC, 2022 WL 499861, at *1 (W.D. Tex. Jan. 11, 2022) ("Defendants argue that the issues presented substantially overlap with those in *Texas v. Biden* . . . However, Defendants base that argument on the content of the original Complaint in *Texas v. Biden* . . . As discussed, that Complaint is no longer operative, as Texas has filed an Amended Complaint in *Texas v. Biden* that challenges a different set of federal government actions. Because the allegations in the case before the Northern District have changed, Defendants' Motion . . . is DENIED as moot."); *see also Encore Wire Corp. v. Copperweld Bimetallics, L.L.C.*, No. 4:22-CV-232-SDJ, 2023 WL 123506, at *5 (E.D. Tex. Jan.

6, 2023) ("Encore's false advertising declaratory claim pending in this Court (and for that matter, Copperweld's Lanham Act and unfair competition counterclaims) do not substantially overlap with the antitrust claims pending in the Alabama action."); *see also L-3 Commc'n Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-CV-0341-B, 2008 WL 89659, at *2 (N.D. Tex. Jan. 8, 2008).

This Court has stated the factors relevant to whether substantial overlap exists include whether "the core issue" in each case is the same and whether "much of the proof adduced . . . would likely be identical."[3] *TravelPass Grp. L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-00153-RWS, 2019 WL 4071784, at *5 (E.D. Tex. Aug. 29, 2019) (citing *Sweet Little Mexico*, 665 F.3d at 678 (citation omitted in *TravelPass*) (alterations in original)). "Where the overlap between two suits is less than complete, the judgment is made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." *Id*. (quoting *Stannard v. Nat'l Indoor RV Centers, L.L.C.*, No. 4:18-CV-00366, 2018 WL 3608560, at *1 (E.D. Tex. July 27, 2018) (quoting *Save Power*, 121 F.3d at 951).

The Magistrate Judge analyzed each of the relevant factors and found that there was no substantial overlap. After comparing Cisco's still-pending claims in California and the Sherman Antitrust claims currently alleged by Dexon in this Court, the Magistrate Judge noted as follows:

> In the California Lawsuit, Cisco alleges claims of trademark infringement, trademark counterfeiting, false designation of origin, and associated state law

---

[3] In *TravelPass*, although both pending cases contained similar allegations regarding the existence of an unlawful agreement between the five hotel companies in violation of antitrust laws, the Court agreed with the Magistrate Judge that the cases did not substantially overlap. While the cases were related, there are many significant differences (different claimants, claims, allegations, defenses, defendants, witnesses and damages) between them. *TravelPass Grp. L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-00153-RWS, 2019 WL 4071784, at *5 (E.D. Tex. Aug. 29, 2019).

claims, asserting that Dexon allegedly "engaged in schemes to traffic counterfeit Cisco products." *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 541 F. Supp. 3d 1009, 1013 (N.D. Cal. June 1, 2021). In the current Texas Lawsuit, Dexon alleges five claims under the Sherman Antitrust Act and one claim under the Texas Free Enterprise and Antitrust Act, including allegations of a conspiracy between Cisco and CDW to monopolize and to suppress inter-brand and intra-brand competition from entities like Dexon.

Order at 13. The Magistrate Judge stated the "core issues" in the two forums are not the same, and

the "proof adduced" will not be identical. *Id.* at 14 (citing *Sweet Little Mexico*, 665 F.3d at 678).

The Magistrate Judge concluded that "Cisco has not shown how any ruling by this Court will affect

the California Lawsuit, which concerns different issues, much less the risk of piecemeal litigation

or inconsistent outcomes." *Id.* (citing *Cadle*, 174 F.3d at 604; *BNSF Ry. Co. v. OOCL (USA), Inc.*,

667 F. Supp. 2d 703, 709 (N.D. Tex. 2009)).

In large part, Defendants object to the Magistrate Judge's interpretation of the first-to-file

rule but do not expressly object to the Magistrate Judge's finding of a lack of substantial similarity

between the claims pending in the instant case and the claims pending in California. *See* Docket

No. 96 at 1–4. Defendants otherwise resort to policy arguments. *See id.* at 4–5. In making those

policy arguments, Defendants cite only *Cadle*. *See id.* at 4–5 (citing no further case law other than

*Cadle*, 174 F.3d at 603-04, 606). But instead of citing *Cadle* for any instructive rule in this instance,

Defendants cite *Cadle* to highlight the principles of economy, consistency and comity underlying

the first-to-file rule and collateral estoppel doctrine (both of which *Cadle* discusses). *See id.*

The Court does not minimize—or ignore—those important policy considerations but

agrees with the Magistrate Judge that the cases do not substantially overlap, and application of the

first-to-file rule is inappropriate. Dexon's antitrust claims pending in this Court do not substantially

overlap with the claims currently pending in California. And hearing Dexon's antitrust claims in

this case does not threaten to undermine the principles of comity and judicial economy underlying

the first-to-file rule. *See W. Gulf Maritime Ass'n*, 751 F.2d at 728 (recognizing that the first-to-file rule requires the federal courts "to exercise care to avoid interference with each other's affairs"). Accordingly, Defendants' Objection (Docket No. 96) to the Magistrate Judge's Order is **OVERRULED**.

### II.      Defendants' Motions to Dismiss

The Court has reviewed the pleadings, motions to dismiss, R&R, objections to the motions to dismiss, and relevant briefing. Based on the Court's review of the unobjected to-portions of the R&R, the Court is of the opinion the unobjected-to findings and conclusions of the Magistrate Judge's R&R (including, but not limited to, those related to CDW's specific intent to monopolize) are correct and are hereby **ADOPTED** as the opinion of the District Court.

The Court now conducts a *de novo* review of the objected-to portions of the Magistrate Judge's Report recommending to deny Defendants' motions to dismiss.

### A.      Claim Preclusion (*True Res Judicata*)

**Report and Recommendation.** In the R&R, the Magistrate Judge found Cisco's true res judicata arguments are premature at the Rule 12(b)(6) stage; thus, the Magistrate Judge recommended the Court deny the part of Cisco's motion for dismissal on true res judicata grounds without prejudice to refiling. R&R at 22–23 (citing *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020); *Giddy Holdings, Inc. v. Kim*, No. 1:20-CV-434-DAE-ML, 2021 WL 2773019, at *4 (W.D. Tex. June 7, 2021), *report and recommendation adopted as modified*, No. 1:20-CV-434-DAE, 2021 WL 8442028 (W.D. Tex. July 2, 2021); also citing *Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018) (finding that "Plaintiffs have a plausible claim and res judicata would be better addressed at a later stage in the proceeding")); *see also* R&R at 26. According to the Magistrate

Judge, even if the Court were to address the applicability of true res judicata at this early stage, "the Court would have serious concerns as to whether Cisco, on its current briefing, could show the third and fourth elements for true res judicata." *Id.* at 23.

Regarding the third element, requiring final judgment on the merits, the Magistrate Judge noted the California Court dismissed Dexon's initial set of counterclaims (which included its California antitrust counterclaims) with leave to amend and that Dexon's next amended counterclaims, which were eventually dismissed with prejudice, did not include any antitrust allegations. R&R at 23. The Magistrate Judge was not persuaded the California Court's dismissal was a final adjudication on the merits with preclusive effect. The Magistrate Judge discussed *Eldridge v. Kohls Dep't Stores, Inc.*, No. CIV-20-158-R, 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020), the case relied upon by Cisco in its motion to dismiss, stating the unique circumstances in that case limits its application to the instant case where Dexon added new claims, legal theories, and "non-trivial factual allegations" that were not alleged in the California Lawsuit. R&R at 24.

Regarding the fourth element, whether the same claim or cause of action is involved in both suits, the Magistrate Judge listed the new claims and facts alleged in this lawsuit which were not alleged in the California Lawsuit and held "Cisco fails to show that the claims here arise out of the same nucleus of operative facts as [Dexon's] initial counterclaims in California." *Id.* at 25.

**Cisco's assertions.** In its objections, Cisco states the Court can decide true res judicata[4] at the dismissal stage because the R&R took judicial notice of the filings in the California Lawsuit (R&R at 15, n.3) and "all of the relevant facts are contained in the record before [the court] and are uncontroverted." Docket No. 119 at 2 (citing *R&R Motorsports, L.L.C. v. Textron Specialized*

---

[4] Cisco often uses the term "claim splitting" in its briefing even though that doctrine is not wholly equivalent to claim preclusion. The R&R pointed out that Cisco fundamentally relies on claim preclusion (R&R at 21 n. 8), and Cisco did not object to that finding.

*Vehicles, Inc.*, 2022 WL 4379515, at *2 (E.D. La. Sept. 22, 2022) (brackets in original) (granting 12(b)(6) motion on res judicata grounds); also citing *McIntyre v. Ben E. Keith Co.*, 754 Fed. Appx. 262, 264–65 (5th Cir. 2018) (per curiam) (affirming 12(b)(6) dismissal on res judicata grounds)). According to Cisco, *Anderson*, 958 F.3d at 314–15, wherein the Fifth Circuit affirmed a dismissal based on true res judicata, does not support the R&R's conclusion that "Dexon can prolong this case simply by objecting." Docket No. 119 at 2.

Substantively, Cisco asserts the California Court's earlier dismissal of Dexon's antitrust counterclaims with leave to amend satisfies the third element (the finality requirement) for claim preclusion.[5] Relying for the first time in its objections on a Third Circuit case, *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272 (3d Cir. 2016), Cisco asserts that the California Court's decision in *Cisco I*, 2021 WL 5848080, has preclusive effect because Dexon did not re-assert its antitrust counterclaims when granted leave to do so. Docket No. 119 at 2.

Regarding the fourth element, Cisco states Dexon's complaint in this case arises out of the same nucleus of operative facts as the California counterclaims. *Id.* at 3. According to Cisco, although the California counterclaims did not include allegations about the Texas bank, energy

---

[5] In its objections, Cisco states the R&R misunderstands "Cisco's argument for finality of the California court's rulings: those rulings are preclusive not only because Dexon failed to amend its antitrust counterclaims when given the chance . . . but also because the California court dismissed Dexon's remaining counterclaims with*out* leave to amend . . ." Docket No. 119 at 1 (emphasis in original).

The R&R did not misunderstand Cisco's argument. The R&R cited it, providing the following summary of Cisco's finality argument:

> "The California Court eventually dismissed with prejudice Dexon's amended counterclaims. Cisco claims that final dismissal with prejudice meets the finality requirement of claim preclusion because Dexon could have, but chose not to, replead its initial set of antitrust counterclaims. Dkt. No. 32 at 1–2."

R&R at 23.

company, or car dealership, "that conduct is of a piece with the conduct that Dexon did allege, pre-dates the California court's ruling, and could have been asserted there." *Id.* at 4.

   ***De novo* review.** The Court agrees with the R&R that dismissal on claim preclusion grounds at this stage would be premature and that the part of the motion seeking dismissal under true res judicata should thus be denied without prejudice. Here, Cisco's argument that Dexon's claims are barred by true res judicata is inappropriate at this early stage of the case. *See Madison*, 2022 WL 14225447, at *2. Looking to the pleadings and viewing them in the light most favorable to Dexon, a true res judicata defense does not appear "clearly on the face of the pleadings to warrant dismissal under 12(b)(6)." *See id.* The Court finds Dexon has a plausible claim and true res judicata would be better addressed at a later stage in the proceeding. *See Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018).

   Cisco's claim preclusion defense, as currently raised at this early stage of the proceeding, also lacks merit. It is not clear that *Cisco I* satisfies the finality requirement, even considering the reasoning—which Cisco cites for the very first time in its objections—provided by the Third Circuit in *Hoffman*, 837 F.3d at 272. Discussing *Hoffman*, the Third Circuit recently explained that claim preclusion's requirement of a "judgment on the merits" is "better understood in terms of its functional equivalent: whether a dismissal is with prejudice." *Smith v. Kershentsef*, 843 Fed. Appx. 447, 449 (3d Cir. 2021) (quoting *Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020)). Thus, "[a] dismissal with prejudice operates as an adjudication on the merits, so it ordinarily precludes future claims." *Id*. (quoting *Papera*, 948 F.3d at 611 (internal quotation marks omitted in *Smith*)). On the other hand, a dismissal without prejudice does not operate as an adjudication on the merits and therefore does not have a claim-preclusive effect. *Id.*

In determining whether an order was a final judgment for jurisdictional purposes, the Third Circuit in *Hoffman* held a plaintiff can convert a dismissal "without prejudice" into a final order by "declar[ing] his intention to stand on his complaint." *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 279 (3d Cir. 2016). However, in *Hoffman*, the order dismissing without prejudice was self-effectuating and automatically converted to a dismissal with prejudice when the appellant did not file an amended complaint within the mandated deadline.[6] *Smith*, 843 Fed. Appx. at 450, n. 4 (citing *Hoffman*, 837 F.3d at 279–80); *see also id.* at 449-50 (citing *Weber v. McGrogan*, 939 F.3d 232, 240 (3d Cir. 2019) (noting "a 'self-effectuating' order is one that directs a party to take some action to cure a defective complaint by a defined date and provides express notice that it will then automatically produce a final order of dismissal when the time to amend runs out")). In *Smith*, the Third Circuit could not read the district court's dismissal of Smith's FDCPA claim as having ripened into a dismissal with prejudice. *Id.* at 450.

In *Cisco I*, the California Court dismissed Dexon's antitrust counterclaims with leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-CV-04926-CRB, 2021 WL 5848080, at *9 (N.D. Cal. Dec. 9, 2021) ("Dexon may file an amended answer and counterclaims within 30 days of the date of this order."). Cisco has not shown any express intent from Dexon (or the California Court) that would convert the California Court's dismissal with leave to amend to some final judgment equivalent to a dismissal with prejudice. *See Weber*, 939 F.3d at 240 ("while it

---

[6] The Court further notes both actions at issue in *Hoffman* had been brought before the same court. *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 280 (3d Cir. 2016). The Court has the authority to *sua sponte* dismiss cases on the basis of claim preclusion or res judicata when both claims are brought before it. *See Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980) ("Dismissal by the court sua sponte on res judicata grounds, however, is permissible in the interest of judicial economy where both actions were brought before the same court."); *see also McIntyre v. Ben E. Keith Co.*, 754 Fed. Appx. 262, 264-65 (5th Cir. 2018) (explaining the court's ability to dismiss a case *sua sponte* on res judicata grounds for purposes of judicial economy). Here, Dexon's cases have not been brought before the same court.

provided thirty days' leave to file an amended complaint, it lacked any language converting the dismissal to a final order at the end of the period. And . . . Weber did not submit a clear and unequivocal declaration of intent to 'stand on her complaint'").

Cisco has also not established the fourth element essential for claim preclusion at this time. Under the "same claim" inquiry, the critical issue is whether the two actions under consideration are based on the same nucleus of operative facts. *Test Masters*, 428 F.3d at 571. "What grouping of facts constitutes a 'transaction' or a 'series of transactions' must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Tillman v. Hammond's Transportation, L.L.C.*, No. CV 20-1656, 2021 WL 1733995, at *3 (E.D. La. May 3, 2021) (quoting *Test Masters*, 428 F.3d at 571 (citing *Petro–Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004))).

At the hearing on Defendants' motions, Dexon's counsel focused on the new allegations regarding the Cisco/CDW conspiracy. *See, e.g.,* Docket No. 62 (Transcript) at 66:20-67:13 (citing Docket No. 1, ¶ 61) (new allegations regarding the Cisco/CDW conspiracy); *see also id.* at 67:14-68:4; 72:14-73:24 (citing Docket No. 1, ¶ 3 (new allegations regarding the Texas bank), ¶ 7 (new allegations regarding the Texas energy company), ¶ 51 (new allegations regarding the Texas automobile dealership), ¶¶ 65-67 (new allegations regarding the Texas school district); ¶¶ 69-77 (detailed allegations of global and U.S. IP phones); and ¶ 4 (more specific allegations regarding limited IP budgets)). Comparing the factual predicate of the antitrust claims asserted here with the counterclaims that were at one time pending in California, the Court is not convinced the claims arise out of the same transaction or series of transactions. *See Students for Fair Admissions, Inc.*

*v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1088–89 (5th Cir. 2022) (explaining the transactional test applied here focuses on the facts out of which the claims arise). Accordingly, Cisco's objections to the R&R regarding claim preclusion are **OVERRULED**.

### B. Issue Preclusion (Collateral Estoppel)

Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. Docket No. 28 at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

**Report and Recommendation.** In the R&R, the Magistrate Judge noted issue preclusion requires that the issues in the two suits be identical. R&R at 28. For an issue to be identical, both the facts and the "legal standard used to assess them" must be identical. *Id.* (citing *Hammervold v. Blank*, 3 F.4th 803, 810–11 (5th Cir. 2021) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 n.1 (5th Cir. 1991))). The Magistrate Judge held the facts, and the legal standard used to assess the facts, are not identical in both the California Lawsuit and this lawsuit. *Id.* at 29. Therefore, the Magistrate Judge recommended the Court deny CDW's motion to dismiss under collateral estoppel or issue preclusion. *Id.*

**CDW's assertions.** In its objections, CDW asserts the R&R "gives too much weight to Dexon's argument" that a *per se* tying claim and conspiracy claims are entirely different, as well as "Dexon's conclusory allegations relating to loss of Interbrand competition." Docket No. 120 at 8. According to CDW, the legal standards for assessing both harm to competition and antitrust injury are identical in tying claims and conspiracy claims, and Dexon already had an opportunity to litigate "these two common elements in California." *Id.* Additionally, CDW argues, as it did in

its motion to dismiss, that the only "new" factual allegations raised in this lawsuit—relating to loss of interbrand competition—are "entirely conclusory . . . and should be disregarded . . ." *Id.*

**De novo review.** Dexon's California Counterclaims addressed tying rather than an "inter-corporate conspiracy that gives rise to two new claims against CDW, separate and apart from Dexon's claims against Cisco for tying." R&R at 26 (quoting Docket No. 37 at 19–20). The word "conspiracy" (or any similar derivation) does not appear in Dexon's California counterclaims, "whereas the term appears thirty-six times in the Complaint" in the Texas Lawsuit. *Id.* at 26–27 (quoting Docket No. 37 at 19). Focusing on a "host of new facts about the conspirators, their motivations, their agreement and coordinated conduct, and the effects of the conspiracy" which have been alleged under new causes of action in this case, Dexon asserts, and the Magistrate Judge agreed, that the issues in both cases are not identical. *Id.*

The Court, having reviewed *de novo* the parties' arguments, the relevant case law, the R&R, CDW's objections, and Dexon's response to CDW's objections, finds issue preclusion (or collateral estoppel) does not apply. Dexon pleads factual allegations here, not found in the California Lawsuit, to allege CDW and Cisco entered into a conspiracy that violated §§ 1 and 2 of the Sherman Act. *See, e.g.*, Docket No. 1, ¶¶ 56–58, 60–63, 87–100. As one example, although Dexon alleged in California that it lost a sale to a Pennsylvania hospital due to Cisco's unilateral monopolization, the California Court did not consider that the lost sale could have been the result of a conspiracy to accomplish that end. R&R at 28. Additionally, the Court is not convinced that the issues before the California Court (*i.e.*, Dexon's allegations that Cisco threatened customers that it would terminate their SmartNet service unless they purchased new Cisco equipment; that Cisco engaged in "pressure and bullying tactics" to dissuade customers from doing business with Dexon; or that Cisco pressured a "value added reseller" (CDW) to stop doing business with Dexon)

were fully and vigorously litigated in the California Lawsuit and necessary to the judgment in that action. Accordingly, CDW's objections to the R&R regarding issue preclusion are **OVERRULED**.

### C.    *Rule 12(b)(6) Pleading Standard Regarding Dexon's Antitrust Claims*

#### 1)    **Dexon's conspiracy claims against Cisco and CDW under Sherman Act §§ 1, 2 (Counts I, II)**

To the extent they overlap, the Court addresses Defendants' objections under this section (even if some of the arguments might also apply to Dexon's other claims against Cisco alone).

**Defendants' motions, generally.** In their motions to dismiss, with regard to Dexon's conspiracy claims asserted against them, Cisco and CDW separately argue as follows: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to establish an antitrust injury.

**Report and Recommendation, generally.** In the R&R, the Magistrate Judge addressed the first two arguments in the context of Dexon's Sherman Act § 1 claim (Count I) and then addressed CDW's separate argument specific to Dexon's Sherman Act § 2 conspiracy claim (Count II), namely whether Dexon fails to allege specific intent by CDW to monopolize. Because Cisco asserts Dexon's failure to allege antitrust injury applies to Counts I–VI (all of which have been asserted against Cisco), the Magistrate Judge addressed antitrust injury following the Magistrate Judge's discussion of Counts III, IV, and V against Cisco.

Regarding Dexon's conspiracy claims against Cisco and CDW, the Magistrate Judge found Dexon sufficiently alleges an agreement between Cisco and CDW and does not involve a "mere unilateral change of distributors" as urged by Cisco; thus, the alleged agreement is not *per se* legal. R&R at 33. Although the Magistrate Judge noted the sufficiency of Dexon's allegations of competitive harm is a closer call, on the whole, the Magistrate Judge concluded that Dexon's

allegations, in combination with the specific examples provided in the complaint, are sufficient to survive a motion to dismiss (other than Dexon's allegation that CDW had specific intent to monopolize). *Id.*

The Magistrate Judge found Dexon fails to plausibly allege specific intent by CDW to monopolize for purposes of the Sherman Act § 2 conspiracy to monopolize claim. *Id.* at 42–44. Rather than recommend dismissal of Dexon's conspiracy to monopolize claim against CDW, the Magistrate Judge recommended Dexon be given an opportunity to amend. Accordingly, the Magistrate Judge recommended this part of CDW's motion to dismiss be denied without prejudice to refiling and that, if the R&R is adopted, Dexon be ordered to replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize.  *Id.* at 44.

Regarding antitrust injury, the Magistrate Judge found Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommended this part of Defendants' motions to dismiss be denied. *Id.* at 77.

**Defendants' objections, generally.** In its objections, CDW identifies the three arguments it raised in its motion and argues the R&R erred in not agreeing with those arguments: (1) Dexon's failure to plausibly allege an anticompetitive agreement between Cisco and CDW; (2) Dexon's failure to plausibly allege harm to competition; and (3) Dexon's failure to allege antitrust injury. Docket No. 120 at 4.  In both its second and third objections, CDW asserts Dexon's complaint is devoid of factual allegations to explain how the alleged conspiracy harmed competition. *Id.* at 2–3. According to CDW, Dexon relies on conclusory allegations of "loss of interbrand" and "intrabrand" competition but does not plausibly explain how interbrand competition was harmed. *Id.* at 2. Specifically, CDW asserts Dexon never alleges it was prevented from selling its secondary

Cisco equipment to end-customers; thus, Dexon was not foreclosed from selling Cisco products which would result in harm to competition. *Id.* at 3.

In its objections, Cisco similarly asserts, as it did in its underlying briefing, that Dexon does not allege an anticompetitive agreement between Cisco and CDW. Docket No. 119 at 6–7. Additionally, Cisco states the R&R "errs in devising a theory supporting Dexon's conspiracy claim that Dexon neither pleaded nor argued," namely, that because Dexon pleads Cisco and CDW have market power, competitive harm can be inferred. *Id.* at 6. Finally, Cisco argues Dexon has failed to allege antitrust injury. According to Cisco, "Dexon has not alleged any harm to competition because the gravamen of its claims is that it was denied sales of *Cisco* products, not products manufactured by Cisco's competitors." *Id.* at 8 (emphasis in original) (further stating "Dexon cannot show that its injuries flow from that which makes conspiracy, tying, or monopolization unlawful, and it lacks antitrust injury").

**Applicable law.** To establish a violation of § 1 of the Sherman Act, a plaintiff must demonstrate that: "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (citation omitted). To satisfy the conspiracy element of a Sherman Act claim, a plaintiff must show "that the defendants engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 373–74 (quoting *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984))).

To establish concerted action, the plaintiff must present "evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve

an unlawful objective." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007) (quoting *Monsanto,* 465 U.S. at 768). In other words, "[t]here must be evidence that tends to exclude the possibility of independent action." *Id.* Whether an action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S. Ct. 2613, 2616, 86 L. Ed. 2d 202 (1985) (emphasis in original).

Under Sherman Act § 2, a conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce. *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

Antitrust cases are not subject to a heightened pleading standard. *Torrey v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *7 (E.D. Tex. Sept. 27, 2018) (citing *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010))*.* At this stage in the litigation, plaintiffs need only allege facts that "state a claim to relief that is plausible on its face." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest III*"), No. 5:17-CV-1295-RCL, 2022 WL 980791, at *6 (W.D. Tex. Mar. 31, 2022) (quoting *Twombly*, 550 U.S. at 570). "'[E]nough data must be pleaded so that each element of the alleged antitrust violation can be properly identified.'" *David B. Turner Builders L.L.C. v. Weyerhaeuser Co.*, No. 3:21-CV-309-KHJ-LGI, 2021 WL 5869183, at *2 (S.D. Miss. Dec. 10, 2021).

### (a) *Whether Dexon plausibly alleges a competition-harming agreement between Cisco and CDW*

**Defendants' motions.** In its motion, Cisco states Count I (§ 1 of the Sherman Act), Count II (§ 2 of the Sherman Act), and Count VI (Texas Free Enterprise and Antitrust Act) each depend

on allegations that Cisco entered into an unlawful agreement with CDW. Cisco argues Dexon's claim that "Cisco and CDW conspired to exclude Dexon" from the Relevant Networking Equipment Market fails because Dexon has not plausibly alleged any competition-harming agreement between Cisco and CDW. Docket No. 22 at 13–14. Specifically, Cisco asserts Dexon has not properly alleged any unlawful agreement to replace Dexon with CDW as a seller of Cisco products. *Id*. at 14. CDW similarly argues Dexon fails to plausibly allege any direct evidence of an anticompetitive agreement between Cisco and CDW. Docket No. 28 at 13. Whether considered individually or as a whole, CDW argues "Dexon's allegations are more consistent with CDW's independent actions and its individual interest than with a conspiracy." *Id*.

**Report and Recommendation.** The Magistrate Judge considered whether Dexon plausibly alleges an agreement between Cisco and CDW, and separately, whether Dexon's allegations plausibly raise the suggestion of an unlawful agreement. Specifically, the Magistrate Judge found Dexon sufficiently alleges "the who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco," and the complaint does not allege a "mere unilateral change of distributors" or that the alleged conspiracy falls exclusively within Cisco's "right to control its distribution network;" thus, the alleged agreement is not *per se* legal. R&R at 33, 35, 38.

The Magistrate Judge further considered whether Dexon plausibly alleges competitive harm and concluded the allegations regarding CDW, combined with the allegations regarding Cisco as a monopolist, allow the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition. *Id.* at 42. After distinguishing the allegations in this case from those involved in *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245

(5th Cir. 1975), and other dealer termination/substitution cases, the Magistrate Judge stated as follows:

> Further, case law supports the view that a monopolist manufacturer who conspires with a large distributor to exclude a lower-priced distributor can survive a motion to dismiss. *See Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n. 20 (11th Cir. 1983) ("A seller with considerable market power in the interbrand market—whether stemming from its dominant position in the market structure or from the successful differentiation of its products—will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold."). The court in *Graphic Prods.* explained that "in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price" and in that scenario, vertical restraints "may enable a manufacturer to retain monopoly profits arising from an Interbrand competitive advantage." *Id.* Dexon alleges this precise scenario: a Cisco-CDW conspiracy enabling Cisco to maintain its monopoly profits. The Third Circuit Court of Appeals similarly found a well-pled conspiracy alleging a dominant insurer conspired with a dominant hospital to exclude a smaller rival due to allegations of increased prices and decreased competition for the co-conspirators' services. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010).

R&R at 37–38. According to the Magistrate Judge, Dexon's allegations of interbrand harm and intrabrand harm (which were not pleaded with this level of specificity in the California Lawsuit) explain how the alleged conspiracy harms competition and mirrors the allegations contained in *Graphic Prods.* and *West Penn*. *Id.* at 39.

The Magistrate Judge also found instructive *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013), wherein the court found the plaintiffs' allegations sufficient to state a plausible Sherman Act § 1 claim against PoolCorp, the country's largest distributor of Pool Products, and the Manufacturer Defendants, the three largest manufacturers of Pool Products in the country, even though the complaint did not allege that PoolCorp possessed any specific share of the Pool Products Distribution Market. *Id.* at 40–41 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 373, 383, 399). The court held the allegations that the Manufacturer Defendants

had "substantial market clout" combined with the "market power" of the distributor "allow[ed] the Court to draw the reasonable inference" that the conspiracy was "capable of causing substantial harm to competition." *Id.* at 41 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 398). The Magistrate Judge also noted the court in *In re Pool Prods.* pointed out the Fifth Circuit has stated that the reason for looking at market power is to determine "whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market." *Id.* (quoting *In re Pool Prods.*, 940 F. Supp. 2d at 398 (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001)); also citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("[T]he purpose of the inquiries into market definition and market power is to determine whether an *arrangement* has the potential for genuine adverse effects on competition. . . .") (emphasis added in *In re Pool Prods.*))).

The Magistrate Judge stated Dexon has alleged facts sufficient to create a reasonable inference of Cisco's market power in the relevant markets. R&R at 41 (citing Docket No. 1, ¶¶ 1 ("Cisco is a monopolist . . ."); 24 ("On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry . . . Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceed 40% or more with its closest competitors half its size, in markets with high barriers to entry."); 29 ("Upon information and belief, Cisco consistently possessed a share of the Relevant Service Market in excess of 90% . . .")). The Magistrate Judge further stated Dexon has pleaded factual content that allows the Court to draw the reasonable inference that CDW has "substantial clout in the industry." *Id.* at 41–42 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 398; also citing Docket No. 1, ¶ 56 (alleging CDW's 2020 annual revenue was $18.47 billion

compared to Cisco's $49.8 billion in the same time period); also citing *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *11 (W.D. Tex. Oct. 15, 2015) ("At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share." (quoting *Scooter Store, Inc. v. Spinlife.Com.*, 777 F.Supp.2d 1102, 1117 (S.D. Ohio 2011)))). Considering the allegations regarding CDW, combined with Dexon's allegations regarding Cisco as a monopolist, the Magistrate Judge concluded the complaint allows the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition. *Id.* at 42.

**Defendants' objections.** In their objections, Defendants take issue with these findings. Among other things, both Cisco and CDW argue CDW's decision not to sell Cisco equipment to its direct competitor does not raise the suggestion of an unlawful agreement between Cisco and CDW. Docket No. 119 at 6 (stating CDW had every incentive to compete with Dexon for sales and CDW's alleged sale of Cisco products to a Pennsylvania hospital could have been independent action); Docket No. 120 at 5 (stating Cisco has the absolute right to control its distribution network, including to sell through one reseller (here, CDW) over another (Dexon)). According to Cisco and CDW, any agreement would be *per se* legal under *Burdett Sound*, 515 F.2d 1245 and *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997) [hereinafter *Doctor's Hospital*]. Docket No. 119 at 7; Docket No. 120 at 5. Consideration of these arguments dovetails into the related issue of whether Dexon has plausibly alleged harm to competition. Thus, the Court considers the issues together.

**De novo review.** As an initial matter, the Court agrees with the Magistrate Judge that Dexon sufficiently shows the existence of an agreement between Cisco and CDW as distinct from independent action. Dexon alleges Cisco conspired with one of its favored distributors, CDW, "to

help it exclude resellers like Dexon and maintain its network equipment monopolies." Docket No. 1, ¶ 13. The complaint provides a specific example of an alleged conspiracy involving a Pennsylvania hospital system. *Id.*, ¶¶ 58–63. There are two aspects to Dexon's conspiracy allegations.

First, Dexon alleges Cisco and CDW coordinated their communications and actions for the Pennsylvania hospital system, which awarded a contract to Dexon to purchase Ethernet switches and routers. *Id.*, ¶ 59. According to the complaint, when Cisco learned that the hospital system awarded the order to Dexon, it threatened the customer that it would "not honor the contemplated new SmartNet service package, [and] also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics." *Id.* "Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment." *Id.*, ¶ 60. Dexon alleges the "sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the 'savior' to the hospital system in that the customer would keep its service for all of its Networking Equipment." *Id.* Dexon alleges "Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon." *Id.*

Second, Dexon alleges that as part of the conspiracy, CDW agreed not to sell Networking Equipment to Dexon. *Id.*, ¶ 62. Specifically, Dexon alleges that as part of the conspiracy, which continues through the present day, "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." *Id.* According to Dexon, "when the CDW representative previously assigned

to Dexon refused to comply with" Cisco's demand that CDW stop selling Networking Equipment and associated services to Dexon, "CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* According to Dexon, pursuant to the conspiracy, "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* Dexon alleges Cisco recruited CDW into the conspiracy because it favors Cisco products over those of Cisco's competitors; when one completes a search on CDW's website for ethernet switches, it pulls up 1,440 selections for Cisco with no other ethernet switch competitor with more than 250 selections. *Id.*, ¶ 61.

Contrary to CDW's suggestion otherwise, the Court finds Dexon's complaint states facts that raise a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. *See* Docket No. 120 at 4 (citing *Twombly*, 550 U.S. at 557). As pointed out by the Magistrate Judge, the Fifth Circuit recently decided *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022), a case which supports Dexon. R&R at 36, n. 12.

In that case, the Fifth Circuit reiterated that tacit agreements are still agreements. *BRFHH*, 49 F.4th at 526 (citing *Twombly*, 550 U.S. at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision *or from an agreement, tacit or express*." (emphasis added and quotation omitted in *BRFHH*))). According to the Fifth Circuit, threat and accession is one way to form a tacit agreement. *Id.* (discussing *Monsanto*, 465 U.S. at 765, wherein the Supreme Court held that evidence of A's threat to B, coupled with B's subsequent buckling to the pressure, could constitute "substantial direct evidence" of an agreement for § 1 purposes.). The Fifth Circuit had elaborated on a threat-and-accession theory, *id.* (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220–22 (5th Cir. 2001); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 331–33 (5th Cir. 2015);

*Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763–64 (5th Cir. 2002); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844–45 (5th Cir. 2015)), making it clear that a threat itself is not enough. Rather, A's threat can give rise to an agreement with B only if B actually gives in and does what A wants—and only if B gives in because of A's threat. *Id.* (citing *Viazis*, 314 F.3d at 764).

In *BRFHH*, the Fifth Circuit, addressing a threat-and-accession case for the first time at the Rule 12(b)(6) stage, stated as follows:

> A plaintiff proceeding on a threat-and-accession theory must plausibly allege three things: first, that A made a threat; second, that B subsequently did what A wanted; and third, that B did so because of A's threat. That third requirement is often the hardest to satisfy. It's not enough to allege that B's behavior was "merely consistent with" caving to the threat. *See Twombly*, 550 U.S. at 557, 127 S.Ct. 1955. The plaintiff must do more, providing "allegations plausibly suggesting" that B acted in response to the threat rather than out of its own self-interest. *See ibid.*; *Viazis*, 314 F.3d at 764 (affirming a district court's grant of judgment as a matter of law on the ground that the plaintiff hadn't shown the defendant acted "in response to [the relevant] threats" rather than "based on an independent evaluation of its best interests" after "ignor[ing] the threats"); *Abraham & Veneklasen*, 776 F.3d at 333 (similar).

*Id.*

In its complaint, Dexon plausibly alleges Cisco threatened CDW to stop selling Networking Equipment and associated services to Dexon and that CDW subsequently did what Cisco demanded it do. It is not enough to allege that CDW's behavior was "merely consistent with" caving to the threat. *BRFHH*, 49 F.4th at 526 (citing *Twombly*, 550 U.S. at 557). Rather, Dexon must provide "allegations plausibly suggesting" that CDW acted in response to the threat rather than out of its own self-interest.[7] *Id.* (citations omitted).

---

[7] In its motion, CDW points out that Dexon and CDW are competitors and argues it has "clear unilateral incentives not to supply its rivals." Docket No. 28 at 14. CDW further contends the fact that it displays Cisco's products prominently on its website demonstrates CDW's efforts to

At this stage of the litigation, the Court finds Dexon has provided allegations plausibly suggesting that CDW acted in response to Cisco's alleged demand. Dexon alleges CDW removed the CDW representative previously assigned to Dexon to a different region and account when the representative "refused to comply with . . . Cisco's demand." Docket No. 1, ¶ 62. According to Dexon, CDW did this "so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* As further factual support for CDW's behavior, Dexon alleges "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.*

Even without a threat-and-accession theory, the Court finds, similar to the Magistrate Judge, that Dexon has sufficiently alleged the co-conspirators, the conspirators' respective motivations and intent, the sequencing of their coordinated conduct, the impact of that conduct, and how, most recently, "CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest)." R&R at 35–36 (quoting Docket No. 34 at 4–5 (citing Docket No. 1, ¶¶ 56–63, 87–100)). Accepting as true all well-pleaded facts in the complaint and viewing those facts as a whole in the light most favorable to Dexon, the Court finds Dexon has plausibly alleged an agreement between Cisco and CDW.

That brings the Court to the next issue: whether Dexon has alleged a competition-harming agreement between Cisco and CDW. According to Defendants, any alleged agreement between Cisco and CDW is not anticompetitive because Cisco as manufacturer has the absolute right to control its distribution network, including to sell through one reseller (here, CDW) over another (Dexon). Docket No. 120 at 5. In its motion to dismiss, Cisco asserts any alleged agreement

---

compete with rival distributors like Dexon and does not suggest an anticompetitive agreement with Cisco "to do anything, much less restrain trade." *Id*. at 15.

between Cisco and CDW that CDW would not sell Cisco equipment to Dexon would be *per se* lawful under Fifth Circuit law.  Docket No. 22 at 16 (citing *Burdett Sound*, 515 F.2d at 1245; also citing *Doctor's Hospital*, 123 F.3d at 301). According to Cisco, it does not violate antitrust law for Cisco to encourage end-users to purchase Cisco equipment from one reseller rather than another. Cisco contends that in either event, the customer is purchasing Cisco equipment; thus, the alleged conduct does not affect the market opportunities of other equipment manufacturers (the competitors in the markets that Dexon alleges). *Id*. at 15.

As noted in the R&R, *Burdett Sound* states that "it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." R&R at 36 (citing *Burdett Sound*, 515 F.2d at 1249). As explained by the Fifth Circuit in that case, it is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. *Id.* (citing *Burdett Sound*, 515 F.2d at 1248 (citations omitted in R&R)). The Magistrate Judge explained Dexon does not present claims based on a "mere unilateral change of distributors," *i.e.*, a claim that Dexon was excluded from Cisco's distribution and nothing more. *Id.* at 37 (citing *Burdett Sound*, 515 F.2d at 1248). Instead, according to the Magistrate Judge, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (which provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets).  *Id.*

In its objections, CDW states this is "a dealer termination case" "exactly" like *Burdett Sound*. Docket No. 120 at 5 ("Dexon alleges it was prevented from effectively reselling Cisco equipment by Cisco (the manufacturer) and replaced with CDW (the new reseller)."). According

to CDW, under *Burdett Sound*, "any loss of *intrabrand* competition—*i.e.*, the loss of Dexon as a Cisco reseller—is immaterial because the purpose of the antitrust laws is to promote *interbrand* competition." *Id.* (emphasis in original). CDW argues this is true "even when the new dealer and the manufacturer agree before the termination of the old dealer." *Id.* (quoting *Doctor's Hospital*, 123 F.3d at 307).

Based on *Burdett Sound* and *Doctor's Hospital*, Defendants ask the Court to find any agreement between Cisco and CDW would be *per se* legal because this case is nothing more than a dealer termination/substitution case. Not only are Defendants incorrect on the applicability of *Burdett Sound*, but a review of *Doctor's Hospital* also shows—through proper analysis under the rule of reason—why this case is distinguishable from the dealer termination/substitution cases.

First, *Burdett Sound* supports the general proposition that <u>without a showing of an actual adverse effect on competition market-wide</u>, it is not a violation of antitrust laws "for a manufacturer to terminate a distributor . . . and to appoint an exclusive distributor." *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997) (citing *Burdett Sound*, 515 F.2d at 1249). This does not mean that a manufacturer's or supplier's discretion as to whom it will sell is unlimited. *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 33 (5th Cir. 1977). As explained in *Burdett Sound*, a refusal to deal becomes illegal under the Sherman Act when it produces an unreasonable restraint of trade, such as price-fixing, elimination of competition, or creation of a monopoly. *Burdett Sound*, 515 F.2d at 1248 (citations omitted). In other words, if a refusal to deal is a device used to, among other things, acquire a monopoly or establish market dominance and drive out competitors, it is illegal. *Universal Brands*, 546 F.2d at 33 (citations omitted).

In *Burdett Sound*, the Fifth Circuit held the appellant had not presented an antitrust claim, noting the appellant alleged no horizontal conspiracy among competitors, no effort by either appellee to establish market dominance, no restrictive trade practices, and no anti-competitive intent or effect. *Burdett Sound*, 515 F.2d at 1248. Here, Dexon does not merely allege—without more—that Cisco substituted one distributor for another within the scope of *Burdett Sound*. Rather, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). R&R at 37 (citing Docket No. 1, ¶¶ 56, 60–61, 90–91). Dexon further alleges the alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices, reduced technology choices for customers, and Cisco's maintaining its monopoly in the relevant markets. *Id.* (citing Docket No. 1, ¶¶ 63, 100).

Second, *Burdett Sound* only addressed conduct designed to lessen intrabrand competition. *Nw. Power Prod., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 87 (5th Cir. 1978). Here, as explained more fully below, Dexon alleges the Cisco-CDW conspiracy restricted both interbrand competition (between Cisco and its competitors) and intrabrand competition (between Cisco resellers). Docket No. 1, ¶¶ 60–61, 90–91.

Defendants' reliance on *Doctor's Hospital* does not support their argument that any agreement between Cisco and CDW should be considered *per se* legal under *Burdett Sound.* In that case, Doctor's Hospital of Jefferson, Inc. ("DHJ") filed suit against a competing hospital and a preferred provider organization ("PPO"), which sold a mix of providers' products as a separate product and substituted one provider for DHJ allegedly at the insistence of a competing provider. *Doctor's Hospital*, 123 F.3d at 302, 308. The district court granted summary judgment to the defendants, reasoning that DHJ lacked standing to bring an antitrust suit against the defendants

because it had failed to demonstrate antitrust injury. *Id*. at 303. On appeal, the Fifth Circuit disagreed with the district court's analysis of the standing issue but affirmed the grant of summary judgment on other grounds, one of which being that DHJ failed to establish injury to competition as required for a Sherman Act § 1 claim. *Id.*

As their principal answer to each of DHJ's alleged harms to competition, the defendants argued on appeal that the case was governed by the "substitution of dealer cases" like *Burdett Sound*, 515 F.2d at 1249, "which hold that a manufacturer has a virtually absolute right to choose to whom it sells its goods." *Doctor's Hosp.*, 123 F.3d at 307. Rather than find the alleged agreement *per se* lawful, the Fifth Circuit applied the rule of reason and found DHJ had not presented evidence that affiliation with the PPO was necessary to compete in the marketplace or that DHJ's exclusion from the PPO "somehow reflected injury to competition generally." *Id.* at 309. Among other things, the court considered DHJ's allegation that it had been substantially weakened as a competitor because it lost PPO revenues and had been unfairly deprived of membership in a "premier managed care plan." *Id.* at 310. The court noted that while injury to a competitor can be some evidence of injury to competition, "the injuries to DHJ [were] insufficient under the circumstances to create a fact issue on injury to competition." *Id.*

Conducting that analysis here, the Court cannot say there are insufficient facts to state a claim and that it is implausible that Defendants engaged in a conspiracy, effectively restraining trade. An antitrust violation only occurs if the termination or substitution of a dealer produces an "unreasonable restraint of trade." *Daniels v. All Steel Equip., Inc.*, 590 F.2d 111, 113 (5th Cir. 1979) (quoting *Burdett Sound*, 515 F.2d at 1248). *Continental T.V.* teaches that market considerations provide the "objective benchmarks" for distinguishing antitrust violations. *Id.* (citing *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977)). "The first step in

establishing an unreasonable restraint of trade is to show anticompetitive effect, either in the intrabrand or interbrand markets." *Id.* (quoting *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978)).

According to the Fifth Circuit, the question is whether the agreement caused anticompetitive effects or "created the potential for anticompetitive effects." *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 712 (2021), (citing *Doctor's Hosp.*, 123 F.3d at 310; *Retractable Techs, Inc. v. Becton Dickinson & Co*., 842 F.3d 883, 895 (5th Cir. 2016) ("noting that an antitrust plaintiff must show that a restraint 'had the potential to eliminate, or did in fact eliminate, competition'")). "Anticompetitive effects are those that harm consumers. Think increased prices, decreased output, or lower quality goods." *Id.* at 493. Such effects may be proved "indirectly," with "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 492–93 (quoting *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2284 (2018)).

Deciding whether a plaintiff has plausibly alleged that a vertical agreement causes substantial anti-competitive harm requires an analysis of the defendants' role in the relevant market. *In re Pool Prods.*, 940 F. Supp. 2d at 397 (citing *Dickson v. Microsoft Corp*., 309 F.3d 193, 207 (4th Cir. 2002)). Under the rule of reason, the plaintiff must plausibly allege that defendants have sufficient market power to restrain competition substantially in a relevant market.[8]

---

[8] Whether or not a combination or conspiracy falls under the *per se* rule often depends upon whether the restriction is implemented by a vertical or horizontal agreement. *Jayco Sys., Inc. v. Savin Bus. Machines Corp*., 777 F.2d 306, 317 (5th Cir. 1985) (citing *Red Diamond Supply, Inc. v. Liquid Carbonic Corp*., 637 F.2d 1001, 1004 (5th Cir.1981) (explaining the first step of the analysis is to determine whether alleged conspiracy is vertical or horizontal)). Horizontal agreements affect *inter* brand competition, and because interbrand competition is "the primary concern of antitrust law," they are generally illegal *per se*. *Id.* (citing *Cont'l T. V., Inc.* 433 U.S. at 36). Vertical agreements, on the other hand, generally affect *intra* brand competition. *Id.* "Because interbrand competition can act as a check on intrabrand restrictions, [] and because intrabrand

*Id.* The Fifth Circuit has stated that an examination of anti-competitive harm "cannot stop without an inquiry into the market power of the defendants." *Nw. Power Prod.*, 576 F.2d at 90.

Notably, in *Northwest Power Products*, the Fifth Circuit pointed out in this regard that *Burdett Sound* indicated the evidence there showed "no effort by either (defendant) to establish market dominance." *Id.* (quoting *Burdett Sound*, 515 F.2d at 1248). In contrast, in *Cherokee Lab'ys, Inc. v. Rotary Drilling Servs., Inc.*, 383 F.2d 97 (5th Cir. 1967), a case involving interbrand as well as intrabrand competition, the Fifth Circuit held an anticompetitive effect existed when the new distributor, if effective in driving out the old, would become a monopolist. *Id.*

This case involves allegations of both interbrand and intrabrand competition, and Dexon has pleaded allegations of market dominance. As noted by the Magistrate Judge concerning intrabrand competition, the complaint alleges the Cisco-CDW conspiracy required customers to pay more for Cisco equipment from CDW and limited customers' choices for the services for Cisco products. R&R at 39. The conspiracy allegedly harmed interbrand competition by removing Dexon who "does not prioritize" Cisco products, thereby "limiting the opportunities of its competitors to make sales through resellers like Dexon." *Id.* (quoting Docket No. 1, ¶ 61). Dexon provides an example of this conspiracy involving a Pennsylvania hospital system wherein the hospital bought equipment from CDW at a higher price than had been negotiated with Dexon. *Id.* (citing Docket No. 1, ¶ 60). This conspiracy allegedly allows Cisco to maintain its monopoly position and its supra-competitive prices. *Id.*, (citing Docket No. 1, ¶¶ 90–93). According to the Magistrate Judge, not only do these interbrand and intrabrand allegations explain how the conspiracy harms competition, but they also mirror those in *Graphic Prods.*, 717 F.2d at 1572

---

restrictions in turn can increase interbrand competition in several ways, [] vertical agreements are generally considered not so pernicious as to warrant *per se* treatment." *Id.*

n. 20 and *West Penn*, 627 F.3d at 85. Relying further on *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013), discussed above, the Magistrate Judge held the alleged agreement between a monopolist and a favored distributor to exclude interbrand and intrabrand competition states a claim.

In its objections, Cisco argues Dexon cannot plausibly allege harm to competition because the vertical conspiracy alleged by Dexon "cannot conceivably prevent Cisco's *competitors* from making sales—Dexon instead alleges that the conspiracy caused *it* to specifically lose sales of *Cisco* equipment." Docket No. 119 at 6 (emphasis in original). In its objections, CDW argues Dexon alleges "nothing more than a classic, lawful restriction on intrabrand competition to promote interbrand competition, which is presumptively lawful under the Sherman Act." Docket No. 120 at 7. Although CDW attempts to distinguish the *Graphic Prods.* and *West Penn* cases relied upon by the Magistrate Judge,[9] Dexon argues in its response that both cases illustrate that when a monopolist allegedly uses its power to foreclose interbrand and intrabrand competition from an unfavored dealer, that is sufficient to state a claim under the Sherman Act. Docket No. 122 at 5. Dexon further points out CDW fails to meaningfully discuss the Magistrate Judge's application of *In re Pool Prods.*, "which confirms the correct result." *Id*. Both Defendants fail to address the critical fact that Cisco is an alleged monopolist that allegedly has the ability to control price and exclude competition in the relevant markets.

---

[9] According to CDW, in both cases cited in the R&R (*Graphic Prods.* and *West Penn*), the disfavored distributor was excluded from the market, affecting prices or output market-wide. Docket No. 120 at 6. CDW contends Dexon does not allege it was excluded from selling its Cisco products (or those of other OEMs) to end customers or that a few lost sales opportunities had a market-wide effect. *Id.* The Magistrate Judge noted these arguments but found them insufficient to grant Defendants' motion to dismiss in light of Dexon's well-pleaded complaint. R&R at 38–39.

The Fifth Circuit has held that "injury to a competitor can be some evidence of injury to the competition." *Doctor's Hospital*, 123 F.3d at 311; *see also West Penn*, 627 F.3d at 108 ("a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency. . . or the merits."). Here, the Court finds Dexon has sufficiently alleged indirect proof of anticompetitive effects with allegations of "market power plus some evidence that the challenged restraint harms competition." *Impax*, 994 F.3d at 492–93 (quoting *Am. Express Co.*, 138 S.Ct. at 2284). Dexon contends the Cisco-CDW conspiracy resulted in sales losses to Dexon and in improper losses of goodwill, "which has had the effect of lowering intra-brand and inter-brand competition to Cisco in the upstream market." Docket No. 24 at 19. Dexon states it provides price and quality competition to other Cisco resellers and provides an opportunity for Cisco's competitors to penetrate the Relevant Product Markets, but the alleged conspiracy between Cisco and CDW blocked competition from a "price cutting" distributor. *Id.* at 17–19 (citing Docket No. 1, ¶¶ 60–61, 90–92).

Dexon's complaint is neither vague nor speculative; it contains far more than a "bare assertion of conspiracy" or "conclusory allegation of agreement[.]" *Drs. Hosp. of Laredo v. Cigarroa*, No. SA-21-CV-01068-XR, 2022 WL 3567353, at *13 (W.D. Tex. Aug. 17, 2022) (quoting *Twombly*, 550 U.S. at 556–57). Upon *de novo* review, the Court finds Dexon's complaint plausibly alleges a restraint that is likely to result in an anticompetitive effect. Accordingly, Defendants' objections to this portion of the R&R are **OVERRULED**.

### (b)     *Whether Dexon sufficiently alleges antitrust injury*

**Report and Recommendation.** Regarding antitrust injury, the Magistrate Judge found Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommended this part of Defendants' motions to dismiss be denied. R&R at 77. Specifically, the Magistrate

Judge noted the Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *Id.* at 73 (citations omitted). According to the Magistrate Judge, injury to competition, while often a necessary component to substantive liability, need not be pleaded as an element of standing for a plaintiff's antitrust claims to survive a motion to dismiss. *Id.* (citing *TravelPass Grp., L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-153-RWS-CMC, 2019 WL 5691996, at *24 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, No. 5:18-CV-00153-RWS-CMC, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019)).

For purposes of the analysis, the Magistrate Judge assumed a violation of the antitrust laws. R&R at 76 (citing *Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) (stating in the context of exclusive dealing that "[i]n analyzing this [antitrust] standing issue, we assume that [plaintiffs'] allegations of exclusive dealing amount to an antitrust violation" (citing *Doctor's Hospital*, 123 F.3d at 306 )). At this stage of the litigation, viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Magistrate Judge found Dexon has adequately claimed an antitrust injury. *Id.* According to the Magistrate Judge, the alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the "conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Id.* (quoting *Doctor's Hospital*, 123 F.3d at 305) (other citations omitted).

In finding Dexon has sufficiently shown antitrust injury, the Magistrate Judge found *Pulse Network* instructive. In that case, the Fifth Circuit held Pulse had not shown antitrust injury as to its first theory (PAVD), but it had shown antitrust injury as to its second and third theories (FANF and volume-based agreements). *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491–95 (5th Cir. 2022). In its FANF theory, Pulse alleged the FANF pricing structure used by Visa caused

merchants to use its debit network less, decreasing Pulse's revenue. *Id*. at 491. According to Pulse, "Visa uses its market dominance to foist on merchants a high fixed fee they wouldn't ordinarily accept" and "then uses the revenues from that unavoidable upfront fee to artificially lower its per-transaction fees, which effectively forecloses rivals like Pulse from competing." *Id.* In arguing there was no antitrust injury, Visa argued that Pulse was "really harmed only by the increased competition created by FANF (i.e., cheaper per-transaction fees), rather than some anticompetitive aspect of the pricing structure." *Id*. The Fifth Circuit held as follows:

> Pulse claims more than price competition is afoot, though. After the Durbin Amendment loosened Visa's grip on the debit network market, Visa began shedding merchants to Pulse and other networks because its pricing wasn't competitive on a per-transaction basis. Instead of improving its product or competing on price, however, VISA began charging the FANF to merchants—and then using some of those revenues to reduce per-transaction fees. This integrated fee structure, argues Pulse, forces merchants to pay a higher total cost (fixed plus per-transaction fees) than before, and yet Visa's market share and profits have recovered.

> This alleged scheme inflicts antitrust injury on Pulse. Under Pulse's theory, it doesn't lose customers to Visa in a fair fight over per-transaction fees. Rather, Pulse loses customers because Visa abuses its dominance in the debit card market. Merchants have no choice but to pay Visa's high fixed monthly fee. They recoup that expense by routing more transactions through Visa's network, which charges lower per-transaction fees than competitors. But Visa can achieve that only by leveraging the upfront fees to artificially deflate its per-transaction fees. We must assume this pricing structure violates the antitrust laws. *See Sanger Ins. Agency* [*v. HUB Intern, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015)]; *Doctor's Hosp.*, 123 F.3d at 306. When we do, the link between Pulse's injury and Visa's alleged anticompetitive conduct becomes plain. Pulse is squeezed out of the market because Visa exploits its dominance to impose supra-competitive prices on merchants and simultaneously undercut competitors' per-transaction fees. That is textbook antitrust injury. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor . . . suffers a distinct injury if it is prevented from selling its product.").

*Id*. at 74–75.

**Defendants' objections.** CDW contends, along with Cisco, that Dexon did not sustain an antitrust injury. In its objections, Cisco argues that to the extent Dexon alleges it lost sales to

Cisco-authorized resellers like CDW, those losses result from competition, not the lack thereof. Docket No. 119 at 8. CDW argues Dexon lacks antitrust injury because "it does not allege it has been prevented from selling its products to customers." Docket No. 120 at 7. Attempting to distinguish *Pulse Network*, CDW states that case involved allegations that the defendant "manipulat[ed] prices in a way that excludes competitors from the market." *Id.* (quoting *Pulse Network*, 30 F.4th at 493). According to CDW, Dexon does not allege it has been excluded from anything. *Id*.

The Magistrate Judge stated that antitrust injury requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." R&R at 74 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc*., 429 U.S. 477, 488–89 (1977)). In *Doctor's Hospital*, the Fifth Circuit held that when the antitrust injury was viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition, the plaintiff's "alleged losses and competitive disadvantage because of its exclusion from SMA [fell] easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hospital*, 123 F.3d at 305.

The R&R explains that when "viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Court finds Dexon has adequately claimed an antitrust injury." *Id*. at 76. According to the Magistrate Judge, "[t]he alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Id.* (citing *Doctor's Hospital*, 123 F.3d at 305; *Pulse Network*, 30 F.4th at 491 (finding Pulse's incremental exclusion from the relevant market because of defendant's alleged anticompetitive

conduct "is textbook antitrust injury"); *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor. . . suffers a distinct injury if it is prevented from selling its product.")).

Defendants object to the R&R's finding as to antitrust injury, focusing narrowly on whether Dexon was excluded from the market. In its response to Cisco's objections, Dexon states it has alleged Cisco's conduct was specifically designed to maintain its dominance over its smaller competitors and also that Dexon's reputation as a trusted multi-vendor reseller has been harmed by Defendants' conduct. Docket No. 121 at 8. As the R&R points out, Dexon's allegations of antitrust injury include, among other allegations, the following:

> Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

R&R at 14; *see also id.* at 15.

An antitrust plaintiff must present plausible allegations establishing an antitrust injury in its complaint. *Corrente v. Charles Schwab Corp.*, Case No. 4:22-CV-00470, 2023 WL 2244680, at *6 (E.D. Tex. Feb. 24, 2023) (citing *In re Pool Prods.*, 940 F. Supp. 2d at 399). That said, the adequacy of a plaintiff's contentions regarding a transaction's effect on competition is often a fact-intensive inquiry that requires discovery. *Id.* (citing *Sanger*, 802 F.3d at 738 ("noting that antitrust injury and other standing issues 'may present disputed issues of fact'"); *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 501 (E.D. Pa. 2018) ("noting that 'the adequacy of a plaintiff's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial'")). For this reason, "the existence of an antitrust injury

is not typically resolved through motions to dismiss." *Id.* (quoting *TravelPass*, 2019 WL 5691996, at \*22 n. 25). Indeed, in assessing whether a plaintiff has adequately alleged an antitrust injury, the Court must assume that an antitrust violation has occurred. *Id.* (citing *Sanger*, 802 F.3d at 738). Similar to the court in *Corrente*, the Court finds on *de novo* review that Dexon has adequately pleaded an antitrust injury. *Id.* Accordingly, Defendants' objections to this portion of the R&R are **OVERRULED**.

> 2) **Dexon's *per se* tying claim against Cisco under Sherman Act § 1 (Count III) and monopolization and attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V)**

**Cisco's assertions regarding Dexon's *per se* tying claim.** Cisco asserts Dexon's tying claim under Sherman Act § 1 (Count III) fails for three reasons, two of which relate to the California Court's earlier dismissal of Dexon's California Counterclaims with leave to amend. R&R at Docket No. 22 at 17–23. Cisco first asserts Dexon never alleges any facts to support its conclusory allegations that Cisco used its market power to foreclose sales of any competitor's equipment and cites the California Court's dismissal of Dexon's tying claim for failure to allege "Cisco's competitors are impacted." *Id.* at 17–21 (citing *Cisco I*, 2021 WL 5848080, at \*4). Cisco next asserts Dexon has not plausibly alleged any tie between service and equipment. *Id*. at 21–22. Again, Cisco references the California Court's decision, noting the California Court found the supposed tie "makes no logical sense." *Id.* at 21 (citing *Cisco I*, 2021 WL 5848080, at \*5). Finally, unrelated to the California Court's decision, Cisco argues Dexon's allegations state that customers can pay a "'re-certification fee" to forego the purchase of new equipment as a condition of obtaining SmartNet service, and that is not a tying claim. *Id.* at 22–23.

Dexon makes at least two arguments in response to Cisco's motion, both of which would distinguish the reasoning provided by the California Court based on the factual allegations

contained in Dexon's California Counterclaims. First, Dexon disputes that it is required to plead "substantial foreclosure" in the tied product market. Docket No. 24 at 17. Dexon asserts Cisco improperly attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this *per se* tying claim. *Id.*

Second, unlike in the California Lawsuit, here Dexon says "lock-in" is key to its *per se* tying claim. Apparently relying on a *Kodak* "lock-in" theory of tying, Dexon states it alleges Cisco has threatened to withhold service on an entire installed base of products "to extract supra-competitive purchases of specific tied products." Docket No. 34 at 8. Pursuant to this theory, Dexon states it has sufficiently alleged anticompetitive effects in the tied product markets by providing "detailed allegations that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding considering of competitive alternatives." Docket No. 24 at 23; *see also id.* at 22–23 (further stating Cisco "takes advantage" of "locked-in customers" who had been assured they would receive maintenance and service without purchasing anything else, "forcing the customer to spend more of their limited budget to eliminate competitive alternatives in the process"). According to Dexon, as in *Kodak,* it is the timing of the withholding service that makes Cisco's conduct anticompetitive. *Id.* at 22.

**Cisco's assertions regarding Dexon's monopolization/attempted monopolization claims.** Regarding Dexon's monopolization/attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V), Cisco asserts Dexon fails to allege actionable exclusionary conduct. Docket No. 22 at 23–28. Cisco argues the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents

Cisco's equipment-manufacturing competitors from making sales." *Id*. at 24. Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. *Id*. Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted to maintain its monopoly position by having distributors charge higher prices do not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id*. at 24–28.

**Report and Recommendation.** In the R&R, the Magistrate Judge discusses at length the "lock-in" tying arrangement expressed in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). *See* R&R at 48, 52–65. The Magistrate Judge found Dexon's complaint contains sufficient allegations concerning a *Kodak* lock-in theory of tying, explaining the installed networking equipment already purchased is the alleged "lock-in" product; SmartNet service is the alleged tying product; and new networking equipment in the Relevant Products Markets is the alleged tied product. *Id*. at 55 (citing *Lee v. Life Ins. Co. of N. Am*., 23 F.3d 14, 17 (1st Cir. 1994)); *see also id.* at 55–56 (citing Docket No. 1, ¶¶ 45–46, 67, 102; also citing Docket No. 1 at 15 ("Cisco locks in customers who required maintenance with SmartNet, and then uses SmartNet as a hammer to force supracompetitive purchases of routers and ethernet switches.")).

The Magistrate Judge noted the parties' arguments reflect differences in how the parties view Dexon's tying claim. Dexon alleges a *Kodak* "lock-in" theory of tying liability, arguing it does not need to allege substantial foreclosure to competitors because that is only applicable to exclusive dealing claims. R&R at 52. Having found Dexon plausibly alleges a *Kodak* theory of *per se* tying liability, *id*. at 52–58, and that Cisco has not shown Dexon's theory fails to make economic sense, *id*. at 58–60, the Magistrate Judge stated Dexon has sufficiently alleged a tying

arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase. *Id.* at 60–65.

The Magistrate Judge found Cisco fails to persuasively show that such a theory of tying liability requires a showing of substantial market foreclosure of competitors' sales that it argues for in its briefing. *Id.* at 65. Even so, the Magistrate Judge further found Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. Among other things, the Magistrate Judge noted Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. *Id.* (citing Docket No. 24 at 23 (citing Docket No. 1, ¶¶ 4–5, 51)).

Regarding Cisco's argument that Dexon's tying claims also fail because Dexon alleges that customers can avoid purchasing new equipment by instead paying a "re-certification fee" (apparently arguing that because no new equipment is purchased, there is no tie), the Magistrate Judge stated "Cisco's argument is not well developed, and the extent, effect, and details of any re-certification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile." *Id*. at 66. For all these reasons, the Magistrate Judge concluded Dexon has plausibly stated a *per se* tying claim against Cisco under Sherman Act § 1.

The Magistrate Judge, viewing Dexon's allegations collectively and in the light most favorable to Dexon, further found Dexon plausibly states monopolization and attempted monopolization claims against Cisco under Sherman Act § 2. *Id*. at 69. Specifically, the Magistrate Judge held as follows:

> Cisco does not challenge Dexon's pleading regarding the first element, that Cisco possesses monopoly power in each of the Relevant Markets. Cisco disputes the

second element, the anticompetitive (or "exclusionary") conduct element. Dexon alleges two theories to establish anticompetitive conduct: tying and FUD tactics.

Dexon's allegations regarding Cisco's tying-related conduct and FUD strategies towards the end-users of its equipment are sufficient to defeat a motion to dismiss. As noted above, the Court in *Kodak* stated the second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482–83 (citations omitted). According to the Court, if Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2. *Id*. The Court further stated respondents had presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market; liability turned, then, on whether "valid business reasons" could explain Kodak's actions. Id. at 483 (citations omitted). Finally, the Court considered Kodak's "three valid business justifications for its actions," concluding factual questions existed "about the validity and sufficiency of each claimed justification, making summary judgment inappropriate." *Id*. at 483. Like the ISOs in *Kodak*, Dexon alleges Cisco's tying conduct supports a § 2 claim as well.

Further, Dexon's allegations concerning Cisco's FUD strategies also plausibly show exclusionary conduct by Cisco to support Dexon's § 2 claims. *See* Dkt. No. 1, ¶¶ 6–9, 64–68 (alleging Cisco uses FUD to dissuade customers from purchasing from resellers with lower prices and to accomplish its coercion strategies). The Third Circuit previously rejected a defendant's attempt to claim such conduct does not show anticompetitive conduct, specifically "in the context of a *Kodak* claim." *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) (holding that "the allegedly predatory acts—e.g., terminating dealings with TLI; sending 'fear, doubt, and uncertainty' letters to TLI's maintenance customers; and trespassing and spying on TLI's customers" was "sufficient to show exclusionary conduct for purposes of § 2" and to support the jury's judgment on the issue). For its part, Cisco's briefing does not specifically address Dexon's FUD[] allegations.

Instead, Cisco first argues that the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's equipment-manufacturing competitors from making sales." Dkt. No. 22 at 24. For the reasons explained with respect to Dexon's tying claims, Cisco's argument that Dexon fails to plausibly plead harm to competition is rejected. Further, Cisco does not address Fifth Circuit law holding that "injury to competition is presumed to follow from the conduct proscribed by § 2." *Walker* [*v. U–Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984)].

Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. Dkt. No. 22 at 24. Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted

to maintain its monopoly position by having distributors charge higher prices does not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id*. at 24–28. None of these arguments are proper at this stage. Dexon does allege a mere change of distributor or refusal to deal dispute, and assuming the allegations are true, Cisco's tying and FUD strategies make economic sense, at least in terms of a *Kodak* claim, as long as those actions maintain or enhance Cisco's monopoly power as alleged. *See* Dkt. No. 24 at 27 (citing Dkt. No. 1, ¶¶ 84, 91, 98, 106, 112).

*Id*. at 67–69.

The Magistrate Judge recommended the Court deny Cisco's motion to dismiss Dexon's *per se* tying claim against Cisco under Sherman Act § 1 and Dexon's monopolization and attempted monopolization claims against Cisco under Sherman Act § 2.

**Cisco's objections.** In its objections, Cisco asserts Dexon's failure to allege that Cisco's conduct hindered competitors from making sales is fatal to Dexon's claims. Docket No. 119 at 4. Relying on *Cisco I*, Cisco argues Dexon's claims require allegations of foreclosure—"that is, that Cisco's conduct prevented Cisco's competitors from making sales in the relevant markets." *Id*. (citing *Cisco I*, 2021 WL 5848080, at *4–5). Asserting the R&R conflicts with the ruling of the California Court, Cisco asserts the Magistrate Judge fails to "distinguish" *Cisco I* on the tying claim on the ground that Dexon's complaint relies on a *Kodak* lock-in theory of tying. According to Cisco, Dexon's California Counterclaims pleaded this theory, and the California Court rejected the theory. *Id*. at 4–5. Cisco further asserts the R&R cites no case supporting its holding that a plaintiff need not allege harm to competition in the relevant market, and it ignores relevant cases cited by Cisco. *Id*. at 5 (citing *Chawla v. Shell Oil Co*., 75 F. Supp. 2d 626, 641 (S.D. Tex. 1999) ("*Kodak* . . . does not excuse failure of a plaintiff to allege an effect on competition in the tied product's market.")).

Cisco reiterates its arguments as expressed in its underlying briefing that Dexon fails to allege foreclosure. In its objections, Cisco asserts the R&R cites no case holding that a plaintiff

can state a monopolization claim without alleging foreclosure. *Id.* Cisco argues Dexon's tying and monopolization/attempted monopolization claims fail because Dexon "does not allege that any customer wanted to buy networking equipment or IP phones made by Cisco's competitors and that Cisco prevented them from doing so." *Id.* (citing *Cisco I*, 2021 WL 5848080, at *4–5).

Finally, Cisco asserts Dexon does not allege a tie with regard to its *Kodak* lock-in theory. *Id.* at 7. According to Cisco, the R&R "has no meaningful response" to Cisco's argument regarding the "re-certification fee." *Id.* Cisco further contends, as it did in its motion to dismiss, that Dexon's antitrust claims do not make economic sense and must be dismissed. *Id.* at 7–8.

***De novo* review.** The R&R considered Dexon's complaint in detail and properly found that the Court must accept as true all well-pleaded facts in the complaint and view those facts in the light most favorable to Dexon. R&R at 19. In doing so, the Magistrate Judge found that Cisco is a monopolist in the Relevant Networking Equipment Markets (*id.* at 41), the Relevant IP Phone Markets (*id.*), (together the "Relevant Product Markets"), and the Relevant Service Markets (collectively the "Relevant Markets"). *Id.* at 41–42. The Magistrate Judge also found that Dexon properly stated claims under §§ 1 and 2 of the Sherman Act as well as under the Texas Free Enterprise Act due to Dexon's allegations regarding Cisco's alleged tying-related conduct and use of fear, uncertainty and doubt ("FUD") strategies. Cisco's objections to the R&R's recommended findings of fact and conclusions of law regarding Counts III, IV, and V do not specifically challenge the majority of the Magistrate Judge's findings and conclusions, except for Cisco's assertions as outlined above and which the Court summarizes as follows:

- The R&R conflicts with *Cisco I* because the California Court considered and rejected a *Kodak* "lock-in" theory of tying liability, stated the "supposed tie makes no logical sense," and also held Dexon's monopolization claims fail because the "theory for why Cisco took action against Dexon makes little economic sense."

- The R&R errs with regard to Dexon's tying and monopolization claims because it did not find foreclosure (i.e., that Cisco's conduct affected the sales of Cisco's competitors).

- The R&R did not correctly determine a tie as required to allege a *Kodak* "lock-in" theory, and the R&R has "no meaningful response" to Cisco's arguments regarding Dexon's allegations of "re-certification fee."

Although many of the arguments rehash Cisco's earlier assertions without meaningfully engaging in the analysis contained in the R&R, the Court considers each in turn, finding each one without merit. Throughout its objections, Cisco challenges the R&R's finding of *per se* tying on the basis that it conflicts with the California Court's prior ruling on Dexon's California Counterclaims. According to Cisco, the California Court specifically rejected a "lock-in" theory of *per se* tying liability, citing *Kodak*. Docket No. 119 at 3–4. Cisco argues the California Court held that "this reverse-*Kodak* theory" "makes no logical sense" because no consumer wants Cisco service unless it wants Cisco equipment in the first place. *Id.* at 7.

The Magistrate Judge was clear that he would only revisit specific findings of the California Court to the extent there was a compelling reason to do so, "such as a difference in controlling law, citation to prior rulings of this Court, or substantive factual allegations not pleaded in the California Court." R&R at 17. The R&R also makes clear there are four new examples of alleged anticompetitive conduct involving tying in this complaint which were not alleged in Dexon's California Counterclaims (Texas bank, automotive dealership, energy company, and school district), and the "IT budget phenomenon" was also absent from the California Lawsuit. *Id.* at 52–53. As the R&R explains, Dexon states the "lock-in combined with the limited IT budget" brings Dexon's allegations in this case in line with *Kodak*. *Id.* at 53 (quoting Docket No. 62 (Transcript) at 102:18–20).

Additionally, in addressing whether Dexon's *Kodak* "lock-in" tying claim makes economic sense as alleged in this case, the Magistrate Judge specifically considered whether the California Court had substantively ruled on a *Kodak* "lock-in" theory of tying liability in *Cisco I*. *Id.* at 59. Although the California Court stated in a footnote that it "is at least theoretically possible for a firm to harm competitors by locking customers into a costly long-term service plan and then requiring purchases in a tied equipment market that customers en masse (for some set of reasons) cannot refuse," the California Court also noted the "the conditions necessary" for such an arrangement were "far away from the facts alleged here." *Id.* (quoting *Cisco I*, 2021 WL 5848080, at *5, n.2). The Magistrate Judge found the California Court had not ruled on a *Kodak* "lock-in" theory of tying liability, especially considering the new substantive factual allegations pleaded in this case. *Id.* (citing Docket No. 62 (Transcript) at 73:4–7 (stating an "important fact" that was not before the California Court "that is littered throughout these [new] examples but also pled more generally are limited IT budgets"); also citing *id.* at 90:22–24 ("I just did a search, the only allegation on budget that we made in California was why a customer might buy SmartNet in general. It was not about lock-in")). The Court finds no conflict between the R&R and the substantive rulings of the California Court in *Cisco I*.

Cisco argues Dexon's claims do not make economic sense without addressing the Magistrate Judge's extensive discussion that they do make economic sense in the context of a *Kodak* "lock-in" theory of tying liability. *Id.* at 59–60. As the R&R explains, "fundamentally, Dexon does not allege [as Cisco contends] that the already owned network equipment is the tied product; rather, as explained above, Dexon alleges here that the equipment the customer already owns is the lock-in product while the new equipment is the tied product." *Id.* at 59 (emphasis added). In addition, "the complaint sufficiently alleges that Cisco has threatened to withhold

service on an entire installed base of products to extract supra-competitive purchases of specific tied products." *Id.*

In its objections, Cisco reiterates, with regard to the *per se* tying claims, its argument regarding Dexon's allegation that some customers can pay a recertification fee to receive SmartNet service. However, as the R&R explained, "Cisco's argument is not well developed, and the extent, effect, and details of any recertification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile." *Id*. at 66. Cisco's assertions regarding Dexon's allegation of a "re-certification fee" do not invalidate the sufficiency of other allegations contained in the complaint which properly raise a *Kodak* "lock-in" theory of tying that makes economic sense. For example, in Dexon's response to Cisco's objections, Dexon points out "the R&R correctly observed that in the case of the Texas Bank, it could only be eligible for SmartNet renewal if it bought more Cisco switches and routers. Docket No. 121 at 7 (citing R&R at 60).

In its objections, Cisco incorrectly describes the R&R as concluding a "plaintiff need not allege harm to competition in the relevant market," arguing the R&R ignores that *Kodak* does not excuse the failure of a plaintiff to allege an effect on competition in the tied product's market. Docket No. 119 at 4.  Instead, the R&R states as follows: "[a]s explained below, Cisco has failed to show Dexon fails to allege the requisite level of foreclosure to survive a motion to dismiss." R&R at 61.

The R&R points out Dexon's allegations of four new examples of "foreclosure." *Id*. at 61–62. The R&R then explains why the Fifth Circuit's decision *Roy B. Taylor Sales, Inc. v. Hollymatic Corp*., 28 F.3d 1379 (5th Cir. 1994), *cert. denied*, 513 U.S. 1103 (1995), a case relied upon by Cisco, is procedurally different from Cisco's motion to dismiss and also "tends to support Dexon's argument that the law does not require plaintiffs to plead the same level of foreclosure in

tying claims." *Id.* at 62; *see also id.* at 64 ("The claim in *Roy B. Taylor Sales* was not a *Kodak* 'lock-in' theory of tying liability which would result in an ultimate foreclosure of choice to the ultimate consumer. Rather, the case involved 'an exclusive dealing line-forcing arrangement' where a manufacturer was forcing the dealer to buy its full line to the exclusion of other competitors."). The Magistrate Judge concluded as follows:

> In this case, Dexon alleges a *Kodak* "lock-in" theory of *per se* tying liability. As noted by the Fifth Circuit in *Roy B. Taylor Sales*, the common ground to those types of tying arrangements is "consumers have to buy one product or service to receive another, removing them from the market for the tied good." *Id.* at 1383 (citing *Kodak*, 504 U.S. 451). As noted by the Fifth Circuit, a *per se* condemnation requires proof that the tying arrangement involved "the use of market power to force [consumers] to buy [goods] they would not otherwise purchase." *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) . . . . Likewise, here, Dexon has sufficiently alleged a tying arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase.

*Id.* at 65 (internal footnote omitted).

Although disagreeing with Cisco that "substantial" market foreclosure of competitors' sales is necessary for a *Kodak* "lock-in" theory of *per se* tying liability, the Magistrate Judge held Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. *Id.* Specifically, the Magistrate Judge concluded as follows:

> Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. Dkt. No. 24 at 23 (citing Dkt. No. 1, ¶¶ 4–5, 51). According to Dexon, "if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when they bought the equipment and service." *Id.* (citing Dkt. No. 1, ¶¶ 7, 13, 46, 50–51, 82). Dexon alleges Cisco subsequently takes advantage of locked-in customers because of Cisco's virtual monopoly in service, forcing the customers to spend more of their limited budget to eliminate competitive alternatives in the process. *Id.* (citing Dkt. No. 1, ¶¶ 4–5, 26, 51, 103, 125).

*Id.* at 65–66.

Upon *de novo* review, the Court agrees with the Magistrate Judge that Dexon sufficiently alleges *per se* tying under § 1 that results in competitive foreclosure due to unwanted and forced purchases from an alleged monopolist. The Court also finds Dexon has sufficiently alleged that Cisco engages in anticompetitive or exclusionary conduct for purposes of its monopolization and attempted monopolization claims under § 2. Accordingly, Cisco's objections to Dexon's *per se* tying and monopolization/attempted monopolization claims are **OVERRULED**.

## CONCLUSION

For the reasons set forth above, the Court does not find clearly erroneous or contrary to law the Magistrate Judge's December 22, 2022 Order (Docket No. 94) denying Defendant Cisco Systems, Inc.'s Motion to Transfer (Docket No. 21). Accordingly, it is

**ORDERED** that Defendants Cisco Systems, Inc. and CDW Corporation's Objection to the Order Denying Cisco's Motion to Transfer (Docket No. 96) is **OVERRULED**.

For the reasons set forth above, the Court is of the opinion the findings and conclusions of the Magistrate Judge's Report and Recommendation (Docket No. 107) are correct, and the Defendants' Objections (Docket Nos. 119, 120) are without merit as to the ultimate findings of the Magistrate Judge. Accordingly, it is

**ORDERED** that the Report and Recommendation of the United States Magistrate Judge (Docket No. 107) is **ADOPTED** as the opinion of the District Court. It is further

**ORDERED** that Defendant Cisco's Objections to the Report and Recommendation (Docket No. 119) and Defendant CDW's Objections to the Report and Recommendation (Docket No. 120) are **OVERRULED**. It is further

**ORDERED** that Defendant Cisco's Motion to Dismiss (Docket No. 22) is **DENIED**, with the part of the motion seeking dismissal under true res judicata being **DENIED WITHOUT PREJUDICE**. It is further

**ORDERED** that Defendant CDW Corporation's Motion to Dismiss (Docket No. 28) is **DENIED**, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being **DENIED WITHOUT PREJUDICE**. It is further

**ORDERED** that within thirty (30) days from the date of entry of this Order, Dexon shall replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize.

**So ORDERED and SIGNED this 31st day of March, 2023.**

*Robert W Schroeder III*

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

|  |  |
|---|---|
| DEXON COMPUTER, INC., )<br><br>Plaintiff, )<br><br>v. )<br><br>CISCO SYSTEMS, INC. and )<br>CDW CORPORATION, )<br><br>Defendants. ) | Civil Action No. 5:22-cv-00053-RWS-JBB<br>**JURY TRIAL DEMANDED** |

### DEFENDANT CISCO SYSTEMS, INC.'S
### ANSWER TO PLAINTIFF'S COMPLAINT
### AND AFFIRMATIVE DEFENSES

As to those allegations and claims concerning, related to, or supporting Counts I, II, III, IV, V, and VI of the Original Complaint filed by Plaintiff Dexon Computer, Inc. ("Dexon") against Defendants Cisco Systems, Inc. ("Cisco") and CDW Corporation ("CDW"), Cisco answers as follows:

### <u>GENERAL DENIAL</u>

Except as expressly admitted herein, Cisco denies each allegation and characterization contained in the Complaint, including any allegations and characterizations contained in headings.  The numbered paragraphs in this Answer correspond to the numbered paragraphs in the Complaint.  Cisco denies any allegation, averment, contention, or statement in the Complaint not specifically and unequivocally admitted herein.

1

**App.938**

## I.    INTRODUCTION

1.    Cisco is a monopolist threatening and coercing customers into buying overpriced networking equipment because of the market power Cisco holds over customers, especially small and medium businesses that have no choice but to give into Cisco's demands. Specifically, after customers pay for necessary network equipment maintenance and service, Cisco changes its course of conduct and demands that customers must buy new overpriced equipment in order to avoid a technologically compromised network, and foreclosing its networking equipment competitors in the process.

*Denied.*

2.    Upon information and belief these tactics have been employed by Cisco across the country, but Cisco has carried out these tactics extensively in Texas. Dexon is aware of at least five examples, involving millions of dollars in equipment sales, in Texas in order to keep networking prices high and to foreclose competition from competing providers of networking equipment. For these reasons, Dexon seeks relief before this Court.

*Denied.*

3.    As one example, a Texas-based bank bought Ethernet switches and routers (types of networking products discussed below), as well as a maintenance and service package for that equipment under a program called SmartNet. When the SmartNet service package came up for renewal, the customer sought only to renew the package, but Cisco demanded that it must also buy new Ethernet switches and routers to be eligible for the renewal. The customer did not want or need any new networking equipment, but had no choice other than to give into Cisco's demand to obtain and keep the maintenance and support it needed. This requirement expanded Cisco's grip over the customer due to the additional networking equipment the customer was forced to purchase. Cisco has been able to maintain its supra-competitive prices for its networking equipment, foreclose networking equipment competitors which customers would consider in the absence of Cisco's conduct, and decrease the amount of revenue and profits Cisco's networking equipment competitors have to fund innovation and new product offerings.

*Cisco lacks information or knowledge sufficient to admit or deny the allegations contained in Paragraph 3 related to the unidentified bank's transactions with entities other than Cisco or its motives and preferences.  Cisco denies the remaining allegations in Paragraph 3.*

4.    Cisco's conduct is especially oppressive and greatly injures competition for networking products because Cisco's conduct applies to small and medium businesses with limited IT budgets for networking products necessary for their network infrastructures. As explained in further detail below, purchases of networking products are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products. As a result, when Cisco forces customers to purchase overpriced equipment through its coercive tactics, Cisco forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase.

**App.939**

*Cisco lacks information or knowledge sufficient to admit or deny the allegations contained in Paragraph 4 related to unidentified end users' unidentified purchases of unidentified products. Cisco admits that some customers might wait years before upgrading or updating some networking products, but Cisco denies that is true for all customers or as a general proposition. Cisco denies the remaining allegations in Paragraph 4.*

5.     In addition, through Cisco's coercion, it has forced customers to pay a higher price for networking equipment they had already purchased through a "re-certification fee," by threatening not to service that equipment unless customers pay the additional equipment fees. When customers pay that re-certification fee, customers' limited budgets are restrained further, because the money spent on that fee cannot be spent with Cisco's networking competitors if customers could choose a product on a merits. Thus, any claim by Cisco that its conduct does not foreclose its network equipment competitors ignores how purchases of networking equipment are made and the limited opportunities that competitors have to meaningfully expand their market share; instead, Cisco is able to maintain and increase its market share and supra-competitive pricing by unlawfully constraining the opportunities of its competitors.

*Admitted that Cisco offers recertification to end users.  Cisco lacks information or knowledge sufficient to admit or deny the allegations contained in Paragraph 5 related to unidentified end users' "budgets" for unidentified products.  Cisco denies the remaining allegations in Paragraph 5.*

6.     Cisco considers certain resellers selling both Cisco networking equipment and the networking equipment of Cisco's competitors to be a prime competitive threat to its networking equipment monopolies. Through its improper conduct, by its business practices, Cisco has coerced customers not to purchase from these customers' desired resellers. Cisco has successfully employed a strategy of "fear, uncertainty and doubt," or "FUD," wrongly claiming to customers that unfavored resellers sell "bootleg", "unauthorized", or goods with "malware" or "spyware" to dissuade purchases from these resellers of other manufacturers, including Cisco's competitors. In the process, Cisco has further foreclosed its networking equipment competitors who by and large have never cracked single digit market shares and has allowed Cisco to maintain market power and monopoly shares for decades.

*Denied.*

7.     Another instance of Texas-based coercion illustrates Cisco's FUD strategy. An energy company headquartered in Texas bought Ethernet switches and routers from Dexon, and also bought a multi-year SmartNet maintenance and service package through one of Cisco's preferred dealers. The Ethernet switches and router purchases from Dexon were known and approved by Cisco at the time of these purchases. After providing the promised maintenance and service support to the customer for several years, Cisco then changed its course of conduct and demanded that the customer purchase new Ethernet switches and routers from a vendor other than Dexon to continue receiving the SmartNet maintenance and service. The customer informed Dexon that it still desired to buy networking equipment from Dexon now and in the future, due to the attractive pricing and competitive options Dexon is able to provide, but it could no longer do so because Cisco's new position was that Cisco no longer provide the maintenance support

the customer needed. As a result, Cisco's networking equipment competitors selling through Dexon or any other reseller have been foreclosed for at least the lifespan of the products and services Cisco forced the customer to purchase, and the customer has been forced to restrict its choices and ability to make future purchasing decisions on the merits.

*Admitted on information and belief that Dexon has transacted with the energy company referred to in Paragraph 7, and that this customer obtained a SmartNet service contract.  Cisco lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 7 related to correspondence between Dexon and the unidentified nonparty.  Cisco denies the remaining allegations in Paragraph 7.*

8.      Cisco's anticompetitive conduct also impacted a local Texas emergency 911-center which had purchased networking equipment from Dexon. In the midst of a five-year SmartNet service package the 911-center had purchased from Cisco, Cisco told the Texas emergency 911-center it needed to purchase new routers and Ethernet switches from a non-Dexon vendor when the customer checked on its account for purposes of a service issue if it wanted to receive the service it was due under its SmartNet service package. Cisco had never notified the customer of a cancellation of the SmartNet service package in the absence of a new equipment purchase. The 911-center cannot afford new equipment, and thus continues to face Cisco's threat that it will not receive the previously paid for service unless it chooses a different vendor for new product purchases, even if that means human lives are put at risk due to a network support issue. This FUD based strategy intends to and successfully: (1) forecloses Cisco's networking equipment competitors from reaching customers through resellers like Dexon, and (2) forces customers to pay more for products that it sought to purchase from less expensive resellers like Dexon.

*Admitted on information and belief that that the customer referred to in Paragraph 8 obtained a SmartNet service contract, that Cisco notified the customer that Dexon is an unauthorized reseller, and that certain of its equipment might not be eligible for service under the terms of applicable service agreements.  Cisco denies the remaining allegations in Paragraph 8.*

9.      Cisco's conduct violates both Sections 1 and 2 of the Sherman Act, by using its near-virtual monopoly position in the relevant aftermarket for the maintenance and service of its network equipment in order to foreclose customers from buying from competitors in the equipment market and allowing Cisco to maintain supra-competitive prices in relevant product markets in which Cisco is still a monopolist, but faces more prospective competition. Cisco is a monopolist that uses whatever means necessary to keep the prices for its networking products as high as possible to the detriment of its customers.

*Denied.*

10.      Cisco's use of its "service arm," which upon information and belief is entirely separate in terms of personnel, expertise, profitability, process, and corporate structure from its "products arm," to maintain and maximize profitability in its products arm, must stop.

*Cisco admits that it has both a product and services business.  Cisco denies the remaining allegations in Paragraph 10.*

**App.941**

11.     Any claim by Cisco that it is merely controlling its distribution channel and has the incentive to keep its prices as competitive as possible ignores that it is a monopolist in several markets and its improper conduct maintains its supra-competitive pricing and forecloses its networking equipment competitors. Cisco's threats to withhold service in no way serves anyone other than Cisco, and making such threats because Dexon and other multi-vendor resellers have been deemed a competitive problem for Cisco.

*Denied.*

12.     It was not always this way. Dexon is a company that has been servicing its customers for decades, providing timely and reliable services as well as selling network equipment to meet the budgets of hospitals, emergency services providers, public service organizations, and many other small and medium businesses, including those providing essential services before and during the COVID-19 pandemic. Cisco even previously sent one of its representatives to Dexon to aid it in its sales efforts and familiarity with its products. For at least four years prior to 2015, Dexon had access to Cisco's online database in which it could arrange for maintenance service on behalf of it and Cisco's customers. This served to everyone's benefit, as Dexon kept its customers happy while Cisco earned customers' loyalty to its product line.

*Admitted that Dexon has previously accessed a Cisco service portal. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 12 characterizing Dexon's business history. Cisco also lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 12 related to a meeting with Dexon involving unidentified "representatives" at an unidentified location on an unidentified date. Cisco denies the remaining allegations in Paragraph 12.*

13.     But by at least 2015, Cisco deemed resellers like Dexon a competitive threat to its product monopolies. Upon information and belief, Cisco learned that Dexon had been able to convert customers of Cisco networking equipment to customers of its competitors' networking equipment, such as from Juniper. Even for customers that did not convert from Cisco to one of its competitors, resellers like Dexon put pressure on Cisco to lower prices and improve its service (including shipping lead times, where Cisco has been especially lagging). To put an end to these competitive threats, Cisco engaged in the discussed multi-prong strategy, including to threaten customers not to do business with resellers like Dexon or else pay the consequences in the service market where Cisco has complete control. In the process, Cisco has constrained its network equipment competitors and thus customer choice and has maintained its supra-competitive pricing in several relevant product markets. As discussed below, Cisco even recruited and agreed with one of its favored distributors, CDW, to help it exclude resellers like Dexon and maintain its network equipment monopolies.

*Denied.*

14.     The Court must hold Cisco accountable for these anticompetitive acts that are crippling small and medium businesses and Cisco competitors, including Dexon.

**App.942**

*Denied.*

## II.    THE PARTIES

15.    Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

*Admitted on information and belief.*

16.    On information and belief, Defendant Cisco Systems, Inc. (Cisco) is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134 and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

*Admitted that Cisco is a Delaware corporation with corporate headquarters at the above-provided address.  Paragraph 16 otherwise states a legal conclusion as to which no response is required.*

17.    On information and belief, Defendant CDW Corporation (CDW) is a Delaware corporation with its principal place of business at 200 North Milwaukee Ave, Vernon Hills, IL 60061 and may be served through its registered agent Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

*Admitted that CDW is a Delaware corporation and that Paragraph 17 identifies its listed registered agent.  Paragraph 17 is directed to CDW, and Cisco lacks knowledge or information sufficient to admit or deny the allegations regarding the location of CDW's "principal place of business" or where it "may be served," which is itself a legal conclusion as to which no response is required.*

## III.    JURISDICTION

18.    Dexon brings this case under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages, costs, and attorney's fees for injuries sustained by Dexon because of Cisco's and CDW's violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

*Paragraph 18 states a legal conclusion as to which no response is required.*

19.    This Court has jurisdiction over Dexon's antitrust claims under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22.

*Paragraph 19 states a legal conclusion as to which no response is required.*

20.    This Court also has jurisdiction over Dexon's claims pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Dexon, Cisco, and CDW, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

**App.943**

*Paragraph 19 states a legal conclusion as to which no response is required.*

21.     Venue is appropriate in this district under Sections 4 and 12 of the Clayton Act, 15
U.S.C. §§ 15 and 22, because Cisco and CDW transact business in this district, and has served
countless customers within this District that utilize networking equipment, and many of the
actions and activities complained of in this Complaint occurred and are occurring in this District.

*Paragraph 19 states a legal conclusion as to which no response is required.  To the extent a
response is required, Cisco denies that venue is proper.  See Ex. A at 2; Ex. B at 2; Ex. C at 1.*

22.     Indeed, Cisco has two offices in Dallas, and offices in San Antonio, Houston and
Lubbock, Texas. CDW has an office in Plano, Texas. Given the extensive business the
Defendants do in the State, there is sufficient basis for personal jurisdiction over the Defendants.

*Admitted that Cisco has offices in the locations described.  Admitted on information and belief
that CDW has an office in Plano, Texas.  Paragraph 16 otherwise states a legal conclusion as to
which no response is required.*

## IV.    FACTS

23.     Cisco is dominant in several Worldwide and US markets related to networking equipment
and services for the Internet. Cisco offers products and related services in the core technologies
of routing and switching, along with more advanced technologies in areas such as home
networking, IP telephony, optical networking, security, storage area networking, and wireless
technology. On information and belief, Cisco contracts for the manufacture of a majority of its
products overseas to keep costs of manufacture at a minimum.

*Admitted Cisco provides enterprise and consumer products relating to Internet networking, IP
telephony, optical networking, security, storage, and wireless technologies.  Cisco denies the
remaining allegations in Paragraph 23.*

24.     On information and belief, Cisco has a stranglehold on the supply of networking products
in the United States, with a dominant market share that has reached 70% or more, including in
routers and Ethernet switches, both markets with high barriers to entry as explained below. Cisco
is also dominant in the Worldwide and United States markets for IP phones, with market shares
that have exceeded 40% or more with its closest competitors half its size, in markets with high
barriers to entry.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph
24 asserting a "share" of "networking products" and "IP phones" – terms that Dexon does not
define or explain in Paragraph 24.  Cisco denies the remaining allegations in Paragraph 24.*

**<u>Cisco is Using Its Monopoly In After Market Maintenance Services to Force Subsequent
Supracompetitive Network Equipment Purchases</u>**

*Denied.*

**App.944**

**A. Cisco is a Monopolist For After-Market Maintenance Services On Cisco Equipment**

*Denied.*

25.    Customers of networking equipment may require maintenance and service to ensure the proper functioning of their equipment. Only Cisco can provide full maintenance and support on its router and Ethernet switch products. These maintenance services include onsite visits from certified engineers, software updates, technical assistance center ("TAC") access, online resources, and hardware replacement services. Without such maintenance services, customers cannot address critical performance issues and address service problems that can be catastrophic to their businesses.

*Admitted that customers of networking equipment might seek maintenance or service to improve or repair the performance of that equipment, and that such maintenance or service can include – among other options – Cisco-supported onsite service, software updates, access to the Technical Assistance Center, and other online resources, in addition to hardware replacement.  Cisco denies the remaining allegations in Paragraph 25.*

26.    Customers without the budget to justify maintenance services provided by Cisco rely on third-party maintenance and service providers to provide hardware maintenance and support (for instance for a power supply or fan issue), but because of Cisco's policies described herein, cannot provide software maintenance and support. Thus, Cisco is able to maintain a price premium for its maintenance services, including its SmartNet service packages. As Cisco highlights in its SmartNet sales materials, "no Third Party Maintenance Provider can provide [customers] with an apples-to-apples match with what Cisco's SmartNet provides," and "a Third Party Maintenance Provider is not authorized to provide [customers] with Cisco bug fixes, patches and updates." These "bug fixes, patches and updates" can be essential to the efficient, effective, and full operation of Cisco's hardware – they cannot be replicated and there are no reasonably interchangeable substitutes for such services.

*Admitted that some consumers use third-party maintenance and service providers, that Cisco issues some proprietary software updates made available to consumers of certain products, and that Cisco's proprietary software can optimize the performance of certain products.  Cisco otherwise lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 26 relating to the business practices of unidentified third parties.  Supposedly quoted documents speak for themselves; Cisco denies any characterization of those materials.  Cisco denies the remaining allegations in Paragraph 26.*

27.    Although end users are not required to purchase SmartNet service packages for their Cisco products, they are effectively compelled do so, because the service packages offered are integral to the products' functionality. Without SmartNet service, end users will not receive important software bug fixes, patches, and updates (collectively, "updates") that permit Cisco products to serve their intended functions. These updates are designed to repair malfunctions or defects in the software or to combat security vulnerabilities. Consumers who do not update the

**App.945**

software on their Cisco products are potentially exposed to security and operational risks. In addition, without the software updates, their Cisco products may not function properly.

*Admitted that end users are not required to purchase "SmartNet service packages" as described in Paragraph 27, and that out-of-date software can present security or operational risks or impair proper functioning of certain networking equipment. Cisco denies the remaining allegations in Paragraph 27.*

28.    Because Cisco products run on proprietary operating system software that is essential for the products to function, these updates can be obtained only from Cisco. While customary and routine in the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and Microsoft, to make updates available to their consumers for free, Cisco, in contrast, provides updates only to consumers who purchase SmartNet service packages. Upon information and belief, Cisco does not routinely inform customers at the time of initial purchase of these stifling limitations.

*Admitted that Cisco possesses proprietary software that can optimize the functionality of certain products, including – but not limited to – security patches (addressing some critical vulnerabilities) that Cisco may make available for free to some consumers of certain products. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 28 relating to the business practices of the third parties listed in Paragraph 28. Cisco denies the remaining allegations in Paragraph 28.*

29.    Thus, the aforementioned services constitute a Relevant After-Market for Maintenance Services on Cisco Equipment (hereinafter the "Relevant Service Market") in which Cisco is a monopolist, and no other competitive service provider has reached a double-digit share. Upon information and belief, Cisco consistently has possessed a share of the Relevant Service Market in excess of 90%, and because it dictates that only it can provide certain critical services, Cisco has erected its own high barriers to entry to prevent any meaningful penetration of its dominance by any competitive service vendor. Cisco has thus admitted that SmartNet pricing is far more expensive than that of third-party providers. The geographic market for the Relevant Service Market is (i) the United States and (ii) the world, determined by the geographic scope of customers and the extent to which they require maintenance services in the US only or worldwide. In the case of the former, customers look to service providers located in the US, whereas in the latter case, customers will require vendors with an international team and associated capabilities.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 29 relating to supposed "share" calculations for which Dexon provides no supporting factual material. Paragraph 29 states legal conclusions as to which no response is required. To the extent a response is required, denied.*

30.    The Relevant Service Market is separate and distinct from the Relevant Markets for routers, Ethernet switches, and IP phones discussed below. Customers can and do purchase Cisco networking equipment without maintenance services, and the pricing for networking equipment is entirely independent and separate from SmartNet service package pricing. Moreover, upon

**App.946**

information and belief, Cisco's customers in these separate markets (1) deal with different Cisco personnel teams (e.g., TAC support vs. sales managers), (2) purchase the products and services at different times/schedules based on different needs, and (3) work with different engineers because engineers on the service and maintenance team are often different than the engineers on the product manufacturing and sales teams. In addition, upon information and belief, Cisco's tracks and monitors the profitability of its "service arm" separately from its "products arm," despite its current anticompetitive efforts for one unit to support the profitability of the other unit.

*Admitted that end users can interact with different personnel at Cisco (or other businesses) depending on their needs, and that Cisco separately reports financial metrics related to sales of services and products.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 30 relating to the motivations of unidentified customers as referenced in Paragraph 30.  Paragraph 30 states legal conclusions as to which no response is required. To the extent a response is required, Cisco denies the remaining allegations in Paragraph 30.*

## B.     Cisco is Also A Monopolist In the Router and Ethernet Switch Relevant Markets

*Denied.*

31.     Ethernet switches are a relevant product market. Ethernet switches are devices that control data flow within a network to enable network components to communicate efficiently. They are the fundamental building blocks of modern local area networks, deployed in virtually every modern business and government office. While Ethernet switches are differentiated across vendors and customer types, there is no adequate substitute technology that provides the same function and value within a network infrastructure.

*Admitted that Ethernet switches can control data flow within a network to enable network components to communicate efficiently and thereby serve an important function in modern local area networks (including where deployed in businesses and government offices).  Paragraph 31 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 31.*

32.     Ethernet switches are durable, high fixed cost goods with extended longevity; consumers of these Ethernet switches commonly intend to use them for many years. Transitioning from Cisco Ethernet switches to Ethernet switches made by another manufacturer is an expensive process, requiring the replacement of significant amounts of hardware and the retraining of personnel.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 32 relating to unidentified consumers referenced in Paragraph 32, including their motivations and business practices.  Cisco denies the remaining allegations in Paragraph 32.*

33.     Buyers of Ethernet switches would not be able to turn to routers or other alternative technologies in response to a monopolist's price increase above the competitive level.

**App.947**

*Paragraph 33 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

34.    The geographic markets for the sale of Ethernet switches are (i) the United States and (ii) the world. The global market for Ethernet switches includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is substantial industry recognition of both a global market for Ethernet switches and narrower U.S.-only market for Ethernet switches. A monopolist of Ethernet switches in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of Ethernet switches globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices above competitive levels both globally and in the United States.

*Paragraph 34 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 34.*

35.    Cisco has monopoly power in the U.S. and global markets for Ethernet switches, consistently holding shares above 60% in both markets, and protected by high barriers to entry as discussed below. Cisco's Ethernet switch market shares are commonly at least five times its closest Ethernet switch competitors in the US, as well as commonly five times its closest Ethernet switch competitors globally. Cisco has managed to maintain its market dominance for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 35 relating to supposed "share" calculations for which Dexon provides no supporting factual material.  Paragraph 35 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 35.*

36.    Routers have been a technology that is complementary to, and not a substitute for, Ethernet switches, and also constitute their own relevant product market. While Ethernet switches connect components to create a network, routers allow for communication between networks. The two types of devices generally operate at different logical levels in a network: Ethernet switches transfer information in the data link layer using physical addresses for network components, whereas routers transfer packets in the Network or IP layer using virtual addresses. As technology has evolved, Ethernet switch manufacturers have begun to incorporate certain routing technologies into a single combined product. This confirms that routers are complements for Ethernet switches and not substitutes.

*Admitted that routers and Ethernet switches can be used as different products (although they need not be used for different purposes), that Ethernet switches can transfer information using physical addresses for network components, that routers can transfer packets using virtual or logical or IP addresses, and that some technologies include elements of both Ethernet switches and routers.  Paragraph 36 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 36.*

**App.948**

37.     Buyers of routers would not be able to turn to Ethernet switches or other alternative technologies in response to a monopolist's price increase above the competitive level.

*Paragraph 37 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

38.     The geographic markets for the sale of routers are (i) the United States and (ii) the world. The global market for routers includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is substantial industry recognition of both a global market for routers and a narrower U.S.-only market for routers. A monopolist of routers in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of routers globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for routers above competitive levels both globally and in the United States.

*Admitted that some router manufacturers sell products worldwide.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 38 relating to supposed "substantial industry recognition," a phrase Dexon does not define or substantiate with any factual material.  Paragraph 38 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 38.*

39.     Cisco has monopoly power in the U.S. and global markets for routers, consistently holding a share in excess of 60% in both markets, and protected by high barriers to entry as discussed below. Cisco's router market shares are roughly at least five times its closest router competitors in the US, as well as five times its closest router competitors globally. Cisco has managed to maintain its market dominance on routers for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 39 relating to supposed "share" calculations for which Dexon provides no supporting factual material.  Paragraph 39 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 39.*

40.     The Relevant Router and Switch Markets are both characterized by high barriers to entry and expansion. There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors. To begin with, the costs to develop router software and hardware as well as switch software and hardware are substantial, requiring tens of millions of dollars for initial development, and then hundreds of millions more to tailor the product to specific customer needs and to build an effective sales network.

*Admitted that Cisco has devoted millions of dollars to the research and development of its routers and Ethernet switches and related business.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 40 relating to research and development costs third parties have incurred.  Paragraph 40 states legal conclusions as to which no*

**App.949**

*response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 40.*

41.     Another barrier to entry for the Relevant Router and Switch Markets lies in customers' long purchase cycles when replacing or upgrading their network components to the next technology. For example, it took approximately 15 years for customers to widely deploy 10+ Gigabit Ethernet switches to replace 1 Gigabit Ethernet switches. These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

*Admitted that some customers did not switch from "1 Gigabit Ethernet switches" to "10+ Gigabit Ethernet switches" for several years.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 41 relating to how many years, approximately, it took for unidentified customers referenced in Paragraph 41 generally to "widely deploy 10+ Gigabit Ethernet switches."  Cisco denies the remaining allegations in Paragraph 41.*

42.     As Cisco publicly promotes (e.g., https://blogs.cisco.com/internet-of-things/ciscoranked-1-again-in-industrial-networking), it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to Ethernet switches and routers. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new Ethernet switch or router entrant may need to offer a full line of network components.

*Cisco's public materials speak for themselves; Cisco denies any characterization of those materials.  Paragraph 42 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 42.*

43.     Cisco's practice of holding customers hostage through their SmartNet service packages also creates a particularly pernicious barrier to entry. Any customer wishing to preserve the value of its SmartNet package would not be able to viably consider router or Ethernet switch purchases from competitive vendors to Cisco if the customers are under duress that in the absence of a Cisco purchase their maintenance service may not be provided. Even if a customer were willing to risk a period without maintenance, purchasing replacement routers or Ethernet switches from a Cisco competitor means risking the value of the SmartNet package for which the customer has already paid during the remaining service period.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 43 relating to how an unidentified customer would make decisions in a hypothetical situation that does not accurately describe Cisco's conduct.  Cisco denies the remaining allegations in Paragraph 43.*

44.     To summarize, Cisco has monopoly power in the following relevant markets: the Relevant Service Market (both globally and limited to the U.S.), the Relevant Router Market (both globally and limited to the U.S.), and the Relevant Switch Market (both globally and limited to the U.S.). Hereinafter the Relevant Router and Switch Markets are referred to

**App.950**

collectively as the "Relevant Network Equipment Markets." As explained below, Cisco is also attempting to monopolize the IP Phone Markets, which will be referred to as the Relevant IP Phone Markets. Hereinafter the Relevant Network Equipment Markets and the Relevant IP Phone Markets are referred to collectively as the "Relevant Product Markets." Upon information and belief, Cisco may be engaging in the same coercive tactics with respect to other Relevant Product Markets, such as optics, access points, and network management software, and should that prove to be the case Dexon will make that apparent in the course of litigation.

*Paragraph 44 summarizes Dexon's own allegations; Cisco repeats and incorporates the foregoing responses.  Paragraph 44 states legal conclusions as to which no response is required.  To the extent a response is required, denied.*

### C.     Cisco Locks In Customers Who Require Maintenance With SmartNet, and Then Uses SmartNet As A Hammer To Force Supracompetitive Purchases of Routers and Ethernet Switches

*Denied.*

45.     Customers seek to find the best economic and performance deal for networking equipment regardless of when it is purchased. Either around the time of such an equipment purchase or at a different time, customers may also consider purchasing a SmartNet service package for several different types of networking equipment. Upon information and belief, the larger a particular deployment and the more legacy Cisco equipment the customer has in its network, the more likely customers will require a SmartNet package for one or more aspects of their network at any time.

*Admitted that some customers generally seek quality performance and the best economic transaction when purchasing networking equipment, and that some customers using Cisco equipment might consider acquiring SmartNet service for some equipment.  Cisco otherwise lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 45 relating to how unidentified customers referenced in Paragraph 45 make purchasing and business decisions.  Cisco denies the remaining allegations in Paragraph 45.*

46.     For those customers that do or might require a SmartNet service package, the objective is to secure maintenance services for networking equipment that already is or will be in use for the customers' networks. To satisfy themselves that this will be the case, SmartNet customers will provide Cisco with the precise serial numbers, part numbers, products, and customer information for which the purchased SmartNet service package will apply. Cisco specifically approves the service package with this information, including in scenarios where Cisco can see that customer is purchasing the SmartNet service package through a secondary reseller which does not have a direct purchasing relationship with Cisco.

*Admitted that certain customers desire SmartNet service for networking equipment they purchase, that some customers provide equipment serial numbers to receive some service, and that Cisco uses this information – among other information – to provide some services to certain customers, including customers that have purchased equipment through certain resellers.  Cisco*

*lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 46 relating to how unidentified customers referenced in Paragraph 46 make purchasing and business decisions.  Cisco denies the remaining allegations in Paragraph 46.*

47.     Indeed, Cisco has full knowledge that its standard sellers or partners sell an extremely large volume of SmartNet service packages to secondary market sellers such as Dexon. In fact, Cisco's Technical Assistance Center has and will alter or change serial numbers in order to approve and thereby receive payment for SmartNet service packages relating to secondary market equipment. Cisco willfully turns a blind eye to such transactions because they are extremely profitable for Cisco.

*Denied.*

48.     Upon information and belief, Cisco receives a payment from customers pursuant to this SmartNet approval process at or around the time of the SmartNet purchases.

*Admitted that Cisco receives some compensation from certain customers for some services at the time of purchase.  Cisco denies the remaining allegations in Paragraph 48.*

49.     Customers expect to receive the service they paid for from Cisco for anywhere from months to years into the purchased SmartNet service package. As explained below, parties such as Dexon would facilitate such service through Cisco's service team that would keep customers happy with both companies. But since at least 2015 through the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet service package that the SmartNet service packages were no longer valid in the absence of a new purchase of Cisco equipment, including at least routers and/or Ethernet switches. Alternatively, Cisco forced customers to pay a "re-certification" fee for previously purchased networking equipment so that SmartNet service would not be withheld, as Cisco threatened. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process for the equipment and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. Given that customers are locked into the Cisco installed base of products, they have little choice other than to accede to Cisco's demands.

*Admitted that Cisco offers a recertification program to end users.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 49 relating to how unidentified customers referenced in Paragraph 49 make purchasing and business decisions or their expectations.  Cisco denies the remaining allegations in Paragraph 49.*

50.     Given the Cisco approval process associated with customers' SmartNet purchases, customers had no reasonable expectation when they bought the SmartNet service package that Cisco would subsequently claim that entirely new, unwanted networking equipment or a "recertification" fee for the equipment would be required. This is especially true given that Cisco has unique access to customers for the months or years after it purchased the service packages, and customers received the service for which they had paid during that period. Cisco changed its course of conduct not because of enforcement of a consistent policy, but rather because it newly

**App.952**

disapproved, after approving previously, customers' purchase of networking equipment and SmartNet service.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 50 relating to how unidentified customers referenced in Paragraph 50 make purchasing and business decisions or their expectations.  Cisco denies the remaining allegations in Paragraph 50.*

51.     Another example from Texas, in addition to those above, represents an iteration of how this has occurred in the marketplace. A Texas based automobile dealership purchased Ethernet switches through Dexon as well as a SmartNet service package through another vendor, all with the knowledge and approval of Cisco. Pursuant to the SmartNet service package, Cisco first provided maintenance services and support for the Ethernet switches, including with software updates. However, one of Cisco's software updates had a critical flaw that, when deployed by Cisco, rendered the Ethernet switches useless (or "bricked" as known in the industry). At first, Cisco replaced the Ethernet switches pursuant to the SmartNet service package, but Cisco then claimed it would not replace other defective Ethernet switches or complete any maintenance unless the customer bought entirely new Ethernet switches from a vendor other than Dexon. Because the customer could not afford new Ethernet switches, due to a limited IT budget, the customer was forced to deal with a network disruption on its own and without any ability to switch to a competing network equipment provider. Because the customer relied on Cisco's original assurance that the customer would receive the service and maintenance for which it had paid, when Cisco changed its position, it robbed the customer of the ability to make a free choice about its equipment manufacturer and reseller. Thus, both Cisco's competitors in the Relevant Networking Products were improperly foreclosed, as well as Dexon because the customer is under a new impression that any use of its products or services will put any Cisco service in jeopardy.

*Admitted on information and belief that Dexon sold networking equipment to the auto dealership referred to in Paragraph 51, and that Cisco provided maintenance services to this end user for some of its networking equipment.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 51 relating to the end user's motivations and business decisions.  Paragraph 51 states a legal conclusion as to which no response is required.  To the extent a response is required, and as to the other allegations in Paragraph 51, denied.*

52.     Upon information and belief, these examples are part of an overall course of conduct by Cisco to hold up its SmartNet customers, at least since 2015. As explained below through Dexon's experience, upon information and belief, there has been an enterprise-wide effort at Cisco to use SmartNet service packages in this way to be sure that customers purchase networking equipment at supra-competitive prices to pad Cisco's profits as well as the commissions of its sales representatives. Dexon is aware of at least one of its customers that has threatened legal action against Cisco for these tactics, but Cisco does not care, as Cisco's continued profiteering from this conduct as a monopolist in the Relevant Service Market and Relevant Networking Markets far outweighs the costs it would face for defending itself in litigation.

16

**App.953**

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 52 relating to an unnamed legal matter of which Dexon is aware. Paragraph 52 states legal conclusions as to which no response is required. To the extent a response is required, Cisco denies the remaining allegations in Paragraph 52.*

53.     Cisco draws an economic benefit from these coercion tactics to SmartNet customers because, upon information and belief, its margins are far higher for sales made through channels that have higher resale prices. For instance, if Cisco can maintain the supra-competitive prices it charges to favored VARs, such as CDW, by coercing customers to use that distribution channel, Cisco can maintain its overall profitability. For this reason, as part of Cisco's anticompetitive strategy, it has sought to limit the number of resellers who compete for each customer, even though such competition benefits customers. Conversely, if VARs can negotiate lower pricing from Cisco because customers have a variety of distribution options unimpacted by coercion, then Cisco's overall profitability goes down. Cisco's sales representatives also earn higher commissions for sales in the Relevant Product Markets made through coercion, on the backs of their customers.

*Denied.*

54.     There is a substantial amount of commerce involved in the Relevant Product Markets for which Cisco is forcing supracompetitive purchases. Each year, Cisco sells billions of dollars of Ethernet switches and routers, both in the US and worldwide.

*Admitted that Cisco's revenues related to the sale of Ethernet switches and routers have surpassed $1 billion in certain years. Paragraph 54 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

55.     Cisco also attempts to leverage its exclusive control of essential software updates and services for Cisco products to functionally incapacitate select secondary market products. Cisco provides services and updates to its products via SmartNet service packages. End users acquire these packages in order to obtain those services.

*Admitted that Cisco makes available SmartNet service packages for purchase as to certain networking equipment, and that Cisco also provides product updates to customers for certain products. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 55 relating to the motivations of unidentified "end users" generally. Cisco denies the remaining allegations in Paragraph 55.*

**D.     Cisco Recruits CDW to Aid It In Its Plan, and Cisco's Coercion Strategy Expands to IP Phones**

*Denied.*

56.     One of Cisco's favored resellers is CDW, headquartered in Illinois, with revenue of $18.47 billion in fiscal year 2020 (compared with Cisco's $49.8 billion in the same time period). Upon information and belief, CDW sells Cisco equipment in the Relevant Networking Markets.

**App.954**

Cisco favors CDW because CDW's resale prices in the Relevant Networking Markets allow Cisco to maintain its supra-competitive pricing in those Markets. Conversely, resellers like Dexon provide attractive service and pricing to customers that puts pressure on Cisco to charge lower prices to its favored resellers.

*Admitted that Cisco's reported revenue in its fiscal year 2020 was approximately $49 billion, and that CDW sells Cisco-manufactured Ethernet switches and routers among many other products (including from other manufacturers).  Cisco lacks knowledge or information sufficient to admit or deny the amount of CDW revenue during Cisco's fiscal year 2020 (which is not concurrent with the calendar year).  The remaining allegations in Paragraph 56 state legal conclusions as to which no response is required.  To the extent a response is required, denied.*

57.     Once Cisco deemed Dexon a competitive threat, it also determined that CDW could be an ally in its plan to foreclose resellers like Dexon from providing superior service, pricing, and competitive network equipment options for its customers. To this end, Cisco and CDW conspired to exclude Dexon from making sales in at least the Relevant Networking Equipment Market to end user customers.

*Denied.*

58.     Dexon's attempt to sell Relevant Networking Equipment to a hospital system in Pennsylvania provides an example of how the conspiracy works. For several years, Dexon had provided routers, Ethernet switches, line cards, access points and modules to the hospital. The customer was open to purchasing products from manufacturers apart from Cisco, and valued the fact that Dexon provided those options, because it led to better pricing and service.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 58 relating to Dexon's historical business (relating to events in 2015 or earlier) with the unidentified hospital.  Paragraph 58 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

59.     Pleased with the products and service Dexon had provided, the hospital decided to make a significant investment in routers and Ethernet switches, and the deal would have been worth a significant amount of business for Dexon (on top of the prior business with Dexon which was already significant). Upon learning that the hospital had selected Cisco for the purchase and had awarded the order to Dexon, Cisco threatened the customer that if it did not cancel the order for the new purchase of hardware and associated SmartNet service with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics which the customer had been receiving service and support from Cisco for years. This tactic worked, and the customer did not go through with the contemplated deal with Dexon, and never made another purchase from Dexon again.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 59 relating to the motivations and business decisions of the unidentified hospital as it relates to*

*events taking place in 2015.  Cisco denies Dexon's characterization of the events that transpired between it, Cisco, and the hospital.*

60.    Cisco's agreement with CDW to exclude Dexon from at least the Relevant Networking Equipment Market facilitated this outcome, which restricted both inter-brand competition (between Cisco and its competitors in the Relevant Network Markets) and intra-brand competition (between Cisco resellers). Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment. The sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the "savior" to the hospital system so that the customer could keep its service for all of its Networking Equipment, when in fact the intention and purpose of the scheme was to exclude resellers like Dexon, so that the customer would pay more for the equipment with CDW as the sole supplier. Upon information and belief, the Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon.

*Admitted on information and belief that CDW made a sale to the unidentified hospital, and that the unidentified hospital obtained SmartNet service for the products that CDW sold.  Paragraph 60 states legal conclusions as to which no response is required.  To the extent a response is required, denied.*

61.    This Cisco-CDW conspiracy has limited intra-brand competition between resellers selling Cisco Networking Equipment in the Relevant Markets, because its purpose and effect is to prevent end user customers' from having access to Dexon which offers top quality service at more aggressive pricing than other resellers. The conspiracy also had the dual effect of limiting interbrand competition between Cisco and its competitors in the Relevant Networking Equipment Markets, because not all resellers prioritize or promote competitive products in the Relevant Networking Equipment Market in the same way. As an example, on CDW's website, when one completes a search for "Ethernet switches," it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections (and most below 100). Upon information and belief, this is because CDW believes it will receive favorable treatment by Cisco by showing so many of its offerings and portraying its competitors as more limited. By contrast, Dexon has earned the respect and trust of its customers precisely because it does not prioritize any particular brand or make assumptions about what a customer wants, and merely seeks to guide the customer to the best option. Thus, when Cisco conspired with CDW, Cisco knew that it would tilt the competitive playing field in its favor, limiting the opportunities of its competitors to make sales through resellers like Dexon which does not favor any particular Network Equipment competitor.

*CDW's public materials speak for themselves; Cisco denies any characterization of those materials.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 61 relating to the "respect and trust" Dexon has from unidentified customers referenced in Paragraph 61.  Paragraph 61 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 61.*

**App.956**

62.     The conspiracy between Cisco and CDW continues through the present day. Upon information and belief, as part of their conspiracy to exclude Dexon, Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed. Confirming this agreement, upon information and belief, when the CDW representative previously assigned to Dexon refused to comply with the Cisco's demand, CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy. This worked. Pursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021.

*Admitted that Cisco notified CDW that Dexon is not an authorized reseller of Cisco products. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 62 relating to the status of the business relationship between CDW and Dexon through the present.  Paragraph 62 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 62.*

63.     The Cisco-CDW conspiracy has foreclosed a substantial amount of interstate commerce to Dexon by virtue of the Pennsylvania Health System alone, but upon information and belief, millions of dollars of purchases across the country have been foreclosed to Dexon due to the Cisco-CDW conspiracy.

*Paragraph 63 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

64.     Dexon believes that several such instances with Cisco's favored resellers occurred, but rather than hearing about representatives that were willing to stick up for customers' right to the best deal, Cisco successfully coerced such resellers to limit or withdraw their business from Dexon.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 64 about what Dexon believes.  To the extent there are additional allegations in Paragraph 64, Cisco denies the remaining allegations in Paragraph 64.*

65.     Upon seeing how successful this FUD and coercion campaign worked for the Relevant Networking Equipment Markets, Cisco expanded its sights to IP Phones. Once again in Texas, an Independent School District awarded Dexon a multi-year exclusive contract to provide IP phones to the District, after several years of successful dealings with Dexon. Dexon was awarded the most recent business after an exhaustive RFP process, in which Dexon was rated the clear winner for every criterion being considered by the School Board. Indeed, several of the evaluation criteria related to the reputation and quality of Dexon's goods and services, which would include the products of several IP phone manufacturers. As a result, the School Board approved the award of the contract to Dexon for thousands of IP phones. Upon information and belief, Cisco threatened the School District that if it did not cancel the order from Dexon, it would not service the other Networking Equipment already purchased by the District. Once again, this coercion worked, and the customer was forced to cancel its order with Dexon, and

**App.957**

upon information and belief, the District paid more for the same exact equipment from another reseller.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 65 concerning Dexon's business relationship with the unidentified school district, or the school district's RFP process and related decision-making, or its subsequent purchase history. Cisco denies the remaining allegations in Paragraph 65.*

66.    As a result, upon information and belief, not only was the Texas School District forced to spend more for an RFP that was already completed and approved, but it forecloses any competitive product purchase that would have been considered from Dexon due to the successful execution of FUD.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 66 concerning the unidentified school district's purchase history. Cisco denies the remaining allegations in Paragraph 65.*

67.    Upon information and belief, these FUD tactics are not isolated instances of misconduct but rather a standard coercion tactic used by Cisco, especially in Texas, when it seeks to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products. Because customers are forced to rely on Cisco to service its installed base of networking equipment, the FUD tactic can be used with respect to any new purchase a customer is considering for which Cisco offers a purchase option. In the above example for a Texas School District, there is simply no plausible reason the School would be forced to withdraw from its preferred business partner in the absence of FUD from Cisco.

*Denied.*

68.    As another example of FUD, Cisco recently claimed to a Maryland customer that line cards sold by Dexon suffered from "malware," even though there is no software associated with the sale of line cards. Cisco is essentially immune from any criticism it may receive from customers due to these false statements because it knows that customers still require so many of its services.

*Denied.*

69.    While not quite as dominant in IP phones as it is in other types of networking equipment, Cisco still maintains in excess of a 40% share of the global and US based IP phone markets, and has possessed in excess of a 60% share of enterprise Unified Communications (UC) purchases which include IP phones. Cisco has shipped more than 100 million IP phones to more than 200,000 customers worldwide, with 95% penetration in Fortune 500 companies. Like other markets in which it is dominant, Cisco's next closest competitors in these IP phone markets are a fraction of its size, possessing shares at least 20% lower than that of Cisco.

*Admitted that Cisco has manufactured millions of IP phones sold to customers around the world. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph*

**App.958**

*69 relating to shares of "IP phones" because Dexon has not identified the sources of its information so that Cisco may verify the figures (nor does it identify "Cisco's next closest competitors" for verification). Cisco denies the remaining allegations in Paragraph 69.*

70.     Thus, through the above tactics, Cisco has attempted to and likely succeeded in monopolizing the Global and US Relevant Markets for IP Phones (hereinafter "Relevant IP Phone Markets"). While landlines, or analog phone systems, carry voice signals over copper wires, VoIP technology transmits voice traffic over the internet in the form of data packets. IP phones need only a live broadband connection to make and receive calls, and thus have eliminated the need for expensive landline rentals.

*Admitted that landline telephones are sometimes known as analog phone systems and can carry voice signals over copper wires, that "VoIP technology" transmits audio as data packets, and that "IP phones" can make and receive calls using a broadband Internet connection. Paragraph 70 states a legal conclusion as to which no response is required. To the extent a response is required, Cisco denies the remaining allegation in Paragraph 70.*

71.     Additionally, IP phones offer far greater geographical flexibility for users than landline phones. Landlines are tethered to the wired office phone, yet IP phones allow you to have a virtual local presence anywhere in the world. IP phones are also easily scalable, allowing a company to remove or add new users with ease, and gives users the ability to have a phone with them via their own smartphone or computer via software.

*Admitted that landline telephones are tethered to a physical phone and jack, that IP phones and similar technologies can enable end users to "have a phone with them via their own smartphone or computer via software," and that this can provide "greater geographical flexibility" than "landline phones." Cisco denies the remaining allegations in Paragraph 71.*

72.     IP phones can offer more features at a lower cost than landlines as well, such as video conferencing. IP phones can integrate voice, messaging, presence and cloud sharing and more into one single platform. There are likely several sub-segments to the Relevant IP phone markets, such as UC communications, that will be identified in the course of discovery.

*Admitted that some IP phones and similar technologies can offer more features (including videotelephony, messaging, and cloud services at a lower cost than some landline phones. Paragraph 72 states a legal conclusion as to which no response is required. To the extent a response is required, Cisco denies the remaining allegations in Paragraph 72.*

73.     Buyers of IP phones would not be able to turn to landlines or other alternative technologies in response to a monopolist's price increase above the competitive level.

*Denied.*

74.     The geographic markets for the sale of IP phones are (i) the United States and (ii) the world. The global market for IP phones includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability.

**App.959**

There is industry recognition of both a global market for IP phones and a narrower U.S.-only market for IP phones. A monopolist of IP phones in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of IP phones globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for IP phones above competitive levels both globally and in the United States.

*Paragraph 74 states legal conclusions as to which no response is required. To the extent a response is required, denied.*

75.    The Relevant IP Phone Markets are characterized by high barriers to entry and expansion. There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors. The costs to develop IP phone software and hardware are substantial, likely at least tens of millions of dollars, and requires millions more to build the capability to install in large national and multinational corporations.

*Admitted that Cisco has devoted millions of dollars to the research and development of its IP phones and related or similar technologies. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 75 relating to research and development costs third parties have incurred. Paragraph 75 states legal conclusions as to which no response is required. To the extent a response is required, Cisco denies the remaining allegations in Paragraph 75.*

76.    Another barrier to entry for the Relevant IP Phone markets is customers' long purchase cycles when replacing or upgrading their phones to the next technology. These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 76 relating to the motivations, business decisions, and purchasing decisions of unidentified customers as a general group. Cisco denies the remaining allegations in Paragraph 76.*

77.    As Cisco publicly promotes, it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to IP phones. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new IP phone entrant may need to offer a full line of network components.

*Cisco's public materials speak for themselves; Cisco denies any characterization of those materials. Cisco denies the remaining allegations in Paragraph 77.*

**E.     The Anticompetitive Effects of Cisco's Conduct Are Overwhelming**

*Denied.*

**App.960**

78.     Upon information and belief, the instances described above are not isolated instances of pressure, but rather part of an overall effort to force customers to only be able to access networking equipment, IP phones and service through the most expensive avenues, while foreclosing Cisco's equipment competitors. As explained, Cisco was not always hostile to a channel that sought to give customers the best deals, likely because that process aided Cisco's overall effort to be known as the most ubiquitous networking equipment provider regardless of the channel the networking equipment reached the customer. But that changed sometime around 2015, when Cisco apparently decided that padding its own profit margins and keeping its sales representatives satisfied was more important than servicing all of its customers.

*Denied.*

79.     In some cases, Cisco was able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. There is no "business justification" to this, and Cisco practices are merely designed to shift economic welfare from customers to itself.

*Admitted that Cisco offers a recertification program to end users.  Paragraph 79 states a legal conclusion as to which no response is required.  To the extent a response is required, denied Cisco denies the remaining allegations in Paragraph 79.*

80.     The inevitable effect of this overall course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives. While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases. As the above examples make clear, many customers are left with no practical choice other than to purchase unwanted and overpriced equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

*Paragraph 80 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

81.     Indeed, in the case of a Texas-based 911 operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics. There is no justification that can be advanced to accept this needless risk to human safety.

*Admitted on information and belief that Dexon sold unauthorized networking equipment to a 911 operator in Texas, depriving the 911 operator of authorized equipment, and vendors of authorized equipment a potential sale.  Cisco denies the remaining allegations in Paragraph 81.*

**App.961**

82.     Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather are forced to acquiesce to Cisco's pressure. Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers cannot afford to risk the services it needs that only Cisco provides. In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

*Denied.*

**F.     Dexon Has Suffered An Antitrust Injury**

*Denied.*

83.     Cisco's overall course of conduct is specifically designed (i) to foreclose or otherwise eliminate distribution options through which customers can purchase from manufacturers competitive to Cisco, and (ii) to eliminate the option a customer would have to secure such a product for a lower price that puts upstream pressure on Cisco to lower its own prices should customers opt for a Cisco product. Dexon's injury illustrates both of these phenomenon. As illustrated above, Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 83 related to Dexon's business.  Paragraph 83 also states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

84.     Cisco's conduct is designed to harm resellers like Dexon precisely because of the benefits to customers that Dexon has provided for decades, which run counter to Cisco's profit motives. Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive, exclusive channels. If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions or quality improvements that would impact Cisco's bottom line. The coercion and other conduct at issue in this case allows Cisco's monopoly power to not only be maintained, but grown, and Dexon's losses are a direct byproduct of this phenomenon.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 84 related to Dexon's business.  Paragraph 84 also states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**App.962**

85.     Dexon has also sustained loses to its goodwill and reputation in the marketplace by virtue of Cisco's conduct. Because of Cisco's monopoly position in both the Relevant Service Market and the Relevant Product Markets, it has been immune to customer dissatisfaction with its conduct and has attempted to shift the problem of its own creation to Dexon. Namely, rather than respond to customer feedback and attempt to win purchases by virtue of better service or terms, Cisco has attempted to portray Dexon as an unworthy sales partner who is the cause of the customers' problems. But this is not the case, as Dexon has spent decades building trust and goodwill with its customers, even to the benefit of Cisco. But now that Cisco's priority is to bully and intimidate any company that stands in the way of its maximum profit, Dexon is being painted in a different light.

*Admitted that Cisco has notified certain customers of the fact that Dexon is not an authorized reseller of Cisco products. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 85 related to Dexon's business. Paragraph 85 also states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

86.     Dexon's reputation has been unjustifiably harmed due to Cisco's antitrust violations in the United States and in Texas specifically. Dexon lost a major award for IP phones from a public school district, was forced to sustain losses so that a 911 operator could continue to serve citizens, was forced to stop doing business with an automobile chain, and no longer can do business with an energy company all because of Cisco's FUD and associated coercive tactics. Texans should be able to benefit from the competition options and service that Dexon can offer, but instead Cisco has employed anticompetitive tactics specific to the State to deprive its businesses and public entities of those benefits.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 86 related to Dexon's business. Paragraph 86 also states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

### V.     CLAIMS FOR RELIEF

**A.     Count I (Sherman Act Section 1) Conspiracy in Unreasonable Restraint of Trade Against Cisco and CDW**

87.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 87, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses. To the extent a further response is required, denied.*

88.     Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

26

**App.963**

*Paragraph 88 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

89.     The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery.

*Paragraph 89 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

90.     The goal and effect of the conspiracy was to limit both inter-brand and intra-brand competition in the Relevant Product Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products over Cisco's competitors. In addition, Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit interbrand and intra-brand competition for Cisco's networking products.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 90 relating to what Dexon has prided itself upon.  Cisco denies the remaining allegations in Paragraph 90.*

91.     As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets. This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly positions in all of these product markets, and potentially others.

*Paragraph 91 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

92.     The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 92 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

93.     The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 93 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**App.964**

**B.      Count II (Sherman Act Section 2)**
**Conspiracy To Monopolize Against Cisco and CDW**

94.      Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 94, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

95.      Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

*Paragraph 95 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

96.      The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery. Cisco pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

*Paragraph 96 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

97.      Another goal and effect of the conspiracy was to limit both inter-brand and intrabrand competition in at least the Relevant Networking Equipment Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products. Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit inter-brand and intrabrand competition for Cisco's networking products.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 97 relating to what Dexon has prided itself upon.  Cisco denies the remaining allegations in Paragraph 97.*

98.      As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets. This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly positions in all of these product markets, and potentially others.

*Paragraph 98 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**App.965**

99.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 99 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

100.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in at least the Relevant Networking Equipment Markets, harm innovation associated with the products offered in the Relevant Networking Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 100 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**C.    Count III (Sherman Act Section 1)**
        **Per Se Tying In the Relevant Product Markets Against Cisco**

101.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 101, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

102.    Cisco is a monopolist in the Relevant Service Markets and has used its SmartNet service packages in that Market as a tying product. Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

*Paragraph 102 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

103.    The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently. Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Market. Indeed, Cisco's conduct at issue in this case confirms that Cisco's near absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain

29

**App.966**

and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

*Paragraph 103 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

104.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

*Denied.*

105.    A substantial amount of commerce has been affected in the Relevant Product Markets (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

*Paragraph 105 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

106.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

*Paragraph 106 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

107.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 107 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

108.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the

Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 108 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**D.     Count IV (Sherman Act Section 2)**
**Unlawful Monopolization of the Relevant Networking Equipment Markets Against**
**Cisco**

109.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 109, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

110.     Cisco's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Network Equipment Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

*Paragraph 110 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

111.     For the purpose of maintaining its monopoly power, Cisco committed numerous acts, including: a. Coercing purchases in the Relevant Network Equipment Markets by withholding service in the Relevant Service Markets; b. Engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels; and c. Upon information and belief, engaging in related FUD tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Network Equipment Markets and likely other Markets.

*Denied.*

112.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Network Equipment Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Network Equipment Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco, not to that of customers or competition on the merits.

*Paragraph 112 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

113.    Cisco's conduct has injured competition in the Relevant Network Equipment Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 113 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

114.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Network Equipment Markets, harm innovation associated with the products offered in the Relevant Network Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 114 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**E.    Count V (Sherman Act Section 2)**
**Unlawful Attempted Monopolization of the Relevant Product Markets Against**
**Cisco**

115.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 115, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

116.    Cisco acted with a specific intent to monopolize and destroy competition in the Relevant Product Markets. Cisco devised and implemented an overall plan to force customers to pay supra-competitive prices in the Relevant Product Markets, with the associated destruction of competition in the Relevant Product Markets.

*Paragraph 116 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

117.    Cisco willfully engaged in a course of anticompetitive conduct to obtain a monopoly in the Relevant Product Markets, including: a. Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets; b. Engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supracompetitive through Cisco's most expensive channels; c. Interfering with the proper award of at least one major RFP to Dexon, and denigrating Dexon for the purpose of securing a direct sales relationship with an important Texas public entity; and d. Upon information and belief, engaging in related FUD tactics similar to the above which resulted in additional revenue and goodwill loses, and stunted overall competition in the Relevant Product Markets and other Markets.

*Paragraph 117 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

118.   Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

*Paragraph 118 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

119.   Throughout the time Cisco engaged in this anticompetitive conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Product Markets and continuing to maintain supra-competitive prices and exclude its competitors.

*Paragraph 119 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

120.   Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 120 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

121.   Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 121 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

**F.     Count VI (Violation of the Texas Free Enterprise & Antitrust Act, Against Cisco and CDW)**

122.   Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

**App.970**

*In response to Paragraph 122, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

123.    Upon information and belief, Cisco's overall anticompetitive scheme was directed and executed within Texas and has a direct impact upon Texas-based small and medium businesses.

*Paragraph 123 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

124.    Cisco is a monopolist in the Relevant Service Market and has used its SmartNet service packages in that Market as a tying product. Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

*Paragraph 124 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

125.    The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently. Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Markets. Indeed, Cisco's conduct at issue in this case confirms that Cisco's near absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

*Paragraph 125 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

126.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

*Paragraph 126 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

127.    A substantial amount of commerce has been affected in the Relevant Product Markets due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has

**App.971**

constituted tens or hundreds of thousands of dollars. This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

*Paragraph 127 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

128.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

*Paragraph 128 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

129.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 129 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

130.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 130 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

131.    Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

*Paragraph 131 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

132.    The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Product Markets, and potentially others as will be confirmed in discovery. Cisco pursued this conspiracy with the intended and

**App.972**

realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

*Paragraph 132 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

133.    Another goal and effect of the conspiracy was to limit both inter-brand and intrabrand competition in the Relevant Product Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products. In addition, Dexon has prided itself on being a value driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 133 relating to what Dexon has prided itself upon. Cisco denies the remaining allegations in Paragraph 133.*

134.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets and is dominant in the Relevant IP Phone Markets. The Cisco-CDW conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly and dominant positions in all of these product markets, and potentially others.

*Paragraph 134 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

135.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 135 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

136.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 136 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

137. The above conduct has harmed competition and resulted in loses to Dexon in Texas.

*Paragraph 137 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

**App.973**

## VI.     PRAYER FOR RELIEF

Dexon Computer, Inc. prays for judgment and relief against Defendants Cisco and CDW as follows:

      a.    An Order directing the termination of the anticompetitive conduct in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1-2) and the Texas Free Enterprise & Antitrust Act;

      b.    Treble damages (including lost profits), in an amount to be determined at trial and that cannot now be adequately quantified before relevant discovery;

      d.    Awarding Dexon's costs of suit herein, including its attorneys' fees incurred in asserting antitrust claims;

      i.    An award of punitive damages in an amount sufficient to punish Defendants, to make an example of them to the community, and to deter them from such conduct as to Dexon or others in the future;

      j.    For equitable remedial efforts by Defendants sufficient to rehabilitate Dexon's damaged reputation;

      k.    For orders restraining Cisco and Dexon from engaging in similar conduct in the future; and

      p.    Such other and further relief as this Court deems just and equitable.

*This paragraph describes Dexon's own pleading (and relief sought) and requires no response. To the extent a response is required, denied.*

## VII.     DEMAND FOR JURY TRIAL

Dexon demands a trial by jury on all issues so triable.

*This paragraph describes Dexon's own pleadings and requires no response.  To the extent a response is required, denied.*

## AFFIRMATIVE AND OTHER DEFENSES

      Without assuming any burden of proof that it would not otherwise bear, Cisco reasserts, without limitation, all defenses raised in its Motion To Dismiss and other filings, whether or not separately re-pleaded herein.  Cisco also asserts the following affirmative and other defenses.  In listing the defenses below, Cisco does not knowingly or intentionally waive any defenses,

**App.974**

including arguments about which issues fall within Dexon's burden of proof.  Cisco also reserves

the right to rely on any affirmative or other defense or claim that may subsequently come to

light, and expressly reserves the right to amend its Answer to assert such additional defenses or

claims.

## FIRST AFFIRMATIVE DEFENSE

The statute of limitations bars Dexon's claims.  On information and belief, the events

relating to the Pennsylvania hospital giving rise to Dexon's conspiracy claims occurred by no

later than 2015.  Other of the conduct that Dexon alleges concerns customer interactions and

transactions occurring more than four years before Dexon filed the Complaint.  Accordingly, 15

U.S.C. § 15b and Tex. Bus. & Com. Code § 15.25 bar Dexon's claims.

## SECOND AFFIRMATIVE DEFENSE

Dexon's claims fail because venue is improper.  On information and belief, none of the

specific customer transactions alleged in the Complaint took place in the United States District

for the Eastern District of Texas.  Each of the Maryland business, the Pennsylvania hospital, the

energy company, the auto dealership, the bank, the school, and the 911-operator are

headquartered outside of the District and, on information and belief, engaged with Dexon outside

of the District.  *See* Ex. A at 2; Ex. B at 2; Ex. C at 1.  Venue is also improper for the reasons

described in Cisco's Motion To Transfer (Dkt. 21), incorporated here, along with all related

briefing (including Dkt. 31 and Dkt. 96).

## THIRD AFFIRMATIVE DEFENSE

Dexon's claims fail because it has failed to state a claim for which relief can be granted.

Without limitation or prejudice to identifying additional deficiencies in the course of discovery,

**App.975**

Cisco incorporates the deficiencies addressed in its Motion To Dismiss (Dkt. 22), along with all related briefing (including Dkt. 32 and Dkt. 119).

### FOURTH AFFIRMATIVE DEFENSE

Dexon's claim that Cisco's conduct was exclusionary fails because there are procompetitive justifications and legitimate business justifications for the alleged conduct.

### FIFTH AFFIRMATIVE DEFENSE

Dexon's claims fail because Cisco's conduct did not harm competition and consumers.

### SIXTH AFFIRMATIVE DEFENSE

Dexon is not entitled to relief because it has not sustained any antitrust injury proximately caused by Cisco.

### SEVENTH AFFIRMATIVE DEFENSE

The doctrine of laches bars Dexon's claims for injunctive or other equitable relief.

### EIGHTH AFFIRMATIVE DEFENSE

The doctrine of unclean hands bars Dexon's claims for injunctive or other equitable relief.

### NINTH AFFIRMATIVE DEFENSE

Dexon's claims fail because the alleged conduct was not the proximate cause of its asserted damages.

### TENTH AFFIRMATIVE DEFENSE

Dexon is entitled to no damages by reason of its failure to mitigate, minimize, or avoid the damages alleged.

### ELEVENTH AFFIRMATIVE DEFENSE

Dexon's claims fail on res judicata (or claim preclusion) grounds.

**App.976**

## TWELFTH AFFIRMATIVE DEFENSE

The doctrine of collateral estoppel (or issue preclusion) bars Dexon's claims.

### **JURY DEMAND**

Cisco demands a trial by jury on all issues so triable.

Dated: April 14, 2023

Respectfully submitted,

/s/ Deron R. Dacus

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center Twenty-
Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ANDREW E. GOLDSMITH (*pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
agoldsmith@kellogghansen.com

*Counsel for Cisco Systems, Inc.*

**App.977**

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on April 14, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ Deron R. Dacus*

Deron R. Dacus (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

# Exhibit A

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

March 13, 2023

*Via Electronic Mail*

David H. Reichenberg, Esq.
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, New York 10036

  Re: *Dexon Computer, Inc. v. Cisco Systems, Inc.*, No. 5:22-cv-00053 (E.D. Tex.)

Dear David:

  Documents Dexon has produced demonstrate that several allegations in Dexon's Complaint are false, as Dexon should have known before it made them.  Cisco requests that Dexon strike these allegations from the Complaint.  If Dexon declines to do so, Cisco reserves the right to seek sanctions under Rule 11 and any other applicable rule or law.

  *First*, the Complaint alleges (¶ 86) that "Dexon . . . no longer can do business with an energy company" because of Cisco's conduct.  In particular, Dexon alleges (¶ 7) that "an energy company headquartered in Texas" bought Ethernet switches and routers from Dexon and a SmartNet service package through a third party.  Later, according to Dexon (*id.*), Cisco "demanded that the customer purchase new Ethernet switches and routers from a vendor other than Dexon," after which the customer allegedly told Dexon it "could no longer" buy equipment from Dexon.  We understand ███████████████████████████ that this energy company is ████████.  But it is not true that Dexon can no longer do business with ████.  Dexon continued to sell purported Cisco products to ████████████████████████████.  *See* ████████████ - ████████████.

  *Second*, the Complaint alleges (¶ 86) that "Dexon . . . was forced to stop doing business with an automobile chain" because of Cisco's conduct.  In particular, the Complaint alleges (¶ 51) that a "Texas based automobile dealership" bought Ethernet switches through Dexon and a SmartNet package through another vendor, but Cisco later "claimed it would not replace [certain] defective Ethernet switches or complete any maintenance unless the customer bought entirely new Ethernet switches from a vendor other than Dexon."  We understand ████████████ ██████████████████████ that this dealership is ████████████████.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

David H. Reichenberg, Esq.
March 13, 2023
Page 2



, *see*                     . But Dexon did not stop doing business with
                                                    . For example,
. *See*                    -                    .

    *Third*, the Complaint alleges (¶ 8) that a "Texas emergency 911-center" that had purchased networking equipment from Dexon and a SmartNet service package from Cisco "continues to face Cisco's threat that it will not receive the previously paid for service unless it chooses a different vendor for new product purchases, even if that means human lives are put at risk due to a network support issue."  According to the Complaint (*id*.), when the 911 center "checked on its account for purposes of a service issue," Cisco said that it needed to purchase new routers and Ethernet switches from a non-Dexon vendor to receive service.  We understand



that this 911 center is
, *see*                    -                    :                    -
:                    . But it is not true that              "continues to face
Cisco's threat" of withheld service, because
                    .                    -                    .

    *Fourth*, the Complaint alleges (¶ 21) that "many of the actions and activities complained of in this Complaint occurred and are occurring in this District."  But there is no evidence that any of the actions or activities described in the Complaint occurred in the Eastern District of Texas.  Three of the non-parties implicated by the Complaint (                    ,
                    , and the "Maryland customer" of Paragraph 68) have no apparent connection to Texas at all, much less to this District.  Three others (
                    ,              , and              )
have operations in other parts of Texas, but none in this District.  The last two (
                              and              ) may or may not have operations in this District.  But the actions and activities described in the Complaint involving
                    occurred in the Northern District of Texas.
*See*              :              . As for         ,
                    Dexon's production contains no documents suggesting any of the events described in the Complaint related to         occurred in this District.  Accordingly, the Complaint's allegation (¶ 21) that "many of the actions and activities complained of in this Complaint occurred and are occurring in this District" is not true.

    Please confirm that Dexon will strike each of these allegations from the Complaint.  If Dexon declines to strike one or more of these allegations, please explain its good-faith basis for doing so.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

David H. Reichenberg, Esq.
March 13, 2023
Page 3

                                        Very truly yours,

                                        */s/ Andrew E. Goldsmith*

    cc:    Counsel of Record

# Exhibit B

# manatt

**David H. Reichenberg**
Manatt, Phelps & Phillips, LLP
Direct Dial:  (212) 790-4626
DReichenberg@manatt.com

April 3, 2023

*Via Electronic Mail*

Andrew Goldsmith, Esq.
agoldsmith@kellogghansen.com
KELLOGG, HANSEN, TODD, FIGEL &
FREDERICK P.L.L.C
1615 M Street, NW, Suite 400
Washington, D.C.  20036

        Re: *Dexon Computer, Inc. v. Cisco Sys., Inc. et al.*, Case No. 5:22-cv-00053 (E.D. Tex.)

Dear Andy:

        We write in response to your letter of March 13, 2023.

        Rule 11 of the Federal Rules of Civil Procedure prohibits pleadings "presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation."  Fed. R. Civ. P. 11(b)(1).  It appears Cisco intends to engage in frivolous motion practice, which runs directly afoul of the Rule.  That co-Defendant CDW did not join in your letter underscores the absence of any merit to the purported grievances stated therein.  Dexon addresses each of Cisco's points in turn.

        *First*, Cisco's improper interference with ████ resulted in the withdrawal of business to Dexon in the Relevant Markets.  That ██████ purchased ████████████ does not change this fact. ████████████ meaningfully withdrew its business due to Cisco's conduct.  Similarly, ████████ entirely withdrew its business from Dexon ████████████, due in significant part to Cisco's misconduct. Cisco's argument that ████████████████████████ misses the mark and ignores that Cisco's interference caused ████████████ to cease all business with Dexon ████████████.

        *Second*, Cisco's argument that ████████████ does not face the threat of Cisco's withdrawing maintenance and service is based upon a flawed reading of the evidence it cites.  The evidence cited, rather, ████████████████████████████████████████.

Manatt, Phelps & Phillips, LLP   7 Times Square, New York, New York  10036   Tel:  212.790.4500  Fax:  212.790.4545
Albany | Boston | Chicago | Los Angeles | New York | Orange County | Sacramento | San Francisco | Silicon Valley | Washington, D.C.

# manatt

April 3, 2023
Page 2


*Finally*, Dexon intended to state that Cisco's conduct has occurred and continues to occur throughout the State of Texas.  This clarification will be made in Dexon's forthcoming Amended Complaint.

The fact that Cisco reviewed over 200,000 of Dexon's documents and make these arguments about a Complaint filed almost a year ago is troubling.  In any event, in a good faith effort to avoid any misunderstanding, Dexon will make appropriate clarifications in its upcoming Amended Complaint.

Should Cisco file a Rule 11 motion, Dexon will seek additional sanctions against Cisco, in addition to and in conjunction with its Motions for Discovery and Spoliation Sanctions.

Dexon reserves all rights and waives none.

Sincerely,

*/s/ David H. Reichenberg*
David H. Reichenberg

Manatt, Phelps & Phillips, LLP


cc:  Counsel of Record

# Exhibit C

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900
FACSIMILE:
(202) 326-7999

April 5, 2023

*Via Electronic Mail*

David H. Reichenberg, Esq.
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, New York 10036

Re:    *Dexon Computer, Inc. v. Cisco Systems, Inc.*, No. 5:22-cv-00053 (E.D. Tex.)

Dear David:

The substance of Dexon's April 3, 2023 letter does not support its indignant tone.

Dexon acknowledges sales ███ to the energy company referenced in the Complaint, confirming the falsity of its allegation (¶ 86) that it "no longer can do business with" that company.  Similarly, Dexon asserts that it "intended" to allege that Cisco's conduct occurred in Texas, confirming that it had no basis to allege (¶ 21) that "many of the actions and activities complained of in th[e] Complaint occurred and are occurring in this District."  Dexon's implication that this allegation was a simple error is hard to credit given Dexon's repeated claims that it sued "in this forum because that is where trial belongs under the facts."  Dkt. 25 at 3 (Dexon's Opp'n To Cisco's Mtn. To Transfer); Dkt. 102 at 5 (Dexon's Opp'n To Cisco's Obj. To M.J. Baxter's Ruling On Mtn. To Transfer).

Dexon now says that it "will make appropriate clarifications in its upcoming Amended Complaint."  Dexon apparently intends to force Defendants to answer allegations in the current Complaint that Dexon and its counsel know to be baseless.  This is not appropriate.  Dexon should strike its factual contentions that lack evidentiary support immediately.

Very truly yours,

*/s/ Andrew E. Goldsmith*

cc:   Counsel of Record

**App.987**

## CERTIFICATE OF SERVICE

I hereby certify that, on April 24, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Aaron M. Panner*
Aaron M. Panner